## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division
www.flsb.uscourts.gov

In re:

GINN-LA ST. LUCIE LTD., LLLP, *et al.*,

        Debtors.

_____/

In re:

GINN-LA QUAIL WEST LTD., LLLP, *et al.*,

        Debtors.

_____/

DREW M DILLWORTH, Chapter 7 Trustee,

        Plaintiff,

        vs.

EDWARD R. GINN III; ERG ENTERPRISES, L.P.;
LUBERT-ADLER MANAGEMENT CO., L.P.;
LUBERT-ADLER REAL ESTATE FUND III, L.P.;
LUBERT-ADLER REAL ESTATE PARALLEL
FUND III, L.P.; LUBERT-ADLER CAPITAL
REAL ESTATE FUND III, L.P.; LUBERT-ADLER
REAL ESTATE FUND IV, L.P.; LUBERT-ADLER
REAL ESTATE PARALLEL FUND IV, L.P.;
LUBERT-ADLER CAPITAL REAL ESTATE
FUND IV, L.P.; THE PRESIDENT AND FELLOWS
OF HARVARD COLLEGE; THE UNIVERSITY
OF MICHIGAN; THE JOHN D. AND
CATHERINE T. MACARTHUR FOUNDATION;

**CASE NO. 08-29769-PGH**

All Cases Jointly Administered

Chapter 7

(4 Cases Substantively Consolidated Under
Lead Case No. 08-29769-PGH)[1]

(3 Cases Substantively Consolidated Under
Lead Case No. 08-29774-PGH)[2]

**ADV. PRO. NO. 10-02976-PGH**

**FIRST AMENDED COMPLAINT
FOR AVOIDANCE AND
RECOVERY OF
FRAUDULENT TRANSFERS**

---

[1] The "Tesoro Debtors' Estates" (Nos. 08-29769-PGH, 08-29770-PGH, 08-29772-PGH, and 08-29773-PGH) are substantively consolidated into Lead Case No. 08-29769-PGH. *See* Order [D.E. 308/309]. The "Tesoro Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA St. Lucie Ltd., LLLP – 5632; (ii) Ginn-St Lucie GP, LLC – 0983; (iii) Tesoro Golf Club Condo., LLC – 4385; and (iv) The Tesoro Club, LLC – 1917. *See* 11 U.S.C. § 342(c)(1).

[2] The "Quail West Debtors' Estates" (Nos. 08-29774-PGH, 08-29775-PGH, and 08-29776-PGH) are substantively consolidated into Lead Case No. 08-29774-PGH. *See* Order [D.E. 34]. The "Quail West Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA Quail West Ltd., LLLP – 2397; (ii) Ginn-Quail West Beach, LLC – 9142; and (iii) Ginn-Quail West GP, LLC – 6313. *See* 11 U.S.C. § 342(c)(1).

THE MARYLAND STATE RETIREMENT AND
PENSION SYSTEM; THE OHIO POLICE AND
FIRE PENSION FUND; THE PENNSYLVANIA
PUBLIC SCHOOL EMPLOYEES' RETIREMENT
SYSTEM; THE PENNSYLVANIA STATE
EMPLOYEES' RETIREMENT SYSTEM;
AND JOHN DOES 1-50,

                Defendants.

_____/

### FIRST AMENDED COMPLAINT

Plaintiff, Drew M. Dillworth ("Trustee Dillworth"), in his capacity as Chapter 7 Trustee for the Tesoro Debtors' Estates and the Quail West Debtors' Estates, based upon information and belief, and as a result of his investigation to date, hereby sues the Defendants enumerated above, alleging:

### INTRODUCTION

1.      Through this action, Trustee Dillworth seeks to avoid and recover for a series of fraudulent transfers made to or for the benefit of Edward R. "Bobby" Ginn III ("Ginn"), Lubert-Adler Management Company, L.P., d/b/a Lubert-Adler Partners, L.P. ("Lubert-Adler"), and other affiliated entities involved in the development of the luxury residential communities known as Tesoro and Quail West, located in Port St. Lucie and Naples, Florida.

2.      During the time periods in question, Ginn and the Lubert-Adler-managed equity funds commonly referred to as "Lubert-Adler Funds III & IV" owned the assets which make up Tesoro and Quail West through a number of holding companies and other subsidiaries, including the entities identified above as the Tesoro and Quail West Debtors (collectively, the "Debtors").[3]

_____

[3]The Tesoro Debtors were the "Project Entities" created to hold, develop, and operate the assets of Tesoro. The Quail West Debtors were the Project Entities created to hold, develop, and operate the assets of Quail West.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

3.      As discussed more fully below, originally, Ginn and Lubert-Adler had intended to use Tesoro and Quail West lot sales to finance the completion of the Tesoro and Quail West projects.

