# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division
www.flsb.uscourts.gov

In re:

GINN-LA ST. LUCIE LTD., LLLP, *et al.*,

            Debtors.

_____/

In re:

GINN-LA QUAIL WEST LTD., LLLP, *et al.*,

            Debtors.

_____/

DREW M DILLWORTH, Chapter 7 Trustee,

            Plaintiff,

        vs.

EDWARD R. GINN III; EDWARD R. GINN III
REVOCABLE TRUST DATED SEPT. 14, 2002;
ERG MANAGEMENT, LLC; ERG ENTERPRISES,
L.P.; IRA M. LUBERT; DEAN S. ADLER;
LUBERT-ADLER MANAGEMENT CO., L.P.;
LUBERT-ADLER GROUP, III, L.P.;
LUBERT-ADLER REAL ESTATE FUND III, L.P.;
LUBERT-ADLER REAL ESTATE PARALLEL
FUND III, L.P.; LUBERT-ADLER CAPITAL
REAL ESTATE FUND III, L.P.;
LUBERT-ADLER GROUP IV, L.P.;
LUBERT-ADLER REAL ESTATE FUND IV, L.P.;
LUBERT-ADLER REAL ESTATE PARALLEL
FUND IV, L.P.; LUBERT-ADLER CAPITAL
REAL ESTATE FUND IV, L.P.;

**CASE NO. 08-29769-PGH**

All Cases Jointly Administered

Chapter 7

(4 Cases Substantively Consolidated Under
Lead Case No. 08-29769-PGH)[1]

(3 Cases Substantively Consolidated Under
Lead Case No. 08-29774-PGH)[2]

**ADV. PRO. NO. 10-02976-PGH**

**SECOND AMENDED COMPLAINT
FOR AVOIDANCE AND
RECOVERY OF
FRAUDULENT TRANSFERS
(CORRECTED VERSION)**

---

[1] The "Tesoro Debtors' Estates" (Nos. 08-29769-PGH, 08-29770-PGH, 08-29772-PGH, and 08-29773-PGH) are substantively consolidated into Lead Case No. 08-29769-PGH. *See* Order [D.E. 308/309]. The "Tesoro Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA St. Lucie Ltd., LLLP – 5632; (ii) Ginn-St Lucie GP, LLC – 0983; (iii) Tesoro Golf Club Condo., LLC – 4385; and (iv) The Tesoro Club, LLC – 1917. *See* 11 U.S.C. § 342(c)(1).

[2] The "Quail West Debtors' Estates" (Nos. 08-29774-PGH, 08-29775-PGH, and 08-29776-PGH) are substantively consolidated into Lead Case No. 08-29774-PGH. *See* Order [D.E. 34]. The "Quail West Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA Quail West Ltd., LLLP – 2397; (ii) Ginn-Quail West Beach, LLC – 9142; and (iii) Ginn-Quail West GP, LLC – 6313. *See* 11 U.S.C. § 342(c)(1).

THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE; THE REGENTS OF THE
UNIVERSITY OF MICHIGAN; THE JOHN D. AND
CATHERINE T. MACARTHUR FOUNDATION;
THE MARYLAND STATE RETIREMENT &
PENSION SYSTEM; THE OHIO POLICE & FIRE
PENSION FUND; THE COMMONWEALTH OF
PENNSYLVANIA STATE EMPLOYEES'
RETIREMENT SYSTEM; THE PENNSYLVANIA
PUBLIC SCHOOL EMPLOYEES' RETIREMENT
SYSTEM; & CAPITAL PARTNERS, L.P.;
A. DONALD MCCULLOCH, JR.; CAROLYN B.
MCCULLOCH; A.C. ISRAEL ENTERPRISES, INC.;
ADAM L. MILLER; ADOLF A. PAIER;
ALAN P. SMITH; RUTH N. SMITH;
ALAN P. SMITH, AS TRUSTEE U/D OF HAROLD
L. NEUMAN TRUST #1 DATED 11/21/69;
ALAN P. SMITH, AS TRUSTEE U/D HAROLD L.
NEUMAN TRUST #2 DATED 11/21/69;
ALAN D. LEVOW; AMACHIE KWEKU ACKAH;
AMY A. FOX; DANIEL H. WHEELER; AMY B.
ERLBAUM; ANDREW D. RUBIN; LOUISE RUBIN;
ANDREW PERRY; ANDREW GOLDMAN; ANKA
LIMITED PARTNERSHIP; ANTHONY J. CALISE,
IRA; ARTHUR MARION REVOCABLE TRUST;
AVRIL KLAFF & ALLAN REICH, AS TRUSTEES
OF THE ZARA TRUST U/T/A DATED 1/1/2006;
AVRIL KLAFF & ALLAN REICH, AS TRUSTEES
OF THE DANIEL TRUST U/T/A DATED 1/1/2006;
AVRIL KLAFF & ALLAN REICH, AS TRUSTEES
OF THE MARISSA TRUST U/T/A DATED 1/1/2006;
BAHM IV; BARBARA TOLL; BCIP ASSOCIATES
II; BLACKACRE CAPITAL PARTNERS, L.P.;
BLK INVESTMENTS, L.P.; BOB C. LADD;
BOWDOIN COLLEGE; BRETT RUBINSON;
BRUCE A. LEVY; BRUCE S. MARKS;
BONNIE KAY MARKS; BULL VENTURES
LIMITED PARTNERSHIP; C.H.A.I., LLC;
CANDACE L. SNEBERGER; CARL MARBACH;
HELEN MARBACH; CATENARY PARTNERS,
L.P.; CHAFETZ GROUP LLC; CHARLES M.
ROBINS; CHRISTINE V. KANTER;
CHRISTOPHER MOLLER; JENNIFER MOLLER;
CHRISTOPHER ASPLUNDH; CITIZENS BANK AS
CUSTODIAN, F/B/O HIRTLE CALLAGHAN
PRIVATE EQUITY FUND III, L.P.; CITY OF

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

PHILADELPHIA SINKING FUND COMMISSION,
AS TRUSTEE FOR THE PHILADELPHIA GAS
WORKS RETIREMENT RESERVE FUND;
CONNELL FAMILY PARTNERSHIP III;
CRITERION HOLDINGS, LLC; DAN NASSER;
DAVCO MANAGEMENT, LLC; DAVID
SCHLESSINGER; DAVID NAZARIAN, AS
TRUSTEE FOR THE SAMY NAZARIAN TRUST;
DAVID RAY; MARGARET CARVER; DAVID A.
BRAVER; DAVID D. KIM TRUST DATED
12/31/87; DAVID & ANGELLA NAZARIAN
FAMILY TRUST; DAVID O. OBERKIRCHER;
DAVID V. WACHS; DAVID F. LINCOLN;
DAVID A. BROWNSTEIN; DEBRA ELLEN FOX;
DEUTSCHE    BANK SHARPS PIXLEY INC.;
DEVIN ARONSTAM; DIANE C. RAY; DIANE L.
MYER REV. TRUST DATED 8/3/2001; DONALD
M. GLEKLEN; DONALD R. AUTEN; JUDITH W.
AUTEN; DONALD M. ROSEN; DREXEL
UNIVERSITY; E WACHS II, L.P.; EDMUND F.
GARNO, JR.; EDMUND F. GARNO, JR. IRA;
EDMUND F. GARNO, III; EDWARD H. ROSEN;
EDWARD J. FITZSIMMONS; EDWARD RAY;
LONNETTA G. RAY; EDWARD BOWMAN;
KATHLEEN BOWMAN; EDWARD M. SNIDER;
EDWIN J. BERKOWITZ; EMORY UNIVERSITY;
EMPLOYEES' RETIREMENT PLAN OF
DUKE UNIVERSITY; ENGLE ASSOCIATES;
ERLBAUM FAMILY LIMITED PARTNERSHIP;
ERLBAUM INVESTMENTS, L.P.; ESTATE OF
JOSEPH A. PULEO, JR.; FEA II, L.P.;
FOSTER & FOSTER, LLC; FRANCE-MERRICK
FOUNDATION, INC.; FROG HOLLOW PARTNERS
XI, L.P.; GARFIELD REFINING COMPANY
PROFIT SHARING PLAN; GARY E. ERLBAUM;
GEORGE M. ROSS; LYN M. ROSS; GEORGE W.
KARR, JR.; GERALD A. RONON; GERALD M.
WILK; GLENVILLE CAPITAL PARTNERS, L.P.;
GLENWOOD ROAD ASSOCIATES
PARTNERSHIP; GOTHIC CORPORATION;
GRAHAM ALTERNATIVE INVESTMENT
PARTNERS I; GROUP FORE, LLC; GT REAL
PROPERTY HOLDINGS II, LLC; HARRIS
WILDSTEIN; HARVARD PRIVATE CAPITAL
REALTY, INC.; HEM PRIVATE EQUITY FUND
2000, LLC; HENRY DOLFINGER #2 T/W;

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

HERSCH M. KLAFF; HMK TRUST; HOFFMAN INVESTMENT COMPANY; HOWARD SALASIN; HOWARD B. ASHER; HOWARD D. ROSS; SUSAN K. HOLLENSTEIN; HUMILLS, LLC; HYMAN R. KAHN, M.D.; IRM ASSOCIATES, LP; IRVIN J. BOROWSKY; JAMES A. OUNSWORTH; JAMES MERRITT SPRINGSTEAD, JR.; JAMES J. KIM; JAMES J. KIM TRUST DATED SEPT. 30, 1992; JAMES M. SPRINGSTEAD; DIANE B. SPRINGSTEAD; JAMES M. MEYER; JAMES W. ZUG; JAMES M. RIORDAN; JAMES WOLF; NANCY WOLF; JARED PRUSHANSKY; JAVICK, L.P.; JAY PHILIP SLOVIN; JAY H. TOLSON; JEAN ELLEN RAY; TOBIAS SPECKBACHER; JEANNINE PULITO; JEANNINE PULITO & NICOLE LINEHAN, AS TRUSTEES OF THE JOHN T. FRIES DYNASTY TRUST PNC BANK DELAWARE; JEFFREY HONICKMAN; JENNIE R. BERLIANT REVOCABLE TRUST; JEREMY ALLEN; DEBRA ALLEN; JEWISH FEDERATION OF GREATER PHILADELPHIA; JILCY-1, L.P.; JILCY-6, L.P.; JLT INVESTMENTS, LP; JOHN T. KIM TRUST DATED 12/31/87; JOHN R. JAEB REVOCABLE TRUST DATED 7/5/2000; JOHN T. LUPTON TRUST; JOHN ZAGARA; JOHNS HOPKINS UNIVERSITY; JON M. LUBERT; JONATHAN B. DETWEILER, AS TRUSTEE OF THE JONATHAN B. DETWILER REVOCABLE TRUST, U/T/A DATED 4/29/2003; JOSEPH F. WATERMAN; MARY JOEL WATERMAN; JOSEPH NEUBAUER; JOSEPH R. PAPA; JOSEPH ZAGARA; JOSEPH P. FAHEY; KATE PARTNERS, LP; KEIBREAUX ASSOCIATES, LP; KEITH LOISELLE; CAROL LOISELLE; KENNETH J. GOLD; KENNETH A. FOX; KENNETH WAETZMAN; SHELLEY E. WAETZMAN; KERRI SCHNEIDER; KIRSCHNER BROTHERS PROFIT SHARING PLAN; KLT INVESTMENTS, LP; KODAK RETIREMENT INCOME PLAN TRUST; KOEN INVESTMENTS, LLC; L. FREDERICK SUTHERLAND; BARBARA H. SUTHERLAND; LARRY A. CUTLER; SUSAN E. CUTLER; LAWRENCE CHIMERINE; LAWRENCE S. SMITH PROFIT SHARING TRUST; LAWRENCE S. SMITH PROFIT SHARING PLAN;

