**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**
**www.flsb.uscourts.gov**

———————————————————

In re:                                          :   **CASE NO. 08-29769(PGH)**
GINN-LA ST. LUCIE LTD., LLLP, *et al.*,   :   All Cases Jointly Administered
                                                :
        Debtors.                           :

———————————————————

In re:                                          :
GINN-LA QUAIL WEST., LTD, LLLP, *et al.,*  :   Chapter 7
                                                :
        Debtors.                           :

———————————————————

DREW M. DILLWORTH, Chapter 7 Trustee,   :   **ADV. PRO. NO. 10-02976-PGH**
                                                :
        Plaintiff,                         :
                                                :
        vs.                                :
                                                :
EDWARD R. GINN III, *et al.*,              :
                                                :
        Defendants.                        :

———————————————————

**THE LUBERT-ADLER DEFENDANTS' MOTION, INCLUDING MEMORANDUM
OF LAW, PURSUANT TO RULE 7012(b)(6) OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE TO DISMISS THE
TRUSTEE'S SECOND AMENDED COMPLAINT FOR THE AVOIDANCE AND
<u>RECOVERY OF FRAUDULENT TRANSFERS</u>**

        Lubert-Adler Management Co., L.P.; Lubert-Adler Real Estate Fund III, L.P.; Lubert-

Adler Real Estate Parallel Fund III, L.P.; Lubert-Adler Capital Real Estate Fund III; Lubert-

Adler Real Estate Fund IV, L.P.; Lubert-Adler Real Estate Parallel Fund IV, L.P.; Lubert-Adler

Capital Real Estate Fund IV, L.P.; Lubert-Adler Group III, L.P. and Lubert-Adler Group IV, L.P.

(collectively, the "Lubert-Adler Defendants"), by undersigned counsel, respectfully move

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") made applicable in this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure for an order dismissing with prejudice in its entirety the Trustee's Second Amended Complaint For Avoidance and Recovery of Fraudulent Transfers (the "Second Amended Complaint").[1]

In the alternative, the Lubert-Adler Defendants move for dismissal of Counts I, II, VI and VII (the New York Counts) of the Second Amended Complaint.

## I.    INTRODUCTION

The Debtors are entities which engaged in the development of resort communities in Port St. Lucie and Naples, Florida.  Prior to this bankruptcy case, certain non-debtors borrowed $675,000,000 pursuant to loans administered by Credit Suisse, Cayman Islands Branch (the "Credit Suisse Loan").  The Debtors were not borrowers under the loan documents and never received any of the loan proceeds (the "Credit Suisse Loan Proceeds").  Indeed, the Debtors were mere guarantors, having each respectively executed agreements titled "Subsidiary Guarantee," which guaranties were secured by liens on substantially all of the Debtors' respective assets (collectively the "Debtor Liens").

---

[1] On August 12, 2010, the Trustee filed a "Corrected Version" of the *Second Amended Complaint for Avoidance and Recovery of Fraudulent Transfers* [D.E. 39 to Adv. No. 10-02976] (the "Second Amended Complaint").  The named defendants are (i) the Lubert-Adler Defendants; (ii) Edward R. Ginn, III, ERG Enterprises, L.P., Edward R. Ginn III Revocable Trust Dated Sept. 14, 2002 and ERG Management, LLC (the "Ginn Defendants"); and (iii) several hundred investors in the Lubert-Adler Funds III and IV investment partnerships discussed in footnote 4 *infra* (the "Investor Defendants").  The Ginn Defendants are filing a joinder to this motion.  Pursuant to a stipulation of the Trustee and the parties, the Investor Defendants do not have to respond to the Second Amended Complaint until October 22, 2010.

Claims concerning the Debtor Liens have been resolved in the underlying bankruptcy cases.  Upon the Trustee's motion [D.E. 21, 54], this Court entered orders in the underlying bankruptcy case – which orders have become final - confirming the validity of the Debtor Liens. [D.E. 77, 88, 99].  Likewise, upon the Trustee's motion [D.E. 104], this Court entered Sale Orders approving the sale of the underlying assets to which the Debtor Liens attached.  Pursuant to those Sale Orders, the underlying assets were conveyed free and clear of all liens, with Credit Suisse and the Debtors sharing in the proceeds.  [D.E. 163, 185, 188 and 189].[2]

In this action, the Trustee, pursuant to Sections 544 and 550 of the United States Bankruptcy Code, is suing to recover $148,000,000 of the Credit Suisse Loan Proceeds that Credit Suisse transferred directly to the non-debtor borrowers, which monies were then transferred to various of the defendants (collectively the "Non-Debtor Transfers").

The Second Amended Complaint is fatally defective.  The Non-Debtor Transfers cannot be avoided because they did not involve a transfer of property of the Debtors.   These fundamental facts cannot be disputed and need not be the subject of discovery.  Accordingly, the Second Amended Complaint should be dismissed with prejudice for failure to state a claim under Sections 544 and 550 of the United States Bankruptcy Code.

Alternatively, the Lubert-Adler Defendants move to dismiss Counts I, II, VI and VII (the "New York Counts") of the Second Amended Complaint because the Trustee has asserted parallel claims under both the Florida and New York fraudulent conveyance statutes even though only one state's law may be applied to determine the claims.  Based on the allegations of the Second Amended Complaint, it is clear that the claims should be determined under Florida law.

---

[2] Unless otherwise specified, all docket entries relating to the underlying bankruptcy cases refer to Case No. 08-29769.

## II.  FACTUAL BACKGROUND

### A.  THE CREDIT SUISSE LOAN CLOSING

Lubert-Adler Fund III ("Fund III") and Lubert Adler Fund IV ("Fund IV") are private equity funds comprised of various investment limited partnerships.[3]  Defendant Edward R. Ginn III is a developer of residential resort properties.  Prior to 2006, Fund III and Fund IV formed joint ventures with affiliates of Mr. Ginn for the purpose of developing residential communities (i) in Port St. Lucie, Florida (the "Tesoro Project"); (ii) in Naples, Florida (the "Quail West Project"); (iii) in Palm Coast Florida (the "Bulow Project"); (iv) in Boone, North Carolina (the "Laurelmor Project"); and (v) in Grand Bahama Island (the "Ginn Sur Mer Project") (collectively, the "Projects").  The Laurelmor Project, the Bulow Project and the Ginn Sur Mer  Project are collectively referred to as the "Other Projects."

The Trustee's claims relate to the Credit Suisse Loan which closed on June 8, 2006, which loan was documented via two "Lien Credit Agreements" (collectively the "Credit Agreements").[4]  The parties to the Credit Agreements were: (i) Ginn-LA CS Borrower, LLC

---

[3] Lubert-Adler Fund III is comprised of Defendants Lubert-Adler Capital Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., and Lubert-Adler Real Estate Fund III, L.P. (the "Fund III Investment Partnerships"). Lubert-Adler Fund IV is comprised of Defendants Lubert-Adler Capital Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P., and Lubert-Adler Real Estate Fund IV, L.P. (the "Fund IV Investment Partnerships").

[4] True and correct copies of the Credit Agreements (together with Schedule 4.5 thereto) are attached to the accompanying Declaration of Stuart Margulies (the "Margulies Declaration") as Exhibit A and Exhibit B respectively.  The Court may consider the Exhibits to the Margulies Declaration without converting this Motion To Dismiss to a motion for summary judgment because these exhibits are either public records or are integral to the allegations made in the Amended Complaint and their authenticity is not disputed.  *See* discussion in Section II *infra.*

("CS Borrower")[5] and Ginn-LA Conduit Lender, Inc. ("Conduit Lender")[6] (defined collectively as the "Borrower" in the Credit Agreements); (ii) various lenders listed therein (the "Lenders"); (iii) Credit Suisse, Cayman Islands Branch (as Administrative Agent and Collateral Agent) ("Credit Suisse"); and (iv) Credit Suisse Securities (USA), LLC (as Paying Agent, Fronting Bank, Sole Lead Arranger and Sole Bookrunner).

The Debtors were not parties to or signatories to the Credit Agreements, and they were not defined therein as a "Borrower." Rather, the Debtors, together with entities involved in the development of the Other Projects discussed above, were listed on Schedule 4.5 of and defined in the Credit Agreements as "Subsidiaries" of the Borrower. *See* Exhibits A and B.

