# Exhibit A

 EXECUTION VERSION

# FIRST LIEN CREDIT AGREEMENT

### DATED AS OF JUNE 8, 2006

Among

### GINN-LA CS BORROWER, LLC

and

### GINN-LA CONDUIT LENDER, INC.
collectively, as the Borrower,

### THE LENDERS LISTED HEREIN,
as the Lenders,

### CREDIT SUISSE, CAYMAN ISLANDS BRANCH
as Administrative Agent and Collateral Agent

and

### CREDIT SUISSE SECURITIES (USA) LLC,
as Paying Agent, Fronting Bank, Sole Lead Arranger and Sole Bookrunner,

---

### $525,000,000 SENIOR FIRST LIEN CREDIT FACILITY

---

**CREDIT AGREEMENT**

TABLE OF CONTENTS

Page

Section 1. DEFINITIONS ........................................................................................ 7

  1.1   Certain Defined Terms ............................................................................ 7
  1.2   Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
       Calculations Under Agreement .............................................................. 36

Section 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS ........... 37

  2.1   Tranche A Credit-Linked Deposit Accounts .......................................... 37
  2.2   Commitments; Loans ............................................................................ 41
  2.3   Disbursement Procedures for Tranche B Loans ..................................... 42
  2.4   Disbursement Procedures for Tranche A Loans ..................................... 43
  2.5   Letters of Credit ................................................................................... 44
  2.6   Interest on the Loans ............................................................................ 47
  2.7   Fees .................................................................................................... 51
  2.8   Repayments and Prepayments; General Provisions Regarding Payments .... 52
  2.9   Use of Proceeds ................................................................................... 58
  2.10  Special Provisions Governing Eurodollar Rate Loans ............................ 58
  2.11  Increased Costs; Taxes ......................................................................... 60
  2.12  Mitigation Obligations; Replacement of Lenders .................................. 63
  2.13  Releases of Collateral .......................................................................... 63
  2.14  Break Funding Payments ...................................................................... 65

Section 3. CONDITIONS TO EFFECTIVENESS ................................................... 65

  3.1   Conditions to Effectiveness on the Effective Date ................................. 65
  3.2   Conditions to Each Credit Event ........................................................... 71
  3.3   Conditions to Disbursements from the Company's Operating Account ..... 72

Section 4. REPRESENTATIONS AND WARRANTIES .......................................... 72

  4.1   Organization and Qualification. ............................................................ 73
  4.2   Power and Authority ............................................................................ 73
  4.3   Legally Enforceable Agreement ........................................................... 73
  4.4   No Conflict .......................................................................................... 73
  4.5   Capital Structure ................................................................................. 74
  4.6   Special Purpose Entity ......................................................................... 74
  4.7   Corporate Names ................................................................................. 74
  4.8   Business Locations; Agent for Process .................................................. 74
  4.9   Title to Properties ............................................................................... 74
  4.10  Priority of Liens; UCC-1 Financing Statements .................................... 75
  4.11  No Subordination ................................................................................ 75
  4.12  Permits; Franchises ............................................................................. 75
  4.13  Indebtedness ....................................................................................... 75
  4.14  Financial Condition; Pro Forma Balance Sheet; Projections .................. 75
  4.15  Disclosure ........................................................................................... 76

CREDIT AGREEMENT

EXECUTION VERSION

4.16   Solvent Financial Condition...................................................................................76
4.17   Surety Obligations...............................................................................................76
4.18   Taxes....................................................................................................................77
4.19   Brokers.................................................................................................................77
4.20   Intellectual Property.............................................................................................77
4.21   Governmental Authorization.................................................................................77
4.22   Compliance with Laws.........................................................................................78
4.23   Ground Leases......................................................................................................78
4.24   Litigation..............................................................................................................79
4.25   No Defaults...........................................................................................................79
4.26   Leases...................................................................................................................79
4.27   Employee Benefit Plans.......................................................................................79
4.28   Labor Relations....................................................................................................80
4.29   Not a Regulated Entity.........................................................................................80
4.30   Margin Stock........................................................................................................80
4.31   No Material Adverse Change................................................................................80
4.32   Environmental Matters.........................................................................................80
4.33   Material Contracts................................................................................................82
4.34   Utilities.................................................................................................................82
4.35   Licenses................................................................................................................82
4.36   Entitlements.........................................................................................................83
4.37   Loan Documents...................................................................................................83
4.38   Insurance Coverage..............................................................................................84
4.39   Master Declarations.............................................................................................84

Section 5. AFFIRMATIVE COVENANTS....................................................................................84

5.1    Visits and Inspections..........................................................................................84
5.2    Notices..................................................................................................................85
5.3    Financial Statements and Other Reports..............................................................86
5.4    Corporate Existence.............................................................................................91
5.5    Payment of Taxes and Claims; Tax Consolidation..............................................91
5.6    Maintenance of Properties; Insurance..................................................................91
5.7    Lender Meeting.....................................................................................................91
5.8    Compliance with Laws and Equator Principles....................................................92
5.9    Environmental Disclosure and Inspection............................................................92
5.10   The Borrower's Remedial Action Regarding Hazardous Materials......................93
5.11   Subsidiaries..........................................................................................................94
5.12   Interest Rate Protection........................................................................................94
5.13   Further Assurances...............................................................................................95
5.14   Title......................................................................................................................95
5.15   Estoppels..............................................................................................................95
5.16   SPE Covenants......................................................................................................95
5.17   Maintenance of Entitlements................................................................................97
5.18   Asset Sales...........................................................................................................97
5.19   Control..................................................................................................................97
5.20   Credit Rating........................................................................................................97
5.21   Accounts...............................................................................................................97
5.22   Bahamas Intercompany Indebtedness...................................................................98
5.23   Maintenance of Ground Leases............................................................................98
5.24   Material Contracts................................................................................................98

2

CREDIT AGREEMENT

 EXECUTION VERSION

Section 6. NEGATIVE COVENANTS ....................................................................................... 99

   6.1    Indebtedness........................................................................................ 99
   6.2    Liens and Related Matters............................................................... 100
   6.3    Investments ...................................................................................... 101
   6.4    Contingent Obligations ................................................................... 102
   6.5    Restricted Payments ........................................................................ 102
   6.6    Financial Covenants........................................................................ 102
   6.7    Restriction on Fundamental Changes .............................................. 104
   6.8    Asset Sales ....................................................................................... 104
   6.9    Transactions with Shareholders and Affiliates .............................. 105
   6.10   Conduct of Business........................................................................ 106
   6.11   Amendments or Waivers of Certain Agreements. ........................... 106
   6.12   Fiscal Year ....................................................................................... 106

Section 7. EVENTS OF DEFAULT ......................................................................................... 106

   7.1    Payment of Obligations.................................................................... 106
   7.2    Misrepresentations .......................................................................... 106
   7.3    Breach of Certain Covenants .......................................................... 106
   7.4    Breach of Other Covenants ............................................................. 107
   7.5    Default Under Loan Documents ...................................................... 107
   7.6    Second Lien Credit Agreement; Other Defaults .............................. 107
   7.7    Material Adverse Effect.................................................................... 107
   7.8    Solvency........................................................................................... 107
   7.9    Insolvency Proceedings.................................................................... 107
   7.10   Business Disruption; Condemnation................................................ 108
   7.11   ERISA.............................................................................................. 108
   7.12   Challenge to Loan Documents ........................................................ 108
   7.13   Judgment .......................................................................................... 108
   7.14   Change in Control ............................................................................ 108
   7.15   Criminal Forfeiture ......................................................................... 109

Section 8. AGENTS................................................................................................................... 109

   8.1    Appointment .................................................................................... 109
   8.2    Rights as a Lender............................................................................ 110
   8.3    Exculpatory Provisions .................................................................... 110
   8.4    Reliance by the Agents .................................................................... 111
   8.5    Delegation of Duties ........................................................................ 111
   8.6    Resignation of Administrative Agent and/or Collateral Agent.......... 111
   8.7    Collateral Documents; Successor Collateral Agent ......................... 112
   8.8    Non-Reliance on Agents and Other Lenders .................................. 112
   8.9    Withholding Taxes........................................................................... 113

Section 9. MISCELLANEOUS ................................................................................................ 113

   9.1    Assignments and Participations in Loans ....................................... 113
   9.2    Expenses; Indemnity; Damage Waiver............................................ 116
   9.3    Right of Set-Off ............................................................................... 117
   9.4    Sharing of Payments by Lenders .................................................... 117

3

CREDIT AGREEMENT

LA000015

 EXECUTION VERSION

| | | |
|---|---|---|
| 9.5 | Amendments and Waivers | 118 |
| 9.6 | Independence of Covenants | 119 |
| 9.7 | Notices | 119 |
| 9.8 | Survival of Representations, Warranties and Agreements | 121 |
| 9.9 | Failure or Indulgence Not Waiver; Remedies Cumulative | 121 |
| 9.10 | Marshalling; Payments Set Aside | 122 |
| 9.11 | Severability | 122 |
| 9.12 | Obligations Several; Independent Nature of the Lenders' Rights | 122 |
| 9.13 | Maximum Amount | 122 |
| 9.14 | Headings | 123 |
| 9.15 | Applicable Law | 123 |
| 9.16 | Successors and Assigns | 123 |
| 9.17 | Consent to Jurisdiction and Service of Process | 123 |
| 9.18 | Waiver of Jury Trial | 124 |
| 9.19 | Confidentiality | 124 |
| 9.20 | Limitation of Liability | 125 |
| 9.21 | Counterparts; Integration; Effectiveness; Electronic Execution | 125 |
| 9.22 | USA Patriot Act Notification | 126 |

4

**CREDIT AGREEMENT**

LA000016

 EXECUTION VERSION

## SCHEDULES

Schedule 1.1(a)..............Borrower Competitors
Schedule 1.1(b) .............List of Existing Indebtedness (to be extinguished)
Schedule 1.1(c).............Existing Equipment Financing
Schedule 1.1(d) .............Master Plans
Schedule 3.1E ...............Consents and Estoppels Required as of the Closing Date
Schedule 3.1G ...............Real Property Collateral
Schedule 3.1P................Capital Structure and Ownership of Borrower
Schedule 4.1 .................Organization and Qualification
Schedule 4.5.................Borrower's Subsidiaries
Schedule 4.7.................Corporate Names
Schedule 4.8.................Business Locations
Schedule 4.9C ...............Taxes Related to Project
Schedule 4.17................Surety Obligations
Schedule 4.18................Borrower's FEIN
Schedule 4.20...............Intellectual Property
Schedule 4.24................Litigation
Schedule 4.26................Leases
Schedule 4.27................Employee Benefit Plan
Schedule 4.28................Labor Relations
Schedule 4.32................Environmental Matters
Schedule 4.33................Material Contracts
Schedule 4.36 ................List of Current and Pending Entitlements
Schedule 4.38................Insurance Coverage
Schedule 4.39...............Master and Supplemental Declarations
Schedule 6.1 .................List of Permitted Existing Indebtedness

5

CREDIT AGREEMENT

NY\1139561.13

LA000017

 EXECUTION VERSION

## EXHIBITS

Exhibit I .........................Form of Project Projections
Exhibit II .......................Form of Collateral Assignment of Mortgage and Note
Exhibit III......................Form of Administrative Questionnaire
Exhibit IV.....................Form of Assignment Agreement
Exhibit V .......................Form of Compliance Certificate
Exhibit VI......................Form of Recognition, Collateral Assignment and Estoppel
                               Agreement
Exhibit VII ....................Form of Affiliate Operating Agreement Subordination
Exhibit VIII...................Form of Notes
Exhibit IX......................Form of Disbursement Authorization
Exhibit X.......................Form of Notice of Conversion/Continuation
Exhibit XI .....................Form of Pledge Agreement
Exhibit XI-A .................Form of Pledge Agreement and Limited Recourse Guaranty
Exhibit XII ....................Form of Security Agreement
Exhibit XIII...................Description of Project
Exhibit XIV...................Form of Request for Loan
Exhibit XV ....................Form of Mortgage
Exhibit XVI...................Form of Solvency Certificate
Exhibit XVII ................Form of Request for Release
Exhibit XVIII ...............Form of Qualified Sales Agreement
Exhibit XIX...................Intentionally Deleted
Exhibit XX ....................Form of Collateral Assignment of Declarant's Rights
Exhibit XXI ...................Form of Control Agreement
Exhibit XXII ................Form of Subsidiary Guaranty
Exhibit XXIII ...............Form of Intercreditor Agreement
Exhibit XXIV...............Location of Hammock Beach River Club 50 Acre and 1100 Acre
                               Required Release Tracts
Exhibit XXV .................Form of Reservation Agreement

6



EXECUTION VERSION

**CREDIT AGREEMENT**

This **FIRST LIEN CREDIT AGREEMENT** (this "<u>Agreement</u>") is dated as of June 8, 2006 and entered into by and among GINN-LA CONDUIT LENDER, INC., a Delaware corporation, and GINN-LA CS BORROWER, LLC, a Delaware limited liability company (collectively, the "<u>Borrower</u>"), THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF (each individually, together with its successors and assigns referred to herein as a "<u>Lender</u>" and collectively, together with their successors and assigns, as the "<u>Lenders</u>"), CREDIT SUISSE, CAYMAN ISLANDS BRANCH ("<u>Credit Suisse</u>"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns, the "<u>Administrative Agent</u>") and as collateral agent (in such capacity, together with its successors and assigns, the "<u>Collateral Agent</u>"), CREDIT SUISSE SECURITIES (USA) LLC, as lead arranger for the Lenders (in such capacity, together with its successors and assigns, the "<u>Arranger</u>") as paying agent (in such capacity, together with its successors and assigns, the "<u>Paying Agent</u>"), as fronting bank (in such capacity, together with its successors and assigns, the "<u>Fronting Bank</u>"), and as sole bookrunner (in such capacity, together with its successors and assigns, the "<u>Bookrunner</u>"; together with the Administrative Agent, the Arranger, the Collateral Agent and the Paying Agent, the "<u>Agents</u>") for the Lenders.

## R E C I T A L S

A.   WHEREAS, the Borrower desires that the Lenders extend certain senior term loans (Tranche B) to the Borrower hereunder, the proceeds of which, together with the proceeds of the loans under the Second Lien Credit Agreement will be used: (i) to repay the Existing Indebtedness of the Borrower and its Subsidiaries, (ii) to make certain distributions to the holders of the Capital Stock of the Borrower, and (iii) to pay the Transaction Costs.

B.   WHEREAS, the Borrower desires that the Lenders extend certain senior "synthetic revolving" loans (Tranche A) to the Borrower hereunder, the proceeds of which may be used to finance a portion of the development, construction and other costs associated with each Project and to fund general company and working capital needs of the Borrower and its Subsidiaries; and

C.   WHEREAS, the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrower subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, and for ten dollars and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree to enter into this Credit Agreement as follows:

## SECTION 1.
## DEFINITIONS

1.1   <u>Certain Defined Terms</u>.

The following terms used in this Agreement shall have the following meanings:

"<u>Account Holder</u>" means a financial institution reasonably acceptable to Administrative Agent at which certain Deposit Accounts and/or securities accounts will be maintained, it being understood and agreed that Colonial Bank and First Caribbean Bank are acceptable to Administrative Agent.

7

CREDIT AGREEMENT

LA000019

 ECUTION VERSION

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit III annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in Section 2.10C.

"**Affected Loans**" has the meaning assigned to that term in Section 2.10C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Affiliate Operating Agreement**" means any agreement between Borrower, any Subsidiaries of Borrower and any Affiliate thereof, which provides for the construction, operation and/or management of or provision of development consultant services to all or any portion of each Project.

"**Affiliate Operating Agreement Subordination**" means an agreement, substantially in the form of Exhibit VII, pursuant to which an Affiliate party to any Affiliate Operating Agreement agrees to certain subordinations and other provisions reasonably satisfactory to the Administrative Agent for the benefit of the Lenders.

"**Agents**" means, collectively, the Administrative Agent, Collateral Agent, the Arranger and the Bookrunner.

"**Agreement**" has the meaning assigned to that term in the introductory paragraph as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Applicable Base Rate Margin**" means with respect to Loans that are Base Rate Loans, (i) for Tranche B Loans and Tranche A Loans held by Tranche A Lenders, the applicable rate margin set forth on Appendix A attached hereto, and (ii) for Tranche A Loans held by the Fronting Bank, the applicable rate margin is 0.0%.

"**Applicable Eurodollar Rate Margin**" means with respect to Loans that are Eurodollar Rate Loans, (i) for Tranche B Loans and Tranche A Loans held by Tranche A Lenders, the applicable rate margin set forth on Appendix A attached hereto, and (ii) for Tranche A Loans held by the Fronting Bank, the applicable rate margin is 0.0%.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrower, any of its Subsidiaries, the Guarantors, each Project or any Collateral, or any of the other assets of the Borrower and its Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrower or any of its Subsidiaries, at any time in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrower and its Subsidiaries.

8

CREDIT AGREEMENT

LA000020




EXECUTION VERSION

"**Applicable Percentage**" means, (a) with respect to any Tranche A Lender for purposes of Section 2 or the calculation of the Tranche A LC Exposure or the Tranche A Exposure, or in respect of any indemnity claim arising out of an action or omission of the Fronting Bank under this Agreement, the percentage of the Tranche A Funding Amounts represented by such Tranche A Lender's Tranche A Funding Amount, and (b) with respect to any Lender in respect of any indemnity claim arising out of an action or omission of the Paying Agent under this Agreement, the percentage of the total of the Tranche A Funding Amounts and the aggregate principal amount of the Tranche B Loans represented by the respective aggregate amounts thereof held by such Lender. If the Tranche A Funding Amounts have been reduced to zero, the Applicable Percentages shall be determined based upon the Tranche A Funding Amounts most recently in effect, giving effect to any assignments. If the Tranche B Loans have been paid in full, the Applicable Percentages shall be determined based upon the principal amounts of the Tranche B Loans outstanding immediately before their payment in full, giving effect to any assignments.

"**Appraised Value**" means the "Total Net Value" (as defined in the Initial Appraisal) of the Real Property Collateral as determined by the Appraiser in the most recent and available Qualified Appraisal Update. As of the Effective Date, the Appraised Value of the Real Property Collateral based on the Initial Appraisal is $1,500,000,000.

"**Appraiser**" means, collectively, Cushman & Wakefield of Florida, Inc. and Cushman & Wakefield of Georgia, Inc., or such other independent appraisal firm selected by the Administrative Agent.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition (other than Operating Leases entered into in the Ordinary Course of Business) by the Borrower or any of its Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, any Capital Stock of the Borrower or the Borrower's Subsidiaries.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit IV annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Bahamas Borrower**" means Ginn-LA Conduit Lender, Inc. a Delaware corporation.

"**Bahamas Intercompany Indebtedness**" means Indebtedness pursuant to which Bahamas Owner is liable to Bahamas Borrower in a maximum amount from time to time of up to $276,750,000 to fund (1) Project Expenses associated with the construction and development of the Residential Lots located at the Project commonly known as Grand Bahamas (West End) and (2) other Project Expenses incurred by the Borrower or its Subsidiaries from time to time; provided that, (a) no Default or Event of Default has occurred and is continuing as of the time of the incurrence thereof or would result therefrom and (b) all such intercompany Indebtedness between the Bahamas Borrower and the Bahamas Owner shall be evidenced by a promissory note and secured by a mortgage, each of which shall have been pledged to the Collateral Agent pursuant to the Collateral Assignment of Mortgage and Note and such other documentation as Administrative Agent may reasonably require.

