

EXECUTION VERSION

(xiv)    such other information and data with respect to the Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lender.

## 5.3    Financial Statements and Other Reports.

The Borrower will maintain, and cause each of its Subsidiaries to maintain, proper books and records including a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP. The Borrower will deliver to the Administrative Agent for distribution to each Lender:

(i)    Monthly Financials: within thirty (30) days after the end of each calendar month end (other than the last calendar month of any Fiscal Year) commencing with the calendar month ending June 30, 2006, a progress report highlighting progress made in accordance with the Project Projections including revenue and expenditures;

(ii)    Quarterly Financials: as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter (other than the fourth Fiscal Quarter of any Fiscal Year) commencing with the Fiscal Quarter ending June 30, 2006, (a) the consolidated balance sheet of Principal Borrower, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, as at the end of such Fiscal Quarter and the related consolidated statement of operations and consolidated statement of cash flows for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth, in the case of the statement of operations only, in comparative form the corresponding figures for the corresponding periods of the previous fiscal year (if applicable) on a GAAP accrual basis, excluding Percentage of Completion calculations and a project status report prepared on a cash flow basis along with the corresponding figures from the consolidated plan and financial forecast for the current Fiscal Year delivered pursuant to Section 5.3(xvii) in reasonable detail (as identified in the Project Projection categories) and certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition as at the dates indicated and the results of operations and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments; and (b) a narrative report describing the operations of Principal Borrower and its Subsidiaries, Bahamas Borrower and its Subsidiaries and Ginn-LA West End, Ltd., LLLP and its Subsidiaries, if any, in each case, taken as a whole, in the form prepared for presentation to senior management for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter;

(iii)    Year-End Financials: as soon as available and in any event within one hundred five (105) days after the end of each Fiscal Year, (a) the consolidated balance sheets of the Principal Borrower, the Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, as of the end of such Fiscal Year and the related consolidated statement of operations and consolidated statement of cash flows for such Fiscal Year, setting forth, in the case of the statement of operations only, in comparative form the corresponding figures for the previous fiscal year (as applicable) and the corresponding figures from the consolidated plan and financial forecast delivered pursuant to Section 5.1(xvii) for the Fiscal Year covered by such financial statements, all prepared in accordance with GAAP and a project status report prepared on a cash flow basis along with the corresponding figures from the consolidated plan for the Fiscal Year both in reasonable detail (with respect to cash flow, as identified in the Project Projections) and certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition of the entities covered thereby as at the dates indicated and the results of their operations and their cash flows for the periods indicated; (b) a narrative report describing the

74



EXECUTION VERSION

operations of the Principal Borrower and its Subsidiaries, the Bahamas Borrower and Ginn-LA West End, Ltd., LLLP and its Subsidiaries, in each case, taken as a whole, in the form prepared for presentation to senior management for such Fiscal Year; and (c) in the case of such consolidated financial statements of Principal Borrower, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, respectively, a report thereon of independent certified public accountants selected by the Borrower and reasonably satisfactory to the Administrative Agent, which report shall be unqualified as to going concern and scope of audit and contains no other material qualification or exception, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Principal Borrower, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, respectively, as of the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the audit by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(iv)     Officer's Certificates; Compliance Certificates:  together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to subdivisions (ii) and (iii) above, (a) an Officer's Certificate of the Borrower stating that the signer has reviewed the terms of Sections 4, 5, 6 and 7 of this Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of the Borrower and its Subsidiaries during the accounting period covered by such financial statements and that such review has not disclosed the existence during or at the end of such accounting period, and that the signer did not have knowledge of the existence as at the date of such Officer's Certificate, of any condition or event that constitutes a Default or Event of Default under Sections 4, 5, 6 or 7 of this Agreement, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and what action the Borrower has taken, is taking and proposes to take with respect thereto; and (b) a Compliance Certificate demonstrating compliance during and at the end of the applicable accounting periods with the restrictions contained in Section 6.6.

(v)     Reconciliation Statements:  if, as a result of any change in accounting principles and policies from those used in the preparation of the audited financial statements referred to in Section 4.14, the consolidated financial statements delivered pursuant to subdivisions (i), (ii), (iii) or (xvii) of this Section 5.3 will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then together with each delivery of financial statements pursuant to subdivision (i), (ii), (iii) or (xvii) of this Section 5.3 following such change, a written statement of the chief accounting officer or chief financial officer of the Borrower setting forth the differences which would have resulted if such financial statements had been prepared without giving effect to such change, if reasonably requested by the Administrative Agent;

(vi)     Accountants' Certification:  together with each delivery of annual consolidated financial statements pursuant to subdivision (iii) above, a written statement by the independent certified public accountants giving the report thereon (a) stating that their audit has included a reading of the terms of Sections 5 and 6 of this Agreement as they relate to the covenants set forth in Section 6.6 and accounting matters, and (b) stating whether, in connection with their audit examination, any condition or event, insofar as such condition or event relates to the covenants set forth in Section 6.6 or accounting matters, that constitutes an Default or Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof; provided that such accountants shall not be liable by reason of any failure to obtain knowledge of any such Default or Event of Default that would not

75

NY\1151936.6

LA001009





EXECUTION VERSION

be disclosed in the course of their audit examination and provided further that if, in accordance with standard practice of Borrower's independent certified public accountants, the foregoing statement is not available, Borrower shall deliver to Administrative Agent a statement which conforms to this requirement only to the extent available under such practice;

(vii)    Accountants' Reports:    promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to the Borrower by a reputable independent certified public accountants in connection with each annual, interim or special audit of the financial statements of the Principal Borrower and its Subsidiaries, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP and its Subsidiaries made by such accountants, including, without limitation, any comment letter submitted by such accountants to management specifically relating to the annual audits of Borrower;

(viii)    Future Approvals:    promptly upon receipt thereof and upon request of Administrative Agent, copies of any written Entitlements, approvals or consents obtained by the Borrower or any of its Subsidiaries after the Effective Date in connection with the development of each Project;

(ix)    Casualty:    promptly upon the occurrence of any casualty involving any Real Property Asset of the Borrower or any of its Subsidiaries involving a loss that could reasonably be expected to exceed $2,000,000, written notice with sufficient detail describing the casualty and the extent to which any losses resulting from such casualty will be covered by insurance;

(x)    Appraisal Updates:    together with each delivery of financial statements pursuant to subdivisions (ii) and (iii) above, a Qualified Appraisal Update that provides an Appraised Value of the remaining portion of the Real Property Collateral effective as of the last day of the preceding Fiscal Quarter;

(xi)    Budget and Schedule Updates:    together with each delivery of financial statements pursuant to subdivisions (ii) and (iii) above, (A) an update to the Project Projections and their consolidation showing costs incurred and actually paid with regard to line items shown in the Project Projections and a reasonably detailed summary of what progress has been made in accordance with the line items set forth in the consolidated Project Projections and significant line items in the Project Projections for each Project, effective as of the last day of the preceding Fiscal Quarter, provided that in the event of any material amendment, modification or adjustment to the Project Projections on a global basis or any material amendment, modification or adjustment to any material line item in the consolidated Project Projections for each Project, the Borrower shall deliver, together with such update, a Compliance Certificate prepared on a Pro Forma Basis for the applicable Fiscal Year and an explanation of assumptions on which such forecasts are based, and any such material amendment modification or adjustment shall be subject to the approval of the Administrative Agent not to be unreasonably withheld or delayed and (B) a report from The Sullivan Company describing the progress of the Project commonly known as Grand Bahama (West End) as compared with the Project Projections for such Project and milestones contemplated under the Master Plan applicable to such Project. It is hereby understood and agreed that the addition to the Project Projections of the purchase of any additional Real Property Collateral shall be deemed a material modification for any Project.

(xii)    Events of Default, etc.:    promptly upon any Responsible Officer of the Borrower obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default (it being understood and agreed that the Borrower shall deliver the Officer's Certificate required hereunder within 5 days after the date on which, to Borrower's Knowledge, such

76



EXECUTION VERSION

condition or event has occurred), (b) that any Person has given any written notice to the Borrower or any of its Subsidiaries or taken any other action that could reasonably be expected to have an adverse effect on the Borrower or any of its Subsidiaries with respect to a claimed default or event or condition of the type referred to in Section 7.6, or (c) of the occurrence of any event or change that has caused or evidences or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the written notice given or action taken by any such Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Borrower (or applicable Subsidiaries) have taken, is taking and proposes to take with respect thereto;

(xiii)    Litigation or Other Proceedings:  (a) promptly upon any Responsible Officer of the Borrower obtaining knowledge of (X) the institution of, or written threat of, any action, suit, proceeding (whether administrative, judicial or otherwise), Environmental Claim, governmental investigation or arbitration against or affecting the Borrower or any of its Subsidiaries or any property of the Borrower or any of its Subsidiaries (collectively, "**Proceedings**") not previously disclosed in writing by the Borrower to the Lenders or (Y) any material development in any Proceeding that, in any case:

(a)    could reasonably be expected to have a Material Adverse Effect; or

(b)    seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

(xiv)    written notice thereof together with such other information as may be reasonably available to the Borrower and as the Borrower and their counsel shall reasonably determine would not jeopardize the attorney-client privilege with respect to such Proceeding, to enable the Lenders and their counsel to evaluate such matters; and (b) within forty-five (45) days after the end of each Fiscal Quarter of the Borrower, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, the Borrower or any of its Subsidiaries equal to or greater than $5,000,000 and promptly after request by the Administrative Agent such other information as may be reasonably requested by the Administrative Agent to enable the Administrative Agent and its counsel to evaluate any of such Proceedings; provided, however, that the Borrower and their counsel may withhold information if in their reasonable determination, disclosure of such information would jeopardize the attorney-client privilege with respect to such Proceeding;

