UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
**West Palm Beach Division**
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>GINN-LA ST. LUCIE LTD., LLLP, *et al.*,<br><br>　　　　Debtors.<br>_____/ | **CASE NO. 08-29769-PGH**<br>All Cases Jointly Administered<br><br>Chapter 7<br><br>(4 Cases Substantively Consolidated Under<br>Lead Case No. 08-29769-PGH)[1/] |
| In re:<br>GINN-LA QUAIL WEST LTD., LLLP, *et al.*,<br><br>　　　　Debtors.<br>_____/ | (3 Cases Substantively Consolidated Under<br>Lead Case No. 08-29774-PGH)[2/] |
| DREW M. DILLWORTH, Chapter 7 Trustee,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>EDWARD R. GINN, III, et al.<br><br>　　　　Defendants.<br>_____/ | **ADV. PRO. NO. 10-02976-PGH** |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
THE "GINN," "LUBERT-ADLER," AND "INVESTOR" DEFENDANTS'
MOTIONS TO DISMISS SECOND AMENDED COMPLAINT**

Plaintiff Drew M. Dillworth ("Trustee Dillworth"), in his capacity as Chapter 7 Trustee for the Tesoro and Quail West Debtors' Estates, hereby files this memorandum in opposition to the Ginn, Lubert-Adler, and Investor Defendants' Motions to Dismiss [ECF No. 76, 78, 95, 103].

---

[1/] The "Tesoro Debtors' Estates" (Nos. 08-29769-PGH, 08-29770-PGH, 08-29772-PGH, and 08-29773-PGH) are substantively consolidated into Lead Case No. 08-29769-PGH. Order [ECF No. 308/309]. The "Tesoro Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA St. Lucie Ltd., LLLP – 5632; (ii) Ginn-St Lucie GP, LLC – 0983; (iii) Tesoro Golf Club Condo., LLC – 4385; and (iv) The Tesoro Club, LLC – 1917. *See* 11 U.S.C. § 342(c)(1).

[2/] The "Quail West Debtors' Estates" (Nos. 08-29774-PGH, 08-29775-PGH, and 08-29776-PGH) are substantively consolidated into Lead Case No. 08-29774-PGH. Order [ECF No. 34]. The "Quail West Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA Quail West Ltd., LLLP – 2397; (ii) Ginn-Quail West Beach, LLC – 9142; and (iii) Ginn-Quail West GP, LLC – 6313. *See* 11 U.S.C. § 342(c)(1).

For convenience, the Ginn, Lubert-Adler, and Investor Defendants who have filed or joined in the Motions to Dismiss at issue are collectively referred to herein as the "Moving Defendants." The following Lubert-Adler Fund III and IV Investor Defendants have declined to join in the Motions to Dismiss, and have instead filed Answers to the Second Amended Complaint:

- The President and Fellows of Harvard College;
- Yale University;
- Yale University Retirement Plan for Staff Employees;
- Yale University Retiree Health Benefits Coverage Trust;
- The Trustees of Princeton University; and
- Washington University in St. Louis.

The Regents of the University of Michigan has separately asserted a defense of sovereign immunity, which will be addressed in a subsequent filing.

## BACKGROUND

In this adversary proceeding, Trustee Dillworth seeks to avoid and recover for a series of fraudulent transfers made to or for the benefit of Edward R. "Bobby" Ginn III ("Ginn"), Lubert-Adler Management Company, L.P., d/b/a Lubert-Adler Partners, L.P. ("Lubert-Adler"), and others involved in the financing and development of the luxury residential communities known as Tesoro and Quail West, located in Port St. Lucie and near Naples, Florida, respectively.

During the time periods in question, Ginn and the Lubert-Adler-managed equity funds commonly referred to as "Lubert-Adler Funds III & IV" owned the assets which make up the Tesoro and Quail West Projects through a number of holding companies and other subsidiaries, including the entities identified herein as the Tesoro and Quail West Debtors.[3/]

---

[3/] The Tesoro Debtors, *i.e.*, Ginn-LA St. Lucie Ltd., Ginn-St Lucie GP, Tesoro Golf Club Condominium, and The Tesoro Club, were the "project-level" subsidiaries created to hold, develop, and operate the Tesoro Project. The Quail West Debtors, *i.e.*, Ginn-LA Quail West Ltd., Ginn-Quail West Beach, and Ginn-Quail West GP, were the "project-level" subsidiaries created to hold, develop, and operate the Quail West Project.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

As described more fully in Trustee Dillworth's Second Amended Complaint ("SAC"), originally, Ginn and Lubert-Adler had intended to use Tesoro and Quail West lot/unit sales to finance the completion of the developments' infrastructure and facilities. SAC, ¶¶ 3, 50. In October 2005, however, Hurricane Wilma struck, impacting both the developments themselves and the real estate markets in the geographic areas in which they are located. SAC, ¶¶ 4, 51-53. That, in turn, prompted Ginn and Lubert-Adler to begin devising and searching for alternate ways to finance the completion of the developments' infrastructure and facilities. SAC, ¶¶ 5, 54.

