# EXHIBIT 1

# FIRST LIEN CREDIT AGREEMENT
# (EXCERPTS)

EXECUTION VERSION

# FIRST LIEN CREDIT AGREEMENT

## DATED AS OF JUNE 8, 2006

### Among

### GINN-LA CS BORROWER, LLC

### and

### GINN-LA CONDUIT LENDER, INC.
collectively, as the Borrower,

### THE LENDERS LISTED HEREIN,
as the Lenders,

### CREDIT SUISSE, CAYMAN ISLANDS BRANCH
as Administrative Agent and Collateral Agent

### and

### CREDIT SUISSE SECURITIES (USA) LLC,
as Paying Agent, Fronting Bank, Sole Lead Arranger and Sole Bookrunner,

### $525,000,000 SENIOR FIRST LIEN CREDIT FACILITY

CREDIT AGREEMENT

EXECUTION VERSION

# CREDIT AGREEMENT

This **FIRST LIEN CREDIT AGREEMENT** (this "**Agreement**") is dated as of June 8, 2006 and entered into by and among **GINN-LA CONDUIT LENDER, INC.**, a Delaware corporation, and **GINN-LA CS BORROWER, LLC**, a Delaware limited liability company (collectively, the "**Borrower**"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (each individually, together with its successors and assigns referred to herein as a "**Lender**" and collectively, together with their successors and assigns, as the "**Lenders**"), **CREDIT SUISSE, CAYMAN ISLANDS BRANCH** ("**Credit Suisse**"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns, the "**Administrative Agent**") and as collateral agent (in such capacity, together with its successors and assigns, the "**Collateral Agent**"), **CREDIT SUISSE SECURITIES (USA) LLC**, as lead arranger for the Lenders (in such capacity, together with its successors and assigns, the "**Arranger**") as paying agent (in such capacity, together with its successors and assigns, the "**Paying Agent**"), as fronting bank (in such capacity, together with its successors and assigns, the "**Fronting Bank**"), and as sole bookrunner (in such capacity, together with its successors and assigns, the "**Bookrunner**"; together with the Administrative Agent, the Arranger, the Collateral Agent and the Paying Agent, the "**Agents**") for the Lenders.

## R E C I T A L S

**A.** **WHEREAS**, the Borrower desires that the Lenders extend certain senior term loans (Tranche B) to the Borrower hereunder, the proceeds of which, together with the proceeds of the loans under the Second Lien Credit Agreement will be used: (i) to repay the Existing Indebtedness of the Borrower and its Subsidiaries, (ii) to make certain distributions to the holders of the Capital Stock of the Borrower, and (iii) to pay the Transaction Costs.

**B.** **WHEREAS**, the Borrower desires that the Lenders extend certain senior "synthetic revolving" loans (Tranche A) to the Borrower hereunder, the proceeds of which may be used to finance a portion of the development, construction and other costs associated with each Project and to fund general company and working capital needs of the Borrower and its Subsidiaries; and

**C.** **WHEREAS**, the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrower subject to the terms and conditions contained herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, and for ten dollars and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree to enter into this Credit Agreement as follows:

## SECTION 1.
## DEFINITIONS

### 1.1    Certain Defined Terms.

The following terms used in this Agreement shall have the following meanings:

"**Account Holder**" means a financial institution reasonably acceptable to Administrative Agent at which certain Deposit Accounts and/or securities accounts will be maintained, it being understood and agreed that Colonial Bank and First Caribbean Bank are acceptable to Administrative Agent.

7

EXECUTION VERSION

"**Applicable Percentage**" means, (a) with respect to any Tranche A Lender for purposes of Section 2 or the calculation of the Tranche A LC Exposure or the Tranche A Exposure, or in respect of any indemnity claim arising out of an action or omission of the Fronting Bank under this Agreement, the percentage of the Tranche A Funding Amounts represented by such Tranche A Lender's Tranche A Funding Amount, and (b) with respect to any Lender in respect of any indemnity claim arising out of an action or omission of the Paying Agent under this Agreement, the percentage of the total of the Tranche A Funding Amounts and the aggregate principal amount of the Tranche B Loans represented by the respective aggregate amounts thereof held by such Lender. If the Tranche A Funding Amounts have been reduced to zero, the Applicable Percentages shall be determined based upon the Tranche A Funding Amounts most recently in effect, giving effect to any assignments. If the Tranche B Loans have been paid in full, the Applicable Percentages shall be determined based upon the principal amounts of the Tranche B Loans outstanding immediately before their payment in full, giving effect to any assignments.

"**Appraised Value**" means the "Total Net Value" (as defined in the Initial Appraisal) of the Real Property Collateral as determined by the Appraiser in the most recent and available Qualified Appraisal Update. As of the Effective Date, the Appraised Value of the Real Property Collateral based on the Initial Appraisal is $1,500,000,000.

"**Appraiser**" means, collectively, Cushman & Wakefield of Florida, Inc. and Cushman & Wakefield of Georgia, Inc., or such other independent appraisal firm selected by the Administrative Agent.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition (other than Operating Leases entered into in the Ordinary Course of Business) by the Borrower or any of its Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, any Capital Stock of the Borrower or the Borrower's Subsidiaries.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit IV annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Bahamas Borrower**" means Ginn-LA Conduit Lender, Inc. a Delaware corporation.

"**Bahamas Intercompany Indebtedness**" means Indebtedness pursuant to which Bahamas Owner is liable to Bahamas Borrower in a maximum amount from time to time of up to $276,750,000 to fund (1) Project Expenses associated with the construction and development of the Residential Lots located at the Project commonly known as Grand Bahamas (West End) and (2) other Project Expenses incurred by the Borrower or its Subsidiaries from time to time; provided that, (a) no Default or Event of Default has occurred and is continuing as of the time of the incurrence thereof or would result therefrom and (b) all such intercompany Indebtedness between the Bahamas Borrower and the Bahamas Owner shall be evidenced by a promissory note and secured by a mortgage, each of which shall have been pledged to the Collateral Agent pursuant to the Collateral Assignment of Mortgage and Note and such other documentation as Administrative Agent may reasonably require.

CREDIT AGREEMENT

"**Commercial Parcel**" means a parcel contemplated to be developed for commercial (i.e., retail, office or similar) purposes at the Project commonly known as Hammock Beach River Club, which lots are described as Parcel 1A and Parcel 1B in the Unit Development Agreement, executed as of January 17, 2006 for such Project.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in Section 2.2 of this Agreement.

"**Company's Operating Account**" means one or more Deposit Accounts or securities accounts to be established by the Borrower and its Subsidiaries pursuant to and in accordance with Section 5.21, which shall at all times be subject to a Control Agreement in favor of the Administrative Agent.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit V annexed hereto delivered to the Administrative Agent by the Borrower pursuant to Sections 5.3(iv), 5.3(xi), and 5.3(xvii).

"**Condemnation Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Condo Parcel**" means one or more parcels designated for development as approximately 100 condominium units at the Project commonly known as Tesoro, 300 condominium units at the Project commonly known as Laurelmor and 4396 condominium units at the Project commonly known as Grand Bahama (West End).

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited, less the portion of any such obligation that has been discharged or performed as of the date of determination.

"**Contractor**" means any contractor providing materials or services under a Material Contract.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

13

**CREDIT AGREEMENT**

"**Control Agreement**" means an account control agreement substantially in the form of Exhibit XXI or otherwise in form and substance acceptable to the Administrative Agent.

"**Credit Suisse**" means Credit Suisse, Cayman Islands Branch, or one or more of its other branches and any Affiliate thereof.

"**Debt Service**" means, for any period, all payments of interest and all scheduled payments of principal made during such period for all Indebtedness of the Borrower and its Subsidiaries (including, without limitation, the Indebtedness evidenced by the Loan Documents), but excluding all mandatory prepayments under Section 2.8(B)(ii).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Developer**" means Ginn Development Company, LLC or such other Affiliate of the Borrower providing development consultant services pursuant to a Development Agreement or similar agreement.

"**Disbursement Authorization**" means a notice in the form of Exhibit IX annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.3 with respect to a proposed borrowing.

"**Disbursement Date**" means any Business Day specified by the Borrower as a date on which the Borrower delivers a Disbursement Authorization.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Effective Date**" means such date on or prior to June 8, 2006, on which the conditions to effectiveness set forth in Section 3.1 are satisfied.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course of its business and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed) and so long as no Default or Event of Default has occurred and is continuing, approved by the Borrower (such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any of its Subsidiaries or, so long as no Event of Default has occurred and is continuing, any Borrower Competitor, other than any such Person that is a Lender as of the Effective Date.

14

"**Investment**" means (a) any direct or indirect purchase or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, Capital Stock or other Securities of any other Person, or (b) any direct or indirect loan, advance (other than advances to employees for moving, education, computer, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business) or capital contribution by the Borrower or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**LC Disbursement**" means a payment made by the Fronting Bank pursuant to a Letter of Credit.

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1; provided that the term "Lenders", when used in the context of a particular Loan Commitment shall mean the Lenders having that Loan Commitment.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrower promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrower and the Administrative Agent.

"**Letter of Credit**" has the meaning set forth in Section 2.5.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan Commitment**" means the commitment of a Lender to make a Loan to the Borrower pursuant to Section 2.2 (including the commitment of any Eligible Assignee to participate with respect to a Loan as part of the primary syndication).

"**Loan Documents**" means this Agreement, the Notes and the Collateral Documents or other documents evidencing or securing Obligations.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Party**" or "**Loan Parties**" means the Borrower and any of its Subsidiaries who executes any of the Loan Documents.

"**Loans**" mean the loans outstanding or made by the Lenders pursuant to Section 2.2.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Master Declarations**" has the meaning assigned to that term in Section 4.39 as they may be further amended, supplemented, amended and restated or otherwise Modified from time to time.

22

**CREDIT AGREEMENT**

"**Net Cash from Operations**" means, for any period, (i) the (A) gross operating revenues (not including, for the avoidance of doubt, any amounts taken into account in determining Cash From Project Sales) actually received by the Borrower and its Subsidiaries during such period with respect to the Golf Courses, the Membership Clubs, any improvements hereafter constructed by the Borrower or any of its Subsidiaries as a part of each Project; (B) any royalty payments under contracts with third party or Affiliate contractors (including, without limitation, any royalties received under the Borrower's and the Subsidiaries' "featured builder" program), and any related amenities; (C) Cash Proceeds received from the sale of golf and general and social club memberships relating to each Project (provided, however that such Cash Proceeds received from any such sale shall only be included in Net Cash from Operations to the extent such Cash Proceeds have not been previously accounted for in connection with the initial sale of the applicable golf, general and/or social club membership); and (D) Cash received as a result of payments of principal, interest and other payments (including, without limitation, all mandatory prepayments) made to Bahamas Borrower by Bahamas Owner under the Bahamas Intercompany Indebtedness, less (ii) all cash amounts of any kind whatsoever paid during such period by the Borrower and its Subsidiaries (including both operating expenses and capital expenditures) but excluding any cash amounts paid from any reserves previously set aside by the Borrower and its Subsidiaries (not including, however, Project Expenses or amounts deducted from Cash EBITDA for purposes of determining Excess Cash Flow.

"**Non-Consenting Lender**" has the meaning assigned to that term in Section 9.5B.

"**Notes**" means (a) the promissory notes of the Borrower issued pursuant to Section 2.3C on the Effective Date and (b) any promissory notes issued by the Borrower in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit VIII annexed hereto, as they may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit X annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.6D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent or otherwise required hereunder, Hedge Agreements, whether for principal, interest or payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organization for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and (c) if such person is one of the Borrower or a Subsidiaries of the Borrower, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

24

**CREDIT AGREEMENT**

EXECUTION VERSION

**B.    Other Fees.**  The Borrower agrees to pay to the Administrative Agent, the Collateral Agent and the Paying Agent, for their own respective accounts, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and each of the Administrative Agent, the Collateral Agent and the Paying Agent.

**C.    General.**  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Paying Agent (or to the Fronting Bank, in the case of fees payable to it) for distribution, in the case of fees payable under Section 2.7A, to the Lenders entitled thereto.  Fees paid shall not be refundable under any circumstances.

## 2.8    Repayments and Prepayments; General Provisions Regarding Payments; Call Protection.

**A.**    Scheduled Payments of Loans.

The Borrower shall make principal payments on the Tranche B Loans in installments in amounts equal to a percentage of the Tranche B Loans funded on the Effective Date as set forth below and on the dates set forth below:

| DATE | AMORTIZATION SCHEDULE |
|------|------------------------|
| September 30, 2006<br>December 31, 2006 | .25%<br>.25% |
| March 31, 2007<br>June 30, 2007<br>September 30, 2007<br>December 31, 2007 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2008<br>June 30, 2008<br>September 30, 2008<br>December 31, 2008 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2009<br>June 30, 2009<br>September 30, 2009<br>December 31, 2009 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2010<br>June 30, 2010<br>September 30, 2010<br>December 31, 2010 | .25%<br>.25%<br>.25%<br>.25% |
| March 30, 2011 | .25% |
| Maturity Date | Remaining Principal (after giving effect to any voluntary or mandatory prepayments in accordance with Section 2.8C) |

If any of the dates above are not a Business Day, then the applicable installment shall be made on the preceding Business Day.  Any voluntary or mandatory prepayments of the Loans in accordance with Section 2.8B shall be applied to the next succeeding scheduled installment of

52

**CREDIT AGREEMENT**

EXECUTION VERSION

principal of the Tranche B Loans set forth above, with any remaining prepayment amount applied to the next following scheduled installment or installments until the full amount of the prepayment has been applied. The final installment on the Maturity Date specified above for the repayment by the Borrower of the Loans shall be in an amount sufficient to repay all amounts owing by the Borrower under this Agreement with respect to the Loans.

**B.    Prepayments**.

(i)    Voluntary Prepayments.

(a)    The Borrower may at any time and from time to time prepay, without premium or penalty, the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; provided, however, that in the event the Borrower elects to prepay a Eurodollar Rate Loan other than on the expiration of the Interest Period applicable thereto, the Borrower shall, at the time of such prepayment, also pay any amounts payable under Section 2.10D hereof. The Borrower shall notify the Administrative Agent, in writing or by telephone, promptly confirmed in writing to the Administrative Agent, no later than 11:00 a.m. (New York time) at least one (1) Business Day prior to such prepaying. The Administrative Agent will promptly notify each Lender upon receipt of such notice from the Borrower. Any notice of prepayment shall be irrevocable and having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein, provided, however that the Borrower may revoke any such notice of prepayment if conditioned upon a refinancing as described in Section 2.8D below. Any voluntary prepayments pursuant to this Section 2.8B(i) shall be applied as specified in Section 2.8C, provided, however that in connection with any voluntary prepayments by the Borrower pursuant to this Section 2.8B(i), such voluntary prepayments shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case, in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

(b)    Call Protection. In the event that the Tranche B Loans are repaid or prepaid pursuant to Sections 2.8B(i) or 2.8B(ii) hereof, on or prior to June 30, 2007, the Borrowers shall pay to the Lenders a prepayment premium in the amount of 1.0% of the principal amount repaid or prepaid. For the avoidance of doubt, such prepayment premium shall not be payable in connection with the repayment or Tranche A Loans.

(ii)    Mandatory Prepayments.

The Tranche B Loans shall be prepaid in the manner provided in Section 2.8C upon the occurrence of the following circumstances:

(a)    Prepayments Due to Issuance of Debt. Concurrently with and as a condition to the closing of any transaction pursuant to which Borrower or any of its Subsidiaries issue debt Securities or incur additional borrowed Indebtedness (other than Indebtedness permitted under Section 6.1 for which no prepayment shall be required), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the principal amount of such debt Securities or borrowed Indebtedness paid or payable to the Borrower or its Subsidiaries; less (ii) Permitted Transaction Costs. Such prepayment shall not be deemed to waive any violation of Section 6.1 hereof.

53

CREDIT AGREEMENT

(b)    Prepayments Due to Issuance of Equity Securities or Intercompany Subordinated Debt. Concurrently with and as a condition to the closing of any transaction pursuant to which the Borrower or any of its Subsidiaries receive any Equity Proceeds or proceeds of Intercompany Subordinated Debt, the Borrower shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds, provided, however that any Equity Proceeds or proceeds of Intercompany Subordinated Debt received by (i) the Borrower from Investments made, from time to time, by the existing holders of the Capital Stock in the Borrower as of the Effective Date or (ii) the Borrower's wholly-owned Subsidiaries from Investments made by the Borrower or another of its Subsidiaries in such Subsidiaries and permitted under Section 6.3, in each case, may be retained by the Borrower or such Subsidiary, provided, however that such Equity Proceeds or proceeds from Intercompany Subordinated Debt are used for (A) Project Expenses or Bahamas Project Expenses in a manner consistent with the Project Projections, (B) for purposes of purchasing additional Real Property Collateral to the extent designated in an Officer's Certificate by a Responsible Officer of the Borrower to be used for such purpose, which purchase shall occur prior to one calendar year following the date of such Investment and which Real Property Collateral will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof, or (C) for purposes of making voluntary prepayments in accordance with Section 2.8B(i) hereof.