4.      During the latter part of October 2005, however, Hurricane Wilma struck, impacting both the developments themselves and the real estate markets in the areas in which they are located.

5.      That, in turn, prompted Ginn and Lubert-Adler to seek an alternate means to finance the remainder of the projects.

6.      Ginn and Lubert-Adler found something even better (for them) in Credit Suisse, which was at that point offering a new syndicated loan product to owners of high-end developments designed to enable the owners to "recapitalize" and take "profits" from their projects long before the projects were to be completed.  As explained by U.S. Bankruptcy Judge Ralph B. Kirscher:

> In 2005, Credit Suisse was offering a new financial product for sale.  It was offering the owners of luxury second-home developments the opportunity to take their profits up front by mortgaging their development projects to the hilt.  Credit Suisse would loan the money . . ., earn a substantial fee, and sell off most of the credit to loan participants.  The development owners would take most of the money out as a profit dividend, leaving their developments saddled with enormous debt.  Credit Suisse and the development owners would benefit, while their developments – and especially the creditors of the developments – bore all the risk of loss.  This newly developed syndicated loan product enriched Credit Suisse, its employees[,] and more than one luxury development owner, but it left the developments too thinly capitalized to survive.  Numerous entities that received Credit Suisse's syndicated loan product have failed financially, including . . . Ginn.  If the foregoing developments were anything like this case, they were doomed to failure once they received their loans [and made the transfers contemplated thereby].

*In re Yellowstone Mountain Club, LLC (Official Comm. of Unsecured Creditors v. Credit Suisse)*, Case No. 08-61570-11-RBK, Adv. Pro. No. 09-00014, Partial & Interim Order, 05/13/09, reported at 2009 WL 3094930, at *8 (Bankr. D. Mont. May 13, 2009) [DE289].[4/]

---

[4/]At Credit Suisse's behest, the Partial & Interim Order quoted above was subsequently vacated pursuant to a settlement agreement.  *See* Stipulation, 06/29/09 [DE297]; Orders, 06/29/09 [DE298, 299].

7.      In the case of Ginn and Lubert-Adler, Credit Suisse offered the opportunity to "recapitalize" and take "profits" out of five luxury residential development projects, including: Tesoro; Quail West; The Hammock Beach River Club / Gardens (Palm Coast, Florida); Laurelmor (North Carolina); and Ginn sur Mer (The Bahamas) (collectively, the "Projects").

8.      The ensuing loan transaction was ultimately consummated in June of 2006, and proceeded as follows:

- Credit Suisse loaned $675 million to a pair of shell companies created to "recapitalize" the Projects, with the Debtors and the affiliated subsidiaries created to hold and develop the other Projects (the "Other Project Entities") serving as "Full Recourse Borrowing Parties" (*i.e.*, co-borrowers);

- Credit Suisse took a substantial fee, in excess of $15 million, and sold off most if not all of the credit to loan participants;

- Existing third-party debt of approximately $158 million was replaced with new debt;

- Ginn and the Lubert-Adler entities took out and paid themselves and their investors over $323 million, as return of capital contributions, interest, preferred return, and/or profit; and

- Each of the Debtors and Other Project Entities was required to issue a guaranty on the full amount of the loans, and to grant liens on substantially all of its assets.

In other words, as in the situation before Judge Kirscher, the transaction was structured such that "Credit Suisse and the development owners [here, Ginn and Lubert-Adler] would benefit, while their developments – and especially the creditors of the developments – bore all the risk of loss."

9.      Indeed, through the loan transaction, Ginn and the Lubert-Adler entities not only enriched themselves and their investors at the expense of the Debtors and Other Project Entities, they effectively looted the Debtors and Other Project Entities and shifted the risks associated with the Projects to creditors, leaving those creditors with a virtual certainty of loss.

-4-

10. According to Ginn / Lubert-Adler records obtained prior to filing this action, of the loan proceeds that Ginn and the Lubert-Adler entities took out for themselves and their investors, the Tesoro and Quail West Debtors were credited with having borrowed $148,828,198.13.

11. The Debtors' transfer of that $148 million, and of the guaranties and liens they were required to issue in connection with the loan transaction, was made with actual intent to hinder, delay, and/or defraud present and future creditors. In addition, the Debtors also did not receive either fair consideration or reasonably equivalent value for the transfer of that $148 million, or for the guaranties and liens they were required to issue in connection with the loan transaction. To the contrary, if the Debtors were not already insolvent at the time of the transfers, they were rendered insolvent thereby, and were left much too thinly capitalized to survive.

12. On December 23, 2008, after a series of defaults and efforts to restructure the loans, each of the Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

13. Later that day, the U.S. Trustee's Office appointed Trustee Dillworth as the interim Chapter 7 Trustee of the Tesoro and Quail West Debtors' Estates (the "Debtors' Estates").