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

LENNART HAGEGARD; LENORE STEINER; LESLIE B. FRANKEL; LINDA C. MELDRUM; LISA ROBERTS; LYNN W. BERNSTEIN; LYONSHARE INVESTMENTS, INC.; LYONSHARE VENTURE CAPITAL; M. WALTER D'ALESSIO; MANAGED CARE CONNECTION, INC.; MARILYN WEISSMAN TRUST; MARJORIE RAWLS ROBERTS; MARK G. CORNISH; MARK WILDSTEIN; MARTIN D. COHEN; MARTIN L. TRICHON; JUDITH K. TRICHON; MARVIN N. DEMCHICK; MILDRED W. DEMCHICK; MATTHEW I. GARFIELD; MARIE H. GARFIELD; MAX H. KRAUS; LOIS B. KRAUS; MAYA B. GOLDBERG; MCE FAMILY LIMITED PARTNERSHIP; MDR II LLC; MELLON TRUST OF NEW ENGLAND, N.A., AS TRUSTEE OF THE KODAK RETIREMENT INCOME PLAN TRUST; MELVIN HERRIN; MICHAEL J. CARUSO; MICHAEL J. HAGAN; JOYCE HAGAN; MICHAEL S. KIRSCHNER; MICHAEL C. ERLBAUM & GARY E. ERLBAUM, AS TRUSTEES OF THE ADAM J. ERLBAUM TRUST U/A DATED 4/4/97; MICHAEL C. ERLBAUM; MICHAEL A. BRAVER; MICHAEL W. MILES; MICHAEL P. MCNULTY; MIRIAM D. GLANTZ; MONS INVESTMENTS, LLC; NANCY S. ENGLE; NANCY J. FOX; NEXTONE LLC; NICOLE LINEHAN; NORTHWESTERN UNIVERSITY; OLIVER ERNEST ASSOCIATES, L.P.; PAMELA ESTADT; PATRICIA GUGGENHEIM; PATRICK S. LEE; PAUL TRAPIDO; JUDE RAY; PEACOCK PRODUCTIONS; PENNOCK J. YEATMAN IV; PETER S. LINDER; PETER UNNEMAN; KATHLEEN UNNEMAN; PHILADELPHIA INVESTMENT PARTNERSHIP I; PHILADELPHIA HEALTH & EDUCATION CORPORATION, D/B/A DREXEL UNIVERSITY COLLEGE OF MEDICINE; PRINCE GEORGE'S COUNTY POLICE PENSION PLAN; PRINCE GEORGE'S COUNTY FIRE SERVICE PENSION PLAN; R. ERIC EMRICH; ANGELA L. EMRICH; RANDY L PULITO; DIANE K. PULITO; RAY FAMILY PARTNERSHIP; RICHARD L. FREUNDLICH; RICHARD L. FOSTER; RICHARD T. KANTER; RICHARD J. ANTHONY, SR.; MARLENE A. ANTHONY; RICHARD H. ROSENTHAL REVOCABLE TRUST;

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

RICHARD GUGGENHEIM TESTAMENTARY
MARITAL TRUST; RICHARD LEVIN; RICHARD
GREENAWALT; ROBERT P. HAUPTFUHRER;
ROBERT A. FOX; ROBERT J. HIGGINS;
ROBERT E. KEITH, JR.; MARGOT W. KEITH;
ROBERT L. MCNEIL, III; ROBERT CROWN;
BARBARA CROWN; ROCHELLE BROAD;
ROGER J. MURPHY; BARBARA K. MURPHY;
RONALD J. ZLATOPER; BARRY O. ZLATOPER;
ROSLYN JAFFE; ROY S. NEFF; RPM SELECT
FUND, LP; RPM METROPOLITAN FUND (QP), LP;
RPM METROPOLITAN FUND, LP; RPM
OPPORTUNITY FUND, LP; RUDMAN FAMILY
LIMITED. PARTNERSHIP, L.P.; S.K.B.
INVESTORS; SADINOFF FAMILY FOUNDATION;
SADINOFF FAMILY ENTERPRISES, LLC;
SARAH M. CORNISH; SEGEL PARTNERSHIP II,
LP; SETH J. LEHR; ELLYN LEHR; SEYMOUR
SADINOFF; SHELDON M. BONOVITZ;
JILL F. BONOVITZ; SIDEWATER ASSOCIATES I;
SIDEWATER FAMILY PARTNERS;
STANLEY H. ENGLE REVOCABLE TRUST;
STEPHEN R. MICKELBERG; STEPHEN S.
PHILLIPS; MARY ANN PHILLIPS;
STEVEN H. ERLBAUM; STEVEN ROSARD;
LAURIE B. ROSARD; STRATEGIC REAL ESTATE
FUND - 2001, L.P.; STUART A. MARGULIES;
SUSAN Y. KIM TRUST DATED 12/31/87;
SUZANNE PARTNERS, L.P.; SWIRNOW L-A IV
INVESTORS, LLC; TEACHERS INSURANCE &
ANNUITY ASSOCIATION OF AMERICA;
TERRY K. WATANABE; THE WASHINGTON
UNIVERSITY; THE VANDERBILT UNIVERSITY;
THE TRUSTEES OF PRINCETON UNIVERSITY;
THE CATHOLIC BISHOP OF CHICAGO -
ENDOWMENT FUND; THE METROPOLITAN
MUSEUM OF ART; THE LONG-TERM ALAN J.
SEGEL TRUST; THE ROCKEFELLER
UNIVERSITY; THE WFC TRUST; THE JAFFE
FAMILY FOUNDATION; THE MELVIN HERRIN
1992 TRUST FBO H. SCOTT HERRIN;
THE PRESIDENT & TRUSTEES OF WILLIAMS
COLLEGE; THE BARRA FOUNDATION, INC.;
THE MARILYN J. ENGLE LIVING REVOCABLE
TRUST DATED SEPT. 21, 2006; THOMAS K.
CLOETINGH; JOAN E. CLOETINGH;

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

THOMAS JEFFERSON UNIVERSITY ENDOWMENT FUND; THOMAS JEFFERSON UNIVERSITY (1-PENSION); THOMAS J. KNOX; THOMAS PARRINGTON; MARY LEE PARRINGTON; TJJK, LLC; TRIANGLE BRIDGE GROUP, L.P.; TRISTRAM C. COLKET, JR., AS TRUSTEE OF THE TRISTRAM C. COLKET, JR. REVOCABLE TRUST U/T/A DATED 02/05/2004; TRUST U/W JOHN SVENNINGSEN;
UBS, AS CUSTODIAN FOR THE ROLLOVER IRA OF JOHN T. FRIES; UBS, AS CUSTODIAN FOR THE ROLLOVER IRA JOSEPH R. PAPA;
UNC INVESTMENT FUND, UR; UNISYS MASTER TRUST; UNITED NATIONAL INSURANCE COMPANY; UNIVERSITY OF SOUTHERN CALIFORNIA; UNIVERSITY OF VIRGINIA INVESTMENT MANAGEMENT COMPANY; UNIVERSITY OF OREGON FOUNDATION; V.G. BELL & E.V. BELL TRUST UD 12/16/92 SV; VALMORA PARTNERS, L.P.; VALMORA PARTNERS II, L.P.; VESTAL VENTURE CAPITAL; VESTAL VENTURE CAPITAL II; VESTAL VENTURE CAPITAL III; VINCENT G. BELL, JR.; ELAINE V. BELL; VSP GROUP; W. KIRK WYCOFF; WARLEN L.P.; WAYNE D. BLOCH; SHEREE I. BLOCH; WELLESLEY COLLEGE;
WFC HOLDINGS CORPORATION; WILLIAM J. STALLKAMP; WILLIAM HARRAL, III;
WILLIAM MARSH RICE UNIVERSITY;
Y & S NAZARIAN REVOCABLE TRUST, UTD DATED 9/2/2003; YALE UNIVERSITY;
YALE UNIVERSITY RETIREMENT PLAN FOR STAFF EMPLOYEES; YALE UNIVERSITY RETIREE HEALTH BENEFITS COVERAGE TRUST; AND JOHN DOES 1-50,

                Defendants.

_____/

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## SECOND AMENDED COMPLAINT
## (CORRECTED VERSION)

Plaintiff, Drew M. Dillworth ("Trustee Dillworth"), in his capacity as Chapter 7 Trustee for the Tesoro Debtors' Estates and the Quail West Debtors' Estates, based upon information and belief, and as a result of his investigation to date, hereby sues the Defendants enumerated above, and alleges:

## INTRODUCTION

1.      Through this action, Trustee Dillworth seeks to avoid and recover for a series of fraudulent transfers made to or for the benefit of Edward R. "Bobby" Ginn III ("Ginn"), Lubert-Adler Management Company, L.P., d/b/a Lubert-Adler Partners, L.P. ("Lubert-Adler"), and others involved in the financing and development of the luxury residential communities known as Tesoro and Quail West, located in Port St. Lucie, Florida, and near Naples, Florida, respectively.[3/]

2.      During the time periods in question, Ginn and the Lubert-Adler-managed equity funds commonly referred to as "Lubert-Adler Funds III & IV" owned the assets which make up the Tesoro and Quail West Projects through a number of holding companies and other subsidiaries, including the entities identified above as the Tesoro Debtors and the Quail West Debtors (collectively, the "Debtors").[4/]

---

[3/]The individuals and entities from which recovery is sought in this proceeding are identified more fully beginning on page 12, *infra*.