In connection with the Credit Suisse Loan, the Debtors, as Subsidiaries, each signed a "Subsidiary Guaranty"[7] in favor of Credit Suisse as Administrative Agent and Collateral Agent, which guaranties were secured by the Debtor Liens. (Sec.Am.Compl. p. 32 at ¶65). The Other Project Entities each signed a similar "Subsidiary Guaranty" and lien documents.

Although the Trustee attempts gratuitously to liken the Credit Suisse Loan which is the subject of this case to that at issue in the *Yellowstone* case (Sec.Am.Compl. p.9 at ¶6), the substance of the transactions are dissimilar. The *Yellowstone* transaction involved loans to the debtors themselves that were secured by liens on assets relating to a single development project.

---

[5] As of the closing, CS Borrower owned a 100% interest in the Debtor Ginn-LA Quail West, Ltd., LLLP, a 100% interest in the Debtor Ginn-LA St. Lucie Ltd., LLLP, and a 100% interest in two non-debtor entities: Ginn-LA Bulow Ltd., LLLP (the developer of the Bulow Project) and Ginn-LA Laurel Creek Ltd., LLLP (the developer of the Laurelmor Project). (Sec.Am.Compl. p. 31 at ¶58).

[6] As of the closing, Conduit Lender was an affiliate of Ginn-LA West End Ltd., LLLP (the developer of a luxury residential community in Grand Bahama Island). (Sec.Am.Compl. p. 31 at ¶59).

[7] A Subsidiary Guaranty executed by the Debtor Ginn-LA Quail West, Ltd., LLLP (similar to those executed by the other Debtors and other Project Entities) is attached to the Margulies Declaration as Exhibit C.

The Credit Suisse Loan here was made to the Borrower and not the Debtors,[8] and the loan was secured through cross-collateralization of the diversified asset base from the five separate Projects – Tesoro, Quail West, Bulow, Laurelmor and Ginn Sur Mer. These Projects were located in five separate markets and guaranteed by entities having an interest in each of the Projects.[9]

The CS Term Loans were governed by the Credit Agreements, and the proceeds of the CS Term Loans were payable to the Borrower and distributed at the closing held on June 8, 2006, as follows:

- $23,446,764.00 for the payment of loan fees and closing costs, including significant costs paid to Credit Suisse;

- $158,291,252.86 for the payment of existing debt of the Projects (e.g., prior mortgages and notes relating to the Projects); and

- $328,261,982.20 of remaining Term Loan proceeds paid directly to the Borrower. (the "Net Borrower Proceeds").

(Sec.Am.Compl. p. 32 at ¶ 64).

The Trustee is seeking to recover $148,000,000 of the Net Borrower Proceeds transferred by Credit Suisse to the Borrower and subsequently transferred by the Borrower, as contemplated by the Credit Agreements, to some of the defendants (as defined above the "Non-Debtor Transfers"). The Debtors never received and did not have any right to receive any portion of the property transferred via the Non-Debtor Transfers. Those funds passed directly from Credit

---

[8] The Credit Suisse Loan consisted of two term loans in the aggregate amount of $510 million (the "CS Term Loans") and a line of credit in the amount of $165 million. (Sec.Am.Compl. p. 31 at ¶¶ 61, 62) and Exhibits A and B to the Margulies Declaration.

[9] The facts of *Yellowstone* are also distinguishable because, *inter alia*, in the years following the closing of the Credit Suisse Loan at issue in this case, the principals of the Borrower reinvested significant additional capital into the Projects that secured the loans.

Suisse to the Borrower's bank accounts and thereafter to bank accounts of others, including some of the defendants.  No funds passed through any accounts of the Debtors.

The following indisputable facts and diagram demonstrate the path of the Non-Debtor Transfers to the defendants.  As demonstrated below, **that path never included the Debtors**.

At the June 8, 2006 closing, Credit Suisse wired the full amount of the Net Borrower Proceeds ($328,261,982.20) to the Borrowers as follows: (a) Credit Suisse wired the sum of $89,961,281.49 to Ginn-LA Conduit Lender, Inc.'s account #8044845538 at Colonial Bank in Florida (the "Conduit Lender Account"); and (b) Credit Suisse wired to CS Borrower the sum of $238,300,700.71 to CS Borrower's account #8044845512 at Colonial Bank in Florida (the "CS Borrower Account").  After Credit Suisse wired the $238,300,700.71 to the CS Borrower Account, CS Borrower wired $237,550,700.71 of those funds to an account of Ginn-LA CS Holding Company, LLC ("CS Holding"), account #8044845520 at Colonial Bank in Florida (the "CS Holding Account"), as follows: $37,550,700.71 on June 12, 2006 and $200,000,000 on June 13, 2006.  After Credit Suisse wired the $89,961,281.49 to the Conduit Lender Account, on June 12, 2006, Conduit Lender wired those funds to Ginn-LA West End Limited's Account # 20059960 at First Caribbean International Bank (the "West End LP Account").  Of those funds: (a) on June 13, 2006, Ginn-LA West End Limited wired $75,456,716.63 to Ginn-LA West End Ltd. LLLP's Account #8044845199 at Colonial Bank in Florida (the "West End LLLP Account"); and (b) on June 14, 2006, Ginn-LA West End Limited wired $14,504,764.86 to the CS Holding Account.  Of the funds transferred to the CS Holding Account and the West End LLLP Account, approximately $316,121,255.75 was distributed to the Lubert-Adler Fund III

Investment Partnerships and Lubert-Adler Fund IV Investment Partnerships, and approximately $7,142,726.48 was distributed to certain of the Ginn Defendants.[10]

The following diagram illustrates the flow of the Non-Debtor Transfers.  None of the Debtors appears on this chart because none of the funds ever were transferred to or from the Debtors:



## B.    HISTORY OF THE BANRUPTCY CASE AND THE VALIDATION CONFIRMATION OF THE DEBTOR LIENS

On December 23, 2008 (the "Petition Date"), the Tesoro Debtors and the Quail West Debtors filed petitions under Chapter 7 of the United States Bankruptcy Code.  That same day, Drew M. Dillworth was appointed as Chapter 7 Trustee.  On December 29, 2009, the Court granted the Debtors' Motion For Joint Administration.  [D.E. 20; D.E. 17 to Case 08-29774].

Despite the Trustee's allegations in the Second Amended Complaint vilifying the Credit

_____

[10] The respective June 2006 account statements of the foregoing  accounts are attached as Exhibits D-H to the

Suisse Loan, which allegations appear to be based on an incomplete understanding of the loan at issue here and an incorrect conclusion that the loan here and the loan in *Yellowstone* are the same (Sec.Am.Compl. p. 9 at ¶6), the fact of the matter is that the Trustee has ratified and confirmed the Debtor Liens and this Court, through the entry of Orders (which are now final) issued in connection with post-petition financing and the sale of the Debtors' assets free and clear of liens, has confirmed the *bona fides* of the Debtor Liens made in connection with the Credit Suisse Loan.  Those Orders acknowledge the validity and non-avoidability of the liens made in favor of Credit Suisse and allowed for the payment to Credit Suisse of the majority of the sales proceeds from the sale of the Debtors' assets.

Specifically, shortly after the Petition Date, the Trustee filed an emergency motion seeking authority operate the Debtors' businesses in the ordinary course until he could sell them. [D.E. 15].  The Trustee needed funds to operate the Debtors' businesses and filed an emergency motion (the "<u>Emergency Cash Collateral Motion</u>") seeking authority to use the Debtors' cash collateral until he could sell their assets.  [D.E. 21].  In the Emergency Cash Collateral Motion, the Trustee confirmed that the collateral he sought permission to use was alleged to be subject to pre-petition liens of Credit Suisse (i.e. the Debtor Liens) arising out of the June 8, 2006 Credit Suisse Loan. [D.E. 21].

On December 31, 2009, the Court granted the relief requested in Emergency Motion on an interim basis (the "<u>First Interim Cash Collateral Order</u>").  [D.E. 29].  In the First Interim Cash Collateral Order, the Court confirmed that Credit Suisse had asserted first priority liens on the underlying cash collateral that that Order authorized the Trustee to use.  [D.E. 29, p. 4 at ¶ D].  In the Order, the Court also granted Credit Suisse adequate protection of its alleged liens in the

Margulies Declaration.

form of replacement liens.  [D.E. 29, p. 8-9].