9

LA000021

 XECUTION VERSION

"**Bahamas Owner**" means Ginn-LA West End, Limited, an international business company formed under the laws of the Bahamas, which entity owns the Project commonly known as Grand Bahama (West End).

"**Bahamas Project Expenses**" means, for any period and without duplication, the costs and expenses incurred by the Bahamas Owner in connection with the development of the Grand Bahamas (West End) Project (including, without limitation, the development and subdivision of any Residential Lots, Infrastructure and any vertical improvements and bonding therefor) as contemplated in the Project Projections including, without limitation, general and administrative expenses, allocated overhead, marketing expenses, architectural, engineering and legal fees, developer and contractor fees, land development costs, construction costs, costs of acquiring additional Real Property Collateral in accordance with the Project Projections, and carrying costs (consisting of taxes, insurance costs, capital expenditures, and property owners association subsidies and reserve funding), excluding, however, for purposes of the definition of Net Cash from Project Sales, all costs and expenses associated with the operations of the Golf Courses, Membership Clubs and related amenities which are included in the calculation of Net Cash from Operations.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, at any time, the higher of (a) the Prime Rate or (b) the rate which is 0.5% in excess of the Federal Funds Effective Rate.

"**Base Rate Borrowing**" means a Borrowing of Base Rate Loans.

"**Base Rate Loans**" means Loans bearing interest at rates determined by reference to the Base Rate as provided in Section 2.6A.

"**Borrower**" has the meaning assigned to that term in the introductory paragraph.

"**Borrower Competitor**" means a Person primarily in the business of acquiring and developing land for sale as single family homes and condominiums, including, without limitation, those Persons identified by the Borrower on Schedule 1.1(a).

"**Borrower's Knowledge**" shall mean the actual knowledge, after reasonable inquiry, of the Responsible Officers of the Borrower.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401(a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by Borrower or its Subsidiaries.

"**Borrowing**" means (a) all Base Rate Loans of the same Class made, converted or continued on the same date or (b) all Eurodollar Rate Loans of the same Class that have the same Interest Period.

"**Bulk Asset Sale**" means an aggregate value of an Asset Sale or a series of related Asset Sales equal to or greater than $20,000,000.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; provided that with respect to matters relating to Eurodollar Rate Loans, the term "**Business Day**" shall mean a day other than a Saturday,

10

LA000022

 XECUTION VERSION

Sunday or other day on which commercial banks in New York City or London, England, are authorized or required by law to close.

"**Calculation Date**" means the last day of the relevant Fiscal Quarter.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means all monetary items treated as cash in accordance with GAAP, consistently applied.

"**Cash Collateral**" means the Cash and/or Cash Equivalents held in the Company's Operating Account.

"**Cash EBITDA**" means the sum during any period, without duplication, of (i) Net Cash from Project Sales, plus (ii) Net Cash from Operations, plus (iii) any interest earned on Cash held by the Borrower or any of its Subsidiaries and invested in Cash Equivalents (including interest earned on funds held in the Company's Operating Account).

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); (e) money market funds administered by the Account Holder with a rating of at least AAA from S&P, and (f) Eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash From Project Sales**" means, with respect to Borrower and its Subsidiaries, for any period and without duplication, the sum of (a) Cash Proceeds (other than Condemnation Proceeds) received during such period attributable to real estate transactions, which occurred during or prior to such period as either (i) a sale of real property, including sales of Residential Lots or (ii) the granting of an option for the purchase of real property (all amounts described in (i) and (ii) above included only if the Cash received with respect to such transaction is nonrefundable); (b) principal and interest collected in Cash on receivables arising from real estate transactions; and (c) Cash previously received in connection with a transaction described in (a)(i) and (ii) above which was previously refundable, but became nonrefundable during the current period; less (d) Permitted Transaction Costs properly allocable to such transactions.

11

LA000023

 EXECUTION VERSION

For purposes of the foregoing, the sale of the Capital Stock of any Subsidiary (to the extent permitted by this Agreement) that owns any Real Property Collateral shall be treated as a sale of such Real Property Collateral.

"**Cash Proceeds**" means, with respect to any Asset Sale, Cash payments (including any Cash received by way of deferred payment pursuant to, or monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means any breach of the covenant contained in Section 5.19.

"**Cleanup**" means all actions required to: (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are purported to be granted by the Collateral Documents.

"**Collateral Agent**" means Credit Suisse, in its capacity as collateral agent hereunder and under the Collateral Documents, and any successor in such capacity.

"**Collateral Assignment of Declarant's Rights**" means the Collateral Assignment of Declarant's Rights executed and delivered by the declarant under the Master Declarations in favor of the Collateral Agent for the benefit of the Agents and the Lenders substantially in the form of Exhibit XX annexed hereto.

"**Collateral Assignment of Mortgage and Note**" means (i) a collateral assignment of the intercompany note evidencing the Bahamas Intercompany Indebtedness and the mortgage encumbering the Project commonly known as Grand Bahama (West End) granted by Bahamas Owner in favor of Bahamas Borrower as security for the Bahamas Intercompany Indebtedness (ii) a collateral assignment of the purchase money promissory note and mortgage in connection with the Tesoro Golf Sale-Leaseback transaction, and (iii) such other collateral assignments of notes and mortgages delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents from time to time in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations, in each case, in substantially the form of Exhibit II annexed hereto as amended, amended and restated, supplemented and Modified from time to time.

"**Collateral Documents**" means the Security Agreement, the Mortgage, the Collateral Assignment of Mortgage and Note, the Recognition, Collateral Assignment and Estoppel Agreements, the Affiliate Operating Agreement Subordination, the Collateral Assignment of Declarant's Rights, the Subsidiary Guaranties, the Pledge Agreements and any other documents, instruments or agreements delivered by any Loan Party or any Shareholder Pledgor pursuant to this Agreement or any of the other Loan Documents from time to time in order to grant, protect or perfect liens on any assets of such Loan Party or any Shareholder Pledgor as security for all or any of the Obligations.

12

CREDIT AGREEMENT

LA000024

EXECUTION VERSION

"**Commercial Parcel**" means a parcel contemplated to be developed for commercial (i.e., retail, office or similar) purposes at the Project commonly known as Hammock Beach River Club, which lots are described as Parcel 1A and Parcel 1B in the Unit Development Agreement, executed as of January 17, 2006 for such Project.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in Section 2.2 of this Agreement.

"**Company's Operating Account**" means one or more Deposit Accounts or securities accounts to be established by the Borrower and its Subsidiaries pursuant to and in accordance with Section 5.21, which shall at all times be subject to a Control Agreement in favor of the Administrative Agent.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit V annexed hereto delivered to the Administrative Agent by the Borrower pursuant to Sections 5.3(iv), 5.3(xi), and 5.3(xvii).

"**Condemnation Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Condo Parcel**" means one or more parcels designated for development as approximately 100 condominium units at the Project commonly known as Tesoro, 300 condominium units at the Project commonly known as Laurelmor and 4396 condominium units at the Project commonly known as Grand Bahama (West End).

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited, less the portion of any such obligation that has been discharged or performed as of the date of determination.

"**Contractor**" means any contractor providing materials or services under a Material Contract.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

13

LA000025

 

"**Control Agreement**" means an account control agreement substantially in the form of Exhibit XXI or otherwise in form and substance acceptable to the Administrative Agent.

"**Credit Suisse**" means Credit Suisse, Cayman Islands Branch, or one or more of its other branches and any Affiliate thereof.

"**Debt Service**" means, for any period, all payments of interest and all scheduled payments of principal made during such period for all Indebtedness of the Borrower and its Subsidiaries (including, without limitation, the Indebtedness evidenced by the Loan Documents), but excluding all mandatory prepayments under Section 2.8(B)(ii).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Developer**" means Ginn Development Company, LLC or such other Affiliate of the Borrower providing development consultant services pursuant to a Development Agreement or similar agreement.

"**Disbursement Authorization**" means a notice in the form of Exhibit IX annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.3 with respect to a proposed borrowing.

"**Disbursement Date**" means any Business Day specified by the Borrower as a date on which the Borrower delivers a Disbursement Authorization.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Effective Date**" means such date on or prior to June 8, 2006, on which the conditions to effectiveness set forth in Section 3.1 are satisfied.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course of its business and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed) and so long as no Default or Event of Default has occurred and is continuing, approved by the Borrower (such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any of its Subsidiaries or, so long as no Event of Default has occurred and is continuing, any Borrower Competitor, other than any such Person that is a Lender as of the Effective Date.

14

CREDIT AGREEMENT

NY\1139561.13

LA000026

 EXECUTION VERSION

"**Entitlement Documents**" has the meaning assigned to that term in Section 4.36.

"**Entitlements**" shall mean those certain Governmental Authorizations which were required to be obtained and maintained (as applicable), or may be required to be obtained and maintained in the future, in order to allow the completion of the development work for each Project and the sale of the Residential Lots (including, without limitation, the Real Property Collateral) and portions of each Project as legal lots, all as contemplated by the Master Plans and the Project Projections, and including, without limitation, all Governmental Authorizations necessary to permit the legal subdivision and sale of the Residential Lots (to the extent the same are to be legally subdivided to achieve the Project Projections) and the development of the Infrastructure, the Golf Courses and the Membership Clubs as well as applicable earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, agreements and instruments relating thereto. The Entitlements currently in effect with respect to the Real Property Collateral are listed on Schedule 4.36 attached hereto. The Entitlements expected to be obtained by the Borrower in the future with respect to the Real Property Collateral are listed on Schedule 4.36 attached hereto under the heading "Pending Entitlements".

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Impact Assessment**" means, collectively (i) that certain "West End Project Environmental Impact Assessment" dated as of December 2004, including the Supplement thereto dated as of April 2005 and the Supplement Addendum thereto dated as of March 2006 (ii) that certain letter from Steven J. Peene, Applied Technology & Management, Inc., to John S. Davies, Ginn Development Company, dated as of June 5, 2006 regarding "West End Project, Grand Bahama Island, Equator Principles Compliance" (the "Equator Principles Review Report"), and (iii) any future Environmental Impact Assessments or Equator Principles Review Reports prepared pursuant to the terms of this Agreement.

"**Environmental Laws**" means all federal, state, local and foreign laws and regulations relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials, laws relating to the management or use of natural resources and the Equator Principles.

"**Environmental Liabilities**" means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and all Environmental Claims pending or threatened against any Loan Party or its Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or its Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental, health or safety conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or its Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

15

LA000027

 

"**Environmental Management Plan**" means that certain Environmental Management Plan included as part of the Environmental Impact Assessment along with any additional Mitigation Measures identified in the Environmental Impact Assessment.

"**Equator Principles**" means those certain principles and standards (including the preamble, materials incorporated by reference and exhibits thereto) voluntarily adopted by certain banks and other financial institutions, all as set forth more fully at www.equator-principles.com/principles.shtml, as the same exist on the date of this Agreement, including without limitation, the following World Bank and International Finance Corporation ("IFC") guidelines, policies and handbooks: Tourism and Hospitality Development Guideline (World Bank Pollution Prevention and Abatement Handbook, Sept. 2001), General Environmental Guidelines (World Bank Pollution Prevention and Abatement Handbook, July 1998), IFC Life and Fire Safety Guidelines (Dec. 2002), IFC Occupational Health and Safety Guidelines (June 2003), IFC Pesticide Handling and Application Guidelines (July 1, 1998) and IFC Hazardous Materials Management Guidelines (Dec. 2001), to the extent properly determined to be applicable to the Project commonly known as Grand Bahama (West End) by an Environmental Impact Assessment.

"**Equity Proceeds**" means the sum of (i) Cash Proceeds from the issuance of any Capital Stock or other equity Securities of the Borrower or any Subsidiaries of the Borrower; less (ii) underwriting discounts and commissions and other Permitted Transaction Costs. For the avoidance of doubt, Equity Proceeds do not include Investments or Intercompany Subordinated Debt made by the existing holders of Capital Stock in Borrower or its Subsidiaries as of the Effective Date in exchange for which additional Capital Stock is not issued to the Person making such Investment provided, however that such Equity Proceeds or proceeds of Intercompany Subordinated Debt are used for (A) Project Expenses and Bahamas Project Expenses in a manner consistent with the Project Projections, (B) for purposes of purchasing additional Real Property Collateral to the extent designated in an Officer's Certificate by a Responsible Officer of the Borrower to be used for such purpose, which purchase shall occur prior to one calendar year following the date of such Investment and which Real Property Collateral will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof or (C) to make a voluntary prepayment in accordance with Section 2.8B(i) hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrower is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrower is a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrower, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a

16

 EXECUTION VERSION

notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrower or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrower or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrower or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrower or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrower or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401(a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurocurrency Reserve Requirements**" means, for each Interest Period for each Eurodollar Rate Loan, the highest reserve percentage applicable to each Lender making such Eurodollar Rate Loan during such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System or any successor for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement), with respect to liabilities or assets consisting of or including Eurocurrency liabilities having a term equal to such Interest Period.

"**Eurodollar Base Rate**" means the rate per annum (determined by the Administrative Agent or the Paying Agent, as applicable) at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of the relevant Interest Period (as specified in the applicable Disbursement Authorization or Notice of Conversion/Continuation) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent or the Paying Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Base Rate" shall be the interest rate per annum determined by the Administrative Agent or the Paying Agent, as applicable, to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Reference Lenders at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of such Interest Period. If any of the Reference Lenders shall be unable or shall otherwise fail to supply such rates to the Administrative Agent or Paying Agent upon its request, the rate of interest shall be determined on the basis of the quotations of the remaining Reference Lenders.

"**Eurodollar Borrowing**" means a Borrowing of Eurodollar Rate Loans.

"**Eurodollar Rate Loans**" means Loans bearing interest at rates determined by reference to the Reserve Adjusted Eurodollar Rate as provided in Section 2.6A.

"**Event of Default**" means each of the events set forth in Section 7.

17

CREDIT AGREEMENT

LA000029

 EXECUTION VERSION

"**Excess Cash Flow**" means, for any period, (a) the amount of Cash EBITDA for such period, less (b) Debt Service for such period.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any Obligation of the Borrower, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the United States or the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any comparable taxes imposed by any other jurisdiction described in clause (a) hereof and (c) in the case of any non-U.S. Administrative Agent, non-U.S. Paying Agent or any Foreign Lender, any withholding tax that is imposed on amounts payable to such Person at the time such Person becomes a party hereto (or designates a new Lender Office) or is attributable to such Person's failure (other than as a result of a Change in Law) to comply with Section 2.11E(v), except to the extent that such Person (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.11E(i).

"**Existing Indebtedness**" means the Indebtedness of the Borrower and Subsidiary Guarantors listed on Schedule 1.1(b) attached hereto, which Indebtedness will be paid in full and extinguished on the Effective Date.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**First Lien Debt LTV Ratio**" has the meaning assigned to that term in Section 6.6B.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than Liens listed in subclauses (a), (g), and (l) of the definition of Permitted Encumbrances and Permitted Equipment Financing) to which such Collateral is subject.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means a Real Property Collateral located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938.

18

 EXECUTION VERSION

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fronting Bank**" means Credit Suisse in its capacities as the Lender of Tranche A Loans and the issuer of Letters of Credit hereunder, and its successors in such capacities.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of its business.

"**Funded Tranche A Loan**" has the meaning set forth in Section 2.1C(iv).

"**Funding and Payment Office**" means the office of the Administrative Agent located at 11 Madison Avenue, New York, NY 10010 (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination; provided, that such definition of GAAP shall not include the application of FASB Interpretation No. 46 or similar pronouncements.

"**Golf Courses**" means the golf courses depicted on Exhibit XIII hereof, each of which has been or is to be developed as part of each Project.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Ground Lease**" means, collectively, (i) that certain Lease Agreement between Ginn Tesoro Golf Ltd., LLLP, a Georgia limited liability limited partnership, as Lessor, and The Tesoro Club, LLC, a Georgia limited liability company, as Lessee, dated December 31, 2005 and (ii) that certain Lease Agreement between the City of Port St. Lucie, Florida, a Florida municipal corporation, as Lessor, and Ginn-LA St. Lucie, Ltd., LLLP, a Georgia limited liability partnership, as Lessee, dated February 3, 2003, in each case, together with all present and future amendments, extensions, renewals, supplements and replacements thereto.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Real Property Asset or to the indoor or outdoor environment.

19

NY\1139561.13

LA000031

 

"**Hedge Agreements**" means all interest rate swaps, caps or collar agreements or similar arrangements entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than payment, performance, surety and indemnity bonds in favor of Governmental Authorities incurred in connection with the development of the Project), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock, (i) all obligations under Hedge Agreements (excluding, however present payments of interest thereunder) with the Administrative Agent, a Lender or any of their respective Affiliates, including, as of any date of determination, the net amounts, if any, required to be paid by such Person as a result of the termination of such Hedge Agreements and unpaid as of such date, (j) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, and (k) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (k) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes and Other Taxes.

"**Indemnitee**" has the meaning assigned to that term in Section 9.2B.

"**Infrastructure**" means all necessary water systems, sewer systems and treatment plants, roads and other similar utilities necessary for the development of each Project in accordance with the Project Projections.

"**Initial Appraisal**" means (i) with respect to Tesoro, the "Appraisal of Real Property" dated as of April 14 , 2006, and prepared by the Appraiser for the Administrative Agent, (ii) with respect to Quail West, the "Appraisal of Real Property" dated as of April 14 , 2006, and prepared by the Appraiser for the Administrative Agent, (iii) with respect to Grand Bahama (West End), the "Appraisal of Real Property" dated as of April 11 , 2006, and prepared by the Appraiser for the Administrative Agent, (iv) with respect to Laurelmor, the "Appraisal of Real Property" dated as of April 12 , 2006, and prepared by the Appraiser for the Administrative Agent and (v) with respect to Hammock Beach

CREDIT AGREEMENT

LA000032

 EXECUTION VERSION

River Club, the "Appraisal of Real Property" dated as of April 13, 2006, and prepared by the Appraiser for the Administrative Agent.

"**Insolvency Proceeding**" means (A) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (B) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case (A) and (B) undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Intellectual Property**" has the meaning assigned to that term in the Security Agreement.

"**Intercompany Subordinated Debt**" means Indebtedness, which is evidenced by promissory notes in favor of the Permitted Holders or the holders of the Capital Stock of the Borrower, the Borrower's Subsidiaries or the Bahamas Owner, as the case may be, as of the Effective Date, which notes shall be unsecured and subordinated in right of payment (including, without limitation, a restriction preventing any payments thereunder upon the occurrence and during the continuance of an Event of Default) to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent, provided that no Event of Default has occurred and is continuing as of the time of the incurrence thereof or would result therefrom.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of the date hereof, substantially in the form of Exhibit XXIII attached hereto, entered into by and between the Collateral Agent and Administrative Agent and Credit Suisse, as Collateral Agent and Administrative Agent under and as defined in the Second Lien Credit Agreement.

"**Interest Payment Date**" means:

> (a)    with respect to any Base Rate Loan, the last Business Day in each of March, June, September and December of each year, commencing on September 29, 2006 and upon each prepayment of Tranche B Loans; and

> (b)    with respect to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include the date that is three months after the commencement of such Interest Period.

"**Interest Period**" has the meaning assigned to that term in Section 2.6B.

"**Interest Rate Determination Date**" means each date for calculating the Reserve Adjusted Eurodollar Rate, for purposes of determining the interest rate in respect of an Interest Period. The Interest Rate Determination Date for purposes of calculating the Reserve Adjusted Eurodollar Rate shall be the date two (2) Business Days prior to the first day of the related Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

21

LA000033

 XECUTION VERSION

"**Investment**" means (a) any direct or indirect purchase or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, Capital Stock or other Securities of any other Person, or (b) any direct or indirect loan, advance (other than advances to employees for moving, education, computer, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business) or capital contribution by the Borrower or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**LC Disbursement**" means a payment made by the Fronting Bank pursuant to a Letter of Credit.