(xv)    ERISA Events:  promptly upon the Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrower or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

(xvi)    ERISA Notices:  with reasonable promptness, copies of (a) all written notices received by the Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (b) such other documents or governmental reports or filings relating to any Pension Plan or Borrower Pension Plan as the Administrative Agent shall reasonably request;

(xvii)    Financial Plans:  as soon as is practicable and in any event no later than ninety (90) days after the end of each Fiscal Year, a monthly consolidated plan and financial forecast for

SECOND LIEN CREDIT AGREEMENT



the next succeeding Fiscal Year, including without limitation (a) forecasted consolidated statement of cash flows of the Borrower and its Subsidiaries for such Fiscal Year in a form reasonably acceptable to the Administrative Agent, together with a Compliance Certificate prepared on a Pro Forma Basis for such Fiscal Year and an explanation of the assumptions on which such forecasts are based and (b) such other information and projections as the Administrative Agent may reasonably request;

(xviii) Press Releases:  promptly upon their becoming available, copies of all press releases and other statements made available generally to the public concerning material developments at each Project or in the business of the Borrower or its Subsidiaries;

(xix) Insurance:  as soon as is practicable and in any event by the last day of each Fiscal Year, an insurance certificate in form and substance satisfactory to the Administrative Agent outlining all material insurance coverage maintained as of the date of such certificate by the Borrower and its Subsidiaries accompanied by a certificate from a Responsible Officer that the coverage described on such certificate is planned to be maintained by the Borrower and its Subsidiaries in the immediately succeeding Fiscal Year;

(xx) Environmental Audits and Reports:  promptly following receipt thereof, copies of all environmental audits and reports, whether prepared by personnel of the Borrower or any of its Subsidiaries or by independent consultants, with respect to environmental matters at any Real Property Asset presently owned or operated by the Borrower or its Subsidiaries or which relate to any Environmental Liabilities of the Borrower or its Subsidiaries, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xxi) Material Contracts:  promptly after (a) any Material Contract is terminated or expires or is renewed or is, amended or otherwise Modified in any manner, or (b) any notice or other communication is delivered by any party to any Material Contract pursuant thereto or in respect thereof relating to (x) any financial matter or other matter having adverse financial consequences to the Borrower or its Subsidiaries in excess of $5,000,000 or (y) any other non-financial matter which could reasonably be expected to have a Material Adverse Effect, notice and a copy thereof and, in the case of any such renewal, amendment, other Modification or new Material Contract, a description in reasonable detail of the material terms thereof; and

(xxii) Other Information:  with reasonable promptness, such other information and data with respect to the Borrower or any of the Borrower's Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lenders, and such other documentation, information and certifications described in Section 3.1T as from time to time requested by the Administrative Agent or any Lender.

## 5.4    Corporate Existence.

The Borrower will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its organizational existence and all rights and franchises material to the business of the Borrower and its Subsidiaries (on a consolidated basis) or the Loan Parties, taken as a whole.

## 5.5    Payment of Taxes and Claims; Tax Consolidation.

The Borrower will, and will cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it and each of its Subsidiaries or any of its properties or assets before

SECOND LIEN CREDIT AGREEMENT



any material penalty accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable which, if unpaid, might become a Lien (other than a Permitted Encumbrance) upon any of its properties or assets; provided that no such tax, charge or claim need be paid if being Properly Contested. For United States federal income tax purposes, Principal Borrower will at all times be treated as a partnership or a "disregarded entity," and Bahamas Borrower will at all times be treated as a corporation. Bahamas Borrower will not be engaged in any active conduct of trade or business and will have no substantial assets other than those arising out of the Bahamas Intercompany Indebtedness, and its assets will at all times be substantially offset by its obligation to the Lenders under the Loan Documents.

## 5.6    Maintenance of Properties; Insurance.

The Borrower will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used in the business of the Borrower and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof as necessary (i) for the development of each Project as contemplated by the Master Plan, (ii) to ensure each Project is in compliance with Applicable Laws in all material respects, and (iii) as and when necessary to achieve the Project Projections by their respective deadlines. The Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business and the properties and businesses of its Subsidiaries against loss or damage of the kinds and with respect to liability customarily carried or maintained under similar circumstances by corporations of established reputation engaged in similar businesses. Each such policy of casualty insurance covering damage to or loss of property shall name the Collateral Agent for the benefit of the Lenders as additional insured and as the loss payee thereunder for all losses, subject to application of proceeds as required by Section 2.8B(ii)(c), and all such policies of insurance shall provide for at least thirty (30) days' prior written notice to the Collateral Agent of any Modification or cancellation of such policy (ten (10) days' prior written notice in the case of nonpayment or nonrenewal).

## 5.7    Lender Meeting.

The Borrower will, upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and the Lenders at least once during each Fiscal Year (and will participate in such other meetings at such other times as the Borrower and the Administrative Agent may agree) to be held telephonically or, at Borrower's election, at the Borrower's corporate offices (or such other location as may be agreed to by the Borrower and the Administrative Agent) at such time as may be agreed to by the Borrower and the Administrative Agent.

## 5.8    Compliance with Laws and Equator Principles.

A.    The Borrower shall, and shall cause each of its Subsidiaries to, comply with the requirements of all Applicable Laws, noncompliance with which, individually or in the aggregate with other non-compliances, could reasonably be expected to cause a Material Adverse Effect.

B.    The Grand Bahamas (West End) Project shall comply, in all material respects, with the Environmental Management Plan.

C.    In the event and to the extent that the Equator Principles applicable to the Grand Bahama (West End) Project materially change after the date of this Agreement, upon the Administrative Agent's written notice to the Borrower of such changes, the Borrower agrees to use commercially reasonable efforts to cause such Project to comply in a commercially reasonable time frame with any such material

79

SECOND LIEN CREDIT AGREEMENT

LA001013




EXECUTION VERSION

changes to the Equator Principles; provided however, that in the event the Borrower cannot comply with the changes to the Equator Principles without expending greater than commercially reasonable efforts, then the Borrower need not attempt to comply with such changes to the Equator Principles, except that in such event the Borrower shall in its reasonable discretion mitigate or cause to be mitigated any such noncompliance with such changes. Nothing in this Section 5.8 shall require any modification to the Environmental Management Plan for the construction of the Grand Bahama (West End) Project.

**D.**     Except where accompanied by material compliance with all applicable Environmental Laws, neither the Borrower nor any Subsidiary shall take any action, enter into any transaction, agreement or proposal or otherwise cause or permit any third person to take any action, that could reasonably be expected to result in a change in the categorization (as determined by a qualified independent consultant reasonably acceptable to the Borrower and the Administrative Agent) of the Grand Bahama (West End) Project from a Category "B" project under the Equator Principles to a "Category A" project thereunder.

## 5.9     Environmental Disclosure and Inspection.

**A.**     The Borrower shall, and shall cause each of its Subsidiaries to, exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the Real Property Assets, (ii) all contractors, engineers, architects and similar vendors and contractors, and (iii) all other Persons on or occupying the Real Property Assets, to comply with all Environmental Laws, except for any such noncompliance which could not reasonably be expected to cause a Material Adverse Effect.

**B.**     The Borrower agrees that the Administrative Agent may, from time to time, retain, at the Borrower's expense, an independent professional consultant reasonably acceptable to the Borrower to review any report relating to Hazardous Materials or Borrower's or its Subsidiaries' compliance with Environmental Laws prepared by or for the Borrower and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances) of any Real Property Asset currently owned, leased, operated or used by the Borrower or any of its Subsidiaries, if (x) a Default or an Event of Default shall have occurred and be continuing, or (y) the Administrative Agent reasonably believes (1) that an occurrence relating to such Real Property Asset is likely to give rise to an Environmental Liability, (2) that a violation of an Environmental Law on or around such Real Property Asset has occurred or is likely to occur or Effect or (3) that a material violation of the Equator Principles or the Environmental Management Plan has occurred or is likely to occur, which could, in each case, reasonably be expected to result in a Material Adverse Effect. The Borrower shall use its reasonable efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice to the Borrower, to enter into or on to the Real Property Assets currently owned, leased, operated or used by the Borrower or any of its Subsidiaries to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation.     Any such investigation of any Real Property Asset shall be conducted, unless otherwise agreed to by the Borrower and the Administrative Agent, during normal business hours and, shall be conducted so as not to unreasonably interfere with the ongoing operations at any such Real Property Asset or to cause any damage or loss to any property at such Real Property Asset. The Borrower and the Administrative Agent hereby acknowledge and agree that any report of any investigation conducted at the request of the Administrative Agent pursuant to this Section 5.9B will be obtained and shall be used by the Administrative Agent and the Lenders for the purposes of the Lenders' internal credit decisions, to monitor and police the Loans and to protect the Lenders' security interests, if any, created by the Loan Documents, and the Administrative Agent and the Lenders hereby acknowledge and agree. any such report will be kept confidential by them to the extent permitted by law except as provided in the following sentence. The Administrative Agent agrees to deliver a copy of any such report to the Borrower with the understanding that the Borrower acknowledge and agree that (i) they will indemnify and hold harmless

80

 

EXECUTION VERSION

the Administrative Agent and each Lender from any costs, losses or liabilities relating to the Borrower's use of or reliance on such report, (ii) neither Agent nor any Lender makes any representation or warranty with respect to such report, and (iii) by delivering such report to the Borrower, neither the Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report.