Ginn and Lubert-Adler ultimately found something even better (for them) in Credit Suisse, which was at that point offering a new syndicated loan product to owners of high-end developments designed to enable the owners to "recapitalize" and take "profits" from their projects long before the projects were to be completed. In the words of Bankruptcy Judge Ralph B. Kirscher:

> In 2005, Credit Suisse was offering a new financial product for sale. It was offering the owners of luxury second-home developments the opportunity to take their profits up front by mortgaging their development projects to the hilt. Credit Suisse would loan the money . . ., earn a substantial fee, and sell off most of the credit to loan participants. The development owners would take most of the money out as a profit dividend, leaving their developments saddled with enormous debt. Credit Suisse and the development owners would benefit, while their developments – and especially the creditors of the developments – bore all the risk of loss. This newly developed syndicated loan product enriched Credit Suisse, its employees[,] and more than one luxury development owner, but it left the developments too thinly capitalized to survive. Numerous entities that received Credit Suisse's syndicated loan product have failed financially, including . . . Ginn. If the foregoing developments were anything like this case, they were doomed to failure once they received their loans [and made the transfers contemplated thereby].

SAC, ¶¶ 6, 55; *In re Yellowstone Mtn. Club, LLC*, Case No. 08-61570-11, Adv. Pro. No. 09-00014, Partial & Interim Order, reported at 2009 WL 3094930, at *3-4 (Bankr. D. Mont. May 13, 2009); Memorandum of Decision, 436 B.R. 598, 609-09, 655-60 (Bankr. D. Mont. Aug. 16, 2010) (avoiding, as fraudulent, transfer of $209 million in loan proceeds secured by development project which former owner had taken out and distributed to himself and others).

-3-

In the case of Ginn and Lubert-Adler, Credit Suisse offered the opportunity to "recapitalize" and take future "profits" out of *five* luxury residential developments, on a cross-collateralized basis – *i.e.*, Tesoro, Quail West, River Club / Gardens (Palm Coast, Florida), Laurelmor (North Carolina), and Ginn sur Mer (The Bahamas) (collectively, the "Projects") – but the loan transaction itself was otherwise materially the same, in both structure and effect:

- Credit Suisse loaned $675 million to Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. (shell entities formed to "pool" Project assets), through a First Lien Credit Agreement ($525 million in total financing) and a Second Lien Credit Agreement ($165 million in "term" loan financing), with the Debtors and other Project subsidiaries (the "Other Project Entities") serving as "Full Recourse Borrowing Parties" (*i.e.*, "co-borrowers");

- Credit Suisse took a substantial fee, in excess of $15 million, and sold off most if not all of the credit to loan participants;

- Existing third-party debt of approximately $158 million was replaced with new debt;

- The Ginn and Lubert-Adler Defendants, as insiders in control of the Debtors and Other Project Entities, took out and paid themselves and their investors approximately $325 million as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits"; and

- Each of the Debtors and Other Project Entities was required to execute a "Subsidiary Guaranty" providing for "*primary* and *not secondary*" liability for the full $675 million loan amount, and to grant *mortgages* and other *liens* on substantially all its assets, *without receiving any loan proceeds in return*.

SAC, ¶¶ 7-8, 56-66.

In short, as in *In re Yellowstone Mtn. Club, LLC*, the transaction was structured such that "Credit Suisse and the development owners [here, Ginn and Lubert-Adler] would benefit, while their developments – and especially the creditors of the developments – bore all the risk of loss." SAC, ¶¶ 8, 74; Partial & Interim Order, 2009 WL 3094930, at *3 (Bankr. D. Mont. May 13, 2009); Memorandum of Decision, 436 B.R. 598, 655-60, 674-77 (Bankr. D. Mont. Aug. 16, 2010).[4]

---

[4] It bears noting that the same Ginn-LA representative, Robert F. Masters, signed the operative Loan Documents for both the "Borrower" entities and the supposed "Subsidiary Guarantors." *See* Exs. 1-4.

Trustee Dillworth's investigation has determined (from Ginn and Lubert-Adler records) that of the approximately $325 million of Credit Suisse loan proceeds distributed to insiders, nearly half that amount was credited against the Tesoro and Quail West Debtors' capital accounts, as follows:

| Transferee / Allocation | Tesoro | Quail West | Total |
|---|---|---|---|
| Ginn "Promote" | $5,357,044.85 | $1,785,681.62 | $7,142,726.47 |
| Lubert-Adler "Debt" Pay-Off | $0.00 | $19,675,813.02 | $19,675,813.02 |
| Lubert-Adler Accrued Interest | $0.00 | $1,394,436.65 | $1,394,436.65 |
| Lubert-Adler Equity | $76,298,706.81 | $8,611,730.28 | $84,910,437.09 |
| Lubert-Adler Preferred Return | $6,384,354.18 | $909,513.44 | $7,293,867.62 |
| Lubert-Adler Profit | $21,413,194.24 | $6,997,723.04 | $28,410,917.28 |
| Total | $109,453,300.09 | $39,374,898.05 | $148,828,198.14 |

In other words, through the Credit Suisse loan transaction, insiders in control of the Debtors took out $148,828,198 of "capital" and replaced it with $148,828,198 of loan debt. SAC, ¶¶ 67-68.