(c)    Prepayments Due to Insurance and Condemnation Proceeds. No later than the fifth (5th) Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any cash payments which exceed $5,000,000 (i) under any insurance policy as a result of any damage to or loss of (a "**Casualty**") all or any portion of the Collateral (the "**Insurance Proceeds**"), or (ii) resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof, "**Condemnation Proceeds**") (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a "**Recovery Event**"), the Borrower shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received, unless, in each case, the Borrower shall have delivered a Reinvestment Notice. Concurrently with any prepayment of Loans pursuant to this Section 2.8B(ii)(c), the Borrower shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

(d)    Prepayments from Excess Cash Flow. In the event that there shall be Excess Cash Flow with respect to any Fiscal Quarter, the Borrower shall, no later than the date upon which the Borrower is required to deliver financial statements under Section 5.3(ii) and (iii) with respect to such Fiscal Quarter, prepay the Loans in an aggregate amount equal to 100% of such Excess Cash Flow provided that, at the point at which such prepayment of Excess Cash Flow results in the occurrence of the Trigger Date Events on such date, such prepayment obligations shall be reduced to 50% of such Excess Cash Flow.

(e)    Prepayments Due to Asset Sales. Concurrently with the consummation of any Asset Sale (except with respect to Permitted Collateral Asset Sales or Required Releases to the extent the proceeds thereof constitute Excess Cash Flow), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs. Such prepayment shall not be deemed to waive any violation of Section 6.8 hereof.

Any Lender may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) at least seven (7) Business Days prior to the applicable prepayment date,

54

to decline such Lender's portion of such mandatory prepayment. Failure of any Lender to provide such notice to decline shall be deemed an election by such Lender to accept its portion of such mandatory prepayment. In the event one or more Lenders elect to decline to accept such mandatory prepayment, the aggregate amount of the mandatory prepayment that would have been applied to prepay the Loans but was so declined shall be re-offered to those Lenders under this Agreement who initially accepted (or were deemed to have accepted) such mandatory prepayment (such re-offer to be made to each such Lender based on the percentage which such Lender's Loans represents of the aggregate Loans of all such Lenders who have initially accepted such prepayment). In the event of such a re-offer, the relevant Lenders may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) within two (2) Business Days of receiving notification of such re-offer, to decline all of the amount of such prepayment that is re-offered to them, in which case the aggregate amount of the mandatory prepayment that would have been applied to prepay such Loans pursuant to such re-offer but was so declined shall be retained by the Borrowers to be used for any other purpose not prohibited by this Agreement (including without limitation distributions or repayment of Intercompany Subordinated Debt to the Permitted Holders if permitted or voluntary prepayments pursuant to Section 2.8B(i)).

In connection with any mandatory prepayments by the Borrower of the Tranche B Loans pursuant to Section 2.8B(ii) such prepayments shall be applied on a pro rata basis to the then outstanding Tranche B Loans being prepaid irrespective of whether such outstanding Tranche B Loans are Base Rate Loans or Eurodollar Rate Loans; provided that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.8B(ii) then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Tranche B Loans that are Base Rate Loans to the full extent thereof before application to Tranche B Loans that are Eurodollar Rate Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

(iii)    No Waiver. Nothing contained in Section 2.8B(ii) shall be deemed to permit the Borrower to consummate any Asset Sale unless otherwise permitted under this Agreement.

## C.    Application of Prepayments.

Each payment received by Collateral Agent or Administrative Agent from the Borrower with respect to the Loans shall be applied in the following order: First, any prepayment premiums; second, to the payment of any late charges due and payable hereunder; third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder); fourth, to the payment of accrued and unpaid interest; fifth, to fund any reserves or escrows required by Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; sixth, to payment of any Eurodollar breakage costs incurred by Lenders on account of such payment; seventh, to reduction of the outstanding principal balance of the Tranche A Loans; and eighth, to the reduction of the outstanding principal balance of the Tranche B Loans (provided that any outstanding principal balance under the Tranche A Loans has been paid in full). All such funds shall be deposited into the Company's Operating Account to be used for the purposes provided by this Agreement. Notwithstanding the foregoing, (A) if an Event of Default has occurred and is continuing, Collateral Agent may apply any payments received in such order or proportion as Collateral Agent, in Collateral Agent's sole discretion, may determine, and (B) as among the Lenders, such payments shall be applied in accordance with Section 2.8D(iii) below.

**2.9     Use of Proceeds**.

      **A.     Tranche B Loans**.  The proceeds of the Tranche B Loans made to the Borrower shall be applied, together with the proceeds of the loans made pursuant to the Second Lien Credit Agreement, (i) to repay the Existing Indebtedness of the Borrower, its Subsidiaries and Bahamas Owner, (ii) to make certain distributions to the holders of Capital Stock in the Borrower in the amount of the $333,125,000, and (iii) to pay the Transaction Costs.

      **B.     Tranche A Loans**.  The proceeds of the Tranche A Loans made to the Borrower shall be applied to fund Project Expenses and Bahamas Project Expenses and for general company and working capital needs of the Borrower, its Subsidiaries and Bahamas Owner in a manner consistent with the Project Projections.

      **C.     Compliance With Laws.**  The Borrower undertakes that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

      **D.     Margin Regulations.**  Without limiting the generality of Section 2.9A and B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrower or any of its Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**2.10     Special Provisions Governing Eurodollar Rate Loans**.

      Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

      **A.     Determination of Applicable Interest Rate**.  As soon as practicable after 11:00 A.M. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

      **B.     Inability to Determine Applicable Interest Rate**.  In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate, the Administrative Agent shall, on such date, give notice (by telecopy or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower; provided, however that, at the option of the Borrower, any such Disbursement Authorization may be re-submitted to the Administrative

**2.14    Break Funding Payments**.

In the event of the reduction of any Tranche A Credit-Linked Deposit other than on the last day of an Interest Period, the Borrower shall compensate the Paying Agent for the loss, cost and expense attributable to such event; provided, however, Borrower shall not be required to compensate the Paying Agent if such event is not the result of Borrower's Default or Borrower's failure to pay any amounts due in connection with any Tranche A Loans or Letters of Credit.  Such loss, cost or expense may, at the option of the Paying Agent, be deemed to include an amount determined by the Paying Agent to be the excess, if any, of (i) the amount of interest which would have accrued on such Tranche A Credit-Linked Deposit had such event not occurred, at the Eurodollar Base Rate that would have been applicable to such Tranche A Credit-Linked Deposit, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Paying Agent would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of the Paying Agent setting forth any amount or amounts that the Paying Agent is entitled to receive pursuant to this Section 2.14 shall be delivered to the Borrower and shall be conclusive absent manifest error.  In the event the Borrower shall fail to pay any amount due to the Paying Agent under this Section 2.14, the interest payable by the Paying Agent to the Tranche A Lenders on their Tranche A Credit-Linked Deposits under Section 2.1D shall be correspondingly reduced and the Tranche A Lenders shall without further act succeed, ratably in accordance with their Applicable Percentages, to the rights of the Paying Agent hereunder with respect to such amount.

## SECTION 3.
## CONDITIONS TO EFFECTIVENESS

**3.1    Conditions to Effectiveness on the Effective Date**.

The effectiveness of this Agreement, and the obligation of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A.    Organizational Documents**.  On or before the Effective Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following with respect to itself and its Subsidiaries, each, unless otherwise noted, dated the Effective Date:

(i)    a certified copy of the Organizational Documents of the Borrower and each of its Subsidiaries certified as of the Effective Date by a Responsible Officer of the Borrower, dated a recent date prior to the Effective Date;

(ii)    certified copies of the Organizational Certificate of the Borrower and each of its Subsidiaries, together with a good standing certificate from the applicable Governmental Authority of their jurisdictions of incorporation, organization or formation, each state or jurisdiction in which any of their Real Property Assets are located, and each other state or jurisdiction in which they are qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(iii)    copies of the Organizational Authorizations of the Borrower and each of its Subsidiaries approving and authorizing the execution, delivery and performance of the Loan Documents to which each Borrower and Subsidiary is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by a

65

**CREDIT AGREEMENT**

EXECUTION VERSION

Responsible Officer of such Borrower or Subsidiary as being in full force and effect without Modification;

(iv)    incumbency certificates of the officers of the Borrower and its Subsidiaries executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(v)    executed originals of this Agreement and the other Loan Documents to which the Borrower and its Subsidiaries is a party that are to be delivered on the Effective Date;

(vi)    certified copies of each of the other Loan Documents to which the Borrower or its Subsidiaries is a party that are to be delivered on the Effective Date; and

(vii)    such other documents as the Administrative Agent may reasonably request.

**B.    Intentionally Deleted.**

**C.    Consummation of Transactions.**

(i)    (a) each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)    $150,000,000 shall have been borrowed by the Borrower pursuant to the Second Lien Credit Agreement;

(iii)    simultaneously with funding of the Loans, the obligations of the lenders under the Existing Indebtedness shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iv)    simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(v)    after giving effect to the Transactions and the other transactions contemplated hereby, the Borrower and its Subsidiaries shall have no outstanding Indebtedness or preferred stock other than (a) the Loans under this Agreement and the loans under the Second Lien Credit Agreement, and (b) the Indebtedness permitted under Section 6.1.

**D.    Lender Signatures.**    The following Persons shall have executed and delivered this Agreement:

(i)    the Lenders; and

(ii)    the Agents.

66

EXECUTION VERSION

E.    **Necessary Consents.** The Borrower shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrower and its Subsidiaries, all applicable appeal periods shall have expired and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent. Such approvals and consents shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)    executed consents from any Person required in connection with the Collateral Documents;

(ii)    executed consents from any Person required in connection with the Security Agreement;

(iii)    executed consents and estoppels as set forth on Schedule 3.1E annexed hereto; and

(iv)    executed consents from any Person required in connection with any Indebtedness permitted under Section 6.1 and not extinguished in full on the Effective Date.

F.    **Perfection of Security Interests.** The Borrower shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Collateral Documents. Such actions shall include: (i) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (ii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made.

G.    **Real Property.** The Administrative Agent shall have received on or prior to the Effective Date from the Borrower and each applicable Loan Party:

(i)    Mortgages. Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of the appropriate county or counties in the state where the applicable Real Property Collateral is located, encumbering the Real Property Collateral listed on Schedule 3.1.G, in each case in form and substance satisfactory to the Collateral Agent;

67

**CREDIT AGREEMENT**

**3.3**    **Conditions to Disbursements from the Company's Operating Account**.

**A.    General.**  The Borrower has established, and hereafter agrees to continue to maintain the Company's Operating Account.  The Borrower hereby grants a security interest to the Administrative Agent in the Company's Operating Account to secure the Obligations.  Concurrently with the execution of this Agreement, the Borrower has entered into a Control Agreement with respect to the Company's Operating Account with the Collateral Agent and the Account Holder substantially in the form of Exhibit XXI attached hereto.

**B.    Investments, Withdrawals and Deposits.**

(i)    The Borrower may direct the Account Holder regarding investment of funds contained in the Company's Operating Account in Cash Equivalents (to the extent available in such account), provided, however, that such direction may be required to be accomplished through direction to the Administrative Agent, who will subsequently direct the Account Holder regarding the same.  At any time prior to the occurrence and continuance of an Event of Default, the Borrower shall have the right to withdraw funds from the Company's Operating Account to be used in a manner consistent with the Project Projections or for purposes of purchasing additional Real Property Collateral, which will be pledged as collateral to secure the Borrrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof.

(ii)    The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, rental programs, club, golf club memberships or otherwise) within five (5) Business Days after receipt of such funds into the Company's Operating Account.

**C.    Priority of Distributions.**  In the event that the Lenders elect to exercise their remedies under Section 8, the funds contained in the Company's Operating Account shall be applied (a) first, to the reasonable expenses of the Administrative Agent, (b) second, to the payment of any late charges due and payable hereunder, (c) third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder), (d) fourth, to the payment of accrued and unpaid interest (e) fifth, to the outstanding principal amount of, and interest on, the Tranche A Loans until the same are paid in full, (f) sixth, to the outstanding principal amount of, and interest on the Tranche B Loans until the same are paid in full, (g) seventh, to the other Obligations until the same are paid in full, and then (h) eighth, after all Obligations of the Borrower under this Agreement and the Loan Documents shall have been paid in full, returned to the Borrower or the other Persons legally entitled thereto.

# SECTION 4.
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans and to induce the other Lenders to purchase participations therein, the Borrower represents and warrants to each Lender, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

CREDIT AGREEMENT

EXECUTION VERSION

**5.11    Subsidiaries.**

As of the Effective Date, the Subsidiaries of the Borrower are as set forth on Schedule 4.5. The Borrower will not form (or permit to be formed) any new Subsidiaries after the Effective Date without first receiving the prior written consent of the Administrative Agent, which consent the Administrative Agent may condition upon, among other things, (i) such new Subsidiaries executing a guaranty (in form and substance satisfactory to the Administrative Agent) of the Borrower's Obligations, (ii) the Borrower executing a pledge of the Capital Stock of such Subsidiaries, and (iii) such further action and such further documents and instruments as may be required to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority security interest in all of the: (a) personal property assets of such Subsidiaries; (b) real property assets owned by such Subsidiaries; and (c) leasehold interests owned by such Subsidiaries. With respect to any Subsidiary approved by the Administrative Agent, the Borrower shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Subsidiary's Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing such guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or rescinded, and (ii) a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Collateral Agent and its counsel, as to (a) the due organization and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the parent of such Subsidiaries in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents, and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel. In addition, the Borrower shall promptly deliver a supplement to Schedule 4.1 to the Administrative Agent if any Subsidiary is created or acquired, if applicable.

**5.12    Interest Rate Protection.**

At all times, commencing one hundred-eighty (180) days after the Effective Date, the Borrower (through itself or one of the Subsidiaries) shall maintain in effect one or more interest rate Hedge Agreements (which, to the extent secured by the Collateral, shall be with the Administrative Agent or the Lenders, or any of their respective Affiliates) in form and substance reasonably satisfactory to the Administrative Agent with respect to an aggregate principal amount equal to at least 50% of the aggregate outstanding principal amount of the Tranche B Loan and the loans under the Second Lien Credit Agreement. Such Hedge Agreements shall be maintained for two (2) years after the Effective Date in a form and with a counterparty acceptable to the Administrative Agent in its reasonable discretion.

**CREDIT AGREEMENT**

**GINN-LA CS BORROWER, LLC**,
a Delaware limited liability company

By: _____
Name: Robert F. Masters
Title:  Manager

First Lien Credit Agreement

**GINN-LA CONDUIT LENDER, INC.,**
a Delaware corporation

By: _Robert Masters_
Name: Robert F. Masters
Title:  President

First Lien Credit Agreement

# EXHIBIT 2

## SECOND LIEN CREDIT AGREEMENT
## (EXCERPTS)

# SECOND LIEN CREDIT AGREEMENT


## DATED AS OF JUNE 8, 2006

### Among


### GINN-LA CS BORROWER, LLC


### and


### GINN-LA CONDUIT LENDER, INC.
collectively, as the Borrower,


### THE LENDERS LISTED HEREIN,
as the Lenders,


### CREDIT SUISSE, CAYMAN ISLANDS BRANCH
as Administrative Agent and Collateral Agent

### and

### CREDIT SUISSE SECURITIES (USA) LLC,
as Sole Lead Arranger and Sole Bookrunner,


## $150,000,000 SENIOR SECOND LIEN CREDIT FACILITY

**SECOND LIEN**

**CREDIT AGREEMENT**

This **SECOND LIEN CREDIT AGREEMENT** (this "**Agreement**") is dated as of June 8, 2006 and entered into by and among **GINN-LA CONDUIT LENDER, INC.**, a Delaware corporation, and **GINN-LA CS BORROWER, LLC**, a Delaware limited liability company (collectively, the "**Borrower**"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (each individually, together with its successors and assigns referred to herein as a "**Lender**" and collectively, together with their successors and assigns, as the "**Lenders**"), **CREDIT SUISSE, CAYMAN ISLANDS BRANCH** ("**Credit Suisse**"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns, the "**Administrative Agent**") and as collateral agent (in such capacity, together with its successors and assigns, the "**Collateral Agent**"), **CREDIT SUISSE SECURITIES (USA) LLC**, as lead arranger for the Lenders (in such capacity, together with its successors and assigns, the "**Arranger**") and as sole bookrunner (in such capacity, together with its successors and assigns, the "**Bookrunner**"; together with the Administrative Agent, the Arranger, and the Collateral Agent, the "**Agents**") for the Lenders.