14. No trustee was elected at the subsequent Meeting of Creditors held in accordance with 11 U.S.C. § 341; thus, pursuant to 11 U.S.C. § 702, Trustee Dillworth is the duly appointed, qualified, and acting Chapter 7 Trustee for the Debtors' Estates.

15. In that capacity, Trustee Dillworth seeks to avoid, pursuant to 11 U.S.C. § 544(b) and applicable state law, the Debtors' transfer of the $148 million in loan proceeds referenced above, as well as the guaranties and liens issued in connection with the loan transaction; and to recover, pursuant to § 550(a), on behalf of and for the benefit of the Debtors' Estates, the value of the property interests transferred, from the entities to whom or for whose benefit said property interests were transferred.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## JURISDICTION AND VENUE

16.     This adversary proceeding arises under the above-captioned jointly administered Chapter 7 cases.  It is, therefore, a core proceeding within the meaning of 28 U.S.C. § 157.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

18.     The Plaintiff is Drew M. Dillworth, in his capacity as Chapter 7 Trustee for the Tesoro Debtors' Estates and the Quail West Debtors' Estates.

19.     Defendant Edward R. Ginn III is an individual who specializes in land acquisition, real estate development, and related matters.  At all material times, Defendant Ginn either directly or indirectly owned and controlled Defendant ERG Enterprises, L.P. ("ERG"), a Georgia limited partnership which held a 20% equity interest in each of the Debtors.

20.     Defendant Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P., is a Delaware limited partnership which invests and participates in real estate development projects. It is the ultimate parent company of Defendants Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., Lubert-Adler Capital Real Estate Fund III, L.P., Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P., and Lubert-Adler Capital Real Estate Fund IV, L.P. (the "Lubert-Adler Fund III & IV Entities"), Delaware limited partnerships which collectively held an 80% equity interest in each of the Debtors.

21.     With respect to the transfers for which avoidance and recovery is sought in this case, Ginn, ERG, Lubert-Adler, and the Lubert-Adler Fund III & IV Entities constitute initial transferees or entities for whose benefit such transfers were made within the meaning of 11 U.S.C. § 550(a)(1); or, alternatively, immediate or mediate transferees within the meaning of 11 U.S.C. § 550(a)(2).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

22.     The Defendants enumerated below are Lubert-Adler Fund III and/or IV investors which are believed to have received pro-rata distributions from the Credit Suisse loan proceeds taken out as return of capital contributions, interest, preferred return, and/or profit, which the Debtors were credited with having borrowed (*i.e.*, the $148,828,198.13 referenced above):

(a)     The President and Fellows of Harvard College, a/k/a Harvard Corporation and Harvard University, a private institution of higher learning located in Cambridge, Massachusetts;

(b)     The University of Michigan, a public institution of higher learning based in Ann Arbor, Michigan;

(c)     The John D. and Catherine T. MacArthur Foundation, a private philanthropic foundation based in Chicago, Illinois;

(d)     The Maryland State Retirement and Pension System, a state-established organization which administers and manages pension/benefit funds, based in Baltimore, Maryland;

(e)     The Ohio Police and Fire Pension Fund, a state-established organization which administers and manages pension/benefit funds, based in Columbus, Ohio;

(f)     The Pennsylvania Public School Employees' Retirement System, a state-established organization which administers and manages pension/benefit funds, based in Harrisburg, Pennsylvania;

(g)     The Pennsylvania State Employees' Retirement System, a state-established organization which administers and manages pension/benefit funds, based in Harrisburg, Pennsylvania.

With respect to the transfers for which avoidance and recovery is sought herein, each of these entities – collectively, the "Lubert-Adler Fund III & IV Investors" – was either an initial transferee or entity for whose benefit such transfers were made within the meaning of 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).[5]

---

[5]/The Defendants identified above as the Lubert-Adler Fund III & IV Investors represent only the subset of Lubert-Adler Fund III & IV investors which have made public disclosures concerning their Fund III & IV investments. Discovery has been sought concerning the additional Fund III & IV investors and their respective investments.

23.    Defendants John Does 1-50 are as-yet-unidentified persons and/or entities which, with respect to the transfers for which avoidance and recovery is sought herein, also satisfy the requirements of 11 U.S.C. §§ 550(a)(1) or 550(a)(2).

24.    Once discovery is sought and obtained with respect to the loan proceed distributions, leave will be sought to substitute as a defendant any person or entity which is an initial transferee or entity for whose benefit such transfers were made within the meaning of 11 U.S.C. § 550(a)(1), or an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).[6/]

25.    The Defendants are properly joined in this action pursuant to Fed. R. Civ. P. 20, made applicable by Fed. R. Bankr. P. 7020, because the right to relief asserted against all Defendants arises out of the same transaction or occurrence, and questions of law and fact common to all Defendants will arise in this action.