[4/]The Tesoro Debtors, *i.e.*, Ginn-LA St. Lucie Ltd., Ginn-St Lucie GP, Tesoro Golf Club Condominium, and The Tesoro Club, were the "project-level" subsidiaries created to hold, develop, and operate the Tesoro Project. The Quail West Debtors, *i.e.*, Ginn-LA Quail West Ltd., Ginn-Quail West Beach, and Ginn-Quail West GP, were the "project-level" subsidiaries created to hold, develop, and operate the Quail West Project.

-8-

3.      As discussed more fully below, originally, Ginn and Lubert-Adler had intended to use Tesoro and Quail West lot sales to finance the completion of the Tesoro and Quail West Projects.

4.      During the latter part of October 2005, however, Hurricane Wilma struck, impacting both the developments themselves and the real estate markets in the areas in which they are located.

5.      That, in turn, prompted Ginn and Lubert-Adler to seek an alternate means to finance the remainder of the projects.

6.      Ginn and Lubert-Adler found something even better (for them) in Credit Suisse, which was at that point offering a new syndicated loan product to owners of high-end developments designed to enable the owners to "recapitalize" and take "profits" from their projects long before the projects were to be completed.  As explained by U.S. Bankruptcy Judge Ralph B. Kirscher:

> In 2005, Credit Suisse was offering a new financial product for sale.  It was offering the owners of luxury second-home developments the opportunity to take their profits up front by mortgaging their development projects to the hilt.  Credit Suisse would loan the money . . ., earn a substantial fee, and sell off most of the credit to loan participants.  The development owners would take most of the money out as a profit dividend, leaving their developments saddled with enormous debt.  Credit Suisse and the development owners would benefit, while their developments – and especially the creditors of the developments – bore all the risk of loss.  This newly developed syndicated loan product enriched Credit Suisse, its employees[,] and more than one luxury development owner, but it left the developments too thinly capitalized to survive.  Numerous entities that received Credit Suisse's syndicated loan product have failed financially, including . . . Ginn.  If the foregoing developments were anything like this case, they were doomed to failure once they received their loans [and made the transfers contemplated thereby].

*In re Yellowstone Mountain Club, LLC (Official Comm. of Unsecured Creditors v. Credit Suisse)*, Case No. 08-61570-11-RBK, Adv. Pro. No. 09-00014, Partial & Interim Order, 05/13/09, reported at 2009 WL 3094930, at *8 (Bankr. D. Mont. May 13, 2009) [DE289].[5]

_____

[5]At Credit Suisse's behest, the Partial & Interim Order quoted above was subsequently vacated pursuant to a settlement agreement.  *See* Stipulation, 06/29/09 [DE297]; Orders, 06/29/09 [DE298, 299].

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET,  MIAMI,  FLORIDA 33130  ·  TELEPHONE (305) 789-3200

7.      In the case of Ginn and Lubert-Adler, Credit Suisse offered the opportunity to "recapitalize" and take "profits" out of five luxury residential development projects, including: Tesoro; Quail West; The Hammock Beach River Club / Gardens (Palm Coast, Florida); Laurelmor (North Carolina); and Ginn sur Mer (The Bahamas) (collectively, the "Projects").

8.      The ensuing loan transaction was ultimately consummated in June of 2006, and proceeded as follows:

- • Credit Suisse loaned $675 million to a pair of shell companies created to "recapitalize" the Projects, with the Debtors and the affiliated subsidiaries created to hold and develop the other Projects (the "Other Project Entities") serving as "Full Recourse Borrowing Parties" (*i.e.*, co-borrowers);

- • Credit Suisse took a substantial fee, in excess of $15 million, and sold off most if not all of the credit to loan participants;

- • Existing third-party debt of approximately $158 million was replaced with new debt;

- • Ginn and the Lubert-Adler entities took out and paid themselves and their investors over $323 million, as "return of capital contributions," "interest," "preferred return," and/or "profit"; and

- • Each of the Debtors and Other Project Entities was required to issue a guaranty on the full amount of the loans, and to grant liens on substantially all of its assets.

In other words, as in the situation before Judge Kirscher, the transaction was structured such that "Credit Suisse and the development owners [here, Ginn and Lubert-Adler] would benefit, while their developments – and especially the creditors of the developments – bore all the risk of loss."

9.      Indeed, through the loan transaction, Ginn and the Lubert-Adler entities not only enriched themselves and their investors at the expense of the Debtors and Other Project Entities, they effectively looted the Debtors and Other Project Entities and shifted the risks associated with the Projects to creditors, leaving those creditors with a virtual certainty of loss.

-10-

10.     According to Ginn / Lubert-Adler records obtained prior to filing this action, of the loan proceeds that Ginn and the Lubert-Adler entities took out for themselves and their investors, the Tesoro and Quail West Debtors were credited with having borrowed $148,828,198.14.

11.     The Debtors' transfer of that $148 million, and of the guaranties and liens they were required to issue in connection with the loan transaction, was made with actual intent to hinder, delay, and/or defraud present and future creditors.  In addition, the Debtors also did not receive either fair consideration or reasonably equivalent value for the transfer of that $148 million, or for the guaranties and liens they were required to issue in connection with the loan transaction. To the contrary, if the Debtors were not already insolvent at the time of the transfers, they were rendered insolvent thereby, and were left much too thinly capitalized to survive.

12.     On December 23, 2008, after a series of defaults and efforts to restructure the loans, each of the Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

13.     Later that day, the U.S. Trustee's Office appointed Trustee Dillworth as the interim Chapter 7 Trustee of the Tesoro and Quail West Debtors' Estates (the "Debtors' Estates").

14.     No trustee was elected at the subsequent Meeting of Creditors held in accordance with 11 U.S.C. § 341; thus, pursuant to 11 U.S.C. § 702, Trustee Dillworth is the duly appointed, qualified, and acting Chapter 7 Trustee for the Debtors' Estates.

15.     In that capacity, Trustee Dillworth seeks to avoid, pursuant to 11 U.S.C. § 544(b) and applicable state law, the Debtors' transfer of the $148 million in loan proceeds referenced above, as well as the guaranties and liens issued in connection with the loan transaction; and to recover, pursuant to § 550(a), on behalf of and for the benefit of the Debtors' Estates, the value of the property interests transferred, from the entities to whom or for whose benefit said property interests were transferred.

-11-

## JURISDICTION AND VENUE

16.     This adversary proceeding arises under the above-captioned jointly administered Chapter 7 cases.  It is, therefore, a core proceeding within the meaning of 28 U.S.C. § 157.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

18.     The Plaintiff is Drew M. Dillworth, in his capacity as Chapter 7 Trustee for the Tesoro Debtors' Estates and the Quail West Debtors' Estates.

19.     Defendant Edward R. Ginn III ("Ginn") is an individual who specializes in land acquisition, real estate development, and related matters.

20.     Defendant Edward R. Ginn III is sued herein both individually and in his capacity as Trustee of the Edward R. Ginn III Revocable Trust dated September 14, 2002.

21.     Defendant Edward R. Ginn III Revocable Trust dated September 14, 2002, is a Trust which held a 99% interest in Defendant ERG Enterprises, L.P.

22.     Defendant ERG Management, LLC, is a South Carolina limited liability company which held the remaining 1% interest in Defendant ERG Enterprises, L.P.

23.     Defendant ERG Enterprises, L.P., is a Georgia limited partnership which held a 20% equity interest in the Tesoro and Quail West Debtors.

24.     For convenience, Edward R. Ginn III, the Edward R. Ginn III Revocable Trust dated September 14, 2002, ERG Management, LLC, and ERG Enterprises, L.P. are referred to herein as the "Ginn Defendants."

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

25.     Defendant Ira M. Lubert ("Lubert") is an individual who co-founded and serves as the Chairman of Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P.

26.     Defendant Dean S. Adler ("Adler") is an individual who co-founded and serves as the C.E.O. of Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P.

27.     Defendant Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P., is a Delaware limited partnership which provides management and other related services to the Lubert-Adler "Group" and "Fund" Entities.

28.     Defendant Lubert-Adler Group III, L.P., is a Delaware limited partnership which serves as the General Partner of Defendants Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., and Lubert-Adler Capital Real Estate Fund III, L.P. (the "Lubert-Adler Fund III Entities"), Delaware limited partnerships which, collectively, held an 80% equity interest in the Tesoro Debtors, and a 40% equity interest in the Quail West Debtors.

29.     Defendant Lubert-Adler Group IV, L.P., is a Delaware limited partnership which serves as the General Partner of Defendants Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P., and Lubert-Adler Capital Real Estate Fund IV, L.P. (the "Lubert-Adler Fund IV Entities"), Delaware limited partnerships which, collectively, held a 40% equity interest in the Quail West Debtors.

30.     For convenience, Ira M. Lubert, Dean S. Adler, Lubert-Adler Management Co., Inc., Lubert-Adler Group III, L.P., the Lubert-Adler Fund III Entities, Lubert-Adler Group IV, L.P., and the Lubert-Adler Fund IV Entities are referred to herein as the "Lubert-Adler Defendants."