The Trustee operated the Debtors' businesses and continued to market the Debtors' assets for sale.  Unable to locate a purchaser prior to the expiration of the relief granted in the First Interim Cash Collateral Order, the Court entered additional interim orders authorizing the Trustee's use of Cash Collateral, including an order dated January 16, 2009 (the "Challenge Order").  [D.E. 77].  The Challenge Order established February 23, 2009, as the "Challenge Period Termination Date."  [D.E. 77, p. 15 at ¶ 8].  The "Challenge Period Termination Date" was the date by which the Trustee himself as well as all creditors and all other parties in interest had to file an objection or commence an adversary proceeding respecting Credit Suisse and the Lenders and the Debtor Liens.  The Challenge Order further provided that in the event no objection or complaint was filed prior to the Challenge Period Termination Date, the waiver and release granted by paragraph 7 of the Challenge Order would "become final and binding on all parties (including any creditor or any subsequently appointed trustee)" and that the liens granted in favor of Credit Suisse "shall be valid, perfected, *nonavoidable*, and in full force and effect, not subject to any claims, counterclaims, setoffs, or defenses. . . ." [D.E. 77, p. 15 at ¶7].  Notably, the waiver and release contained in paragraph 7 specifically provided that the Trustee waived "any and all claims, defenses (including without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability (under sections 510, 544, 545, 547, 548, 549, 550, 552 or 553 of the Bankruptcy Code or otherwise)" of the liens of Credit Suisse that were the subject of the Challenge Order.  *Id.*[11]  Identical language was also included in the Final Cash Collateral Order entered on February 4, 2009.  [D.E. 99].[12]

---

[11] The Court amended the above order on January 23, 2009 [D.E. 88].  The amendment did not alter or affect the above quoted paragraph.

On February 6, 2009, prior to the Challenge Period Termination Date, the Trustee filed a motion seeking authority to sell the Debtors' real property and assets free and clear of liens, claims and encumbrances, including the liens and claims of Credit Suisse (the "Sale Motion"). [D.E. 104].

Neither the Trustee nor any party in interest filed an objection or adversary proceeding challenging the validity of the Credit Suisse's lien prior to the Challenge Period Termination Date.

On March 12, 2009, the Trustee filed a *Third Supplement and Additional Proposed Amendment to the Sale Motion* in which the Trustee confirmed the validity and nonavoidability of liens granted in connection with the Credit Suisse Loan, stating:

> The date established in the Final Financing Order by which Trustee Dillworth and any creditors or other parties in interest could challenge the validity and priority of Credit Suisse's liens and security interests upon virtually all of the Debtors' assets passed without any challenge being made. Accordingly, pursuant to the Final Financing Order, **Credit Suisse's liens have been conclusively established in this case as constituting valid first liens encumbering virtually all of the Debtors assets**. …." (Bold added).

[D.E. 163, p. 3 at ¶ 4].[13]

On March 20, 2009, the Court Approved the Trustee's Sale Motion in three orders which authorized three separate sales of the Debtors' Property (collectively the "Sale Orders"). [D.E. 185, 188 and 189]. The first Sale Order (the "Beach Lot Order") authorized the free and clear

---

[12] The above quoted language is included in the Final Sale Order at paragraphs 9 and 10 of the Final Sale Order.

[13] *See also* D.E. 351, p. 3 at ¶8 (*Trustee Dillworth's Motion to Authorize Sale of Estates' Right, Title and Interest in Accounts Receivable Pursuant to 11 U.S.C. § 363(b) and (f)*; and D.E. 143, p. 4 at ¶ 6 (*Trustee's Supplement to Motion for Order (A) Approving Sale Procedures Governing Sales of Real Property and Assets; (B) Approving Form and Manner of Notice With Respect to Such Sales; (C) Scheduling a Hearing to Consider the Approval of Such Sales and (D) Granting Related Relief).*

sale of several beach lots belonging to the Quail West Debtors' estates to the approved buyer for the sum of $2,650,000. [D.E. 185, p. 6]. Pursuant to the Beach Lot Order, the Net Proceeds[14] of the sale, excluding $50,000 to be used by the Trustee for post-closing operational expenses were to be paid to Credit Suisse. [D.E. 185, p. 14 at ¶ 13]. The second Sale Order (the "Tesoro Sale Order") authorized the free and clear sale property of the Tesoro Debtors' estates to the approved buyer for the sum of $10,990,000. D.E. 188. The Net Proceeds of the Tesoro Property were to be paid to Credit Suisse at closing, excluding $150,000, which the Trustee was authorized to use to cover post-closing operational expenses. [D.E. 188, p. 16-17 at ¶ 14]. The Third Sale Order (the "Quail West Development Sale Order") authorized the free and clear sale of the remaining real property of the Quail West Debtors (the "Quail West Development Property") to the approved buyer for the sum of $13,500,000. [D.E. 189]. The Net Proceeds of the Quail West Development Property were to paid to Credit Suisse at closing, excluding $50,000, which the Trustee was authorized to use to cover post-closing operational expenses. [D.E. 189, p. 22-23 at ¶ 19].

### C.    THE TRUSTEE HAS ASSERTED PARALLEL CLAIMS UNDER BOTH FLORIDA AND NEW YORK LAW

In addition to failing to state a cognizable avoidance claim, the Trustee advances no legitimate purpose for asserting parallel claims under both the Florida fraudulent transfer statute, Florida Statute sections 726.106(1)(a), 726.105(1), and 726.106(1)(b) (Counts III, IV, VIII and

---

[14] Each of the Sale Orders define the term "Net Proceeds" to mean: the sale proceeds, less (i) taxes (real estate taxes, 50% of recording fees, if any) payable on closing pursuant to the Orders of this court; (ii) the Carve Out, including the surveying costs and real estate tax consultant costs to the extent not already paid; and (iii) the expenses provided for in the Beach Lots Contract; Paragraphs 1.2 and 10.2 of the Tesoro Contract, the expenses provided for in paragraphs 1.2 and 10.2 of the QW 2009 Contract and London Bay Contract.

IX),[15] and the New York fraudulent conveyance statute, New York Debtor and Creditor Law sections 273-275 and 278(1)(a) (Counts I, II, VI and VII).  In a fraudulent conveyance action, the Court will apply one state's law to determine the Trustee's claims that, pursuant to Section 544 of the United States Bankruptcy Code, the Non-Debtor Transfers of $148 million should be avoided.

As discussed more fully in this subsection:

- The Trustee is seeking to recover $148,000,000 of the Non-Debtor Transfers for the benefit of the estates of the Debtors.  The Debtors are Georgia entities qualified to do business in Florida, whose businesses were conducted in Florida and whose assets were located in Florida.

- The challenged Non-Debtor Transfers were made by CS Borrower and Conduit Lender, non-Debtor Delaware entities qualified to do business in Florida (not New York) from bank accounts at Colonial Bank in Florida.

- The challenged Non-Debtor Transfers were made to the Lubert-Adler Defendants, non-New York entities. [16]

Given these undisputed facts that are integral to the Second Amended Complaint, the choice of law criteria favor the application of Florida law and disfavor the application of New

---

[15] As pleaded, the Second Amended Complaint seeks to state claims under Florida Statutes §§ 726.106(1)(a), 726.105(1) and 726.106(1)(b).  The sections pleaded do not correlate to the actual Florida Statutes.  For purposes of this Motion, the Lubert-Adler Defendants will assume that the Trustee meant to plead under Florida Statutes §§ 726.105(1)(a); 726.105(1)(b), and 726.106(1).

[16] The Trustee also challenges transfers to the Ginn Defendants and the Investor Defendants.  As set forth in the Ginn Joinder, the Ginn Defendants are non-New York entities: Ginn is a Florida resident, the Ginn Trust is a Florida Trust for which Ginn serves as sole trustee, ERG Management is a South Carolina entity and ERG LP is a Georgia entity.  Both ERG Management and ERG have been qualified to do business in Florida since March, 2006 and have their principal places of business in Florida.

York law. Therefore, the Lubert-Adler Defendants should not be required to litigate under two states' laws when it is manifest from the outset of this case that one of them – New York's law– will not apply.