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1; provided that the term "Lenders", when used in the context of a particular Loan Commitment shall mean the Lenders having that Loan Commitment.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrower promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrower and the Administrative Agent.

"**Letter of Credit**" has the meaning set forth in Section 2.5.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan Commitment**" means the commitment of a Lender to make a Loan to the Borrower pursuant to Section 2.2 (including the commitment of any Eligible Assignee to participate with respect to a Loan as part of the primary syndication).

"**Loan Documents**" means this Agreement, the Notes and the Collateral Documents or other documents evidencing or securing Obligations.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Party**" or "**Loan Parties**" means the Borrower and any of its Subsidiaries who executes any of the Loan Documents.

"**Loans**" mean the loans outstanding or made by the Lenders pursuant to Section 2.2.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Master Declarations**" has the meaning assigned to that term in Section 4.39 as they may be further amended, supplemented, amended and restated or otherwise Modified from time to time.

22

**CREDIT AGREEMENT**

LA000034

 EXECUTION VERSION

"**Master Plans**" means the documentation described on Schedule 1.1(d), as amended, restated, amended and restated, supplemented or Modified from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets or condition (financial or otherwise) of the Borrower, its Subsidiaries and Bahamas Owner, taken as a whole, (b) the material impairment of the ability of the Loan Parties, taken as a whole, to perform the Obligations (regardless of whether or not such Material Adverse Effect can be or has been cured at any time or whether Borrower has knowledge of such Material Adverse Effect), (c) a material adverse effect upon the legality, validity, binding effect or enforceability against a Loan Party or the Shareholder Pledgor of the First Lien Credit Agreement, the Second Lien Credit Agreement, any Collateral Document, or any other material Loan Document or Second Lien Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document, taken as a whole, (e) a material adverse effect upon the value of the then remaining Real Property Collateral, taken as a whole or (f) a material adverse effect upon the Entitlements and the intended development of the Real Property Collateral as contemplated by the Project Projections, taken as a whole.

"**Material Contracts**" has the meaning assigned to that term in Section 4.33A.

"**Maturity Date**" means June 8, 2011 as to both the Tranche A Loans and the Tranche B Loans.

"**Maximum Amount**" has the meaning assigned to that term in Section 9.13A.

"**Maximum Net Indebtedness**" has the meaning assigned to that term in Section 6.6C.

"**Membership Clubs**" mean the clubhouses and resort club amenities contemplated to be developed at each Project as set forth in the Project Projections.

"**Modifications**" shall mean any amendments, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**," or related words shall have meanings correlative thereto.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means the first lien mortgages, security agreement, assignment of leases and rents, and fixture filings, substantially in the form of Exhibit XV annexed hereto, executed and delivered by any Loan Party on or after the Effective Date, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be amended, restated, amended and restated, supplemented, or otherwise Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policies**" has the meaning assigned to that term in Section 3.1G(ii).

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate is contributing or to which the Borrower or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Net Cash from Project Sales**" means, for any period, (i) Cash From Project Sales realized during such period, less (ii) Project Expenses incurred in such period.

23

LA000035

 EXECUTION VERSION

"**Net Cash from Operations**" means, for any period, (i) the (A) gross operating revenues (not including, for the avoidance of doubt, any amounts taken into account in determining Cash From Project Sales) actually received by the Borrower and its Subsidiaries during such period with respect to the Golf Courses, the Membership Clubs, any improvements hereafter constructed by the Borrower or any of its Subsidiaries as a part of each Project; (B) any royalty payments under contracts with third party or Affiliate contractors (including, without limitation, any royalties received under the Borrower's and the Subsidiaries' "featured builder" program), and any related amenities; (C) Cash Proceeds received from the sale of golf and general and social club memberships relating to each Project (provided, however that such Cash Proceeds received from any such sale shall only be included in Net Cash from Operations to the extent such Cash Proceeds have not been previously accounted for in connection with the initial sale of the applicable golf, general and/or social club membership); and (D) Cash received as a result of payments of principal, interest and other payments (including, without limitation, all mandatory prepayments) made to Bahamas Borrower by Bahamas Owner under the Bahamas Intercompany Indebtedness, less (ii) all cash amounts of any kind whatsoever paid during such period by the Borrower and its Subsidiaries (including both operating expenses and capital expenditures) but excluding any cash amounts paid from any reserves previously set aside by the Borrower and its Subsidiaries (not including, however, Project Expenses or amounts deducted from Cash EBITDA for purposes of determining Excess Cash Flow.

"**Non-Consenting Lender**" has the meaning assigned to that term in Section 9.5B.

"**Notes**" means (a) the promissory notes of the Borrower issued pursuant to Section 2.3C on the Effective Date and (b) any promissory notes issued by the Borrower in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit VIII annexed hereto, as they may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit X annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.6D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent or otherwise required hereunder, Hedge Agreements, whether for principal, interest or payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organization for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and (c) if such person is one of the Borrower or a Subsidiaries of the Borrower, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

24

CREDIT AGREEMENT

LA000036

 XECUTION VERSION

"**Ordinary Course of Business**" means, with respect to the Borrower and its Subsidiaries, the ordinary course of their business, as related to developing each Project in accordance with the Project Projections, marketing or selling Residential Lots, Condo Parcels and Commercial Parcels and the business of owning and operating the Golf Courses, the Membership Clubs and any other improvements developed as part of each Project, and in each case, as undertaken by the Borrower and its Subsidiaries in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Hazard Act of 1970.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Paying Agent**" means Credit Suisse, in its capacity as paying agent for the Lenders hereto.

"**Participant**" has the meaning assigned to that term in Section 9.1D.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in Section 4.32(vi).

"**Pending Entitlements**" has the meaning assigned to that term in Section 4.36.

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrower or any ERISA Affiliate.

"**Permitted Affiliate Sale**" means a transaction for fair market value of one or more Residential Lots by the Borrower or its Subsidiaries to an Affiliate if the sale to such Affiliate results from an oversubscription at the launch for sales of such Residential Lots at the applicable Project pursuant to (i)

25

LA000037

 EXECUTION VERSION

Reservation Agreements prior to Borrower or its Subsidiaries' receipt of HUD or plat approvals necessary to otherwise close such sales to third party buyers, provided, however, that the cumulative, aggregate value of all such sales of such Residential Lots to Affiliates shall not exceed $45,000,000 or (ii) Qualified Sales Agreements prior to Borrower or its Subsidiaries' receipt of HUD or plat approvals necessary to otherwise close such sales to third party buyers.

"**Permitted Collateral Asset Sale**" means any transaction (or series of transactions) constituting an arm's length sale for fair market value of (i) one or more platted and legally subdivided Residential Lots to a third party buyer or (ii) one or more Residential Lots pursuant to a Permitted Affiliate Sale, or (iii) Condo Parcels and Commercial Parcels designated for development as condominium units, and commercial buildings, respectively, to an Affiliate of the Borrower or third party buyer, in each case, for no less than the applicable Release Price and pursuant to a Qualified Sales Agreement.

"**Permitted Encumbrances**" means the following types of Liens:

        (a)    Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by Section 5.5 or otherwise delinquent;

        (b)    statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics, vendors and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or being Properly Contested;

        (c)    Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive, in each case, of obligations for the payment of borrowed money or other Indebtedness);

        (d)    any attachment or judgment Lien with respect to a money judgment, writ, warrant of attachment or similar process not constituting an Event of Default, so long as such Lien could not reasonably be expected to have a Material Adverse Effect;

        (e)    leases, subleases, licenses and sublicenses granted to others (in the Ordinary Course of Business) not interfering with the ordinary conduct of the business or operations of the Borrower or any of its Subsidiaries;

        (f)    any (i) interest or title of a lessor or sublessor under any Capital Lease permitted by Section 6.1(iv) or any Operating Lease not prohibited by this Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii);

        (g)    zoning, building codes and other Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset so long as such zoning, building codes and

26

**CREDIT AGREEMENT**

LA000038

 

EXECUTION VERSION

other Governmental Authorizations could not reasonably be expected to have a Material Adverse Effect;

    (h)    Liens securing Indebtedness permitted pursuant to clauses (iii), (iv), (viii) and (ix) of Section 6.1;

    (i)    bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business;

    (k)    with respect to the Real Property Collateral only, the Permitted Title Exceptions; and

    (l)    any existing or future condominium declarations (and Modifications thereof) recorded against a portion of the Real Property Collateral by the Borrower in the Ordinary Course of Business and in furtherance of the development of each Project in accordance with the Project Projections.

"**Permitted Equipment Financing**" means, collectively, (i) the existing financing listed on Schedule 1.1(c) hereto secured solely by furnishings, fixtures and equipment, (ii) financing obtained in the Ordinary Course of Business which is secured solely by furnishings, fixtures and equipment acquired using the proceeds of such financing and (iii) Indebtedness under Capital Leases capitalized on the consolidated balance sheet of the Borrower, in the aggregate amount not to exceed $7,500,000.

"**Permitted Existing Indebtedness**" means the Indebtedness of the Borrower or Subsidiary Guarantors existing as of the Effective Date as further described on Schedule 6.1 attached hereto.

"**Permitted Holder**" means ERG Enterprises, LP, Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., Lubert-Adler Capital Real Estate Fund III, L.P., Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P. and Lubert-Adler Capital Real Estate Fund IV, L.P.

"**Permitted Title Exceptions**" means the title exceptions reflected in the Mortgagee Policies and, after the Effective Date any title exceptions arising from the recordation of Specified Encumbrances to which Collateral Agent agrees to subordinate the Lien of the Mortgage pursuant to Section 2.13B.

"**Permitted Transaction Costs**" means bona fide, reasonable, direct costs actually incurred by Borrower or its Subsidiaries in connection with an Asset Sale, the issuance of debt Securities (or incurrence of borrowed Indebtedness), or the issuance of equity, including, without limitation, (a) transfer, sales, use and other taxes payable in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any permitted Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such transaction, (c) brokers' or advisors' commissions, (d) fees and expenses of counsel and other advisors and other customary and reasonable closing costs in connection with such transaction, and (e) any underwriting discounts, commitments, arrangements or similar fees.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"**Pledge Agreement**" means the Pledge Agreements and Pledge and Limited Recourse Guaranty Agreements executed and delivered by the Borrower and the Shareholder Pledgors, in each case, in favor

27

LA000039

 EXECUTION VERSION

of the Collateral Agent for the benefit of the Agents and the Lenders substantially in the form of <u>Exhibit XI</u> and <u>Exhibit XI-A</u>, respectively, annexed hereto, with such changes thereto as may be reasonably recommended by the Collateral Agent's local counsel based on local laws or customary practice, as may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time in accordance with the terms thereof and hereof.

"<u>Prime Rate</u>" means the rate of interest per annum announced from time to time by Credit Suisse as its prime commercial lending rate in effect at its principal office in New York City. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Credit Suisse or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"<u>Principal Borrower</u>" means Ginn-LA CS Borrower, LLC.

"<u>Proceedings</u>" has the meaning assigned to that term in Section 5.3(xiii).

"<u>Pro Forma Basis</u>" means, with respect to forward-looking compliance with any test or covenant hereunder, compliance with such covenant or test after giving effect to borrowings and projections, based upon good faith estimates and assumptions believed by the Borrower to be correct and reasonable at the time made, which projections shall give effect to, among other things, any proposed borrowing, acquisition, disposition, budget change, schedule change or other action reasonably anticipated to occur and otherwise in conformity with such procedures as may be agreed upon between the Administrative Agent and the Borrower, all such calculations to be in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Project</u>" means, individually and collectively, the developments commonly known as (a) Tesoro located in Port St. Lucie, Florida, (b) Quail West located in Naples, Florida, (c) Grand Bahama (West End) located on Grand Bahama Island, the Bahamas, (d) Laurelmor located in Boone, North Carolina and the surrounding vicinity, and (e) Hammock Beach River Club located in Palm Coast, Florida, in each case, as depicted respectively on the maps attached hereto as <u>Exhibit XIII</u> (it being understood and agreed that such maps include Residential Lots and the Golf Course at the Tesoro Project, which have already been sold and therefore are not a part of the Real Property Collateral), together with any additional Real Property Collateral acquired and incorporated into such Projects.

"<u>Project Expenses</u>" means, with respect to Borrower and its Subsidiaries, for any period and without duplication, the costs and expenses incurred by the Borrower and its Subsidiaries in connection with the development of each Project (including, without limitation, the development and subdivision of any Residential Lots, Infrastructure and any vertical improvements and bonding therefor) as contemplated in the Project Projections including, without limitation, general and administrative expenses, allocated overhead, marketing expenses, architectural, engineering and legal fees, developer and contractor fees, land development costs, construction costs, costs of acquiring additional Real Property Collateral in accordance with the Project Projections, and carrying costs (consisting of taxes, insurance costs, capital expenditures, and property owners association subsidies and reserve funding), excluding, however, for purposes of the definition of Net Cash from Project Sales, all costs and expenses associated with the operations of the Golf Courses, Membership Clubs and related amenities which are included in the calculation of Net Cash from Operations.

"<u>Project Projections</u>" means the development and construction schedule associated with each Project attached hereto as <u>Exhibit I</u> which estimate the Cash from Project Sales, the cash from project sales to be received by the Bahamas Owner and the expenditures to be incurred in connection with the

28

LA000040

 EXECUTION VERSION

development and construction of each Project over the period from 2006 through 2011. Borrower shall have the right to update the Project Projections in accordance with Section 5.3(xi) below.

"**Properly Contested**" means, any claim against a Loan Party or any Indebtedness of a Loan Party (including any Taxes) that is not paid or settled as and when such claim or Indebtedness is due or payable by reason of such Loan Party's bona fide dispute concerning its liability to pay same or concerning the amount thereof provided that: (i) such claim or Indebtedness is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Loan Party has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such claim or Indebtedness could not reasonably be expected to have a Material Adverse Effect; (iv) no Lien is imposed upon any of such Loan Party's assets with respect to such claim or Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Collateral Agent (except only with respect to Permitted Encumbrances that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the claim or Indebtedness results from, or is determined by the entry, rendition or issuance against a Loan Party or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Loan Party, such Loan Party forthwith pays such claim or Indebtedness and all penalties, interest and other amounts due in connection therewith as and when required to be paid.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by <u>dividing</u> (i) the Loan Exposure of that Lender <u>by</u> (ii) the aggregate Loan Exposure of all the Lenders; in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 9.1. The initial Pro Rata Share of each Lender is set forth in the Register.

"**PTO**" means the United States Patent and Trademark Office.

"**Qualified Appraisal**" means the Initial Appraisal and any other real estate appraisal conducted in accordance with the Uniform Standards of Professional Appraisal Practice (as promulgated by the Appraisal Standards Board of the Appraisal Foundation) and all requirements of Applicable Law applicable to Administrative Agent undertaken by an Appraiser, and providing an assessment of "Total Net Value" (as defined in the Initial Appraisal) of the remaining Real Property Collateral utilizing substantially similar methodology to that used for the Initial Appraisal, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Appraisal Update**" means a quarterly update of the Initial Appraisal or other Qualified Appraisal prepared by the Appraiser, the form and substance of such update to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Sales Agreement**" means (i) an arm's length definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and a third party pursuant to which such third party agrees to purchase a Residential Lot for fair market value; (ii) a definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and an Affiliate evidencing a Permitted Affiliate Sale; (iii) a definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and an Affiliate or third party for purposes of the sale of a Condo Parcel, the purchase price under which shall be at least equal to the product of (A) the number of condominium units proposed to be developed on such Condo Parcel and (B) the applicable Release Price for such condominium units; or (iv) a definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and an Affiliate or third party for purposes of the sale of a Commercial Parcel, the purchase price under which

29

**CREDIT AGREEMENT**

LA000041

 EXECUTION VERSION

shall be at least equal to the Release Price for such Commercial Parcel, in each case, which Qualified Sales Agreement shall be substantially in the applicable form attached hereto as Exhibit XVIII or in a form otherwise approved by Administrative Agent in its reasonable discretion.

"**Rate Increase Maximum Net Indebtedness**" has the meaning assigned to that term in Section 2.6G.

"**Real Property Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by the Borrower, any of the Borrower's Subsidiaries or the Bahamas Owner in any real property.

"**Real Property Collateral**" means the portion of the Collateral comprising a Real Property Asset.

"**Recognition, Collateral Assignment and Estoppel Agreement**" means an agreement, substantially in the form of Exhibit VI attached hereto, pursuant to which a Third Party Operator or the Contractor agrees to recognize certain rights of the Administrative Agent and/or Collateral Agent with regard to each Project and consent to the Lien of the Mortgage, among other things.

"**Recovery Event**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Reference Lenders**" means (a) Credit Suisse and (b) another Lender determined by the Administrative Agent with the consent of the Borrower, which consent shall not be unreasonably withheld or delayed.

"**Register**" has the meaning assigned to that term in Section 9.1C.

"**Registered Loan**" has the meaning assigned to that term in Section 9.1C.

"**Reinvestment Notice**" means a written notice executed by a Responsible Officer and delivered to the Administrative Agent within five (5) Business Days after a Recovery Event stating that no Default or Event of Default has occurred and is continuing, that the Borrower intended to utilize the Insurance Proceeds for purposes of restoration and repair of the affected Real Property Collateral, that the Borrower agrees to pursue such repair and restoration in a diligent manner, in compliance with all Applicable Laws and without permitting any Liens to encumber the Real Property Collateral except those permitted by Section 6.2 hereof.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including, without limitation, the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), or into or out of any property, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

"**Release Price**" means, (i) for each condominium unit located within each Condo Parcel designated to be developed as condominium units, the following amounts: (A) with respect to the Project commonly known as Tesoro, $150,000 for each such condominium unit and (B) with respect to the Projects commonly known as Laurelmor and Grand Bahama (West End), $100,000 for each such

30

*CREDIT AGREEMENT*

LA000042

 ECUTION VERSION

condominium unit, (ii) for each Commercial Parcel, $2,000,000 with respect to the parcel located in the City of Flagler Beach and $7,000,000 with respect to the parcels described as Parcels 1A and 1B in the Planned Unit Development Agreement executed as of January 17, 2006 for the Project commonly known as Hammock Beach River Club and (ii) with respect to the Tesoro Membership Club, $5,917,832.

"**Release Instruments**" has the meaning assigned to that term in Section 2.13.

"**Released Parcel**" has the meaning assigned to that term in Section 2.13.

"**Request for Loan**" means an executed request for loan substantially in the form of <u>Exhibit XIV</u> hereto with all blanks completed by the Borrower.