     **C.**     The Borrower shall promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrower or any of its Subsidiaries that could reasonably be expected to expose the Borrower or any of its Subsidiaries to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrower or any of its Subsidiaries to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrower or any of its Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrower and its Subsidiaries as of the Effective Date.

     **D.**     The Borrower shall, at their own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this Section 5.9.

## 5.10    The Borrower's Remedial Action Regarding Hazardous Materials.

     The Borrower shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all necessary remedial action in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset in order to comply in all material respects with all applicable Environmental Laws and Governmental Authorizations. In the event the Borrower or any of its Subsidiaries undertakes any Cleanup action with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrower or such Subsidiaries shall conduct and complete such Cleanup action in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrower's or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested.

## 5.11    Subsidiaries.

     As of the Effective Date, the Subsidiaries of the Borrower are as set forth on Schedule 4.5. The Borrower will not form (or permit to be formed) any new Subsidiaries after the Effective Date without first receiving the prior written consent of the Administrative Agent, which consent the Administrative Agent may condition upon, among other things, (i) such new Subsidiaries executing a guaranty (in form and substance satisfactory to the Administrative Agent) of the Borrower's Obligations, (ii) the Borrower executing a pledge of the Capital Stock of such Subsidiaries, and (iii) such further action and such further documents and instruments as may be required to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a Second Priority security interest in all of the: (a) personal property assets of such Subsidiaries; (b) real property assets owned by such Subsidiaries; and (c) leasehold interests owned by such Subsidiaries. With respect to any Subsidiary approved by the Administrative Agent, the Borrower shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Subsidiary's

NY\1151936.6

LA001015



Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing such guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or rescinded, and (ii) a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Collateral Agent and its counsel, as to (a) the due organization and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the parent of such Subsidiaries in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents, and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel. In addition, the Borrower shall promptly deliver a supplement to <u>Schedule 4.1</u> to the Administrative Agent if any Subsidiary is created or acquired, if applicable.

**5.12    <u>Interest Rate Protection</u>.**

At all times, commencing one hundred-eighty (180) days after the Effective Date, the Borrower (through itself or one of the Subsidiaries) shall maintain in effect one or more interest rate Hedge Agreements (which, to the extent secured by the Collateral, shall be with the Administrative Agent or the Lenders, or any of their respective Affiliates) in form and substance reasonably satisfactory to the Administrative Agent with respect to an aggregate principal amount equal to at least 50% of the aggregate outstanding principal amount of the Loan and the loans under the First Lien Credit Agreement. Such Hedge Agreements shall be maintained for two (2) years after the Effective Date in a form and with a counterparty acceptable to the Administrative Agent in its reasonable discretion.

**5.13    <u>Further Assurances</u>.**

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, the Borrower will, at its expense, and will cause each of its Subsidiaries, at the Borrower's expense, to promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request only to the extent such acts or things are consistent with the express intent and purpose of the Loan Documents. In furtherance and not in limitation of the foregoing, the Borrower shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Subsidiaries and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of the Loan Documents) of the Borrower and its Subsidiaries.

82

LA001016



### 5.14   Title.

The Borrower shall warrant and defend (a) its title to the Real Property Collateral and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Without limiting the foregoing, the Borrower covenants and agrees that the Administrative Agent shall at all times have a Second Priority Lien on the Real Property Collateral. The Borrower shall reimburse the Administrative Agent for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by the Administrative Agent if an interest in the Real Property Collateral, other than as permitted hereunder, is claimed by another Person.

### 5.15   Estoppels.

The Borrower will at any time and from time to time, within ten (10) days after written demand by Administrative Agent, deliver to Administrative Agent a certificate duly executed, and in form satisfactory to Administrative Agent, stating and acknowledging the then outstanding principal balance of the Loans and the fact that, to Borrower's Knowledge, there are no defenses, offsets or counterclaims (or, if such should not be the fact, then the facts and circumstances relating to such defenses, offsets or counterclaims) and such other information as may reasonably be requested by Administrative Agent.

### *5.16   SPE Covenants.*

The Borrower and its Subsidiaries:

(a)   except with regard to Bahamas Borrower, do not own and will not own any asset or property other than their respective interests in each Project and additional Real Property Collateral permitted to be purchased as provided in Section 2.8B(ii)(b), and together with incidental personal property reasonably necessary for the ownership or operation of each Project;

(b)   except with regard to Bahamas Borrower, will not engage in any business other than the ownership, management and operation of each Project, and incidental personal property reasonably necessary thereto and will conduct and operate its business in all material respects as presently conducted and operated;

(c)   Bahamas Borrower will not engage in any business other than holding and enforcing the note and mortgage evidencing the Bahamas Intercompany Indebtedness and receiving payments thereunder;

(d)   except to the extent permitted by this Agreement, has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity;

(e)   except to the extent permitted by this Agreement, shall not acquire obligations or securities of its Affiliates or any constituent party of Borrower or its Subsidiaries;

(f)   is and will remain solvent and will pay its debts and liabilities from its assets as the same shall become due;

(g)   has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and will not materially amend, Modify or otherwise change its Organizational Documents in any manner which could reasonably be

83

LA001017



expected to be adverse to the interests of the Lenders, and in connection with any non-material amendment of any such Organizational Documents, shall forward a copy of such amendment to the Administrative Agent promptly after the execution or filing thereof;

(h)     will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party and will file its own tax returns except to the extent that (A) a consolidated tax return is permitted by Applicable Law or (B) a tax return is not required by Applicable Law;

(i)     will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any other Borrower and any Affiliate of any Borrower), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall not identify itself or any of its Affiliates as a division or part of the other;

(j)     will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(k)     will not, and will not permit any constituent party to, seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of such entity;

(l)     will not commingle its funds and other assets with those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person;

(m)     has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person; and

(n)     do not and will not hold itself out to be responsible for the debts or obligations of any other Person (except for the Loans and Permitted Indebtedness).

### 5.17   Maintenance of Entitlements.

The Borrower shall warrant and defend, and otherwise maintain, all of the Entitlements obtained in connection with each Project as necessary (i) for the development of each Project as intended and as contemplated by the Master Plan, (ii) to ensure each Project is in compliance with Applicable Laws, and (iii) to enable Borrower to achieve the Project Projections. To the extent any Entitlements require any obligations or conditions to be fulfilled by the Borrower or any of its Subsidiaries, the Borrower will perform (or caused to be performed) such obligations or conditions. To the extent the Borrower must obtain certain Pending Entitlements to develop each Project in accordance with the Project Projections and the Master Plans, the Borrower shall diligently pursue the issuance of such Pending Entitlements in the Ordinary Course of Business and as needed to achieve the Project Projections.

### 5.18   Asset Sales.

The Borrower covenants and agrees that the Real Property Collateral shall only be sold as Residential Lots, Condo Parcels or Commercial Parcels pursuant to a Permitted Collateral Asset Sale and upon payment to the Borrower of the applicable Release Price with respect to sales of Condo Parcels and Commercial Parcels. Except for the Condo Parcels and Commercial Parcels, no Real Property Collateral will be sold in bulk that has not been previously subdivided into individual Residential Lots as contemplated by the Master Plan.

84

LA001018

 

EXECUTION VERSION

### 5.19    Control.

The Permitted Holder shall at all times directly or indirectly Control the Borrower and own, directly or indirectly, 66 2/3% of the beneficial interests in the Borrower; subject only to the death or legal incapacity of the Permitted Holder. ERG Enterprises, LP shall at all times retain direct or indirect management and operational control of the Borrower.

### 5.20    Credit Rating.

The Borrower shall use commercially reasonable efforts to maintain at all times public credit ratings by Moody's and S&P with respect to the Loans.

### 5.21    Accounts.

The Borrower covenants and agrees that all Cash From Project Sales and Equity Proceeds received by Borrower or its Subsidiaries not applied immediately to prepay the Loans as required by Section 2.8B(ii)(d) shall be deposited into and maintained in the Company's Operating Account as provided in Section 3.3 hereof. Subject to the right of Borrower and its Subsidiaries to make Restricted Payments as provided in Section 6.5, all withdrawals from the Company's Operating Account shall be used in a manner consistent with the Project Projections.

Any "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of the Borrower and its Subsidiaries established after the Effective Date shall be subject to effective Control Agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent.

### 5.22    Bahamas Intercompany Indebtedness.

Bahamas Borrower shall, at all times, strictly enforce the terms and provisions of the note evidencing the Bahamas Intercompany Indebtedness and the mortgage securing the same and the obligations of Bahamas Owner thereunder.

### 5.23    Maintenance of Ground Leases.

With respect to each Ground Lease,

**A.**    Borrower shall (i) pay all rents, additional rents and other sums required to be paid by the Borrower, as tenant under and pursuant to the provisions of each Ground Lease, (ii) diligently perform and observe all of the terms, covenants and conditions of each Ground Lease on the part of the Borrower, as tenant thereunder, and (iii) promptly notify the Collateral Agent of the giving of any notice by lessor under the applicable Ground Lease to the Borrower of any default by the Borrower, as tenant thereunder, and deliver to Lender a true copy of each such notice within five (5) Business Days of receipt. The Borrower shall not, without the prior consent of the Collateral Agent surrender the leasehold estate created by the applicable Ground Lease or terminate or cancel any Ground Lease or materially Modify any Ground Lease, either orally or in writing.