The Trustee alleges that the Tesoro and Quail West Debtors' transfers of that $148,828,198, and of the "Subsidiary Guaranties," mortgages, and other liens they were required to issue in connection with the loan transaction – without receiving any of the loan proceeds in return – were made with actual intent to hinder, delay, and/or defraud present and future creditors, SAC, ¶¶ 11, 69-115.

In addition, the Trustee also alleges that the Tesoro and Quail West Debtors did not receive either fair consideration or reasonably equivalent value for the aforementioned transfers of property. To the contrary, if the Debtors were not already insolvent at the time of the transfers in question, they were rendered insolvent thereby, and were left much too thinly capitalized to survive. SAC, ¶¶ 11, 98-100.[5]

---

[5] The Moving Defendants notably do *not* contend that the Second Amended Complaint fails to allege actual intent – or, for that matter, constructively fraudulent intent – with sufficient particularity.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## ARGUMENT

Trustee Dillworth's Second Amended Complaint herein asserts a series of claims pursuant to 11 U.S.C. § 544(b)(1), which provides in pertinent part that:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law . . . .

Specifically, the Trustee has asserted claims which seek to avoid, under New York and Florida law, the Tesoro and Quail West Debtors' transfers of the $148,828,198 referenced hereinabove, as well as the "Subsidiary Guaranties," mortgages, and other liens they were required to issue in connection with the loan transaction. SAC, ¶ 15, Counts I - IV, VI - IX.[6]

In response, the Moving Defendants have asserted what amounts to three arguments for dismissal of the claims asserted against them:

(I) Contrary to factual allegations made in the Second Amended Complaint, under the Credit Suisse loan transaction documents (the "Loan Documents"), the Debtors were *not* "co-borrowers," they were "mere guarantors," and, therefore, "never had an interest in and never controlled" the loan proceeds distributed to insiders as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits";

(II) This Court's Interim "Challenge Order" effected a "release" and "waiver" of "all claims" relating to the "avoidability" of the "Subsidiary Guaranties," mortgages, and other liens, referred to collectively as the "Debtor Liens";

(III) The "New York Counts" should be dismissed because "the applicable law" is Florida law.

Each of these arguments is addressed in turn below.[7]

---

[6] The Trustee also seeks to recover, pursuant to 11 U.S.C. § 550, the value of the property interests transferred, from those to whom or for whose benefit said interests were transferred. SAC, ¶ 15, Counts V, X.

[7] The Moving Defendants contend that, in evaluating the legal sufficiency of the Second Amended Complaint, the Court may and should look beyond the four corners of the pleading and consider matters of public record and other documents "central" or "integral" to the claims asserted, such as the Loan Documents. We agree. In fact, to cut to the chase, we believe the Court may and should also consider *other* evidence which "go[es] to the heart" of the claims asserted, such as the Ginn and Lubert-Adler Defendants' sworn interrogatory answers in this proceeding, which belie their principal argument for dismissal. *See infra* at pp. 11-12, 15-16.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

I.  **TRUSTEE DILLWORTH'S SECOND AMENDED COMPLAINT ACCURATELY ALLEGES THAT THE TESORO AND QUAIL WEST DEBTORS HAD AN INTEREST IN THE CREDIT SUISSE LOAN PROCEEDS**

In *In re Chase & Sanborn Corp. (Nordberg v. Sanchez)*, 813 F.2d 1177 (11th Cir. 1987), the Eleventh Circuit set out a "flexible" and "pragmatic" framework for determining whether, in the context of a fraudulent transfer, the debtor(s) had an "interest" in the property transferred. "[T]he court must look *beyond* the particular transfers in question to *the entire circumstance* of the transactions," and answer two questions relevant to the issue of "control":

1. Did the transfers at issue "diminish the assets" of the debtor(s)?

2. Would avoidance of the transfers "confer on creditors a windfall" at the expense of the defendants?

813 F.2d at 1180-82 (emphasis added).

Stated another way, "[t]he control test . . . simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are *logical* and *equitable*." *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale)*, 848 F.2d 1196, 1199 (11th Cir. 1988) (citations omitted) (emphasis added).

In this case, the Moving Defendants do not dispute – indeed, they effectively concede – that the Second Amended Complaint contains allegations which, *if taken as true*, would establish that the Tesoro and Quail West Debtors *had* a legal or equitable interest in the loan proceeds at issue. *See* SAC, ¶¶ 8, 56, 65 (alleging that, under the operative Credit Suisse Loan Documents, the Debtors and Other Project Entities were identified as "Full Recourse Borrower Parties," *i.e.*, "co-borrowers," and were "jointly and severally liable for the full $675 million loan amount"); *In re Ohio Bus. Machines, Inc.*, 356 B.R. 786, 2007 WL 177941, at *6 (6th Cir. B.A.P. 2007) ("OBM was a co-borrower of the funds [and therefore] had an interest in the funds transferred[.]"); *In re Tousa, Inc.*, 422 B.R. 783, 872-73 (Bankr. S.D. Fla. 2009) ("If funds are lent to co-borrowers (rather than to a single borrower), each of the co-borrowers has a property interest in the funds.").