**R E C I T A L S**

**A.     WHEREAS,** the Borrower desires that the Lenders extend certain junior term loans to the Borrower hereunder, the proceeds of which, together with the proceeds of the loans under the First Lien Credit Agreement will be used: (i) to repay the Existing Indebtedness of the Borrower and its Subsidiaries, (ii) to make certain distributions to the holders of the Capital Stock of the Borrower (iii) to pay the Transaction Costs; (iv) to finance a portion of the development, construction and other costs associated with each Project; and (v) to fund general company and working capital needs of the Borrower and its Subsidiaries.

**B.     WHEREAS,** the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrower subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, and for ten dollars and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree to enter into this Credit Agreement as follows:

**SECTION 1.**
**DEFINITIONS**

**1.1     Certain Defined Terms**.

The following terms used in this Agreement shall have the following meanings:

"**Account Holder**" means a financial institution reasonably acceptable to Administrative Agent at which certain Deposit Accounts and/or securities accounts will be maintained, it being understood and agreed that Colonial Bank and First Caribbean Bank are acceptable to Administrative Agent.

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

7

"**Appraiser**" means, collectively, Cushman & Wakefield of Florida, Inc. and Cushman & Wakefield of Georgia, Inc., or such other independent appraisal firm selected by the Administrative Agent.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition (other than Operating Leases entered into in the Ordinary Course of Business) by the Borrower or any of its Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, any Capital Stock of the Borrower or the Borrower's Subsidiaries.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit IV annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Bahamas Borrower**" means Ginn-LA Conduit Lender, Inc. a Delaware corporation.

"**Bahamas Intercompany Indebtedness**" means Indebtedness pursuant to which Bahamas Owner is liable to Bahamas Borrower in a maximum amount from time to time of up to $276,750,000 to fund (1) Project Expenses associated with the construction and development of the Residential Lots located at the Project commonly known as Grand Bahamas (West End) and (2) other Project Expenses incurred by the Borrower or its Subsidiaries from time to time; provided that, (a) no Default or Event of Default has occurred and is continuing as of the time of the incurrence thereof or would result therefrom and (b) all such intercompany Indebtedness between the Bahamas Borrower and the Bahamas Owner shall be evidenced by a promissory note and secured by a mortgage, each of which shall have been pledged to the Collateral Agent pursuant to the Collateral Assignment of Mortgage and Note and such other documentation as Administrative Agent may reasonably require.

"**Bahamas Owner**" means Ginn-LA West End, Limited, an international business company formed under the laws of the Bahamas, which entity owns the Project commonly known as Grand Bahama (West End).

"**Bahamas Project Expenses**" means, for any period and without duplication, the costs and expenses incurred by the Bahamas Owner in connection with the development of the Grand Bahamas (West End) Project (including, without limitation, the development and subdivision of any Residential Lots, Infrastructure and any vertical improvements and bonding therefor) as contemplated in the Project Projections including, without limitation, general and administrative expenses, allocated overhead, marketing expenses, architectural, engineering and legal fees, developer and contractor fees, land development costs, construction costs, costs of acquiring additional Real Property Collateral in accordance with the Project Projections, and carrying costs (consisting of taxes, insurance costs, capital expenditures, and property owners association subsidies and reserve funding), excluding, however, for purposes of the definition of Net Cash from Project Sales, all costs and expenses associated with the operations of the Golf Courses, Membership Clubs and related amenities which are included in the calculation of Net Cash from Operations.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

**SECOND LIEN CREDIT AGREEMENT**

environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are purported to be granted by the Collateral Documents.

"**Collateral Agent**" means Credit Suisse, in its capacity as collateral agent hereunder and under the Collateral Documents, and any successor in such capacity.

"**Collateral Assignment of Declarant's Rights**" means the Second Lien Collateral Assignment of Declarant's Rights executed and delivered by the declarant under the Master Declarations in favor of the Collateral Agent for the benefit of the Agents and the Lenders substantially in the form of Exhibit XX annexed hereto.

"**Collateral Assignment of Mortgage and Note**" means (i) a Second Priority collateral assignment of the intercompany note evidencing the Bahamas Intercompany Indebtedness and the mortgage encumbering the Project commonly known as Grand Bahama (West End) granted by Bahamas Owner in favor of Bahamas Borrower as security for the Bahamas Intercompany Indebtedness (ii) a Second Priority collateral assignment of the purchase money promissory note and mortgage in connection with the Tesoro Golf Sale-Leaseback transaction, and (iii) such other Second Priority collateral assignments of notes and mortgages delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents from time to time in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations, in each case, in substantially the form of Exhibit II annexed hereto as amended, amended and restated, supplemented and Modified from time to time.

"**Collateral Documents**" means the Security Agreement, the Mortgage, the Collateral Assignment of Mortgage and Note, the Recognition, Collateral Assignment and Estoppel Agreements, the Affiliate Operating Agreement Subordination, the Collateral Assignment of Declarant's Rights, the Subsidiary Guaranties, the Pledge Agreements and any other documents, instruments or agreements delivered by any Loan Party or any Shareholder Pledgor pursuant to this Agreement or any of the other Loan Documents from time to time in order to grant, protect or perfect liens on any assets of such Loan Party or any Shareholder Pledgor as security for all or any of the Obligations.

"**Commercial Parcel**" means a parcel contemplated to be developed for commercial (i.e., retail, office or similar) purposes at the Project commonly known as Hammock Beach River Club, which lots are described as Parcel 1A and Parcel 1B in the Unit Development Agreement, executed as of January 17, 2006 for such Project.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in Section 2.2 of this Agreement.

"**Company's Operating Account**" means one or more Deposit Accounts or securities accounts to be established by the Borrower and its Subsidiaries pursuant to and in accordance with Section 5.21, which shall at all times be subject to a Control Agreement in favor of the Administrative Agent

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit V annexed hereto delivered to the Administrative Agent by the Borrower pursuant to Sections 5.3(iv), 5.3(xi), and 5.3(xvii).

"**Condemnation Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

12

**SECOND LIEN CREDIT AGREEMENT**

"**Condo Parcel**" means one or more parcels designated for development as approximately 100 condominium units at the Project commonly known as Tesoro, 300 condominium units at the Project commonly known as Laurelmor and 4396 condominium units at the Project commonly known as Grand Bahama (West End).

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited, less the portion of any such obligation that has been discharged or performed as of the date of determination.

"**Contractor**" means any contractor providing materials or services under a Material Contract.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Agreement**" means an account control agreement substantially in the form of Exhibit XXI or otherwise in form and substance acceptable to the Administrative Agent.

"**Credit Suisse**" means Credit Suisse, Cayman Islands Branch, or one or more of its other branches and any Affiliate thereof.

"**Debt Service**" means, for any period, all payments of interest and all scheduled payments of principal made during such period for all Indebtedness of the Borrower and its Subsidiaries (including, without limitation, the Indebtedness evidenced by the Loan Documents), but excluding all mandatory prepayments under Section 2.8(B)(ii).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

13

**SECOND LIEN CREDIT AGREEMENT**

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan Commitment**" means the commitment of a Lender to make a Loan to the Borrower pursuant to Section 2.2 (including the commitment of any Eligible Assignee to participate with respect to a Loan as part of the primary syndication).

"**Loan Documents**" means this Agreement, the Notes and the Collateral Documents or other documents evidencing or securing Obligations.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Party**" or "**Loan Parties**" means the Borrower and any of its Subsidiaries who executes any of the Loan Documents.

"**Loans**" mean the loans outstanding or made by the Lenders pursuant to Section 2.2.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Master Declarations**" has the meaning assigned to that term in Section 4.39 as they may be further amended, supplemented, amended and restated or otherwise Modified from time to time.

"**Master Plans**" means the documentation described on Schedule 1.1(d), as amended, restated, amended and restated, supplemented or Modified from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties, taken as a whole, to perform the Obligations (regardless of whether or not such Material Adverse Effect can be or has been cured at any time or whether Borrower has knowledge of such Material Adverse Effect), (c) a material adverse effect upon the legality, validity, binding effect or enforceability against a Loan Party or the Shareholder Pledgor of the Second Lien Credit Agreement, the First Lien Credit Agreement, any Collateral Document, or any other material Loan Document or First Lien Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document, taken as a whole, (e) a material adverse effect upon the value of the then remaining Real Property Collateral, taken as a whole or (f) a material adverse effect upon the Entitlements and the intended development of the Real Property Collateral as contemplated by the Project Projections, taken as a whole.

"**Material Contracts**" has the meaning assigned to that term in Section 4.33A.

"**Maturity Date**" means June 8, 2012.

"**Maximum Amount**" has the meaning assigned to that term in Section 9.13A.

"**Maximum Net Indebtedness**" has the meaning assigned to that term in Section 6.6B.

**SECOND LIEN CREDIT AGREEMENT**

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit X annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.6D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent or otherwise required hereunder, Hedge Agreements, whether for principal, interest or payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organization for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and (c) if such person is one of the Borrower or a Subsidiaries of the Borrower, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to the Borrower and its Subsidiaries, the ordinary course of their business, as related to developing each Project in accordance with the Project Projections, marketing or selling Residential Lots, Condo Parcels and Commercial Parcels and the business of owning and operating the Golf Courses, the Membership Clubs and any other improvements developed as part of each Project, and in each case, as undertaken by the Borrower and its Subsidiaries in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

24

| Fiscal Quarter ending | Rate Increase Maximum Net Indebtedness |
|---|---|
| September 30, 2008 | $300,000 |
| December 31, 2008 | $300,000 |
| Thereafter | N/A |

but such amount is less than the Maximum Net Indebtedness, the Applicable Base Rate Margin, in the case of Base Rate Loans and the Applicable Eurodollar Rate Margin, in the case of Eurodollar Rate Loans, shall increase by 0.25%, provided, however that the maximum cumulative amount of all such increases shall be 0.50% such that the maximum Applicable Base Rate Margin shall in no event exceed 6.50% and the maximum Applicable Eurodollar Rate Margin shall in no event exceed 7.50%. Such increased rate of interest shall apply from and including the Calculation Date on which it is determined that the preceding sentence shall apply to but excluding the Calculation Date on which it is determined that the next succeeding sentence shall apply and on such a subsequent Calculation Date, such increased rate of interest shall be reduced as set forth in the next succeeding sentence. If, as of any subsequent Calculation Date, the aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner less the aggregate amount of Cash Collateral and Cash and Cash Equivalents held by the Borrower, its Subsidiaries and the Bahamas Owner is less than the Rate Increase Maximum Net Indebtedness specified for the applicable period in the table above, the Applicable Base Rate Margin, in the case of Base Rate Loans and the Applicable Eurodollar Rate Margin, in the case of Eurodollar Rate Loans, shall decrease to such applicable rates as set forth on Annex A attached hereto. Notwithstanding anything to the contrary contained in this Agreement, in no event shall this Section 2.6G apply from and after January 1, 2009.

**2.7**    **Fees**. The Borrower agrees to pay the following fees:

**A.**    **Fees**.

The Borrower agrees to pay such fees to the Agents as set forth in the Engagement Letter dated March 30, 2006 (as amended) and as may hereafter be agreed upon. The Borrower also agrees to pay to the Agents for their own respective accounts, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and the Agents.

**B.**    **General**. All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Agents, respectively. Fees paid shall not be refundable under any circumstances.

**2.8**    **Repayments and Prepayments; General Provisions Regarding Payments**.

**A.**    **Scheduled Payments of Loans**. The Borrower shall repay the entire amount outstanding under each of the Loans on the Maturity Date.

**B.**    **Prepayments; Call Protection**.

(i)    Voluntary Prepayments; Call Protection.

(a)    Subject to the terms of subsection 2.8B(i)(b), so long as all amounts outstanding under the First Lien Credit Agreement have been paid in full, the Borrower may at any time and from time to time prepay, on or prior to the second anniversary of the Effective Date with the premiums under subsection 2.8B(i)(b) below, or after the second anniversary of the Effective

**SECOND LIEN CREDIT AGREEMENT**

Date without premium or penalty, the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; provided, however, that in the event the Borrower elects to prepay a Eurodollar Rate Loan other than on the expiration of the Interest Period applicable thereto, the Borrower shall, at the time of such prepayment, also pay any amounts payable under Section 2.10D hereof. The Borrower shall notify the Administrative Agent, in writing or by telephone, promptly confirmed in writing to the Administrative Agent, no later than 11:00 a.m. (New York time) at least one (1) Business Day prior to such prepaying. The Administrative Agent will promptly notify each Lender upon receipt of such notice from the Borrower. Any notice of prepayment shall be irrevocable and having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein, provided, however that the Borrower may revoke any such notice of prepayment if conditioned upon a refinancing as described in Section 2.8D below. Any voluntary prepayments pursuant to this Section 2.8B(i) shall be applied as specified in Section 2.8C, provided, however that in connection with any voluntary prepayments by the Borrower pursuant to this Section 2.8B(i), such voluntary prepayments shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case, in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

(b)    Call Protection. In the event that the Loans are repaid or prepaid pursuant to Sections 2.8B(i) or 2.8B(ii) hereof, on or prior to the second anniversary of the Effective Date, the Borrowers shall pay to the Lenders a prepayment premium as follows:

| Relevant Period in which prepayment occurs | Prepayment Premium (expressed as a percentage of the principal amount repaid) |
|---|---|
| On or prior to the first anniversary of the Effective Date | 2.0% |
| After the first anniversary of the Effective Date through and including June 30, 2008 | 1.0% |

(ii)    Mandatory Prepayments.

Subject to the provisions of the last sentence of this subsection 2.8B(ii) below and the terms of the Intercreditor Agreement, the Loans shall be prepaid in the manner provided in Section 2.8C upon the occurrence of the following circumstances:

(a)    Prepayments Due to Issuance of Debt. Concurrently with and as a condition to the closing of any transaction pursuant to which Borrower or any of its Subsidiaries issue debt Securities or incur additional borrowed Indebtedness (other than Indebtedness permitted under Section 6.1 for which no prepayment shall be required), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the principal amount of such debt Securities or borrowed Indebtedness paid or payable to the Borrower or its Subsidiaries; less (ii) Permitted Transaction Costs. Such prepayment shall not be deemed to waive any violation of Section 6.1 hereof.

41

**SECOND LIEN CREDIT AGREEMENT**

(b)     Prepayments Due to Issuance of Equity Securities or Intercompany Subordinated Debt.  Concurrently with and as a condition to the closing of any transaction pursuant to which the Borrower or any of its Subsidiaries receive any Equity Proceeds or proceeds of Intercompany Subordinated Debt, the Borrower shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds, provided, however that any Equity Proceeds or proceeds of Intercompany Subordinated Debt received by (i) the Borrower from Investments made, from time to time, by the existing holders of the Capital Stock in the Borrower as of the Effective Date or (ii) the Borrower's wholly-owned Subsidiaries from Investments made by the Borrower or another of its Subsidiaries in such Subsidiaries and permitted under Section 6.3, in each case, may be retained by the Borrower or such Subsidiary, provided, however that such Equity Proceeds or proceeds from Intercompany Subordinated Debt are used for (A) Project Expenses or Bahamas Project Expenses in a manner consistent with the Project Projections, (B) for purposes of purchasing additional Real Property Collateral to the extent designated in an Officer's Certificate by a Responsible Officer of the Borrower to be used for such purpose, which purchase shall occur prior to one calendar year following the date of such Investment and which Real Property Collateral will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof, or (C) for purposes of making voluntary prepayments in accordance with Section 2.8B(i) hereof.

(c)     Prepayments Due to Insurance and Condemnation Proceeds.  No later than the fifth (5th) Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any cash payments which exceed $5,000,000 (i) under any insurance policy as a result of any damage to or loss of (a "**Casualty**") all or any portion of the Collateral (the "**Insurance Proceeds**"), or (ii) resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof, "**Condemnation Proceeds**") (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a "**Recovery Event**"), the Borrower shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received, unless, in each case, the Borrower shall have delivered a Reinvestment Notice.  Concurrently with any prepayment of Loans pursuant to this Section 2.8B(ii)(c), the Borrower shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

(d)     Prepayments from Excess Cash Flow.  In the event that there shall be Excess Cash Flow with respect to any Fiscal Quarter, the Borrower shall, no later than the date upon which the Borrower is required to deliver financial statements under Section 5.3(ii) and (iii) with respect to such Fiscal Quarter, prepay the Loans in an aggregate amount equal to 100% of such Excess Cash Flow provided that, at the point at which such prepayment of Excess Cash Flow results in the occurrence of the Trigger Date Events on such date, such prepayment obligations shall be reduced to 50% of such Excess Cash Flow.