---

[6/]This would include any additional Lubert-Adler Fund III & IV investors which received pro-rata distributions from the Credit Suisse loan proceeds  taken out as return of capital contributions, interest, preferred return, and/or profit which the Debtors were credited with having borrowed, as well as any other entities/persons identified which qualify as initial transferees or entities for whose benefit such transfers were made within the meaning of 11 U.S.C. § 550(a)(1), or immediate or mediate transferees within the meaning of 11 U.S.C. § 550(a)(2).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## GENERAL ALLEGATIONS

**A.    The Ginn / Lubert-Adler Development Known as Tesoro**

26.    Tesoro is a 1,400 acre private community and club located near the St. Lucie River, in Port St. Lucie, Florida.

27.    Ginn and the Lubert-Adler Fund III & IV Entities purchased the land for Tesoro through a number of subsidiaries, between 2001 and 2003.

28.    Construction of the first phase of Tesoro – "Tesoro West" – was completed in 2004. It consisted of 470 single family residential lots and a number of amenities, including a small clubhouse, golf shop, and an 18 hole golf course.

29.    Construction of the second phase – "Tesoro East" – began shortly thereafter. It was to include an additional 453 single family residential lots, 100 villa-style condominium units, and a number of amenities, including a larger clubhouse with a restaurant, ballroom, spa, fitness center, and pool, a tennis complex, two additional 18 hole golf courses, and an off-site beach club on Hutchinson Island, with a restaurant, grille, exercise room, surf shop, elevated pool, cabanas, and private beach access.

**B.    Quail West**

30.    Quail West is a 1,180 acre private community and club located east of Interstate 75, along the border between Collier and Lee Counties, near Naples, Florida.

31.    Ginn and the Lubert-Adler Fund III & IV Entities took over Quail West in 2005, after approximately half of the roughly 900 available residential lots had been developed and sold, and much of the infrastructure had been completed, including a grand clubhouse with a restaurant and spa, a tennis complex, and two 18 hole golf courses.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

32.     According to Ginn marketing materials, the plan was to re-brand the project and enhance the marketability of the remaining residential lots, by upgrading existing facilities and adding an off-site beach club, with a restaurant, pool, and a marina with boat slips.

**C.     The Original Financing Plan and the Impact of Hurricane Wilma**

33.     Originally, Ginn and Lubert-Adler intended to use Tesoro and Quail West lot sales to finance the completion/upgrading of the developments' respective infrastructure and facilities, with profits – if any – to be taken upon completion of each project.

34.     In October 2005, Ginn and Lubert-Adler held an extravagant "launch" event at Tesoro and succeeded in obtaining sales reservations or contracts for most of the remaining residential lots.

35.     Later that month, however, Hurricane Wilma struck the areas in which Tesoro and Quail West are located, impacting both the developments themselves and the real estate markets in Port St. Lucie and Naples, Florida.

36.     The vast majority of the Tesoro sales reservations and contracts pending at that time, and the vast majority of the Quail West sales reservations and contracts obtained at a "launch" event held later that year, either were subsequently cancelled or otherwise failed to close.

37.     That, in turn, prompted Ginn and Lubert-Adler to begin searching for alternate ways to finance the completion/upgrading of the developments' respective infrastructure and facilities.

38.     That search ultimately led to Credit Suisse, which offered them the opportunity to "recapitalize" and take "profits" out of Tesoro, Quail West, and the three other Projects, long before any of the Projects were to be completed, at a time when real estate markets were collapsing and it was uncertain whether any "profits" would in fact be realized.[7]

---

[7]This opportunity was particularly appealing to Lubert-Adler, as it enabled Lubert-Adler to artificially enhance the financial performance of Funds III and IV, at a time when it was actively seeking to raise capital for Fund V.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

###### D.    The Credit Suisse Loan Transaction

39.    On or about June 8, 2006, Credit Suisse, Ginn, and Lubert-Adler representatives reached agreement as to the terms of a complex, multi-tiered, syndicated loan transaction in which Credit Suisse lent $675 million to Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc., with the Debtors and Other Project Entities serving as "Full Recourse Borrowing Parties" (*i.e.*, co-borrowers).

40.    Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. were shell companies formed shortly prior to the closing of the loan transaction, to facilitate the transaction and the transfers contemplated thereby.

41.    Ginn-LA CS Borrower, LLC, a Delaware limited liability company, became the immediate "parent" of the Tesoro and Quail West Debtors, as well as the River Club / Gardens and Laurelmor Project entities, and served as a conduit for a portion of the loan proceeds.

42.    Ginn-LA Conduit Lender, Inc., a Delaware corporation, became part of the corporate structure which held the assets of the Ginn Sur Mer Project entities, and also served as a conduit for a portion of the loan proceeds.

43.    The principal loan transaction documents were a First Lien Credit Agreement and a Second Lien Credit Agreement, both of which contained a choice of law provision purporting to invoke New York law.