-13-

31.     The Defendants listed below have been identified by Lubert-Adler as investors in

Lubert-Adler Real Estate Fund III, L.P.:

| |
|---|
| Lubert-Adler Group III, L.P. |
| & Capital Partners, L.P. |
| A. Donald McCulloch, Jr. & Carolyn B. McCulloch, as Tenants by the Entireties |
| Adam L. Miller |
| Adolf A. Paier |
| Alan P. Smith & Ruth N. Smith, as Tenants by the Entireties |
| Amachie Kweku Ackah |
| Amy A. Fox & Daniel H. Wheeler, as Tenants by the Entireties |
| Andrew Perry |
| BAHM IV |
| Blackacre Capital Partners, L.P. |
| Bruce A. Levy |
| Bull Ventures Limited Partnership |
| C.H.A.I., LLC |
| Candace L. Sneberger |
| Catenary Partners, L.P. |
| Chafetz Group LLC |
| Charles M. Robins |
| Christopher Moller & Jennifer Moller, as Joint Tenants With Right of Survivorship |
| Citizens Bank as Custodian, F/B/O Hirtle Callaghan Private Equity Fund III, L.P. |
| City of Philadelphia Sinking Fund Commission, as Trustee for The Philadelphia Gas Works Retirement Reserve Fund |
| Commonwealth of Pennsylvania State Employees' Retirement System (SERS) |
| Connell Family Partnership III |
| Dan Nasser |
| David & Angella Nazarian Family Trust |
| David A. Brownstein |
| David F. Lincoln |
| Dean Adler |

-14-

| |
|---|
| Debra Ellen Fox |
| Deutsche Bank Sharps Pixley Inc. |
| Devin Aronstam |
| Drexel University |
| Edward H. Rosen |
| Edward J. Fitzsimmons |
| Edwin J. Berkowitz |
| Employees' Retirement Plan of Duke University |
| Engle Associates |
| Erlbaum Family Limited Partnership |
| Erlbaum Investments, L.P. |
| Estate of Joseph A. Puleo, Jr. |
| FEA II, L.P. |
| Gary E. Erlbaum |
| George M. Ross |
| George W. Karr, Jr. |
| Gerald A. Ronon |
| Gerald M. Wilk |
| Glenville Capital Partners, L.P. |
| Glenwood Road Associates Partnership |
| Gothic Corporation |
| GT Real Property Holdings II, LLC |
| Howard D. Ross & Susan K. Hollenstein |
| Howard Salasin |
| Hyman R. Kahn, M.D. |
| Ira M. Lubert |
| Irvin J. Borowsky |
| James A. Ounsworth |
| James J. Kim Trust dated September 30, 1992 |
| James M. Meyer |
| James M. Riordan |
| James W. Zug |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

| |
|---|
| Jared Prushansky |
| Javick, L.P. |
| Jay H. Tolson |
| Jay Philip Slovin |
| Jewish Federation of Greater Philadelphia |
| JILCY-1, L.P. |
| John Zagara |
| Jonathan B. Detwiler, as Trustee for the Jonathan B. Detwiler Revocable Trust, U/T/A dated 4/29/2003 |
| Joseph F. Waterman & Mary Joel Waterman |
| Joseph Neubauer |
| Joseph P. Fahey |
| Joseph Zagara |
| Kate Partners, LP |
| Keibreaux Associates, LP |
| Kenneth A. Fox |
| Kerri Schneider |
| Kirschner Brothers Profit Sharing Plan |
| Kodak Retirement Income Plan Trust |
| Koen Investments, LLC |
| Lawrence Chimerine |
| Lawrence S. Smith Profit Sharing Trust |
| Lisa Roberts |
| Lyonshare Venture Capital |
| Marilyn Weissman Trust |
| Marvin N. Demchick & Mildred W. Demchick |
| Maryland State Retirement & Pension System |
| MCE Family Limited Partnership |
| MDR II LLC |
| Michael A. Braver |
| Michael J. Caruso |
| Michael J. Hagan |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| Michael P. McNulty |
| Michael W. Miles |
| Miriam D. Glantz |
| Nancy J. Fox |
| Ohio Police & Fire Pension Fund |
| Patrick S. Lee |
| Pennock J. Yeatman IV |
| The Pennsylvania Public School Employees' Retirement System (PSERS) |
| Philadelphia Health & Education Corporation, d/b/a Drexel University College of Medicine |
| Philadelphia Investment Partnership I |
| Prince George's County Fire Service Pension Plan |
| Prince George's County Police Pension Plan |
| R. Eric Emrich & Angela L. Emrich |
| Richard Greenawalt |
| Richard L. Foster |
| Richard Levin |
| Richard T. Kanter |
| Robert A. Fox |
| Robert E. Keith, Jr. & Margot W. Keith, as Tenants by the Entireties |
| Robert J. Higgins |
| Robert P. Hauptfuhrer |
| Ronald J. Zlatoper & Barry O. Zlatoper, as Tenants by the Entireties |
| Roslyn Jaffe |
| Roy S. Neff |
| Rudman Family Limited Partnership, L.P. |
| David Nazarian, as Trustee for the Samy Nazarian Trust |
| Sheldon M. Bonovitz & Jill F. Bonovitz, as Tenants by the Entireties |
| Stanley H. Engle Revocable Trust |
| Steven Rosard & Laurie B. Rosard, as Joint Tenants With Right of Survivorship |
| Steven H. Erlbaum |
| Strategic Real Estate Fund - 2001, L.P. |

-17-

| |
|---|
| Stuart A. Margulies |
| Suzanne Partners, L.P. |
| Terry K. Watanabe |
| The Jaffe Family Foundation |
| The Long-Term Alan J. Segel Trust |
| The Regents of the University of Michigan |
| The Trustees of Princeton University |
| The Vanderbilt University |
| The WFC Trust |
| Thomas J. Knox |
| Thomas Jefferson University (1 - Pension) |
| Thomas Jefferson University Endowment Fund |
| Thomas K. Cloetingh |
| TJJK, LLC |
| Triangle Bridge Group, L.P. |
| UBS, Custodian for the Rollover IRA John T. Fries |
| UBS, Custodian for the Rollover IRA Joseph R. Papa |
| Unisys Master Trust |
| United National Insurance Company |
| Valmora Partners, L.P. |
| Vestal Venture Capital |
| Vincent G. Bell, Jr. |
| Warlen L.P. |
| WFC Holdings Corporation |
| William J. Stallkamp |
| Y & S Nazarian Revocable Trust, UTD dated 9/2/2003 |
| Yale University |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

32.     The Defendants listed below have been identified by Lubert-Adler as investors in

Lubert-Adler Real Estate Parallel Fund III, L.P.:

| |
|---|
| Lubert-Adler Group III, L.P. |
| A.C. Israel Enterprises, Inc. |
| Michael C. Erlbaum & Gary E. Erlbaum, as Trustees of the Adam J. Erlbaum Trust U/A dated 4/4/97 |
| Avril Klaff & Allan Reich, as Trustees of the Daniel Trust U/T/A dated 1/1/2006 |
| Avril Klaff & Allan Reich, as Trustees of the Marissa Trust U/T/A dated 1/1/2006 |
| Avril Klaff & Allan Reich, as Trustees of the Zara Trust U/T/A dated 1/1/2006 |
| Brett Rubinson |
| David Ray |
| David V. Wachs |
| Diane C. Ray |
| Donald M. Gleklen |
| Donald R. Auten |
| Edmund F. Garno, III |
| Edmund F. Garno, Jr. IRA |
| Edward Bowman & Kathleen Bowman |
| Edward Ray & Lonnetta G. Ray |
| Edward Ray & Lonnetta G. Ray #2 (PD). |
| Edward Ray & Lonnetta G: Ray #3 (WD) |
| Garfield Refining Company Profit Sharing Plan |
| HMK Trust |
| Hoffman Investment Company |
| James Merritt Springstead, Jr. |
| Jean Ellen Ray |
| Jeannine Pulito |
| Jeffrey Honickman |
| Jennie R. Berliant Revocable Trust |
| JILCY-6, L.P. |
| Jeannine Pulito & Nicole Linehan, as Trustees of The John T. Fries Dynasty Trust PNC Bank Delaware |

-19-

| |
|---|
| Joseph R. Papa |
| Kenneth Waetzman & Shelley E. Waetzman |
| Kenneth J. Gold |
| Lennart Hagegard |
| M. Walter D'Alessio |
| Managed Care Connection, Inc. |
| Martin D. Cohen |
| Matthew I. Garfield |
| Max H. Kraus & Lois B. Kraus |
| Maya B. Goldberg |
| Nicole Linehan |
| Paul Trapido & Jude Ray |
| Peacock Productions |
| Ray Family Partnership |
| Richard H. Rosenthal Revocable Trust |
| Roger J. Murphy & Barbara K. Murphy |
| S.K.B. Investors |
| Sadinoff Family Enterprises, LLC |
| Seth J. Lehr |

33.    The Defendants listed below have been identified by Lubert-Adler as investors in Lubert-Adler Capital Real Estate Fund III, L.P.:

| |
|---|
| Lubert-Adler Group III, L.P. |
| The President and Fellows of Harvard College, through Harvard Private Capital Realty, Inc. |

34.    For convenience, the investors in the Lubert-Adler Fund III Entities are referred to herein as the "Lubert-Adler Fund III Investors."

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

35.     The Defendants listed below have been identified by Lubert-Adler as investors in

Lubert-Adler Real Estate Fund IV, L.P.:

| |
|---|
| Lubert-Adler Group IV, L.P. |
| Michael C. Erlbaum & Gary E. Erlbaum, as Trustees of The Adam J. Erlbaum Trust U/A dated 4/4/97 |
| Amy A. Fox & Daniel H. Wheeler |
| BCIP Associates II |
| Bob C. Ladd |
| Bowdoin College |
| Commonwealth of Pennsylvania State Employees' Retirement System (SERS) |
| David & Angella Nazarian Family Trust |
| David D. Kim Trust dated 12/31/87 |
| Debra Ellen Fox |
| Emory University |
| Employees' Retirement Plan of Duke University |
| Erlbaum Family Limited Partnership |
| Erlbaum Investments, L.P. |
| FEA II, L.P. |
| France-Merrick Foundation, Inc. |
| Frog Hollow Partners XI, L.P. |
| Gary E. Erlbaum |
| Gothic Corporation |
| Graham Alternative Investment Partners I |
| GT Real Property Holdings II, LLC |
| The President and Fellows of Harvard College, through Harvard Private Capital Realty, Inc. |
| James J. Kim |
| John D. & Catherine T. MacArthur Foundation |
| John T. Kim Trust dated 12/31/87 |
| John T. Lupton Trust |
| Johns Hopkins University |
| Joseph Neubauer |