The lone suggestion that New York law could apply to the Trustee's claims is the allegation in paragraph 60 of the Second Amended Complaint that "[t]he principal loan transaction documents were a First Lien Credit Agreement and a Second Lien Credit Agreement, both of which contained a choice of law provision *purporting* to invoke New York law." Sec.Am.Compl. p. 31 at ¶60 (italics added). As set forth below, the actual loan provision has no bearing whatsoever on the claims asserted in this action. This is not an action seeking to construe or enforce the Credit Agreements.

Requiring the Lubert-Adler Defendants to litigate under both the New York and Florida statutes when only one statute can apply would be especially unfair: New York is one of only five states that has a fraudulent conveyance statute based on the Uniform Fraudulent Conveyance Act (*see N.Y. Debt. & Cred. Law* Ch. 12, Art. 10, Refs & Annos; N.Y. Debt & Cred. Law §§ 270-81), whereas the Florida Statute is based on the more modern Uniform Fraudulent Transfer Act (*see* § 726.101, Fla. Stat. *et. seq*). These statutes' differences relating to, *inter alia*, the definition of solvency and available defenses will materially impact the direction and complexity of fact and expert discovery, as well as trial preparation should the Court not dismiss the Second Amended Complaint as requested by this Motion.

There is no sound reason to require the parties to incur this additional burden of litigating under two statutes and wait until later in the case to decide this issue. No amount of document or deposition discovery can change the undisputed facts that are already known: Each of the

Debtors is a non-New York entity; each of the Debtors' real property and substantially all of their personal property were located in Florida; the Debtor Transfers were made by the Debtors; the Non-Debtor Transfers were made through a non-New York bank (a Florida bank, in fact) to non-New York entities; and this lawsuit does not involve the enforcement of Credit Suisse loan documents.

- The Debtors Operated out of Florida, Owned Property in Florida and Were Not New York Entities

As set forth in the Second Amended Complaint and the record of the Debtors' bankruptcy cases: Each of the Debtors is a non-New York entity; each of the Debtors' real property and leasehold interests were located in Florida; each of the Debtors' personal property was substantially located in Florida; and none of the Debtors' real property was located in New York. Moreover, each of the Debtors was qualified to do business in the State of Florida.[17]

Each of the Debtors' Bankruptcy Petitions reflects that each of the Debtors' principal place of business is Osceola County Florida and lists as their address 215 Celebration Place, Suite 200, Celebration Florida. *See*. D.E. 1, Bankruptcy Petitions at p. 1 to each of the Debtors' Cases. Each petition also lists 215 Celebration Place, Suite 200, Celebration Florida as the location of each of the Debtors' principal assets. *Id.*

As mentioned above, on August 12, 2009, this Court entered an Order substantively consolidating the Debtors' Chapter 7 cases into two lead cases, one lead case for the Tesoro Debtor Estates and one lead case for the Quail West Debtor Estates.

The lead Quail West debtor is Ginn-LA Quail West Ltd., LLLP ("Quail West Lead Debtor"), a Georgia limited liability limited partnership with one general partner, Ginn Quail

West GP, LLC, and one limited partner, Ginn-LA CS Borrower, LLC.  *See* D.E. 1 to Case No. 08-29774, at p. 5 of the Petition: the Corporate Resolution Authorizing the Filing of the Bankruptcy.  The lead Quail West Debtor's primary assets included real property located in Lee County Florida, Collier County Florida, and Naples Florida.  *See* D.E. 23 to 08-29774, Schedule A.  It did not own any real property in New York.  *Id.*  Further, a majority of its personal property was located in Florida, including two bank accounts at Colonial Bank located in Daytona Beach, Florida.  *See id. at Schedule* B, and Statement of Financial Affairs.  Quail West Lead Debtor did not have any personal property in the State of New York.  *Id.*

The first Quail West consolidated debtor is Ginn-Quail West GP, LLC ("Quail West Consolidated Debtor #1"), a Georgia limited liability company with one member, Ginn-LA CS Borrower, LLC, and one manager, Robert H. Gidel.  *See* D.E. 1 to 08-29775 at p. 5 of the Petition: the Corporate Resolution Authorizing the Filing of the Bankruptcy. Quail West Consolidated Debtor #1 is the sole general partner of Quail West Lead Debtor.  *Id*.  It did not own any real or personal property in New York.  *See* D.E. 29 to 08-29775, Schedules A and B.

The second Quail West consolidated debtor is Ginn Quail West Beach LLC ("Quail West Consolidated Debtor #2"), a Georgia limited liability company whose sole member is Quail West Lead Debtor, and whose sole manager is Robert H. Gidel.  *See* D.E. 1 to Case No. 08-29776 at p. 5 of the Petition: the Corporate Resolution Authorizing the Filing of the Bankruptcy.  Quail West Consolidated Debtor #2 owned six parcels of land in Lee County Florida, and all of its personal property was located in Florida as well.  *See* D.E. 25 to Case No. 08-29776, Schedules A and B.  It did not own any real or personal property in New York.  *Id.*

---

[17] A true and correct copy of the Debtors' respective Qualifications To Do Business in the State of Florida filed with the Secretary of State of Florida are attached to the Margulies Declaration as Exhibit I.

The lead Tesoro Debtor is Ginn-LA St. Lucie Ltd., LLLP ("Lead Tesoro Debtor"), a Georgia limited liability limited partnership with one general partner, Ginn St. Lucie GP, LLC, and one limited partner, Ginn-LA CS Borrower, LLC. *See* D.E. 1 to Case No. 08-29769 at p. 5 of the Petition: the Corporate Resolution Authorizing the Filing of the Bankruptcy. The Lead Tesoro Debtor's real property was located in St. Lucie County Florida. *See* D.E. 92 to Case No. 08-29769 at Schedule A. Almost all of the lead Tesoro Debtor's personal property, including all of its computer equipment and a vehicle, was located in Florida as well. *Id.* at Schedule B. The lead Tesoro Debtor also had a bank account at Colonial Bank in Daytona Beach, Florida. *Id.* No assets of the Lead Tesoro Debtor were located in New York. *See id.* at Schedules A and B.

The first consolidated Tesoro debtor is Ginn-St. Lucie GP, LLC ("Consolidated Tesoro Debtor #1"**)**, a Georgia limited liability company with a sole manager, Robert Gidel, and a sole member, Ginn-LA CS Borrower, LLC. *See* D.E. 1 to Case No. 08-29770 at p. 5 of the Petition: the Corporate Resolution Authorizing the Filing of the Bankruptcy. Consolidated Tesoro Debtor #1 is the sole general partner of the Lead Debtor. *Id.* Consolidated Tesoro Debtor #1 did not own any real or personal property in New York. *Id.* at Schedules A and B.

The second consolidated Tesoro debtor is The Tesoro Club, LLC ("Consolidated Tesoro Debtor #2"), a Georgia limited liability company with a sole member, the Lead Tesoro Debtor, and a sole manager, Robert H. Gidel. *See* D.E. 1, to Case No. 08-29772 at p. 5 of the Petition: the Corporate Resolution Authorizing the Filing of the Bankruptcy. Consolidated Tesoro Debtor #2 owned leasehold interests in certain real property in St. Lucie County Florida. *See* D.E. 23 to Case No. 08-29772, Schedule A. Further, almost all of Consolidated Tesoro Debtor #2's personal property, including computer equipment and vehicles, was located in Florida. *Id.* at

Schedule B.  Consolidated Tesoro Debtor #2 also maintained three bank accounts with Colonial Bank in Daytona Beach, Florida.  *Id.*  It did not own any real or personal property in New York. *Id*. at Schedules A and B.

The third Consolidated Tesoro Debtor is Tesoro Golf Club Condominium, LLC (Consolidated Tesoro Debtor #3), a Georgia limited liability company with one member, the Lead Tesoro Debtor, and one manager, Robert Gidel.  *See* D.E. 1 to Case No. 08-29773 at p. 5 of the Petition: the Corporate Resolution Authorizing the Filing of the Bankruptcy.  It did not own any real or personal property in New York.  *See* D.E. 23 to Case no. 08-29773 at Schedules A and B.

- • The Non-Debtor Transfers at Issue Were to and From Florida Bank <u>Accounts That Were Not Owned or Controlled By the Debtors</u>

There is nothing more integral to the Trustee's claims against the Lubert-Adler Defendants than the Trustee's assertion that the Lubert-Adler Defendants were transferees of the Non-Debtor Transfers.  *See* Sec.Am.Compl. at ¶¶1, 8, 10, 15, 21, 22, 58, 59, 63. 64, 66, 67, 68, 97, 119, 130, 141, 144, 155 and 166.  The Lubert-Adler Defendants are not New York citizens or entities.  *See*  Sec.Am.Compl. at ¶¶ 25-29.