"**Required Release**" means (a) a dedication or conveyance of a portion of the Real Property Collateral (other than a Residential Lot) in the Ordinary Course of Business at the direction of a Governmental Authority or public utility or as may be required pursuant to the Master Declarations upon completion and approval by the applicable Governmental Authority of plats legally sufficient to effect such dedication or conveyance with respect to respective portions of the Real Property Collateral to (i) such Governmental Authority (or any designee of such Governmental Authority) or public utility, or (ii) to the Resort Association or equity members thereof under the applicable Master Declaration, in each case for roads, common areas, easements and other shared uses; (b) a conveyance of a portion of the Real Property Collateral consisting of approximately 50 acres of real property located within the Project commonly known as Hammock Beach River Club as shown on <u>Exhibit XXIV</u> hereof pursuant to the Post-Closing Agreement dated _____, provided, however, that the documentation pursuant to which such conveyance is effectuated is reasonably acceptable to the Administrative Agent; (c) conveyance of a portion of the Real Property Collateral to Flagler County, Florida or an agency thereof consisting of approximately 1100 acres of real property located within the Project commonly known as Hammock Beach River Club as shown on <u>Exhibit XXIV</u> for purposes of conservation of wetlands and uplands areas, provided, however, that the documentation pursuant to which such conveyance is effectuated is reasonably acceptable to the Administrative Agent; and (d) conveyance of the Golf Courses and Membership Clubs located at the Projects commonly known as Tesoro and Quail West upon either (1) the applicable Subsidiary's conveyance of all Residential Lots contemplated to be platted and developed therein pursuant to the Project Projections and the Master Plans for each such Project or (2) if the applicable Subsidiary is required to convey to the Resort Association or the members thereof pursuant to the Master Declarations, the satisfaction of the conditions necessary to trigger the requirement for such conveyance or (3) in the case of the Membership Club at Tesoro, the applicable Subsidiary's conveyance to an Affiliate in exchange for a purchase money promissory note and mortgage pursuant to the Tesoro Membership Club Sale Leaseback approved by Administrative Agent in its reasonable discretion and pursuant to which the applicable Release Price is paid or evidenced by such purchase money promissory note and mortgage to Ginn-LA St. Lucie Ltd., LLLP and the documentation pursuant to which such conveyance is effectuated is reasonably acceptable to the Administrative Agent, provided, in each case, that any such dedication or conveyance (individually and/or taken together will all other such dedications and conveyances) (i) has not had and could not reasonably be expected to have a Material Adverse Effect or (ii) has not impaired and could not reasonably be expected to impair the Collateral Agent's First Priority Lien on the remaining Real Property Collateral.

"**Requisite Lenders**" means Lenders having or holding more than 50% of the sum of the aggregate Loan Exposure of all Lenders.

"**Reservation Agreement**" means an arms length agreement with a third party buyer to reserve the right to purchase a Residential Lot for fair market value, which Reservation Agreement shall be

31

NY\1139561.13

LA000043



EXECUTION VERSION

substantially in the form attached hereto as <u>Exhibit XXV</u> or in a form otherwise approved by Administrative Agent in its reasonable discretion.

"<u>Reserve Adjusted Eurodollar Rate</u>" means, with respect to each day during each Interest Period pertaining to a Eurodollar Rate Loan, a rate per annum determined for such day in accordance with the following formula; provided, however, that at all times such rate shall be equal to or exceed 1%:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"<u>Residential Lot</u>" means each of (a) Hammock Beach River Club's 453, (b) Tesoro's 397, (c) Quail West's 290, (d) Grand Bahama's (West End) 1858, and (e) Laurelmor's 1500 residential dwelling lots, as the case may be, approved by the Master Plans for development within the Real Property Collateral, some of which are not yet subdivided or platted and which are expected to comprise a combination of estates and single family home lots.

"<u>Responsible Officer</u>" means the chief executive officer, chairman of the board, president/chief operating officer, any vice president, general counsel or chief financial officer of the Borrower or its Subsidiaries, but in any event, with respect to financial matters, the chief financial officer or treasurer of the Borrower or its Subsidiaries.

"<u>Restricted Payment</u>" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock (or of any other Capital Stock) of the Borrower or any of its Subsidiaries now or hereafter outstanding or a payment of principal or interest under Intercompany Subordinated Debt, except a dividend or other distribution by the Subsidiaries of the Borrower to the Borrower and any dividend payable solely in shares of that class of stock to the holders of that class, excluding the initial distribution of proceeds of a portion of the Loan as described in Section 2.9A, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock (or of any other Capital Stock) of its, the Borrower or any of its Subsidiaries now or hereafter outstanding, (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock (or of any other Capital Stock) of its, the Borrower or any of its Subsidiaries now or hereafter outstanding, and (d) payment of principal and interest in respect of the Indebtedness incurred under the Second Lien Credit Agreement and any refinancing thereof. For the avoidance of doubt, payments from one Loan Party to another Loan Party under intercompany indebtedness permitted pursuant to Section 6.1(v) shall not constitute a Restricted Payment.

"<u>Restricted Payment Amount</u>" means, on any date of determination, an amount equal to 50% of Excess Cash Flow received by the Borrower or its Subsidiaries during the period commencing on the first day of the first Fiscal Quarter on or after the Trigger Date Events shall have occurred and be continuing and ending on the last day of the Fiscal Quarter immediately prior to such date of determination for which financial statements have been delivered pursuant to Section 5.3(ii) or (iii).

"<u>S&P</u>" means Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"<u>Second Lien Credit Agreement</u>" means the Second Lien Credit Agreement dated as of the date hereof among the Borrower, Credit Suisse as administrative agent and collateral agent and Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner, and the lenders party thereto, as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

CREDIT AGREEMENT

NY\1139561.13

LA000044

 EXECUTION VERSION

"**Second Lien Loan Documents**" means, collectively, the Second Lien Credit Agreement and the other documents, instruments and agreements entered into or delivered by any Loan Party in connection therewith.

"**Securities**" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, bonds, debentures, notes, or other evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement** " means each Security Agreement executed and delivered by any Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders substantially in the form of Exhibit XII annexed hereto, with such changes thereto as may be reasonably recommended by the Collateral Agent's local counsel based on local laws or customary practice, as may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time in accordance with the terms thereof and hereof.

"**Shareholder Pledgor**" means, collectively, Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., Lubert-Adler Capital Real Estate Fund III, L.P., Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P., Lubert-Adler Capital Real Estate Fund IV, L.P., ERG Enterprises, LP, Ginn-LA CS Holding Company, LLC and Ginn-LA West End Ltd., LLLP.

"**Solvency Certificate**" has the meaning assigned to that term in Section 3.1I.

"**Solvent**" means, with respect to any Person, that as of the date of determination both (a) (i) the then fair saleable value of the property of such Person, sold as a going concern, is (A) greater than the total amount of liabilities (including contingent liabilities but excluding amounts payable under intercompany promissory notes) of such Person and (B) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Encumbrances**" has the meaning assigned to that term in Section 2.13B.

"**Stated Amount**" means, on any date and with respect to any Letter of Credit, the total amount then available to be drawn under such Letter of Credit.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other direct ownership interests in such entity entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the

**CREDIT AGREEMENT**

NY\1139561.13

LA000045

 EXECUTION VERSION

management and policies of such entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, excluding Ginn-LA West End Ltd., LLLP, Ginn-LA International Business Company, Ltd., Ginn-LA West End, Limited and Quail West Foundation, Inc.

"**Subsidiary Guarantor**" means, individually, each Subsidiary of Borrower and all Subsidiaries of Subsidiaries of Borrower, and "Subsidiary Guarantors" means, collectively, all of the foregoing, excluding, however Quail West Foundation, Inc.

"**Subsidiary Guaranties**" means the Subsidiary Guaranties, substantially in the form of Exhibit XXII annexed hereto, executed and delivered by each of the Subsidiary Guarantors on the Effective Date, or executed and delivered by any additional Subsidiary Guarantors from time to time thereafter pursuant to Section 5.11, as such Guaranty may hereafter be amended, restated, supplemented or otherwise Modified from time to time.

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in Section 8.1B.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tesoro Golf Lease**" means the Lease Agreement between Ginn Tesoro Golf Ltd., LLLP, as Lessor, and The Tesoro Club, LLC, as Lessee, dated December 31, 2005 pursuant to which the Golf Course (more particularly described therein) located at the Tesoro Project is leased to The Tesoro Club, LLC.

"**Tesoro Golf Sale Leaseback**" means the sale of the Golf Course located at the Tesoro Project and more particularly described in the Tesoro Golf Lease in exchange for a purchase money promissory note and mortgage in favor of Ginn-LA St. Lucie Ltd., LLLP and the Tesoro Golf Lease, which purchase money promissory note and mortgage are collaterally assigned to Collateral Agent pursuant to a Collateral Assignment of Mortgage and Note.

"**Tesoro Membership Club Sale Leaseback**" means the sale of the Membership Club located at the Tesoro Project to an Affiliate in exchange for a purchase money promissory note and mortgage and lease back of such Membership Club in favor of Ginn-LA St. Lucie Ltd., LLLP, which purchase money promissory note and mortgage are collaterally assigned to Collateral Agent pursuant to a Collateral Assignment of Mortgage and Note.

"**Third Party Operator**" means any third party operator or manager of the Golf Courses, the Membership Clubs or other amenities related to each Project providing operations, management and/or other services with regard to each Project.

"**Third Party Operating Agreement**" means any management, operating or other similar agreement between Borrower or any of its Subsidiaries and any Third Party Operator, which agreement shall be in form and substance reasonably satisfactory to the Administrative Agent.

"**Title Company**" means, collectively, one or more title insurance companies reasonably satisfactory to the Administrative Agent.

"**Total Debt LTV Ratio**" has the meaning assigned to that term in Section 6.6A.

34

 

"**Tranche A Availability Period**" means the period from and including the Business Day next succeeding the Effective Date to but excluding the earlier of the Tranche A Maturity Date and the date of termination of the Tranche A Funding Amounts.

"**Tranche A Credit-Linked Deposit**" means, with respect to each Tranche A Lender at any time, amounts actually on deposit in the Tranche A Credit-Linked Deposit Account to the credit of such Lender's Tranche A Credit-Linked Sub-Account at such time.

"**Tranche A Credit-Linked Deposit Account**" means the "Tranche A Lenders (Ginn) Credit-Linked Deposit Account" established by the Paying Agent at Credit Suisse pursuant to Section 2.1A.

"**Tranche A Credit-Linked Sub-Account**" has the meaning set forth in Section 2.1A.

"**Tranche A Exposure**" means, with respect to any Tranche A Lender at any time, the sum of its Applicable Percentage of the outstanding principal amount of the Tranche A Loans and its Tranche A LC Exposure at such time.

"**Tranche A Funding Amount**" means, with respect to each Tranche A Lender, the amount that such Tranche A Lender is required hereby to maintain as its Tranche A Credit-Linked Deposit, as such amount may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.1. The initial amount of each Tranche A Lender's Tranche A Funding Amount is set forth in an Assignment and Agreement pursuant to which such Lender shall have assumed its Tranche A Funding Amount, as applicable. The aggregate amount of the Tranche A Lenders' Tranche A Funding Amounts is $165,000,000.

"**Tranche A LC Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The Tranche A LC Exposure of any Tranche A Lender at any time shall be its Applicable Percentage of the total Tranche A LC Exposure at such time.

"**Tranche A Lender**" means a Lender with a Tranche A Funding Amount or, if the Tranche A Funding Amounts have terminated or expired, a Lender with Tranche A Exposure.

"**Tranche A Loan Borrowing Conditions**" means (i) no Default or Event of Default shall have occurred and be continuing and (ii) Borrower has provided evidence satisfactory to Administrative Agent of compliance with the financial covenants set forth in Section 6.6 on a Pro Forma Basis for the Fiscal Quarter immediately succeeding the applicable Request for Loan.

"**Tranche A Loans**" means the loans made pursuant to Section 2.2B.

"**Tranche A Maturity Date**" means the fifth anniversary of the Effective Date.

"**Tranche B Loans**" means the Loans made pursuant to Section 2.2A.

"**Tranche B Loan Commitment**" means, with respect to each Tranche B Loan Lender, the commitment, if any, of such Lender to make one or more Tranche B Loans hereunder on the Effective Date, expressed as an amount representing the maximum aggregate principal amount of the Tranche B Loans to be made by such Lender hereunder, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.1. The initial amount of each Tranche B Loan Lender's Tranche B Loan Commitment is set forth in an Assignment and Agreement

LA000047




XECUTION VERSION

pursuant to which such Lender shall have assumed its Tranche B Loan Commitment. The aggregate amount of the Tranche B Loan Lenders' Tranche B Loan Commitments is $360,000,000.

"**Tranche B Loan Lender**" means a Lender with a Tranche B Loan Commitment or an outstanding Tranche B Loan.

"**Tranche B Maturity Date**" means the fifth anniversary of the Effective Date.

"**Transaction Costs**" means the fees, costs and expenses payable by the Borrower and its Subsidiaries in connection with the Transactions and set forth in the schedule delivered by the Borrower pursuant to Section 3.1J, including, without limitation, amounts payable to the Agents and the Lenders.

"**Transactions**" means, collectively, (a) the consummation of the transactions contemplated under this Agreement and the Second Lien Credit Agreement, (b) the repayment in full of the obligations owing to the lenders under the Existing Indebtedness, and (c) the termination of the Existing Indebtedness and all Liens associated therewith.

"**Trigger Date Events**" means that (i) the Borrower has provided evidence of compliance with the financial covenants set forth in Section 6.6 on a Pro Forma Basis; (ii) the aggregate outstanding principal amount of the Tranche B Loan on such date shall be less than fifty percent (50%) of the aggregate outstanding principal amount of the Tranche B Loan on the Effective Date; (iii) the outstanding principal amount of the Tranche A Loan is equal to zero; and (iv) no Default or Event of Default has occurred and is continuing.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

## 1.2    Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement.

A.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise Modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all Documents, General Intangibles, Goods, Intellectual Property, Investment Related Property, Letter of Credit Rights, Money, Receivables, Receivable Records, Commercial Tort Claims, Material Contracts, and proceeds therefrom (for purposes of this Section, as each such term is defined in the Security Agreement).

36

 XECUTION VERSION

**B.**     Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrower to the Lenders pursuant to clauses (iii) and (xvii) of Section 5.3 shall be prepared as required pursuant to Section 5.3. Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements of the Borrower referred to in Section 4.14A; provided that should such accounting principles and policies change, the Borrower, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants in conformity therewith.

## SECTION 2.
## AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

**2.1**     **Tranche A Credit-Linked Deposit Accounts**.

**A.**     **Establishment of Tranche A Credit-Linked Deposit Account and Tranche A Credit-Linked Sub-Accounts.**  On or prior to the Effective Date, the Paying Agent shall establish a Tranche A Credit-Linked Deposit Account at Credit Suisse with the title "Tranche A Lenders (Ginn) Credit-Linked Deposit Account". The Paying Agent shall maintain records enabling it to determine at any time the amount of the interest of each Tranche A Lender in the Tranche A Credit-Linked Deposit Account (the interest of each Tranche A Lender in the Tranche A Credit-Linked Deposit Account, as evidenced by such records, being referred to as such Lender's "**Tranche A Credit-Linked Sub-Account**"). The Paying Agent shall establish such additional Tranche A Credit-Linked Sub-Accounts for assignee Lenders as shall be required pursuant to Section 9.1B(i)(d). No Person (other than the Paying Agent) shall have the right to make any withdrawal from the Tranche A Credit-Linked Deposit Account or to exercise any other right or power with respect thereto. Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that the Tranche A Credit-Linked Deposits are and (subject to the last paragraph of Section 7) will at all times be solely the property of the Tranche A Lenders, that the Tranche A Credit-Linked Deposits shall be used solely in accordance with this Agreement and that no amount on deposit at any time in the Tranche A Credit-Linked Deposit Account shall be the property of any of the Loan Parties, constitute collateral for any Obligations of the Loan Parties under the Loan Documents or otherwise be available in any manner to satisfy any Obligations of any of the Loan Parties under the Loan Documents. Each Tranche A Lender agrees that its right, title and interest in and to the Tranche A Credit-Linked Deposit Account shall be limited to the right to require amounts in its Tranche A Credit-Linked Sub-Account to be applied as provided in Section 2.1C below and that it will have no right to require the return of its Tranche A Credit-Linked Deposit other than as expressly provided in such Section 2.1C (each Tranche A Lender hereby acknowledging that its Tranche A Credit-Linked Deposit constitutes payment for its participations in Tranche A Loans made or to be made hereunder and that the Fronting Bank will be making Tranche A Loans and issuing, amending, renewing and extending Letters of Credit in reliance on the availability of such Lender's Tranche A Credit-Linked Deposit to discharge such Lender's obligations in accordance with Sections 2.1I and 2.5F). The funding of the Tranche A Credit-Linked Deposits and the agreements with respect thereto set forth in this Agreement constitute arrangements solely among the Paying Agent, the Fronting Bank and the Tranche A Lenders with respect to the funding and reimbursement obligations of the Tranche A Lenders under this Agreement, and do not constitute loans, extensions of credit or other financial accommodations to any Loan Party. No Loan Party shall have any responsibility or liability to the Tranche A Lenders, the Paying Agent or any other Person in respect of the establishment, maintenance, administration or misappropriation of the Tranche A Credit-Linked Deposit Account (or any Tranche A Credit-Linked Sub-Account) or with respect to the investment of amounts held therein, including pursuant to Section 2.1D below.

**CREDIT AGREEMENT**

LA000049

 

**B.** **Deposits in Tranche A Credit-Linked Deposit Account.** The following amounts will be deposited in the Tranche A Credit-Linked Deposit Account at the following times:

     (i)     On the Effective Date, each Tranche A Lender shall deposit in the Tranche A Credit-Linked Deposit Account an amount in Dollars equal to such Lender's Tranche A Funding Amount. Thereafter, the Tranche A Credit-Linked Deposits shall be available, on the terms and subject to the conditions set forth herein, for application pursuant to Sections 2.1I and 2.5F to pay such Lender's Applicable Percentage of (i) the principal of Tranche A Loans that are not paid when due (at stated maturity, by acceleration or otherwise), and (ii) LC Disbursements that are not reimbursed by the Borrower as and when due.

     (ii)     On any date prior to the Tranche A Maturity Date on which the Paying Agent or the Fronting Bank receives any reimbursement payment from the Borrower in respect of an LC Disbursement, or any payment of principal of Tranche A Loans, with respect to which amounts were withdrawn from the Tranche A Credit-Linked Deposit Account to reimburse or pay the Fronting Bank, subject to clause (iii) below, the Paying Agent shall deposit in the Tranche A Credit-Linked Deposit Account, and credit to the Tranche A Credit-Linked Sub-Accounts of the Tranche A Lenders, the portion of such reimbursement or other payment to be deposited therein, in accordance with Sections 2.1I and 2.5F.

     (iii)     If at any time when any amount is required to be deposited in the Tranche A Credit-Linked Deposit Account under clause (ii) above the sum of such amount and the aggregate amount of the Tranche A Credit-Linked Deposits at such time would exceed the higher of the total aggregate Tranche A Funding Amounts and the Tranche A Exposure, then such excess shall not be deposited in the Tranche A Credit-Linked Deposit Account and the Paying Agent shall instead pay to each Tranche A Lender its Applicable Percentage of such excess.

     (iv)     Concurrently with the effectiveness of any assignment by any Tranche A Lender of all or any portion of its Tranche A Funding Amount, the Paying Agent shall transfer into the Tranche A Credit-Linked Sub-Account of the assignee the corresponding portion of the amount on deposit in the assignor's Tranche A Credit-Linked Sub-Account in accordance with Section 9.1(B)(i)(d).

**C.** **Withdrawals From and Closing of Tranche A Credit-Linked Deposit Account.** Each Tranche A Lender irrevocably and unconditionally agrees that its deposit in the Tranche A Credit-Linked Deposit Account shall be withdrawn and distributed (or transferred, in the case of clause (v) below) as follows:

     (i)     In the event the Borrower fails to reimburse the Fronting Bank pursuant to Section 2.5F, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account the amount of such unreimbursed LC Disbursement (and debit the Tranche A Credit-Linked Deposit Sub-Account of each Tranche A Lender in the amount of such Tranche A Lender's Applicable Percentage of such unreimbursed Disbursement) and make such amount available to the Fronting Bank in accordance with Section 2.5F and each of the Tranche A Funding Amount and the Tranche A LC Exposure shall be reduced by such amount.