**B.**    If the Borrower shall default in the performance or observance of any term, covenant or condition of any Ground Lease on the part of Borrower, as tenant thereunder, and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, the Collateral Agent shall have the right, to the extent the Collateral Agent has received notice of, or has otherwise become aware of any such default, but shall be under no obligation, to pay any sums and to perform any act or take any

85

LA001019

 

EXECUTION VERSION

action as may be appropriate to cause all of the terms, covenants and conditions of such Ground Lease on the part of the Borrower to be performed or observed on behalf of the Borrower, to the end that the rights of the Borrower in, to and under such Ground Lease shall be kept unimpaired and free from default. If the landlord under the applicable Ground Lease shall deliver to the Collateral Agent a copy of any notice of default under such Ground Lease, such notice shall constitute full protection to the Collateral Agent for any action taken or omitted to be taken by the Collateral Agent, in good faith, in reliance thereon. The Borrower shall exercise each individual option, if any, to extend or renew the term of each Ground Lease prior to or within the period in which any such option may be exercised, and the Borrower hereby expressly authorizes and appoints the Collateral Agent its attorney-in-fact to exercise any such option in the name of and upon behalf of the Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

### 5.24    Material Contracts.

**A.**    Neither Borrower nor any of its Subsidiaries shall enter into a Third Party Operating Agreement or an Affiliate Operating Agreement without prior written consent of the Administrative Agent, such consent not to be unreasonably withheld and without providing the Administrative Agent with a Recognition, Collateral Assignment and Estoppel Agreement or an Affiliate Operating Agreement Subordination (which shall be provided for all Affiliate Operating Agreements even if such Affiliate Operating Agreement does not constitute a Material Contract), as the case may be, in form and substance reasonably satisfactory to the Administrative Agent. Neither Borrower nor any of its Subsidiaries shall terminate or materially Modify any such approved Third Party Operating Agreement that is a Material Contract or Affiliate Operating Agreement without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld.

**B.**    Neither Borrower nor any of its Subsidiaries shall transfer the responsibility for the oversight of the construction of each Project from the Developer to any other person or entity without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld and without providing the Administrative Agent with a Recognition, Collateral Assignment and Estoppel Agreement in form and substance reasonably satisfactory to the Administrative Agent.

**C.**    Neither Borrower nor any of its Subsidiaries shall enter into any development agreement or any other agreement with any party other than Developer the purpose of which is to obtain the property development services, similar to those provided by the Developer without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld and without providing the Administrative Agent with a Recognition, Collateral Assignment and Estoppel Agreement or an Affiliate Operating Agreement Subordination, as the case may be, in form and substance reasonably satisfactory to the Administrative Agent.

**D.**    Neither Borrower nor any of its Subsidiaries shall enter into any new Material Contract, the value of (or the costs required to be paid under) which exceeds $10,000,000 other than Qualified Sales Agreements without the prior approval of Administrative Agent, such approval not to be unreasonably withheld.

**E.**    Neither Borrower nor any of its Subsidiaries shall enter into any material shared use agreement or master declaration with respect to any portion of the Real Property Collateral, without the prior approval of Administrative Agent, except as permitted in Section 2.13B.

86

LA001020



EXECUTION VERSION

## SECTION 6.
## NEGATIVE COVENANTS

The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

### 6.1    Indebtedness.

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that the Borrower and its Subsidiaries may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

(i)    Each of the Loan Parties may become and remain liable with respect to its respective Obligations in accordance with the terms of this Agreement and the Loan Documents;

(ii)    The Borrower and its Subsidiaries may become and remain liable with respect to trade payables incurred in the Ordinary Course of Business of the Borrower or its Subsidiaries;

(iii)    The Borrower and its Subsidiaries may become and remain liable with respect to obligations owed under the First Lien Credit Agreement in an aggregate principal amount not to exceed $525,000,000 less the amount of any permanent repayments or prepayments thereof (other than repayments or prepayments in connection with a refinancing thereof permitted hereunder);

(iv)    The Borrower and its Subsidiaries may become and remain liable with respect to Permitted Equipment Financing;

(v)    Each of the Loan Parties and Bahamas Owner may become and remain liable with respect to Indebtedness to any other Loan Party and Bahamas Owner; provided that, in each case, (a) no Event of Default has occurred and is continuing as the time of the incurrence thereof or would result therefrom, (b) all such intercompany Indebtedness shall be evidenced by promissory notes (which promissory note may be a grid note under which such Loan Parties may direct Administrative Agent to make entries to reflect additional sums advanced) which shall have been pledged to the Collateral Agent pursuant to the Collateral Documents, (c) all such intercompany Indebtedness owed by the Borrower to any of its Subsidiaries or by the Borrower or any of its Subsidiaries to Bahamas Owner shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent, and (d) any payment by any Subsidiaries of the Borrower under any Guaranty or any payment by the Borrower of the Obligations shall result in a pro tanto reduction of the amount of any intercompany Indebtedness owed by the Borrower or by such Subsidiaries to the Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(vi)    The Borrower and its Subsidiaries may become and remain liable with respect to Indebtedness under appeal bonds required by Governmental Authorities in connection with the development of each Project incurred in the Ordinary Course of Business.

87

LA001021



EXECUTION VERSION

(vii)   Intentionally deleted;

(viii)   The Borrower and its Subsidiaries may become and remain liable with respect to Indebtedness under any Hedge Agreements;

(ix)   The Borrower and its Subsidiaries may remain liable with respect to the Permitted Existing Indebtedness; and

(x)   The Borrower and its Subsidiaries may become liable with respect to Intercompany Subordinated Debt, provided that no Event of Default shall have occurred and be continuing at the time of the incurrence thereof or would result therefrom.

**6.2   Liens and Related Matters.**

**A.   Prohibition on Liens.**   The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Borrower or any of its Subsidiaries (or a Lien on the Capital Stock of Borrower or its Subsidiaries), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the Uniform Commercial Code of any state or under any similar recording or notice statute, except (solely with respect to the Borrower and its Subsidiaries),

(i)   any Permitted Encumbrances; provided, however, that (i) with respect to the Real Property Collateral no Permitted Encumbrances except the Liens securing obligations under the First Lien Loan Documents, and Permitted Title Exceptions shall be senior or prior to the Second Priority liens under the Mortgages (which Permitted Title Exceptions include, without limitation, a Lien securing certain of the Permitted Existing Indebtedness); and (ii) no such Permitted Encumbrances shall result in a Lien on the Capital Stock of the Borrower or its Subsidiaries;

(ii)   Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents or granted in favor of any Agent or Lender pursuant to the terms of this Agreement; and

(iii)   Liens on the Collateral securing obligations under the First Lien Credit Agreement and the other First Lien Loan Documents.

**B.   No Further Negative Pledges.**   Except with respect to specific property encumbered to secure payment of particular Indebtedness permitted by this Agreement or to be sold pursuant to an Asset Sale otherwise permitted by this Agreement, neither the Borrower nor any of its Subsidiaries shall enter into any agreement (other than the Loan Documents and the First Lien Loan Documents) prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**C.   No Restrictions on Distributions, etc.**   Except as otherwise provided in the Loan Documents or the First Lien Loan Documents, the Borrower will not, and will not permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance, limitation or restriction of any kind on the ability of any Subsidiaries of the Borrower to (i) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by the

88

LA001022



Borrower or any other Subsidiaries of the Borrower, (ii) repay or prepay any Indebtedness owed by such Subsidiary to the Borrower or any other Subsidiary of the Borrower, (iii) make loans or advances to the Borrower or any other Subsidiary of the Borrower, or (iv) transfer any of its property or assets to the Borrower or any other Subsidiary of the Borrower.

**6.3    Investments.**

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, make or own any Investments, except the Borrower and its Subsidiaries may:

(i)    enter into Intercompany Subordinated Debt, provided no Event of Default shall have occurred and be continuing at the time of the incurrence thereof or shall result therefrom;

(ii)    enter into the Investments evidencing the purchase money promissory note and mortgage in connection with the Tesoro Membership Club Sale Leaseback and the Tesoro Golf Sale Leaseback, provided, however that such purchase money promissory note and mortgages are collateral assigned to Collateral Agent pursuant to a Collateral Assignment of Mortgage and Note;

(iii)    enter into Investments evidencing Indebtedness permitted under Section 6.1(v) hereof;

(iv)    make Investments in Cash Equivalents;

(v)    make Investments for purposes of purchasing additional Real Property Collateral, which will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof;

(vi)    make Investments in its Subsidiaries; and

(vii)    make the loans contemplated by the Bahamas Intercompany Indebtedness.

**6.4    Contingent Obligations.**

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

(i)    The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of customary indemnification and purchase price adjustment obligations of any such Person incurred in connection with Asset Sales permitted by this Agreement;

(ii)    The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations under Qualified Sales Agreements or other agreements with Governmental Authorities to complete Infrastructure, Golf Courses, Membership Clubs and other amenities at the Projects.

(iii)    The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of any of the Indebtedness that, if outstanding, would be permitted under Section 6.1.

89

SECOND LIEN CREDIT AGREEMENT

LA001023



**6.5    Restricted Payments.**

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment; provided that so long as no Event of Default has occurred and is continuing or would result therefrom, the Borrower and its Subsidiaries may make Restricted Payments to the holders of the Capital Stock of the Borrower in an aggregate amount not to exceed the Restricted Payment Amount, provided that no Restricted Payment shall be permitted pursuant to this Section 6.5 unless the Trigger Date Events shall have occurred and be continuing.