-7-

Rather, it is the Moving Defendants' position that, under the operative Loan Documents, the "characterization" of the Tesoro and Quail West Debtors as "co-borrowers" is "just plain wrong," and should therefore be disregarded. Lubert-Adler Defendants' Motion, p. 26-27 [ECF No. 76]; Investor Defendants' Motion, pp. 5-6 [ECF No. 95].

That argument unabashedly seeks to elevate "form" over "substance" in a situation where *neither* the "form" nor the "substance" of the transaction ultimately helps them.

### A. The Moving Defendants' Position is Contradicted by Governing Law and the Plain Language of the Credit Suisse Loan Documents

Under New York law, which governs the interpretation of the Credit Suisse Loan Documents, there is a difference between a contract of "primary" liability and a contract of "secondary" liability. In the context of a loan transaction, for instance, the loan/credit agreement is typically a contract of "primary" liability; whereas "[a] guaranty, by contrast, is a contract of secondary liability[.]" *Weissman v. Sinorm Deli, Inc.*, 88 N.Y. 2d 437, 446, 669 N.E. 2d 242, 246 (N.Y. 1996).

In this case, however, the loan transaction – and loan documents – were anything but typical. While the First and Second Lien Credit Agreements identified the putative "Borrower" as Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. (the shell entities referenced above), the "Subsidiary Guaranties" which the Debtors and Other Project Entities were required to execute explicitly provided for "primary and not secondary" liability for the full $675 million loan amount:

> <u>Nature and Scope of Liability</u>. Guarantor's liability under this Guaranty shall be *primary* and *not secondary*, in the *full amount* of the Guaranteed Obligations [defined as "all Obligations" under the Loan Documents].

Ex. 1, First Lien Credit Agreement, ¶¶ 1.1, 5.11; Ex. 2, Second Lien Credit Agreement, ¶¶ 1.1, 5.11; Ex. 3, First Lien Subsidiary Gty., ¶ 3; Ex. 4, Second Lien Subsidiary Gty., ¶ 3 (emphasis added). That is, under the so-called Subsidiary Guaranties, "*even if Borrower had no liability* at the time of execution of the Loan Documents or later cease[d] to be liable under any Loan Documents . . . ," each of the "Guarantors" was "fully obligated" for "all Obligations" under the Loan Documents. Exs. 3-4, First and Second Lien Subsidiary Gtys., ¶ 5 (emphasis added).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Further departing from the norm, the Credit Suisse Loan Documents also specified that "[both] the Borrower *and* its Subsidiaries" – the supposed "Guarantors" – were responsible for loan repayment, with the Guarantors' assets serving as *the principal source* of loan repayment:

- "The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, rental programs, club, golf club memberships or otherwise) within five (5) Business Days after receipt of such funds into the Company's Operating Account," defined as "one or more Deposit Accounts or securities accounts to be established by the Borrower and its Subsidiaries[,] which shall at all times be subject to a Control Agreement in favor of the Administrative Agent," namely, Credit Suisse;

- "Concurrently with the consummation of any [Borrower or Subsidiary] Asset Sale [as defined below], the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs. . . ."

- "'Asset Sale' means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition (other than Operating Leases entered into in the Ordinary Course of Business) by the Borrower or any of its Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible . . . ."

Exs. 1-2, First and Second Lien Credit Agreements, ¶¶ 1.1, 2.8(B)(ii)(e), 3.3(B)(ii).

Indeed, in later Loan Documents, the Debtors and Other Project Entities were identified as "Full Recourse Borrower Parties" – *not* "mere guarantors" – and were explicitly called upon to "*reaffirm[] and acknowledge[] the obligations to pay*, when due, all principal, interest and fees" owed under the Loan Documents. Ex. 5, Master Restructuring Agreement, ¶ 2 (emphasis added).[8]

---

[8] The Moving Defendants conspicuously do not even attempt to explain how "Full Recourse Borrower Parties" which "reaffirm[ed] and acknowledge[d] the obligations to pay, when due, all principal, interest and fees" owed under the Loan Documents could be deemed anything *other than* "co-borrowers."