(e)     Prepayments Due to Asset Sales.  Concurrently with the consummation of any Asset Sale (except with respect to Permitted Collateral Asset Sales or Required Releases to the extent the proceeds thereof constitute Excess Cash Flow), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs.  Such prepayment shall not be deemed to waive any violation of Section 6.8 hereof.

Any Lender may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) at least seven (7) Business Days prior to the applicable prepayment date,

**SECOND LIEN CREDIT AGREEMENT**

to decline such Lender's portion of such mandatory prepayment. Failure of any Lender to provide such notice to decline shall be deemed an election by such Lender to accept its portion of such mandatory prepayment. In the event one or more Lenders elect to decline to accept such mandatory prepayment, the aggregate amount of the mandatory prepayment that would have been applied to prepay the Loans but was so declined shall be re-offered to those Lenders under this Agreement who initially accepted (or were deemed to have accepted) such mandatory prepayment (such re-offer to be made to each such Lender based on the percentage which such Lender's Loans represents of the aggregate Loans of all such Lenders who have initially accepted such prepayment). In the event of such a re-offer, the relevant Lenders may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) within two (2) Business Days of receiving notification of such re-offer, to decline all of the amount of such prepayment that is re-offered to them, in which case the aggregate amount of the mandatory prepayment that would have been applied to prepay such Loans pursuant to such re-offer but was so declined shall be retained by the Borrowers to be used for any other purpose not prohibited by this Agreement (including without limitation distributions or repayment of Intercompany Subordinated Debt to the Permitted Holders if permitted or voluntary prepayments pursuant to Section 2.8B(i)).

In connection with any mandatory prepayments by the Borrower of Loans pursuant to Section 2.8B(ii) such prepayments shall be applied on a pro rata basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are Base Rate Loans or Eurodollar Rate Loans; provided that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.8B(ii) then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Loans that are Base Rate Loans to the full extent thereof before application to Loans that are Eurodollar Rate Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

Notwithstanding the foregoing provisions of this subsection 2.8B(ii), no mandatory prepayment of the Loans shall be required to be made pursuant to this subsection 2.8B(ii) until all amounts outstanding under the terms of the First Lien Credit Agreement and the other First Lien Loan Documents (and any refinancings thereof permitted under the Intercreditor Agreement) have been paid in full, it being understood and agreed that to the extent that a portion of the amount of any such mandatory prepayment results in a repayment in full of all amounts outstanding under the First Lien Credit Agreement and the other First Lien Loan Documents as described above, then only the remaining portion of such mandatory prepayment amount shall be required to be made pursuant to this Section 2.8B(ii).

(iii)    No Waiver. Nothing contained in Section 2.8B(ii) shall be deemed to permit the Borrower to consummate any Asset Sale unless otherwise permitted under this Agreement.

## C.    **Application of Prepayments**.

Each payment received by Collateral Agent or Administrative Agent from the Borrower with respect to the Loans shall be applied in the following order: First, any prepayment premiums, if any, due and payable hereunder, second, to the payment of any late charges due and payable hereunder; third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder); fourth, to the payment of accrued and unpaid interest; fifth, to fund any reserves or escrows required by Collateral

43

**SECOND LIEN CREDIT AGREEMENT**

**2.9** **Use of Proceeds**.

    **A.** **Loans**. The proceeds of the Loans made to the Borrower shall be applied, together with the proceeds of the loans made pursuant to the First Lien Credit Agreement, (i) to repay the Existing Indebtedness of the Borrower, its Subsidiaries and Bahamas Owner, (ii) to make certain distributions to the holders of Capital Stock in the Borrower in the amount of the $333,125,000, (iii) to pay the Transaction Costs; and (iv) to fund Project Expenses and Bahamas Project Expenses and for general company and working capital needs of the Borrower, its Subsidiaries and Bahamas Owner in a manner consistent with the Project Projections.

    **B.** **Compliance With Laws**. The Borrower undertakes that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

    **C.** **Margin Regulations**. Without limiting the generality of Section 2.9A and B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrower or any of its Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**2.10** **Special Provisions Governing Eurodollar Rate Loans**.

    Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

    **A.** **Determination of Applicable Interest Rate**. As soon as practicable after 11:00 A.M. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

    **B.** **Inability to Determine Applicable Interest Rate**. In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate, the Administrative Agent shall, on such date, give notice (by telecopy or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower; provided, however that, at the option of the Borrower, any such Disbursement Authorization may be re-submitted to the Administrative Agent indicating that the Borrower is electing a Base Rate Loan, which Loan shall be funded no later than one (1) Business Day after the date of such Base Rate Loan Disbursement Authorization.

NY\1151936.6

**2.14    First Lien Credit Agreement**.

Lenders acknowledge and agree that their rights under this Agreement and the Loan Documents are subject to the rights of the "Lenders" under the First Lien Credit Agreement and the First Lien Loan Documents pursuant to the terms and conditions of the Intercreditor Agreement.

# SECTION 3.
# CONDITIONS TO EFFECTIVENESS

**3.1    Conditions to Effectiveness on the Effective Date**.

The effectiveness of this Agreement, and the obligation of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A.    Organizational Documents**. On or before the Effective Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following, with respect to itself and its Subsidiaries, each, unless otherwise noted, dated the Effective Date:

(i)    a certified copy of the Organizational Documents of the Borrower and each of its Subsidiaries certified as of the Effective Date by a Responsible Officer of the Borrower, dated a recent date prior to the Effective Date;

(ii)    certified copies of the Organizational Certificate of the Borrower and each of its Subsidiaries, together with a good standing certificate from the applicable Governmental Authority of their jurisdictions of incorporation, organization or formation, each state or jurisdiction in which any of their Real Property Assets are located, and each other state or jurisdiction in which they are qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(iii)    copies of the Organizational Authorizations of the Borrower and each of its Subsidiaries approving and authorizing the execution, delivery and performance of the Loan Documents to which each Borrower and Subsidiary is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by a Responsible Officer of such Borrower or Subsidiary as being in full force and effect without Modification;

(iv)    incumbency certificates of the officers of the Borrower and its Subsidiaries executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(v)    executed originals of this Agreement and the other Loan Documents to which the Borrower and its Subsidiaries is a party that are to be delivered on the Effective Date;

(vi)    certified copies of each of the other Loan Documents to which the Borrower or its Subsidiaries is a party that are to be delivered on the Effective Date; and

(vii)    such other documents as the Administrative Agent may reasonably request.

53

**B.**     **Intentionally Deleted**.

**C.**     **Consummation of Transactions**.

(i)     (a) each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)     $525,000,000 shall have been borrowed by the Borrower pursuant to the First Lien Credit Agreement;

(iii)     simultaneously with funding of the Loans, the obligations of the lenders under the Existing Indebtedness shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iv)     simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(v)     after giving effect to the Transactions and the other transactions contemplated hereby, the Borrower and its Subsidiaries shall have no outstanding Indebtedness or preferred stock other than (a) the Loans under this Agreement and the loans under the First Lien Credit Agreement, and (b) the Indebtedness permitted under Section 6.1.

**D.**     **Lender Signatures**.   The following Persons shall have executed and delivered this Agreement:

(i)     the Lenders; and

(ii)     the Agents.

**E.**     **Necessary Consents**.   The Borrower shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrower and its Subsidiaries, all applicable appeal periods shall have expired and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent.   Such approvals and consents shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)     executed consents from any Person required in connection with the Collateral Documents;

(ii)     executed consents from any Person required in connection with the Security Agreement;

SECOND LIEN CREDIT AGREEMENT

(iii)    executed consents and estoppels as set forth on <u>Schedule 3.1E</u> annexed hereto; and

(iv)    executed consents from any Person required in connection with any Indebtedness permitted under Section 6.1 and not extinguished in full on the Effective Date.

**F.    Perfection of Security Interests.** The Borrower shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected Second Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Collateral Documents. Subject to the terms of the Intercreditor Agreement, such actions shall include:  (i) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized  by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (ii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the Second Priority liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made.

**G.    Real Property.** The Administrative Agent shall have received on or prior to the Effective Date from the Borrower and each applicable Loan Party:

(i)    <u>Mortgages</u>.    Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of the appropriate county or counties in the state where the applicable Real Property Collateral is located, encumbering the Real Property Collateral listed on <u>Schedule 3.1.G</u>, in each case in form and substance satisfactory to the Collateral Agent;

(ii)    <u>Title Insurance</u>.    ALTA extended coverage mortgagee title insurance policies satisfactory to Collateral Agent (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on <u>Schedule 3.1G</u>, in amounts not less than the respective amounts designated on such Schedule with respect to any particular portion of Real Property Collateral, insuring fee simple title to or a leasehold interest in each such portion of Real Property Collateral vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable Second Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, subject only to the Permitted Encumbrances, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent, including, if available, an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request and is available in the applicable jurisdiction, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the  Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all

55

**SECOND LIEN CREDIT AGREEMENT**

warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)    No event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Disbursement Authorization that would constitute a Default or Event of Default, or could reasonably be expected to have a Material Adverse Effect; and

(iii)    No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

**3.2**    **Conditions to Each Credit Event**.  (i) The obligation of each Lender to make any Loan after the Effective Date is additionally subject to the satisfaction of the following conditions:

(ii)    The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Loan to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iii)    At the time of and immediately after giving effect to such Loan no Default or Event of Default shall have occurred and be continuing; and

(iv)    For each borrowing of a Loan, Borrower shall have delivered a completed and signed Request for Loan.

Each borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 3.2.

**3.3**    **Conditions to Disbursements from the Company's Operating Account**.

**A.**    **General**.  The Borrower has established, and hereafter agrees to continue to maintain the Company's Operating Account.  The Borrower hereby grants a security interest to the Administrative Agent in the Company's Operating Account to secure the Obligations.  Concurrently with the execution of this Agreement, the Borrower has entered into a Control Agreement with respect to the Company's Operating Account with the Collateral Agent and the Account Holder substantially in the form of <u>Exhibit XXI</u> attached hereto.

**B.**    **Investments, Withdrawals and Deposits**.

(i)    The Borrower may direct the Account Holder regarding investment of funds contained in the Company's Operating Account in Cash Equivalents (to the extent available in such account), provided, however, that such direction may be required to be accomplished through direction to the Administrative Agent, who will subsequently direct the Account Holder regarding the same.  At any time prior to the occurrence and continuance of an Event of Default, the Borrower shall have the right to withdraw funds from the Company's Operating Account to be used in a manner consistent with the Project Projections or for purposes of purchasing additional Real Property Collateral, which will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof.

SECOND LIEN CREDIT AGREEMENT

(ii)    The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, rental programs, club, golf club memberships or otherwise) within five (5) Business Days after receipt of such funds into the Company's Operating Account.

**C.    Priority of Distributions.**  In the event that the Lenders elect to exercise their remedies under Section 8, the funds contained in the Company's Operating Account shall be applied, subject to the terms and provisions of the Intercreditor Agreement, (a) <u>first</u>, to the reasonable expenses of the Administrative Agent, (b) <u>second</u>, to the payment of any late charges due and payable hereunder, (c) <u>third</u>, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder), (d) <u>fourth</u>, to the payment of accrued and unpaid interest (e) <u>fifth</u>, to the outstanding principal amount of, and interest on the Loans until the same are paid in full, (g) <u>sixth</u>, to the other Obligations until the same are paid in full, and then (h) <u>seventh</u>, after all Obligations of the Borrower under this Agreement and the Loan Documents shall have been paid in full, returned to the Borrower or the other Persons legally entitled thereto.

**D.    Intercreditor Agreement.**  This Section 3.3 is subject to the terms and provisions of the Intercreditor Agreement

# SECTION 4.
# REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans and to induce the other Lenders to purchase participations therein, the Borrower represents and warrants to each Lender, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

## 4.1    <u>Organization and Qualification.</u>

The Borrower and the Loan Parties are duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  The Borrower and the Loan Parties are duly qualified and is authorized to do business and is in good standing as a foreign corporation in each state or jurisdiction listed on <u>Schedule 4.1</u> hereto and in all other states and jurisdictions in which the failure of the Borrower or the Loan Parties to be so qualified could reasonably be expected to have a Material Adverse Effect.

## 4.2    <u>Power and Authority</u>.

The Borrower and the other Loan Parties are duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which each is a party.  The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary action.

## 4.3    <u>Legally Enforceable Agreement</u>.

This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of the Borrower and its Subsidiaries signatories thereto, enforceable against each of them in accordance with the respective terms of such Loan Documents,

the Administrative Agent and each Lender from any costs, losses or liabilities relating to the Borrower's use of or reliance on such report, (ii) neither Agent nor any Lender makes any representation or warranty with respect to such report, and (iii) by delivering such report to the Borrower, neither the Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report.

C.    The Borrower shall promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrower or any of its Subsidiaries that could reasonably be expected to expose the Borrower or any of its Subsidiaries to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrower or any of its Subsidiaries to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrower or any of its Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrower and its Subsidiaries as of the Effective Date.

D.    The Borrower shall, at their own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this Section 5.9.

## 5.10    The Borrower's Remedial Action Regarding Hazardous Materials.

The Borrower shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all necessary remedial action in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset in order to comply in all material respects with all applicable Environmental Laws and Governmental Authorizations.  In the event the Borrower or any of its Subsidiaries undertakes any Cleanup action with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrower or such Subsidiaries shall conduct and complete such Cleanup action in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrower's or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested.

## 5.11    Subsidiaries.

As of the Effective Date, the Subsidiaries of the Borrower are as set forth on Schedule 4.5. The Borrower will not form (or permit to be formed) any new Subsidiaries after the Effective Date without first receiving the prior written consent of the Administrative Agent, which consent the Administrative Agent may condition upon, among other things, (i) such new Subsidiaries executing a guaranty (in form and substance satisfactory to the Administrative Agent) of the Borrower's Obligations, (ii) the Borrower executing a pledge of the Capital Stock of such Subsidiaries, and (iii) such further action and such further documents and instruments as may be required to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a Second Priority security interest in all of the: (a) personal property assets of such Subsidiaries; (b) real property assets owned by such Subsidiaries; and (c) leasehold interests owned by such Subsidiaries.  With respect to any Subsidiary approved by the Administrative Agent, the Borrower shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Subsidiary's

81

Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing such guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or rescinded, and (ii) a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Collateral Agent and its counsel, as to (a) the due organization and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the parent of such Subsidiaries in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents, and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel.  In addition, the Borrower shall promptly deliver a supplement to Schedule 4.1 to the Administrative Agent if any Subsidiary is created or acquired, if applicable.

## 5.12    **Interest Rate Protection**.

At all times, commencing one hundred-eighty (180) days after the Effective Date, the Borrower (through itself or one of the Subsidiaries) shall maintain in effect one or more interest rate Hedge Agreements (which, to the extent secured by the Collateral, shall be with the Administrative Agent or the Lenders, or any of their respective Affiliates) in form and substance reasonably satisfactory to the Administrative Agent with respect to an aggregate principal amount equal to at least 50% of the aggregate outstanding principal amount of the  Loan and the loans under the First Lien Credit Agreement.  Such Hedge Agreements shall be maintained for two (2) years after the Effective Date in a form and with a counterparty acceptable to the Administrative Agent in its reasonable discretion.

## 5.13    **Further Assurances**.

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, the Borrower will, at its expense, and will cause each of its Subsidiaries, at the Borrower's expense, to promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request only to the extent such acts or things are consistent with the express intent and purpose of the Loan Documents.  In furtherance and not in limitation of the foregoing, the Borrower shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Subsidiaries and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of the Loan Documents) of the Borrower and its Subsidiaries.

**SECOND LIEN CREDIT AGREEMENT**

**GINN-LA CS BORROWER, LLC,**
a Delaware limited liability company

By: _____

Name: Robert F. Masters
Title:  Manager

Second Lien Credit Agreement

**GINN-LA CONDUIT LENDER, INC.,**
a Delaware corporation

By: _____
Name: Robert F. Masters
Title:  President

Second Lien Credit Agreement

# EXHIBIT 3

## FIRST LIEN SUBSIDIARY GUARANTY

## SUBSIDIARY GUARANTY

### (First Lien)

This **GUARANTY** (the "Guaranty") is made and entered into as of June 8 , 2006 (the "Closing Date") by each person signing this Guaranty, each having an address as stated below its signature of this Guaranty (each, a "Guarantor"), for the benefit of CREDIT SUISSE, CAYMAN ISLANDS BRANCH, in its capacity as Administrative Agent and Collateral Agent for the Lenders, as more fully described in the First Lien Credit Agreement, as defined below (the "Administrative Agent"). This Guaranty is made with reference to the following facts (with some capitalized terms being defined below):

      A.    The Lenders, acting by and through Administrative Agent, are making certain loans (the "Loan") in the amount of $525,000,000, to Ginn-LA CS Borrower, LLC, a Delaware limited liability company and Ginn-LA Conduit Lender, Inc., a Delaware corporation (collectively, the "Borrower").