44.    The First Lien Credit Agreement extended a total of $525 million in financing, in the form of a $165 million synthetic revolving loan and a $360 million first lien term loan.

45.    The Second Lien Credit Agreement extended an additional $150 million in financing, in the form of a second lien term loan.

-11-

46.     Significantly, the Credit Suisse loan transaction documents overtly contemplated that less than a quarter of the loan proceeds would be used for working capital or development purposes. Under the First and Second Lien Credit Agreements, only the $165 million synthetic revolving loan was to be maintained in a deposit account "to fund general company and working capital needs" and "to finance a portion of the development, construction and other costs associated with each Project." The remaining $510 million in loan proceeds was *required* to be utilized to pay transaction costs, to replace existing third-party debt, and to make distributions to the equity owners of the Projects, *i.e.*, insiders and affiliates of the Debtors and Other Project Entities.

47.     According to Ginn / Lubert-Adler records obtained prior to the filing of this action, no portion of the $165 million revolving loan was distributed at the closing of the loan transaction. By contrast, the $510 million in first lien and second lien term loan proceeds was distributed in its entirety at closing, as follows:

| Description | Amount |
|---|---|
| Credit Suisse Loan Fee and Other Closing Costs | $23,446,764.94 |
| Replacement of Existing Third-Party Debt | $158,291,252.86 |
| Distributions to Ginn / Lubert-Adler Entities | $328,261,982.20 |
| Total | $510,000,000.00 |

48.     Nonetheless, to induce Credit Suisse to extend the loans, each of the Debtors and Other Project Entities was required to execute a guaranty rendering it jointly and severally liable for the full $675 million loan amount, and to grant liens on substantially all of its assets.

49.     Although Credit Suisse was the entity to whom the guaranties and liens were issued, the Defendants – who stood to receive the lion's share of the loan proceeds – were the entities for whose benefit the guaranties and liens were issued.

-12-

**E.    How the Loan Proceed Distributions Were Debited and Credited Among the Projects**

50.    Per Ginn / Lubert-Adler records, the portion of the Credit Suisse loan proceeds which was distributed to Ginn and Lubert-Adler entities at the closing of the loan transaction was debited and credited among the Projects as follows:

| Transferee / Allocation | Tesoro | Quail West | River Club / Gardens | Laurelmor | Gin sur Mer | Total |
|---|---|---|---|---|---|---|
| Ginn | $5,357,044.85 | $1,785,681.62 | $0.00 | $0.00 | $0.00 | $7,142,726.47 |
| Lubert-Adler Debt / Accrued Interest | $0.00 | $21,070,249.67 | $28,494,552.35 | $54,445,748.45 | $0.00 | $104,010,550.47 |
| Lubert-Adler Equity / Preferred Return | $82,674,075.78 | $9,521,243.70 | $3,807,573.89 | $12,148,881.52 | $75,539,027.86 | $183,690,802.75 |
| Lubert-Adler Profit | $21,413,194.24 | $7,006,708.26 | $0.00 | $0.00 | $0.00 | $28,419,902.50 |
| Subtotal | $109,444,314.87 | $39,383,883.26 | $32,302,126.24 | $66,594,629.97 | $75,539,027.86 | $323,263,982.19 |
| Overhead / Post-Closing Costs | | | | | | $4,998,000.00 |
| Grand Total | | | | | | $328,261,982.19 |

51.    In other words, of the loan proceeds that Ginn and the Lubert-Adler entities took out for themselves and their investors, the Tesoro Debtors were credited with having borrowed $109,444,314.87, and the Quail West Debtors were credited with having borrowed $39,383,883.26, making for a combined total of $148,828,198.13, or approximately 45.33% of the total distributed amount, $328,261,982.19.[8]

---

[8] The Ginn / Lubert-Adler records produced to date do not specify whether the distributions made to Ginn which were credited to Tesoro and Quail West were attributable to debt, accrued interest, equity, preferred return, or profit. Nor do those records specify how the distributions made to the Lubert-Adler entities were allocated among Lubert-Adler, the Lubert-Adler Fund III & IV Entities, and the Lubert-Adler Fund III & IV Investors.  Once discovery is obtained as to those matters, leave will be sought to serve an amended pleading incorporating that information, if necessary.

-13-

F.      **The Fraudulent Nature and Impact of the Loans and Transfers at Issue**

(1)     **The Underlying Loan Appraisals**

52.     The Credit Suisse loan amounts were predicated on Cushman & Wakefield appraisals of the "Total Net Value" of the five Projects; a novel valuation methodology Credit Suisse developed in conjunction with Cushman & Wakefield in order to enhance the marketability of its loan product.