-21-

| |
|---|
| Mellon Trust of New England, N.A., as Trustee of The Kodak Retirement Income Plan Trust |
| Michael C. Erlbaum |
| Northwestern University |
| The Pennsylvania Public School Employees' Retirement System (PSERS) |
| Robert A. Fox |
| RPM Metropolitan Fund (QP), LP |
| RPM Metropolitan Fund, LP |
| RPM Opportunity Fund, LP |
| RPM Select Fund, LP |
| Steven H. Erlbaum |
| Susan Y. Kim Trust dated 12/31/87 |
| Teachers Insurance & Annuity Association of America |
| The Catholic Bishop of Chicago - Endowment Fund |
| The Metropolitan Museum of Art |
| The President & Trustees of Williams College |
| The Regents of the University of Michigan |
| The Rockefeller University |
| The Trustees of Princeton University |
| The Vanderbilt University |
| The Washington University |
| UNC Investment Fund, UR |
| University of Oregon Foundation |
| University of Southern California |
| University of Virginia Investment Management Company |
| Warlen L.P. |
| Wellesley College |
| WFC Holdings Corporation |
| William Marsh Rice University |
| Y & S Nazarian Revocable Trust, UTD dated 9/2/2003 |
| Yale University |
| Yale University Retiree Health Benefits Coverage Trust |
| Yale University Retirement Plan for Staff Employees |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

36.    The Defendants listed below have been identified by Lubert-Adler as investors in Lubert-Adler Real Estate Parallel Fund IV, L.P.:

| |
|---|
| Lubert-Adler Group IV, L.P. |
| Alan D. Levow |
| Alan P. Smith, as Trustee U/D of Harold L. Neuman Trust #1 dated 11/21/69 |
| Alan P. Smith, as Trustee U/D Harold L. Neuman Trust #2 dated 11/21/69 |
| Andrew D. Rubin & Louise Rubin |
| Andrew Goldman |
| Andrew Perry |
| ANKA Limited Partnership |
| Anthony J. Calise, IRA |
| Barbara Toll |
| Bruce S. Marks & Bonnie Kay Marks |
| Carl Marbach & Helen Marbach |
| Charles M. Robins |
| Christopher Asplundh |
| David A. Braver |
| David Ray & Margaret Carver |
| David Schlessinger |
| Diane C. Ray |
| Diane L. Myer Rev. Trust dated 8/3/01 |
| Donald R. Auten & Judith W. Auten |
| Edward Bowman & Kathleen Bowman |
| Edward M. Snider |
| Edward Ray & Lonnetta G. Ray |
| Group Fore, LLC |
| HEM Private Equity Fund 2000, LLC |
| IRM Associates, LP |
| Irvin J. Borowsky |
| James Wolf & Nancy Wolf |
| James M. Springstead & Diane B. Springstead |
| Jean Ellen Ray & Tobias Speckbacher |
| Jennie R. Berllant Revocable Trust |
| Jeremy Allen & Debra Allen |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| JLT Investments, LP |
| John R. Jaeb Revocable Trust dated 7/5/2000 |
| Keith Loiselle & Carol Loiselle |
| KLT Investments, LP |
| Lennart Hagegard |
| Lenore Steiner |
| Leslie B. Frankel |
| Linda C. Meldrum |
| Lisa Roberts |
| Lynn W. Bernstein |
| Lyonshare Investments, Inc. |
| Marilyn Weissman Trust |
| Marjorie Rawls Roberts |
| Mark Wildstein |
| Martin L. Trichon & Judith K. Trichon, as Husband & Wife |
| Maya B. Goldberg |
| Melvin Herrin |
| Pamela Estadt |
| Patricia Guggenheim |
| Paul Trapido & Jude Ray |
| Ray Family Partnership |
| Richard Guggenheim Testamentary Marital Trust |
| Richard H. Rosenthal Revocable Trust |
| Richard J. Anthony, Sr. & Marlene A. Anthony |
| Richard T. Kanter |
| Robert Crown & Barbara Crown |
| S.K.B. Investors |
| Sadinoff Family Enterprises, LLC |
| Sadinoff Family Foundation |
| Seymour Sadinoff |
| Stephen R. Mickelberg |
| Terry K. Watanabe |
| The Melvin Herrin 1992 Trust FBO H. Scott Herrin |
| Thomas Parrington & Mary Lee Parrington |
| Tristram C. Colket, Jr., as Trustee of the Tristram C. Colket, Jr. Revocable Trust U/T/A dated 02/05/2004 |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| Trust U/W John Svenningsen |
| Vestal Venture Capital III |
| VSP Group |
| W. Kirk Wycoff |

37.    The Defendants listed below have been identified by Lubert-Adler as investors in

Lubert-Adler Capital Real Estate Fund IV, L.P.:

| |
|---|
| Lubert-Adler Group IV, L.P. |
| Adolf A. Paier |
| Alan P. Smith & Ruth N. Smith, as Tenants by the Entireties |
| Amy B. Erlbaum |
| Arthur Marion Revocable Trust |
| BLK Investments, L.P. |
| Bruce A. Levy |
| Chafetz Group LLC |
| Christine V. Kanter |
| Criterion Holdings, LLC |
| Davco Management, LLC |
| David O. Oberkircher |
| Donald M. Rosen |
| E WACHS II, L.P. |
| Edmund F. Garno, III |
| Edmund F. Garno, Jr. |
| Edward J. Fitzsimmons |
| Edwin J. Berkowitz |
| Engle Associates |
| Foster & Foster, LLC |
| Garfield Refining Company Profit Sharing Plan |
| George M. Ross & Lyn M. Ross |
| George W. Karr, Jr. |
| Glenwood Road Associates Partnership |
| Harris Wildstein |
| Henry Dolfinger #2 T/W |
| Hersch M. Klaff |
| Hoffman Investment Company |

-25-

| |
|---|
| Howard B. Asher |
| Howard D. Ross & Susan K. Hollenstein |
| Humills, LLC |
| Hyman R. Kahn, M.D. |
| James A. Ounsworth |
| James M. Meyer |
| Javick, L.P. |
| JILCY-1, L.P. |
| JILCY-6, L.P. |
| Jon M. Lubert |
| Jonathan B. Detweiler, as Trustee of the Jonathan B. Detwiler Revocable Trust, U/T/A dated 4/29/2003 |
| Joseph F. Waterman & Mary Joel Waterman |
| Keibreaux Associates, LP |
| Kirschner Brothers Profit Sharing Plan |
| Koen Investments, LLC |
| L. Frederick Sutherland & Barbara H. Sutherland |
| Larry A. Cutler & Susan E. Cutler |
| Lawrence Chimerine |
| Lawrence S. Smith Profit Sharing Plan |
| Mark G. Cornish |
| Matthew I. Garfield & Marie H. Garfield |
| MDR II LLC |
| Michael J. Hagan & Joyce Hagan |
| Michael J. Caruso |
| Michael P. McNulty |
| Michael S. Kirschner |
| Mons Investments, LLC |
| Nancy S. Engle |
| Nextone LLC |
| Oliver Ernest Associates, L.P. |
| Peacock Productions |
| Peter Unneman & Kathleen Unneman |
| Peter S. Linder |
| R. Eric Emrich & Angela L. Emrich |
| Randy L Pulito & Diane K. Pulito |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

| |
|---|
| Richard L. Foster |
| Richard L. Freundlich |
| Richard Levin |
| Robert E. Keith, Jr. & Margot W. Keith, as Tenants by the Entireties |
| Robert L. McNeil, III |
| Robert P. Hauptfuhrer |
| Rochelle Broad |
| Ronald J. Zlatoper & Barry O. Zlatoper |
| Roy S. Neff |
| Sarah M. Cornish |
| Segel Partnership II, LP |
| Seth J. Lehr & Ellyn Lehr |
| Sheldon M. Bonovitz & Jill F. Bonovitz, as Tenants by the Entireties |
| Sidewater Associates I |
| Sidewater Family Partners |
| Stanley H. Engle Revocable Trust |
| Stephen R. Mickelberg |
| Stephen S. Phillips & Mary Ann Phillips |
| Steven Rosard & Laurie B. Rosard, as Joint Tenants With Right of Survivorship |
| Swirnow L-A IV Investors, LLC |
| The Barra Foundation, Inc. |
| The Marilyn J. Engle Living Revocable Trust dated September 21, 2006 |
| Thomas J. Knox |
| Thomas K. Cloetingh & Joan E. Cloetingh |
| TJJK, LLC |
| Triangle Bridge Group, L.P. |
| V.G. Bell & E.V. Bell Trust UD 12/16/92 SV |
| Valmora Partners II, L.P. |
| Vestal Venture Capital II |
| Vincent G. Bell, Jr. & Elaine V. Bell |
| Wayne D. Bloch & Sheree I. Bloch, as Joint Tenants With Right of Survivorship |
| William Harral, III |

38.    For convenience, the investors in the Lubert-Adler Fund IV Entities are referred to herein as the "Lubert-Adler Fund IV Investors."

-27-

39.    With respect to the transfers for which avoidance and recovery is sought in this case, each of the individuals and entities named as Defendants herein was either an initial transferee or entity for whose benefit a transfer was made within the meaning of 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

40.    Defendants John Does 1-50 are as-yet-unidentified persons and/or entities which, with respect to the transfers for which avoidance and recovery is sought herein, also satisfy the requirements of 11 U.S.C. §§ 550(a)(1) or 550(a)(2).

41.    Once discovery is obtained with respect to the loan proceed distributions at issue, leave will be sought to substitute as a defendant any person or entity which is an initial transferee or entity for whose benefit such transfers were made within the meaning of 11 U.S.C. § 550(a)(1), or an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

42.    The Defendants are properly joined in this action pursuant to Fed. R. Civ. P. 20, made applicable by Fed. R. Bankr. P. 7020, because the right to relief asserted against all Defendants arises out of the same transaction or occurrence, and questions of law and fact common to all Defendants will arise in this action.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## GENERAL ALLEGATIONS

**A.      The Ginn / Lubert-Adler Development Known as Tesoro**

43.      Tesoro is a 1,400 acre private community and club located near the St. Lucie River, in Port St. Lucie, Florida.

44.      Ginn and the Lubert-Adler Fund III Entities purchased the land for Tesoro through a number of subsidiaries, between 2001 and 2003.

45.      Construction of the first phase of Tesoro – "Tesoro West" – was completed in 2004. It consisted of 470 single family residential lots and a number of amenities, including a small clubhouse, golf shop, and an 18 hole golf course.

46.      Construction of the second phase – "Tesoro East" – began shortly thereafter. It was to include an additional 453 single family residential lots, 100 villa-style condominium units, and a number of amenities, including a larger clubhouse with a restaurant, ballroom, spa, fitness center, and pool, a tennis complex, two additional 18 hole golf courses, and an off-site beach club on Hutchinson Island, with a restaurant, grille, exercise room, surf shop, elevated pool, cabanas, and private beach access.