Central to the Trustee's claim related to the Non-Debtor Transfers are the bank accounts through which the Non-Debtor Transfers were transferred.  As discussed at length above, the Account Statements demonstrate that the Non-Debtor Transfers to the Lubert-Adler Defendants flowed through accounts at Colonial Bank in Florida and that none of those funds ever flowed to or from any account of the Debtors.

### III.    THE STANDARD AND SCOPE OF REVIEW

A motion to dismiss under Rule 12(b)(6), made applicable to this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, is the proper means for challenging the Second Amended Complaint's legal sufficiency.  The Rule 12(b)(6) standard recently was refined in two United States Supreme Court decisions, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, __ U.S.__, 129 S. Ct. 1937 (2009).  *Twombly* and *Iqbal* require, among other things, a two-part analysis of the complaint under Rule 12(b)(6): <u>first</u>, all legal conclusions and formulaic recitations of claims must be stripped away and discarded; and, <u>second</u>, the remaining factual averments must be examined to determine if they are sufficient to <u>plausibly</u> state the claim.  Moreover, the Supreme Court stated, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1940.

The Eleventh Circuit, in recognition of the Supreme Court's recent articulation of the Rule 12(b)(6) and Rule 8 standards, has summarized the applicable standard as follows:

> To survive a motion to dismiss, a complaint need not contain detailed factual allegations, but it must contain sufficient factual allegations to suggest the required elements of a cause of action.  A formulaic recitation of the elements of a cause of action will not do.  Nor will mere labels and legal conclusions withstand a 12(b)(6) motion to dismiss.

*Mukamal v. Bakes*, No. 08-14346, 2010 WL 1731775, at *5 (11th Cir. Apr. 30, 2010).

Moreover, in deciding a motion to dismiss, the Eleventh Circuit recognizes that there are exceptions to the general rule that a trial court may consider only the allegations within the four corners of the complaint.  *In re First NLC Fin. Servs., LLC,* 410 B.R. 726, 729 (Bankr. S.D. Fla. 2008) (citing *Long v. Slaton,* 508 F.3d 576, 578 n.3 (11th Cir. 2007)).  One such exception is that

the court may take judicial notice of matters in the public record, including any court filings because the materials are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *In re First NLC Fin. Servs., LLC,* 410 B.R at 729; *see also* Fed. R. Evid. 201; *McTernan v. City of York,* 577 F.3d 521, 526 (3d Cir. 2009) (court may consider matters of public record); *MGIC Indem. Corp. v. Weisman,* 803 F. 2d 500, 504 (9th Cir. 1986) (taking judicial notice of pleadings filed in another case); *Strong v. Yellow Transp., Inc.,* No. 09-cv-00061-WYD-MJW, 2009 WL 1655028, at *2 (D. Colo. June 12, 2009) (holding that the court may take judicial notice of the Debtors' schedules in the context of a Rule 12(b)(6) motion).

Another such exception is for undisputed documents that are **"**central to the plaintiff's claims" or "integral to the allegations" contained in the complaint. *Daewoo Motor Am., Inc., v. General Motors Corp.,* 459 F.3d 1249, 1266 n.11 (11th Cir. 2006); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991) (holding that, for a Rule 12(b)(6) motion, a defendant may introduce material that is "integral to [the] complaint," even if the complaint did not contain or reference that material, "because plaintiff should not so easily be allowed to escape the consequences of its own failure"). Under this exception, the court may consider a document outside the four corners of the complaint without converting a motion to dismiss to one for summary judgment if the "document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir. 2002)). The first requirement will be met when the contents of the document go to the heart of a plaintiff's cause of action. *Day,* 400 F.3d at 1276. Second, a

document will be "undisputed" for purposes of a Rule 12(b)(6) motion when the authenticity of the document is not challenged. *Id*.

## IV.    ARGUMENT

Measured against the foregoing standard of review, the Second Amended Complaint fails to state a claim and should be dismissed in its entirety.  In this case, the Trustee seeks to recover $148,000,000 of the Non-Debtor Transfers from the Lubert-Adler Defendants (as well as the other defendants).   The claims are based entirely on the avoidability of the Non-Debtor Transfers.  Based on the four corners of the pleading, the record of the Debtors' bankruptcy cases, and the undisputed documents that go to the heart of the Trustee's claims (the Credit Agreements, Subsidiary Guaranties, and relevant bank account statements), it is clear that the Trustee has not properly stated and cannot properly state a fraudulent conveyance claim under section 544, let alone a claim that he is entitled to any recovery under section 550.

The Trustee cannot avoid the Non-Debtor Transfers because the Debtors, mere guarantors, never had an interest in and never controlled the $148,000,000 transferred.  Thus, the Non-Debtor Transfers did not diminish to the detriment of any creditor any funds that were generally available for distribution to creditors of the Debtors.  While the Second Amended Complaint contains a lot of rhetoric and is replete with generalized allegations of "fraud," these dispositive facts cannot be challenged.

Alternatively, Counts I, II, VI and VII of the Second Amended Complaint should be dismissed because there is no legitimate basis to apply the law of New York to the claims in this action.  The Trustee is suing on behalf of the estates of the Debtors, entities that were authorized to and conducted their business in Florida, where their assets were located.  The Trustee is suing to recover funds that were transferred through Florida accounts by non-New York entities

authorized to do business in Florida to the Lubert-Adler Defendants, non-New York entities and citizens.

**A.    PURSUANT TO RULE 12(b)(6), THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM BECAUSE THE NON-DEBTOR TRANSFERS DID NOT CONSIST OF PROPERTY OF THE ESTATE**

Section 544 of the Bankruptcy Code provides in pertinent part:

> (a) The Trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any *transfer of property of the debtor or any obligation incurred by the debtor* that is voidable by— …

11 U.S.C. § 544(a) (italics added).  Put another way, under section 544(a) the Trustee may only avoid a transfer of "property of the debtor" or "obligations incurred by the debtor."  *Id.*

Section 550 of the Bankruptcy Code provides in pertinent part:

> (a) *[T]o the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . .*

11 U.S.C. § 550(a) (italics added).  In other words, unless a transfer is avoidable there can be no recovery.  *Id.*

The Debtors cannot avoid or recover the value of the Non-Debtor Transfers because, as the indisputable facts discussed above demonstrate, the Non-Debtor Transfers did not consist of any property of the Debtors: the Debtors never borrowed the transferred funds, the transferred funds never passed through any bank account of the Debtors, and the Debtors never otherwise had any custody and control of these funds.  The Trustee alleges no facts which, if proven, could

establish that the Non-Debtor Transfers diminished the assets of the Debtors and are therefore avoidable.[18]

The purpose of section 544 "is to prevent a debtor from diminishing, to the detriment of some or all creditors, funds that are generally available for distribution to creditors." *Norberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177, 1181 (11th Cir. 1987); *see also Buncher Co. v. Official Committee of Unsecured Creditors of Genfarm LP IV,* 229 F.3d 245, 250 (3d Cir. 2000) *(citing In re Cybergenics Corp.*, 226 F.3d 237, 241-42 (3d Cir. 2000) (statute's purpose is "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away").  Thus, when determining whether a transfer is fraudulent, courts look to its <u>effect</u> on the debtor's estate:  "The touchstone . . . is the unjust diminution of the estate of the debtor that otherwise would be available to the creditor." G. Glenn, *The Law of Fraudulent Conveyances* § 195 (1931).

In the Eleventh Circuit, courts look to "the entire circumstance of the transactions" in determining whether property is "property of the debtor" for fraudulent transfer purposes.  *In re Chase & Sanborn Corp*., 813 F.2d at 1181-82.  "The dispositive question is whether the Debtor had *control* over the subject funds."  *In re Bankest Capital Corp*., 374 B.R. 333, 338 (Bankr.