     (ii)     In the event the Borrower fails to pay when due (at stated maturity, by acceleration or otherwise) any principal of any Tranche A Loan, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account (and debit each Lender's Tranche A Credit-Linked Deposit Sub-Account in the amount of) such Lender's Applicable Percentage of the

LA000050

 

EXECUTION VERSION

amount of such principal not paid when due and the Tranche A Funding Amount shall be reduced by such amount.

(iii)     At any time and from time to time, if the Fronting Bank, in its sole discretion, directs the Paying Agent to withdraw an amount from the Tranche A Credit-Linked Deposit Account sufficient to repay all outstanding Tranche A Loans or any portion thereof, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account (and debit each Lender's Tranche A Credit-Linked Deposit Sub-Account in the amount of) such Lender's Applicable Percentage of such amount so directed and the Tranche A Funding Amount shall be reduced by such amount. Additionally, the Fronting Bank, in its sole discretion, may direct the Paying Agent to fund a Tranche A Loan directly with amounts on deposit in the Tranche A Credit-Linked Deposit Account (and such Tranche A Loan shall immediately become a Funded Tranche A Loan as set forth in clause (iv)).

(iv)     Upon the withdrawal of any amounts on deposit in the Tranche A Credit-Linked Deposit Account pursuant to clause (C)(i), (ii) or (iii), each Tranche A Lender shall be deemed to have made a loan (relative to each Tranche A Lender, its "**Funded Tranche A Loan**") to the Borrower in an amount equal to such Tranche A Lender's Applicable Percentage of the amount withdrawn from the Tranche A Credit-Linked Deposit Account. The Borrower may elect to have Funded Tranche A Loans accrue as Eurodollar Rate Loans or Base Rate Loans as further set forth in Section 2.6D. The Borrower may repay Funded Tranche A Loans by making deposits into the Tranche A Credit-Linked Deposit Account, which, so long as no Event of Default has occurred and is continuing, will not cause a reduction in the Tranche A Funding Amount.

(v)     Concurrently with the effectiveness of any assignment by any Tranche A Lender of all or any portion of its Tranche A Funding Amount, the corresponding portion of the assignor's Tranche A Credit-Linked Sub-Account shall be transferred from the assignor's Tranche A Credit-Linked Sub-Account to the assignee's Tranche A Credit-Linked Sub-Account in accordance with Section 9.1B and, if required by Section 9.1B, the Paying Agent shall close such assignor's Tranche A Credit-Linked Sub-Account.

(vi)     Upon the reduction of each of the Tranche A Funding Amount and the Tranche A LC Exposure to zero, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account and pay to each Tranche A Lender the entire remaining amount of such Lender's Tranche A Credit-Linked Deposit, and shall close the Tranche A Credit-Linked Deposit Account.

Each Tranche A Lender irrevocably and unconditionally agrees that its Tranche A Credit-Linked Deposit may be applied or withdrawn from time to time as set forth in this Section 2.1C.

**D.     Deposit Earnings.** Each of the Paying Agent, the Fronting Bank and each Tranche A Lender hereby acknowledges and agrees that (i) each Tranche A Lender is funding its Tranche A Credit-Linked Deposit to the Paying Agent for application in the manner contemplated by Sections 2.1I and 2.5F, (ii) the Paying Agent has agreed to invest the Tranche A Credit-Linked Deposits in such investments as may be determined from time to time by the Paying Agent in its discretion and (iii) the Paying Agent shall pay to the Tranche A Lenders a return on such Tranche A Credit Linked Deposit (except during periods when such Tranche A Credit-Linked Deposits are used to cover unreimbursed LC Disbursements or Tranche A Loans that have not been repaid when due (at stated maturity, by acceleration or otherwise)) equal at any time to (x) the Eurodollar Base Rate for a three-month interest period (provided, however that the initial Interest Period shall be the period commencing on the Effective Date and ending on September 29, 2006) minus (y) 10 basis points. Such interest will be paid to the

39

NY\1139561.13

LA000051

 

EXECUTION VERSION

Tranche A Lenders by the Paying Agent in arrears on each day on the last day of the interest period applicable to such Tranche A Credit Linked Deposit (which corresponds to the date on which fees are due and payable to the Tranche A Lenders under Section 2.7). Any amounts earned and received with respect to Tranche A Credit-Linked Deposits during any applicable Interest Period in excess of the Eurodollar Base Rate for the Interest Period in effect shall be for the account of the Paying Agent. No Person other than the Paying Agent shall have any obligation under or in respect of this clause. Notwithstanding anything to the contrary in this Agreement, the Borrower shall not be liable for any losses due to (i) the misappropriation of any Tranche A Credit-Linked Deposit or return thereon or (ii) the failure of the Paying Agent to pay a return to any Tranche A Lender (it being understood and agreed for greater certainty that this clause shall not limit any obligation of the Borrower hereunder to pay any fees pursuant to Section 2.7, repay any Tranche A Loan or Funded Tranche A Loan). Neither the Paying Agent, the Fronting Bank nor any other Person guarantees any rate of return on the investment of any Tranche A Credit-Linked Deposit held in the Tranche A Credit-Linked Deposit Account.

E.    **Sufficiency of Deposits to Provide for Tranche A Exposure.** Notwithstanding any other provision of this Agreement, no Tranche A Loan shall be made, and no Letter of Credit shall be issued or any Stated Amount of any Letter of Credit increased, if after giving effect thereto the aggregate amount of the Tranche A Exposures would exceed the aggregate amount of the Tranche A Credit-Linked Deposits as a result of application of Tranche A Credit-Linked Deposits pursuant to paragraph 2.1(C)(i) or (ii) above.

F.    **Satisfaction of Lender Funding Obligations.** The Borrower and the Fronting Bank acknowledge and agree that, notwithstanding any other provision contained herein (but without limiting the obligations of any Tranche A Lender under Section 9.2C), (i) deposit by each Tranche A Lender in the Tranche A Credit-Linked Deposit Account on the Effective Date of funds equal to its Tranche A Funding Amount will fully discharge the obligation of such Lender to fund Loans by such Lender pursuant to Section 2.2B and to reimburse such Lender's Applicable Percentage of LC Disbursements that are not reimbursed by the Borrower pursuant to Section 2.5F, and that no other or further payments shall be required to be made by any Tranche A Lender in respect of any such funding or reimbursement obligations, and (ii) the failure of any Tranche A Lender to deposit such funds into the Tranche A Credit-Linked Deposit Account shall not release the Fronting Bank from its obligation to fund the full amount of the Tranche A Loan pursuant to the other terms of this Agreement.

G.    **Security.** Each Tranche A Lender hereby grants to the Fronting Bank a first priority security interest in such Tranche A Lender's Tranche A Credit-Linked Deposit to secure the obligations of such Tranche A Lender under Sections 2.1I and 2.5F.

H.    **Fronting Bank Insecure.** If the Fronting Bank is enjoined from taking any action referred to in Section 2.1C, or if the Fronting Bank reasonably determines that, by operation of law, it may reasonably be precluded from taking any such action, or if any Tranche A Lender challenges in any legal proceeding any of its respective acknowledgements, agreements or characterizations set forth in Section 2.1A, then, in any such case (and so long as such event or condition shall be continuing), and notwithstanding anything contained herein to the contrary, the Fronting Bank shall have the right to reduce the amount of any Tranche A Loan or issuance, renewal or extension of any Letter of Credit by the prorata portion of such Tranche A Loan or issuance, renewal or extension of any Letter of Credit represented by the Applicable Percentage of the challenging Tranche A Lender or the Tranche A Lender affected by operation of law and also in such event the Borrower shall have the right to reduce the Tranche A Funding Amounts by the same amount for so long as such condition is in effect]. If any Loan Party challenges in any legal proceeding any of its respective acknowledgements, agreements or characterizations set forth in Section 2.1A, then, in any such case (and so long as such event or condition

40

**CREDIT AGREEMENT**

LA000052

 EXECUTION VERSION

shall be continuing), and notwithstanding anything contained herein to the contrary, the Fronting Bank shall not be required to make any Tranche A Loan or to issue, renew or extend any Letter of Credit.

I.       **Reimbursement of Fronting Bank.** If the Borrower fails to pay when due (at stated maturity, by acceleration or otherwise) any principal of any Tranche A Loan, the Fronting Bank shall direct the Paying Agent to withdraw from the Tranche A Credit-Linked Deposit Account (and debit each Tranche A Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of the amount of such principal not paid when due. Promptly following receipt by the Paying Agent of any payment from the Borrower of principal of Tranche A Loans, the Paying Agent shall distribute such payment to the Fronting Bank or, to the extent that amounts have been withdrawn from the Tranche A Credit-Linked Deposit Account to make any payment pursuant to this paragraph to the Fronting Bank, then such payment shall be deposited in the Tranche A Credit-Linked Deposit Account (and credited to each Tranche A Lender's Tranche A Credit-Linked Sub-Account in the amount of such Lender's Applicable Percentage of such deposit). Any payment made with amounts withdrawn from the Tranche A Credit-Linked Deposit Account to pay the Fronting Bank for any defaulted principal payment shall constitute the funding by the respective Tranche A Lender of its participation in the related Tranche A Loan and shall not constitute a new Loan or relieve the Borrower of its obligation to pay such principal.

## 2.2    Commitments; Loans.

A.       **Tranche B Loans.** Subject to the terms and conditions of this Agreement, each of the Tranche B Lenders agrees to make on the Effective Date a Loan in the amount equal to its Tranche B Loan Commitment. The Borrower may make one borrowing under the Tranche B Loan Commitment. As described below, the Tranche B Loans will be disbursed to the Borrower on the Effective Date for the payment of the Existing Indebtedness, Transaction Costs, to make certain distributions to holders of the Capital Stock of the Borrower as provided in Section 2.9A, with the remainder to be deposited into the Company's Operating Account for the purposes contemplated herein. Each Tranche B Loan Commitment shall terminate immediately and without further action after giving effect to the making of the Tranche B Loans. The proceeds of the Tranche B Loans shall be used for the purposes identified in Section 2.9A. Tranche B Loans, once repaid or prepaid, may not be reborrowed.

B.       **Tranche A Loans.**

(i)       Subject to the terms and conditions of this Agreement, the Fronting Bank shall, from time to time during the Tranche A Availability Period upon receipt of a Request for Loan from the Borrower, make one or more Tranche A Loans to the Borrower in an aggregate principal amount that will not result in the total Tranche A Exposures exceeding the lesser of the aggregate balance of the Tranche A Credit-Linked Deposit Account (excluding any portion of the Tranche A  Credit-Linked Deposit Account attributable to interest) or the total Tranche A Funding Amounts, provided that the Tranche A Loan Borrowing Conditions have been satisfied. Within the foregoing limits and subject to satisfaction of the Tranche A Loan Borrowing Conditions and the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Tranche A Loans in accordance with the procedures set forth herein.

(ii)       By the making of a Tranche A Loan, and without any further action on the part of the Fronting Bank or the Lenders, the Fronting Bank hereby grants to each Tranche A Lender, and each Tranche A Lender hereby acquires from the Fronting Bank, a participation in such Loan equal to such Lender's Applicable Percentage of the principal amount thereof. Each Tranche A Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section in respect of Tranche A Loans is absolute and unconditional and shall not be

NY\1139561.13

LA000053

 

EXECUTION VERSION

affected by any circumstance whatsoever, including the occurrence and continuance of a Default or, subject to Section 2.1F, reduction or termination of the Tranche A Funding Amounts.

(iii)    In consideration and in furtherance of the foregoing, each Tranche A Lender hereby absolutely and unconditionally authorizes and directs the Paying Agent to withdraw from the Tranche A Credit-Linked Deposit Account (and debit such Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of the principal amount of each Tranche A Loan not paid when due (whether at stated maturity, acceleration or otherwise), or of any payment of principal of any Tranche A Loan required to be refunded to the Borrower for any reason (it being understood and agreed that each Tranche A Lender's obligations in respect of participations in Tranche A Loans shall be payable solely from, and limited to, such Lender's Tranche A Credit-Linked Deposit).

## 2.3    Disbursement Procedures for Tranche B Loans.

**A.    Disbursement Authorization.** For the Tranche B Loans, the Borrower shall deliver to the Administrative Agent a Disbursement Authorization no later than 11:00 a.m. (New York time), at least one (1) Business Day in advance of the Effective Date. In lieu of delivering the above-described Disbursement Authorization, the Borrower may give the Administrative Agent telephonic notice by the required time of any proposed borrowing under this Section 2.3A; provided that such notice shall be promptly confirmed in writing by delivery of a Disbursement Authorization to the Administrative Agent on or before the Effective Date. Upon Administrative Agent's receipt of the Disbursement Authorization, Administrative Agent will be fully authorized to fund the Tranche B Loans.

The Borrower shall notify the Administrative Agent prior to the funding of any Loans in the event that any of the matters to which the Borrower is required to certify in the applicable Disbursement Authorization are no longer true and correct as of the Effective Date or the requested Disbursement Date, and the acceptance by the Borrower of the proceeds of any Loans shall constitute a re-certification by the Borrower, as of the Effective Date or the requested Disbursement Date, as to the matters to which the Borrower is required to certify in the applicable Disbursement Authorization.

**B.    Disbursement Procedures for Tranche B Loans.** The Tranche B Loans shall be made by the Lenders in the amounts of their respective Tranche B Loan Commitments, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder nor shall the Commitment of any Lender to make the particular type of Loan requested be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder.

Each Lender shall make the amount of its Loan available to the Administrative Agent not later than 2:00 pm (New York time) on the Effective Date in same day funds at the Funding and Payment Office. Unless the Administrative Agent shall have received written notice to the contrary prior to the Effective Date, the Administrative Agent may assume that each Lender will fund its respective Loan Commitment and may, in reliance upon such assumption, distribute to the Borrower the amount of each such Loan Commitment. In such event, if any Lender does not in fact fund its respective Loan Commitment, then such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed by the Administrative Agent to the Borrower, with interest thereon as computed in accordance with this Agreement, for each day from and including the date such amount is distributed to the Borrower to the date of payment to the Administrative Agent.

Upon satisfaction or waiver of the conditions precedent specified in Section 3.1, the Administrative Agent shall make the proceeds of the Tranche B Loans available to the Borrower on the

42

NY\1139561.13

LA000054

 XECUTION VERSION

Effective Date by causing an amount of same day funds equal to the proceeds of all such Tranche B Loans received by the Administrative Agent from the Lenders to be credited pursuant to the terms of the Disbursement Request for payment of the Existing Indebtedness, Transaction Costs and making of certain distributions to the holders of the Capital Stock of the Borrower with the remainder to be deposited into the Company's Operating Account.

C.    **Tranche B Notes.**  The Borrower shall execute and deliver on the Effective Date to each Lender requesting the same (or to the Administrative Agent for that Lender) a Note substantially in the form of __Exhibit VIII__ annexed hereto to evidence that Lender's Loan. Any Lender not receiving a Note may request at any time that the Borrower issue it such Note on the terms set forth herein, and the Borrower agree to issue such Note promptly upon the request of a Lender. The Notes and the Obligations evidenced thereby shall be governed by, subject to and benefit from all of the terms and conditions of this Agreement and the other Loan Documents and shall be secured by the Collateral, provided however, that the Register shall be determinative as to the identity of the Lenders hereunder.

## 2.4    Disbursement Procedures for Tranche A Loans.

A.    __Minimum Amounts__.  Each Borrowing shall be in an aggregate amount of at least $1,000,000 and any integral or multiple of $500,000 in excess of that; provided that a Base Rate Borrowing may be in an aggregate amount that is equal to the entire unused balance of the Tranche A Funding Amount.

B.    __Limitations on Interest Periods__.  The initial Interest Period for any Tranche A Loan that is a Eurodollar Rate Loan shall commence on the date of such Borrowing and expire on the date on which such Interest Period would expire pursuant to Section 2.6B. Each successive Interest Period shall commence on the date on which the next preceding Interest Period expires. Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request (or to elect to convert to or continue as a Eurodollar Borrowing) any Tranche A Borrowing if the Interest Period requested therefor would end after the Tranche A Maturity Date.

C.    __Requests for Borrowings__.  To request a Borrowing, the Borrower shall notify the Fronting Bank (with a copy to the Administrative Agent) of such request by telephone in the case of a Tranche A Eurodollar Borrowing or a Tranche A Base Rate Borrowing, not later than 11:00 a.m. (New York time), at least one (1) Business Day in advance of a Base Rate Borrowing and at least three (3) Business Days in advance of a Eurodollar Borrowing. Each such telephonic request for a Tranche A Loan shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Paying Agent of a Request for Loan signed by the Borrower. In connection with the Borrower's obligation under Section 2.5F to reimburse the Fronting Bank for each LC Disbursement on the date thereof, the Borrower shall be deemed to have furnished a timely, duly completed Request for Loan for a Tranche A Base Rate Borrowing to be made on such date, in an amount equal to the amount of such LC Disbursement, the proceeds of which shall be applied directly to such obligation. Each telephonic request for a Tranche A Loan and written Request for Loan shall specify the following information and otherwise comply with Section 3.2:

(i)    the aggregate amount of the requested Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an Base Rate Borrowing or a Eurodollar Borrowing;

43

**CREDIT AGREEMENT**

LA000055

 EXECUTION VERSION

(iv)     in the case of a Eurodollar Borrowing, the Interest Period therefor, which shall be a period contemplated by the definition of the term "Interest Period" and permitted under this Agreement;

(v)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of this Agreement and be subject to a Control Agreement in favor of the Collateral Agent; and

(vi)     evidence of Borrower's satisfaction with the Tranche A Loan Borrowing Conditions.

**D.     Failure to Elect**. If no election as to the type of a Borrowing is specified, then the requested Borrowing shall be a Base Rate Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Interest Period shall be one month.

**E.     Disbursement Procedures for Tranche A Loans**. The Fronting Bank shall make each Tranche A Loan to be made by it hereunder on the date requested in the applicable Request for Loan by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Borrower, as designated in the Request for Loan.

**2.5     Letters of Credit**

**A.     General**. Subject to the terms and conditions set forth herein, in addition to the Loans provided for in Section 2.2, the Borrower may request the Fronting Bank to issue, and the Fronting Bank shall issue, at any time and from time to time during the period commencing on the Effective Date and ending on the date that is 30 days prior to the Tranche A Maturity Date, one or more standby letters of credit (each, a "**Letter of Credit**") in such form as is acceptable to the Fronting Bank in its reasonable determination (including, without limitation, "auto-renewal" letters of credit); provided that the Fronting Bank shall not be under any obligation to issue any Letter of Credit if the issuance of such Letter of Credit would violate one or more policies of the Fronting Bank generally applicable to the issuance of letters of credit. All Letters of Credit issued hereunder by the Fronting Bank shall be issued for the account of the Borrower as the named account party thereon.   Letters of Credit issued hereunder shall constitute utilization of the Tranche A Funding Amounts.

**B.     Notice of Issuance, Amendment, Renewal or Extension**. To request the issuance of a Letter of Credit (or the amendment, renewal (other than "auto-renewal" letters of credit) or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Fronting Bank) to the Fronting Bank and with a copy to the Administrative Agent (other than the Letters of Credit requested prior to the date hereof, not later than 11:00 a.m. on the fourth Business Day preceding the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with Section 2.5D below), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. If requested by the Fronting Bank, the Borrower also shall submit a letter of credit application on the Fronting Bank's standard form in connection with any request for a Letter of Credit. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Fronting Bank relating to any Letter of Credit, the

44

LA000056

 

EXECUTION VERSION

terms and conditions of this Agreement shall control. The Fronting Bank shall promptly notify the Administrative Agent of any Letters of Credit issued, amended, renewed or extended by it hereunder and shall deliver a report (in form and substance reasonably acceptable to the Administrative Agent) on the last Business Day of each month after the Effective Date detailing its letter of credit activity under this Agreement; provided that if the last Business Day of such month coincides with the end of a Fiscal Quarter, such report shall be delivered five Business Days prior to the last day of such Fiscal Quarter, and the Fronting Bank shall promptly provide an update report to the Paying Agent of any letter of credit activity under this Agreement during such five Business Day period.