**6.6    Financial Covenants.**

    **A.    Total Debt LTV Ratio.** The ratio (the "**Total Debt LTV Ratio**") of (i) the aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner as of the Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral <u>shall not exceed</u> the following ratios:

| Fiscal Quarter ending | Total Debt LTV Ratio |
|---|---|
| After the Effective Date and on or prior to September 30, 2006 | 55% |
| December 31, 2006 | 45% |
| March 31, 2007 and June 30, 2007 | 40% |
| September 30, 2007 and December 31, 2007 | 35% |
| Thereafter | 30% |

    **B.    Maximum Net Indebtedness.** The aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner as of the Calculation Date <u>less</u> the aggregate amount of Cash Collateral and Cash and Cash Equivalents held by the Borrower, its Subsidiaries and the Bahamas Owner (the "**Maximum Net Indebtedness**") shall not exceed the following amounts (shown in thousands):

| Fiscal Quarter ending | Maximum Net Indebtedness |
|---|---|
| After the Effective Date and on or prior to June 30, 2006 | $650,000 |
| September 30, 2006 | $650,000 |
| December 31, 2006 | $650,000 |
| March 31, 2007 | $650,000 |
| June 30, 2007 | $525,000 |
| September 30, 2007 | $525,000 |
| December 31, 2007 | $525,000 |
| March 31, 2008 | $425,000 |
| June 30, 2008 | $425,000 |
| September 30, 2008 | $425,000 |
| December 31, 2008 | $425,000 |
| March 31, 2009 | $275,000 |

90

SECOND LIEN CREDIT AGREEMENT

LA001024




EXECUTION VERSION

| Fiscal Quarter ending | Maximum Net Indebtedness |
|---|---|
| June 30, 2009 | $275,000 |
| September 30, 2009 | $275,000 |
| December 31, 2009 | $275,000 |
| March 31, 2010 | $125,000 |
| June 30, 2010 | $125,000 |
| September 30, 2010 | $125,000 |
| Thereafter | $125,000 |

  **C.**  **Liquidity Test.** At all times (A) the sum of (i) Cash Collateral, all Cash and Cash Equivalents held by Borrower, its Subsidiaries and the Bahamas Owner, plus (ii) the amount of Tranche A Loans (as defined in the First Lien Credit Agreement) available to be made to the Borrower in accordance with the First Lien Credit Agreement <u>shall be greater than</u> (B) $25,000,000.

  **D.**  **Compliance with Financial Covenants.** In the event Borrower fails to comply with the covenants set forth in this Section 6.6 hereof, the Shareholder Pledgors shall have the right, from time to time, but in no event more frequently than once per Fiscal Year, to ensure Borrower's compliance with such covenants by making an Investment in Borrower or by making a loan through Intercompany Subordinated Debt.

**6.7**  <u>**Restriction on Fundamental Changes**</u>.

  Neither the Borrower nor any of its Subsidiaries shall, without the prior written consent of the Requisite Lenders in their sole and absolute discretion, directly or indirectly, enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve, or cause or consent to either the Borrower or any Subsidiaries to enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve.

**6.8**  <u>**Asset Sales**</u>.

  Without the prior written consent of the Requisite Lenders, the Borrower shall not, and shall not permit any of its Subsidiaries to engage in any Asset Sales, except as follows:

    (i)  With respect to Real Property Collateral, a Permitted Collateral Asset Sale or Required Release, provided that each of the following conditions has been satisfied:

    (a)  no Event of Default shall have occurred and be continuing (other than an Event of Default that will be cured through the consummation of the proposed Asset Sale);

    (b)  not less than fifteen (15) days prior written notice of the closing of such sale has been provided to the Collateral Agent with a true, correct and complete copy of the relevant Qualified Sales Agreement;

    (c)  such Asset Sale is consummated in accordance with the terms of a Qualified Sales Agreement, as applicable;

    (d)  if such Asset Sale is for a Condo Parcel or Commercial Parcel, the Release Price is paid to the Borrower;

91

**SECOND LIEN CREDIT AGREEMENT**

LA001025



(e)     any and all mandatory prepayments of the Loan required to be made through the date of the proposed Asset Sale have been made, and all mandatory prepayments resulting from such Asset Sale will be made in accordance with Section 2.8B(ii)(e);

(f)     the Real Property Collateral subject to such Asset Sale or Required Release, and the remaining Real Property Collateral after giving effect to such Asset Sale or Required Release shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(g)     the Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with such release; and

(h)     in connection with the occurrence of an Asset Sale the consummation of which will result in a Bulk Asset Sale, Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2.

(ii)     With respect to the Capital Stock of the Borrower (or any Subsidiaries of the Borrower), the sale of such Capital Stock provided that each of the following conditions has been satisfied:

(a)     no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)     the mandatory prepayment required under Section 2.8B(ii)(b), if any, shall have been made concurrently with the consummation of the proposed Asset Sale; and

(c)     no Change of Control will result from the proposed Asset Sale.

Notwithstanding the foregoing, this Section 6.8(ii) shall not apply to sales of Capital Stock in exchange for Intercompany Subordinated Debt or Investments made in the Borrower or any Subsidiaries of the Borrower by holders of the Capital Stock therein as of the Effective Date.

## 6.9     Transactions with Shareholders and Affiliates.

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the payment of any management fees, consulting fees or the making of other disbursements) with any holder of 5% or more of any class of equity Securities of the Borrower or a Subsidiary or with any Affiliate of the Borrower or of any such Subsidiary or holder, on terms that are less favorable to the Borrower or that Subsidiaries, as the case may be, than those that might be obtained at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not apply to:

92

NY\1151936.6

LA001026




EXECUTION VERSION

(i)    the Transactions;

(ii)    the amounts expressly contemplated by the Project Projections to be paid to Affiliates of the Borrower;

(iii)    the Tesoro Golf Lease and Tesoro Membership Club Sale Leaseback in accordance with Section 2.13; and

(iv)    sales of Condo Parcels or Commercial Parcels designated to be developed as condominium units or for commercial purposes to an Affiliate pursuant to a Permitted Collateral Asset Sale.

**6.10    Conduct of Business**.

The Borrower shall not, and shall not permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by the Borrower and its Subsidiaries on the Effective Date and (ii) such other lines of business as may be reasonably related thereto, in each case, which shall be related to the Project.

**6.11    Amendments or Waivers of Certain Agreements.**

None of the Borrower nor its Subsidiaries shall terminate or agree to any amendment, restatement, supplement or other Modification to, or waive any of its rights under, any Organizational Certificates or Organizational Documents of the Borrower and its Subsidiaries, if such termination, amendment, restatement, supplement, Modification or waiver would be materially adverse to the Lenders.

**6.12    Fiscal Year**.

Neither the Borrower nor any of its Subsidiaries shall change its Fiscal Year-end from December 31.

## SECTION 7.
## EVENTS OF DEFAULT

If any of the following conditions or events ("**Events of Default**") shall occur:

**7.1    Payment of Obligations**.

The Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise), provided that with respect to regularly scheduled interest payments required pursuant to Section 2.6C or fees required pursuant to Section 2.7, the Borrower is required to make such payments within five (5) days after the date on which such payments are due; or

**7.2    Misrepresentations**.

Any representation, warranty or other written statement to any Agent or any Lender by or on behalf of any Loan Party, or any Shareholder Pledgor whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made or furnished; or

93

LA001027



**7.3    Breach of Certain Covenants**.

The Borrower shall fail or neglect to perform, keep or observe (i) any covenant contained in Sections 5.1, 5.3(i), (ii), (iii) and (xii), 5.4, 5.16, 5.18, 5.19, 5.21, 5.23B and Section 6 (except to the extent such failure or neglect is being cured pursuant to Section 6.6E) hereof on the date that the Borrower is required to perform, keep or observe such covenant, provided, however that with respect to any failure to perform, keep or observe any covenant contained in Sections 5.3(i) or 5.3(ii) hereof, on the date that is ten (10) days after the date that the Borrower is required to perform, keep or observe such covenant; or

**7.4    Breach of Other Covenants**.

The Borrower shall fail or neglect to perform, keep or observe any other covenant contained in this Agreement not otherwise addressed in this Section 7 and the breach of such other covenant is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes known to any Responsible Officer; or

**7.5    Default Under Loan Documents**.

Except as otherwise provided in this Section 7, the Borrower or any other Loan Party or any Shareholder Pledgor shall default in the due and punctual observance or performance of any liability or obligation to be observed or performed by it under any of the Loan Documents and such default or breach is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such default or breach from the Administrative Agent or the date on which such default or breach first becomes known to any Responsible Officer; or

**7.6    First Lien Credit Agreement; Other Defaults**.

There shall occur an event of default under (i) any of the Permitted Existing Indebtedness, or (ii) there shall occur an Event of Default under the First Lien Credit Agreement or any of the First Lien Loan Documents, or (iii) there shall occur any default or event of default on the part of the Borrower or any Subsidiary beyond any applicable cure or grace period under any agreement, document or instrument to which the Borrower or any Subsidiary is a party or by which the Borrower or any Subsidiary or any of their respective properties is bound, creating or relating to any Indebtedness (other than the Obligations) in excess of $2,000,000 if, in each case, the payment or maturity of such Indebtedness may be accelerated in consequence of such event of default or demand for payment of such Indebtedness may be made; or

**7.7    Material Adverse Effect**.

There shall occur any event or condition that has resulted in a Material Adverse Effect; or