-9-

If that were not enough, the same Credit Suisse Loan Documents also belie the assertion that the Debtors "never had any control" over the loan proceeds which were distributed to insiders as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits." Contrary to the Moving Defendants' suggestion, the transfers of loan proceeds at issue in this case were *not* the product of after-the-fact decisions. Nor were they made "independent" of the Debtors. They were an integral part of the loan transaction, which was expressly "conditioned" upon the Debtors' consent and acceptance of "primary" liability for the full $675 million loan amount, and the granting of mortgages and liens on substantially all their assets, without receiving any of the loan proceeds in return:

- The First and Second Lien Credit Agreements explicitly provided that the "term" loan proceeds "*shall* be applied . . . to make certain distributions" totaling "$333,125,000" to insiders of the Debtors and Other Project Entities;

- The Credit Agreements also required – as a "*condition*" of the Loans – that *each Debtor and Other Project Entity grant mortgages and other liens* on all Project assets, and supply Organizational Authorizations "*approving* and *authorizing* the execution, delivery and performance of the Loan Documents to which [it] is a party or by which its assets may be bound"; and

- The so-called Subsidiary Guaranties issued in connection with the transaction additionally recited that:

    "The Lenders *would not make*, and *would not be obligated to make*, the Loan to Borrower *unless Guarantor executed this Guaranty*. This Guaranty is therefore delivered to Lenders, acting through Administrative Agent, to induce the Lenders to make the Loan. . . ."

    "Guarantor acknowledges, represents, and warrants that Guarantor has *had a full and adequate opportunity to review the Loan Documents*, *the transaction contemplated by the Loan Documents* and *all underlying facts relating to such transaction*. . . ."

Exs. 1-2, First and Second Lien Credit Agreements, Recital A, ¶¶ 2.9(A), 3.1(A) & (G)(i); Exs. 3-4, First and Second Lien Subsidiary Gtys., Recital F, ¶ 9 (emphasis added).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Indeed, the Ginn and Lubert-Adler Defendants squarely contradicted their present argument in sworn interrogatory answers served barely a month prior to the filing of their Motions to Dismiss, which attested that:

> *The transfers [of loan proceeds credited against the Tesoro Debtors' accounts] were made pursuant to the terms of the Second Amended and Restated Agreement of Limited Partnership of [Debtor] Ginn-LA St. Lucie Ltd., LLLP* which provided for distributions in the following order of priority:
>
> 1. To the limited partners in repayment of their loans to Debtor Ginn-LA St. Lucie Ltd., LLLP, including interest thereon;
>
> 2. To the limited partners, in proportion to their respective preferred return account balances;
>
> 3. To the partners in proportion to the balance of their unreturned capital contributions; and
>
> 4. The balance to the partners in proportion to their respective percentage interests (i.e., 20% to the general partner and 80% to the limited partners).
>
> \* \* \*
>
> *The transfers [of loan proceeds credited against the Quail West Debtors' accounts] were made pursuant to the terms of the Amended and Restated Agreement of Limited Partnership of Debtor Ginn-LA Quail West Ltd., LLLP* which provided for distributions in the following order of priority:
>
> 1. To the limited partners in repayment of their loans to Debtor Ginn-LA Quail West Ltd., LLLP, including interest thereon;
>
> 2. To the limited partners, in proportion to their respective preferred return account balances;
>
> 3. To the partners in proportion to the balance of their unreturned capital contributions; and
>
> 4. The balance to the partners in proportion to their respective percentage interests (i.e., 20% to the general partner and 80% to the limited partners).

Ex. 6, Ginn Defendants' Responses to First Set of Interrogatories, Int. Nos. 7-9 (emphasis added);

Ex. 7, Lubert-Adler Defendants' Responses to First Set of Interrogatories, Int. Nos. 7-9 (same).

Needless to say, how can the Debtors be found to have lacked a legal or equitable interest in the Credit Suisse loan proceeds at issue in this litigation, if the transfers of those loan proceeds "were made pursuant to the terms of" the lead Debtors' respective operating agreements? Those sworn acknowledgments are, by definition, evidence of a legal or equitable interest, and, respectfully, should end this debate.

Coupled with the detailed factual allegations concerning the Credit Suisse loan transaction, the Defendants' sworn acknowledgments regarding the transfers at issue are *more* than sufficient to satisfy the Eleventh Circuit's flexible and pragmatic "control" test:

| Question | Answer |
| --- | --- |
| 1. Did the transfers "diminish the assets" of the debtor(s)? | Yes. The Defendant insiders took out $148,828,198 of "capital" and replaced it with $148,828,198 of loan debt. |
| 2. Would avoidance of the transfers "confer on creditors a windfall" at the expense of the defendants? | No. "Equity" was paid before creditors, at a time when it was uncertain whether any returns – much less "profits" – would be realized, leaving creditors with the entire risk of loss. |

*See In re Chase & Sanborn Corp. (Nordberg v. Sanchez)*, 813 F.2d 1177, 1181-82 (11th Cir. 1987); *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale)*, 848 F.2d 1196, 1199 (11th Cir. 1988); SAC, ¶¶ 67-77; Exs. 6-7, Ginn / Lubert-Adler Defendants' Resp. to First Set of Ints., Nos. 7-9.[9]

---

[9] Notably, unlike in *In re Chase & Sanborn Corp. (Nordberg v. Sanchez)*, 813 F.2d 1177, 1182 (11th Cir. 1987), where the plaintiff "admit[ted]" that the defendants "were innocent of any intent to diminish the assets of the debtor," in the present case, the Second Amended Complaint expressly alleges that the Credit Suisse loan transaction "was specifically *designed* to enable the Defendants to *loot* the Debtors and Other Project Entities, and to *shift the risks* associated with their Projects *to creditors* . . . [,] leaving Project creditors with *a virtual certainty of loss*." SAC, ¶¶ 74, 77, 119-20, 130-31, 144-45, 155-56 (emphasis added).