      B.    The Loan is to be evidenced by a note, to the extent requested by the Lenders, dated as of the Closing Date executed by Borrower (as it may be modified, extended, renewed, or replaced, the "Note"), and is more fully described in the First Lien Credit Agreement dated as of the Closing Date entered into between Administrative Agent (as Administrative Agent and Collateral Agent for the Lenders, as defined in the First Lien Credit Agreement), Credit Suisse Securities (USA) LLC, as paying agent, fronting bank, sole lead arranger and sole bookrunner and Borrower (the "First Lien Credit Agreement").

      C.    As security for the Loan, Guarantor is executing and delivering to Administrative Agent for the Lenders a First Lien Mortgage or Collateral Assignment of Mortgage and Note with respect to the real property commonly known as Grand Bahama (West End) (the "Mortgage") encumbering the real property commonly known as Quail West, Laurelmor, Tesoro, Tesoro Beach Club and Hammock Beach River Club (the "Real Property Collateral").

      D.    Guarantor acknowledges that Administrative Agent has examined, among other things, Borrower's creditworthiness and ability to pay and perform the Obligations and has requested, as a condition of making the Loan, that Guarantor guaranty some or all Obligations, as provided for below.

      E.    Guarantor, a wholly-owned subsidiary of Borrower, will benefit if the Lenders, acting through Administrative Agent, make the Loan; and desires that the Lenders, acting through Administrative Agent, make the Loan to Borrower.

      F.    The Lenders would not make, and would not be obligated to make, the Loan to Borrower unless Guarantor executed this Guaranty. This Guaranty is therefore delivered to Lenders, acting through Administrative Agent, to induce the Lenders to make the Loan.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and for $10 and other good, adequate, and valuable consideration, the receipt of which Guarantor acknowledges, Guarantor agrees:

1.    <u>Definitions</u>.  For purposes of this Guaranty, the following terms shall be defined as set forth below.  In addition, any capitalized term defined in the First Lien Credit Agreement but not defined in this Guaranty shall have the same meaning in this Guaranty as in the First Lien Credit Agreement.

    a.    "<u>Borrower</u>" means:  (a) Borrower as defined above, acting on its own behalf; (b) any estate created by the commencement of an Insolvency Proceeding affecting Borrower; (c) any trustee, liquidator, sequestrator or receiver of Borrower or Borrower's property; and (d) any similar person appointed in any Insolvency Proceeding of Borrower.

    b.    "<u>Guaranteed Obligations</u>" means all Obligations.

    c.    "<u>Insolvency Proceeding</u>" means any Proceeding under any present or future state or federal law on bankruptcy, reorganization, insolvency or relief of debtors, appointment of a trustee (or custodian or receiver), assignment for the benefit of creditors, readjustment, liquidation, dissolution, or the rights of creditors generally, including the federal bankruptcy code and laws on fraudulent conveyances and fraudulent transfers.

    d.    "<u>Loan Documents</u>" shall have the meaning given such term in the First Lien Credit Agreement.  If the Loan Documents, as so defined, are modified pursuant to any Insolvency Proceeding, even if Administrative Agent consented to such modification, then such modification shall not affect the definition of "Loan Documents" under this Guaranty, unless Administrative Agent elects otherwise in its sole discretion.

    e.    "<u>Preserved Defenses</u>" means only any defenses that Borrower could, under the express terms of the Loan Documents, properly assert against the Obligations based upon only: (a) actual payment and performance in compliance with the Loan Documents; or (b) Administrative Agent's acts and omissions.

    f.    "<u>Proceeding</u>" means any action, suit, nonjudicial foreclosure, arbitration hearing or proceeding arising out of, or relating to the interpretation or enforcement of, this Guaranty or the Loan Documents, including: (a) an Insolvency Proceeding; and (b) any proceeding in which Administrative Agent endeavors to realize upon any Collateral or enforce any Loan Document(s) against Borrower, Guarantor, or any other obligor.

    g.    "<u>State</u>" means the State of New York.

2.    <u>Guaranteed Obligations</u>.  Guarantor unconditionally, absolutely and irrevocably guarantees Borrower's prompt and complete payment, observance, fulfillment and performance of all Guaranteed Obligations.  Guarantor shall be personally liable for, and personally obligated to perform, all Guaranteed Obligations.  All assets of Guarantor shall be subject to recourse if Guarantor fails to pay and perform any Guarantied Obligation.  Guarantor shall personally pay and perform all Guaranteed Obligations, as if Guarantor had itself assumed and agreed to

2

perform such Guaranteed Obligations in the first instance. Administrative Agent shall apply any payments Guarantor makes under this paragraph on account of such Guaranteed Obligations as Administrative Agent shall determine. To the extent that Guarantor at any time incurs any liability under this Guaranty as to any Guaranteed Obligations, Guarantor shall immediately pay Administrative Agent (to be applied on account of the Guaranteed Obligations) the amount provided for in this Guaranty, without any requirement that Administrative Agent demonstrate that the Real Property Collateral provides inadequate security for the Loan; that Administrative Agent has currently suffered any loss; or that Administrative Agent has otherwise exercised (to any degree) or exhausted any of Administrative Agent's remedies against Borrower or any Collateral. If (a) the Loan Documents provide that any Guaranteed Obligation does not arise unless and until Administrative Agent has given notice to Borrower (whether or not any additional conditions must be satisfied for such liability to arise), and (b) Borrower is the subject of any Insolvency Proceeding, then for purposes of this Guaranty and Guarantor's liability, Administrative Agent may give any such notice to Guarantor in place of Borrower, and, as against Guarantor, such Guaranteed Obligation shall arise at the same time and in the same manner as if Administrative Agent had validly given notice to Borrower as of the date of Administrative Agent's notice to Guarantor, and no notice to Borrower shall be required.

3.      Nature and Scope of Liability.  Guarantor's liability under this Guaranty shall be primary and not secondary, in the full amount of the Guaranteed Obligations, including any interest, default interest, costs and fees (including attorney's fees) that would have accrued under the Loan Documents on account of the Guaranteed Obligations but for any Insolvency Proceeding affecting Borrower, but subject to the Preserved Defenses.

4.      Changes in Loan Documents.  Without notice to, or consent by, Guarantor, and in Administrative Agent's sole and absolute discretion and without prejudice to Administrative Agent or in any way limiting or reducing Guarantor's liability under this Guaranty, Administrative Agent may:  (a) grant extensions of time, renewals or other indulgences or Modifications to Borrower or any other party liable under any Loan Document(s); (b) change the rate of interest under the Note; (c) change, amend, or modify any Loan Document(s); (d) authorize the sale, exchange, release, or subordination of any Collateral; (e) accept or reject additional Collateral; (f) discharge or release any Loan Party or any other party or parties liable under the Loan Documents or any Collateral; (g) foreclose or otherwise realize on any Collateral, or attempt to foreclose or otherwise realize on any Collateral, whether successfully or unsuccessfully; (h) accept or make compositions or other arrangements or file or refrain from filing a claim in any Insolvency Proceeding; (i) make other or additional loans to Borrower in such amount(s) and at such time(s) as Administrative Agent may determine; (j) credit payments in such manner and order of priority to the Obligations as Administrative Agent may determine in its discretion; and (k) otherwise deal with Borrower and any other party related to the Loan or any Collateral as Administrative Agent may determine in its sole and absolute discretion. Without limiting the generality of the foregoing, Guarantor's liability under this Guaranty shall continue even if Administrative Agent alters any Obligations in any way or if Administrative Agent's remedies or Guarantor's remedies or rights against Borrower are in any way impaired or suspended without Guarantor's consent. If Administrative Agent performs any action described in this paragraph, then Guarantor's liability shall continue in full force and effect even if Administrative Agent's actions impair, diminish or eliminate Guarantor's subrogation,

contribution, or reimbursement rights (if any) against Borrower or any other person, or otherwise adversely affect Guarantor or expand Guarantor's liability. Guarantor hereby consents to each and all of the foregoing acts, events and occurrences.

5. .    Nature of Guaranty. Subject to the terms of this Guaranty and subject to the Preserved Defenses, Guarantor's liability under this Guaranty is a guaranty of payment and performance of the Guarantied Obligations, and not a guaranty of collection or collectibility. Guarantor's liability under this Guaranty is not conditioned or contingent upon the genuineness, validity, regularity, or enforceability of any of the Loan Documents. Guarantor's liability under this Guaranty is a continuing, absolute, and unconditional obligation under any and all circumstances whatsoever, including the renewal, extension, compromise, refinance or restructure from time to time of the Guaranteed Obligations, subject only to the Preserved Defenses. Guarantor is fully obligated under this Guaranty even if Borrower had no liability at the time of execution of the Loan Documents or later ceases to be liable under any Loan Document, whether through Insolvency Proceedings or otherwise, subject only to the Preserved Defenses. Guarantor may not claim, and irrevocably covenants not to raise or assert, any defense, offset, claim, counterclaim, setoff, diminution, abatement, or right of recoupment against the Guarantied Obligations that would or might be available to Borrower, except the Preserved Defenses. If any Guarantied Obligation is or becomes void or unenforceable (because of inadequate consideration, lack of capacity, Insolvency Proceedings, or for any other reason except a Preserved Defense), then Guarantor's liability under this Guaranty shall continue in full force for all Guarantied Obligations as if they were and continued to be legally enforceable. Guarantor waives any defenses arising or purportedly arising from: (a) how Administrative Agent disburses the Loan to Borrower or otherwise; (b) Administrative Agent's waiver of the terms of any Loan Document; or (c) Administrative Agent's failure to require full compliance with the Loan Documents. Except to the extent (if any) that this Guaranty expressly provides otherwise, Guarantor's liability under this Guaranty shall continue until all Obligations have been paid in full and all other performance required under the Loan Documents has been rendered in full, subject to the Preserved Defenses. Guarantor's liability under this Guaranty shall not be limited or affected in any way by any impairment or any diminution or loss of value of any Collateral whether caused by (a) Hazardous Materials, (b) Administrative Agent's failure to perfect a security interest in any Collateral, (c) any disability or other defense(s) of Borrower or any other person obligated to pay the Obligations, or (d) Borrower's breach of any representation or warranty in any Loan Document. Nothing in this paragraph limits any Preserved Defense.

6.    Waivers of Rights and Defenses. Guarantor waives any right to require Administrative Agent to (a) proceed against Borrower or any other person obligated on the Obligations, (b) proceed against or exhaust any Collateral, or (c) pursue any other right or remedy for Guarantor's benefit. Administrative Agent may proceed against Guarantor for the Guarantied Obligations without proceeding against Borrower, any other obligor, or any Collateral. Administrative Agent may unqualifiedly exercise in its sole discretion any or all of Administrative Agent's remedies against Borrower or any other person without impairing Administrative Agent's rights and remedies in enforcing this Guaranty, under which Guarantor's liabilities for the Guarantied Obligations shall remain independent and unconditional. Guarantor agrees and acknowledges that Administrative Agent's exercise of certain of such rights or

remedies may affect or eliminate Guarantor's right of subrogation or recovery against Borrower (if any) and that Guarantor may incur a partially or totally nonreimbursable liability in performing under this Guaranty. Guarantor has assumed the risk of any such loss of subrogation rights, even if caused by Administrative Agent's acts or omissions. If Administrative Agent's enforcement of rights and remedies, or the manner of such enforcement, limits or precludes Guarantor from exercising any right of subrogation that might otherwise exist, then such limitation or preclusion shall not in any way limit Administrative Agent's rights to enforce this Guaranty. Guarantor hereby waives any right to assert against Administrative Agent as a defense, counterclaim, setoff or crossclaim, any defense (legal or equitable), counterclaim, setoff or crossclaim which Guarantor may now or at any time hereafter have under applicable law, rule, arrangement or relationship against Borrower, Administrative Agent or any other party, other than Preserved Defenses.

       7.      <u>Foreclosure; Application of Payments</u>. Except as the Loan Documents otherwise provide, without limiting the generality of any other waivers in this Guaranty, Guarantor expressly waives any statutory or other right that Guarantor might otherwise have to: (i) limit Guarantor's liability after a nonjudicial foreclosure sale to the difference between the Guarantied Obligations and the fair market value of the property or interests sold at such nonjudicial foreclosure sale or to any other extent, (ii) otherwise limit Administrative Agent's right to recover a deficiency judgment after any foreclosure sale, or (iii) require Administrative Agent to exhaust its Collateral before Administrative Agent may obtain a personal judgment for any deficiency. Any proceeds of a foreclosure or similar sale may be applied first to Obligations (if any) that do not also constitute Guarantied Obligations. Guarantor acknowledges and agrees that any nonrecourse or exculpation provided for in any Loan Document, or any other provision of a Loan Document limiting Administrative Agent's recourse to specific Collateral or limiting Administrative Agent's right to enforce a deficiency judgment against Borrower, shall have absolutely no application to Guarantor's liability for the Guarantied Obligations. To the extent that Administrative Agent collects or receives any sums or payments from any source on account of the Obligations, Administrative Agent may, but need not, apply such amounts first to any Obligations not constituting Guarantied Obligations, regardless of how the payor characterizes any such payments and/or amounts. Nothing in this paragraph limits any Preserved Defenses.

       8.      <u>Additional Waivers</u>. Guarantor waives diligence and all demands, protests, presentments and notices of every kind or nature, including notices of protest, dishonor, nonpayment, acceptance of this Guaranty and the creation, renewal, extension, modification, or accrual of any Obligations. Guarantor waives the right to plead any and all statutes of limitations as a defense to Guarantor's liability under this Guaranty or the enforcement of this Guaranty. No failure or delay by Administrative Agent in exercising any power, right, or privilege under this Guaranty shall impair or waive any such power, right or privilege. Nothing in this paragraph limits any Preserved Defense and nothing herein shall constitute a waiver of any notice expressly required under any Loan Document.

       9.      <u>Full Knowledge</u>. Guarantor acknowledges, represents, and warrants that Guarantor has had a full and adequate opportunity to review the Loan Documents, the transaction contemplated by the Loan Documents and all underlying facts relating to such transaction. Guarantor represents and warrants that Guarantor fully understands: (a) the

5

remedies Administrative Agent may pursue against Borrower in the event of a default under the Loan Documents, (b) the value (if any) of any Collateral, and (c) Borrower's financial condition and ability to perform under the Loan Documents. Guarantor shall keep itself fully informed regarding all aspects of Borrower's financial condition and the performance of Borrower's obligations to Administrative Agent. Guarantor agrees that Administrative Agent has no duty, whether now or in the future, to disclose to Guarantor any information about Borrower or any Collateral. If at any time provided for in the Loan Documents, the Guarantor agrees that its bankruptcy, insolvency, default, or other actions or events relating to Guarantor may be events of default under the Loan Documents.

10.    Consent to Jurisdiction. Any Proceeding to enforce this Guaranty may be brought in any state or federal court located in the State, as Administrative Agent may elect. By executing this Guaranty, Guarantor irrevocably accepts and submits to the nonexclusive personal jurisdiction of each of the aforesaid courts, generally and unconditionally with respect to any such Proceeding. Guarantor shall not assert any basis to transfer jurisdiction of any such proceeding to another court. Guarantor further agrees that a final judgment against Guarantor in any Proceeding shall be conclusive evidence of Guarantor's liability for the full amount of such judgment.

11.    Merger; No Conditions; Amendments; Assignment. This Guaranty and documents referred to in this Guaranty contain the entire agreement among the parties relating to the matters set forth in this Guaranty. This Guaranty supersedes all prior agreements among the parties relating to such matters. No course of prior dealings among the parties, no usage of trade, and no parol or extrinsic evidence of any nature shall be used to supplement, modify, or vary any term of this Guaranty. This Guaranty is unconditional. There are no unsatisfied conditions to the full effectiveness of this Guaranty. No term or provision of this Guaranty may be changed, waived, revoked, or amended without Administrative Agent's prior written consent. If any provision of this Guaranty is unenforceable, then all other provisions shall remain fully effective. Neither this Guaranty nor any rights under this Guaranty may be assigned by Guarantor without the prior written consent of Administrative Agent.

12.    Attorney's Fees and Costs. Guarantor shall reimburse Administrative Agent and the Lenders for all reasonable costs and attorney's fees they actually incur in the following, whether or not they prevail: (a) any Proceeding between Borrower or Guarantor and Administrative Agent or any Lender; (b) any Proceeding in which Administrative Agent or any Lender enforces or attempts to enforce this Guaranty or the Loan against Borrower or Guarantor; or (c) litigation between or among any of Borrower, Guarantor, and any other persons liable for the Obligations.

13.    Further Assurances. Guarantor shall execute and deliver such further documents, and perform such further acts, as Administrative Agent may reasonably request to achieve the intent of the parties as expressed in this Guaranty, provided in each case that any such documentation is consistent with this Guaranty and with the Loan Documents.