53.     The Cushman & Wakefield appraisals defined the "Total Net Value" of each Project as "the sum of the market value of the bulk lots of the entire planned community, *as if* all of the bulk lots were *complete . . .* and *available for sale* to merchant builders, as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

54.     In other words, the "Total Net Value" methodology was designed to generate a value which significantly exceeded the actual as-is fair market value of the property interests being valued, thus enabling the proposed loan to be marketed as having a much lower "loan-to-value" ratio than would otherwise have been possible using a traditional market valuation of the proposed collateral.

55.     For example, whereas the St. Lucie County Property Appraiser assessed the value of all Tesoro real and tangible property in 2006 to be $74,910,626, Cushman & Wakefield's appraisal of the "Total Net Value" of just the unsold Tesoro lots as of April 14, 2006 was $210,000,000.

56.     As a consequence, the Credit Suisse loans did not comply with U.S. banking laws, such as the Financial Institutions Recovery Reform Act of 1989, which provides that, before a regulated financial institution may make or invest in a loan secured by real estate, the loan must be supported by an appraisal reflecting a traditional market valuation of the proposed collateral.

57.     To circumvent that requirement, Credit Suisse coordinated the loans through its "Cayman Islands Branch," an off-shore "affiliate" with no physical presence in the Cayman Islands, and syndicated the loan product to non-regulated entities, such as hedge funds.

-14-

58.     To make matters worse, the Ginn / Lubert-Adler sales projections supplied to Cushman & Wakefield for use in appraising the "Total Net Value" of the Projects had no basis in historical reality, and were vastly overstated.

59.     For instance, although Ginn and Lubert-Adler missed their original projections for the Tesoro East "launch" by a huge margin (they had projected 421 lot closings by January 31, 2006, but achieved fewer than 40, with the real estate market in Port St. Lucie worsening with every day), the projections supplied to Cushman & Wakefield to support the loans made in June of 2006 forecasted 74 additional lot and condominium unit closings during the second half of 2006 alone, and 290 more by the end of 2008.  In actuality, they achieved fewer than 40 additional lot closings, and 0 condominium unit closings, through the end of 2008.

60.     Further, based on information obtained regarding Ginn and Lubert-Adler sales efforts, it is believed that Ginn and Lubert-Adler used a variety of deceptive practices to obtain sales of Tesoro and Quail West lots/units at artificially-inflated prices, and then used those sales as "comparables" both for the purpose of generating sales of other lots/units, and in establishing the projections supplied to Cushman & Wakefield of anticipated average closing prices for the remaining available lots/units in the Projects.

61.     In fact, after the closing of the loan transaction, Ginn reportedly boasted that it was "the best sales job of [his] life."

62.     And when the Tesoro Club's General Manager at the time learned of the loans and the sales projections upon which the loan amounts and repayment schedule had been established, he knew the Tesoro Project was "doomed to failure."

63.     The Tesoro Club's General Manager was, of course, correct.   And the same is true of Quail West, as well.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

**(2)      The Loan Transaction and Transfers Made Incident Thereto**

64.     Typically, for a developer to make money on a development project, he must overcome a series of hurdles, some of which may be unforseen at the time the project is commenced.

65.     The developer must, among other things, construct the project at a cost which is reasonable relative to the anticipated market for sales, successfully market his product to potential purchasers, and avoid the vagaries of development work, such as changes in economic conditions, catastrophic weather events, and other events which can increase costs, suppress demand, and/or lead real estate markets into a downturn.

66.     When a developer stands to take profits only "at the end" of a development project, it incentivizes the work necessary to achieve successful completion of the project.

67.     Moreover, when a developer is well-capitalized and his profits are "in the project," both the developer and his creditors enjoy a measure of protection in the event the unforseen occurs.

68.     In the present case, what Ginn and the Lubert-Adler entities found in Credit Suisse – the opportunity to "recapitalize" and take "capital contributions," "interest," "preferred return," and "profits" out of the Projects, long before they were to be completed – effectively eliminated any meaningful incentive to do the things necessary to successfully complete the Projects.

69.     Similarly, in the wake of the Credit Suisse loans and the transfers made incident thereto, the Debtors and Other Project Entities – and their creditors – were left without a measure of protection in the event the unforseen (or, in this case, the foreseen) were to occur.

70.     Indeed, the loan transaction was specifically designed to enable the Defendants to loot the Debtors and Other Project Entities, and to shift the risks associated with the Projects to creditors, leaving those creditors with a virtual certainty of loss.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

71.     As noted above, of the loan proceeds which Ginn and the Lubert-Adler entities took out for themselves and their investors, the Tesoro Debtors were credited with having borrowed $109,444,314.87, and the Quail West Debtors were credited with having borrowed $39,383,883.26.

72.     The Tesoro Debtors did not receive fair consideration or reasonably equivalent value for the transfer of the $109,444,314.87, the guaranties they were required to execute which rendered them jointly and severally liable for the full $675 million loan amount, or the liens they were required to issue on substantially all of their assets (the "Tesoro Asset Transfers").