**B.      Quail West**

47.      Quail West is a 1,180 acre private community and club located east of Interstate 75, along the border between Collier and Lee Counties, near Naples, Florida.

48.      Ginn and the Lubert-Adler Fund III & IV Entities took over Quail West in 2005, after approximately half of the roughly 900 available residential lots had been developed and sold, and much of the infrastructure had been completed, including a grand clubhouse with a restaurant and spa, a tennis complex, and two 18 hole golf courses.

**STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON, P.A.**
**MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200**

49.     According to Ginn marketing materials, the plan was to re-brand the project and enhance the marketability of the remaining residential lots, by upgrading existing facilities and adding an off-site beach club, with a restaurant, pool, and a marina with boat slips.

**C.     The Original Financing Plan and the Impact of Hurricane Wilma**

50.     Originally, Ginn and Lubert-Adler intended to use Tesoro and Quail West lot sales to finance the completion/upgrading of the developments' respective infrastructure and facilities, with profits – if any – to be taken upon completion of each project.

51.     In October 2005, Ginn and Lubert-Adler held an extravagant "launch" event at Tesoro and succeeded in obtaining sales reservations or contracts for most of the remaining residential lots.

52.     Later that month, however, Hurricane Wilma struck the areas in which Tesoro and Quail West are located, impacting both the developments themselves and the real estate markets in Port St. Lucie and Naples, Florida.

53.     The vast majority of the Tesoro sales reservations and contracts pending at that time, and the vast majority of the Quail West sales reservations and contracts obtained at a "launch" event held later that year, either were subsequently cancelled or otherwise failed to close.

54.     That, in turn, prompted Ginn and Lubert-Adler to begin searching for alternate ways to finance the completion/upgrading of the developments' respective infrastructure and facilities.

55.     That search ultimately led to Credit Suisse, which offered them the opportunity to "recapitalize" and take "profits" out of Tesoro, Quail West, and the three other Projects, long before any of the Projects were to be completed, at a time when real estate markets were collapsing and it was uncertain whether any "profits" would in fact be realized.[6]

---

[6] This opportunity was particularly appealing to Lubert-Adler, as it enabled Lubert-Adler to artificially enhance the financial performance of Funds III and IV, at a time when it was actively seeking to raise capital for Fund V.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

D.      **The Credit Suisse Loan Transaction**

56.     On or about June 8, 2006, Credit Suisse, Ginn, and Lubert-Adler representatives reached agreement as to the terms of a complex, multi-tiered, syndicated loan transaction in which Credit Suisse lent $675 million to Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc., with the Debtors and Other Project Entities serving as "Full Recourse Borrowing Parties" (*i.e.*, co-borrowers).

57.     Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. were shell companies formed shortly prior to the closing of the loan transaction, to facilitate the transaction and the transfers contemplated thereby.

58.     Ginn-LA CS Borrower, LLC, a Delaware limited liability company, became the immediate "parent" of the Tesoro and Quail West Debtors, as well as the River Club / Gardens and Laurelmor Project entities, and served as a conduit for a portion of the loan proceeds.

59.     Ginn-LA Conduit Lender, Inc., a Delaware corporation, became part of the corporate structure which held the assets of the Ginn Sur Mer Project entities, and also served as a conduit for a portion of the loan proceeds.

60.     The principal loan transaction documents were a First Lien Credit Agreement and a Second Lien Credit Agreement, both of which contained a choice of law provision purporting to invoke New York law.

61.     The First Lien Credit Agreement extended a total of $525 million in financing, in the form of a $165 million synthetic revolving loan and a $360 million first lien term loan.

62.     The Second Lien Credit Agreement extended an additional $150 million in financing, in the form of a second lien term loan.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

63.     Significantly, the Credit Suisse loan transaction documents overtly contemplated that less than a quarter of the loan proceeds would be used for working capital or development purposes. Under the First and Second Lien Credit Agreements, only the $165 million synthetic revolving loan was to be maintained in a deposit account "to fund general company and working capital needs" and "to finance a portion of the development, construction and other costs associated with each Project." The remaining $510 million in loan proceeds was *required* to be utilized to pay transaction costs, to replace existing third-party debt, and to make distributions to the equity owners of the Projects, *i.e.*, insiders and affiliates of the Debtors and Other Project Entities.

64.     According to Ginn / Lubert-Adler records obtained prior to the filing of this action, no portion of the $165 million revolving loan was distributed at the closing of the loan transaction. By contrast, the $510 million in first lien and second lien term loan proceeds was distributed in its entirety at closing, as follows:

| Description | Amount |
|---|---|
| Credit Suisse Loan Fee and Other Closing Costs | $23,446,764.94 |
| Replacement of Existing Third-Party Debt | $158,291,252.86 |
| Distributions to Ginn / Lubert-Adler Entities | $328,261,982.20 |
| Total | $510,000,000.00 |

65.     Nonetheless, to induce Credit Suisse to extend the loans, each of the Debtors and Other Project Entities was required to execute a guaranty rendering it jointly and severally liable for the full $675 million loan amount, and to grant liens on substantially all of its assets.

66.     Although Credit Suisse was the entity to whom the guaranties and liens were issued, the Defendants – who stood to receive the lion's share of the loan proceeds – were the entities for whose benefit the guaranties and liens were issued.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

E.    **How the Loan Proceed Distributions Were Debited and Credited Among the Projects**

67.    According to Ginn and Lubert-Adler, the portion of the Credit Suisse loan proceeds which they took out at closing was debited and credited among the Projects as follows:

| Transferee / Allocation | Tesoro | Quail West | River Club / Gardens | Laurelmor | Gin sur Mer | Total |
|---|---|---|---|---|---|---|
| Ginn "Promote" | $5,357,044.85 | $1,785,681.62 | $0.00 | $0.00 | $0.00 | $7,142,726.47 |
| Lubert-Adler Debt Pay-Off | $0.00 | $19,675,813.02 | $25,576,449.47 | $51,105,603.89 | $0.00 | $96,357,866.38 |
| Lubert-Adler Accrued Interest | $0.00 | $1,394,436.65 | $2,918,102.88 | $3,340,144.56 | $0.00 | $7,652,684.09 |
| Lubert-Adler Equity | $76,298,706.81 | $8,611,730.28 | $3,397,383.42 | $11,175,677.33 | $71,240,826.58 | $170,724,324.42 |
| Lubert-Adler Preferred Return | $6,384,354.18 | $909,513.44 | $973,204.19 | $973,204.19 | $4,298,201.28 | $13,538,477.28 |
| Lubert-Adler Profit | $21,413,194.24 | $6,997,723.04 | $0.00 | $0.00 | $0.00 | $28,410,917.28 |
| Subtotal | $109,453,300.09 | $39,374,898.05 | $32,302,126.24 | $66,594,629.97 | $75,539,027.86 | $323,263,982.20 |
| Overhead / Post-Closing Costs | | | | | | $4,998,000.00 |
| Grand Total | | | | | | $328,261,982.20 |

68.    In other words, of the loan proceeds that Ginn and the Lubert-Adler entities took out for themselves and their investors, the Tesoro Debtors were credited with having borrowed $109,453,300.09, and the Quail West Debtors were credited with having borrowed $39,374,898.05, making for a combined total of $148,828,198.14, or approximately 45.33% of the total distributed amount, $328,261,982.20.[7]

---

[7]The Lubert-Adler distributions for Tesoro were divided among the Lubert-Adler Fund III Entities as follows: Lubert-Adler Real Estate Fund III, L.P., 86.0689%; Lubert-Adler Real Estate Parallel Fund III, L.P., 1.8429%; and Lubert-Adler Capital Real Estate Fund, III, L.P., 12.0882%. The Lubert-Adler distributions for Quail West were divided among the Fund III & IV Entities as follows: Lubert-Adler Real Estate Fund III, L.P., 43.0344%; Lubert-Adler Real Estate Parallel Fund III, L.P., 0.9215%; Lubert-Adler Capital Real Estate Fund, III, L.P., 6.0441%; Lubert-Adler Real Estate Fund IV, L.P., 45.6057%; Lubert-Adler Real Estate Parallel Fund IV, L.P., 1.4002%; and Lubert-Adler Capital Real Estate Fund, IV, L.P., 2.9941%. Lubert-Adler has, to this point, refused to disclose precisely how those distributions were allocated among the numerous Lubert-Adler Fund III & IV Investors. Once that information is obtained, leave will be sought to serve an amended pleading incorporating it, if necessary.

**STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.**
**MUSEUM  TOWER, 150  WEST  FLAGLER  STREET,  MIAMI,  FLORIDA  33130  ·  TELEPHONE  (305) 789-3200**

F.      **The Fraudulent Nature of the Loans and Transfers at Issue**

      (1)      **The Purpose and Effect of the Loan Transaction**

69.      Typically, for a developer to make money on a development project, he must overcome a series of hurdles, some of which may be unforseen at the time the project is commenced. The developer must, among other things, construct the project at a cost which is reasonable relative to the anticipated market for sales, successfully market his product to potential purchasers, and avoid the vagaries of development work, such as changes in economic conditions, catastrophic weather events, and other events which can increase costs, suppress demand, and/or lead real estate markets into a downturn.

70.      When a developer stands to take profits only "at the end" of a development project, it incentivizes the work necessary to achieve successful completion of the project.

71.      Moreover, when a developer is well-capitalized and his profits are "in the project," both the developer and his creditors enjoy a measure of protection in the event the unforseen occurs.

72.      In the present case, what Ginn and the Lubert-Adler entities found in Credit Suisse – the opportunity to "recapitalize" and take "capital contributions," "interest," "preferred return," and "profits" out of the Projects, long before they were to be completed – effectively eliminated any meaningful incentive to do the things necessary to successfully complete the Projects.

73.      Similarly, in the wake of the Credit Suisse loans and the transfers made incident thereto, the Debtors and Other Project Entities – and their creditors – were left without a measure of protection in the event the unforseen (or, in this case, the foreseen) were to occur.

74.      Quite the contrary, the transaction was specifically designed to enable the Defendants to loot the Debtors and Other Project Entities, and to shift the risks associated with their Projects to creditors.

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
**MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200**

75.    Indeed, the Lubert-Adler Defendants candidly acknowledged as much in a "Memo" from Lubert-Adler Partners, L.P. to the Lubert-Adler Fund III and IV Advisory Boards, quasi-legislative bodies comprised of large-dollar Fund III and IV investors, which serve to represent the interests of all Fund III and IV investors, respectively.