---

[18] Any challenge to the validity of the Debtor Liens would be barred by the law of the case doctrine.  The doctrine of "law of the case" precludes the relitigation of issues decided previously by coordinating courts.  *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988).  It is well settled that when a bankruptcy court affirmatively resolves an issue "either expressly or by necessary implication through final judgments and orders of the court, including decisions that were issued without an opinion" in a main case, that decision is binding in subsequently filed adversary proceedings.  *Artra Group, Inc. v. Salomon Bros. Holding Co.,* No. 95-C-5233, 1996 WL 637595 at *4-5 (N.D. Ill. Oct. 31, 1996); *see also Cohen v. Bucci,* 905 F.2d 1111, 1112 (7th Cir. 1990); *In re Montagne,* No. 08-1024, 2010 WL 396252, at *6 (Bankr. D. Vt. Jan. 25, 2010).  Here, the Challenge Order (which was rendered final when no objections were made by the Challenge Date) plainly provides that the Debtor Liens "shall be valid, perfected, nonavoidable, and in full force and effect, not subject to any claims, counterclaims, setoffs, or defenses" and that the waiver and release granted in the Challenge Order was "final and binding on all parties."  [D.E. 77]. A challenge at this juncture by the Trustee to the validity of the Debtor Liens would be inconsistent with the Court's earlier Orders affirming the Debtor Liens as valid and unavoidable.

S.D. Fla. 2007) (citing *In re Chase & Sanborn Corp.*, 813 F.2d at 1181-82).  To establish "control," the Trustee must be able to satisfy a two prong test:

> [C]ontrol has two components: first, the power to designate which party will receive the funds; and second, the power to actually disburse the funds at issue to that party . In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

*In re Bankest Capital Corp.* 374 B.R. at 338-339 (quoting *In re Safe-T-Brake of S. Fla., Inc.,* 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993)).

Requisite control for purposes of Section 544 of the Bankruptcy Code cannot be found if the debtor had no equitable interest in the funds, even if the debtor once possessed the funds.  For instance, in *In re Chase & Sanborn*, the Court sustained the dismissal of a trustee's avoidance claim relating to the transfer of funds obtained through a personal loan of the debtor corporation's principal even though the loan proceeds were placed in a debtor account for a few days and then used to repay the owner's personal loan.  The Court stated, " . . .neither the use by the debtor of some of the funds for its own purposes nor the fact that the debtor's president [Duque] ordered the transfer can overcome the overwhelming evidence that Duque, not Chase & Sanborn, controlled the transaction at issue."  *Chase & Sanborn*, 813 F.2d at 1182; *see also Maple Mortgage, Inc. v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 595 (5th Cir. 1996) (citing *Southmark Corp. v. Grosz (In re Southmark)*, 49 F.3d 1111, 1117 (5th Cir. 1995) (transfer by debtor of funds obtained in purchase of mortgage servicing rights not recoverable by trustee as fraudulent transfer because debtor had only legal title to funds and no equitable interest in them; debtor found to be holding funds for those to whom money was owed)); *see also Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399, 1401-02 (6th

Cir. 1984) (pre-petition setoff by bank to satisfy claim secured by lien on accounts receivable could not constitute fraudulent transfer because it did not diminish assets available to other creditors).

Guarantors have no interest, legal or equitable, in the proceeds of the loans guaranteed. *See Varsames v. Palazzo,* 96 F. Supp. 2d 361 (S.D.N.Y. 2000) (holding that guarantor's interest in property he personally guaranteed was solely "in the nature of a contingent liability rather than a property right") (citing *Pro-Specialties Inc. v. Thomas Funding Corp.,* 812 F.2d 797, 799 (2d Cir. 1987); *see also* 38A CJS Guaranty *Rights and Remedies of Guarantor* (West 2010) (stating that "the guaranty relationship does not merge with that of a principal borrower").

In order for his complaint to survive, the Trustee must sufficiently allege that the property transferred was "property of the debtor" under section 544 of the Bankruptcy Code. He has not and cannot do so. The transferred $148 million that the Trustee seeks to recover derived from monies that Credit Suisse lent to its Borrower, not the Debtors. It is evident from the facts as pleaded in the Second Amended Complaint, the record in the Debtors' bankruptcy cases and the undisputed documents integral to the pleading that are attached to Margulies Declaration, the Trustee has failed to and cannot plead sufficient facts to state a claim relating to the Non-Debtor Transfers.

Neither component of the Eleventh Circuit "control" test can be met. The Credit Agreements and Subsidiary Guaranties alike establish that the Debtors were not a "Borrower" of the funds relating to the Credit Suisse Loan, but were mere guarantors. Indeed, the Trustee acknowledges the Debtors' status as guarantors in paragraph 65 of the Second Amended Complaint. As mere guarantors, the Debtors never had any legal or equitable interest in or right

to the $148,000,000. Consistent with the Debtors' status as guarantors, no Borrower Net Proceeds from the Credit Suisse Loan were ever deposited into a Debtor account and the Debtors never possessed any portion of those funds. In short, the Debtors lacked the power to designate who could receive the transferred funds as well as the power to disburse the funds at issue to anyone.

The Trustee, aware that the distinction between the rights of a borrower and a guarantor to the proceeds of a loan is of crucial importance to his case, improperly attempts to blur this important distinction by confabulating at paragraph 56 of the Second Amended Complaint that the Debtors were "co-Borrowers." Given the clear language of the Credit Agreements and the Debtor Guaranties, the Trustee's characterization of the Debtors as co-Borrowers is just plain wrong.

The Trustee's claim cannot be salvaged by his allegation that the financing transaction was designed to enable the defendants to effectively "loot" the Debtors. Sec.Am.Compl. at ¶¶9 74. No property of the Debtors was transferred to the defendants herein, let alone looted. The Debtors were not entitled to any of the Net Borrower Proceeds from the Credit Suisse Loan, and the Debtors never controlled them.

Nor can the Trustee's claim be salvaged by his allegation that the Borrower made internal accounting entries allocating a portion of the Net Borrower Proceeds to the Debtors Sec.Am.Compl. p 33 at ¶68. Such internal entries, made by the Borrower parent for administrative purposes, are not reflective of any movement of any of the funds either into or out of any Debtor accounts. There were no such movements. Nor do the internal entries reflect that the Debtors had any right to or interest in any of the funds. As the undisputed documents

attached hereto that are integral to the pleading show, the Debtors were not borrowers. They never had any right to receive the loan proceeds at issue in this case or to direct to whom they could be transferred.

Given the Trustee's failure and inability to allege that the Debtors were a Borrower or had any "control" over the transferred funds, the Trustee cannot state a claim that the transfer of the $148 million that he seeks to avoid consisted of any "property" of the Debtors, as required by section 544. Accordingly, the Trustee cannot state a claim that the Non-Debtor Transfers to any of the defendant transferees are avoidable under section 544. The only conveyances from the Credit Suisse Loan that the Trustee could have potentially avoided were the Debtor Liens. The Trustee elected early in this Bankruptcy Case not to pursue any avoidance actions relating thereto.

### B.    The New York Counts Should be Dismissed Because the "Applicable Law" Under § 544 is Florida Law.

Section 544(b) of the Bankruptcy Code permits a trustee to recover any fraudulent transfer avoidable under "*applicable law*." 11 U.S.C. §544(b) (emphasis added). "Applicable law" for purposes of section 544(b) is applicable *state* law. *In re McElwee,* 161 B.R. 41, 43 (Bankr. S.D.Ill. 1993) (citing 4 *Collier on Bankruptcy* ¶ 544.03[1]); *In re Kenval Mktg. Corp.*, 69 B.R. 922, 923 (Bankr. E.D. Pa. 1987) (applicable law is state law for purposes of §544(b)). Notably, the term "law" as used by section 544(b) is singular, reflecting the intent of Congress that just one state's law will constitute the applicable law, not multiple states' laws. Accordingly, when a party pleads causes of action or defenses under multiple states' laws in a fraudulent conveyance action, a court will only permit recovery under one state's law. *See In re Friedlander Capital Mgmt. Corp.,* 411 B.R. 434 (Bankr. S.D. Fla. 2009) (where the Trustee

brought section 544 claims under Connecticut law, but asserted that Florida law applied to the defense of "reverse veil piercing," this Court applied Connecticut law uniformly); *In re Prosser*, Adv. No. 08-03002, 2009 WL 3270765, at *5 (Bankr. D.V.I. Oct. 9, 2009) (dismissing several counts of a Trustee's complaint which sought recovery under the fraudulent conveyance statutes of New York, Florida and the Virgin Islands, on grounds that the applicable law is Florida law alone, and thus only the Florida law counts survived); *In re Hydrogen, L.L.C.,* Adv. No. 09-01142(AJG), 2010 WL 1609536, at *10 (Bankr. S.D.N.Y. Apr. 20, 2010) (holding that where the Trustee asserted a cause of action under § 544(b) by pleading liability under both the Ohio and New York fraudulent conveyance laws, the court's first focus should be a choice of law analysis to determine which law is the "applicable law" under §544(b));  *In re Trace Int'l. Holdings, Inc.,* 287 B.R. 98, 105 (Bankr. S.D.N.Y. 2002) (applying only the New York fraudulent conveyance statute in a § 544(b) action, notwithstanding the fact that the Trustee brought causes of action under both the Delaware and New York fraudulent conveyance statutes).