**C.**    **Limitations on Amounts.**  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension the total Tranche A LC Exposure shall not exceed $40,000,000.

**D.**    **Expiration Date.**  Each Letter of Credit shall expire (or provide that the Fronting Bank shall have the option to refuse to renew such Letter of Credit) at or prior to the close of business on the earlier of (i) the date twelve months (or such longer period as the Fronting Bank may agree) after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, which renewal or extension may be automatic, twelve months (or such longer period as the Fronting Bank may agree) after the then-current expiration date of such Letter of Credit, so long as such renewal or extension occurs within three months of such then-current expiration date), and (ii) the date that is five Business Days prior to the Tranche A Maturity Date.

**E.**    **Participations.**  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) by the Fronting Bank, and without any further action on the part of the Fronting Bank or the Lenders, the Fronting Bank hereby grants to each Tranche A Lender, and each Tranche A Lender hereby acquires from the Fronting Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit. Each Tranche A Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or, subject to Section 2.1F, reduction or termination of the Tranche A Funding Amounts.

In consideration and in furtherance of the foregoing, each Tranche A Lender hereby absolutely and unconditionally authorizes and directs the Paying Agent to withdraw from the Tranche A Credit-Linked Deposit Account (and debit such Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of each LC Disbursement made by the Fronting Bank and not reimbursed by the Borrower on the date due as provided in subjection F below, or of any reimbursement payment required to be refunded to the Borrower for any reason (it being understood and agreed that each Tranche A Lender's obligations in respect of participations in Letters of Credit shall be payable solely from, and limited to, such Lender's Tranche A Credit-Linked Deposit).

**F.**    **Reimbursement.**  If the Fronting Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse the Fronting Bank in respect of such LC Disbursement by paying to the Paying Agent an amount equal to such LC Disbursement on the date of such disbursement.

If the Borrower fails to make such payment when due and the Borrower is not entitled to make a Borrowing in the amount of such payment, the Paying Agent shall notify the Administrative Agent who will notify each Tranche A Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof, and the Paying Agent shall

45

LA000057

 EXECUTION VERSION

withdraw from the Tranche A Credit-Linked Deposit Account (and debit such Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of such LC Disbursement and promptly apply such amount to make payment to the Fronting Bank. Promptly following receipt by the Paying Agent of any payment from the Borrower pursuant to this Section 2.5F, the Paying Agent shall distribute such payment to the Fronting Bank or, to the extent that amounts have been withdrawn (and credited to each Tranche A Lender's Tranche A Credit-Linked Sub-Account in the amount of such Lender's Applicable Percentage of such deposit) from the Tranche A Credit-Linked Deposit Account to make any payment pursuant to this paragraph to reimburse the Fronting Bank, then such payment shall be deposited in the Tranche A Credit-Linked Deposit Account. Any payment made with amounts withdrawn from the Tranche A Credit-Linked Deposit Account to reimburse the Fronting Bank for any LC Disbursement constitute the funding by the respective Tranche A Lender of its participation in the related Letter of Credit and shall not constitute a Loan or relieve the Borrower of its obligation to reimburse such LC Disbursement.

If any unreimbursed LC Disbursement resulting in a withdrawal from the Tranche A Credit-Linked Deposit Account as provided in the preceding paragraph shall be subsequently reimbursed other than on the last day of an Interest Period for Tranche A Credit-Linked Deposits, the Paying Agent shall invest the amount so reimbursed in overnight or short-term cash equivalent investments until the end of the Interest Period at the time in effect for Tranche A Credit-Linked Deposits and the Borrower shall pay to the Paying Agent, upon the Paying Agent's request therefor, the amount, if any, by which the interest accrued on a like amount of the Tranche A Credit-Linked Deposits at the Eurodollar Base Rate for such Interest Period shall exceed the interest earned through the investment of the amount so reimbursed for the period from the date of such reimbursement through the end of such Interest Period, as determined by the Paying Agent (such determination to be conclusive absent manifest error) and set forth in the request for payment delivered to the Borrower. In the event the Borrower shall fail to pay any amount due under this paragraph, the interest payable by the Paying Agent to the Tranche A Lenders on their Tranche A Credit-Linked Deposits under Section 2.1D shall be correspondingly reduced and the Tranche A Lenders shall without further act succeed, ratably in accordance with their Applicable Percentages, to the rights of the Paying Agent with respect to such amount.

G.    **Obligations Absolute.**  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.5F above shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Fronting Bank under a Letter of Credit against presentation of a draft or other document that does not comply strictly with the terms of such Letter of Credit, and (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of the Borrower's obligations hereunder.

Neither the Paying Agent, the Tranche A Lenders nor the Fronting Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit by the Fronting Bank or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Fronting Bank; provided that the foregoing shall not be construed to excuse the Fronting Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law)

46

**CREDIT AGREEMENT**

LA000058



EXECUTION VERSION

suffered by the Borrower that are caused by the Fronting Bank's gross negligence or willful misconduct when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that:

(i)  the Fronting Bank may accept documents that appear on their face to be in substantial compliance with the terms of a Letter of Credit without responsibility for further investigation, regardless of any notice or information to the contrary, and may make payment upon presentation of documents that appear on their face to be in substantial compliance with the terms of such Letter of Credit;

(ii)  the Fronting Bank shall have the right, in its sole discretion, to decline to accept such documents and to make such payment if such documents are not in strict compliance with the terms of such Letter of Credit; and

(iii)  this sentence shall establish the standard of care to be exercised by the Fronting Bank when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof (and the parties hereto hereby waive, to the extent permitted by applicable law, any standard of care inconsistent with the foregoing).

H.  **Disbursement Procedures.**  The Fronting Bank shall, within a reasonable time following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Fronting Bank shall promptly after such examination notify the Paying Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Fronting Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Fronting Bank and the Tranche A Lenders with respect to any such LC Disbursement.

I.  **Interim Interest.**  If the Fronting Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse (including through a Borrowing of Tranche A Loans) such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, as provided in Section 2.6A and Section 2.6E. Interest accrued pursuant to this paragraph shall be for the account of the Fronting Bank, except that interest accrued on and after the date of payment from the Tranche A Credit-Linked Deposit of any Tranche A Lender to reimburse the Fronting Bank shall be for the account of such Tranche A Lender to the extent of such payment.

## 2.6    Interest on the Loans.

A.  **Rate of Interest.**  Subject to the provisions of Sections 2.10 and 2.11, each Loan shall bear interest on the unpaid principal amount thereof from the date made to maturity (whether by acceleration or otherwise) at a rate determined by reference to the Base Rate or the Reserve Adjusted Eurodollar Rate, as the case may be. The Tranche B Loans shall be made as Base Rate Loans as of the Effective Date (it being understood that Tranche B Loans may be converted to Eurodollar Rate Loans after the Effective Date in accordance with Section 2.6D). If on any day any Loan is outstanding with respect to which notice has not been delivered to the Administrative Agent in accordance with the terms of this Agreement specifying the applicable basis for determining the rate of interest, then for that day that Loan shall bear interest determined by reference to the Base Rate. Subject to the provisions of Sections 2.10 and 2.11 and in addition to the fees payable under Section 2.7 hereof, the Loans shall bear interest through maturity as follows:

47

LA000059

EXECUTION VERSION

    (i)    if a Base Rate Loan, then at the Base Rate <u>plus</u> the Applicable Base Rate Margin;
or

    (ii)    if a Eurodollar Rate Loan, then at the Reserve Adjusted Eurodollar Rate for the relevant Interest Period <u>plus</u> the Applicable Eurodollar Rate Margin.

    **B.    Interest Periods**. In connection with each Eurodollar Rate Loan, the Borrower may, pursuant to the applicable Notice of Conversion/Continuation select an interest period (each an "**Interest Period**") to be applicable to such Loan, which Interest Period shall be, at the Borrower's option, either a one (1), two (2), three (3) or six (6) month period; provided that:

    (i)    the initial Interest Period for any Eurodollar Rate Loan shall commence on the date specified in the applicable Notice of Conversion/Continuation, in the case of a Loan converted to a Eurodollar Rate Loan;

    (ii)    in the case of immediately successive Interest Periods applicable to a Eurodollar Rate Loan continued as such pursuant to a Notice of Conversion/Continuation, each successive Interest Period shall commence on the day on which the next preceding Interest Period expires;

    (iii)    if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

    (iv)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (v) of this Section 2.6B, end on the last Business Day of a calendar month;

    (v)    no Interest Period with respect to any portion of the Loans shall extend beyond the Maturity Date for such Loans;

    (vi)    the Borrower may not select an Interest Period of longer than one (1) month prior to the end of the period commencing on and including the Effective Date and ending on the earlier of (a) the date on which the Administrative Agent notifies the Borrower that it has concluded its primary syndication of the Loans and the Commitments, and (b) the date which is six (6) months following the Effective Date;

    (vii)    there shall be no more than ten (10) Interest Periods outstanding at any time;

    (viii)    with respect to a conversion, in the event the Borrower fail to specify an Interest Period for any Eurodollar Rate Loan in the applicable Notice of Conversion/Continuation, the Borrower shall be deemed to have selected an Interest Period of one (1) month; and

    (ix)    with respect to a continuation, in the event the Borrower fail to specify an Interest Period for any Eurodollar Rate Loan in the applicable Notice of Conversion/Continuation, the Eurodollar Rate Loan shall automatically be converted to a Base Rate Loan.

CREDIT AGREEMENT

LA000060

 ECUTION VERSION

**C.        Interest Payments.** Subject to the provisions of Section 2.6E below, (i) interest on each Eurodollar Loan shall be payable in arrears on each Interest Payment Date applicable to that Loan and (ii) interest on each Base Rate Loan shall be payable in arrears on the Interest Payment Date, and (iii) except with respect to Tranche A Loans that are Base Rate Loans, which is payable pursuant to (ii) above, interest on any Loan shall be payable upon any prepayment of that Loan (to the extent accrued on the amount being prepaid) and at maturity (including final maturity, by acceleration or otherwise). In each case, with respect to interest payable under this Section 2.6, with respect to Tranche A Loans, such interest shall be payable to the Paying Agent for the account of the Tranche A Lenders, except if the Fronting Bank shall make Tranche A Loans or LC Disbursements that are not reimbursed from the Tranche A Credit-Linked Deposits or by the Borrower, then from and after the date of the making of such Tranche A Loan or LC Disbursement, such interest shall accrue for the account of the Fronting Bank.

**D.        Conversion or Continuation.** Subject to the provisions of Section 2.10, the Borrower shall have the option: (i) to convert at any time all or any part of its outstanding Loans equal to $1,000,000 and integral multiples of $500,000 in excess of that amount from Loans bearing interest at a rate determined by reference to one basis to Loans bearing interest at a rate determined by reference to an alternative basis; provided, however, that a Eurodollar Rate Loan may only be converted into a Base Rate Loan on the expiration date of an Interest Period applicable thereto; or (ii) upon the expiration of any Interest Period applicable to a Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount as a Eurodollar Rate Loan.

The Borrower shall deliver a Notice of Conversion/Continuation to the Administrative Agent no later than 11:00 a.m. (New York time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan), and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). A Notice of Conversion/Continuation shall specify (i) the proposed conversion/continuation date (which shall be a Business Day), (ii) the amount and type of the Loan to be converted/continued, (iii) the nature of the proposed conversion/continuation, (iv) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, the requested Interest Period, and (v) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, that no Default or Event of Default has occurred and is continuing. In lieu of delivering the above-described Notice of Conversion/Continuation, the Borrower may give the Administrative Agent irrevocable telephonic notice by the required time of any proposed conversion/continuation under this Section 2.6D; provided that such notice shall be promptly confirmed in writing by delivery of a Notice of Conversion/Continuation to the Administrative Agent on or before the proposed conversion/continuation date.

Neither the Administrative Agent nor any Lender shall incur any liability to the Borrower in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized to act on behalf of the Borrower or for otherwise acting in good faith under this Section 2.6D, and upon conversion or continuation of the applicable basis for determining the interest rate with respect to any Loans in accordance with this Agreement pursuant to any such telephonic notice, the Borrower shall have effected a conversion or continuation, as the case may be, hereunder.

Except as otherwise provided in Sections 2.10B, 2.10C and 2.10G, a Notice of Conversion/Continuation for conversion to, or continuation of, any Eurodollar Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

**E.        Post-Default Interest.** Upon the occurrence and during the continuation of any Event of Default, if requested by the Requisite Lenders, the outstanding principal amount of all Loans and, to the

49

CREDIT AGREEMENT

LA000061

 EXECUTION VERSION

extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable under this Agreement for Loans bearing interest at a rate determined by reference to the Base Rate); provided that, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate equal to 2% per annum in excess of the interest rates otherwise payable under this Agreement for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.6E is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

F.    **Computation of Interest.** Interest on Loans shall be computed on the basis of a 360-day year (a 365 or 366-day year, as applicable, in the case of Base Rate Loans based on the Prime Rate) and for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

G.    **Rate Increase Maximum Net Indebtedness.**

In the event that, as of any Calculation Date, the aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner as of the Calculation Date less the aggregate amount of Cash Collateral and Cash and Cash Equivalents held by the Borrower, its Subsidiaries and the Bahamas Owner (the "Rate Increase Maximum Net Indebtedness") shall exceed the following amounts (shown in thousands):

| Calculation Date Occurring | Rate Increase Maximum Net Indebtedness |
|---|---|
| After the Effective Date and on or prior to June 30, 2006 | $650,000 |
| September 30, 2006 | $650,000 |
| December 31, 2006 | $500,000 |
| March 31, 2007 | $400,000 |
| June 30, 2007 | $350,000 |
| September 30, 2007 | $350,000 |
| December 31, 2007 | $300,000 |
| March 31, 2008 | $300,000 |
| June 30, 2008 | $300,000 |
| September 30, 2008 | $300,000 |
| December 31, 2008 | $300,000 |
| Thereafter | N/A |

50

NY\1139561.13

LA000062



but such amount is less than the Maximum Net Indebtedness, the Applicable Base Rate Margin, in the case of Base Rate Loans and the Applicable Eurodollar Rate Margin, in the case of Eurodollar Rate Loans, shall increase by 0.25%, provided, however that the maximum cumulative amount of all such increases shall be 0.50% such that the maximum Applicable Base Rate Margin shall in no event exceed 2.50% and the maximum Applicable Eurodollar Rate Margin shall in no event exceed 3.50%. Such increased rate of interest shall apply from and including the Calculation Date on which it is determined that the preceding sentence shall apply to but excluding the Calculation Date on which it is determined that the next succeeding sentence shall apply and on such a subsequent Calculation Date, such increased rate of interest shall be reduced as set forth in the next succeeding sentence. If, as of any subsequent Calculation Date, the aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner less the aggregate amount of Cash Collateral and Cash and Cash Equivalents held by the Borrower, its Subsidiaries and the Bahamas Owner is less than the Rate Increase Maximum Net Indebtedness specified for the applicable period in the table above, the Applicable Base Rate Margin, in the case of Base Rate Loans and the Applicable Eurodollar Rate Margin, in the case of Eurodollar Rate Loans, shall decrease to such applicable rates as set forth on Annex A attached hereto. Notwithstanding anything to the contrary contained in this Agreement, in no event shall this Section 2.6G apply from and after January 1, 2009.

2.7    Fees. The Borrower agrees to pay the following fees:

A.    Tranche A Credit-Linked Deposits. The Borrower agrees to pay to the Paying Agent on behalf of the Tranche A Lenders on a quarterly basis on the last Business Day of each Fiscal Quarter ending in March, June, September and December of each Fiscal Year (provided, however that the initial Interest Period shall be the period commencing on the Effective Date and ending on September 29, 2006) for the account of each Tranche A Lender a fee, accruing (subject to Section 2.6E) at the rate of 3.00% on the positive difference between (i) the daily amount of the Tranche A Credit-Linked Deposit of such Tranche A Lender based upon such Tranche A Lender's Tranche A Funding Amount and (ii) the principal amount of the Tranche A Loans outstanding during such period and held by Tranche A Lenders and not by the Fronting Bank in its capacity as such plus the principal amount of LC Disbursements reimbursed to the Fronting Bank from the Tranche A Credit-Linked Deposits during the period from and including the Effective Date to but excluding the date on which each of the Tranche A Funding Amounts of all of the Tranche A Lenders and the Tranche A LC Exposure have been reduced to zero. In addition, the Borrower agrees to pay to the Paying Agent for the account of each Tranche A Lender an additional amount, accruing at the rate of 0.10% per annum, on the positive difference between (i) the daily amount of the Tranche A Credit-Linked Deposit of such Tranche A Lender based upon such Tranche A Lender's Tranche A Funding Amount and (ii) the principal amount of the Tranche A Loans outstanding during such period and held by Tranche A Lenders and not by the Fronting Bank in its capacity as such plus the principal amount of LC Disbursements reimbursed to the Fronting Bank from the Tranche A Credit-Linked Deposits during the period from and including the Effective Date hereof to but excluding the date on which each of the Tranche A Funding Amounts of all of the Tranche A Lenders and the Tranche A LC Exposure have been reduced to zero. Fees and other amounts under this paragraph accrued to but excluding the Interest Payment Date shall be payable on such Interest Payment Date, and on the date on which each of the Tranche A Funding Amounts of all of the Tranche A Lenders and the Tranche A LC Exposure have been reduced to zero. All fees payable under this paragraph shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The foregoing commitment fees shall be payable in arrears on the last Business Day in each of March, June, September and December of each year, commencing on June 30, 2006.

51

NY\1139561.13

LA000063

 ECUTION VERSION

**B.    Other Fees.** The Borrower agrees to pay to the Administrative Agent, the Collateral Agent and the Paying Agent, for their own respective accounts, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and each of the Administrative Agent, the Collateral Agent and the Paying Agent.

**C.    General.** All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Paying Agent (or to the Fronting Bank, in the case of fees payable to it) for distribution, in the case of fees payable under Section 2.7A, to the Lenders entitled thereto. Fees paid shall not be refundable under any circumstances.

### 2.8    Repayments and Prepayments; General Provisions Regarding Payments; Call Protection.

A.    Scheduled Payments of Loans.

The Borrower shall make principal payments on the Tranche B Loans in installments in amounts equal to a percentage of the Tranche B Loans funded on the Effective Date as set forth below and on the dates set forth below:

| DATE | AMORTIZATION SCHEDULE |
|------|-----------------------|
| September 30, 2006<br>December 31, 2006 | .25%<br>.25% |
| March 31, 2007<br>June 30, 2007<br>September 30, 2007<br>December 31, 2007 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2008<br>June 30, 2008<br>September 30, 2008<br>December 31, 2008 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2009<br>June 30, 2009<br>September 30, 2009<br>December 31, 2009 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2010<br>June 30, 2010<br>September 30, 2010<br>December 31, 2010 | .25%<br>.25%<br>.25%<br>.25% |
| March 30, 2011 | .25% |
| Maturity Date | Remaining Principal (after giving effect to any voluntary or mandatory prepayments in accordance with Section 2.8C) |

If any of the dates above are not a Business Day, then the applicable installment shall be made on the preceding Business Day. Any voluntary or mandatory prepayments of the Loans in accordance with Section 2.8B shall be applied to the next succeeding scheduled installment of

NY\1139561.13

**CREDIT AGREEMENT**

LA000064

 EXECUTION VERSION

principal of the Tranche B Loans set forth above, with any remaining prepayment amount applied to the next following scheduled installment or installments until the full amount of the prepayment has been applied. The final installment on the Maturity Date specified above for the repayment by the Borrower of the Loans shall be in an amount sufficient to repay all amounts owing by the Borrower under this Agreement with respect to the Loans.