**7.8    Solvency**.

Any Loan Party shall cease to be Solvent; or

**7.9    Insolvency Proceedings**.

Any Insolvency Proceeding shall be commenced by any Loan Party or any Shareholder Pledgor; an Insolvency Proceeding is commenced against any Loan Party and any of the following events occur: such Loan Party or any Shareholder Pledgor consents to the institution of the Insolvency Proceeding against it, the petition commencing the Insolvency Proceeding is not timely controverted by such Loan

94

 

EXECUTION VERSION

Party or any Shareholder Pledgor, as the case may be, the petition commencing the Insolvency Proceeding is not dismissed within thirty (30) days after the date of the filing thereof (provided that, in any event, during the pendency of any such period, Lenders shall be relieved from their obligation to make Loans or otherwise extend credit to or for the benefit of the Borrower hereunder), an interim trustee is appointed to take possession all or a substantial portion of the properties of such Loan Party or any Shareholder Pledgor or to operate all or any substantial portion of the business of such Loan Party or any Shareholder Pledgor, as the case may be, or an order for relief shall have been issued or entered in connection with such Insolvency Proceeding; or any Loan Party or any Shareholder Pledgor shall make an offer of settlement extension or composition to its unsecured creditors generally; or

### 7.10    Business Disruption; Condemnation.

There shall occur a cessation of a substantial part of the business of any Loan Party for a period which may be reasonably expected to have a Material Adverse Effect; or any Loan Party shall suffer the loss or revocation of any license, permit or Approval now held or hereafter acquired by such Loan Party which is material to the operations of such Loan Party or necessary to the continued or lawful operation of its business or the development of each Project as contemplated by the Master Plans, the Project Projections, and this Agreement and it is reasonably expected that such license, permit, or Approval will not be re-issued or reinstated with sufficient time to avoid a Material Adverse Effect; or any Loan Party shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs and such injunction or restraint is not dismissed or stayed within sixty (60) days; or any material lease or agreement pursuant to which any Loan Party leases or occupies any premises on which any Collateral is located shall be canceled or terminated prior to the expiration of its stated term and such cancellation or termination has a Material Adverse Effect; or the Appraised Value of the applicable Project shall be materially impaired through condemnation such that it results in a Material Adverse Effect; or

### 7.11    ERISA.

An ERISA Event shall occur which could reasonably be expected to result in a Material Adverse Effect or which the Administrative Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the PBGC of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan; or if any Pension Plan shall be terminated or any such trustee shall be requested or appointed; or if the Borrower or any Subsidiaries is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from the Borrower's or such Subsidiary's complete or partial withdrawal from such Pension Plan; or

### 7.12    Challenge to Loan Documents.

Any Loan Party, any Shareholder Pledgor, or any of its Affiliates shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to the Collateral Agent, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by the applicable Agent and Lenders in accordance with the terms thereof; or

### 7.13    Judgment.

One or more judgments or orders for the payment of money in an amount that exceeds, individually or in the aggregate, $5,000,000 shall be entered against the Borrower or any other Loan Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of

95

SECOND LIEN CREDIT AGREEMENT

LA001029



EXECUTION VERSION

enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

### 7.14    Change in Control.

If any Change of Control shall occur.

### 7.15    Criminal Forfeiture.

Any Loan Party shall be convicted under any criminal law that could lead to a forfeiture of any property of such Loan Party.

**THEN** subject to the terms of the Intercreditor Agreement, (i) upon the occurrence of any Event of Default described in Section 7.9, each of (a) the unpaid principal amount of and accrued interest on the Loans, and (b) all other Obligations shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company, and the obligation of each Lender to make any Loan shall thereupon terminate, and (ii) upon the occurrence and during the continuation of any other Event of Default, the Administrative Agent shall, upon the written request of the Requisite Lenders, by written notice to the Company, declare all or any portion of the amounts described in clauses (a) and (b) above to be, and the same shall forthwith become, immediately due and payable, and the obligation of each Lender to make any Loan shall thereupon terminate. Upon the occurrence of any Event of Default, and subject to the Intercreditor Agreement, Administrative Agent may (and shall as directed by the Requisite Lenders) (A) exercise, on behalf of the Lenders, any and all rights and remedies under any guaranties including the Subsidiary Guaranties (to the extent applicable), the Collateral Documents, and any other collateral documents entered into with respect to the Loans; and/or (B) exercise any and all rights, powers and remedies available to Administrative Agent or Lenders at law, in equity or otherwise, including, without limitation, under the other Loan Documents, all of which rights, powers and remedies are cumulative and not exclusive.

## SECTION 8.
## AGENTS

### 8.1    Appointment.

**A.    Appointment Authority.** Each of the Lenders hereby irrevocably appoints Credit Suisse as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes Credit Suisse, in such capacities, to take such actions on its behalf and to exercise such powers as are delegated to Credit Suisse, in such capacities by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable. In performing its functions and duties under this Agreement, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries. The provisions of this Section 8 are solely for the benefit of the Agents, the Lenders and the Borrower shall not have rights as third party beneficiaries of any of such provisions.

**B.    Appointment of Supplemental Collateral Agents.** It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan

96

LA001030



EXECUTION VERSION

Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent deems that by reason of any present or future law of any jurisdiction the Administrative Agent or the Collateral Agent may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Administrative Agent or the Collateral Agent appoint an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Collateral Agent**" and collectively as "**Supplemental Collateral Agents**").

In the event that the Administrative Agent or the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Administrative Agent or the Collateral Agent or such Supplemental Collateral Agent, and (ii) the provisions of this Section 8 and of Section 9.2 that refer to the Administrative Agent or the Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Administrative Agent or the Collateral Agent shall be deemed to be references to the Administrative Agent or the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

Should any instrument in writing from the Borrower or any other Loan Party or any Shareholder Pledgor be required by any Supplemental Collateral Agent so appointed by the Administrative Agent or the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party or any Shareholder Pledgor to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent or the Collateral Agent. In case any Supplemental Collateral Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

### 8.2    Rights as a Lender.

The Persons serving as the Agents hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Agents hereunder in their individual capacity. Such Persons and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiaries or other Affiliate thereof as if such Persons were not Agents hereunder and without any duty to account therefor to the Lenders.

### 8.3    Exculpatory Provisions.

The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agents (i) shall not be

97



EXECUTION VERSION

subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be necessary under the circumstances as provided in Section 9.5), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, and (iii) shall not, except as expressly set forth herein and in the other Loan Documents have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity. No Agent shall be liable to the Lenders for any action taken or not taken by it with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.5) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender. The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

**8.4    Reliance by the Agents**.

The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agents also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of such Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agents may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**8.5    Delegation of Duties**.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent. The Agents and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of Section 8.3 shall apply to any such sub-agent and to the Related Parties of such Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.

98

NY\1151936.6

LA001032



EXECUTION VERSION

**8.6    Resignation of Administrative Agent and/or Collateral Agent.**

The Administrative Agent and/or Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the written consent of the Borrower if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent and/or Collateral Agent, as applicable, which shall be a bank with an office in New York, or an Affiliate of any such bank with an office in New York. If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 10 days after the retiring Administrative Agent and/or Collateral Agent as the case may be, gives notice of its resignation, then the retiring Administrative Agent may, with the written consent of the Borrower if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), on behalf of the Lenders, appoint a successor Administrative Agent and/or Collateral Agent, as applicable, meeting the qualifications set forth above, provided that if the Administrative Agent and/or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no such successor is willing to accept such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent and/or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent and/or Collateral Agent, as applicable, shall instead be made by or to each Lender directly, until such time as the Requisite Lenders appoint a successor Administrative Agent and/or Collateral Agent, as applicable, as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent and/or Collateral Agent, as applicable hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent and/or Collateral Agent, as applicable, and the retiring Administrative Agent and/or Collateral Agent, as applicable shall be discharged from all of its duties and obligations hereunder or under the Loan Documents. The fees payable by the Borrower to a successor Administrative Agent and/or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's and/or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 8 and Section 9.2 shall continue in effect for the benefit of such retiring Administrative Agent and/or Collateral Agent, as applicable, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent and/or Collateral Agent, as applicable was acting in such capacity.

**8.7    Collateral Documents; Successor Collateral Agent.**

Each Lender hereby further authorizes the Collateral Agent to enter into each Collateral Document as secured party on behalf of and for the benefit of the Lenders and the other beneficiaries named therein and agrees to be bound by the terms of each Collateral Document; provided that, except as otherwise provided in this Agreement, the Collateral Agent shall not enter into or consent to any amendment, Modification, termination or waiver of any provision contained in any Collateral Document without the prior consent of the Requisite Lenders (or, if required pursuant to Section 9.5, all the Lenders); provided further, however, that, without further written consent or authorization from any Lender, the Collateral Agent may execute any documents or instruments necessary to effect the release of any asset constituting Collateral from the Lien of the applicable Collateral Document in the event that such asset is sold or otherwise disposed of in a transaction effected in accordance with Section 6.9 or to the extent otherwise required by any Collateral Document. Anything contained in any of the Loan Documents to the contrary notwithstanding, each Lender agrees that no Lender shall have any right individually to realize upon any of the Collateral under any Collateral Document, it being understood and

SECOND LIEN CREDIT AGREEMENT

LA001033




EXECUTION VERSION

agreed that all rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders and the other beneficiaries named therein in accordance with the terms thereof.