### B. While Not Necessary, the Court May Alternatively "Collapse" the Transaction to Reflect the Economic Realities Thereof

It is well established that, on a claim arising in equity, "substance will not give way to form, [and] technical considerations will not [be allowed to] prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 305, 60 S. Ct. 238, 244, 84 L. Ed. 281 (1939) (citations omitted).

Accordingly, in evaluating whether a fraudulent conveyance has been adequately alleged, the conveyance must be viewed *in context*: a court must "step back and evaluate [the] transaction in its entirety [so as] to make sure that [its ultimate] conclusions are logical and equitable." *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale)*, 848 F.2d at 1199 (citation omitted); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("[If] a transfer [wa]s only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'") (citation omitted).

In a recent decision involving analogous issues, Judge Posner similarly observed that "[f]raudulent conveyance doctrine . . . is a *flexible* principle that looks to *substance*, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights . . . ." *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) (quoting Douglas G. Baird, Elements of Bankruptcy, pp. 153-54 (4th ed. 2006)) (emphasis added).

Thus, if the "form" of a multilevel transaction obscures the "substance" of the transaction, a court may effectively "collapse" the transaction, so as to reflect the economic realities thereof. *See, e.g., United States v. Tabor Ct. Realty Corp.*, 803 F.2d 1288, 1302-03 (3d Cir. 1986); *Boyer*, 587 F.3d at 793; *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635-36 (2d Cir. 1995); *In re Joy Recovery Technology Corp.*, 286 B.R. 54, 74-75, 77-78 (Bankr. N.D. Ill. 2002) ("Courts will *eschew appeals to form* which obscure the substance of a [particular] transaction. Thus, a multilevel transaction will be collapsed and *treated as a single transaction* in order to determine if there was a fraudulent conveyance.") (citations omitted) (emphasis added); *In re Mervyn's Holdings, LLC (Mervyn's LLC v. Lubert-Adler Group IV, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010) (same).

In this case, the Ginn / Lubert-Adler / Credit Suisse loan transaction structure was similar to – but in many respects more egregious than – the leveraged buyout ("LBO") transaction structure to which the "collapsing transaction" doctrine is most frequently applied.

In the Credit Suisse loan transaction, the equity owners of the Project Entities ("Party A"), took out hundreds of millions of dollars from a loan made to two shell holding entities ("Party B"), which was "guaranteed" by – and secured by virtually all assets of – the Project Entities ("Party C"). "[T]he owners . . . t[ook] their profits up front by mortgaging their development projects to the hilt." *In re Yellowstone Mtn. Club, LLC*, 2009 WL 3094930, at *3-4; 436 B.R. 598, 655-60, 674-77.

Likewise, in a conventional LBO, the equity owner of the "target" entity ("Party A") sells its interests in that entity for a price paid through a loan to the "acquiring" entity ("Party B") which is guaranteed by and/or secured by some or all of the assets of the "target" entity ("Party C"). *See Boyer*, 587 F.2d at 791-92 ("In a conventional LBO, an investor buys the stock of a corporation from the stockholders with the proceeds of a loan secured by the corporation's own assets. . . ."); *In re Joy Recovery Tech. Corp.*, 286 B.R. at 74-75 ("The essential characteristic of an LBO is that the target company's assets are used to finance the purchase of the company. Typically, the acquirer invests little if any equity, and the shareholders who are bought out are replaced by others as owners of the company, while the risk of insolvency formerly borne by the selling shareholders are shifted to the unsecured creditors because the company assumes a heavier debt to fund the transaction.").

Much as in the present case, when an LBO transaction is subsequently challenged, the original equity owner, Party A, invariably asserts that the transferred loan proceeds were "property" of Party B, not Party C, and, therefore, may not be avoided by a successor to Party C. When that occurs, however, courts routinely invoke the "collapsing transaction" doctrine to reflect the economic realities of the transaction; namely, that the loan proceeds were "property" of Party C. *See, e.g., Boyer*, 587 F.2d at 791-92, 793-94; *In re Joy Recovery Tech. Corp.*, 286 B.R. at 74-75; *Mervyn's LLC*, 426 B.R. at 497-98.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

In *Mervyn's LLC*, for instance, another case involving the Lubert-Adler Fund IV Entities, the presiding Bankruptcy Court did precisely that earlier this year, stating:

- "While the Court will not rule on the merits as to whether the 2004 Sale was a fraudulent transaction, the Court does find . . . the Amended Complaint states facts to support a finding that [Party A] is liable as a transferee in the alleged fraudulent conveyance [of loan proceeds]."

- "[Party A] had constructive knowledge of the transactions that were going to take place subsequent to the conveyance of their membership interest in [Party C] Debtor."