14.    Miscellaneous. Administrative Agent may assign this Guaranty together with any one or more of the Loan Documents, without in any way affecting Guarantor's liability. This Guaranty shall benefit Administrative Agent and its successors and assigns and shall bind

6

Guarantor and its heirs, executors, administrators, successors, and assigns. All notices given hereunder shall be given in accordance with the notice information and in the manner set forth in Section 9.7 of the First Lien Credit Agreement. A party may change its address by notice given in the same manner. This Guaranty shall be enforced and interpreted according to the laws of the State, disregarding its rules on conflicts of laws. The word "include" and its variants shall be interpreted in each case as if followed by the words "without limitation." This Guaranty is executed and delivered for the benefit of Administrative Agent and its heirs, successors, and assigns, and is not intended to benefit any third party. The invalidity or unenforceability of any particular provision of this Guaranty shall not affect the other provisions, and this Guaranty shall be construed in all respects as if any invalid or unenforceable provision were omitted.

15.     Use of Designee. Administrative Agent may, at its option, exercise any of its rights and remedies under this Guaranty through its assignee, designee, nominee, or wholly-owned subsidiary (a "Designee"). Any Designee shall be entitled to all the rights, remedies, protections and indemnities of the Administrative Agent under the Loan Documents, as if each reference to Administrative Agent included a reference to such Designee.

16.     WAIVER OF JURY TRIAL. ADMINISTRATIVE AGENT AND GUARANTOR EACH WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN ANY WAY IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THE LOAN DOCUMENTS, OR THE INTERPRETATION OR DETERMINATION THEREOF, OR THE ENFORCEMENT OF ANY ADMINISTRATIVE AGENT'S REMEDIES. ANY SUCH DISPUTES SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

17.     Maximum Guarantied Amount. Notwithstanding anything to the contrary in this Guaranty, Guarantor's liability shall in no event exceed the maximum amount that Administrative Agent could, at the date of determination, claim from Guarantor without rendering Administrative Agent's claim against Guarantor voidable or avoidable under 11 U.S.C. § 548 or any applicable state fraudulent transfer or fraudulent conveyance law (whether statutory or common law) after taking into account, among other things, Guarantor's rights of contribution and indemnity from any other person.

18.     Multiple Guarantors. Every reference to "Guarantor" shall refer to any one or more of the multiple person(s) signing this Guaranty, jointly and severally. Each person signing this Guaranty shall have all the liability that such person would have incurred if such person were the only person signing this Guaranty as Guarantor. The liability of each such person signing this Guaranty is joint and several, and is not conditioned upon the liability or performance of any other person signing this Guaranty. Each Guarantor is fully personally liable for all obligations under this Guaranty, whether or not any other Guarantor is so liable, and whether or not any other purported Guarantor has actually executed and delivered this Guaranty.

19.     Financial Information. Guarantor shall, within ninety (90) days after the close of each fiscal year of Guarantor, deliver to Administrative Agent financial statements of Guarantor in form satisfactory to Administrative Agent. Guarantor shall, within thirty (30) days after

7

Administrative Agent's request from time to time, give Administrative Agent such other financial information about Guarantor as Administrative Agent shall reasonably request.

20.    <u>Confirmation Certificates</u>.  Guarantor shall, upon Administrative Agent's request from time to time, deliver to Administrative Agent or to any assignee of the Loan a certificate in form and substance reasonably satisfactory to Administrative Agent (a "<u>Confirmation Certificate</u>") that confirms:  (a) the continued validity, effectiveness, and enforceability of this Guaranty, (b) the application of this Guaranty to specific Guarantied Obligations as Administrative Agent specifies; (c) that any specified amendment(s) of the Loan Documents do(es) not impair the continued validity, effectiveness, and enforceability of this Guaranty, (d) reaffirmation of Guarantor's representations and warranties in this Guaranty as of the date of such Confirmation Certificate; and (e) except as expressly stated in the Confirmation Certificate, Guarantor has no defense, offset, claim, counterclaim, or other limitation on its liability under this Guaranty in accordance with its terms.  Any Confirmation Certificate shall bind Guarantor whether or not the addressee can demonstrate detrimental reliance.  Administrative Agent need not obtain a Confirmation Certificate as a condition to the continued effectiveness of this Guaranty or of any waiver it contains.

21.    <u>Governing Law</u>.  This Guaranty (and any claims arising under this Guaranty or relating to or arising from the relationship between the parties, whether in contract, in tort, or otherwise) shall be governed solely by New York internal Law (disregarding such state's law on conflict of laws) notwithstanding the location of any Collateral.  Guarantor acknowledges that any restrictions, limitations, and prohibitions set forth in New York Real Property Actions and Proceedings Law Sections 1301 and 1371 that would or might otherwise limit or establish conditions to Administrative Agent's recovery of a judgment against Guarantor if the Collateral were located in New York State shall have absolutely no application to Administrative Agent's enforcement of this Guaranty as against Guarantor, except to the extent that real property Collateral is located within the State of New York.  Guarantor acknowledges that this Guaranty is an "instrument for the payment of money only," within the meaning of New York Civil Practice Law and Rules Section 3213.

22.    <u>Representations and Warranties</u>.  Guarantor acknowledges, represents, and warrants as follows, and acknowledges that Administrative Agent is relying upon the following acknowledgments, representations, and warranties in making the Loan:

a.    <u>No Conflict</u>.  The execution, delivery, and performance of this Guaranty will not violate any provision of any law, regulation, judgment, order, decree, determination, or award of any court, arbitrator or governmental authority, or of any mortgage, indenture, loan, or security agreement, lease, contract, or other agreement, instrument, or undertaking to which Guarantor is a party or that purports to bind Guarantor or any of Guarantor's property or assets.

b.    <u>No Third Party Consent Required</u>.  No consent of any person (including creditors or partners, members, stockholders, or other owners of Guarantor) is required in connection with Guarantor's execution of this Guaranty or performance of Guarantor's obligations under this Guaranty.  Guarantor's execution of, and obligations under, this Guaranty are not contingent upon any consent, license, permit, approval, or authorization of, exemption

8

by, notice or report to, or registration, filing, or declaration with, any governmental authority, bureau, or agency, whether local, state, federal, or foreign.

       c.    <u>Authority and Execution</u>.  Guarantor has full power, authority, and legal right to execute, deliver and perform its obligations under this Guaranty.  Guarantor has taken all necessary corporate and legal action to authorize this Guaranty, which has been duly executed and delivered and is a legal, valid, and binding obligation of Guarantor, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other laws of general application affecting the enforcement of creditor's rights or general equitable principals, whether applied in law or equity.

       d.    <u>No Representations by Administrative Agent</u>.  Guarantor delivers this Guaranty based solely upon Guarantor's own independent investigation and based in no part upon any representation, statement, or assurance by Administrative Agent.

       e.    <u>Status; Valid Title; Liens</u>.  Guarantor is duly organized, validly existing, and in good standing under the laws of a state of the United States.  Guarantor has good and marketable title to all of its property and assets, real and personal.  None of such property or assets are subject to any lien whatsoever except as disclosed to Administrative Agent in writing before Guarantor's execution of this Guaranty.

       f.    <u>No Misstatements</u>.  No information, exhibit, report or certificate furnished by Borrower or Guarantor to Administrative Agent in connection with the Loan or any Loan Documents contains any material misstatement of fact or has omitted to state a material fact or any fact necessary to make the statements contained therein not materially misleading.

    23.    <u>Reimbursement and Subrogation Rights</u>.  Except to the extent that Administrative Agent notifies Guarantor to the contrary in writing from time to time:

       a.    <u>General Deferral of Reimbursement</u>.  Guarantor waives any right to be reimbursed by Borrower for any payment(s) Guarantor makes on account of the Guarantied Obligations, unless and until all Obligations have been paid in full and all periods within which such payments may be set aside or invalidated have expired.  Guarantor acknowledges that Guarantor has received adequate consideration for execution of this Guaranty by virtue of Administrative Agent's making the Loan.  Guarantor does not require or expect, and is not entitled to, any other right of reimbursement against Borrower as consideration for this Guaranty.

       b.    <u>Deferral of Subrogation and Contribution</u>.  Guarantor shall have no right of subrogation against Borrower or Administrative Agent, no right of subrogation against any Collateral, and no right of contribution against any other person obligated to pay or perform any Obligations unless and until in Administrative Agent's reasonable determination:  (i) such right does not violate (or otherwise produce any result adverse to Administrative Agent under) any applicable law, including any bankruptcy or insolvency law; (ii) all Obligations have been paid and performed in full; (iii) all periods within which such payment and performance may be set aside or invalidated have expired; and (iv) Administrative Agent has released, transferred, or disposed of all of its right, title, and interest in all Collateral (such deferral of Guarantor's subrogation and contribution rights, the "<u>Subrogation Deferral</u>").

9

c.   Effect of Invalidation.  To the extent that a court of competent jurisdiction determines that Guarantor's Subrogation Deferral is void or voidable for any reason, Guarantor agrees, notwithstanding any acts or omissions by Administrative Agent, that: (i) Guarantor's rights of subrogation against Borrower, Administrative Agent, or any Collateral shall at all times be junior and subordinate to Administrative Agent's rights against Borrower and such Collateral; and (ii) Guarantor's right of contribution against any other obligor under the Loan shall be junior and subordinate to Administrative Agent's rights against such other obligor.

d.   Claims in Insolvency Proceeding.  Guarantor shall not file any claim in any Insolvency Proceeding affecting Borrower unless Guarantor simultaneously assigns and transfers such claim to Administrative Agent, without consideration, pursuant to documentation fully satisfactory to Administrative Agent.  Guarantor shall automatically be deemed to have assigned and transferred such claim to Administrative Agent whether or not Guarantor executes documentation to such effect.  If such assignment and transfer is not legally permitted, then Guarantor shall vote (or refrain from voting) its claims in accordance with Administrative Agent's instructions.  By executing this Guaranty, Guarantor authorizes Administrative Agent (and grants Administrative Agent a power of attorney coupled with an interest, and hence irrevocable) to execute and file such assignment and transfer documentation on Guarantor's behalf.  Administrative Agent shall have the sole right to vote (or to direct Guarantor how to vote), receive distributions, and exercise all other rights with respect to any such claim.  If and when the Guarantied Obligations have been paid in full Administrative Agent shall release to Guarantor any further payments received on account of any such claim.

24.   Disgorgement Payments.  Upon payment of all or any portion of the Guarantied Obligations (including from the proceeds of a foreclosure sale or as the result of Administrative Agent's credit bid at any foreclosure sale, or otherwise as a result of Administrative Agent's exercise of its rights and remedies under the Loan Documents or applicable law), or upon Borrower's delivery to Administrative Agent of a conveyance in lieu of foreclosure, Guarantor's obligations under this Guaranty shall continue and remain in full force and effect (and be reinstated, to the extent such obligations shall have previously terminated) if all or any part of such payment or conveyance is, through any Insolvency Proceeding or otherwise, avoided or recovered directly or indirectly from Administrative Agent, or if Administrative Agent is otherwise required to return, repay, or disgorge any such payment or conveyance, as a preference, fraudulent transfer, or otherwise (a "Disgorgement Payment" by Administrative Agent), regardless of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, or (b) full payment and performance of the Obligations.  Guarantor's liability under this Guaranty shall continue until all periods have expired within which Administrative Agent could (on account of Insolvency Proceedings, whether or not then pending, affecting Borrower or any other person) be required to make any Disgorgement Payment.

25.   Disgorgement Actions.  If any party seeks to require Administrative Agent to make a Disgorgement Payment (a "Disgorgement Action"), then within ten (10) days after written notice from Administrative Agent Guarantor shall deposit with Administrative Agent funds in an amount equal to 110% of the Disgorgement Payment being sought (together with interest, the "Disgorgement Deposit").  Administrative Agent shall hold the Disgorgement Deposit in an interest-bearing account as cash collateral (under documents satisfactory to

10

Administrative Agent) for Guarantor's potential obligation to make a Disgorgement Payment. If Guarantor timely makes a Disgorgement Deposit, then so long as Guarantor performs all its obligations under this Guaranty, Administrative Agent shall, at Guarantor's option, either: (a) refund to Borrower's estate an amount equal to the Disgorgement Payment and apply the Disgorgement Deposit as a payment on account of the Guarantied Obligations and refund any excess to Guarantor; or (b) permit Guarantor to defend the Disgorgement Action at Guarantor's expense (including all legal costs) on Administrative Agent's behalf, all in a manner reasonably satisfactory to Administrative Agent, provided such defense does not in Administrative Agent's judgment cause Administrative Agent to incur any unreimbursed cost, expense, liability, or other detriment of any kind (including any adverse effect on any other actions Administrative Agent takes or intends to take in the Insolvency Proceeding). To the extent that Guarantor's defense ultimately succeeds beyond right of further appeal (so Administrative Agent is not obligated to make any Disgorgement Payment) and Guarantor has paid all Administrative Agent's costs incurred in the Disgorgement Action (including all legal costs), Administrative Agent shall return the Disgorgement Deposit.

26.    Fundamental Changes.  Guarantor shall not wind up, liquidate, or dissolve its affairs or enter into any transaction of merger or consolidation, or sell, lease, or otherwise dispose of (or agree to do any of the foregoing) all or substantially all of its property or assets, or change its state of formation or entity status, without Administrative Agent's prior written consent.

27.    Certain Entities.  If Borrower or Guarantor is a partnership, limited liability company, or other unincorporated association, then: (i) Guarantor's liability shall not be impaired by changes in the name or composition of such entity; and (ii) the withdrawal or removal of any partner(s) or member(s) of such entity shall not diminish Guarantor's liability or (if Guarantor is a partnership) the liability of any withdrawing general partner of Guarantor.

28.    Termination of Guaranty.  Guarantor's obligations under this Guaranty shall continue in full force and effect and this Guaranty shall not terminate until the Guaranteed Obligations are fully paid, performed and discharged (free and clear of any right of any person to set aside any such payment including, without limitation, any right to recover preferences voidable under Title 11 of the United States Code) and Administrative Agent gives Guarantor notice of that fact.

29.    Representation by Counsel.  Guarantor acknowledges that before executing this Guaranty:  (a) Guarantor has had the opportunity to review it with an attorney of Guarantor's choice; (b) Administrative Agent has recommended to Guarantor that Guarantor obtain separate counsel, independent of Borrower's counsel, for this Guaranty; and (c) Guarantor has carefully read this Guaranty and understood the meaning and effect of its terms.

*[No Further Text on this Page.]*

11

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the Closing Date.

**GINN-LA QUAIL WEST LTD., LLLP,**
a Georgia limited liability limited partnership

By:    Ginn-Quail West GP, LLC,
       a Georgia limited liability company

By:    _[signature]_
Name:  Robert F. Masters
Title:  President

**GINN-LA LAUREL CREEK LTD., LLLP,**
a Georgia limited liability limited partnership

By:    Ginn-Laurel Creek GP, LLC,
       a Georgia limited liability company

By:    _[signature]_
Name:  Robert F. Masters
Title:  President

**GINN-LA BULOW LTD., LLLP,**
a Georgia limited liability limited partnership

By:    Ginn- Bulow GP, LLC,
       a Georgia limited liability company, its
       General Partner

By:    _[signature]_
Name:  Robert F. Masters
Title:  President

**GINN-LA ST. LUCIE LTD., LLLP,**
a Georgia limited liability limited partnership

By:    Ginn- St. Lucie GP,  LLC,
       its general partner

By:    _[signature]_
Name:  Robert F. Masters
Title:  President

First Lien Subsidiary Guaranty

**GINN-BULOW GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**GINN-ST. LUCIE GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**GINN-QUAIL WEST GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**GINN-LAUREL CREEK GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**THE TESORO CLUB, LLC ,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**TESORO GOLF CLUB CONDOMINIUM, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**TESORO BEACH CLUB CONDOMINIUM, LLC ,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

First Lien Subsidiary Guaranty

**GINN QUAIL WEST BEACH, LLC,**
a Georgia limited liability company

By: _____

Name: Robert F. Masters
Title:  President

**HAMMOCK BEACH RIVER CLUB, LLC,**
a Georgia limited liability company

By: _____

Name: Robert F. Masters
Title:  President

First Lien Subsidiary Guaranty

# EXHIBIT 4

## SECOND LIEN SUBSIDIARY GUARANTY

## SUBSIDIARY GUARANTY

## (Second Lien)

This **GUARANTY** (the "Guaranty") is made and entered into as of June 8, 2006 (the "Closing Date") by each person signing this Guaranty, each having an address as stated below its signature of this Guaranty (each, a "Guarantor"), for the benefit of CREDIT SUISSE, CAYMAN ISLANDS BRANCH, in its capacity as Administrative Agent and Collateral Agent for the Lenders, as more fully described in the Second Lien Credit Agreement, as defined below (the "Administrative Agent"). This Guaranty is made with reference to the following facts (with some capitalized terms being defined below):

A.    The Lenders, acting by and through Administrative Agent, are making certain loans (the "Loan") in the amount of $150,000,000, to Ginn-LA CS Borrower, LLC, a Delaware limited liability company and Ginn-LA Conduit Lender, Inc., a Delaware corporation (collectively, the "Borrower").