73.     The Quail West Debtors also did not receive fair consideration or reasonably equivalent value for the transfer of the $39,383,883.26, the guaranties they were required to execute which rendered them jointly and severally liable for the full $675 million loan amount, or the liens they were required to issue on substantially all of their assets (the "Quail West Asset Transfers").

74.     Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Tesoro and Quail West Debtors were not already insolvent at the time of the Tesoro and Quail West Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive.  Which is precisely what occurred.

75.     According to the consolidated financial statements for Ginn-LA CS Borrower, LLC, in the wake of the loan transaction and the transfers made incident thereto, the entity formed to "recapitalize" and "hold" the Tesoro, Quail West, River Club / Gardens, and Laurelmor Projects had a combined net balance sheet *deficit* of $198,620,249 – *i.e.*, it was nearly $200 million in the "red."

76.     As a result, the Debtors and Other Project Entities lacked sufficient capital to fund normal development operations and  were unable to make required loan payments as they came due, leading to a series of defaults and efforts to restructure the loans, which ultimately proved unsuccessful in keeping the entities afloat.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

**(3)    The Master Restructuring Agreement**

77.    On or about December 19, 2008, Credit Suisse, Ginn-LA CS Borrower, LLC,
Ginn-LA Conduit Lender, Inc., and other Ginn / Lubert-Adler entities, including the Debtors and
Other Project Entities, entered into a Master Restructuring Agreement ("MRA").

78.    The MRA expressly contemplated that each of the Tesoro and Quail West Debtors
would file a voluntary petition under Chapter 7 of the Bankruptcy Code.

79.    In addition, the MRA also expressly contemplated that the Trustee(s) appointed for
the Debtors' Estates would pursue actions against Ginn / Lubert-Adler entities, such as this case.

80.    Indeed, Ginn and Lubert-Adler specifically bargained for a contractual provision
designed to limit the claims which could be asserted against any recovery in this case, in the hope
that doing so would operate to minimize their ultimate exposure in the case:

> <u>Waiver of Recovery Regarding Certain Bankruptcy Claims</u>. . . . [I]n the event that the
> trustee of the Tesoro and/or Quail West bankruptcy estates is successful in pursuing
> actual or threatened litigation against any of the Borrower Released Parties or the
> Other Ginn/LA Released Parties, [Credit Suisse] and the [loan participants], on
> behalf of themselves and their respective heirs, executors, administrators, successors
> and assigns, hereby waive any right to receive any of the proceeds thereof arising
> from settlement, judgment or otherwise.

MRA, ¶ 3(f).

**(4)    The Filing of the Underlying Bankruptcy Proceedings**

81.    On December 23, 2008, the Tesoro and Quail West Debtors filed voluntary petitions
under Chapter 7 of the Bankruptcy Code.

82.    As of that date of those petitions, each of the Debtors was jointly and severally liable
with the Other Project Entities for loan principal and interest totaling $715,986,962.07, with liens
on substantially all of their assets, and no hope of recovery.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET,  MIAMI,  FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT I - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 276, 278(1)(a))

83.     Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

84.     Under the control of Ginn and the Lubert-Adler entities, the Tesoro Debtors made the Tesoro Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

85.     As set forth in greater detail above, the Tesoro Asset Transfers were specifically designed to shift the risks associated with the development of the Tesoro Project to creditors, and left those creditors with a virtual certainty of loss.

86.     Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Tesoro Debtors were not already insolvent at the time of the Tesoro Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

87.     The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

88.     Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 276 and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT II - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 273-275, 278(1)(a))

89.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

90.    The Tesoro Debtors did not receive fair consideration in exchange for the property interests conveyed in the Tesoro Asset Transfers.

91.    The Tesoro Debtors either were insolvent at the time of the Tesoro Asset Transfers or were rendered insolvent as a result of the Tesoro Asset Transfers; were engaged in a business for which the property remaining in their hands following the Tesoro Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Tesoro Asset Transfers, intended to incur, or believed they would incur, debts beyond their ability to pay as those debts matured.

92.    The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

93.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 273-275, and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT III - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))

94.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

95.    Under the control of Ginn and the Lubert-Adler entities, the Tesoro Debtors made the Tesoro Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

96.    As set forth in greater detail above, the Tesoro Asset Transfers were specifically designed to shift the risks associated with the development of the Tesoro Project to creditors, and left those creditors with a virtual certainty of loss.

97.    Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Tesoro Debtors were not already insolvent at the time of the Tesoro Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

98.    The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

99.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT IV - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1), 726.106(1)(b), 726.108(1)(a))

100.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

101.    The Tesoro Debtors did not receive reasonably equivalent value in exchange for the property interests conveyed in the Tesoro Asset Transfers.