76.    The stated purpose of the "Memo" was to gain the approval of the Advisory Boards to consummate the loan transaction, which it characterized as having three principal "goals" and "objectives":

    (A)    "The removal of all guarantee exposure to Bobby Ginn, Lubert-Adler Fund III and Lubert-Adler Fund IV," by "paying off all existing recourse debt" and replacing it with debt that was recourse only at the Project level;

    (B)    "[To establish] a revolving credit facility . . . [t]o pay a portion of the development and construction costs associated with the [Projects]"; and

    (C)    "[To fund] an immediate dividend" of more than $325,000,000, which would enable (i) "[t]he immediate mitigation of *100% of the capital risk*, through the repayment of all invested equity and bridge fundings," and (ii) "the *harvesting of profits*" on an "accelerated" basis.

In addition, the "Memo" also expressed an "inten[t] to reserve [$75,000,000] of otherwise distributable loan proceeds as a sort of contingency fund that could be used to 'balance' the loans in the event that the Projects collectively fail to perform as anticipated."

77.    Needless to say, Lubert-Adler obtained the approval of the Advisory Boards to consummate the loan transaction, and the transaction proceeded, with one significant caveat. Lubert-Adler did *not* reserve $75,000,000 "as a sort of contingency fund that could be used to 'balance" the loans in the event that the Projects collectively fail to perform as anticipated." Instead, it "harvested" that $75,000,000 for itself and its investors, leaving Project creditors with a virtual certainty of loss.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

(2)      The Loan Appraisals and Underlying Sales Projections

78.      Ginn and Lubert-Adler records indicate that the Credit Suisse loan amounts were predicated upon Cushman & Wakefield appraisals of the "Total Net Value" of the five Projects; a novel valuation methodology Credit Suisse developed in conjunction with Cushman & Wakefield in order to enhance the marketability of its syndicated loan product.

79.      The Cushman & Wakefield appraisals defined the "Total Net Value" of each Project as "the sum of the market value of the bulk lots of the entire planned community, *as if* all of the bulk lots were *complete . . .* and *available for sale* to merchant builders, as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

80.      In other words, the "Total Net Value" methodology was designed to generate a value which significantly exceeded the actual as-is fair market value of the property interests being valued, thus enabling the proposed loan to be marketed as having a much lower "loan-to-value" ratio than would otherwise have been possible using a traditional market valuation of the proposed collateral.

81.      For example, whereas the St. Lucie County Property Appraiser assessed the value of all Tesoro real and tangible property in 2006 to be $74,910,626, Cushman & Wakefield's appraisal of the "Total Net Value" of just the unsold Tesoro lots as of April 14, 2006 was $210,000,000.

82.      As a consequence, the Credit Suisse loans did not comply with U.S. banking laws, such as the Financial Institutions Recovery Reform Act of 1989, which provides that, before a regulated financial institution may make or invest in a loan secured by real estate, the loan must be supported by an appraisal reflecting a traditional market valuation of the proposed collateral.

83.      To circumvent that requirement, Credit Suisse coordinated the loans through its "Cayman Islands Branch," an off-shore "affiliate" with no physical presence in the Cayman Islands, and syndicated the loan product to non-regulated entities, such as hedge funds.

-36-

84.     To make matters worse, the Ginn and Lubert-Adler sales projections supplied to Credit Suisse and Cushman & Wakefield for use in appraising the "Total Net Value" of the Projects had no basis in historical reality, and were vastly overstated.

85.     For instance, although Ginn and Lubert-Adler missed their original projections for the Tesoro East "launch" by a huge margin – they had projected 421 lot closings by January 31, 2006 but achieved fewer than 40, with the real estate market in Port St. Lucie worsening with every day– the projections supplied to "support" the loans forecasted 74 lot and condominium unit closings during the second half of 2006 alone, and 290 more by the end of 2008.  In actuality, they achieved fewer than 40 additional lot closings, and 0 condominium unit closings, through the end of 2008.

86.     Respectfully, under the circumstances, these overstatements cannot be excused as merely innocent or accidental.  They were deliberate.

87.     In April 2006, approximately six weeks prior to the closing of the loan transaction, Ginn, Adler, and others received a memorandum from outside attorney John G. "Sonny" Morris entitled "CSFB Financing / *Concerns About Repayment and Presales*," which foreshadowed a series of problems the proposed borrowers could expect to encounter given the size of the loans they were attempting to procure, and the terms of the loans then under discussion.

88.     The following month, after having spoken to Dean Adler, Morris further reported that "[Adler] is *greatly concerned that a failure to meet projections will result in a default*."

89.     Likewise, the Ginn-LA C.F.O. – John P. Klumph –  also expressed "concerns" that "the Lenders could second guess the completeness of the [pre-loan] disclosure" in light of a failure to account for dozens of Tesoro and Quail West contract cancellations.  He then advised that "[i]n the detailed reports to be provided going forward [he was] planning to show total contracts and cancellations for 2006 *only as of year end so as not to draw unwarranted attention to the issue*."

-37-

90.    Lubert-Adler principal Robert Rosenberg even went so far as to suggest that Lubert-Adler use the recent real estate market downturn as *a selling point* in its efforts to obtain approval from the Fund III and IV Advisory Boards to consummate the loan transaction. In his words: "[W]e could point out that the pace of sales at Tesoro has recently begun to slow, thereby making it increasingly likely that the Fund III investors will *not* get to a $36M profit point in the near-term future [absent the loans and 'the harvesting of profits' on an 'accelerated' basis]."

91.    In fact, Credit Suisse was so anxious about "market conditions" in June 2006 that it strenuously advised against "any kind of delay" or "any material change in structure [that] may cause us to have to go back out to investors and reconfirm their orders."

92.    Suffice it to say, Ginn, Lubert-Adler, and Credit Suisse all knew the projections submitted to "support" the loans did not remotely account for "market conditions" at the time.

93.    Further, based on information obtained regarding Ginn and Lubert-Adler sales efforts, it is believed that Ginn and Lubert-Adler used a variety of deceptive practices to obtain sales of Tesoro and Quail West lots/units at artificially-inflated prices, and then used those sales as "comparables" in establishing the projections supplied to Credit Suisse and Cushman & Wakefield of anticipated average closing prices for the remaining available lots/units in the Projects.

94.    Indeed, after the closing of the loan transaction, Ginn reportedly boasted that it was "the best sales job of [his] life."

95.    And when the Tesoro Club's General Manager at the time learned of the loans and the sales projections upon which the loan amounts and repayment schedule had been established, he knew the Tesoro Project was "doomed to failure."

96.    The Tesoro Club's General Manager was, of course, correct.   And the same is true of Quail West, as well.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### (3)    The Impact of the Transfers at Issue

97.    As noted above, of the loan proceeds which the Ginn and Lubert-Adler Defendants took out for themselves and their investors, the Tesoro Debtors were credited with having borrowed $109,453,300, and the Quail West Debtors were credited with having borrowed $39,374,898.

98.    The Tesoro Debtors did not receive fair consideration or reasonably equivalent value for the transfer of the $109,453,300, the guaranties they were required to execute which rendered them jointly and severally liable for the full $675,000,000 loan amount, or the liens they were required to issue on substantially all of their assets (the "Tesoro Asset Transfers").

99.    The Quail West Debtors also did not receive fair consideration or reasonably equivalent value for the transfer of the $39,374,898, the guaranties they were required to execute which rendered them jointly and severally liable for the full $675,000,000 loan amount, or the liens they were required to issue on substantially all of their assets (the "Quail West Asset Transfers").

100.    The Ginn and Lubert-Adler Defendants knew or turned a blind eye to the fact that, if the Tesoro Debtors and Quail West Debtors were not already insolvent at the time of the Tesoro and Quail West Asset Transfers, they would each be rendered insolvent thereby, and would be left much too thinly capitalized to survive.  Which is precisely what occurred.

101.    As of September 30, 2006, the entities formed to recapitalize and hold the Projects had a combined net balance sheet deficit – *i.e.*, they were in the "red" – to the tune of $154,228,629. By December 31, 2006, that combined net balance deficit had grown to $227,643,417.

102.    As a result, the Debtors and Other Project Entities lacked sufficient capital to fund normal development operations and  were unable to make required loan payments as they came due, leading to a series of defaults and efforts to restructure the loans, which ultimately proved unsuccessful in keeping the entities afloat.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

**(4)    The Initial Efforts to Restructure the Loans**

103.    Ginn and Lubert-Adler records reveal that, during the third quarter of 2006, total net revenues at Tesoro and Quail West – the most "mature" of the five Projects – were approximately 3% of forecasted amounts.

104.    By the end of the 2006, the "Borrowing Parties" had already initiated discussions aimed at a restructuring of the loans, so as to enable them to comply with certain financial covenants and avoid going into default.

105.    In addition, during the same time period, the "Borrowing Parties" also engaged in the first of a series of related party transactions in which the Debtors and Other Project Entities would sell off condominium parcels in bulk to affiliates to generate needed cash to "feed" the loans and fund development expenses.

106.    By mid-2007, Ginn and Lubert-Adler were formally reporting to the Lenders that "[t]he slowdown in the residential real estate markets ha[d] adversely impacted the Borrower's project sales and, as a result, its ability to comply with the terms of the existing credit agreements." In addition, they also acknowledged that, "[d]ue to the significant shortfall in expected sales to date, the Borrower must source outside capital in order to fund the key infrastructure and amenities costs."

107.    Notably, however, at no time did Ginn or Lubert-Adler seek to "claw back" and inject into the Projects any portion of the $323,263,982 of loan proceeds which they took out as return of capital, interest, preferred return, or profit.

108.    Rather, "the Borrower [sought] *to shift* financial responsibility for certain infrastructure and amenity costs *to others*" through the related party sale/purchase transactions described above.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

109.    Early the following year, as it became harder for Ginn and Lubert-Adler to deny that they had, in fact, "doomed" the Projects "to failure," the Ginn-LA C.F.O., John P. Klumph, sent an email to three of "Sonny" Morris' law partners, asking:

> Would you gentlemen please check and see what *solvency certificates* I have signed for cs [*i.e.*, Credit Suisse] and if there may be *any individual liability* that could possibly accrue?

> Cass, *indemnity agreements*.