### 1.    The Three Approaches to Choice of Law Under *Friedlander*

To determine the "applicable law" the Court must engage in a choice of law analysis. This Court has recently held in the context of a claim to avoid fraudulent transfers under section 544(b) that it may employ one of three choice of law approaches: (1) the diversity jurisdiction approach; (2) the uniform federal common law approach; or (3) the hybrid approach.  *In re Friedlander,* 411 B.R. at 441-43.  As reflected in the *Friedlander* decision, when all three approaches point to application of the same state's law to claims or defenses under section 544(b) of the Bankruptcy Code, then the court need not adopt one approach over the others.  In the present case, each of the choice of law approaches enunciated in *Friedlander* leads conclusively to the application of Florida law.

- **The Diversity Jurisdiction Approach**

"Under the diversity jurisdiction approach, bankruptcy courts borrow from the law applicable in diversity cases to hold that the forum state's choice of law rules are imposed on bankruptcy adjudications where the underlying rights and obligations are defined by state law." *In re Friedlander Capital Mgmt. Corp.,* 411 B.R. at 441-42 (quoting *Marine Midland Bank v. Portnoy (In re Portnoy)*, 201 B.R. 685, 697 (Bankr. S.D.N.Y. 1996)) (internal citations and quotation marks omitted). Actions commenced under section 544(b) are plainly actions where the parties' underlying rights and obligations are defined by state law. *In re Friedlander Capital Mgmt. Corp.*, 411 B.R. at 442. Here the forum state is Florida. Therefore, under the diversity jurisdiction approach, Florida choice of law rules will apply. *Id.*[19]

Florida's choice of law provisions provide that the appropriate law should be determined by first classifying the type of claim (*e.g.*, tort, breach of contract, breach of fiduciary duty), and then looking to the applicable provisions of the Restatement (Second) of Conflicts of Law to determine which state's law applies. *See Mukamal v. Bakes,* 383 B.R. 798, 815 (S.D. Fla. 2007) ("Under Florida law, courts must characterize the claims at issue… and then look to the Second Restatement of Law on Conflicts of laws.") (citing *Grupo Televisa v. Telemundo Commc'ns Group, Inc.,* 485 F.3d 1233, 1240-41 (11th Cir. 2007); *Int'l Ins. Co. v. Johns,* 874 F.2d 1447, 1458 at n.19 (11th Cir. 1989); *In re Dear Creek Prods., Inc.,* 325 B.R. 913, 916 (S.D. Fla. 2005)).

---

[19] The "diversity jurisdiction approach" provides yet another reason for the Court to consider undisputed documents on this motion that are not referenced explicitly in the First Amended Complaint. Since the Court is in effect treating this proceeding for choice of law purposes as an action in which there is complete diversity among the parties, and in deciding the threshold issue of diversity the federal courts will typically consider matters outside the pleadings, the same degree of flexibility should be employed in this threshold motion to dismiss.

The Trustee's fraudulent conveyance action herein is most appropriately classified as a tort. *See In re Cyrus II P'ship,* 413 B.R. 609, 619 (Bankr. S.D. Tex. 2008) ("[A]voidance actions under § 544(b) are appropriately characterized as tort actions.  As actions that sound in tort, § 145 of the Restatement should apply in determining conflict of law issues").  Likewise, in this action for avoidance and recovery of alleged fraudulent transfers, section 145 of the Restatement (Second) of Conflict of Laws supplies the choice of law analysis applicable to Trustee's claims.

Section 145 of the Restatement (Second) of Conflict of Laws provides:

> (1)    The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2)    Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>> (a)    the place where the injury occurred,
>>
>> (b)    the place where the conduct causing the injury occurred,
>>
>> (c)    the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>>
>> (d)    the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws §145 (1971).

This test is often referred to as the "significant relationship test."  The first and second prongs of the significant relationship test focus on the location of the injury.  *Id.*  Here, the alleged injury was the distribution of loan proceeds relating to the Debtors who conducted their businesses solely in Florida.  The Tesoro Project is located in Port St. Lucie, Florida (the "Tesoro

Project"). *See* Sec.Am.Compl. p.29 at ¶ 43. The Quail West Project is located in Naples, Florida (the "Quail West Project"). *See* Sec.Am.Compl. p.29 at ¶ 47. It was the Debtors' Florida assets relating to these Florida projects, as well as the assets of three other non-New York projects – one in Florida, one in the Bahamas, and one in North Carolina - that served as collateral for the Credit Suisse Loan. *See* Sec.Am.Compl. at ¶¶ 7 8. Each of the Debtor Liens was recorded in the applicable local Florida recording office. It is also evident from the facts gleaned from the Debtors' schedules that none of the Debtors' owned property in the State of New York.

Moreover, as outlined above, the funds at issue passed through Florida bank accounts of CS Borrower, Conduit Lender and CS Holding (each a Delaware entity authorized to conduct business in the State of Florida) and into certain bank accounts of the Lubert-Adler Defendants (Delaware entities).[20]

The third factor in the significant relationship test focuses on the parties' domicile, residence, nationality and place of business. Restatement (Second) of Conflict of Laws § 145(2)(c). Each of the Debtors' Petitions reflects a street address of 215 Celebration Place, Suite 200, Celebration, Florida. This is also the same address as CS Borrower and Conduit Lender, the entities which received and distributed the funds from Credit Suisse. The Debtors' principal place of business was likewise in Florida, where all of their tangible property was located. None of the Debtors or other relevant entities is incorporated in the State of New York or owns New York assets. Although Georgia entities, the Debtors are all authorized to conduct business in Florida.

---

[20]Ginn-LA CS Borrower, LLC, Ginn-LA CS Holding Co., LLC and Ginn-LA Conduit Lender, Inc.'s respective Qualifications to Conduct Business in the State of Florida from the public records of the Florida Secretary of State are attached to the Margulies Declaration as Exhibit J..

The final prong is the "place where the relationship, if any, between the parties is centered."  Restatement (Second) of Conflict of Laws § 145(2)(d).  As stated above, the centers of gravity for the relationship between the Debtors and the Lubert-Adler Defendants were the Tesoro and Quail West Projects and the Florida real estate associated with those projects.

Under the diversity jurisdiction approach, the first two factors in the significant relationship test are arguably the most important with respect to the Trustee's claims, because the gravamen of those claims is the alleged injury to the Debtors' estates.  As demonstrated above, those factors overwhelmingly favor the application of Florida law.

> •  **The Uniform Federal Common Law Approach**

The second approach to determining the appropriate choice of law is the "uniform federal common law approach."  *In re Friedlander Capital Mgmt. Corp.,* 411 B.R. at 442.  "Under the uniform federal common law approach, a bankruptcy court applies federal, not forum state, choice of law rules."  *Id.* (citing *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay),* 59 F.3d 942, 948 (9th Cir. 1995)).  This Court has recently explained the uniform federal common law approach as follows:

> In general, a bankruptcy court's choice of applicable law requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order to best accommodate the equities among the parties to the policies of those states.

*In re Friedlander Capital Mgmt. Corp.,* 411 B.R. at 442 (citing *In re Segre's Iron Works, Inc.,* 258 B.R. 547, 551 (Bankr. D. Conn. 2001); *Vanston Bondholders Prot. Comm. v. Green,* 329 U.S. 156, 162 (1946)) (internal quotation marks omitted).