**B.    Prepayments.**

        (i)    Voluntary Prepayments.

        (a)    The Borrower may at any time and from time to time prepay, without premium or penalty, the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; provided, however, that in the event the Borrower elects to prepay a Eurodollar Rate Loan other than on the expiration of the Interest Period applicable thereto, the Borrower shall, at the time of such prepayment, also pay any amounts payable under Section 2.10D hereof. The Borrower shall notify the Administrative Agent, in writing or by telephone, promptly confirmed in writing to the Administrative Agent, no later than 11:00 a.m. (New York time) at least one (1) Business Day prior to such prepaying. The Administrative Agent will promptly notify each Lender upon receipt of such notice from the Borrower. Any notice of prepayment shall be irrevocable and having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein, provided, however that the Borrower may revoke any such notice of prepayment if conditioned upon a refinancing as described in Section 2.8D below. Any voluntary prepayments pursuant to this Section 2.8B(i) shall be applied as specified in Section 2.8C, provided, however that in connection with any voluntary prepayments by the Borrower pursuant to this Section 2.8B(i), such voluntary prepayments shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case, in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

        (b)    <u>Call Protection.</u> In the event that the Tranche B Loans are repaid or prepaid pursuant to Sections 2.8B(i) or 2.8B(ii) hereof, on or prior to June 30, 2007, the Borrowers shall pay to the Lenders a prepayment premium in the amount of 1.0% of the principal amount repaid or prepaid. For the avoidance of doubt, such prepayment premium shall not be payable in connection with the repayment or Tranche A Loans.

        (ii)    Mandatory Prepayments.

The Tranche B Loans shall be prepaid in the manner provided in Section 2.8C upon the occurrence of the following circumstances:

        (a)    <u>Prepayments Due to Issuance of Debt.</u> Concurrently with and as a condition to the closing of any transaction pursuant to which Borrower or any of its Subsidiaries issue debt Securities or incur additional borrowed Indebtedness (other than Indebtedness permitted under Section 6.1 for which no prepayment shall be required), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the principal amount of such debt Securities or borrowed Indebtedness paid or payable to the Borrower or its Subsidiaries; less (ii) Permitted Transaction Costs. Such prepayment shall not be deemed to waive any violation of Section 6.1 hereof.

CREDIT AGREEMENT

NY\1139561.13

LA000065

 ECUTION VERSION

(b)     Prepayments Due to Issuance of Equity Securities or Intercompany Subordinated Debt. Concurrently with and as a condition to the closing of any transaction pursuant to which the Borrower or any of its Subsidiaries receive any Equity Proceeds or proceeds of Intercompany Subordinated Debt, the Borrower shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds, provided, however that any Equity Proceeds or proceeds of Intercompany Subordinated Debt received by (i) the Borrower from Investments made, from time to time, by the existing holders of the Capital Stock in the Borrower as of the Effective Date or (ii) the Borrower's wholly-owned Subsidiaries from Investments made by the Borrower or another of its Subsidiaries in such Subsidiaries and permitted under Section 6.3, in each case, may be retained by the Borrower or such Subsidiary, provided, however that such Equity Proceeds or proceeds from Intercompany Subordinated Debt are used for (A) Project Expenses or Bahamas Project Expenses in a manner consistent with the Project Projections, (B) for purposes of purchasing additional Real Property Collateral to the extent designated in an Officer's Certificate by a Responsible Officer of the Borrower to be used for such purpose, which purchase shall occur prior to one calendar year following the date of such Investment and which Real Property Collateral will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof, or (C) for purposes of making voluntary prepayments in accordance with Section 2.8B(i) hereof.

(c)     Prepayments Due to Insurance and Condemnation Proceeds. No later than the fifth (5th) Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any cash payments which exceed $5,000,000 (i) under any insurance policy as a result of any damage to or loss of (a "**Casualty**") all or any portion of the Collateral (the "**Insurance Proceeds**"), or (ii) resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof, "**Condemnation Proceeds**") (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a "**Recovery Event**"), the Borrower shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received, unless, in each case, the Borrower shall have delivered a Reinvestment Notice. Concurrently with any prepayment of Loans pursuant to this Section 2.8B(ii)(c), the Borrower shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

(d)     Prepayments from Excess Cash Flow. In the event that there shall be Excess Cash Flow with respect to any Fiscal Quarter, the Borrower shall, no later than the date upon which the Borrower is required to deliver financial statements under Section 5.3(ii) and (iii) with respect to such Fiscal Quarter, prepay the Loans in an aggregate amount equal to 100% of such Excess Cash Flow provided that, at the point at which such prepayment of Excess Cash Flow results in the occurrence of the Trigger Date Events on such date, such prepayment obligations shall be reduced to 50% of such Excess Cash Flow.

(e)     Prepayments Due to Asset Sales. Concurrently with the consummation of any Asset Sale (except with respect to Permitted Collateral Asset Sales or Required Releases to the extent the proceeds thereof constitute Excess Cash Flow), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs. Such prepayment shall not be deemed to waive any violation of Section 6.8 hereof.

Any Lender may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) at least seven (7) Business Days prior to the applicable prepayment date,

54

**CREDIT AGREEMENT**

LA000066

 EXECUTION VERSION

to decline such Lender's portion of such mandatory prepayment. Failure of any Lender to provide such notice to decline shall be deemed an election by such Lender to accept its portion of such mandatory prepayment. In the event one or more Lenders elect to decline to accept such mandatory prepayment, the aggregate amount of the mandatory prepayment that would have been applied to prepay the Loans but was so declined shall be re-offered to those Lenders under this Agreement who initially accepted (or were deemed to have accepted) such mandatory prepayment (such re-offer to be made to each such Lender based on the percentage which such Lender's Loans represents of the aggregate Loans of all such Lenders who have initially accepted such prepayment). In the event of such a re-offer, the relevant Lenders may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) within two (2) Business Days of receiving notification of such re-offer, to decline all of the amount of such prepayment that is re-offered to them, in which case the aggregate amount of the mandatory prepayment that would have been applied to prepay such Loans pursuant to such re-offer but was so declined shall be retained by the Borrowers to be used for any other purpose not prohibited by this Agreement (including without limitation distributions or repayment of Intercompany Subordinated Debt to the Permitted Holders if permitted or voluntary prepayments pursuant to Section 2.8B(i)).

In connection with any mandatory prepayments by the Borrower of the Tranche B Loans pursuant to Section 2.8B(ii) such prepayments shall be applied on a pro rata basis to the then outstanding Tranche B Loans being prepaid irrespective of whether such outstanding Tranche B Loans are Base Rate Loans or Eurodollar Rate Loans; provided that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.8B(ii) then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Tranche B Loans that are Base Rate Loans to the full extent thereof before application to Tranche B Loans that are Eurodollar Rate Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

(iii)    No Waiver. Nothing contained in Section 2.8B(ii) shall be deemed to permit the Borrower to consummate any Asset Sale unless otherwise permitted under this Agreement.

## C.    Application of Prepayments.

Each payment received by Collateral Agent or Administrative Agent from the Borrower with respect to the Loans shall be applied in the following order: First, any prepayment premiums; second, to the payment of any late charges due and payable hereunder; third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder); fourth, to the payment of accrued and unpaid interest; fifth, to fund any reserves or escrows required by Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; sixth, to payment of any Eurodollar breakage costs incurred by Lenders on account of such payment; seventh, to reduction of the outstanding principal balance of the Tranche A Loans; and eighth, to the reduction of the outstanding principal balance of the Tranche B Loans (provided that any outstanding principal balance under the Tranche A Loans has been paid in full). All such funds shall be deposited into the Company's Operating Account to be used for the purposes provided by this Agreement. Notwithstanding the foregoing, (A) if an Event of Default has occurred and is continuing, Collateral Agent may apply any payments received in such order or proportion as Collateral Agent, in Collateral Agent's sole discretion, may determine, and (B) as among the Lenders, such payments shall be applied in accordance with Section 2.8D(iii) below.

55

**CREDIT AGREEMENT**

LA000067

 XECUTION VERSION

**D.    General Provisions Regarding Payments.**

(i)    <u>Manner and Time of Payment</u>.  All payments by the Borrower of principal, interest, fees and other Obligations hereunder and under the Notes shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent or the Paying Agent, as the case may be, not later than 2:00 pm (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent or the Paying Agent, as the case may be, after that time on such due date shall, at the Administrative Agent's or Paying Agent's sole discretion, be deemed to have been paid by the Borrower on the next succeeding Business Day. The Borrower hereby authorizes the Administrative Agent to charge its account with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent or the Paying Agent, as the case may be, of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for such purpose). Unless the Administrative Agent or the Paying Agent, as the case may be, shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent or the Paying Agent, as the case may be, for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent or the Paying Agent, as the case may be, may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent or the Paying Agent, as the case may be, forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent or the Paying Agent, as the case may be, at the greater of the Base Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(ii)    <u>Application of Payments to Principal, Interest, Prepayment Premiums and Breakage Costs</u>.  Except as provided in Section 2.6C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest, prepayment premiums and Eurodollar breakage costs, if any, on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest, prepayment premiums and Eurodollar breakage costs, if any, before application to principal.

(iii)    <u>Apportionment of Payments</u>.  The aggregate principal, prepayment fees and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares.  The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent and the commitment fees of such Lender when received by the Administrative Agent pursuant to Section 2.7. Notwithstanding the foregoing provisions of this Section 2.8D(iii) if, pursuant to the provisions of Section 2.10C, any Notice of Conversion/Continuation is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, the Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(iv)    <u>Payments on Business Days</u>.  Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time

56

LA000068

 EXECUTION VERSION

shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

(v)     Notation of Payment. Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; provided that the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect such disposition or the obligations of the Borrower hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note. In the event of Borrower's satisfaction and repayment in full of the Obligations hereunder, each Lender shall surrender to Borrower any and all Notes held by it.

(vi)    Revocation of Prepayment Notices. Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.8(B) if such prepayment would have resulted from a refinancing of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

E.      **Application of Proceeds of Collateral.**

(i)     Application of Proceeds of Collateral. Except as provided in Section 2.8B(ii) with respect to prepayments, all proceeds received by the Collateral Agent after an Event of Default or as a result of exercising remedies under the Loan Documents, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Collateral Document may, in the discretion of the Collateral Agent, be held by the Collateral Agent as Collateral for, and/or (then or at any time thereafter) applied in full or in part by the Administrative Agent against, the applicable Secured Obligations (as defined in such Collateral Document) in the following order of priority:

(a)     to the payment of all costs and expenses of such sale, collection or other realization, including, without limitation, reasonable compensation to the Agents and their agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Agents in connection therewith, and all amounts for which such Agents are entitled to indemnification under such Collateral Document and all advances made by the Collateral Agent thereunder for the account of the applicable Loan Party (excluding principal and interest in respect to any Loans of such Loan Party), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(b)     thereafter, to the extent of any excess proceeds, to the payment of all other Secured Obligations (as defined in the Security Agreement), including any Secured Obligations related to Hedge Agreements; and

(c)     thereafter, to the extent of any excess proceeds, to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**CREDIT AGREEMENT**

LA000069

 EXECUTION VERSION

### 2.9 Use of Proceeds.

**A.    Tranche B Loans.** The proceeds of the Tranche B Loans made to the Borrower shall be applied, together with the proceeds of the loans made pursuant to the Second Lien Credit Agreement, (i) to repay the Existing Indebtedness of the Borrower, its Subsidiaries and Bahamas Owner, (ii) to make certain distributions to the holders of Capital Stock in the Borrower in the amount of the $333,125,000, and (iii) to pay the Transaction Costs.

**B.    Tranche A Loans.** The proceeds of the Tranche A Loans made to the Borrower shall be applied to fund Project Expenses and Bahamas Project Expenses and for general company and working capital needs of the Borrower, its Subsidiaries and Bahamas Owner in a manner consistent with the Project Projections.

**C.    Compliance With Laws.** The Borrower undertakes that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

**D.    Margin Regulations.** Without limiting the generality of Section 2.9A and B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrower or any of its Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

### 2.10   Special Provisions Governing Eurodollar Rate Loans.

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

**A.    Determination of Applicable Interest Rate.** As soon as practicable after 11:00 A.M. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

**B.    Inability to Determine Applicable Interest Rate.** In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto) on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate, the Administrative Agent shall, on such date, give notice (by telecopy or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower; provided, however that, at the option of the Borrower, any such Disbursement Authorization may be re-submitted to the Administrative

58

LA000070

EXECUTION VERSION

Agent indicating that the Borrower is electing a Base Rate Loan, which Loan shall be funded no later than one (1) Business Day after the date of such Base Rate Loan Disbursement Authorization.

C.    **Illegality or Impracticability of Eurodollar Rate Loans.** In the event that on any date any Lender shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrower and the Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans, shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to the Disbursement Authorization or a Notice of Conversion/Continuation, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Notice of Conversion/Continuation, the Borrower shall have the option, subject to the provisions of Section 2.10D, to rescind such Disbursement Authorization or Notice of Conversion/Continuation as to all Lenders by giving notice (by telecopy or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.10C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms of this Agreement.

D.    **Compensation For Breakage or Non-Commencement of Interest Periods.** The Borrower shall compensate the Administrative Agent, upon written request by that Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by that Lender to the lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any actual loss, expense or liability sustained by that Lender in connection with the liquidation or re-employment of such funds) which that Lender may sustain: (i) if for any reason (other than a default by that Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Disbursement Authorization or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation or a telephonic request for conversion or continuation, (ii) if any prepayment (including any prepayment pursuant to Section 2.8B or assignment pursuant to Section 2.12) or conversion of any of its Eurodollar Rate Loans occurs on a date that is not the last day of an Interest Period applicable to that Loan (including, without limitation, as a result of the Transactions), (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of

CREDIT AGREEMENT

LA000071

 ECUTION VERSION

prepayment given by the Borrower, or (iv) as a consequence of any other default by the Borrower in the repayment of its Eurodollar Rate Loans when required by the terms of this Agreement.

E.    **Booking of Eurodollar Rate Loans.**  Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

F.    **Assumptions Concerning Funding of Eurodollar Rate Loans.**  Calculation of all amounts payable to a Lender under this Section 2.10 and under Section 2.11A shall be made as though that Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of Reserve Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such Eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.10 and under Section 2.11A.

G.    **Eurodollar Rate Loans After Default.**  After the occurrence of and during the continuation of a Default or Event of Default, (i) the Borrower may not elect to have a Loan be made or maintained as, or converted to, a Eurodollar Rate Loan after the expiration of any Interest Period then in effect for that Loan and (ii) subject to the provisions of Section 2.10D, any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by the Borrower.

## 2.11    Increased Costs; Taxes.

A.    **Increased Costs Generally.**  If any Change in Law shall:  (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Reserve Adjusted Eurodollar Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

B.    **Capital Requirements.**  If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

60

LA000072

 EXECUTION VERSION

**C.    Certificates for Reimbursement.** A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 2.11A or 2.11B and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

**D.    Delay in Requests.** Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**E.    Taxes.**

(i)    <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of the Borrower hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct or withhold any Indemnified Taxes or Other Taxes from such payments (other than backup withholding or similar Taxes resulting from Lender's failure to comply with Section 2.11(E)(v)) below, then (a) the sum payable shall be increased as necessary so that after making all required deductions or withholding (including deductions or withholding applicable to additional sums payable under this Section) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions or withholding been made, (b) the Borrower shall make such deductions or withholding and (c) the Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(ii)    <u>Payment of Other Taxes by the Borrower</u>. Without limiting the provisions of paragraph (i) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)    <u>Indemnification by the Borrower</u>. The Borrower shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.11E) paid by such Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)    <u>Evidence of Payments</u>. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

61

**CREDIT AGREEMENT**

LA000073

 EXECUTION VERSION

(v)     Status of Lenders.    Any Lender, if requested by the Borrower or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements or to qualify any such Lender for any exemption from or reduction in the rate of any withholding, backup withholding, Indemnified Taxes or Other Tax. Without limiting the generality of the foregoing, in the event that the Borrower is a resident for tax purposes in the United States of America, (a) each Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent duly completed copies of Internal Revenue Service Form W-9 or other documents to establish such Lender's exempt status in order to prevent the application of the U.S. backup withholding tax and (b) each Foreign Lender shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement, whichever of the following is applicable: (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed copies of Internal Revenue Service Form W-8ECI, (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, together with (iv) duly completed copies of Internal Revenue Service form W-8IMY, if required. In addition, each Foreign Lender shall deliver any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrower or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent to permit the Borrower to determine the withholding or deduction required to be made. Each Foreign Lender shall also deliver such forms promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Foreign Lender, and from time to time thereafter upon the request of the Borrower or the Administrative Agent. Each Foreign Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide, or no longer qualified for any benefit pursuant to, any previously delivered certificate to the Borrower (or any other form of certification adopted by a taxing authority for such purpose). A Foreign Lender shall not be required to deliver any form or statement pursuant to this Section 2.11E(v) that such Foreign Lender is not legally able to deliver. If, after reasonable request delivered by Borrower to Lender, such Lender shall refuse or fail to timely deliver the documentation required under this Section or by applicable law (excluding forms or statements a Lender is not legally able to deliver), then Borrower shall not be obligated to increase or "gross-up" any payments due hereunder to account for such required deductions or withholdings. Thus, for the avoidance of doubt, if a U.S. lender is obligated to certify its U.S. taxpayer identification number but fails to do so, Borrower may reduce any payments due by the amount of backup withhold tax required by applicable law.

(vi)     Treatment of Certain Refunds.    If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to such Section 2.11, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under such Section 2.11 with respect to the Taxes or Other Taxes giving

62

**CREDIT AGREEMENT**

LA000074

 EXECUTION VERSION

rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the event such Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

## 2.12    Mitigation Obligations; Replacement of Lenders.

**A.    Designation of a Different Lender Office.**  If any Lender requests compensation under Section 2.11A or 2.11B, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11E, or any Lender becomes an Affected Lender, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 in the future and, if applicable, cause such Lender to no longer be an Affected Lender and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**B.    Replacement of Lenders.**  If any Lender requests compensation under Section 2.11A or 2.11B, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its Eurodollar Rate Loans in accordance with Section 2.10C hereof, then the Borrower may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 9.1B(i)(c), (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.10D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) such Eligible Assignee is able to make, maintain or continue, as applicable, Eurodollar Rate Loans, (iv) in the case of any such assignment resulting from a claim for compensation under Section 2.11A or 2.11B or payments required to be made pursuant to Section 2.11E, such assignment will result in a reduction in such compensation or payments thereafter, and (v) such assignment does not conflict with applicable law.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## 2.13    Releases of Collateral.