## 8.8   Non-Reliance on Agents and Other Lenders.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

## 8.9   Withholding Taxes.

To the extent required by any Applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from accounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from or reduction of withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with any and all expenses incurred.

## SECTION 9.
## MISCELLANEOUS

## 9.1   Assignments and Participations in Loans.

**A.     Successors and Assigns Generally.** The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the Administrative Agent and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 9.1B, (ii) by way of participation in accordance with the provisions of Section 9.1D or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 9.1F (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 9.1D and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**B.     Assignments by Lenders.**

(i)     Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it); provided that

100

*SECOND LIEN CREDIT AGREEMENT*

LA001034



EXECUTION VERSION

(a)    except in the case of an assignment of entire remaining amount of the assigning Lender's Loans or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Loans subject to each such assignment (determined as of the date of the Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 or an integral multiple of $500,000 in excess thereof, unless the Administrative Agent otherwise consents;

(b)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned;

(c)    subject to Section 9.1B(ii), the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent), and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and an Administrative Questionnaire and if required, applicable tax forms; and .

(ii)    Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 9.1C, from and after the effective date specified in each Assignment Agreement, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 2.11 with respect to facts and circumstances occurring prior to the effective date of such assignment.  An Eligible Assignee shall not be entitled to receive any greater payment under Section 2.11 that the assigning Lender would have been entitled to receive with respect to the Loan or portion of the Loan assigned to such Eligible Assignee, unless the grant to such Eligible Assignee is made with the Borrower' prior written consent.  Except in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund with respect to a Lender, any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.1D.

C.    **The Register.**  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders and principal amounts of the Loans (each, a "**Registered Loan**") owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

D.    **Participations.**  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or

NY\1151936.6

LA001035

 

the Borrower or any of the Affiliates or Subsidiaries of the Borrower) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that

      (i)     such Lender's obligations under this Agreement shall remain unchanged,

      (ii)    such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and

      (iii)   the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, Modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, Modification or waiver with respect to any action (i) effecting the extension of the final maturity of the Loan allocated to such participation, (ii) effecting a reduction of the principal amount of or affecting the rate of interest payable on any Loan or any fee allocated to such participation, or (iii) releasing all or substantially all of the Collateral other than in connection with payment of the Loans in full. Subject to Section 9.1E, the Borrower agree that each Participant shall be entitled to the benefits of Section 2.11 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.1B; provided that such Participant agrees to be subject to Section 2.12 as though it were a Lender. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.3 as though it were a Lender, provided such Participant agrees to be subject to Section 9.4 as though it were a Lender.

    **E.**    **Limitations Upon Participant Rights.** A Participant shall not be entitled to receive any greater payment under Section 2.11 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower' prior written consent. Without limiting the generality of the foregoing, a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.11E unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.11E(v) as though it were a Lender.

    **F.**    **Certain Pledges.** Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Notes, if any, held by it to the trustee for holders of obligations owed, or Securities issued, by such Fund as security for such obligations or Securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 9.1, (i) no such pledge shall release the pledging Lender from any of its obligations under this Agreement and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under this Agreement and the Notes even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

102

**SECOND LIEN CREDIT AGREEMENT**



EXECUTION VERSION

## 9.2    Expenses; Indemnity; Damage Waiver.

**A.    Costs and Expenses.**  In addition to the reimbursement of costs and expenses the Borrower has heretofore agreed to in writing to pay to the Administrative Agent, the Borrower shall pay: (i) all reasonable, actual out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, Modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent or any Lender (and fees and time charges for attorneys who may be employees of the Administrative Agent, the Collateral Agent or any Lender), in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 9.2A, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, and (iii) all reasonable, actual out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection with each Permitted Collateral Asset Sale and loan disbursement requested pursuant to Section 3.3.

**B.    Indemnification by the Borrower.**  The Borrower shall indemnify each Agent (and any sub-Agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (and fees and time charges for attorneys who may be employees of any Agent or any Lender), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of any Indemnitee.

**C.    Reimbursement by the Lenders.**  To the extent that the Borrower fails to pay any amount required under Section 9.2A or 9.2B to be paid by it to any Agent (or any sub-Agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agent (or any such sub-Agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-Agent) in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-

103

LA001037



Agent) in connection with such capacity. The obligations of the Lenders under this Section 9.2C are subject to the provisions of Section 9.12.

**D.        Waiver of Consequential Damages, Etc.**  To the fullest extent permitted by Applicable Law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in Section 9.2B above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, unless such damages are directly caused solely by the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final and nonappealable judgment.

**E.        Payments.**  All amounts due under this Section 9.2 shall be payable promptly after demand therefor.

### 9.3    Right of Set-Off.

Without limitation of any other rights of the Agents or Lenders, if an Event of Default shall have occurred and be continuing, subject to the Administrative Agent's consent, each Agent, Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Agent, Lender, or any such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Agent or Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of the Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Agent, Lender and their respective Affiliates under this Section 9.3 are in addition to other rights and remedies (including other rights of setoff) which such Agent, Lender or their respective Affiliates may have and are subject to the terms of the Intercreditor Agreement. Each Agent and Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

### 9.4    Sharing of Payments by Lenders.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for Cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, to the end that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery,

SECOND LIEN CREDIT AGREEMENT

LA001038



EXECUTION VERSION

without interest, and (ii) the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiaries thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

**9.5    Amendments and Waivers.**

A.    **Amendment and Waivers.** No amendment, Modification, termination or waiver of any provision of this Agreement or of the Notes, or consent to any departure by the Borrower or any other Loan Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders; provided that any such amendment, Modification, termination, waiver or consent which: (a) reduces or forgives the principal amount of any of the Loans; (b) increases or reduces the percentage specified in the definition of the "Requisite Lenders" (it being understood that, with the consent of the Requisite Lenders, additional extensions of credit pursuant to this Agreement may be included in the definition of the "Requisite Lenders" on substantially the same basis as the Loans are included on the Effective Date); (c) changes in any manner any provision of this Agreement which, by its terms, expressly requires the approval or concurrence of all the Lenders; (d) postpones the scheduled final maturity date of any of the Loans; (e) postpones the date or reduces the amount of any scheduled payment (but not prepayment) of principal of any of the Loans; (f) postpones the date on which any interest, any fees or any amounts due under Section 2.8B(ii) are payable; (g) decreases the interest rate borne by any of the Loans (other than any waiver of any increase in the interest rate applicable to any of the Loans pursuant to Section 2.3E) or the amount of any fees payable hereunder or any amounts payable under Section 2.8B(ii); (h) increases the Commitment of any Lender or the maximum duration of Interest Periods permitted hereunder; (i) releases all or substantially all of the Collateral or any of the Subsidiary Guaranties (except to the extent otherwise required to be released under the terms of the Loan Documents); and (j) changes in any manner the provisions contained in Section 7.1 or this Section 9.5; shall be effective only if evidenced by a writing signed by or on behalf of all the Lenders to whom Obligations are owed being directly affected by such amendment, Modification, termination, waiver or consent (the consent of the Requisite Lenders not being required for any such change); provided, further that any amendment, Modification, termination, waiver or consent which amends or modifies the definition of "Approved Fund," "Eligible Assignee," or "Fund," shall be effective only if evidenced by a written concurrence of the Requisite Lenders and the Administrative Agent. In addition, (i) any amendment, Modification, termination or waiver of any of the provisions contained in Section 3.2 for periods following the Effective Date shall be effective only if evidenced by a writing signed by or on behalf of the Administrative Agent and the Requisite Lenders, (ii) no amendment, Modification, termination or waiver of any provision of any Note shall be effective without the written concurrence of the Lender which is the holder of that Note, and (iii) no amendment, Modification, termination or waiver of any provision of Section 8 or of any other provision of this Agreement which, by its terms, expressly requires the approval or concurrence of the Administrative Agent shall be effective without the written concurrence of the Administrative Agent. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances. Any amendment, Modification, termination, waiver or consent effected in accordance with this Section 9.5 shall be binding upon each Lender at the time a party to this Agreement, each future Lender and, if signed by the Borrower, on the Borrower.

105

NY\1151936.6

LA001039



**B.**     **Non-Consenting Lenders.**  Each Lender grants (x) to the Administrative Agent the right to purchase all (but not less than all) of such Lender's Commitments and Loans owing to it and the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents, and (y) to the Borrower the right to cause an assignment of all (but not less than all) of such Lender's Loans owing to it, its participations in the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents to Eligible Assignees, which right may be exercised by the Administrative Agent or the Borrower, as the case may be, if such Lender (a "**Non-Consenting Lender**") refuses to execute any amendment, waiver or consent which requires the written consent of Lenders other than Requisite Lenders and to which the Requisite Lenders, the Administrative Agent and the Borrower has otherwise agreed; provided that such Non-Consenting Lender shall receive, in connection with such assignments, payment equal to the aggregate amount of outstanding Loans owed to such Lender (together with all accrued and unpaid interest, fees and other amounts (other than indemnities) owed to such Lender plus an amount equal to the prepayment premium, if any, that would be payable in respect of the Loans of such Lender upon prepayment thereof pursuant to subsection 2.4B(i)(b)).  Each Lender agrees that if the Administrative Agent or the Borrower, as the case may be, exercises their option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in Section 9.1.  The Borrower shall be entitled (but not obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender and any such agreement and/or documentation so executed by the Borrower shall be effective for purposes of documenting an assignment pursuant to Section 9.1.