- "[E]ach transactions would [not] have occurred on its own. . . . [They] were each dependent on the others."

- "[T]he Court must also examine the overall financial consequences the transactions have had on creditors. Here, they were devastating . . . . Debtor was subsequently left with working capital as little as $22 million and acquired additional debt totaling over $800 million. . . ."

- "For the above-mentioned reasons, Debtor has successfully established a valid claim . . . for collapsing the transactions surrounding the 2004 Sale such that the Court can find a fraudulent transfer upon proof."

*Mervyn's LLC*, 426 B.R. at 497-98.

The same reasoning is equally applicable to the present set of facts, if not *more* so. In this case, the Ginn / Lubert-Adler Defendants, did not merely have "constructive" knowledge of the "transactions" that were going to take place after the shell "Borrower" entities received the loans, the First and Second Lien Credit Agreements *dictated* that the $510,000,000 in "term" loan proceeds "*shall* be applied" to make "distributions" to insiders of the Debtors and Other Project Entities. Likewise, as discussed above, each of the "transactions" was not only "dependent on the others," they were "*conditioned*" upon the Debtors' and Other Project Entities' consent and acceptance of "primary" liability for the full $675 million loan amount, and the granting of mortgages and liens on substantially all of their respective assets, without receiving any of the loan proceeds in return. Exs. 1-2, First and Second Lien Credit Agreements, Recital A, ¶¶ 2.9(A), 3.1(A) & (G)(i); Exs. 3-4, First and Second Lien Subsidiary Gtys., Recital F, ¶ 9.

-15-

In *In re Best Products Co.*, 157 B.R. 222 (Bankr. S.D.N.Y. 1993), the Bankruptcy Court confronted a similar situation:

> From the outset, it is clear that MONY and Best contemplated a loan to Best and that Best California would serve merely as a conduit for the benefit of MONY. [A] MONY loan officer [noted] that the proposed borrower would be a subsidiary of Best that had yet to be formed and that [said] entity's sole asset would consist of the sublease to Best. . . . [He] also noted that MONY was loaning the $2.2 million to a "shell company," . . . which [was] deemed the "technical borrower." . . .

*Id.* at 229. Relying on the "LBO 'collapsing' cases," the Court then notably went on to rule:

> I *cannot* conclude that Best and MONY intended a loan from MONY to Best California, *a subsidiary with no assets and no accounts*. Rather, at bottom, this transaction was a loan from MONY to Best with Best California serving as a vehicle to "get around" [state] antideficiency rules. . . . *[W]hile the parties to a transaction may intend that, as between themselves, their relationship is to be governed by the labels they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement. . . . This is especially so in bankruptcy, where Congress has defined the legal consequences of commercial relationships. It would be inequitable to allow the parties' choice of label to affect the rights of third parties.*

*Id.* at 229-30 (citations omitted) (emphasis added).

The same "conclusion" follows here. In this case, the shell holding entities which served as the "technical borrowers" were formed for the express purpose of "pooling" Project assets. Their role was that of a conduit, nothing more. In fact, Ginn-LA attorneys expressly stated as much in a "Memorandum" summarizing the federal tax implications of the Credit Suisse loan transaction:

> [If] Credit Suisse had extended the loan[s] directly to each of the project partnerships, and the project partnerships had distributed the loan proceeds directly to the Lubert Adler-Funds and ERG Enterprises, then no disguised sale would have occurred. *The fact that the loan proceeds were channeled through CS Holding Co. and CS Borrower should not change this result.*

Ex. 8, Memo. by Morris, Manning & Martin, LLP to Ginn-LA Representatives (emphasis added).

Thus, were there any doubt here, the Court may and should "collapse" the loan transaction so as to reflect the economic reality that the loan proceeds at issue were "property" of the Debtors. To paraphrase the Eleventh Circuit, any *other* conclusion would not be "logical" or "equitable."

-16-

## II. TRUSTEE DILLWORTH HAS NOT "RELEASED" OR "WAIVED" ANY CLAIMS AGAINST THE DEFENDANTS RELATING TO THE "DEBTOR LIENS"

The Moving Defendants' second argument for dismissal is arguably even *more* disingenuous. The Defendants' representation of what the Court's Interim "Challenge Order" says bears little resemblance to what the Challenge Order *actually* says:

| What Defendants' Say the Challenge Order Says | What the Challenge Order Says |
|---|---|
| "Upon the Trustee's motion . . ., this Court entered orders in the underlying bankruptcy case – which orders have become final – confirming the validity of the Debtor Liens." <br><br> "[T]he Trustee waived 'any and all claims, defenses (including without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability (under sections 510, 544, 545, 547, 548, 549, 550, 552 or 553 of the Bankruptcy Code or otherwise)' of the liens[.]" <br><br> *Lubert-Adler Defendants' Motion to Dismiss*, pp. 3, 10 [ECF No. 76] | "[T]he Trustee, on behalf of himself, as Chapter 7 Trustee, and the Debtors' estates and their successors . . .: (i) release and discharge the *First* Lien Agent and the *First* Lien Lenders, together with their affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to the *First* Lien Credit Agreement, *First* Lien Collateral Documents and all other instruments and documents executed or delivered in connection therewith, (ii) waive any and all claims, defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability (under Sections 510, 544, 545, 547, 548, 549, 550, 552 or 553 of the Bankruptcy Code or otherwise) of the *First* Lien Obligations or the security interests, mortgages, deeds of trust, and liens granted to secure *First* Lien Obligations . . . ." <br><br> "In the event that no objection or complaint is filed prior to the Challenge Period Termination Date: (a) *the waiver and release granted by Paragraph 7 above* shall become final and binding on all parties (including any creditor or any subsequently appointed trustee); (b) the *First* Lien Obligations, and the *First* Lien Agent's and *First* Lien Lenders' Liens in the *First* Lien Collateral shall be valid, perfected, nonavoidable, and in full force and effect, not subject to any claims, counterclaims, setoffs, or defenses; . . . ." <br><br> *Challenge Order*, ¶¶ 7, 8 (emphasis added) <br> Case No. 08-29769-PGH [ECF No. 77] |

-17-

In other words, contrary to the Moving Defendants' suggestion, the Challenge Order only operated to release and discharge the *First* Lien Agent (Credit Suisse) and *First* Lien Lenders from claims relating to the *First* Lien Obligations, and the liens granted to secure those Obligations. It did *not* operate to release the *Second* Lien Agent (Wilmington Trust) or *Second* Lien Lenders from claims relating to the *Second* Lien Obligations or the liens granted to secure *those* Obligations. Nor did it release any other *third-parties* from claims relating to the *First or Second* Lien Obligations or the liens granted to secure the *First or Second* Lien Obligations.

Which, of course, makes sense, as only the *First* Lien Agent and *First* Lien Lenders were providing consideration (post-petition financing) for the releases and waivers granted in ¶¶ 7-8. Neither the *Second* Lien Agent, *Second* Lien Lenders, nor any other *third-party* gave consideration for any release or waiver relating to the Obligations, or the liens granted to secure the Obligations. Quite the contrary, the parties expressly agreed to an "Estate Carve Out" pursuant to which $250,000 was made available for the investigation and pursuit of "litigation," such as the present case. Challenge Order, ¶ 15.

Moreover, and perhaps more importantly, consistent with the text of the Challenge Order, the "Notice" provision therein only made reference to the *First* Lien Agent and *First* Lien Lenders:

> All Creditors and Other Parties in Interest are Notified that FEBRUARY 23, 2009 has been Fixed as a Bar Date ([the] "Challenge Period Termination Date") for the Filing of Any Complaint Objecting to the Validity, Priority, Amount, or Other Aspect of the Pre-Petition Liens and Security Interests Encumbering the Debtors' Assets Held by the *First* Lien Agent and *First* Lien Lenders. See Paragraph 8 below.

Challenge Order, p. 1 (emphasis added). Under Bankruptcy Rule 9019, any release of third-parties would have required additional "notice" to creditors "and a hearing," *neither* of which occurred. Fed. R. Bankr. P. 9019(a) ("Compromise. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, [etc.].").

Thus, there is no conceivable basis for a finding of "release" or "waiver" as to the claims against the Defendants relating to the "Debtor Liens."

-18-

### III.   THE "CHOICE OF LAW" ARGUMENT IS MOOT

Trustee Dillworth asserted claims under 11 U.S.C. § 544(b)(1) which apply New York law because the Credit Suisse Loan Documents contain numerous provisions invoking New York law, and in order to avoid being whipsawed by an argument that he "chose the wrong law."

If counsel for the Defendants are prepared to stipulate to the applicability of Florida's UFTA, as appears to be the case, we will voluntarily dismiss the "New York Counts" (*i.e.*, I, II, VI, and VII) in favor of the "Florida Counts" (III, IV, VIII, and IX).

\* \* \*

WHEREFORE, Trustee Dillworth respectfully requests that this Court enter an Order denying the Ginn, Lubert-Adler, and Investor Defendants' Motions to Dismiss, except as to the "choice of law" issue, which should be addressed by stipulation and voluntary dismissal.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Dated: November 11, 2010

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.

Attorneys for Drew M. Dillworth
Chapter 7 Trustee of the Tesoro Debtors' Estates
and the Quail West Debtors' Estates

Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile:  (305) 789-3395

I hereby certify that I am admitted to the Bar of
the United States District Court for the Southern District
of Florida and I am in compliance with the additional
qualifications to practice in this Court set forth in
Local Rule 2090-1(A).

By: /s/ Harold D. Moorefield
    EUGENE E. STEARNS
    Fla. Bar No. 149335
    estearns@stearnsweaver.com
    HAROLD D. MOOREFIELD, JR.
    hmoorefield@stearnsweaver.com
    MATTHEW W. BUTTRICK
    Fla. Bar No. 176028
    mbuttrick@stearnsweaver.com
    ANDREW E. STEARNS
    Fla. Bar No. 661651
    astearns@stearnsweaver.com

-20-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200