B.    The Loan is to be evidenced by a note, to the extent requested by the Lenders, dated as of the Closing Date executed by Borrower (as it may be modified, extended, renewed, or replaced, the "Note"), and is more fully described in the Second Lien Credit Agreement dated as of the Closing Date entered into between Administrative Agent (as Administrative Agent and Collateral Agent for the Lenders, as defined in the Second Lien Credit Agreement), Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner and Borrower (the "Second Lien Credit Agreement").

C.    As security for the Loan, Guarantor is executing and delivering to Administrative Agent for the Lenders a Second Lien Mortgage or Collateral Assignment of Mortgage and Note with respect to the real property commonly known as Grand Bahama (West End) (the "Mortgage") encumbering the real property commonly known as Quail West, Laurelmor, Tesoro, Tesoro Beach Club and Hammock Beach River Club (the "Real Property Collateral").

D.    Guarantor acknowledges that Administrative Agent has examined, among other things, Borrower's creditworthiness and ability to pay and perform the Obligations and has requested, as a condition of making the Loan, that Guarantor guaranty some or all Obligations, as provided for below.

E.    Guarantor, a wholly-owned subsidiary of Borrower, will benefit if the Lenders, acting through Administrative Agent, make the Loan; and desires that the Lenders, acting through Administrative Agent, make the Loan to Borrower.

F.    The Lenders would not make, and would not be obligated to make, the Loan to Borrower unless Guarantor executed this Guaranty. This Guaranty is therefore delivered to Lenders, acting through Administrative Agent, to induce the Lenders to make the Loan.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and for $10 and other good, adequate, and valuable consideration, the receipt of which Guarantor acknowledges, Guarantor agrees:

1.    <u>Definitions</u>.  For purposes of this Guaranty, the following terms shall be defined as set forth below.  In addition, any capitalized term defined in the Second Lien Credit Agreement but not defined in this Guaranty shall have the same meaning in this Guaranty as in the Second Lien Credit Agreement.

a.    "<u>Borrower</u>" means:  (a) Borrower as defined above, acting on its own behalf; (b) any estate created by the commencement of an Insolvency Proceeding affecting Borrower; (c) any trustee, liquidator, sequestrator or receiver of Borrower or Borrower's property; and (d) any similar person appointed in any Insolvency Proceeding of Borrower.

b.    "<u>Guaranteed Obligations</u>" means all Obligations.

c.    "<u>Insolvency Proceeding</u>" means any Proceeding under any present or future state or federal law on bankruptcy, reorganization, insolvency or relief of debtors, appointment of a trustee (or custodian or receiver), assignment for the benefit of creditors, readjustment, liquidation, dissolution, or the rights of creditors generally, including the federal bankruptcy code and laws on fraudulent conveyances and fraudulent transfers.

d.    "<u>Loan Documents</u>" shall have the meaning given such term in the Second Lien Credit Agreement.  If the Loan Documents, as so defined, are modified pursuant to any Insolvency Proceeding, even if Administrative Agent consented to such modification, then such modification shall not affect the definition of "Loan Documents" under this Guaranty, unless Administrative Agent elects otherwise in its sole discretion.

e.    "<u>Preserved Defenses</u>" means only any defenses that Borrower could, under the express terms of the Loan Documents, properly assert against the Obligations based upon only:  (a) actual payment and performance in compliance with the Loan Documents; or (b) Administrative Agent's acts and omissions.

f.    "<u>Proceeding</u>" means any action, suit, nonjudicial foreclosure, arbitration hearing or proceeding arising out of, or relating to the interpretation or enforcement of, this Guaranty or the Loan Documents, including:  (a) an Insolvency Proceeding; and (b) any proceeding in which Administrative Agent endeavors to realize upon any Collateral or enforce any Loan Document(s) against Borrower, Guarantor, or any other obligor.

g.    "<u>State</u>" means the State of New York.

2.    <u>Guaranteed Obligations</u>.  Guarantor unconditionally, absolutely and irrevocably guarantees Borrower's prompt and complete payment, observance, fulfillment and performance of all Guaranteed Obligations.  Guarantor shall be personally liable for, and personally obligated to perform, all Guaranteed Obligations.  All assets of Guarantor shall be subject to recourse if Guarantor fails to pay and perform any Guaranteed Obligation.  Guarantor shall personally pay and perform all Guaranteed Obligations, as if Guarantor had itself assumed and agreed to

2

perform such Guarantied Obligations in the first instance.  Administrative Agent shall apply any payments Guarantor makes under this paragraph on account of such Guarantied Obligations as Administrative Agent shall determine.  To the extent that Guarantor at any time incurs any liability under this Guaranty as to any Guarantied Obligations, Guarantor shall immediately pay Administrative Agent (to be applied on account of the Guarantied Obligations) the amount provided for in this Guaranty, without any requirement that Administrative Agent demonstrate that the Real Property Collateral provides inadequate security for the Loan; that Administrative Agent has currently suffered any loss; or that Administrative Agent has otherwise exercised (to any degree) or exhausted any of Administrative Agent's remedies against Borrower or any Collateral.  If (a) the Loan Documents provide that any Guarantied Obligation does not arise unless and until Administrative Agent has given notice to Borrower (whether or not any additional conditions must be satisfied for such liability to arise), and (b) Borrower is the subject of any Insolvency Proceeding, then for purposes of this Guaranty and Guarantor's liability, Administrative Agent may give any such notice to Guarantor in place of Borrower, and, as against Guarantor, such Guarantied Obligation shall arise at the same time and in the same manner as if Administrative Agent had validly given notice to Borrower as of the date of Administrative Agent's notice to Guarantor, and no notice to Borrower shall be required.

3.    Nature and Scope of Liability.  Guarantor's liability under this Guaranty shall be primary and not secondary, in the full amount of the Guarantied Obligations, including any interest, default interest, costs and fees (including attorney's fees) that would have accrued under the Loan Documents on account of the Guarantied Obligations but for any Insolvency Proceeding affecting Borrower, but subject to the Preserved Defenses.

4.    Changes in Loan Documents.  Without notice to, or consent by, Guarantor, and in Administrative Agent's sole and absolute discretion and without prejudice to Administrative Agent or in any way limiting or reducing Guarantor's liability under this Guaranty, Administrative Agent may:  (a) grant extensions of time, renewals or other indulgences or Modifications to Borrower or any other party liable under any Loan Document(s); (b) change the rate of interest under the Note; (c) change, amend, or modify any Loan Document(s); (d) authorize the sale, exchange, release, or subordination of any Collateral; (e) accept or reject additional Collateral; (f) discharge or release any Loan Party or any other party or parties liable under the Loan Documents or any Collateral; (g) foreclose or otherwise realize on any Collateral, or attempt to foreclose or otherwise realize on any Collateral, whether successfully or unsuccessfully; (h) accept or make compositions or other arrangements or file or refrain from filing a claim in any Insolvency Proceeding; (i) make other or additional loans to Borrower in such amount(s) and at such time(s) as Administrative Agent may determine; (j) credit payments in such manner and order of priority to the Obligations as Administrative Agent may determine in its discretion; and (k) otherwise deal with Borrower and any other party related to the Loan or any Collateral as Administrative Agent may determine in its sole and absolute discretion.  Without limiting the generality of the foregoing, Guarantor's liability under this Guaranty shall continue even if Administrative Agent alters any Obligations in any way or if Administrative Agent's remedies or Guarantor's remedies or rights against Borrower are in any way impaired or suspended without Guarantor's consent.  If Administrative Agent performs any action described in this paragraph, then Guarantor's liability shall continue in full force and effect even if Administrative Agent's actions impair, diminish or eliminate Guarantor's subrogation,

3

contribution, or reimbursement rights (if any) against Borrower or any other person, or otherwise adversely affect Guarantor or expand Guarantor's liability. Guarantor hereby consents to each and all of the foregoing acts, events and occurrences.

5.    Nature of Guaranty. Subject to the terms of this Guaranty and subject to the Preserved Defenses, Guarantor's liability under this Guaranty is a guaranty of payment and performance of the Guaranteed Obligations, and not a guaranty of collection or collectibility. Guarantor's liability under this Guaranty is not conditioned or contingent upon the genuineness, validity, regularity, or enforceability of any of the Loan Documents. Guarantor's liability under this Guaranty is a continuing, absolute, and unconditional obligation under any and all circumstances whatsoever, including the renewal, extension, compromise, refinance or restructure from time to time of the Guaranteed Obligations, subject only to the Preserved Defenses. Guarantor is fully obligated under this Guaranty even if Borrower had no liability at the time of execution of the Loan Documents or later ceases to be liable under any Loan Document, whether through Insolvency Proceedings or otherwise, subject only to the Preserved Defenses. Guarantor may not claim, and irrevocably covenants not to raise or assert, any defense, offset, claim, counterclaim, setoff, diminution, abatement, or right of recoupment against the Guaranteed Obligations that would or might be available to Borrower, except the Preserved Defenses. If any Guarantied Obligation is or becomes void or unenforceable (because of inadequate consideration, lack of capacity, Insolvency Proceedings, or for any other reason except a Preserved Defense), then Guarantor's liability under this Guaranty shall continue in full force for all Guarantied Obligations as if they were and continued to be legally enforceable. Guarantor waives any defenses arising or purportedly arising from: (a) how Administrative Agent disburses the Loan to Borrower or otherwise; (b) Administrative Agent's waiver of the terms of any Loan Document; or (c) Administrative Agent's failure to require full compliance with the Loan Documents. Except to the extent (if any) that this Guaranty expressly provides otherwise, Guarantor's liability under this Guaranty shall continue until all Obligations have been paid in full and all other performance required under the Loan Documents has been rendered in full, subject to the Preserved Defenses. Guarantor's liability under this Guaranty shall not be limited or affected in any way by any impairment or any diminution or loss of value of any Collateral whether caused by (a) Hazardous Materials, (b) Administrative Agent's failure to perfect a security interest in any Collateral, (c) any disability or other defense(s) of Borrower or any other person obligated to pay the Obligations, or (d) Borrower's breach of any representation or warranty in any Loan Document. Nothing in this paragraph limits any Preserved Defense.

6.    Waivers of Rights and Defenses. Guarantor waives any right to require Administrative Agent to (a) proceed against Borrower or any other person obligated on the Obligations, (b) proceed against or exhaust any Collateral, or (c) pursue any other right or remedy for Guarantor's benefit. Administrative Agent may proceed against Guarantor for the Guarantied Obligations without proceeding against Borrower, any other obligor, or any Collateral. Administrative Agent may unqualifiedly exercise in its sole discretion any or all of Administrative Agent's remedies against Borrower or any other person without impairing Administrative Agent's rights and remedies in enforcing this Guaranty, under which Guarantor's liabilities for the Guarantied Obligations shall remain independent and unconditional. Guarantor agrees and acknowledges that Administrative Agent's exercise of certain of such rights or

4

remedies may affect or eliminate Guarantor's right of subrogation or recovery against Borrower (if any) and that Guarantor may incur a partially or totally nonreimbursable liability in performing under this Guaranty. Guarantor has assumed the risk of any such loss of subrogation rights, even if caused by Administrative Agent's acts or omissions. If Administrative Agent's enforcement of rights and remedies, or the manner of such enforcement, limits or precludes Guarantor from exercising any right of subrogation that might otherwise exist, then such limitation or preclusion shall not in any way limit Administrative Agent's rights to enforce this Guaranty. Guarantor hereby waives any right to assert against Administrative Agent as a defense, counterclaim, setoff or crossclaim, any defense (legal or equitable), counterclaim, setoff or crossclaim which Guarantor may now or at any time hereafter have under applicable law, rule, arrangement or relationship against Borrower, Administrative Agent or any other party, other than Preserved Defenses.

7.      Foreclosure; Application of Payments. Except as the Loan Documents otherwise provide, without limiting the generality of any other waivers in this Guaranty, Guarantor expressly waives any statutory or other right that Guarantor might otherwise have to: (i) limit Guarantor's liability after a nonjudicial foreclosure sale to the difference between the Guarantied Obligations and the fair market value of the property or interests sold at such nonjudicial foreclosure sale or to any other extent, (ii) otherwise limit Administrative Agent's right to recover a deficiency judgment after any foreclosure sale, or (iii) require Administrative Agent to exhaust its Collateral before Administrative Agent may obtain a personal judgment for any deficiency. Any proceeds of a foreclosure or similar sale may be applied first to Obligations (if any) that do not also constitute Guarantied Obligations. Guarantor acknowledges and agrees that any nonrecourse or exculpation provided for in any Loan Document, or any other provision of a Loan Document limiting Administrative Agent's recourse to specific Collateral or limiting Administrative Agent's right to enforce a deficiency judgment against Borrower, shall have absolutely no application to Guarantor's liability for the Guarantied Obligations. To the extent that Administrative Agent collects or receives any sums or payments from any source on account of the Obligations, Administrative Agent may, but need not, apply such amounts first to any Obligations not constituting Guarantied Obligations, regardless of how the payor characterizes any such payments and/or amounts. Nothing in this paragraph limits any Preserved Defenses.

8.      Additional Waivers. Guarantor waives diligence and all demands, protests, presentments and notices of every kind or nature, including notices of protest, dishonor, nonpayment, acceptance of this Guaranty and the creation, renewal, extension, modification, or accrual of any Obligations. Guarantor waives the right to plead any and all statutes of limitations as a defense to Guarantor's liability under this Guaranty or the enforcement of this Guaranty. No failure or delay by Administrative Agent in exercising any power, right, or privilege under this Guaranty shall impair or waive any such power, right or privilege. Nothing in this paragraph limits any Preserved Defense and nothing herein shall constitute a waiver of any notice expressly required under any Loan Document.

9.      Full Knowledge. Guarantor acknowledges, represents, and warrants that Guarantor has had a full and adequate opportunity to review the Loan Documents, the transaction contemplated by the Loan Documents and all underlying facts relating to such transaction. Guarantor represents and warrants that Guarantor fully understands: (a) the

remedies Administrative Agent may pursue against Borrower in the event of a default under the Loan Documents, (b) the value (if any) of any Collateral, and (c) Borrower's financial condition and ability to perform under the Loan Documents. Guarantor shall keep itself fully informed regarding all aspects of Borrower's financial condition and the performance of Borrower's obligations to Administrative Agent. Guarantor agrees that Administrative Agent has no duty, whether now or in the future, to disclose to Guarantor any information about Borrower or any Collateral. If at any time provided for in the Loan Documents, the Guarantor agrees that its bankruptcy, insolvency, default, or other actions or events relating to Guarantor may be events of default under the Loan Documents.

10.    Consent to Jurisdiction. Any Proceeding to enforce this Guaranty may be brought in any state or federal court located in the State, as Administrative Agent may elect. By executing this Guaranty, Guarantor irrevocably accepts and submits to the nonexclusive personal jurisdiction of each of the aforesaid courts, generally and unconditionally with respect to any such Proceeding. Guarantor shall not assert any basis to transfer jurisdiction of any such proceeding to another court. Guarantor further agrees that a final judgment against Guarantor in any Proceeding shall be conclusive evidence of Guarantor's liability for the full amount of such judgment.

11.    Merger; No Conditions; Amendments; Assignment. This Guaranty and documents referred to in this Guaranty contain the entire agreement among the parties relating to the matters set forth in this Guaranty. This Guaranty supersedes all prior agreements among the parties relating to such matters. No course of prior dealings among the parties, no usage of trade, and no parol or extrinsic evidence of any nature shall be used to supplement, modify, or vary any term of this Guaranty. This Guaranty is unconditional. There are no unsatisfied conditions to the full effectiveness of this Guaranty. No term or provision of this Guaranty may be changed, waived, revoked, or amended without Administrative Agent's prior written consent. If any provision of this Guaranty is unenforceable, then all other provisions shall remain fully effective. Neither this Guaranty nor any rights under this Guaranty may be assigned by Guarantor without the prior written consent of Administrative Agent.

12.    Attorney's Fees and Costs. Guarantor shall reimburse Administrative Agent and the Lenders for all reasonable costs and attorney's fees they actually incur in the following, whether or not they prevail: (a) any Proceeding between Borrower or Guarantor and Administrative Agent or any Lender; (b) any Proceeding in which Administrative Agent or any Lender enforces or attempts to enforce this Guaranty or the Loan against Borrower or Guarantor; or (c) litigation between or among any of Borrower, Guarantor, and any other persons liable for the Obligations.