102.    The Tesoro Debtors either were insolvent at the time of the Tesoro Asset Transfers or were rendered insolvent as a result of the Tesoro Asset Transfers; were engaged in a business for which the property remaining in their hands following the Tesoro Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Tesoro Asset Transfers, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

103.    The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

104.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.105(1), 726.106(1)(b), and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT V - RECOVERY OF FRAUDULENT TESORO ASSET TRANSFERS FOR THE BENEFIT OF THE TESORO DEBTORS' ESTATES
### (11 U.S.C. § 550(a))

105.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82, 84 to 88, 90 through 93, 95 through 99, and 101 through 104, as if fully set forth herein.

106.    With respect to the Tesoro Asset Transfers, each of the Defendants was either an initial transferee or entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

107.    To the extent that any Defendant was or is found to be an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2), such Defendant was not a transferee who took for value, in good faith, without knowledge of the voidability of the transfer, within the meaning of 11 U.S.C. § 550(b)(1); or an immediate or mediate good faith transferee thereof within the meaning of 11 U.S.C. § 550(b)(2).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Tesoro Debtors' Estates, the value of the property interests conveyed in the Tesoro Asset Transfers, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT VI - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 276, 278(1)(a))

108.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

109.    Under the control of Ginn and the Lubert-Adler entities, the Quail West Debtors made the Quail West Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

110.    As set forth in greater detail above, the Quail West Asset Transfers were specifically designed to shift the risks associated with the development of the Quail West Project to creditors, and left those creditors with a virtual certainty of loss.

111.    Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Quail West Debtors were not already insolvent at the time of the Quail West Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

112.    The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

113.    Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 276 and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT VII - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 273-275, 278(1)(a))

114.     Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

115.     The Quail West Debtors did not receive fair consideration in exchange for the property interests conveyed in the Quail West Asset Transfers.

116.     The Quail West Debtors either were insolvent at the time of the Quail West Asset Transfers or were rendered insolvent as a result of the Quail West Asset Transfers; were engaged in a business for which the property remaining in their hands following the Quail West Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Quail West Asset Transfers, intended to incur, or believed they would incur, debts beyond their ability to pay as those debts matured.

117.     The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

118.     Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 273-275, and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT VIII - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))

119.   Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

120.   Under the control of Ginn and the Lubert-Adler entities, the Quail West Debtors made the Quail West Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

121.   As set forth in greater detail above, the Quail West Asset Transfers were specifically designed to shift the risks associated with the development of the Quail West Project to creditors, and left those creditors with a virtual certainty of loss.

122.   Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Quail West Debtors were not already insolvent at the time of the Quail West Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

123.   The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

124.   Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

-26-

### COUNT IX - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1), 726.106(1)(b), 726.108(1)(a))

125.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

126.    The Quail West Debtors did not receive reasonably equivalent value in exchange for the property interests conveyed in the Quail West Asset Transfers.

127.    The Quail West Debtors either were insolvent at the time of the Quail West Asset Transfers or were rendered insolvent as a result of the Quail West Asset Transfers; were engaged in a business for which the property remaining in their hands following the Quail West Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Quail West Asset Transfers, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

128.    The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

129.    Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.105(1), 726.106(1)(b), and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

### COUNT X - RECOVERY OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### FOR THE BENEFIT OF THE QUAIL WEST DEBTORS' ESTATES
### (11 U.S.C. § 550(a))

130.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 82, 109 through 113, 115 through 118, 120 through 124, and 126 through 129, as if fully set forth herein.

131.    With respect to the Quail West Asset Transfers, each of the Defendants was either an initial transferee or entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

132.    To the extent that any Defendant was or is found to be an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2), such Defendant was not a transferee who took for value, in good faith, without knowledge of the voidability of the transfer, within the meaning of 11 U.S.C. § 550(b)(1); or an immediate or mediate good faith transferee thereof within the meaning of 11 U.S.C. § 550(b)(2).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Quail West Debtors' Estates, the value of the property interests conveyed in the Quail West Asset Transfers, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

Dated:  June 22, 2010

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.

Attorneys for Drew M. Dillworth,
Chapter 7 Trustee of the Tesoro Debtors' Estates
and the Quail West Debtors' Estates

Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

I hereby certify that I am admitted to the Bar of
the United States District Court for the Southern District
of Florida and I am in compliance with the additional
qualifications to practice in this Court set forth in
Local Rule 2090-1(A).

By:_____/s/_____

    EUGENE E. STEARNS
    Fla. Bar No. 149335
    estearns@stearnsweaver.com
    HAROLD D. MOOREFIELD, JR.
    Fla. Bar No. 239291
    hmoorefield@stearnsweaver.com
    MATTHEW W. BUTTRICK
    Fla. Bar No. 176028
    mbuttrick@stearnsweaver.com
    ANDREW E. STEARNS
    Fla. Bar No. 661651
    astearns@stearnsweaver.com

-29-