"Cass" – a.k.a. Cassady V. Brewer – promptly replied, "Roger. I am escalating the subject (again)," and forwarded the email to Morris, with the preface:

> John wants the Rob Gidel strength indemnity agreement.  He has a normal indemnity agreement from [Ginn Development Company], but it is not guaranteed by Lubert-Adler like Rob's.  *I do not think we can duck this issue any longer.*

110.    Similarly, a few months later, Ginn-LA "restructuring" counsel strongly advised *against* any pre-packaged reorganization plan which did *not* include a "release" broad enough to cover a "fraudulent conveyance claim" relating to the Credit Suisse loan proceeds "dividend." For, in counsel's words:

- the Borrowing Parties were "left insolvent by [the] dividend";

- a Trustee would, therefore, have a "fraudulent conveyance claim" regarding the "dividend";

- "nonrecourse [does] not mean can not sue"; and

- Trustees can "file complaints that are horrible."

111.    Ultimately, however, Ginn and Lubert-Adler were unable to achieve a reorganization for the "Borrowing Parties" which included such a "release," forcing them to improvise in anticipation of the present liquidation proceedings.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### (5)    The Master Restructuring Agreement

112.    On December 19, 2008, Credit Suisse, the underlying Lenders, and a number of Ginn-LA entities, including the Tesoro and Quail West Debtors and the Other Project Entities, entered into a Master Restructuring Agreement ("MRA").

113.    The MRA expressly contemplated that each of the Tesoro and Quail West Debtors would file a voluntary petition under Chapter 7 of the Bankruptcy Code.

114.    In addition, the MRA also expressly contemplated that the Trustee(s) appointed for the Debtors' Estates would pursue actions against Ginn / Lubert-Adler entities, such as this case.

115.    Indeed, Ginn and Lubert-Adler specifically bargained for a contractual provision designed to limit the claims which could be asserted against any recovery in this proceeding, in the hope that doing so would operate to minimize their ultimate exposure:

> Waiver of Recovery Regarding Certain Bankruptcy Claims. . . . [I]n the event that the trustee of the Tesoro and/or Quail West bankruptcy estates is successful in pursuing actual or threatened litigation against any of the Borrower Released Parties or the Other Ginn/LA Released Parties, [Credit Suisse] and the [loan participants], on behalf of themselves and their respective heirs, executors, administrators, successors and assigns, hereby waive any right to receive any of the proceeds thereof arising from settlement, judgment or otherwise.

MRA, ¶ 3(f).

### (6)    The Filing of the Underlying Bankruptcy Proceedings

116.    On December 23, 2008, the Tesoro and Quail West Debtors filed voluntary petitions under Chapter 7 of the Bankruptcy Code.

117.    As of that date of those petitions, each of the Debtors was jointly and severally liable with the Other Project Entities for loan principal and interest totaling $715,986,962.07, with liens on substantially all of their assets, and no hope of recovery.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT I - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 276, 278(1)(a))

118.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

119.    Under the control of Ginn and the Lubert-Adler entities, the Tesoro Debtors made the Tesoro Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

120.    As set forth in greater detail above, the Tesoro Asset Transfers were specifically designed to shift the risks associated with the development of the Tesoro Project to creditors, and left those creditors with a virtual certainty of loss.

121.    Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Tesoro Debtors were not already insolvent at the time of the Tesoro Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

122.    The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

123.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 276 and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT II - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 273-275, 278(1)(a))

124.     Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

125.     The Tesoro Debtors did not receive fair consideration in exchange for the property interests conveyed in the Tesoro Asset Transfers.

126.     The Tesoro Debtors either were insolvent at the time of the Tesoro Asset Transfers or were rendered insolvent as a result of the Tesoro Asset Transfers; were engaged in a business for which the property remaining in their hands following the Tesoro Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Tesoro Asset Transfers, intended to incur, or believed they would incur, debts beyond their ability to pay as those debts matured.

127.     The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

128.     Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 273-275, and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT III - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))

129.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

130.    Under the control of Ginn and the Lubert-Adler entities, the Tesoro Debtors made the Tesoro Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

131.    As set forth in greater detail above, the Tesoro Asset Transfers were specifically designed to shift the risks associated with the development of the Tesoro Project to creditors, and left those creditors with a virtual certainty of loss.

132.    Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Tesoro Debtors were not already insolvent at the time of the Tesoro Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

133.    The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

134.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT IV - AVOIDANCE OF FRAUDULENT TESORO ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1), 726.106(1)(b), 726.108(1)(a))

135.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

136.    The Tesoro Debtors did not receive reasonably equivalent value in exchange for the property interests conveyed in the Tesoro Asset Transfers.

137.    The Tesoro Debtors either were insolvent at the time of the Tesoro Asset Transfers or were rendered insolvent as a result of the Tesoro Asset Transfers; were engaged in a business for which the property remaining in their hands following the Tesoro Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Tesoro Asset Transfers, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

138.    The Tesoro Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

139.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Tesoro Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.105(1), 726.106(1)(b), and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT V - RECOVERY OF FRAUDULENT TESORO ASSET TRANSFERS FOR THE BENEFIT OF THE TESORO DEBTORS' ESTATES (11 U.S.C. § 550(a))

140.     Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117, 119 through 123, 125 through 128, 130 through 134, and 136 through 139, as if fully set forth herein.

141.     With respect to the Tesoro Asset Transfers, each of the Defendants was either an initial transferee or entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

142.     To the extent that any Defendant was or is found to be an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2), such Defendant was not a transferee who took for value, in good faith, without knowledge of the voidability of the transfer, within the meaning of 11 U.S.C. § 550(b)(1); or an immediate or mediate good faith transferee thereof within the meaning of 11 U.S.C. § 550(b)(2).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Tesoro Debtors' Estates, the value of the property interests conveyed in the Tesoro Asset Transfers, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT VI - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 276, 278(1)(a))

143.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

144.    Under the control of Ginn and the Lubert-Adler entities, the Quail West Debtors made the Quail West Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

145.    As set forth in greater detail above, the Quail West Asset Transfers were specifically designed to shift the risks associated with the development of the Quail West Project to creditors, and left those creditors with a virtual certainty of loss.

146.    Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Quail West Debtors were not already insolvent at the time of the Quail West Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

147.    The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

148.    Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 276 and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT VII - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
## (11 U.S.C. § 544(b) and New York Debtor and Creditor Law §§ 273-275, 278(1)(a))

149.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

150.    The Quail West Debtors did not receive fair consideration in exchange for the property interests conveyed in the Quail West Asset Transfers.

151.    The Quail West Debtors either were insolvent at the time of the Quail West Asset Transfers or were rendered insolvent as a result of the Quail West Asset Transfers; were engaged in a business for which the property remaining in their hands following the Quail West Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Quail West Asset Transfers, intended to incur, or believed they would incur, debts beyond their ability to pay as those debts matured.

152.    The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

153.    Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including New York Debtor and Creditor Law §§ 273-275, and 278(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT VIII - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))

154.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

155.    Under the control of Ginn and the Lubert-Adler entities, the Quail West Debtors made the Quail West Asset Transfers with actual intent to hinder, delay, or defraud present and future creditors.

156.    As set forth in greater detail above, the Quail West Asset Transfers were specifically designed to shift the risks associated with the development of the Quail West Project to creditors, and left those creditors with a virtual certainty of loss.

157.    Ginn and the Lubert-Adler entities either knew or turned a blind eye to the fact that, if the Quail West Debtors were not already insolvent at the time of the Quail West Asset Transfers, they would be rendered insolvent thereby, and would be left much too thinly capitalized to survive. Which is precisely what occurred.

158.    The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

159.    Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### COUNT IX - AVOIDANCE OF FRAUDULENT QUAIL WEST ASSET TRANSFERS
### (11 U.S.C. § 544(b) and Fla. Stat. §§ 726.105(1), 726.106(1)(b), 726.108(1)(a))

160. Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117 as if fully set forth herein.

161. The Quail West Debtors did not receive reasonably equivalent value in exchange for the property interests conveyed in the Quail West Asset Transfers.

162. The Quail West Debtors either were insolvent at the time of the Quail West Asset Transfers or were rendered insolvent as a result of the Quail West Asset Transfers; were engaged in a business for which the property remaining in their hands following the Quail West Asset Transfers was unreasonably small in relation to the capital requirements of that business; and, at the time of the Quail West Asset Transfers, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

163. The Quail West Asset Transfers were, therefore, fraudulent as to both creditors existing at the time of the transfers, and persons who became creditors thereafter.

164. Each of the Quail West Debtors had at least one actual creditor at the time of the Quail West Asset Transfers holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b), by whom the Quail West Asset Transfers were voidable under applicable law, including Fla. Stat. §§ 726.105(1), 726.106(1)(b), and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Asset Transfers, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT X - RECOVERY OF FRAUDULENT QUAIL WEST ASSET TRANSFERS FOR THE BENEFIT OF THE QUAIL WEST DEBTORS' ESTATES (11 U.S.C. § 550(a))

165.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 117, 144 through 148, 150 through 153, 155 through 159, and 161 through 164, as if fully set forth herein.

166.    With respect to the Quail West Asset Transfers, each of the Defendants was either an initial transferee or entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

167.    To the extent that any Defendant was or is found to be an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2), such Defendant was not a transferee who took for value, in good faith, without knowledge of the voidability of the transfer, within the meaning of 11 U.S.C. § 550(b)(1); or an immediate or mediate good faith transferee thereof within the meaning of 11 U.S.C. § 550(b)(2).

WHEREFORE, Trustee Dillworth respectfully requests entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Quail West Debtors' Estates, the value of the property interests conveyed in the Quail West Asset Transfers, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

-52-

Dated:  August 12, 2010                    Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.

Attorneys for Drew M. Dillworth,
Chapter 7 Trustee of the Tesoro Debtors' Estates
and the Quail West Debtors' Estates

Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

I hereby certify that I am admitted to the Bar of
the United States District Court for the Southern District
of Florida and I am in compliance with the additional
qualifications to practice in this Court set forth in
Local Rule 2090-1(A).

By:_____/s/_____
         EUGENE E. STEARNS
         Fla. Bar No. 149335
         estearns@stearnsweaver.com
         HAROLD D. MOOREFIELD, JR.
         Fla. Bar No. 239291
         hmoorefield@stearnsweaver.com
         MATTHEW W. BUTTRICK
         Fla. Bar No. 176028
         mbuttrick@stearnsweaver.com
         ANDREW E. STEARNS
         Fla. Bar No. 661651
         astearns@stearnsweaver.com