In *Friedlander,* this Court noted that the primary focus of the uniform federal common law approach is which state has most significant contacts with the underlying transaction.  The

"significant contacts" analysis is similar to the "significant relationship" analysis. As set forth above, the Tesoro and Quail West projects were centered in Florida; the Debtors' assets securing the loans at issue were located in Florida; and the challenged distributions were accomplished through Florida bank accounts held by the Debtors' parent company or affiliates. Here, as in *Friedlander*, the Trustee has presented no allegations that New York has more significant contacts, much less evidence that would justify the parties' expenditure of resources on discovery relating to the New York Counts of the First Amended Complaint.

- **The Hybrid Approach**

The third and final approach to choice of law in section 544 cases is the hybrid approach.

In *Friedlander* this Court stated:

> Under the hybrid approach, courts first assess whether creation of federal common law, rather than application of the forum state's law is appropriate because the ability of the federal courts to create federal common law and displace state created rules is severely limited…. Before a bankruptcy court can create federal common law a significant conflict between some federal policy or interest and the use of state law must be specifically shown.

*Id.* at 442-43.

This Court in the *Friedlander* held that neither party had asserted, nor did the Court itself find, any conflict between federal policy or interest and the application of state law. *Id.* at 443. To the contrary, the Court found that actions brought under section 544(b), which specifically incorporate state law by reference, do not create a significant conflict between federal policy and state laws. When no such conflict exists, and therefore no significant federal policy favors the application of one state's law over another, the court should determine which state's law is appropriate under the two previously discussed approaches. *Id.* at 443. As demonstrated above,

the "diversity jurisdiction approach" and the "uniform federal common law approach" point definitively to the exclusive application of Florida law in this proceeding.

- The New York Choice of Law Provision in the First and Second Lien Credit Agreements with Credit Suisse is Irrelevant.

The Trustee alleges in the Second Amended Complaint that "[t]he principal loan transaction documents were a First Lien Credit Agreement and a Second Lien Credit Agreement, both of which contained a choice of law provision purporting to invoke New York law." Am. Compl. at ¶ 60. The Credit Agreements state in paragraph 9.15: "This Agreement shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York without regard to conflict of law principles." *See* Exhibits A and B to Margulies Declaration.

This is not an action to construe or enforce the Credit Agreements. Indeed, Credit Suisse's rights have already been determined in the underlying bankruptcy cases. Thus, the choice of law provision in the Credit Agreements is entitled to no weight.

In *In re Morse Tool, Inc.*, 108 B.R. 384 (Bankr. D. Mass. 1989), the bankruptcy court rejected the defendant's argument that Connecticut law should apply to the trustee's fraudulent conveyance claim based upon a choice of law provision in the loan and security agreement at issue. Despite the broad language of the choice of law provision, which covered "this agreement and all transactions, assignments and transfers hereunder," the court held that this language did not apply to a claim for fraudulent conveyance: "But this is a fraudulent conveyance action, not a contract action. And one of the parties to this suit – the Trustee, who stands in the shoes of the creditors – was not a party to the contract." *Id.* at 386. Here, the Trustee's claims against the Lubert-Adler Defendants arise from *post-loan transfers* that are more remotely related to the

Credit Suisse loan transaction than were the challenged transfers in *In re Morse Tool* from the loan at issue in that case. Accordingly, the reasoning and holding of that case apply with even greater force. As the bankruptcy court explained:

> [T]he focus here should be not so much on the debt to which the fraudulent conveyance action is ancillary as on the fraudulent conveyance action itself. A fraudulent conveyance action is one in which creditors seek to avoid a conveyance of assets from the debtor to a transferee. The crucial parties in the suit, the creditors and the transferee, usually have not dealt directly with each other. The only things they have in common are dealings with the same debtor and claims of entitlement to certain asset[s] of that debtor. . . . [I]t would be reasonable to look to the site of the (allegedly) fraudulently conveyed assets to supply the applicable law.

*Id.* at 387.

As demonstrated above, the situs of the challenged transfers in this proceeding together with virtually all significant contacts point to the application of Florida law. Since the First and Second Lien Credit Agreements provide no basis for the application of New York law, the New York Counts in the Second Amended Complaint should be dismissed.

## V.    CONCLUSION

For all the reasons set forth above, the Second Amended Complaint should be dismissed. The Trustee cannot avoid the Non-Debtor Transfers and recover $148,000,000 because the Debtors, mere guarantors, never had an interest in and never controlled any of the transferred property. Thus, the Non-Debtor Transfers did not diminish to the detriment of any creditor of the Debtors any funds that were generally available for distribution to them. Since the Non-Debtor Transfers are not avoidable, the Trustee cannot recover the value of any of them from any of the defendants.

Alternatively, Counts I, II, VI and VII (the New York Counts) of the Second Amended Complaint should be dismissed in their entirety. Neither the allegations in the Second Amended

Complaint, the facts contained in the Debtors' schedules and other documents of public record, nor the indisputable facts concerning the source of the transfers at issue, suggest any basis to apply New York law under recent precedent in this Court.   Florida law applies exclusively to the Trustee's claims.   There is no sound reason to allow the New York Counts in this action to

proceed and require the parties and the Court to expend resources in pretrial discovery pursuing these claims.

Dated: September 24, 2010                    Respectfully submitted,

                                                                           BERGER SINGERMAN, P.A.
Counsel to Lubert-Adler Management Co., L.P., Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., Lubert-Adler Capital Real Estate Fund III, L.P., Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P., and Lubert-Adler Capital Real Estate Fund IV, L.P.

200 South Biscayne Boulevard
Suite 1000
Miami, Florida  33131
(305) 755-9500
Fax: (305) 714-4340

By: *s/ Paul Steven Singerman*
Paul Steven Singerman
Fla. Bar No. 378860
singerman@bergersingerman.com

- AND -

KLEHR HARRISON HARVEY
BRANZBURG LLP
William A. Harvey
Rona J. Rosen
1835 Market Street
Philadelphia, PA  191103
(215) 568-6060
Fax: (215) 568-6603
*Admitted pro se.*

# EXHIBIT A - SERVICE LIST

Pursuant to the Court's Electronic Mailing Notice List, the following parties are currently registered to receive Notice of Electronic Filings in this adversary proceeding:

**Scott L Baena , Esq.**
**sbaena@bilzin.com**
**eservice@bilzin.com**
**lflores@bilzin.com**
**abeck@bilzin.com**
*Counsel for the President and Fellows of Harvard College; Yale University; Yale University Retirement Plan for Staff Employees; Yale University Retiree Health Benefits Coverage Trust; The Trustees of Princeton University; The Regents of the University of Michigan; and Washington University of St. Louis*

**Harold D Moorefield Jr.**
**hmoorefield@stearnsweaver.com**
**cgraver@stearnsweaver.com**
**larrazola@stearnsweaver.com**
**rross@stearnsweaver.com**
**mmesones-**
**mori@stearnsweaver.com**
*Counsel for Plaintiff, Drew M. Dillworth*

**Stephen D. Busey, Esq.**
**Allan E Wulbern**
**awulbern@smithhulsey.com**
**kgammill@smithhulsey.com**
**jbolling@smithhulsey.com**
**asyed@smithhulsey.com**

**Robert N Gilbert, Esq.**
**rgilbert@carltonfields.com**
**kdemar@carltonfields.com**
*Counsel for Credit Suisse, Cayman Islands Branch*

3105265-1

# EXHIBIT B - SERVICE LIST

Copies will be provided via regular U.S. mail upon the following:

Eugene E. Stearns, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL 33130

Harold D. Moorefield, Jr., Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL 33130

Robert Gilbert, Esq.
525 Okeechobee Boulevard
Suite 1200
West Palm Beach, FL 33401

Rona J. Rosen, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

Scott L. Baena, Esq.
Jay M. Sakalo, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-5340

Stephen B. Busey, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202

Lynn F. Chandler, Esq.
Smith Moore Leatherwood LLP
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202

Kozyak Tropin & Throckmorton, P.A.
Charles W. Throckmorton, Esq.
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134

Andrew Stearns, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200

Miami, FL 33130

Ropes & Gray
D. Ross Martin, Esq.
Peter L. Welsh, Esq.
Keith H. Wofford, Esq.
One International Place
Boston, MA 02110-2624

Allan E. Wulbern, Esq.
Smith Hulsey & Busey
225 Water Street, #1800

Jacksonville, FL 32202

Mattew W. Buttrick, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL 33130