**A.    Releases in Connection with Permitted Collateral Asset Sales and Required Releases.**  In connection with any Permitted Collateral Asset Sale or Required Release, the Collateral

63

CREDIT AGREEMENT

LA000075




EXECUTION VERSION

Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the Lien of the Mortgage or the Collateral Assignment of Note and Mortgage, as the case may be, (such portion of the Real Property Collateral, a "**Released Parcel**"); provided that (a) in the case of the sale of any Condominium Parcel or Commercial Parcel only, the applicable Release Price is paid to the Borrower or the applicable Subsidiary by the Affiliate or third party purchaser under any Qualified Sales Agreement, (b) in the case of the Tesoro Membership Club Sale Leaseback only, the applicable Release Price is paid to Ginn-LA St. Lucie Ltd., LLLP and the Administrative Agent has reviewed and approved (in its reasonable discretion) the purchase money promissory note and mortgage to be executed in connection therewith and the Borrower has executed and delivered or has caused Ginn-LA St. Lucie Ltd., LLLP to execute and deliver a Collateral Assignment of Mortgage and Note and a Mortgage encumbering the leasehold interest held by Ginn-LA St. Lucie Ltd., LLLP in the Membership Club located at the Tesoro Project, and (c) all of the applicable conditions set forth in Section 6.8 have been satisfied, and (c) the Borrower shall have submitted to Collateral Agent (i) a request for release in the form of **Exhibit XVII** attached hereto (the "**Request for Release**"), (ii) one or more reconveyances or releases for each Released Parcel for execution by the Collateral Agent, and (iii) all and all other documentation as Collateral Agent may reasonably require in connection with such Release (collectively, the "**Release Instruments**") in a form appropriate for recordation in the applicable county and otherwise satisfactory to the Collateral Agent in its good faith discretion for each Released Parcel (for execution by Collateral Agent) together with an Officer's Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement or the other Loan Documents, and (iii) the release to be effected will not impair or otherwise adversely affect the Liens (other than the Lien that is actually being released) and other rights of the Collateral Agent under the Loan Documents not being released. Collateral Agent shall have the right to establish an escrow arrangement and appoint an escrow agent responsible for the administration therefor, through which Release Instruments may be placed into escrow by the Collateral Agent prior to the occurrence of a Permitted Collateral Asset Sale or Required Release for release by the escrow agent upon escrow agent's confirmation of certain agreed upon conditions. Borrower shall reasonably cooperate with any such arrangement. If the requirements of this Section 2.13 and Section 6.8 are otherwise satisfied, the Collateral Agent shall execute (and cause to be notarized) each of the Release Instruments accompanying a Request for Release within five (5) Business Days of receipt of such Request for Release and accompanying Release Instruments.

**B.** **Consents and Subordinations in connection with Specified Encumbrances.** Upon ten (10) Business Days prior written notice from the Borrower, the Collateral Agent shall sign and consent to and/or subordinate the First Priority Lien of the Mortgages to any easements, covenants, conditions, master declarations, rights-of-way, restrictions and plats entered into or effected in the Ordinary Course of Business of the Borrower in connection with the development of each Project which are not inconsistent with the current Project Projections (the "**Specified Encumbrances**"); provided that (i) any such signature of the Collateral Agent is expressly made with no implied duty or obligation (other than as otherwise specifically provided in this Agreement) on the part of the Collateral Agent to review such Specified Encumbrance and is only made for the purpose of consenting to and/or subordinating the First Priority Lien of the Mortgage to such Specified Encumbrance, (ii) no Default or Event of Default has occurred and is continuing, and (iii) the Collateral Agent shall, as a condition to such consent and/or subordination, be satisfied in its reasonable discretion that such consent and/or subordination could not reasonably be expected to (a) have the effect of reducing the number of permitted Residential Lots (unless consistent with the Project Projections) or (b) have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral. The Borrower shall pay all reasonable out-of-pocket costs and expenses of the Collateral Agent and the Title Company in connection with any such consent and/or subordination.

CREDIT AGREEMENT

NY\1139561.13

LA000076

 EXECUTION VERSION

## 2.14    Break Funding Payments.

In the event of the reduction of any Tranche A Credit-Linked Deposit other than on the last day of an Interest Period, the Borrower shall compensate the Paying Agent for the loss, cost and expense attributable to such event; provided, however, Borrower shall not be required to compensate the Paying Agent if such event is not the result of Borrower's Default or Borrower's failure to pay any amounts due in connection with any Tranche A Loans or Letters of Credit. Such loss, cost or expense may, at the option of the Paying Agent, be deemed to include an amount determined by the Paying Agent to be the excess, if any, of (i) the amount of interest which would have accrued on such Tranche A Credit-Linked Deposit had such event not occurred, at the Eurodollar Base Rate that would have been applicable to such Tranche A Credit-Linked Deposit, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Paying Agent would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of the Paying Agent setting forth any amount or amounts that the Paying Agent is entitled to receive pursuant to this Section 2.14 shall be delivered to the Borrower and shall be conclusive absent manifest error. In the event the Borrower shall fail to pay any amount due to the Paying Agent under this Section 2.14, the interest payable by the Paying Agent to the Tranche A Lenders on their Tranche A Credit-Linked Deposits under Section 2.1D shall be correspondingly reduced and the Tranche A Lenders shall without further act succeed, ratably in accordance with their Applicable Percentages, to the rights of the Paying Agent hereunder with respect to such amount.

## SECTION 3.
## CONDITIONS TO EFFECTIVENESS

### 3.1    Conditions to Effectiveness on the Effective Date.

The effectiveness of this Agreement, and the obligation of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

A.    **Organizational Documents.** On or before the Effective Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following with respect to itself and its Subsidiaries, each, unless otherwise noted, dated the Effective Date:

(i)    a certified copy of the Organizational Documents of the Borrower and each of its Subsidiaries certified as of the Effective Date by a Responsible Officer of the Borrower, dated a recent date prior to the Effective Date;

(ii)    certified copies of the Organizational Certificate of the Borrower and each of its Subsidiaries, together with a good standing certificate from the applicable Governmental Authority of their jurisdictions of incorporation, organization or formation, each state or jurisdiction in which any of their Real Property Assets are located, and each other state or jurisdiction in which they are qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(iii)    copies of the Organizational Authorizations of the Borrower and each of its Subsidiaries approving and authorizing the execution, delivery and performance of the Loan Documents to which each Borrower and Subsidiary is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by a

65

**CREDIT AGREEMENT**

 EXECUTION VERSION

Responsible Officer of such Borrower or Subsidiary as being in full force and effect without Modification;

(iv)    incumbency certificates of the officers of the Borrower and its Subsidiaries executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(v)    executed originals of this Agreement and the other Loan Documents to which the Borrower and its Subsidiaries is a party that are to be delivered on the Effective Date;

(vi)    certified copies of each of the other Loan Documents to which the Borrower or its Subsidiaries is a party that are to be delivered on the Effective Date; and

(vii)    such other documents as the Administrative Agent may reasonably request.

**B.    Intentionally Deleted.**

**C.    Consummation of Transactions.**

(i)    (a) each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)    $150,000,000 shall have been borrowed by the Borrower pursuant to the Second Lien Credit Agreement;

(iii)    simultaneously with funding of the Loans, the obligations of the lenders under the Existing Indebtedness shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iv)    simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(v)    after giving effect to the Transactions and the other transactions contemplated hereby, the Borrower and its Subsidiaries shall have no outstanding Indebtedness or preferred stock other than (a) the Loans under this Agreement and the loans under the Second Lien Credit Agreement, and (b) the Indebtedness permitted under Section 6.1.

**D.    Lender Signatures.**    The following Persons shall have executed and delivered this Agreement:

(i)    the Lenders; and

(ii)    the Agents.

66

CREDIT AGREEMENT

LA000078

 XECUTION VERSION

E.  **Necessary Consents.** The Borrower shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrower and its Subsidiaries, all applicable appeal periods shall have expired and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent. Such approvals and consents shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)  executed consents from any Person required in connection with the Collateral Documents;

(ii)  executed consents from any Person required in connection with the Security Agreement;

(iii)  executed consents and estoppels as set forth on <u>Schedule 3.1E</u> annexed hereto; and

(iv)  executed consents from any Person required in connection with any Indebtedness permitted under Section 6.1 and not extinguished in full on the Effective Date.

F.  **Perfection of Security Interests.** The Borrower shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Collateral Documents. Such actions shall include: (i) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (ii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made.

G.  **Real Property.** The Administrative Agent shall have received on or prior to the Effective Date from the Borrower and each applicable Loan Party:

(i)  <u>Mortgages.</u>  Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of the appropriate county or counties in the state where the applicable Real Property Collateral is located, encumbering the Real Property Collateral listed on <u>Schedule 3.1.G</u>, in each case in form and substance satisfactory to the Collateral Agent;

67

**CREDIT AGREEMENT**

LA000079

 EXECUTION VERSION

(ii)    Title Insurance.  ALTA extended coverage mortgagee title insurance policies satisfactory to Collateral Agent (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on Schedule 3.1G, in amounts not less than the respective amounts designated on such Schedule with respect to any particular portion of Real Property Collateral, insuring fee simple title to or a leasehold interest in each such portion of Real Property Collateral vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, subject only to the Permitted Encumbrances, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent, including, if available, an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request and is available in the applicable jurisdiction, in all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the real property records in the appropriate county or counties;

(iii)    Title Reports.  With respect to each portion of the Real Property Collateral, a title report issued by the Title Company with respect thereto, dated a date, and in form and substance, satisfactory to the Collateral Agent and may include Permitted Encumbrances;

(iv)    Surveys; Plat Maps.  An ALTA/ACSM survey or other form of survey reasonably acceptable to the Administrative Agent and/or plat maps with respect to the Property dated a date, and prepared and certified by a Person and in form and substance, reasonably satisfactory to the Collateral Agent;

(v)    Appraisal.  One original of the Appraisal, in form and substance satisfactory to the Collateral Agent;

(vi)    Entitlement Documents.  Administrative Agent shall have received true, correct and complete copies of all Entitlement Documents;

(vii)    Engineering Reports.  Administrative Agent shall have received engineering and soils reports with respect to each Project in form and substance satisfactory to the Administrative Agent;

(viii)    Copies of Documents Relating to Title Exceptions.  Copies of all recorded documents listed as exceptions to title or otherwise referred to in the Mortgagee Policies or in the title reports delivered pursuant to clause (iii) above; and

(ix)    Matters Relating to Flood Hazard Properties.  (a) Evidence, which may be in the form of a letter from an insurance broker as to whether (1) any portion of the Real Property Collateral is a Flood Hazard Property and (2) the community in which any such Flood Hazard Property is located is participating in the National Flood Insurance Program, (b) if there are any such Flood Hazard Properties, such Loan Party's written acknowledgment of receipt of written notification from the Collateral Agent (1) as to the existence of each such Flood Hazard Property

NY\1139561.13

CREDIT AGREEMENT

LA000080

 EXECUTION VERSION

and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program, and (c) in the event any such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrower has obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

(x)    Construction Drawings and Budgets.  Administrative Agent shall have received constructions drawings and plans acceptable to it and shall have approved an initial budget and project schedule.

**H.    Copies of Documents for Lenders.**  If requested by any Lender or any potential Eligible Assignee in writing (with such request addressed to the Administrative Agent) prior to the Effective Date, Administrative Agent shall provide a copy of any survey or plat maps, the Initial Appraisal, the title report or any other due diligence document reasonably requested by such Lender or potential Eligible Assignee.

**I.    Financial Condition and Solvency Certificate.**  The Borrower shall have delivered to the Administrative Agent a certificate from the chief financial officer of the Borrower, substantially in the form of Exhibit XVI attached hereto (the "**Solvency Certificate**").

**J.    Transaction Costs, Fees and Expenses.**  On or prior to the Effective Date, the Borrower shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instrument or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Loan Documents. On or prior to the Effective Date, the Borrower shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent, setting forth the Borrower's estimate of the Transaction Costs (other than fees payable to any of the Agents).

**K.    Opinions of Loan Parties' Counsel.**  The Administrative Agent and its counsel shall have received the written opinions of Morris Manning and Martin, L.L.P. (counsel to the Borrower), Baker & Hostetler LLP (New York and Florida), Parker Poe Adams & Bernstein (North Carolina) and Dupuch & Turnquest & Co. (Bahamian), counsel for the Loan Parties and the Shareholder Pledgors (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated as of the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**L.    Financial Information.**  On or before the Effective Date, the Administrative Agent shall have received from the Borrower (i) such budgets and other cash flow and financial information and projections described in Section 5.3 as the Administrative Agent may reasonably request, and (ii) the Project Projections, all in form and substance reasonably satisfactory to the Administrative Agent.

**M.    Evidence of Insurance.**  The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to Section 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**N.    Environmental.**  The Administrative Agent shall have received one or more environmental assessment reports, including the Environmental Impact Assessment for the Grand

69

LA000081

 EXECUTION VERSION

Bahama (West End) Project, which, in their totality, provide a detailed environmental assessment of the entire Project, in form and substance and from an independent environmental assessment firm satisfactory to the Administrative Agent, and the Administrative Agent shall be reasonably satisfied as to the amount and nature of any environmental and employee health and safety exposures to which the Borrower and its Subsidiaries may be subject after giving effect to the Transactions, and with the plans of the Borrower or such Subsidiaries with respect thereto.

**O.**    **No Material Adverse Effect.**  Since December 31, 2005, there shall not have occurred any event, change or condition that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**P.**    **Corporate and Capital Structure, Ownership, Management, Etc.**

(i)    Corporate Structure.  The corporate organizational structure of Borrower and its Subsidiaries as of the Effective Date shall be as set forth on Schedule 3.1P.

(ii)    Capital Structure and Ownership.  The capital structure and ownership of the Borrower and as of the Effective Date shall be as set forth on Schedule 3.1P.

**Q.**    **Representations and Warranties; Performance of Agreements.**  The Borrower shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent, to the effect that the representations and warranties in Section 4 are true and correct in all material respects on and as of the Effective Date and both before and after giving effect to the Transactions, to the same extent as though made on and as of that date and that the Borrower has performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date.

**R.**    **No Litigation.**  There shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, to the Borrower's Knowledge, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or that could reasonably be expected to restrain, prevent or impose burdensome conditions on any of the Transactions.

**S.**    **Completion of Proceedings.**  All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the Transactions and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request.  Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

**T.**    **Money Laundering.**  The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

**U.**    **Rating Agencies.**  The Borrower shall have obtained a public credit rating by S&P and by Moody's with respect to the Loans prior to the Effective Date.

70

**CREDIT AGREEMENT**

LA000082



EXECUTION VERSION

**V.    Disbursement Authorization.** The Administrative Agent shall have received before the Effective Date, in accordance with the provisions of Section 2.2B, an originally executed Disbursement Authorization, signed by the chief executive officer or the chief financial officer of the Borrower or by any executive officer of the Borrower designated by any of the above-described officers on behalf of the Borrower in a writing delivered to the Administrative Agent.

**W.    Searches.** The Administrative Agent shall have received judgment and lien searches satisfactory to it with respect to the Borrower and its Subsidiaries, the Subsidiary Guarantors and any Shareholder Pledgor in all jurisdictions as Administrative Agent may require.

**X.    As of the Effective Date:**

(i)    The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)    No event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Disbursement Authorization that would constitute a Default or Event of Default, or could reasonably be expected to have a Material Adverse Effect; and

(iii)    No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

**3.2    Conditions to Each Credit Event.** The obligation of each Lender to make any Loan after the Effective Date is additionally subject to the satisfaction of the following conditions:

(ii)    The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Loan to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iii)    At the time of and immediately after giving effect to such Loan no Default or Event of Default shall have occurred and be continuing;

(iv)    The total Tranche A Exposures shall not exceed the total Tranche A Funding Amounts; and

(v)    For each borrowing of a Loan, Borrower shall have delivered a completed and signed Request for Loan and for each issuance of a Letter of Credit, Borrower shall have provided the information required by Section 2.5B.

Each borrowing and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 3.2.

71

CREDIT AGREEMENT

LA000083

 EXECUTION VERSION

### 3.3    Conditions to Disbursements from the Company's Operating Account.

A.    **General.** The Borrower has established, and hereafter agrees to continue to maintain the Company's Operating Account. The Borrower hereby grants a security interest to the Administrative Agent in the Company's Operating Account to secure the Obligations. Concurrently with the execution of this Agreement, the Borrower has entered into a Control Agreement with respect to the Company's Operating Account with the Collateral Agent and the Account Holder substantially in the form of Exhibit XXI attached hereto.

B.    **Investments, Withdrawals and Deposits.**

(i)    The Borrower may direct the Account Holder regarding investment of funds contained in the Company's Operating Account in Cash Equivalents (to the extent available in such account), provided, however, that such direction may be required to be accomplished through direction to the Administrative Agent, who will subsequently direct the Account Holder regarding the same. At any time prior to the occurrence and continuance of an Event of Default, the Borrower shall have the right to withdraw funds from the Company's Operating Account to be used in a manner consistent with the Project Projections or for purposes of purchasing additional Real Property Collateral, which will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof.

(ii)    The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, rental programs, club, golf club memberships or otherwise) within five (5) Business Days after receipt of such funds into the Company's Operating Account.

C.    **Priority of Distributions.** In the event that the Lenders elect to exercise their remedies under Section 8, the funds contained in the Company's Operating Account shall be applied (a) first, to the reasonable expenses of the Administrative Agent, (b) second, to the payment of any late charges due and payable hereunder, (c) third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder), (d) fourth, to the payment of accrued and unpaid interest (e) fifth, to the outstanding principal amount of, and interest on, the Tranche A Loans until the same are paid in full, (f) sixth, to the outstanding principal amount of, and interest on the Tranche B Loans until the same are paid in full, (g) seventh, to the other Obligations until the same are paid in full, and then (h) eighth, after all Obligations of the Borrower under this Agreement and the Loan Documents shall have been paid in full, returned to the Borrower or the other Persons legally entitled thereto.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans and to induce the other Lenders to purchase participations therein, the Borrower represents and warrants to each Lender, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

NY\1139561.13

**CREDIT AGREEMENT**

LA000084

 EXECUTION VERSION

### 4.1    Organization and Qualification.

The Borrower and the Loan Parties are duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. The Borrower and the Loan Parties are duly qualified and is authorized to do business and is in good standing as a foreign corporation in each state or jurisdiction listed on Schedule 4.1 hereto and in all other states and jurisdictions in which the failure of the Borrower or the Loan Parties to be so qualified could reasonably be expected to have a Material Adverse Effect.

### 4.2    Power and Authority.

The Borrower and the other Loan Parties are duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which each is a party. The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary action.

### 4.3    Legally Enforceable Agreement.

This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of the Borrower and its Subsidiaries signatories thereto, enforceable against each of them in accordance with the respective terms of such Loan Documents, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or general equitable principals, whether applied in law or equity.

### 4.4    No Conflict.

After giving effect to the Transactions and the execution, delivery and performance by each of the applicable Loan Parties and the Shareholder Pledgors of the Transaction Documents, the issuance, delivery and payment of the Notes and the consummation of the Transactions do not and will not (i) violate any provision of any law or any governmental rule or regulation applicable to any Loan Party or the Shareholder Pledgors, or violate or contravene the organizational certificate or any other organizational documents of any Loan Party or any order, judgment or decree of any court or other Governmental Authority binding on any Loan Party or the Shareholder Pledgors, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any indenture, agreement, contract or instrument to which any Loan Party or any Shareholder Pledgor is a party or by which any of them or any of their property may be bound, except to the extent such conflict, breach or default could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Loan Party or any Shareholder Pledgor (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent and the Liens securing the obligations under the Second Lien Credit Agreement), (iv) require any approval of stockholders, partners or members or any approval or consent of any Person under any organizational certificate or other indenture, agreement, contract or instrument to which any Loan Party or any Shareholder Pledgor is a party or by which any of them or any of their property may be bound, except for such approvals or consents obtained on or before the Effective Date, or (v) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any Applicable Law or any provision of the organizational documents of any Loan Party or any Material Contract to which any Loan Party or any Shareholder Pledgor is a party or by which any Loan Party or any Shareholder Pledgor is bound.

73

NY\1139561.13

LA000085