## 9.6     Independence of Covenants.

All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another such covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

## 9.7     Notices.

**A.**     **Notices Generally.**  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 9.7B below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

If to Borrower:                    Ginn Clubs & Resorts
                                   1 Hammock Beach Parkway
                                   Palm Coast, FL  32127
                                   Attention:  Bobby Masters
                                   Fax:     (386) 246-5785


                                   Ginn Club & Resorts
                                   215 Celebration Place, Suite 200
                                   Celebration, FL  34747
                                   Attention:  John Klumph
                                   Fax:     (321) 939-4721


                                   Lubert-Adler Partners, L.P.
                                   The Cira Centre

106

LA001040

 

EXECUTION VERSION

2929 Arch Street
Philadelphia, PA  19104-2868
Attention: Dean S. Adler
Fax:     (215) 972-2248

with copies to:

Morris, Manning & Martin
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, GA  30326
Attention: Sonny Morris
Phone:    (404) 504-7726

Lubert-Adler Partners, L.P.
535 Madison Avenue
5th floor
New York, NY  10022
Attention: Robert (Bob) Rosenberg
Phone:    (212) 644-0657

Lubert-Adler Partners, L.P.
The Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2868
Attention: Stuart A. Margulies
Fax:     (215) 609-3457

If to the Administrative Agent,
or the Collateral Agent, to Credit Suisse:

Eleven Madison Avenue
New York, New York 10010
Attention: Agency Group - Thomas Lynch
Telephone No.: 212-325-9205
Telecopier No.: 212-743-1865

with copies to:

Latham & Watkins LLP
633 West Fifth Street
Suite 4000
Los Angeles, California 90071
Attention: Paul Fuhrman
Telecopier: (213) 891-8763

.    If to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

107

**SECOND LIEN CREDIT AGREEMENT**

LA001041



Notices delivered through electronic communications to the extent provided in Section 9.7B below, shall be effective as provided in said Section 9.7B.

**B.    Electronic Communications.**    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Section 2.2, if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Section by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**C.    Change of Address, Etc.**    Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

## 9.8    Survival of Representations, Warranties and Agreements.

All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of the Borrower set forth in Sections 2.10D, 2.11, 9.2, and 9.18 and the agreements of the Lenders set forth in Sections 8.2, 8.3, 8.4, 9.2C, 9.3, 9.4, 9.18, 9.19 and 9.20 shall survive the payment of the Loans and the reimbursement of any amounts drawn or paid thereunder, and the termination of this Agreement.

## 9.9    Failure or Indulgence Not Waiver; Remedies Cumulative.

No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

## 9.10    Marshalling; Payments Set Aside.

Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations. To the extent that the Borrower makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent or Collateral Agent for the benefit of the Lenders), or any Agent or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the

108

**SECOND LIEN CREDIT AGREEMENT**



proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**9.11    Severability.**

In case any provision in or obligation under this Agreement or the Notes shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**9.12    Obligations Several; Independent Nature of the Lenders' Rights.**

The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitments of any other Lender hereunder. Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**9.13    Maximum Amount.**

**A.**    It is the intention of the Borrower and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Loan Parties and their respective Subsidiaries and the Lenders, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Loan Documents or in any other agreement given to secure the Indebtedness or obligations of the Borrower to the Lenders, or in any other document evidencing, securing or pertaining to the Indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the "**Maximum Amount**"). If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For the purposes of calculating the actual amount of interest paid and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of the Borrower evidenced hereby, outstanding from time to time shall, to the extent permitted by Applicable Law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the Notes until payment in full of all of such Indebtedness, so that the actual rate of interest on account of such Indebtedness is uniform through the term hereof. The terms and provisions of this Section shall control and supersede every other provision of all agreements between the Borrower or any endorser of the Notes and the Lenders.

**B.**    If under any circumstances any Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of

109



EXECUTION VERSION

the Loans and shall be treated as a voluntary prepayment under Section 2.8B(i) and shall be so applied in accordance with Section 2.8 hereof or if such excessive interest exceeds the unpaid balance of the Loans and any other Indebtedness of the Borrower in favor of such Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Borrower.

### 9.14   Headings.

Section and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

### 9.15   Applicable Law.

THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

### 9.16   Successors and Assigns.

This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Lenders (it being understood that the Lenders' rights of assignment are subject to Section 9.1). Neither the Borrower' rights or obligations hereunder nor any interest therein may be assigned or delegated by the Borrower without the prior written consent of all Lenders.

### 9.17   Consent to Jurisdiction and Service of Process.

A.    SUBMISSION TO JURISDICTION.    EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES DISTRICT COURT SITTING IN NEW YORK CITY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.    EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

B.    WAIVER OF VENUE. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO

110



THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN   SECTION 9.17A.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

      **C.**     **Service of Process.** Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 9.7. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

### 9.18   Waiver of Jury Trial.

     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### 9.19   Confidentiality.

     Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it, its Affiliates' and their respective partners, directors, officers, employees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential as provided herein), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 9.19, to (i) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower (such consent not to be unreasonably withheld or delayed) or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than the Borrower or any of its Subsidiaries or Affiliates.

     For purposes of this Section 9.19, "**Information**" means all written information received from the Borrower or any of its Subsidiaries or Affiliates relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative

SECOND LIEN CREDIT AGREEMENT

LA001045



Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower, which to the extent received on or after the date hereof, is identified as confidential by the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section 9.19 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

## 9.20   Limitation of Liability.

The Loans and Obligations hereunder shall be recourse to the Borrower at all times.   The Shareholder Pledgors have assumed certain limited recourse obligations to Lender pursuant to the Pledge Agreements, but otherwise none of the Shareholders Pledgors or any of their constituent entities shall have any liability whatsoever with respect to the Loans or Obligations. Notwithstanding anything to the contrary herein or in any other Loan Document, none of the direct or indirect partners, members, shareholders, officers, employees, controlling persons or affiliates of the Shareholder Pledgors shall have any liability for the Loans or the Obligations or any other obligation or liability hereunder, whether based in law, in equity or otherwise. It is further hereby understood and agreed that notwithstanding anything to the contrary contained within the Pledge Agreements with regard to the definitions of "Distributions" as defined therein, such definition shall not include, and is not intended to include, the distributions permitted to be made from the proceeds of the Loans on the Effective Date pursuant to Section 2.9 hereof.

## 9.21   Counterparts; Integration; Effectiveness; Electronic Execution.

**A.**   **Counterparts; Integration; Effectiveness.**   This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto required pursuant to Section 3, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**B.**   **Electronic Execution of Assignments.**   The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.22**   **USA Patriot Act Notification.**   The following notification is provided to the Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318, as amended:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person or

112

 

EXECUTION VERSION

entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.

What this means for the Borrower: When the Borrower opens an account, if the Borrower is an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, residential address, tax identification number, date of birth, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower, and, if the Borrower is not an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, tax identification number, business address, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower. The Administrative Agent and the Lenders may also ask, if the Borrower is an individual, to see the Borrower's driver's license or other identifying documents, and, if the Borrower is not an individual, to see the Borrower's legal organizational documents or other identifying documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SECOND LIEN CREDIT AGREEMENT

NY\1151936.6

LA001047

**GINN-LA CS BORROWER, LLC,**
a Delaware limited liability company

By: 

Name: Robert F. Masters
Title:  Manager

LA001048



**GINN-LA CONDUIT LENDER, INC.,**
a Delaware corporation

By: _____

Name: Robert F. Masters
Title: President

LA001049

 

**AGENTS AND LENDERS:**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
individually as a Lender and as the Administrative Agent and Collateral Agent

By:_____
    Name:     **BILL O'DALY**
    Title:     DIRECTOR

By:_____
    Name:     RIANKA MOHAN
    Title:     ASSOCIATE

**CREDIT SUISSE SECURITIES (USA) LLC,**
as the Sole Lead Arranger and Sole Bookrunner

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Second Lien Credit Agreement

LA001050

 

**AGENTS AND LENDERS:**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
individually as a Lender and as the Administrative Agent and Collateral Agent

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**CREDIT SUISSE SECURITIES (USA) LLC,**
as the Sole Lead Arranger and Sole Bookrunner

By:_____
    Name: J. Tracy Mehr
    Title: Managing Director

By:_____
    Name: MICHAEL SPELLER
    Title: DIRECTOR

Second Lien Credit Agreement

LA001051

 

EXECUTION VERSION

## APPENDIX A

### APPLICABLE MARGINS

| EURODOLLAR RATE MARGIN | BASE RATE MARGIN |
|:---:|:---:|
| 700 bps | 600 bps |

116

SECOND LIEN CREDIT AGREEMENT

LA001052

**Schedule 4.5: Borrower's Subsidiaries**

<u>Ginn-LA CS Borrower, LLC</u>
Subsidiaries:

Ginn-St. Lucie GP, LLC
Ginn-LA St. Lucie Ltd., LLLP
       Subsidiaries:
       The Tesoro Club, LLC
       Tesoro Golf Club Condominium, LLC
       Tesoro Beach Club Condominium, LLC

Ginn-Quail West GP, LLC
Ginn-LA Quail West Ltd., LLLP
       Subsidiary:
       Ginn Quail West Beach, LLC
       Quail West Foundation, Inc.

Ginn-Bulow GP, LLC
Ginn-LA Bulow Ltd., LLLP
       Subsidiary:
       Hammock Beach River Club, LLC

Ginn-Laurel Creek GP, LLC
Ginn-LA Laurel Creek Ltd., LLLP

<u>Ginn-LA Conduit Lender, Inc.</u>
Subsidiaries:
None

LA001355