13.    Further Assurances. Guarantor shall execute and deliver such further documents, and perform such further acts, as Administrative Agent may reasonably request to achieve the intent of the parties as expressed in this Guaranty, provided in each case that any such documentation is consistent with this Guaranty and with the Loan Documents.

14.    Miscellaneous. Administrative Agent may assign this Guaranty together with any one or more of the Loan Documents, without in any way affecting Guarantor's liability. This Guaranty shall benefit Administrative Agent and its successors and assigns and shall bind

Guarantor and its heirs, executors, administrators, successors, and assigns. All notices given hereunder shall be given in accordance with the notice information and in the manner set forth in Section 9.7 of the Second Lien Credit Agreement. A party may change its address by notice given in the same manner. This Guaranty shall be enforced and interpreted according to the laws of the State, disregarding its rules on conflicts of laws. The word "include" and its variants shall be interpreted in each case as if followed by the words "without limitation." This Guaranty is executed and delivered for the benefit of Administrative Agent and its heirs, successors, and assigns, and is not intended to benefit any third party. The invalidity or unenforceability of any particular provision of this Guaranty shall not affect the other provisions, and this Guaranty shall be construed in all respects as if any invalid or unenforceable provision were omitted.

15.     Use of Designee. Administrative Agent may, at its option, exercise any of its rights and remedies under this Guaranty through its assignee, designee, nominee, or wholly-owned subsidiary (a "Designee"). Any Designee shall be entitled to all the rights, remedies, protections and indemnities of the Administrative Agent under the Loan Documents, as if each reference to Administrative Agent included a reference to such Designee.

16.     WAIVER OF JURY TRIAL. ADMINISTRATIVE AGENT AND GUARANTOR EACH WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN ANY WAY IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THE LOAN DOCUMENTS, OR THE INTERPRETATION OR DETERMINATION THEREOF, OR THE ENFORCEMENT OF ANY ADMINISTRATIVE AGENT'S REMEDIES. ANY SUCH DISPUTES SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

17.     Maximum Guarantied Amount. Notwithstanding anything to the contrary in this Guaranty, Guarantor's liability shall in no event exceed the maximum amount that Administrative Agent could, at the date of determination, claim from Guarantor without rendering Administrative Agent's claim against Guarantor voidable or avoidable under 11 U.S.C. § 548 or any applicable state fraudulent transfer or fraudulent conveyance law (whether statutory or common law) after taking into account, among other things, Guarantor's rights of contribution and indemnity from any other person.

18.     Multiple Guarantors. Every reference to "Guarantor" shall refer to any one or more of the multiple person(s) signing this Guaranty, jointly and severally. Each person signing this Guaranty shall have all the liability that such person would have incurred if such person were the only person signing this Guaranty as Guarantor. The liability of each such person signing this Guaranty is joint and several, and is not conditioned upon the liability or performance of any other person signing this Guaranty. Each Guarantor is fully personally liable for all obligations under this Guaranty, whether or not any other Guarantor is so liable, and whether or not any other purported Guarantor has actually executed and delivered this Guaranty.

19.     Financial Information. Guarantor shall, within ninety (90) days after the close of each fiscal year of Guarantor, deliver to Administrative Agent financial statements of Guarantor in form satisfactory to Administrative Agent. Guarantor shall, within thirty (30) days after

7

Administrative Agent's request from time to time, give Administrative Agent such other financial information about Guarantor as Administrative Agent shall reasonably request.

20.     Confirmation Certificates.  Guarantor shall, upon Administrative Agent's request from time to time, deliver to Administrative Agent or to any assignee of the Loan a certificate in form and substance reasonably satisfactory to Administrative Agent (a "Confirmation Certificate") that confirms:  (a) the continued validity, effectiveness, and enforceability of this Guaranty, (b) the application of this Guaranty to specific Guarantied Obligations as Administrative Agent specifies; (c) that any specified amendment(s) of the Loan Documents do(es) not impair the continued validity, effectiveness, and enforceability of this Guaranty, (d) reaffirmation of Guarantor's representations and warranties in this Guaranty as of the date of such Confirmation Certificate; and (e) except as expressly stated in the Confirmation Certificate, Guarantor has no defense, offset, claim, counterclaim, or other limitation on its liability under this Guaranty in accordance with its terms.  Any Confirmation Certificate shall bind Guarantor whether or not the addressee can demonstrate detrimental reliance.  Administrative Agent need not obtain a Confirmation Certificate as a condition to the continued effectiveness of this Guaranty or of any waiver it contains.

21.     Governing Law.  This Guaranty (and any claims arising under this Guaranty or relating to or arising from the relationship between the parties, whether in contract, in tort, or otherwise) shall be governed solely by New York internal Law (disregarding such state's law on conflict of laws) notwithstanding the location of any Collateral.  Guarantor acknowledges that any restrictions, limitations, and prohibitions set forth in New York Real Property Actions and Proceedings Law Sections 1301 and 1371 that would or might otherwise limit or establish conditions to Administrative Agent's recovery of a judgment against Guarantor if the Collateral were located in New York State shall have absolutely no application to Administrative Agent's enforcement of this Guaranty as against Guarantor, except to the extent that real property Collateral is located within the State of New York.  Guarantor acknowledges that this Guaranty is an "instrument for the payment of money only," within the meaning of New York Civil Practice Law and Rules Section 3213.

22.     Representations and Warranties.  Guarantor acknowledges, represents, and warrants as follows, and acknowledges that Administrative Agent is relying upon the following acknowledgments, representations, and warranties in making the Loan:

          a.     No Conflict.  The execution, delivery, and performance of this Guaranty will not violate any provision of any law, regulation, judgment, order, decree, determination, or award of any court, arbitrator or governmental authority, or of any mortgage, indenture, loan, or security agreement, lease, contract, or other agreement, instrument, or undertaking to which Guarantor is a party or that purports to bind Guarantor or any of Guarantor's property or assets.

          b.     No Third Party Consent Required.  No consent of any person (including creditors or partners, members, stockholders, or other owners of Guarantor) is required in connection with Guarantor's execution of this Guaranty or performance of Guarantor's obligations under this Guaranty.  Guarantor's execution of, and obligations under, this Guaranty are not contingent upon any consent, license, permit, approval, or authorization of, exemption

8

by, notice or report to, or registration, filing, or declaration with, any governmental authority, bureau, or agency, whether local, state, federal, or foreign.

      c.    Authority and Execution.  Guarantor has full power, authority, and legal right to execute, deliver and perform its obligations under this Guaranty.  Guarantor has taken all necessary corporate and legal action to authorize this Guaranty, which has been duly executed and delivered and is a legal, valid, and binding obligation of Guarantor, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other laws of general application affecting the enforcement of creditor's rights or general equitable principals, whether applied in law or equity.

      d.    No Representations by Administrative Agent.  Guarantor delivers this Guaranty based solely upon Guarantor's own independent investigation and based in no part upon any representation, statement, or assurance by Administrative Agent.

      e.    Status; Valid Title; Liens.  Guarantor is duly organized, validly existing, and in good standing under the laws of a state of the United States. Guarantor has good and marketable title to all of its property and assets, real and personal.  None of such property or assets is subject to any lien whatsoever except as disclosed to Administrative Agent in writing before Guarantor's execution of this Guaranty.

      f.    No Misstatements.  No information, exhibit, report or certificate furnished by Borrower or Guarantor to Administrative Agent in connection with the Loan or any Loan Documents contains any material misstatement of fact or has omitted to state a material fact or any fact necessary to make the statements contained therein not materially misleading.

    23.    Reimbursement and Subrogation Rights.  Except to the extent that Administrative Agent notifies Guarantor to the contrary in writing from time to time:

      a.    General Deferral of Reimbursement.  Guarantor waives any right to be reimbursed by Borrower for any payment(s) Guarantor makes on account of the Guarantied Obligations, unless and until all Obligations have been paid in full and all periods within which such payments may be set aside or invalidated have expired.  Guarantor acknowledges that Guarantor has received adequate consideration for execution of this Guaranty by virtue of Administrative Agent's making the Loan.  Guarantor does not require or expect, and is not entitled to, any other right of reimbursement against Borrower as consideration for this Guaranty.

      b.    Deferral of Subrogation and Contribution.  Guarantor shall have no right of subrogation against Borrower or Administrative Agent, no right of subrogation against any Collateral, and no right of contribution against any other person obligated to pay or perform any Obligations unless and until in Administrative Agent's reasonable determination:  (i) such right does not violate (or otherwise produce any result adverse to Administrative Agent under) any applicable law, including any bankruptcy or insolvency law; (ii) all Obligations have been paid and performed in full; (iii) all periods within which such payment and performance may be set aside or invalidated have expired; and (iv) Administrative Agent has released, transferred, or disposed of all of its right, title, and interest in all Collateral (such deferral of Guarantor's subrogation and contribution rights, the "Subrogation Deferral").

9

    c.   <u>Effect of Invalidation</u>.  To the extent that a court of competent jurisdiction determines that Guarantor's Subrogation Deferral is void or voidable for any reason, Guarantor agrees, notwithstanding any acts or omissions by Administrative Agent, that: (i) Guarantor's rights of subrogation against Borrower, Administrative Agent, or any Collateral shall at all times be junior and subordinate to Administrative Agent's rights against Borrower and such Collateral; and (ii) Guarantor's right of contribution against any other obligor under the Loan shall be junior and subordinate to Administrative Agent's rights against such other obligor.

    d.   <u>Claims in Insolvency Proceeding</u>.  Guarantor shall not file any claim in any Insolvency Proceeding affecting Borrower unless Guarantor simultaneously assigns and transfers such claim to Administrative Agent, without consideration, pursuant to documentation fully satisfactory to Administrative Agent.  Guarantor shall automatically be deemed to have assigned and transferred such claim to Administrative Agent whether or not Guarantor executes documentation to such effect.  If such assignment and transfer is not legally permitted, then Guarantor shall vote (or refrain from voting) its claims in accordance with Administrative Agent's instructions.  By executing this Guaranty, Guarantor authorizes Administrative Agent (and grants Administrative Agent a power of attorney coupled with an interest, and hence irrevocable) to execute and file such assignment and transfer documentation on Guarantor's behalf.  Administrative Agent shall have the sole right to vote (or to direct Guarantor how to vote), receive distributions, and exercise all other rights with respect to any such claim.  If and when the Guarantied Obligations have been paid in full Administrative Agent shall release to Guarantor any further payments received on account of any such claim.

    24.   <u>Disgorgement Payments</u>.  Upon payment of all or any portion of the Guarantied Obligations (including from the proceeds of a foreclosure sale or as the result of Administrative Agent's credit bid at any foreclosure sale, or otherwise as a result of Administrative Agent's exercise of its rights and remedies under the Loan Documents or applicable law), or upon Borrower's delivery to Administrative Agent of a conveyance in lieu of foreclosure, Guarantor's obligations under this Guaranty shall continue and remain in full force and effect (and be reinstated, to the extent such obligations shall have previously terminated) if all or any part of such payment or conveyance is, through any Insolvency Proceeding or otherwise, avoided or recovered directly or indirectly from Administrative Agent, or if Administrative Agent is otherwise required to return, repay, or disgorge any such payment or conveyance, as a preference, fraudulent transfer, or otherwise (a "<u>Disgorgement Payment</u>" by Administrative Agent), regardless of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, or (b) full payment and performance of the Obligations.  Guarantor's liability under this Guaranty shall continue until all periods have expired within which Administrative Agent could (on account of Insolvency Proceedings, whether or not then pending, affecting Borrower or any other person) be required to make any Disgorgement Payment.

    25.   <u>Disgorgement Actions</u>.  If any party seeks to require Administrative Agent to make a Disgorgement Payment (a "<u>Disgorgement Action</u>"), then within ten (10) days after written notice from Administrative Agent Guarantor shall deposit with Administrative Agent funds in an amount equal to 110% of the Disgorgement Payment being sought (together with interest, the "<u>Disgorgement Deposit</u>").  Administrative Agent shall hold the Disgorgement Deposit in an interest-bearing account as cash collateral (under documents satisfactory to

10

Administrative Agent) for Guarantor's potential obligation to make a Disgorgement Payment. If Guarantor timely makes a Disgorgement Deposit, then so long as Guarantor performs all its obligations under this Guaranty, Administrative Agent shall, at Guarantor's option, either: (a) refund to Borrower's estate an amount equal to the Disgorgement Payment and apply the Disgorgement Deposit as a payment on account of the Guarantied Obligations and refund any excess to Guarantor; or (b) permit Guarantor to defend the Disgorgement Action at Guarantor's expense (including all legal costs) on Administrative Agent's behalf, all in a manner reasonably satisfactory to Administrative Agent, provided such defense does not in Administrative Agent's judgment cause Administrative Agent to incur any unreimbursed cost, expense, liability, or other detriment of any kind (including any adverse effect on any other actions Administrative Agent takes or intends to take in the Insolvency Proceeding). To the extent that Guarantor's defense ultimately succeeds beyond right of further appeal (so Administrative Agent is not obligated to make any Disgorgement Payment) and Guarantor has paid all Administrative Agent's costs incurred in the Disgorgement Action (including all legal costs), Administrative Agent shall return the Disgorgement Deposit.

26.   Fundamental Changes.  Guarantor shall not wind up, liquidate, or dissolve its affairs or enter into any transaction of merger or consolidation, or sell, lease, or otherwise dispose of (or agree to do any of the foregoing) all or substantially all of its property or assets, or change its state of formation or entity status, without Administrative Agent's prior written consent.

27.   Certain Entities.  If Borrower or Guarantor is a partnership, limited liability company, or other unincorporated association, then: (i) Guarantor's liability shall not be impaired by changes in the name or composition of such entity; and (ii) the withdrawal or removal of any partner(s) or member(s) of such entity shall not diminish Guarantor's liability or (if Guarantor is a partnership) the liability of any withdrawing general partner of Guarantor.

28.   Termination of Guaranty.  Guarantor's obligations under this Guaranty shall continue in full force and effect and this Guaranty shall not terminate until the Guaranteed Obligations are fully paid, performed and discharged (free and clear of any right of any person to set aside any such payment including, without limitation, any right to recover preferences voidable under Title 11 of the United States Code) and Administrative Agent gives Guarantor notice of that fact.

29.   Representation by Counsel.  Guarantor acknowledges that before executing this Guaranty: (a) Guarantor has had the opportunity to review it with an attorney of Guarantor's choice; (b) Administrative Agent has recommended to Guarantor that Guarantor obtain separate counsel, independent of Borrower's counsel, for this Guaranty; and (c) Guarantor has carefully read this Guaranty and understood the meaning and effect of its terms.

30.   Intercreditor Agreement.  Notwithstanding anything herein to the contrary, the lien and security interest granted to the Administrative Agent pursuant to this Agreement and the exercise of any right or remedy by the Administrative Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of __June   8__, 2006 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Interecreditor Agreement"), among Credit Suisse, Cayman Islands Branch, as First Lien

11

Administrative Agent and Collateral Agent (as defined therein) and Credit Suisse, Cayman Islands Branch, as Second Lien Administrative Agent and Collateral Agent (as defined therein) and certain other persons party or that may become party thereto from time to time.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

*[No Further Text on this Page.]*

12

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the Closing Date.

**GINN-LA QUAIL WEST LTD., LLLP,**
a Georgia limited liability limited partnership

  By:  Ginn-Quail West GP, LLC,
     a Georgia limited liability company

  By:  _Robert Masters_
  Name: Robert F. Masters
  Title: President

**GINN-LA LAUREL CREEK LTD., LLLP,**
a Georgia limited liability limited partnership

  By:  Ginn-Laurel Creek GP, LLC,
     a Georgia limited liability company

  By:  _Robert F Masters_
  Name: Robert F. Masters
  Title: President

**GINN-LA BULOW LTD., LLLP,**
a Georgia limited liability limited partnership

  By:  Ginn- Bulow GP, LLC,
     a Georgia limited liability company, its
     General Partner
  By:  _Robert Masters_
  Name: Robert F. Masters
  Title: President

**GINN-LA ST. LUCIE LTD., LLLP,**
a Georgia limited liability limited partnership

  By:  Ginn- St. Lucie GP,  LLC,
     its general partner
  By:  _Robert Masters_
  Name: Robert F. Masters
  Title: President

Second Lien Subsidiary Guaranty

**GINN-BULOW GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**GINN-ST. LUCIE GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**GINN-QUAIL WEST GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**GINN-LAUREL CREEK GP, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**THE TESORO CLUB, LLC ,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**TESORO GOLF CLUB CONDOMINIUM, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**TESORO BEACH CLUB CONDOMINIUM, LLC ,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**GINN QUAIL WEST BEACH, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President

**HAMMOCK BEACH RIVER CLUB, LLC,**
a Georgia limited liability company

By: _____
Name: Robert F. Masters
Title:  President