# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>GINN-LA ST. LUCIE LTD., LLLP, *et al.*,<br><br>Debtors.<br>_____/ | **CASE NO. 08-29769-PGH**<br>All Cases Jointly Administered<br><br>Chapter 7<br><br>(4 Cases Substantively Consolidated Under Lead Case No. 08-29769-PGH)[1/] |
| In re:<br>GINN-LA QUAIL WEST LTD., LLLP, *et al.*,<br><br>Debtors.<br>_____/ | (3 Cases Substantively Consolidated Under Lead Case No. 08-29774-PGH)[2/] |
| DREW M DILLWORTH, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>vs. | **ADV. PRO. NO. 10-02976-PGH** |
| EDWARD R. GINN III; EDWARD R. GINN III REVOCABLE TRUST DATED SEPT. 14, 2002; ERG MANAGEMENT, LLC; ERG ENTERPRISES, L.P.; IRA M. LUBERT; DEAN S. ADLER; LUBERT-ADLER MANAGEMENT CO., L.P.; LUBERT-ADLER GROUP, III, L.P.; LUBERT-ADLER REAL ESTATE FUND III, L.P.; LUBERT-ADLER REAL ESTATE PARALLEL FUND III, L.P.; LUBERT-ADLER CAPITAL REAL ESTATE FUND III, L.P.; LUBERT-ADLER GROUP IV, L.P.; LUBERT-ADLER REAL ESTATE FUND IV, L.P.; LUBERT-ADLER REAL ESTATE PARALLEL FUND IV, L.P.; LUBERT-ADLER CAPITAL REAL ESTATE FUND IV, L.P.; | **THIRD AMENDED COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS** |

---

[1/]The "Tesoro Debtors' Estates" (Nos. 08-29769-PGH, 08-29770-PGH, 08-29772-PGH, and 08-29773-PGH) are substantively consolidated into Lead Case No. 08-29769-PGH. *See* Order [D.E. 308/309]. The "Tesoro Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA St. Lucie Ltd., LLLP – 5632; (ii) Ginn-St Lucie GP, LLC – 0983; (iii) Tesoro Golf Club Condo., LLC – 4385; and (iv) The Tesoro Club, LLC – 1917. *See* 11 U.S.C. § 342(c)(1).

[2/]The "Quail West Debtors' Estates" (Nos. 08-29774-PGH, 08-29775-PGH, and 08-29776-PGH) are substantively consolidated into Lead Case No. 08-29774-PGH. *See* Order [D.E. 34]. The "Quail West Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA Quail West Ltd., LLLP – 2397; (ii) Ginn-Quail West Beach, LLC – 9142; and (iii) Ginn-Quail West GP, LLC – 6313. *See* 11 U.S.C. § 342(c)(1).

THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE; THE JOHN D. AND
CATHERINE T. MACARTHUR FOUNDATION;
THE MARYLAND STATE RETIREMENT &
PENSION SYSTEM; THE OHIO POLICE & FIRE
PENSION FUND; THE COMMONWEALTH OF
PENNSYLVANIA STATE EMPLOYEES'
RETIREMENT SYSTEM; THE PENNSYLVANIA
PUBLIC SCHOOL EMPLOYEES' RETIREMENT
SYSTEM; & CAPITAL PARTNERS, L.P.;
A. DONALD MCCULLOCH, JR.; CAROLYN B.
MCCULLOCH; A.C. ISRAEL ENTERPRISES, INC.;
ADAM L. MILLER; ADOLF A. PAIER;
ALAN P. SMITH; RUTH N. SMITH;
ALAN P. SMITH, AS TRUSTEE U/D OF HAROLD
L. NEUMAN TRUST #1 DATED 11/21/69;
ALAN P. SMITH, AS TRUSTEE U/D HAROLD L.
NEUMAN TRUST #2 DATED 11/21/69;
ALAN D. LEVOW; AMACHIE KWEKU ACKAH;
AMY A. FOX; DANIEL H. WHEELER; AMY B.
ERLBAUM; ANDREW D. RUBIN; LOUISE RUBIN;
ANDREW PERRY; ANDREW GOLDMAN; ANKA
LIMITED PARTNERSHIP; ANTHONY J. CALISE,
IRA; ARTHUR MARION REVOCABLE TRUST;
AVRIL KLAFF & ALLAN REICH, AS TRUSTEES
OF THE ZARA TRUST U/T/A DATED 1/1/2006;
AVRIL KLAFF & ALLAN REICH, AS TRUSTEES
OF THE DANIEL TRUST U/T/A DATED 1/1/2006;
AVRIL KLAFF & ALLAN REICH, AS TRUSTEES
OF THE MARISSA TRUST U/T/A DATED 1/1/2006;
BAHM IV; BARBARA TOLL; BCIP ASSOCIATES
II; BLACKACRE CAPITAL PARTNERS, L.P.;
BLK INVESTMENTS, L.P.; BOB C. LADD;
BOWDOIN COLLEGE; BRETT RUBINSON;
BRUCE A. LEVY; BRUCE S. MARKS;
BONNIE KAY MARKS; BULL VENTURES
LIMITED PARTNERSHIP; C.H.A.I., LLC;
CANDACE L. SNEBERGER; CARL MARBACH;
HELEN MARBACH; CATENARY PARTNERS,
L.P.; CHAFETZ GROUP LLC; CHARLES M.
ROBINS; CHRISTINE V. KANTER;
CHRISTOPHER MOLLER; JENNIFER MOLLER;
CHRISTOPHER ASPLUNDH; CITIZENS BANK AS
CUSTODIAN, F/B/O HIRTLE CALLAGHAN
PRIVATE EQUITY FUND III, L.P.; CITY OF
PHILADELPHIA SINKING FUND COMMISSION,

-2-

AS TRUSTEE FOR THE PHILADELPHIA GAS
WORKS RETIREMENT RESERVE FUND;
CONNELL FAMILY PARTNERSHIP III;
CRITERION HOLDINGS, LLC; DAN NASSER;
DAVCO MANAGEMENT, LLC; DAVID
SCHLESSINGER; DAVID NAZARIAN, AS
TRUSTEE FOR THE SAMY NAZARIAN TRUST;
DAVID RAY; MARGARET CARVER; DAVID A.
BRAVER; DAVID D. KIM TRUST DATED
12/31/87; DAVID & ANGELLA NAZARIAN
FAMILY TRUST; DAVID O. OBERKIRCHER;
DAVID V. WACHS; DAVID F. LINCOLN;
DAVID A. BROWNSTEIN; DEBRA ELLEN FOX;
DEUTSCHE  BANK SHARPS PIXLEY INC.;
DEVIN ARONSTAM; DIANE C. RAY; DIANE L.
MYER REV. TRUST DATED 8/3/2001; DONALD
M. GLEKLEN; DONALD R. AUTEN; JUDITH W.
AUTEN; DONALD M. ROSEN; DREXEL
UNIVERSITY; E WACHS II, L.P.; EDMUND F.
GARNO, JR.; EDMUND F. GARNO, JR. IRA;
EDMUND F. GARNO, III; EDWARD H. ROSEN;
EDWARD J. FITZSIMMONS; EDWARD RAY;
LONNETTA G. RAY; EDWARD BOWMAN;
KATHLEEN BOWMAN; EDWARD M. SNIDER;
EDWIN J. BERKOWITZ; EMORY UNIVERSITY;
EMPLOYEES' RETIREMENT PLAN OF
DUKE UNIVERSITY; ENGLE ASSOCIATES;
ERLBAUM FAMILY LIMITED PARTNERSHIP;
ERLBAUM INVESTMENTS, L.P.; ESTATE OF
JOSEPH A. PULEO, JR.; FEA II, L.P.;
FOSTER & FOSTER, LLC; FRANCE-MERRICK
FOUNDATION, INC.; FROG HOLLOW PARTNERS
XI, L.P.; GARFIELD REFINING COMPANY
PROFIT SHARING PLAN; GARY E. ERLBAUM;
GEORGE M. ROSS; LYN M. ROSS; GEORGE W.
KARR, JR.; GERALD A. RONON; GERALD M.
WILK; GLENVILLE CAPITAL PARTNERS, L.P.;
G L E N W O O D   R O A D   A S S O C I A T E S
PARTNERSHIP; GOTHIC CORPORATION;
GRAHAM ALTERNATIVE INVESTMENT
PARTNERS I; GROUP FORE, LLC; GT REAL
PROPERTY HOLDINGS II, LLC; HARRIS
WILDSTEIN; HARVARD PRIVATE CAPITAL
REALTY, INC.; HEM PRIVATE EQUITY FUND
2000, LLC; HENRY DOLFINGER #2 T/W;
HERSCH M. KLAFF; HMK TRUST; HOFFMAN

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

INVESTMENT COMPANY; HOWARD SALASIN; HOWARD B. ASHER; HOWARD D. ROSS; SUSAN K. HOLLENSTEIN; HUMILLS, LLC; HYMAN R. KAHN, M.D.; IRM ASSOCIATES, LP; IRVIN J. BOROWSKY; JAMES A. OUNSWORTH; JAMES MERRITT SPRINGSTEAD, JR.; JAMES J. KIM; JAMES J. KIM TRUST DATED SEPT. 30, 1992; JAMES M. SPRINGSTEAD; DIANE B. SPRINGSTEAD; JAMES M. MEYER; JAMES W. ZUG; JAMES M. RIORDAN; JAMES WOLF; NANCY WOLF; JARED PRUSHANSKY; JAVICK, L.P.; JAY PHILIP SLOVIN; JAY H. TOLSON; JEAN ELLEN RAY; TOBIAS SPECKBACHER; JEANNINE PULITO; JEANNINE PULITO & NICOLE LINEHAN, AS TRUSTEES OF THE JOHN T. FRIES DYNASTY TRUST PNC BANK DELAWARE; JEFFREY HONICKMAN; JENNIE R. BERLIANT REVOCABLE TRUST; JEREMY ALLEN; DEBRA ALLEN; JEWISH FEDERATION OF GREATER PHILADELPHIA; JILCY-1, L.P.; JILCY-6, L.P.; JLT INVESTMENTS, LP; JOHN T. KIM TRUST DATED 12/31/87; JOHN R. JAEB REVOCABLE TRUST DATED 7/5/2000; JOHN T. LUPTON TRUST; JOHN ZAGARA; JOHNS HOPKINS UNIVERSITY; JON M. LUBERT; JONATHAN B. DETWEILER, AS TRUSTEE OF THE JONATHAN B. DETWILER REVOCABLE TRUST, U/T/A DATED 4/29/2003; JOSEPH F. WATERMAN; MARY JOEL WATERMAN; JOSEPH NEUBAUER; JOSEPH R. PAPA; JOSEPH ZAGARA; JOSEPH P. FAHEY; KATE PARTNERS, LP; KEIBREAUX ASSOCIATES, LP; KEITH LOISELLE; CAROL LOISELLE; KENNETH J. GOLD; KENNETH A. FOX; KENNETH WAETZMAN; SHELLEY E. WAETZMAN; KERRI SCHNEIDER; KIRSCHNER BROTHERS PROFIT SHARING PLAN; KLT INVESTMENTS, LP; KODAK RETIREMENT INCOME PLAN TRUST; KOEN INVESTMENTS, LLC; L. FREDERICK SUTHERLAND; BARBARA H. SUTHERLAND; LARRY A. CUTLER; SUSAN E. CUTLER; LAWRENCE CHIMERINE; LAWRENCE S. SMITH PROFIT SHARING TRUST; LAWRENCE S. SMITH PROFIT SHARING PLAN; LENNART HAGEGARD; LENORE STEINER;

-4-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

LESLIE B. FRANKEL; LINDA C. MELDRUM;
LISA ROBERTS; LYNN W. BERNSTEIN;
LYONSHARE INVESTMENTS, INC.;
LYONSHARE VENTURE CAPITAL; M. WALTER
D'ALESSIO; MANAGED CARE CONNECTION,
INC.; MARILYN WEISSMAN TRUST; MARJORIE
RAWLS ROBERTS; MARK G. CORNISH;
MARK WILDSTEIN; MARTIN D. COHEN;
MARTIN L. TRICHON; JUDITH K. TRICHON;
MARVIN N. DEMCHICK; MILDRED W.
DEMCHICK; MATTHEW I. GARFIELD; MARIE H.
GARFIELD; MAX H. KRAUS; LOIS B. KRAUS;
MAYA B. GOLDBERG; MCE FAMILY LIMITED
PARTNERSHIP; MDR II LLC; MELLON TRUST OF
NEW ENGLAND, N.A., AS TRUSTEE OF THE
KODAK RETIREMENT INCOME PLAN TRUST;
MELVIN HERRIN; MICHAEL J. CARUSO;
MICHAEL J. HAGAN; JOYCE HAGAN; MICHAEL
S. KIRSCHNER; MICHAEL C. ERLBAUM &
GARY E. ERLBAUM, AS TRUSTEES OF THE
ADAM J. ERLBAUM TRUST U/A DATED 4/4/97;
MICHAEL C. ERLBAUM; MICHAEL A. BRAVER;
MICHAEL W. MILES; MICHAEL P. MCNULTY;
MIRIAM D. GLANTZ; MONS INVESTMENTS,
LLC; NANCY S. ENGLE; NANCY J. FOX;
NEXTONE LLC; NICOLE LINEHAN;
NORTHWESTERN UNIVERSITY; OLIVER
ERNEST ASSOCIATES, L.P.; PAMELA ESTADT;
PATRICIA GUGGENHEIM; PATRICK S. LEE;
PAUL TRAPIDO; JUDE RAY; PEACOCK
PRODUCTIONS; PENNOCK J. YEATMAN IV;
PETER S. LINDER; PETER LINNEMAN;
KATHLEEN LINNEMAN; PHILADELPHIA
INVESTMENT PARTNERSHIP I; PHILADELPHIA
HEALTH & EDUCATION CORPORATION, D/B/A
DREXEL UNIVERSITY COLLEGE OF MEDICINE;
PRINCE GEORGE'S COUNTY POLICE PENSION
PLAN; PRINCE GEORGE'S COUNTY FIRE
SERVICE PENSION PLAN; R. ERIC EMRICH;
ANGELA L. EMRICH; RANDY L PULITO; DIANE
K. PULITO; RAY FAMILY PARTNERSHIP;
RICHARD L. FREUNDLICH; RICHARD L.
FOSTER; RICHARD T. KANTER; RICHARD J.
ANTHONY, SR.; MARLENE A. ANTHONY;
RICHARD H. ROSENTHAL REVOCABLE TRUST;
RICHARD GUGGENHEIM TESTAMENTARY

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

MARITAL TRUST; RICHARD LEVIN; RICHARD
GREENAWALT; ROBERT P. HAUPTFUHRER;
ROBERT A. FOX; ROBERT J. HIGGINS;
ROBERT E. KEITH, JR.; MARGOT W. KEITH;
ROBERT L. MCNEIL, III; ROBERT CROWN;
BARBARA CROWN; ROCHELLE BROAD;
ROGER J. MURPHY; BARBARA K. MURPHY;
RONALD J. ZLATOPER; BARRY O. ZLATOPER;
ROSLYN JAFFE; ROY S. NEFF; RPM SELECT
FUND, LP; RPM METROPOLITAN FUND (QP), LP;
RPM METROPOLITAN FUND, LP; RPM
OPPORTUNITY FUND, LP; RUDMAN FAMILY
LIMITED. PARTNERSHIP, L.P.; S.K.B.
INVESTORS; SADINOFF FAMILY FOUNDATION;
SADINOFF FAMILY ENTERPRISES, LLC;
SARAH M. CORNISH; SEGEL PARTNERSHIP II,
LP; SETH J. LEHR; ELLYN LEHR; SEYMOUR
SADINOFF; SHELDON M. BONOVITZ;
JILL F. BONOVITZ; SIDEWATER ASSOCIATES I;
SIDEWATER FAMILY PARTNERS;
STANLEY H. ENGLE REVOCABLE TRUST;
STEPHEN R. MICKELBERG; STEPHEN S.
PHILLIPS; MARY ANN PHILLIPS;
STEVEN H. ERLBAUM; STEVEN ROSARD;
LAURIE B. ROSARD; STRATEGIC REAL ESTATE
FUND - 2001, L.P.; STUART A. MARGULIES;
SUSAN Y. KIM TRUST DATED 12/31/87;
SUZANNE PARTNERS, L.P.; SWIRNOW L-A IV
INVESTORS, LLC; TEACHERS INSURANCE &
ANNUITY ASSOCIATION OF AMERICA;
TERRY K. WATANABE; THE WASHINGTON
UNIVERSITY; THE VANDERBILT UNIVERSITY;
THE TRUSTEES OF PRINCETON UNIVERSITY;
THE CATHOLIC BISHOP OF CHICAGO -
ENDOWMENT FUND; THE METROPOLITAN
MUSEUM OF ART; THE LONG-TERM ALAN J.
SEGEL TRUST; THE ROCKEFELLER
UNIVERSITY; THE WFC TRUST; THE JAFFE
FAMILY FOUNDATION; THE MELVIN HERRIN
1992 TRUST FBO H. SCOTT HERRIN;
THE PRESIDENT & TRUSTEES OF WILLIAMS
COLLEGE; THE BARRA FOUNDATION, INC.;
THE MARILYN J. ENGLE LIVING REVOCABLE
TRUST DATED SEPT. 21, 2006; THOMAS K.
CLOETINGH; JOAN E. CLOETINGH;
THOMAS JEFFERSON UNIVERSITY

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

ENDOWMENT FUND; THOMAS JEFFERSON
UNIVERSITY (1-PENSION); THOMAS J. KNOX;
THOMAS PARRINGTON; MARY LEE
PARRINGTON; TJJK, LLC; TRIANGLE BRIDGE
GROUP, L.P.; TRISTRAM C. COLKET, JR., AS
TRUSTEE OF THE TRISTRAM C. COLKET, JR.
REVOCABLE TRUST U/T/A DATED 02/05/2004;
TRUST U/W JOHN SVENNINGSEN;
UBS, AS CUSTODIAN FOR THE ROLLOVER IRA
OF JOHN T. FRIES; UBS, AS CUSTODIAN FOR
THE ROLLOVER IRA JOSEPH R. PAPA;
UNC INVESTMENT FUND, UR; UNISYS MASTER
TRUST; UNITED NATIONAL INSURANCE
COMPANY; UNIVERSITY OF SOUTHERN
CALIFORNIA; UNIVERSITY OF VIRGINIA
INVESTMENT MANAGEMENT COMPANY;
UNIVERSITY OF OREGON FOUNDATION; V.G.
BELL & E.V. BELL TRUST UD 12/16/92 SV;
VALMORA PARTNERS, L.P.; VALMORA
PARTNERS II, L.P.; VESTAL VENTURE CAPITAL;
VESTAL VENTURE CAPITAL II; VESTAL
VENTURE CAPITAL III; VINCENT G. BELL, JR.;
ELAINE V. BELL; VSP GROUP; W. KIRK
WYCOFF; WARLEN L.P.; WAYNE D. BLOCH;
SHEREE I. BLOCH; WELLESLEY COLLEGE;
WFC HOLDINGS CORPORATION; WILLIAM J.
STALLKAMP; WILLIAM HARRAL, III;
WILLIAM MARSH RICE UNIVERSITY;
Y & S NAZARIAN REVOCABLE TRUST, UTD
DATED 9/2/2003; YALE UNIVERSITY;
YALE UNIVERSITY RETIREMENT PLAN FOR
STAFF EMPLOYEES; YALE UNIVERSITY
RETIREE HEALTH BENEFITS COVERAGE
TRUST; AND JOHN DOES 1-50,

                  Defendants.

_____/

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

THE PARTIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.     The Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.     The Ginn Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.     The Lubert-Adler Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D.     The Lubert-Adler Fund III Investors. . . . . . . . . . . . . . . . . . . . . . . . . 17

    E.     The Lubert-Adler Fund IV Investors. . . . . . . . . . . . . . . . . . . . . . . . . 24

    F.     Basis for Inclusion as Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    G.     "John Doe" Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    H.     Joinder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

GENERAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    A.     The Ginn / Lubert-Adler Development Known as Tesoro.. . . . . . . . . . . . . . . . 32

    B.     Quail West. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    C.     The Original Financing Plan and the Impact of Hurricane Wilma. . . . . . . . . . . 33

    D.     The Credit Suisse Loan Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . 35

    E.     The Uses of the Credit Suisse Loan Proceeds. . . . . . . . . . . . . . . . . . . . 38

    F.     How the Loan Proceed Distributions to Insiders Were Debited and Credited Among the Project Entities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    G.     Facts Establishing That The Tesoro and Quail West Debtors Were Substantively "Borrowers" With Respect to the Credit Suisse Loans, and, Therefore, Had a Legal or Equitable Interest in the Loan Proceeds Distributed to Insiders at Closing Which Were Credited Against Their Respective Capital Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.**
**MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200**

H. Facts Establishing That the Court May and Should Alternatively "Collapse" the Credit Suisse Loan Transaction so as to Reflect the Economic Realities Thereof..................................... 43

I. The Fraudulent Nature of the Loans and Transfers at Issue................... 45

(1) The Purpose and Effect of the Loan Transaction..................... 45

(2) The Loan Appraisals and Underlying Sales Projections............. 47

(3) The Impact of the Transfers at Issue............................. 53

(4) The Initial Efforts to Restructure the Loans...................... 54

(5) Ensuing Discussions Regarding Bankruptcy....................... 55

(6) The Master Restructuring Agreement............................ 58

(7) The Filing of the Underlying Bankruptcy Proceedings.............. 58

COUNT I - Avoidance of Fraudulent Transfer - Tesoro Distribution...................... 59

COUNT II - Avoidance of Fraudulent Transfer - Tesoro Distribution..................... 61

COUNT III - Recovery of Fraudulent Transfer - Tesoro Distribution..................... 63

COUNT IV - Avoidance of Fraudulent Transfer - Quail West Distribution................ 64

COUNT V - Avoidance of Fraudulent Transfer - Quail West Distribution................ 66

COUNT VI - Recovery of Fraudulent Transfer - Quail West Distribution................ 68

COUNT VII - Avoidance of Fraudulent Transfer - Tesoro Liens........................ 69

COUNT VIII - Avoidance of Fraudulent Transfer - Tesoro Liens....................... 72

COUNT IX - Recovery of Fraudulent Transfer - Tesoro Liens......................... 75

COUNT X - Avoidance of Fraudulent Transfer - Quail West Liens...................... 76

COUNT XI - Avoidance of Fraudulent Transfer - Quail West Liens..................... 79

COUNT XII - Recovery of Fraudulent Transfer - Quail West Liens..................... 82

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## THIRD AMENDED COMPLAINT
## FOR AVOIDANCE AND RECOVERY OF
## FRAUDULENT TRANSFERS

Plaintiff, Drew M. Dillworth ("Trustee Dillworth"), in his capacity as Chapter 7 Trustee for the Tesoro Debtors' Estates and the Quail West Debtors' Estates, based upon information and belief, and as a result of his investigation to date, hereby sues the Defendants enumerated above, and alleges:

### INTRODUCTION

1.      Through this adversary proceeding, Trustee Dillworth seeks to avoid and recover for fraudulent transfers of Tesoro and Quail West Debtor property, made to or for the benefit of Edward R. "Bobby" Ginn III ("Ginn"), Lubert-Adler Management Company, L.P. ("Lubert-Adler"), and other persons and entities involved in the financing and development of the two Debtor projects, *i.e.*, the luxury master-planned residential communities known as "Tesoro" and "Quail West," located in Port St. Lucie and near Naples, Florida, respectively.[3]

2.      During the time periods in question, Ginn and the Lubert-Adler-managed equity funds commonly referred to as "Lubert-Adler Funds III & IV" held equity ownership interests in the Tesoro and Quail West Debtors – *i.e.*, the "project-level" subsidiary entities created to hold, develop, and operate the Tesoro and Quail West Projects.[4]

---

[3] The individuals and entities from which recovery is sought in this proceeding are identified more fully beginning on page 15, *infra*.

[4] The Tesoro Debtors, *i.e.*, Ginn-LA St. Lucie Ltd., Ginn-St Lucie GP, Tesoro Golf Club Condominium, and The Tesoro Club, were the "project-level" subsidiaries created to hold, develop, and operate the Tesoro Project. The Quail West Debtors, *i.e.*, Ginn-LA Quail West Ltd., Ginn-Quail West Beach, and Ginn-Quail West GP, were the "project-level" subsidiaries created to hold, develop, and operate the Quail West Project.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

3.      As discussed more fully below, originally, Ginn and Lubert-Adler had intended to use Tesoro and Quail West lot sales to finance the completion of the Tesoro and Quail West Projects.

4.      During the latter part of October 2005, however, Hurricane Wilma struck the areas in which the Tesoro and Quail West Projects are located, and real estate markets began to collapse, prompting Ginn and Lubert-Adler to seek an alternate means to finance the remainder of the projects.

5.      Ginn and Lubert-Adler found something even better (for them) in Credit Suisse, which was at that point offering a new syndicated loan product to owners of high-end developments designed to enable the owners to "recapitalize" and take "profits" from their projects long before the projects were to be completed.  As explained by U.S. Bankruptcy Judge Ralph B. Kirscher:

> In 2005, Credit Suisse was offering a new financial product for sale.  It was offering the owners of luxury second-home developments the opportunity to take their profits up front by mortgaging their development projects to the hilt.  Credit Suisse would loan the money . . ., earn a substantial fee, and sell off most of the credit to loan participants.  The development owners would take most of the money out as a profit dividend, leaving their developments saddled with enormous debt. Credit Suisse and the development owners would benefit, while their developments – and especially the creditors of the developments – bore all the risk of loss. This newly developed syndicated loan product enriched Credit Suisse, its employees[,] and more than one luxury development owner, but it left the developments too thinly capitalized to survive.  Numerous entities that received Credit Suisse's syndicated loan product have failed financially, including . . . Ginn. If the foregoing developments were anything like this case, they were doomed to failure once they received their loans [and made the transfers contemplated thereby].

*In re Yellowstone Mtn. Club, LLC*, Case No. 08-61570-11, Adv. Pro. No. 09-00014 [ECF No. 289], Partial & Interim Order, reported at 2009 WL 3094930, at *3-4 (Bankr. D. Mont. May 13, 2009); Memorandum of Decision, 436 B.R. 598, 609-09, 655-60 (Bankr. D. Mont. Aug. 16, 2010) (avoiding, as fraudulent, transfer of $209 million in loan proceeds secured by development project which former owner had taken out and distributed to himself and others).[5]

_____

[5]/At Credit Suisse's behest, the Partial & Interim Order quoted above was later vacated pursuant to a settlement. However, Judge Kirscher subsequently reinstated the factual findings made in the Partial & Interim Order, observing it "*cannot* and *will not ignore* the findings therein."  436 B.R. at 677 (emphasis added).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

6.     In the case of Ginn and Lubert-Adler, Credit Suisse offered the opportunity to "recapitalize" and take hypothetical future "profits" out of *five* residential development projects – Tesoro, Quail West, The River Club / Gardens (Palm Coast, Florida), Laurelmor (North Carolina), and Ginn sur Mer (The Bahamas) (collectively, the "Projects") – on a "cross-collateralized" basis, but the loan transaction itself was otherwise materially the same, in both structure and effect:

- In June 2006, Credit Suisse extended a total of $675 million in loan financing to Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. (shell entities formed to "pool" Project assets and facilitate the transaction), through a First Lien Credit Agreement ($525 million in total financing) and a Second Lien Credit Agreement ($150 million in financing);

- Each of the Debtors and other Project subsidiaries ("Other Project Entities") was required to execute a purported "Subsidiary Guaranty" providing for "*primary* and not secondary" liability for the *full* $675 million loan amount, and to grant mortgages and other liens on substantially all of its assets, without receiving any of the loan proceeds in return;

- Credit Suisse took a substantial fee, in excess of $15 million, and sold off most if not all of the credit to loan participants;

- Existing third-party debt totaling $158 million was refinanced; and

- The Ginn and Lubert-Adler Defendants, as insiders in control of the Debtors and Other Project Entities, took out and paid themselves and their investors approximately $325 million as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits."

In other words, as in *In re Yellowstone Mtn. Club, LLC*, the transaction was structured such that "Credit Suisse and the development owners [here, Ginn and Lubert-Adler] would benefit, while their *developments* – and especially the *creditors* of the developments – *bore all the risk of loss*." 2009 WL 3094930, at *3 (emphasis added); 436 B.R. 598, 655-60, 674-77 (same).

7.     Indeed, through the loan transaction, Ginn and the Lubert-Adler entities not only enriched themselves and their investors at the expense of the Debtors and Other Project Entities, they effectively looted the Debtors and Other Project Entities and shifted the risks associated with the Projects to creditors, leaving those creditors with a virtual certainty of loss.

-12-

8.    According to Ginn and Lubert-Adler records and sworn interrogatory answers, of the roughly $325 million in Credit Suisse loan proceeds taken out and distributed to insiders as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits," nearly *half* of the total distributed amount – $148,828,198.14 – was allocated to the Debtors and credited against the Debtors' respective capital accounts.

9.    That is, through the Credit Suisse loan transaction, insiders in control of the Debtors took out $148,828,198.14 of "capital" and replaced it with $148,828,198.14 of loan debt.

10.    The Debtors were substantively "borrowers" with respect to the Credit Suisse loans, and, as a consequence, had a legal or equitable interest in the $148,828,198.14 of loan proceeds upstreamed to insiders which were allocated to the Debtors and credited against their respective capital accounts.

11.    Thus, whether the Debtors are determined to have acted directly or indirectly, voluntarily or involuntarily, the transfers of that $148,828,198.14 were transfers of Debtor property or interests of the Debtors in property.

12.    The Debtors' transfers of that $148,828,198.14 were made with actual intent to hinder, delay, and/or defraud creditors of the Debtors which then existed, and persons and entities which became creditors thereafter.

13.    In addition, the Debtors did not receive reasonably equivalent value in exchange for the transfers of that $148,828,198.14.

14.    To the contrary, if the Debtors were not already insolvent at the time of the transfers, they were rendered insolvent thereby, and were left much too thinly capitalized to survive.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

15.     On December 23, 2008, after a series of defaults and efforts to restructure the loans, each of the Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

16.     Later that day, the U.S. Trustee's Office appointed Trustee Dillworth as the interim Chapter 7 Trustee of the Tesoro and Quail West Debtors' Estates (the "Debtors' Estates").

17.     No trustee was elected at the subsequent Meeting of Creditors held in accordance with 11 U.S.C. § 341; thus, pursuant to 11 U.S.C. § 702, Trustee Dillworth is the duly appointed, qualified, and acting Chapter 7 Trustee for the Debtors' Estates.

18.     In that capacity, Trustee Dillworth seeks to avoid, pursuant to 11 U.S.C. § 544(b)(1) and applicable Florida fraudulent transfer law, the transfers of the $148,828,198.14 to insiders which were allocated to the Debtors and credited against their respective capital accounts; and to recover, pursuant to 11 U.S.C § 550(a), on behalf and for the benefit of the Debtors' Estates, the $148,828,198.14 transferred, from the persons and entities to whom or for whose benefit said transfers were made.

19.     In the alternative, Trustee Dillworth seeks to avoid, pursuant to 11 U.S.C. § 544(b)(1) and applicable Florida fraudulent transfer law, the transfers of the "Subsidiary Guaranties," mortgages, and other liens which the Debtors issued in connection with the loan  transaction; and to recover, pursuant to 11 U.S.C. § 550(a), on behalf and for the benefit of the Debtors' Estates, the value of the "Guaranties," mortgages, and liens transferred, as of the time they were transferred, from the persons and entities for whose benefit the transfers were made.

-14-

## JURISDICTION AND VENUE

20.     This adversary proceeding arises under the above-captioned jointly administered Chapter 7 cases.  It is, therefore, a core proceeding within the meaning of 28 U.S.C. § 157.

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

### A.     The Plaintiff

22.     The Plaintiff, Drew M. Dillworth, is the duly appointed, qualified, and acting Chapter 7 Trustee for the Tesoro Debtors' Estates and the Quail West Debtors' Estates.

### B.     The Ginn Defendants

23.     Defendant Edward R. Ginn III ("Ginn") is an individual who specializes in land acquisition, real estate development, and related matters.

24.     Mr. Ginn is sued herein both in his capacity as an individual and in his capacity as Trustee of the Edward R. Ginn III Revocable Trust dated September 14, 2002.

25.     Defendant Edward R. Ginn III Revocable Trust dated September 14, 2002, is a Trust which held a 99% interest in Defendant ERG Enterprises, L.P.

26.     Defendant ERG Management, LLC, is a South Carolina limited liability company which held the remaining 1% interest in Defendant ERG Enterprises, L.P.

27.     Defendant ERG Enterprises, L.P., is a Georgia limited partnership which held a 20% equity interest in the Tesoro Debtors and the Quail West Debtors.

28.     For convenience, Edward R. Ginn III, the Edward R. Ginn III Revocable Trust dated September 14, 2002, ERG Management, LLC, and ERG Enterprises, L.P. are referred to herein as the "Ginn Defendants."

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### C.    The Lubert-Adler Defendants

29.    Defendants Ira M. Lubert ("Lubert") and Dean S. Adler ("Adler") are individuals who co-founded and co-own Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P., and the affiliated Lubert-Adler "Group" entities.

30.    Mr. Lubert serves as the Chairman of Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P.

31.    Mr. Adler is the Chief Executive Officer of Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P.

32.    Defendant Lubert-Adler Management Co., L.P., d/b/a Lubert-Adler Partners, L.P., is a Delaware limited partnership which provides management and other related services to the Lubert-Adler "Group" and "Fund" Entities.

33.    Defendant Lubert-Adler Group III, L.P., is a Delaware limited partnership which serves as the General Partner of Defendants Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., and Lubert-Adler Capital Real Estate Fund III, L.P. (the "Lubert-Adler Fund III Entities"), Delaware limited partnerships which, collectively, held an 80% equity interest in the Tesoro Debtors, and a 40% equity interest in the Quail West Debtors.

34.    Defendant Lubert-Adler Group IV, L.P., is a Delaware limited partnership which serves as the General Partner of Defendants Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P., and Lubert-Adler Capital Real Estate Fund IV, L.P. (the "Lubert-Adler Fund IV Entities"), Delaware limited partnerships which, collectively, held a 40% equity interest in the Quail West Debtors.

35.    For convenience, Ira M. Lubert, Dean S. Adler, Lubert-Adler Management Co., Inc., Lubert-Adler Group III, L.P., the Lubert-Adler Fund III Entities, Lubert-Adler Group IV, L.P., and the Lubert-Adler Fund IV Entities are referred to herein as the "Lubert-Adler Defendants."

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET,  MIAMI,  FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### D.    The Lubert-Adler Fund III Investors

36.    The Defendants listed below have been identified by Lubert-Adler as investors in

Lubert-Adler Real Estate Fund III, L.P.:

| |
|---|
| Lubert-Adler Group III, L.P. |
| & Capital Partners, L.P. |
| A. Donald McCulloch, Jr. & Carolyn B. McCulloch, as Tenants by the Entireties |
| Adam L. Miller |
| Adolf A. Paier |
| Alan P. Smith & Ruth N. Smith, as Tenants by the Entireties |
| Amachie Kweku Ackah |
| Amy A. Fox & Daniel H. Wheeler, as Tenants by the Entireties |
| Andrew Perry |
| BAHM IV |
| Blackacre Capital Partners, L.P. |
| Bruce A. Levy |
| Bull Ventures Limited Partnership |
| C.H.A.I., LLC |
| Candace L. Sneberger |
| Catenary Partners, L.P. |
| Chafetz Group LLC |
| Charles M. Robins |
| Christopher Moller & Jennifer Moller, as Joint Tenants With Right of Survivorship |
| Citizens Bank as Custodian, F/B/O Hirtle Callaghan Private Equity Fund III, L.P. |
| City of Philadelphia Sinking Fund Commission, as Trustee for The Philadelphia Gas Works Retirement Reserve Fund |
| Commonwealth of Pennsylvania State Employees' Retirement System (SERS) |
| Connell Family Partnership III |
| Dan Nasser |
| David & Angella Nazarian Family Trust |
| David A. Brownstein |
| David F. Lincoln |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| Dean Adler |
| Debra Ellen Fox |
| Deutsche Bank Sharps Pixley Inc. |
| Devin Aronstam |
| Drexel University |
| Edward H. Rosen |
| Edward J. Fitzsimmons |
| Edwin J. Berkowitz |
| Employees' Retirement Plan of Duke University |
| Engle Associates |
| Erlbaum Family Limited Partnership |
| Erlbaum Investments, L.P. |
| Estate of Joseph A. Puleo, Jr. |
| FEA II, L.P. |
| Gary E. Erlbaum |
| George M. Ross |
| George W. Karr, Jr. |
| Gerald A. Ronon |
| Gerald M. Wilk |
| Glenville Capital Partners, L.P. |
| Glenwood Road Associates Partnership |
| Gothic Corporation |
| GT Real Property Holdings II, LLC |
| Howard D. Ross & Susan K. Hollenstein |
| Howard Salasin |
| Hyman R. Kahn, M.D. |
| Ira M. Lubert |
| Irvin J. Borowsky |
| James A. Ounsworth |
| James J. Kim Trust dated September 30, 1992 |
| James M. Meyer |
| James M. Riordan |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM  TOWER, 150  WEST  FLAGLER  STREET,  MIAMI,  FLORIDA  33130  ·  TELEPHONE  (305) 789-3200

| |
|---|
| James W. Zug |
| Jared Prushansky |
| Javick, L.P. |
| Jay H. Tolson |
| Jay Philip Slovin |
| Jewish Federation of Greater Philadelphia |
| JILCY-1, L.P. |
| John Zagara |
| Jonathan B. Detwiler, as Trustee for the Jonathan B. Detwiler Revocable Trust, U/T/A dated 4/29/2003 |
| Joseph F. Waterman & Mary Joel Waterman |
| Joseph Neubauer |
| Joseph P. Fahey |
| Joseph Zagara |
| Kate Partners, LP |
| Keibreaux Associates, LP |
| Kenneth A. Fox |
| Kerri Schneider |
| Kirschner Brothers Profit Sharing Plan |
| Kodak Retirement Income Plan Trust |
| Koen Investments, LLC |
| Lawrence Chimerine |
| Lawrence S. Smith Profit Sharing Trust |
| Lisa Roberts |
| Lyonshare Venture Capital |
| Marilyn Weissman Trust |
| Marvin N. Demchick & Mildred W. Demchick |
| Maryland State Retirement & Pension System |
| MCE Family Limited Partnership |
| MDR II LLC |
| Michael A. Braver |
| Michael J. Caruso |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| Michael J. Hagan |
| Michael P. McNulty |
| Michael W. Miles |
| Miriam D. Glantz |
| Nancy J. Fox |
| Ohio Police & Fire Pension Fund |
| Patrick S. Lee |
| Pennock J. Yeatman IV |
| The Pennsylvania Public School Employees' Retirement System (PSERS) |
| Philadelphia Health & Education Corporation, d/b/a Drexel University College of Medicine |
| Philadelphia Investment Partnership I |
| Prince George's County Fire Service Pension Plan |
| Prince George's County Police Pension Plan |
| R. Eric Emrich & Angela L. Emrich |
| Richard Greenawalt |
| Richard L. Foster |
| Richard Levin |
| Richard T. Kanter |
| Robert A. Fox |
| Robert E. Keith, Jr. & Margot W. Keith, as Tenants by the Entireties |
| Robert J. Higgins |
| Robert P. Hauptfuhrer |
| Ronald J. Zlatoper & Barry O. Zlatoper, as Tenants by the Entireties |
| Roslyn Jaffe |
| Roy S. Neff |
| Rudman Family Limited Partnership, L.P. |
| David Nazarian, as Trustee for the Samy Nazarian Trust |
| Sheldon M. Bonovitz & Jill F. Bonovitz, as Tenants by the Entireties |
| Stanley H. Engle Revocable Trust |
| Steven Rosard & Laurie B. Rosard, as Joint Tenants With Right of Survivorship |
| Steven H. Erlbaum |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| Strategic Real Estate Fund - 2001, L.P. |
| Stuart A. Margulies |
| Suzanne Partners, L.P. |
| Terry K. Watanabe |
| The Jaffe Family Foundation |
| The Long-Term Alan J. Segel Trust |
| The Trustees of Princeton University |
| The Vanderbilt University |
| The WFC Trust |
| Thomas J. Knox |
| Thomas Jefferson University (1 - Pension) |
| Thomas Jefferson University Endowment Fund |
| Thomas K. Cloetingh |
| TJJK, LLC |
| Triangle Bridge Group, L.P. |
| UBS, Custodian for the Rollover IRA John T. Fries |
| UBS, Custodian for the Rollover IRA Joseph R. Papa |
| Unisys Master Trust |
| United National Insurance Company |
| Valmora Partners, L.P. |
| Vestal Venture Capital |
| Vincent G. Bell, Jr. |
| Warlen L.P. |
| WFC Holdings Corporation |
| William J. Stallkamp |
| Y & S Nazarian Revocable Trust, UTD dated 9/2/2003 |
| Yale University |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

37.    The Defendants listed below have been identified by Lubert-Adler as investors in Lubert-Adler Real Estate Parallel Fund III, L.P.:

| |
|---|
| Lubert-Adler Group III, L.P. |
| A.C. Israel Enterprises, Inc. |
| Michael C. Erlbaum & Gary E. Erlbaum, as Trustees of the Adam J. Erlbaum Trust U/A dated 4/4/97 |
| Avril Klaff & Allan Reich, as Trustees of the Daniel Trust U/T/A dated 1/1/2006 |
| Avril Klaff & Allan Reich, as Trustees of the Marissa Trust U/T/A dated 1/1/2006 |
| Avril Klaff & Allan Reich, as Trustees of the Zara Trust U/T/A dated 1/1/2006 |
| Brett Rubinson |
| David Ray |
| David V. Wachs |
| Diane C. Ray |
| Donald M. Gleklen |
| Donald R. Auten |
| Edmund F. Garno, III |
| Edmund F. Garno, Jr. IRA |
| Edward Bowman & Kathleen Bowman |
| Edward Ray & Lonnetta G. Ray |
| Edward Ray & Lonnetta G. Ray #2 (PD). |
| Edward Ray & Lonnetta G: Ray #3 (WD) |
| Garfield Refining Company Profit Sharing Plan |
| HMK Trust |
| Hoffman Investment Company |
| James Merritt Springstead, Jr. |
| Jean Ellen Ray |
| Jeannine Pulito |
| Jeffrey Honickman |
| Jennie R. Berliant Revocable Trust |
| JILCY-6, L.P. |
| Jeannine Pulito & Nicole Linehan, as Trustees of The John T. Fries Dynasty Trust PNC Bank Delaware |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

| |
|---|
| Joseph R. Papa |
| Kenneth Waetzman & Shelley E. Waetzman |
| Kenneth J. Gold |
| Lennart Hagegard |
| M. Walter D'Alessio |
| Managed Care Connection, Inc. |
| Martin D. Cohen |
| Matthew I. Garfield |
| Max H. Kraus & Lois B. Kraus |
| Maya B. Goldberg |
| Nicole Linehan |
| Paul Trapido & Jude Ray |
| Peacock Productions |
| Ray Family Partnership |
| Richard H. Rosenthal Revocable Trust |
| Roger J. Murphy & Barbara K. Murphy |
| S.K.B. Investors |
| Sadinoff Family Enterprises, LLC |
| Seth J. Lehr |

38.     The Defendants listed below have been identified by Lubert-Adler as investors in Lubert-Adler Capital Real Estate Fund III, L.P.:

| |
|---|
| Lubert-Adler Group III, L.P. |
| The President and Fellows of Harvard College, through Harvard Private Capital Realty, Inc. |

39.     For convenience, the investors in the Lubert-Adler Fund III Entities are referred to herein as the "Lubert-Adler Fund III Investors."

-23-

E.    **The Lubert-Adler Fund IV Investors**

40.    The Defendants listed below have been identified by Lubert-Adler as investors in

Lubert-Adler Real Estate Fund IV, L.P.:

| |
|---|
| Lubert-Adler Group IV, L.P. |
| Michael C. Erlbaum & Gary E. Erlbaum, as Trustees of The Adam J. Erlbaum Trust U/A dated 4/4/97 |
| Amy A. Fox & Daniel H. Wheeler |
| BCIP Associates II |
| Bob C. Ladd |
| Bowdoin College |
| Commonwealth of Pennsylvania State Employees' Retirement System (SERS) |
| David & Angella Nazarian Family Trust |
| David D. Kim Trust dated 12/31/87 |
| Debra Ellen Fox |
| Emory University |
| Employees' Retirement Plan of Duke University |
| Erlbaum Family Limited Partnership |
| Erlbaum Investments, L.P. |
| FEA II, L.P. |
| France-Merrick Foundation, Inc. |
| Frog Hollow Partners XI, L.P. |
| Gary E. Erlbaum |
| Gothic Corporation |
| Graham Alternative Investment Partners I |
| GT Real Property Holdings II, LLC |
| The President and Fellows of Harvard College, through Harvard Private Capital Realty, Inc. |
| James J. Kim |
| John D. & Catherine T. MacArthur Foundation |
| John T. Kim Trust dated 12/31/87 |
| John T. Lupton Trust |
| Johns Hopkins University |
| Joseph Neubauer |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| Mellon Trust of New England, N.A., as Trustee of The Kodak Retirement Income Plan Trust |
| Michael C. Erlbaum |
| Northwestern University |
| The Pennsylvania Public School Employees' Retirement System (PSERS) |
| Robert A. Fox |
| RPM Metropolitan Fund (QP), LP |
| RPM Metropolitan Fund, LP |
| RPM Opportunity Fund, LP |
| RPM Select Fund, LP |
| Steven H. Erlbaum |
| Susan Y. Kim Trust dated 12/31/87 |
| Teachers Insurance & Annuity Association of America |
| The Catholic Bishop of Chicago - Endowment Fund |
| The Metropolitan Museum of Art |
| The President & Trustees of Williams College |
| The Rockefeller University |
| The Trustees of Princeton University |
| The Vanderbilt University |
| The Washington University |
| UNC Investment Fund, UR |
| University of Oregon Foundation |
| University of Southern California |
| University of Virginia Investment Management Company |
| Warlen L.P. |
| Wellesley College |
| WFC Holdings Corporation |
| William Marsh Rice University |
| Y & S Nazarian Revocable Trust, UTD dated 9/2/2003 |
| Yale University |
| Yale University Retiree Health Benefits Coverage Trust |
| Yale University Retirement Plan for Staff Employees |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

41.    The Defendants listed below have been identified by Lubert-Adler as investors in Lubert-Adler Real Estate Parallel Fund IV, L.P.:

| |
|---|
| Lubert-Adler Group IV, L.P. |
| Alan D. Levow |
| Alan P. Smith, as Trustee U/D of Harold L. Neuman Trust #1 dated 11/21/69 |
| Alan P. Smith, as Trustee U/D Harold L. Neuman Trust #2 dated 11/21/69 |
| Andrew D. Rubin & Louise Rubin |
| Andrew Goldman |
| Andrew Perry |
| ANKA Limited Partnership |
| Anthony J. Calise, IRA |
| Barbara Toll |
| Bruce S. Marks & Bonnie Kay Marks |
| Carl Marbach & Helen Marbach |
| Charles M. Robins |
| Christopher Asplundh |
| David A. Braver |
| David Ray & Margaret Carver |
| David Schlessinger |
| Diane C. Ray |
| Diane L. Myer Rev. Trust dated 8/3/01 |
| Donald R. Auten & Judith W. Auten |
| Edward Bowman & Kathleen Bowman |
| Edward M. Snider |
| Edward Ray & Lonnetta G. Ray |
| Group Fore, LLC |
| HEM Private Equity Fund 2000, LLC |
| IRM Associates, LP |
| Irvin J. Borowsky |
| James Wolf & Nancy Wolf |
| James M. Springstead & Diane B. Springstead |
| Jean Ellen Ray & Tobias Speckbacher |
| Jennie R. Berllant Revocable Trust |
| Jeremy Allen & Debra Allen |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM  TOWER, 150  WEST  FLAGLER  STREET,  MIAMI,  FLORIDA  33130  ·  TELEPHONE  (305) 789-3200

| |
|---|
| JLT Investments, LP |
| John R. Jaeb Revocable Trust dated 7/5/2000 |
| Keith Loiselle & Carol Loiselle |
| KLT Investments, LP |
| Lennart Hagegard |
| Lenore Steiner |
| Leslie B. Frankel |
| Linda C. Meldrum |
| Lisa Roberts |
| Lynn W. Bernstein |
| Lyonshare Investments, Inc. |
| Marilyn Weissman Trust |
| Marjorie Rawls Roberts |
| Mark Wildstein |
| Martin L. Trichon & Judith K. Trichon, as Husband & Wife |
| Maya B. Goldberg |
| Melvin Herrin |
| Pamela Estadt |
| Patricia Guggenheim |
| Paul Trapido & Jude Ray |
| Ray Family Partnership |
| Richard Guggenheim Testamentary Marital Trust |
| Richard H. Rosenthal Revocable Trust |
| Richard J. Anthony, Sr. & Marlene A. Anthony |
| Richard T. Kanter |
| Robert Crown & Barbara Crown |
| S.K.B. Investors |
| Sadinoff Family Enterprises, LLC |
| Sadinoff Family Foundation |
| Seymour Sadinoff |
| Stephen R. Mickelberg |
| Terry K. Watanabe |
| The Melvin Herrin 1992 Trust FBO H. Scott Herrin |
| Thomas Parrington & Mary Lee Parrington |
| Tristram C. Colket, Jr., as Trustee of the Tristram C. Colket, Jr. Revocable Trust U/T/A dated 02/05/2004 |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

| |
|---|
| Trust U/W John Svenningsen |
| Vestal Venture Capital III |
| VSP Group |
| W. Kirk Wycoff |

42.    The Defendants listed below have been identified by Lubert-Adler as investors in

Lubert-Adler Capital Real Estate Fund IV, L.P.:

| |
|---|
| Lubert-Adler Group IV, L.P. |
| Adolf A. Paier |
| Alan P. Smith & Ruth N. Smith, as Tenants by the Entireties |
| Amy B. Erlbaum |
| Arthur Marion Revocable Trust |
| BLK Investments, L.P. |
| Bruce A. Levy |
| Chafetz Group LLC |
| Christine V. Kanter |
| Criterion Holdings, LLC |
| Davco Management, LLC |
| David O. Oberkircher |
| Donald M. Rosen |
| E WACHS II, L.P. |
| Edmund F. Garno, III |
| Edmund F. Garno, Jr. |
| Edward J. Fitzsimmons |
| Edwin J. Berkowitz |
| Engle Associates |
| Foster & Foster, LLC |
| Garfield Refining Company Profit Sharing Plan |
| George M. Ross & Lyn M. Ross |
| George W. Karr, Jr. |
| Glenwood Road Associates Partnership |
| Harris Wildstein |
| Henry Dolfinger #2 T/W |
| Hersch M. Klaff |
| Hoffman Investment Company |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

| |
|---|
| Howard B. Asher |
| Howard D. Ross & Susan K. Hollenstein |
| Humills, LLC |
| Hyman R. Kahn, M.D. |
| James A. Ounsworth |
| James M. Meyer |
| Javick, L.P. |
| JILCY-1, L.P. |
| JILCY-6, L.P. |
| Jon M. Lubert |
| Jonathan B. Detweiler, as Trustee of the Jonathan B. Detwiler Revocable Trust, U/T/A dated 4/29/2003 |
| Joseph F. Waterman & Mary Joel Waterman |
| Keibreaux Associates, LP |
| Kirschner Brothers Profit Sharing Plan |
| Koen Investments, LLC |
| L. Frederick Sutherland & Barbara H. Sutherland |
| Larry A. Cutler & Susan E. Cutler |
| Lawrence Chimerine |
| Lawrence S. Smith Profit Sharing Plan |
| Mark G. Cornish |
| Matthew I. Garfield & Marie H. Garfield |
| MDR II LLC |
| Michael J. Hagan & Joyce Hagan |
| Michael J. Caruso |
| Michael P. McNulty |
| Michael S. Kirschner |
| Mons Investments, LLC |
| Nancy S. Engle |
| Nextone LLC |
| Oliver Ernest Associates, L.P. |
| Peacock Productions |
| Peter Linneman & Kathleen Linneman |
| Peter S. Linder |
| R. Eric Emrich & Angela L. Emrich |
| Randy L Pulito & Diane K. Pulito |

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

| |
|---|
| Richard L. Foster |
| Richard L. Freundlich |
| Richard Levin |
| Robert E. Keith, Jr. & Margot W. Keith, as Tenants by the Entireties |
| Robert L. McNeil, III |
| Robert P. Hauptfuhrer |
| Rochelle Broad |
| Ronald J. Zlatoper & Barry O. Zlatoper |
| Roy S. Neff |
| Sarah M. Cornish |
| Segel Partnership II, LP |
| Seth J. Lehr & Ellyn Lehr |
| Sheldon M. Bonovitz & Jill F. Bonovitz, as Tenants by the Entireties |
| Sidewater Associates I |
| Sidewater Family Partners |
| Stanley H. Engle Revocable Trust |
| Stephen R. Mickelberg |
| Stephen S. Phillips & Mary Ann Phillips |
| Steven Rosard & Laurie B. Rosard, as Joint Tenants With Right of Survivorship |
| Swirnow L-A IV Investors, LLC |
| The Barra Foundation, Inc. |
| The Marilyn J. Engle Living Revocable Trust dated September 21, 2006 |
| Thomas J. Knox |
| Thomas K. Cloetingh & Joan E. Cloetingh |
| TJJK, LLC |
| Triangle Bridge Group, L.P. |
| V.G. Bell & E.V. Bell Trust UD 12/16/92 SV |
| Valmora Partners II, L.P. |
| Vestal Venture Capital II |
| Vincent G. Bell, Jr. & Elaine V. Bell |
| Wayne D. Bloch & Sheree I. Bloch, as Joint Tenants With Right of Survivorship |
| William Harral, III |

43.     For convenience, the investors in the Lubert-Adler Fund IV Entities are referred to herein as the "Lubert-Adler Fund IV Investors."

-30-

### F.    Basis for Inclusion as Defendants

44.    With respect to the transfers for which avoidance and recovery is sought in this case, each of the individuals and entities named as Defendants herein was either an initial transferee or entity for whose benefit a transfer was made within the meaning of 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

### G.    "John Doe" Defendants

45.    Defendants John Does 1-50 are as-yet-unidentified persons and/or entities which, with respect to the transfers for which avoidance and recovery is sought herein, satisfy the requirements of 11 U.S.C. §§ 550(a)(1) or 550(a)(2).

46.    Once discovery is obtained with respect to the loan proceed distributions at issue, leave will be sought to substitute as a defendant any person or entity which is an initial transferee or entity for whose benefit such transfers were made within the meaning of 11 U.S.C. § 550(a)(1), or an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

### H.    Joinder

47.    The Defendants are properly joined in this action pursuant to Fed. R. Civ. P. 20, made applicable by Fed. R. Bankr. P. 7020, because the right to relief asserted against all Defendants arises out of the same transaction or occurrence, and questions of law and fact common to all Defendants will arise in this action.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## GENERAL ALLEGATIONS

### A.        The Ginn / Lubert-Adler Development Known as Tesoro

48.        Tesoro is a 1,400 acre private community and club located near the St. Lucie River, in Port St. Lucie, Florida.

49.        Ginn and the Lubert-Adler Fund III Entities purchased the land for Tesoro through a number of subsidiaries, between 2001 and 2003.

50.        Construction of the first phase of Tesoro – "Tesoro West" – was completed in 2004. It consisted of 470 single family residential lots and a number of amenities, including a small clubhouse, golf shop, and an 18 hole golf course.

51.        Construction of the second phase – "Tesoro East" – began shortly thereafter. It was to include an additional 453 single family residential lots, 100 villa-style condominium units, and a number of amenities, including a larger clubhouse with a restaurant, ballroom, spa, fitness center, and pool, a tennis complex, two additional 18 hole golf courses, and an off-site beach club on Hutchinson Island, with a restaurant, grille, exercise room, surf shop, elevated pool, cabanas, and private beach access.

### B.        Quail West

52.        Quail West is a 1,180 acre private community and club located east of Interstate 75, along the border between Collier and Lee Counties, near Naples, Florida.

53.        Ginn and the Lubert-Adler Fund III & IV Entities took over Quail West in 2005, after approximately half of the roughly 900 available residential lots had been developed and sold, and much of the infrastructure had been completed, including a grand clubhouse with a restaurant and spa, a tennis complex, and two 18 hole golf courses.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET,  MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

54.     According to Ginn marketing materials, the plan was to re-brand the project and enhance the marketability of the remaining residential lots, by upgrading existing facilities and adding an off-site beach club, with a restaurant, pool, and a marina with boat slips.

### C.     The Original Financing Plan and the Impact of Hurricane Wilma

55.     Originally, Ginn and Lubert-Adler intended to use Tesoro and Quail West lot sales to finance the completion/upgrading of the developments' respective infrastructure and facilities, with profits – if any – to be taken upon completion of each project.

56.     In October 2005, Ginn and Lubert-Adler held an extravagant "launch" event at Tesoro and succeeded in obtaining sales reservations or contracts for most of the remaining residential lots, and nearly half of the available condominium units.

57.     Later that same month, however, Hurricane Wilma struck the areas in which the Tesoro and Quail West Projects are located, impacting both the developments themselves and the real estate markets in Port St. Lucie and Naples, Florida.

58.     According to Ginn himself, it also marked the onset of a broader market collapse which was as bad as he has seen in 40 years as a developer:

> The market crash[] from the end of 2005 . . .  to July of 2006 was as *big a falloff* in housing as I have ever seen in *40 years*.  And it ha[s]n't gotten better, it's gotten a little worse . . . .
>
> * * *
>
> The market was going bad from the end of 2005 through the entire year of 2006, but *the first six months of 2006 was brutal.  I mean it's like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall*. . . .

Transcript of Ginn Resorts Conf. Call, 07/23/08, pp. 9, 18, MMMTQW01_074772 - 074858 (emphasis added).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

59.     In the wake of that Ginn-described "falloff in housing," the vast majority of the Tesoro sales reservations and contracts obtained at the aforementioned October 2005 "launch," and the vast majority of the Quail West sales reservations and contracts obtained at a "launch" event held later that year, either were subsequently cancelled or otherwise failed to close.

60.     That, in turn, prompted Ginn and Lubert-Adler to begin searching for alternate ways to finance the completion/upgrading of Tesoro and Quail West infrastructure and facilities.

61.     Initially, Ginn and Lubert-Adler management began soliciting potential lenders with a view toward obtaining traditional debt financing for the Tesoro and Quail West Projects.

62.     Ultimately, however, they found something even better (for them) in Credit Suisse, which offered them the opportunity to "recapitalize" and take hypothetical future "profits" out of Tesoro, Quail West, and the River Club / Gardens, Laurelmor, and Ginn sur Mer Projects, on a "cross-collateralized" basis, long before any of the Projects were to be completed, at a time when markets were collapsing and it was uncertain whether any profits would in fact be realized.

63.     This opportunity was particularly appealing to Lubert-Adler and its principals, insofar as it enabled them to artificially enhance the financial performance of Funds "III" and "IV" at a time when they were actively seeking to raise capital for Fund "V."

64.     As Dean Adler himself explained, however, the opportunity was even *more* appealing insofar as it enabled them to use the 4 U.S.-based Projects "as fodder" for the Bahamas Project, which was viewed internally as the Project with the greatest potential for profit:

> I would also point out that the 4 [U.S.] properties are giving the necessary credit to get a loan for [Ginn sur Mer] – there are no stand-alone lenders for the Bahamas. *The reality is[] that we are taking the risk by taking 4 financeable properties and using them as fodder in order to get financing for the Bahamas*. . . .

Email, D. Adler to R. Rosenberg, 06/06/06, Forwarded to J. Brannon, 06/06/06, LA048225 - 048226 (emphasis added).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

D.      **The Credit Suisse Loan Transaction**

65.     On or about June 8, 2006, Credit Suisse, Ginn, and Lubert-Adler representatives reached agreement as to the terms of a complex, multi-tiered, syndicated loan transaction in which Credit Suisse, as Agent for numerous lenders, extended a total of $675 million in loan financing to a pair of Ginn-LA shell entities – Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc.– subject to the Debtors' and Other Project Entities' consent and acceptance of "primary" liability for the full $675 million loan amount, and the granting of mortgages and liens on substantially all of their real property and other assets, without receiving any of the loan proceeds in return.

66.     Ginn-LA CS Borrower, LLC was a Delaware limited liability company formed in connection with the loan transaction, whose sole assets consisted of membership interests in the Tesoro and Quail West Debtors, and the River Club / Gardens and Laurelmor Project entities. It was formed for the sole purpose of "pooling" the U.S. Project assets, and served as a conduit for the loan proceeds allocated to the U.S. Projects.

67.     Similarly, Ginn-LA Conduit Lender, Inc. was a Delaware corporation formed in connection with the loan transaction, with no assets whatsoever.  It was created for tax purposes, and served as a conduit for the loan proceeds allocated to Ginn sur Mer, *i.e.*, the Bahamas Project.

68.     The principal loan transaction documents were a First Lien Credit Agreement and a Second Lien Credit Agreement, and a pair of corresponding "Subsidiary Guaranties," all of which contained choice of law provisions purporting to invoke New York law.

69.     The First Lien Credit Agreement extended a total of $525 million in financing, in the form of a $165 million synthetic revolving loan and a $360 million first lien "term" loan.

70.     The Second Lien Credit Agreement extended an additional $150 million in financing, in the form of a second lien "term" loan.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

71.     Unlike a typical loan transaction, however, the purported "Subsidiary Guaranties" which each of the Debtors and Other Project Entities were required to execute specifically provided for "primary" liability for the full $675 million loan amount:

> Nature and Scope of Liability.  Guarantor's liability under this Guaranty shall be *primary* and *not secondary,* in *the full amount* of the Guarantied Obligations [defined as "all Obligations" under the Loan Documents].

First Lien Credit Agreement, p. 1, ¶¶ 1.1, 5.11; Second Lien Credit Agreement, p. 1, ¶¶ 1.1, 5.11; First Lien Subsidiary Guaranty, ¶ 3 (emphasis added); Second Lien Subsidiary Guaranty, ¶ 3 (same).

72.     That is, under the so-called Guaranties, "*even if Borrower had no liability* at the time of execution of the Loan Documents or later cease[d] to be liable under any Loan Documents . . . ," each of the "Guarantors" was "fully obligated" for "all Obligations" under the Loan Documents. First Lien Subsidiary Guaranty, ¶ 5 (emphasis added); Second Lien Subsidiary Guaranty, ¶ 5 (same).

73.     Further departing from the norm, the operative Loan Documents specified that "[both] the Borrower and its *Subsidiaries,*" the supposed "Guarantors," were responsible for loan repayment, with "Guarantor" assets – the only assets appraised in connection with the loans – serving as *the principal source* of loan repayment:

> • "The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, rental programs, club, golf club memberships or otherwise) . . . into the Company's Operating Account," *i.e.*, a depository or securities account "subject to a Control Agreement in favor of [Credit Suisse]";

> • "Concurrently with the consummation of any [Borrower or Subsidiary] Asset Sale [as defined below], the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs. . . ."

> • "'Asset Sale' means the sale, lease, [etc.] by the Borrower or any of its Subsidiaries . . . to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible . . . ."

First / Second Lien Credit Agreements, ¶¶ 1.1, 2.8(B)(ii)(e), 3.3(B)(ii).

-36-

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

74.    In fact, in this case, the entire loan transaction was expressly "condition[ed]" upon the Debtors' and Other Project Entities' execution and delivery of the so-called Guaranties, and the granting of mortgages and liens on substantially all of their real property and other assets:

- "The Lenders would not make, and would not be obligated to make, the Loan to Borrower unless Guarantor executed this Guaranty. This Guaranty is therefore delivered to Lenders, acting through Administrative Agent, to induce the Lenders to make the Loan. . . ."

- "The First [and Second] Lien Credit Agreement[s] require[] that the obligations of the Borrower . . . be secured by liens and security interests covering, among other things, Mortgagor's interest in the Fee Property and the Leased Property.  In connection therewith, Mortgagor is executing and delivering this Mortgage . . . ."

- "It is a condition precedent of the obligation of Lenders to make the Loans to the Borrower under the Credit Agreement[s], that Grantor shall have executed and delivered this [Security] Agreement [granting] a security interest in, all of Grantor's right, title and interest in and to all of the personal property of Grantor, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired, wherever the same may be located . . . ."

First / Second Lien Subsidiary Guaranties, Recital F & ¶ 9; First / Second Lien Mortgages, Security Agreements, Assignments of Rents and Leases and Fixture Filing, Recitals C & D; First / Second Lien Security Agreements, Recital B & ¶ 1.

75.    Suffice it to say, Ginn and Lubert-Adler satisfied that threshold "condition" by exercising control over the Debtors and Other Project Entities in connection with the transaction, as evidenced by the fact that the same Ginn and Ginn-LA representative, Robert F. Masters, executed the Loan Documents on behalf of each of the Ginn and Ginn-LA Loan Parties, including the Debtors and Other Project Entities. *E.g.*, First Lien Credit Agreement, pp. 127-28; Second Lien Credit Agreement, pp. 114-15; First / Lien Subsidiary Guaranties, pp. 12-15; First / Second Lien Mortgages, pp. 23-27;  First / Second Lien Security Agreements, pp. 27-29.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### E.    The Uses of the Credit Suisse Loan Proceeds

76.    Significantly, the First and Second Lien Credit Agreements overtly contemplated that less than a quarter of the loan proceeds would be used for working capital or development purposes.

77.    Of the $675 million loan amount, only the $165 million "synthetic revolving" loan was to be maintained in a deposit account "to fund general company and working capital needs" and "to finance a portion of the development, construction and other costs associated with each Project." The remaining $510 million in "term" loan proceeds was expressly *required* to be "applied" to pay transaction costs, to replace existing third-party debt of the Debtors and Other Project Entities, and "to make certain distributions," totaling approximately $325 million, to the equity owners of the five Projects – namely, insiders and affiliates of the Debtors and Other Project Entities. First and Second Lien Credit Agreements, Recitals A & B, ¶ 2.9.

78.    Needless to say, the "distributions" were *not* the product of after-the-fact decisions. Nor were they made independent of the Debtors.  They were an integral part of the loan transaction, which, as noted above, was expressly "condition[ed]" upon the Debtors' consent and acceptance of "primary and not secondary" liability the full $675 million loan amount, and the granting of mortgages and liens on substantially all of their assets.

79.    No portion of the $165 million synthetic revolving loan was distributed at closing. By contrast, the $510 million in term loan proceeds was distributed in its entirety, as follows:

| Description | Amount |
|---|---:|
| Credit Suisse Loan Fee and Other Closing Costs | $23,446,764.94 |
| Replacement of Existing Third-Party Debt | $158,291,252.86 |
| Distributions to Ginn / Lubert-Adler Entities | $328,261,982.20 |
| Total | $510,000,000.00 |

"Distributions From June 2006 CS Loan Closing," 10/22/09, GINN_TQWBR002409 - 002414.

-38-

F.    **How the Loan Proceed Distributions to Insiders Were Debited and Credited Among the Project Entities**

80.    According to Ginn and Lubert-Adler records, the approximately $325 million in Credit Suisse loan proceeds distributed to insiders at the closing of the loan transaction was credited against the Debtors' and Other Project Entities' respective capital accounts as follows:

| Transferee / Allocation | Tesoro | Quail West | River Club / Gardens | Laurelmor | Gin sur Mer | Total |
|---|---|---|---|---|---|---|
| **Ginn "Promote"** | $5,357,044.85 | $1,785,681.62 | $0.00 | $0.00 | $0.00 | $7,142,726.47 |
| **Lubert-Adler Debt Pay-Off** | $0.00 | $19,675,813.02 | $25,576,449.47 | $51,105,603.89 | $0.00 | $96,357,866.38 |
| **Lubert-Adler Accrued Interest** | $0.00 | $1,394,436.65 | $2,918,102.88 | $3,340,144.56 | $0.00 | $7,652,684.09 |
| **Lubert-Adler Equity** | $76,298,706.81 | $8,611,730.28 | $3,397,383.42 | $11,175,677.33 | $71,240,826.58 | $170,724,324.42 |
| **Lubert-Adler Preferred Return** | $6,384,354.18 | $909,513.44 | $410,190.47 | $973,204.19 | $4,298,201.28 | $12,975,463.56 |
| **Lubert-Adler Profit** | $21,413,194.24 | $6,997,723.04 | $0.00 | $0.00 | $0.00 | $28,410,917.28 |
| **Subtotal** | $109,453,300.09 | $39,374,898.05 | $32,302,126.24 | $66,594,629.97 | $75,539,027.86 | $323,263,982.20 |
| **Overhead / Post-Closing Costs** | | | | | | $4,998,000.00 |
| **Grand Total** | | | | | | $328,261,982.20 |

"Distributions From June 2006 CS Loan Closing," 10/22/09, GINN_TQWBR002409 - 002414; Ginn / Lubert-Adler Defendants' Responses to First Set of Interrogatories, Int. No. 7.

81.    In other words, through the loan transaction, insiders in control of the Tesoro Debtors took out $109,453,300.09 of "capital" and replaced it with $109,453,300.09 of loan debt, and insiders in control of the Quail West Debtors took out $39,374,898.05 of "capital" and replaced it with $39,374,898.05 of loan debt – making for a combined total of $148,828,198.14, or approximately 45.33% of the total amount distributed to insiders at closing, $328,261,982.20. Tesoro / Quail West Debtor Balance Sheets, 2006, LA027395 - 027398, 027369 - 027371; Ginn / Lubert-Adler Defendants' Responses to First Set of Interrogatories, Int. No. 7.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

G.     **Facts Establishing That The Tesoro and Quail West Debtors Were Substantively "Borrowers" With Respect to the Credit Suisse Loans, and, Therefore, Had a Legal or Equitable Interest in the Loan Proceeds Distributed to Insiders at Closing Which Were Credited Against Their Respective Capital Accounts**

82.     Although the Tesoro and Quail West Debtors were not defined as "Borrowers" in the initial Credit Suisse Loan Documents, the facts alleged in ¶¶ 65 through 81 *supra* evidence that the Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the loans, and, therefore, had a legal or equitable interest in the $148,828,198.14 of Credit Suisse loan proceeds upstreamed to insiders which were credited against their capital accounts. To summarize:

- The two technical "Borrowers" were shell entities formed in connection with the loan transaction, whose sole assets – collectively – were membership interests in the U.S. Project entities;

- The "Subsidiary Guaranties" which the Debtors and Other Project Entities were required to execute provided for "primary and not secondary" liability for the full $675 million loan amount;

- The operative Loan Documents also specified, among other things, that "[both] the Borrower and its Subsidiaries," the supposed "Guarantors," were collectively responsible for loan repayment, with "Guarantor" assets – the only assets appraised in connection with the loans – serving as the principal source of loan repayment; and

- The entire loan transaction was expressly "condition[ed]" upon the Debtors' and Other Project Entities' execution and delivery of the so-called Guaranties, and the granting of mortgages and liens on substantially all of their real property and other assets.

83.     Simply stated, Credit Suisse and the syndicated lenders would not have extended $675 million in financing to the shell holding entities which served as the technical "Borrowers" – roughly $325 million of which was to be applied to make "distributions" to insiders of the Debtors and Other Project Entities – *without* the Debtors and Other Project Entities' having "primary" liability for repayment of the loans, and without their granting mortgages and liens on substantially all of their real property and other assets.

-40-

84.     In addition, subsequent Credit Suisse Loan Documents also provide evidence that the Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the loans, and, therefore, had a legal or equitable interest in the $148,828,198.14 of Credit Suisse loan proceeds upstreamed to insiders which were credited against their capital accounts.

85.     In the Master Restructuring Agreement ("MRA") of December 19, 2008, for instance, the Debtors and Other Project Entities were identified as "Full Recourse Borrower Parties" – *not* mere "guarantors" – and were explicitly called upon to "reaffirm[] and acknowledge[] the obligations to pay, when due, all principal, interest and fees" owed under the Loan Documents. MRA, p. 1, ¶ 2, Schedule 1.

86.     The parties to this adversary proceeding have agreed, through respective counsel, that the MRA did not recharacterize the parties' liabilities or position from the initial loan agreements. Transcript of Hearing on Motions to Dismiss, Etc., 11/18/10, pp. 60:4-7, 113:4-9 [ECF No. 151]; Order on Motions to Dismiss, 12/10/10, p. 10 n. 9 [ECF No. 154].

87.     Indeed, the Ginn and Lubert-Adler Defendants each effectively *conceded* that the Debtors had either a legal or equitable interest in the $148,828,198.14 of loan proceeds at issue in response to interrogatories which stated in relevant part:

> Regarding the transfers to Ginn and Lubert-Adler entities of Credit Suisse Loan Proceeds, . . . please identify the consideration or value, if any, received by the Tesoro Debtors in exchange for: (a) the portion of the loan proceeds distribution credited to the Tesoro Debtors; . . .
>
> * * *
>
> Regarding the transfers to Ginn and Lubert-Adler entities of Credit Suisse Loan Proceeds, . . . please identify the consideration or value, if any, received by the Quail West Debtors in exchange for: (a) the portion of the loan proceeds distribution credited to the Quail West Debtors; . . .

First Set of Interrogatories, Int. Nos. 8, 9.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

88.     The Ginn and Lubert-Adler Defendants' sworn answers unequivocally attested that

the transfers of the $148,828,198.14 of loan proceeds at issue were made "pursuant to the terms of"

the Lead Debtors' respective operating agreements:

> The transfers [at issue] were made pursuant to the terms of the Second Amended and Restated Agreement of Limited Partnership of [Debtor] Ginn-LA St. Lucie Ltd., LLLP which provided for distributions in the following order of priority:
>
> 1.     To the limited partners in repayment of their loans to Debtor Ginn-LA St. Lucie Ltd., LLLP, including interest thereon;
>
> 2.     To the limited partners, in proportion to their respective preferred return account balances;
>
> 3.     To the partners in proportion to the balance of their unreturned capital contributions; and
>
> 4.     The balance to the partners in proportion to their respective percentage interests (i.e., 20% to the general partner and 80% to the limited partners).
>
> * * *
>
> The transfers [at issue] were made pursuant to the terms of the Amended and Restated Agreement of Limited Partnership of Debtor Ginn-LA Quail West Ltd., LLLP which provided for distributions in the following order of priority:
>
> 1.     To the limited partners in repayment of their loans to Debtor Ginn-LA Quail West Ltd., LLLP, including interest thereon;
>
> 2.     To the limited partners, in proportion to their respective preferred return account balances;
>
> 3.     To the partners in proportion to the balance of their unreturned capital contributions; and
>
> 4.     The balance to the partners in proportion to their respective percentage interests (i.e., 20% to the general partner and 80% to the limited partners).

Ginn / Lubert-Adler Defendants' Responses to First Set of Interrogatories, Int. Nos. 8-9.

89.     That is, the Defendants *themselves* treated the $148,828,198.14 as Debtor property

which was distributable to insiders under the Lead Debtors' Agreements of Limited Partnership.

Ginn / Lubert-Adler Defendants' Responses to First Set of Interrogatories, Int. Nos. 8-9.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

H.     **Facts Establishing That the Court May and Should Alternatively "Collapse" the Credit Suisse Loan Transaction so as to Reflect the Economic Realities Thereof**

90.     In addition to the foregoing, the facts alleged in ¶¶ 65 - 81 *supra* also establish that the Court may, in the alternative, "collapse" the loan transaction to reflect the economic reality that the Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the loans, and, thus, had a legal or equitable interest in the $148,828,198.14 of Credit Suisse loan proceeds upstreamed to insiders which were credited against their capital accounts.

91.     In fact, in this case, the loan transaction at issue was in many respects *more* egregious than the leveraged buyout transaction structure to which the "collapsing transaction" doctrine is most frequently applied.

92.     Here, Ginn and Lubert-Adler did not merely have *constructive* knowledge of the transactions that were going to take place after the shell "Borrower" entities received the loans, the First and Second Lien Credit Agreements *dictated* that roughly $325 million of loan proceeds "*shall* be applied" to make "distributions" to insiders of the Debtors and the Other Project Entities. First and Second Lien Credit Agreements, ¶ 2.9(A).

93.     Likewise, the loans and "distributions" were not merely dependent on one another, the entire series of transactions was "condition[ed]" on the Debtors' and Other Project Entities' acceptance of "primary and not secondary" liability for the full $675 million loan amount, and the granting of mortgages and liens on substantially all of their real property and other assets. First and Second Lien Subsidiary Guaranties, Recital F & ¶ 9; First and Second Lien Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, Recitals C & D; First and Second Lien Security Agreements, Recital B & ¶ 1.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

94.     Again, Credit Suisse and the underlying syndicated lenders would not have extended $675 million in financing to the shell holding entities which served as the technical "Borrowers" – roughly $325 million of which was to be applied to make "distributions" to insiders of the Debtors and Other Project Entities – *without* the Debtors and Other Project Entities having "primary" liability for repayment of the loans, and without their granting mortgages and liens on substantially all of their real property and other assets.

95.     The shell entities which served as the technical "Borrowers" were simply conduits, nothing more.

96.     Indeed, Ginn-LA attorneys expressly recognized as much in a "Memorandum" summarizing the federal tax implications of the Credit Suisse loan transaction, which stated:

> The Credit Suisse refinancing proceeds were used to repay existing debt and to make distributions to Lubert Adler Funds III and IV and ERG Enterprises. [Ginn-LA] CS Borrower, [LLC] distributed a portion of the loan proceeds to [Ginn-LA] CS Holding Co., [LLC] which in turn distributed the proceeds to the Lubert-Adler Funds and ERG Enterprises.  To the extent these distributions can be traced to the loan proceeds and do not exceed each partner's allocable share of the loan, the distributions should not trigger the disguised sales rules, and CS Holding Co. should not have to separately disclose the distributions to the IRS. . . .
>
> * * *
>
> [T]he following facts provide strong evidence to support the conclusion that no disguised sale occurred.  First, taking into account the direct and indirect ownership interests of the Lubert-Adler Funds and ERG Enterprises, the transaction did not alter the partners' proportionate ownership in the assets of the project partnerships.  Second, [if] Credit Suisse had extended the loan directly to each of the project partnerships, and the project partnerships had distributed the loan proceeds directly to the Lubert-Adler Funds and ERG Enterprises, then no disguised sale would have occurred.  *The fact that the loan proceeds were channeled through CS Holding Co. and CS Borrower should not change this result*.

Memo., Morris, Manning & Martin, LLP to G. Green, C.P.A., T. Buttny, C.P.A., 03/02/07, MMMTQW01-036133 - 036137 (emphasis added).[6/]

---

[6/] Ginn-LA CS Holding Company, LLC was another shell entity formed in connection with the loan transaction to serve as the immediate "parent" of Ginn-LA CS Borrower, LLC, so as to create a more beneficial tax structure. Memo., Memo., Morris, Manning & Martin, LLP to G. Green, T. Buttny, 03/02/07, MMMTQW01-036133 - 036137.

-44-

I.    **The Fraudulent Nature of the Loans and Transfers at Issue**

    (1)    **The Purpose and Effect of the Loan Transaction**

97.    Typically, for a developer to make money on a development project, he must overcome a series of hurdles, some of which may be unforseen at the time the project is commenced. The developer must, among other things, construct the project at a cost which is reasonable relative to the anticipated market for sales, successfully market his product to potential purchasers, and avoid the vagaries of development work, such as changes in economic conditions, catastrophic weather events, and other events which can increase costs, suppress demand, and/or lead real estate markets into a downturn.

98.    When a developer stands to take profits only "at the end" of a development project, it incentivizes the work necessary to achieve successful completion of the project.

99.    Moreover, when a developer is well-capitalized and his profits are "in the project," both the developer and his creditors enjoy a measure of protection in the event the unforseen occurs.

100.    In the present case, what Ginn and the Lubert-Adler entities found in Credit Suisse – the opportunity to "recapitalize" and take "capital contributions," "interest," "preferred return," and "profits" out of the Projects, long before they were to be completed – effectively eliminated any meaningful incentive to do the things necessary to successfully complete the Projects.

101.    Similarly, in the wake of the Credit Suisse loans and the transfers of loan proceeds at issue herein, the Debtors and Other Project Entities, and their creditors, were left without a measure of protection in the event the unforseen – or, in this case, the foreseen – were to occur.

102.    The Credit Suisse loan transaction was, in effect, "[a] *cash out* Mortgage," through which "equity" was paid before creditors, at a time when it was uncertain whether any returns – much less profits – would be realized, leaving creditors with the entire risk of loss.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

103.     Indeed, the Lubert-Adler Defendants candidly admitted as much in a Draft "Memo" from "Lubert-Adler Partners, L.P." to the Lubert-Adler Fund III & IV "Advisory Boards," *i.e.*, quasi-legislative bodies comprised of large-dollar Lubert-Adler Fund III & IV Investors which serve to represent the interests of all Fund III and IV Investors, respectively.

104.     The purpose of the Draft "Memo" was to gain the approval of the Advisory Boards to consummate the loan transaction, which was described as having several "objectives," including:

- "The removal of all guarantee exposure to Bobby Ginn, Lubert-Adler Fund III and Lubert-Adler Fund IV," by "paying off all existing recourse debt" and replacing it with debt that was recourse only at the Project level;

- The "pooling" and "cross-collateralization" of Project assets, so as to achieve "economic advantages," such as "greater loan proceeds"; and

- The funding of "an immediate dividend" of more than $325 million, which would result in "[the] mitigation of 100% of the capital risk, through the repayment of all invested equity and bridge fundings," and allow for "the harvesting of profits" on an "accelerated" basis.

Draft "Memo," 05/22/06, pp. 2, 6, 8, 10, MMMTQW01_009986 - 009996.

105.     The Draft "Memo" also notably "propos[ed]" that, of that more than $325 million, $75 million would be held "[in] reserve . . .  as sort of a contingency fund that could be used to 'balance' the loans in the event that the Projects collectively fail to perform as anticipated." Draft "Memo," 05/22/06, pp. 8-10, MMMTQW01_009986 - 009996.

106.     In the final version of the "Memo," the proposed reserve was reduced to $51 million. "Memo," 06/02/06, pp. 3, 8-10, LA043327 - 043337.

107.     Needless to say, Lubert-Adler ultimately gained the approval of the Advisory Boards to consummate the loan transaction, and the transaction proceeded, but with one significant caveat. Lubert-Adler did *not* establish the proposed "reserve."  Instead, it "harvested" those dollars for itself and its investors, leaving the Project entities – and their creditors – with a virtual certainty of loss. Ginn / Lubert-Adler Defendants' Responses to First Set of Interrogatories, Int. No. 7.

-46-

## (2)    The Loan Appraisals and Underlying Sales Projections

108.    Ginn and Lubert-Adler records indicate that the Credit Suisse loan amounts were predicated upon Cushman & Wakefield appraisals of the "Total Net Value" of the five Projects, a novel valuation methodology Credit Suisse developed in conjunction with Cushman & Wakefield in order to enhance the marketability of its syndicated loan product.

109.    The Cushman & Wakefield appraisals defined the "Total Net Value" of each Project as "the sum of the market value of the bulk lots of the entire planned community, *as if* all of the bulk lots were *complete . . .* and *available for sale* to merchant builders, as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

110.    In other words, the "Total Net Value" methodology was designed to generate a value which significantly exceeded the actual as-is fair market value of the property interests being valued, thus enabling the proposed loan to be marketed as having a much lower "loan-to-value" ratio than would otherwise have been possible using a traditional market valuation of the proposed collateral.

111.    For example, whereas the St. Lucie County Property Appraiser assessed the value of all Tesoro real and tangible property in 2006 to be $74,910,626, Cushman & Wakefield's appraisal of the "Total Net Value" of just the unsold Tesoro lots as of April 14, 2006 was $210,000,000.

112.    As a consequence, the Credit Suisse loans did not comply with U.S. banking laws, such as the Financial Institutions Recovery Reform Act of 1989, which provides that, before a regulated financial institution may make or invest in a loan secured by real estate, the loan must be supported by an appraisal reflecting a traditional market valuation of the proposed collateral.

113.    To circumvent that requirement, Credit Suisse coordinated the loans through its "Cayman Islands Branch," an off-shore "affiliate" with no physical presence in the Cayman Islands, and syndicated the loan product to non-regulated entities, such as hedge funds.

-47-

114.    In fact, in the aforementioned *In re Yellowstone Mtn. Club* adversary proceeding,

Credit Suisse effectively conceded as much, prompting Judge Kirscher to write:

- "Credit Suisse's Total Net Value methodology does not comply with [FIRREA], but that was not important to Credit Suisse because [it] was seeking to sell its syndicated loans 'to non bank institutions.'"

- "[T]he use of a 'Total Net Value' (later changed to 'Total Net Proceeds,' undoubtedly to avoid the impression that actual 'value' was being addressed) appraisal was devastating to the Yellowstone Club. . . . The reasonable inference is that Credit Suisse, with [the developer's] tacit approval, wanted to bulk up the alleged value of the Yellowstone Club in order to inflate the size of the loan. . . ."

- "The result . . . was a loan that failed to comply with good real estate loan practice, that was suffused with excessive risk of failure, and that was unsafe, unsound, and imprudent."

Partial & Interim Order, reported at 2009 WL 3094930, at *3 (Bankr. D. Mont. May 13, 2009);

Memorandum of Decision, 436 B.R. at 657-58 (Bankr. D. Mont. Aug. 16, 2010).

115.    To make matters worse, the Ginn and Lubert-Adler sales projections supplied to

Credit Suisse and Cushman & Wakefield for use in appraising the "Total Net Value" of the Projects

had no basis in historical reality, and were vastly overstated.

116.    For instance, although Ginn and Lubert-Adler missed their original projections for

the Tesoro East "launch" by a huge margin – they had projected 421 lot closings by January 31, 2006

but achieved fewer than 40, with the real estate market in Port St. Lucie worsening with every day–

the projections supplied to "support" the loans forecasted 74 lot and condominium unit closings

during the second half of 2006 alone, and 290 more by the end of 2008.  In actuality, they achieved

a mere 7 lot closings, and 0 condominium unit closings, through the end of 2008.

117.    The same is true of Ginn and Lubert-Adler's projections for the Quail West Project.

Whereas the projections supplied to support the loans forecasted 66 lot closings by the end of 2006,

and 224 more by year-end 2008, in actuality, they achieved a mere 21 lot closings by year-end 2008.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

118.    Under the circumstances, these material overstatements cannot be excused as merely innocent or accidental.  They were deliberate.

119.    In April 2006, approximately six weeks prior to the closing of the loan transaction, Ginn, Adler, and others received a memorandum from Morris, Manning & Martin, LLP attorney John G. "Sonny" Morris, titled  "CSFB Financing /  Concerns About Repayment and Presales," which foreshadowed a series of problems the proposed borrowers could expect to encounter given the size of the loans they were attempting to procure, and the terms of the loans under discussion. Memo., J. Morris to B. Ginn, D. Adler, Etc., 04/19/06, MMMTQW01_024197 - 024201.

120.    The following month, after having spoken to Dean Adler, Morris further reported that "[Adler] is *greatly concerned that a failure to meet projections will result in a default*." Email, J. Morris to B. Masters, Etc., 05/26/06, MMMTQW01_0024495 (emphasis added).

121.    Lubert-Adler principal Robert Rosenberg even went so far as to suggest that Lubert-Adler use the recent real estate market downturn as *a selling point* in its efforts to obtain  approval from the Fund III and IV Advisory Boards to consummate the loan transaction. In his words: "[W]e could point out that the pace of sales at Tesoro has *recently begun to slow*, thereby making it increasingly likely that the Fund III investors will *not* get to a $36M profit point in the near-term future [absent the loans and 'the harvesting of profits' on an 'accelerated' basis]." Email, R. Rosenberg to D. Adler, Etc., 05/03/06, Forwarded to J. Morris, Etc., 05/04/06 - 05/05/06, MMMTQW01_024124 - 024125 (emphasis added).

122.    Indeed, Credit Suisse was so anxious about "market conditions" in June 2006 that it strenuously advised against "any material change in structure [that] may cause us to have to go back out to investors and reconfirm their orders," or would otherwise result in "*any kind of a delay*." Email, M. Speller to B. Wobeck, Etc., 06/02/06, MMMTQW01_024460 - 024467 (emphasis added).

-49-

123.    Suffice it to say, Ginn, Lubert-Adler, and Credit Suisse all knew the projections submitted to "support" the loans did not remotely account for actual "market conditions" at the time.

124.    As noted above, according to Ginn himself, the market collapse during the months immediately preceding the Credit Suisse loans was as bad as he has seen in 40 years:

> The market crashed from the end of 2005 to – or to July of 2006 was as big a falloff in housing as I have ever seen in 40 years.  And it ha[s]n't gotten better, it's gotten a little worse . . . .
>
> * * *
>
> The market was going bad from the end of 2005 through the entire year of 2006, but the first six months of 2006 was brutal.  I mean it's like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall. . . .

Tr. of Ginn Resorts Conf. Call, 07/23/08, MMMTQW01_074772 - 074858, pp. 9, 18.

125.    Likewise, Ginn-LA C.F.O. John P. Klumph later openly expressed "concerns" that "the Lenders could second guess the completeness of the [pre-loan] disclosure" in light of a failure to account for dozens of Tesoro and Quail West contract cancellations.  He then advised that "[i]n the detailed reports to be provided going forward [he was] planning to show total contracts and cancellations for 2006 *only as of year end so as not to draw unwarranted attention to the issue*."  Email, B. Wobeck to J. Morris, Etc., 04/30/07, MMMTQW01_006138 - 006140 (emphasis added).

126.    Similarly, less than a year after the closing of the Credit Suisse loan transaction, Lubert-Adler Principal and Head of Asset Management, Stuart A. Margulies, sent an email acknowledging – with respect to "Future Sales" – that:

> In the current climate and forseeable future, sales forecast[s] are *unreliable even at reduced levels*.  Accordingly, sales proceeds are *not a reliable funding source* [for loan repayment].

Email, S. Marguilies to R. Rosenberg, J. Klumph, J. Morris, 06/06/07, LA051640 - 051642, MMMTQW01_021877 (emphasis added).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

127.    In addition to the foregoing, Ginn and Lubert-Adler also used a variety of deceptive practices to obtain sales of Tesoro and Quail West lots/units at artificially-inflated prices, and then used those sales as "comparables" in establishing the projections supplied to Credit Suisse and Cushman & Wakefield of anticipated average closing prices for the remaining available lots/units in the Projects.

128.    For instance, at and after the Tesoro and Quail West "launch" events in Q4-2005, Tesoro and Quail West lot closings were "front-loaded" with a combination of:

- closings on sales where the prospective purchaser had agreed to pay "all cash," with no independent appraisal of "market value"; and

- closings on sales financed by a Ginn Financial Services, Inc. ("GFS") mortgage, with a Ginn-coordinated appraisal of "market value."

*E.g.*, Tesoro / Quail West Property Records; Tesoro Sales Summary, LA027845 - 027867; Quail West Sales Summary, LA027841 - 027844.

129.    Further, Tesoro and Quail West sales staff did not disclose to prospective purchasers, among other things, that:

- the GFS mortgages would initially be funded by inter-company loans from the Tesoro and Quail West Projects themselves, and would subsequently be pooled and sold in bulk to a third-party at a discount; or

- this GFS "product" was put in place in an effort to keep sales momentum going in the face of a growing reluctance by local banks to provide traditional mortgage financing for residential lots, due to over-saturation and deteriorating market conditions.

*E.g.*, Email Stream, J. Morris to/from W. McCracken, 04/06/07, MMMTQW01_010516 - 010518; Email Stream, J. Klumph to M. Cook, C. Brewer, Etc., 05/26/06, MMMTQW01_030356; Email Stream, C. Brewer to R. Reardon, Etc., 12/06/09, MMMTQW01_043180 - 043182.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

130.    On information and belief, Ginn and Lubert-Adler representatives also used "insider sales," "shills," "kickbacks," and/or "sale and leaseback financing arrangements" as a means to obtain sales of Tesoro and Quail West lots/units at artificially-inflated prices, and subsequently used those sales as purported "comparables" in establishing the projections supplied to Credit Suisse and Cushman & Wakefield of anticipated average closing prices for the remaining available lots/units in the Projects.

131.    It is also believed that Ginn and Lubert-Adler representatives manipulated Tesoro and Quail West development and construction cost projections in order to increase the "Total Net Value" of said Projects.

132.    Indeed, after the closing of the loan transaction, Ginn reportedly boasted that it was "the best sales job of [his] life."

133.    And when The Tesoro Club's General Manager at the time, J.R. Congdon, learned of the loans and the sales projections upon which the loan amounts and payment schedule had been established, he knew the Tesoro Project was "doomed to failure."

134.    The Tesoro Club's General Manager was, of course, correct.   And the same is true of Quail West, as well.

135.    To quote Dean Adler, the "reality" was, they were taking Tesoro, Quail West, and two other "financeable properties," and "using them as *fodder*" for the Bahamas Project. Email, D. Adler to R. Rosenberg, 06/06/06, Forwarded to J. Brannon, 06/06/06, LA048225 - 048226 (emphasis added).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### (3)    The Impact of the Transfers at Issue

136.    As noted above, according to Ginn and Lubert-Adler records, of the over $325 million in Credit Suisse loan proceeds distributed to insiders at the closing of the transaction in June 2006, $109,453,300.09 of that amount was credited against the Tesoro Debtors' capital accounts, and $39,374,898.05 of that amount was credited against the Quail West Debtors' capital accounts.

137.    The Tesoro Debtors did not receive reasonably equivalent value for the transfer of the $109,453,300.09 which was credited against their capital accounts.

138.    Nor did the Quail West Debtors receive reasonably equivalent value for the transfer of the $39,374,898.05 which was credited against their capital accounts.

139.    The Ginn and Lubert-Adler Defendants knew or turned a blind eye to the fact that if the Tesoro and Quail West Debtors were not already insolvent as of the time of those transfers, they would be rendered insolvent thereby and would be left much too thinly capitalized to survive.

140.    Indeed, according to Ginn and Lubert-Adler financial records for the period following the loans, as of June 30, 2006, the "Borrowers" and "Full Recourse Borrower Parties" had a combined net balance sheet deficit – *i.e.*, they were in the red – to the tune of $124,706,245; by September 30, 2006, that combined net balance sheet deficit had grown to $154,228,629; and by December 31, 2006, that combined net balance sheet deficit had balooned to $227,643,417.

141.    As a result, the Debtors and Other Project Entities lacked sufficient capital to fund normal development operations and were unable to make required loan payments as they came due, leading to a series of defaults and efforts to restructure the loans, which ultimately proved unsuccessful in keeping the entities afloat.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

### (4)    The Initial Efforts to Restructure the Loans

142.    Ginn and Lubert-Adler records reveal that, during the third quarter of 2006, total net revenues at Tesoro and Quail West – the most "mature" of the five Projects – were approximately 3% of previously forecasted amounts, due to "the lack of real estate sales."

143.    Shortly thereafter, Ginn and Lubert-Adler initiated discussions with Credit Suisse aimed at a restructuring of the loans, so as to enable compliance with certain financial covenants.

144.    In addition, during the same period, Ginn and Lubert-Adler also consummated the first of a series of related party transactions in which the Debtors and Other Project Entities would sell undeveloped condominium parcels in bulk to affiliates in order to generate needed cash to "feed" the loans and fund development expenses.

145.    Throughout that period and beyond, Ginn and Lubert-Adler also periodically invaded Tesoro Membership Deposits which they were obligated to hold in escrow pending completion of all "Club Facilities" – again, to "feed" the loans and fund development expenses.

146.    By mid-2007, Ginn and Lubert-Adler were formally reporting to the Lenders that "[t]he slowdown in the residential real estate markets ha[d] adversely impacted the Borrower's project sales and, as a result, its ability to comply with the terms of the existing credit agreements." In addition, they also acknowledged that, "[d]ue to the significant shortfall in expected sales to date, the Borrower must source outside capital in order to fund the key infrastructure and amenities costs." *E.g.*, Ginn Lender Presentation, 04/23/07, LA050798 - 050827; 06/21/07, LA053007 - 053042.

147.    Notably, however, at no time did Ginn or Lubert-Adler seek to "claw back" and inject into the Projects any portion of the over $325 million in loan proceeds distributed to insiders. Rather, "the Borrower [sought] *to shift* financial responsibility for certain infrastructure and amenity costs *to others*" through the related party sale/purchase transactions described above. *E.g.*, Ginn Lender Presentation, 04/23/07, LA050798 - 050827; 06/21/07, LA053007 - 053042.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

(5)    **Ensuing Discussions Regarding Bankruptcy**

148.    In early 2008, as it became harder for Ginn and Lubert-Adler to deny that they had, in fact, "doomed" the Projects "to failure," Ginn-LA representatives and attorneys met several times to discuss potential bankruptcy filings for the Debtors and Other Project Entities, and various issues relating thereto, including:

- "[The] need [for] a bankruptcy plan";

- "Conflicts issue[s]";

- "Substantive consolidation";

- "Separation of entities";

- "Debt goes across all projects";

- "Need to figure out how to strip off debt per property";

- "How to separate each project's liabilities";

- "Does each entity have to stand for repayment as a whole";

- "Are there grounds for piercing the corporate veil"; and

- "Return of equity at original closing → *fraudulent conveyance*."

*E.g.*, Handwritten Notes / Emails, 03/28/08 - 04/30/08, MMMTQW01_031126, 031120 - 031125, 031295, 031103 (emphasis added).

149.    With respect to the latter issue, the concern among those involved was that the "[d]istribution to Equity from [the] original closing could be challenged as [a] fraudulent conveyance," because "the debtors . . . did *not* get *reasonably equivalent value* [therefor]," and "[the] conveyance [was one] which rendered the debtors *insolvent* or *unreasonably capitalized*." Handwritten Notes of Mtg., MMMTQW01_016232 (emphasis added).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

150.    Consistent with that concern, on April 29, 2008, Ginn-LA C.F.O. John P. Klumph sent an email to three of "Sonny" Morris' law partners asking whether any "solvency certificate" he provided Credit Suisse in connection with the loans could subject him to "individual liability," and requesting additional "indemnity agreements" to protect against any such "liability":

> Would you gentlemen please check and see what *solvency certificates* I have signed for cs and if there may be *any individual liability* that could possibly accrue?
>
> Cass, *indemnity agreements*.

"Cass" – a.k.a. Cassady V. Brewer – promptly replied, "Roger. I am escalating the subject (again)," and forwarded the email to Morris, with the preface:

> John wants the Rob Gidel strength indemnity agreement.  He has a normal indemnity agreement from [Ginn Development Company], but it is not guaranteed by Lubert-Adler like Rob's. *I do not think we can duck this issue any longer*.

Email Stream, J. Klumph to B. Wobeck, D. Selph, C. Brewer, Etc., 04/29/08, MMMTQW01_026618 - 026619 (emphasis added).

151.    A few days later, on May 1, 2008, Ginn Defendant ERG Enterprises, L.P., the Lubert-Adler Fund III & IV Entities, and ten "Ginn-LA" entities, including the Lead Debtors, entered into a Joint Defense, Common Interest, and Information Sharing Agreement  ("JDA"), which "plainly recite[d] . . . [an] 'anticipation' of a possible bankruptcy filing" under Chapter 11, and "whose purpose [wa]s to protect [the] debtor's adverse insider's prepetition communications[,] to shield evidence of their wrongdoing."  JDA, 05/01/08, Recital No. 1, ¶¶ 1(a), 1(b), 1(c), 1(m); Order, Case No. 08-29769-PGH [ECF No. 572, pp. 12-13].

152.    Notably, as above, the same Ginn-LA officer, Robert F. Masters, executed the JDA on behalf of each of the "Ginn" and "Ginn-LA" parties, including the two Lead Debtors. JDA, 05/01/08, pp. 6, 7, 10; Order, Case No. 08-29769-PGH [ECF No. 572, p. 2].

-56-

153.    In short, by May of 2008, Ginn and Lubert-Adler had already recognized that the Debtors and the other Project subsidiaries they jointly controlled had viable claims to recover the roughly $325,000,000 in Credit Suisse loan proceeds taken out by insiders at closing as return of "capital" and an advance of hypothetical future "profits," amidst a real estate market collapse which Ginn himself described as "as big a falloff in housing as [he had] seen in 40 years."

154.    In addition, they had also recognized that, if the Debtors and Other Project Entities were to file for bankruptcy protection, any successor to those entities would be entitled to assert such claims, and would certainly be inclined to do so.

155.    In fact, later that year, aware of Ginn and Lubert-Adler's exposure to such claims, Ginn-LA "restructuring" counsel  –  Kirkland & Ellis, LLP  –  strongly advised against agreeing to any pre-packaged Chapter 11 or other reorganization plan which did *not* include a "release" broad enough to cover a "fraudulent conveyance claim" relating to the loan proceeds "dividend." For, in counsel's words:

- the Borrower Parties were "left insolvent by [the] dividend";

- a Trustee would, therefore, have a "fraudulent conveyance claim" regarding the "dividend";

- "nonrecourse [does] not mean can not sue"; and

- Trustees can "file complaints that are horrible."

Handwritten Notes by J. Brannon of Telephone Conference with J. Sussberg, 10/02/08, MMMTQW01_031409.

156.    Ultimately, however, the Ginn and Lubert-Adler Defendants were unable to achieve a reorganization which included such a "release," forcing them to improvise in anticipation of the present liquidation proceedings.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

### (6)    The Master Restructuring Agreement

157.    On December 19, 2008, Credit Suisse, the underlying Lenders, and a number of Ginn-LA entities, including the Tesoro and Quail West Debtors and the Other Project Entities, entered into the MRA referenced above.

158.    The MRA expressly contemplated that each of the Tesoro and Quail West Debtors would file a voluntary petition under Chapter 7 of the Bankruptcy Code.

159.    In addition, the MRA also expressly contemplated that the Trustee(s) appointed for the Debtors' Estates would pursue actions against Ginn and Lubert-Adler entities, such as this case.

160.    Indeed, Ginn and Lubert-Adler specifically bargained for a contractual provision designed to limit the claims which could be asserted against any recovery obtained in such a case, in the hope that doing so would operate to minimize their ultimate exposure:

> Waiver of Recovery Regarding Certain Bankruptcy Claims. . . . [I]n the event that the trustee of the Tesoro and/or Quail West bankruptcy estates is successful in pursuing actual or threatened litigation against any of the Borrower Released Parties or the Other Ginn/LA Released Parties, [Credit Suisse] and the [loan participants], on behalf of themselves and their respective heirs, executors, administrators, successors and assigns, hereby waive any right to receive any of the proceeds thereof arising from settlement, judgment or otherwise.

MRA, ¶ 3(f).

### (7)    The Filing of the Underlying Bankruptcy Proceedings

161.    On December 23, 2008, the Tesoro and Quail West Debtors filed voluntary petitions under Chapter 7 of the Bankruptcy Code.

162.    As of that date of those petitions, each of the Debtors was jointly and severally liable with the Other Project Entities for loan principal, interest, and fees totaling $715,986,962.07, with mortgages and other liens on substantially all of their assets, and no hope of recovery.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT I
## AVOIDANCE OF FRAUDULENT TRANSFER
## TESORO DISTRIBUTION
## (11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))

163.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 162, as if fully set forth herein.

164.    This is an action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and applicable Florida law, the portion of the Credit Suisse loan proceeds distribution to insiders which was allocated to the Tesoro Debtors and credited against their capital accounts.

165.    According to Ginn and Lubert-Adler records and sworn interrogatory answers, of the more than $325 million in Credit Suisse loan proceeds distributed to insiders at and following the original closing of the loan transaction in June 2006, $109,453,300.09 of that amount was distributed "pursuant to the terms" of the Lead Tesoro Debtor's operating agreement as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits," and was credited against the Tesoro Debtors' capital accounts (the "Tesoro Distribution").

166.    The Tesoro Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the Credit Suisse loans, and, therefore, had a legal or equitable interest in the $109,453,300.09 of loan proceeds upstreamed to insiders through the Tesoro Distribution.

167.    Thus, whether the Tesoro Debtors are found to have acted directly or indirectly, voluntarily or involuntarily, the transfer of that $109,453,300.09 of loan proceeds to insiders was "[a] transfer of an interest of the debtor[s] in property" within the meaning of 11 U.S.C. § 544(b)(1), as well as "[a] mode, direct or indirect, . . . voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset [of the debtors]" within the meaning of Fla. Stat. § 726.102(12).

-59-

168.    The Tesoro Debtors' transfer of that $109,453,300.09 was made with actual intent to hinder, delay, and/or defraud creditors of the Tesoro Debtors which existed at the time of the transfer, and persons and entities which became creditors of the Tesoro Debtors thereafter, as evidenced by, *inter alia*, the following "badges of fraud":

(a)    The Tesoro Debtors' transfer of that $109,453,300.09 was channeled through insiders (Ginn-LA CS Borrower and Ginn-LA CS Holding Co.) to other insiders (the Ginn and Lubert-Adler Defendants);

(b)    The Tesoro Distribution effectively looted the Tesoro Debtors and shifted the risks associated with the Tesoro Project to creditors, leaving those creditors with a virtual certainty of loss;

(c)    The Tesoro Debtors did not receive reasonably equivalent value in exchange for the transfer of loan proceeds comprising the Tesoro Distribution;

(d)    The Tesoro Debtors were insolvent at the time of the Tesoro Distribution or became insolvent as a result thereof; and

(e)    The Tesoro Distribution was made in connection with a transaction through which a substantial debt was incurred.

169.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Distribution holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Tesoro Distribution was voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Distribution, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-1200

**COUNT II**
**AVOIDANCE OF FRAUDULENT TRANSFER**
**TESORO DISTRIBUTION**
**(11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.105(1)(b), 726.106(1), 726.108(1)(a))**

170.     Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 162, as if fully set forth herein.

171.     This is an action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and applicable Florida law, the portion of the Credit Suisse loan proceeds distribution to insiders which was allocated to the Tesoro Debtors and credited against their capital accounts.

172.     According to Ginn and Lubert-Adler records and sworn interrogatory answers, of the more than $325 million in Credit Suisse loan proceeds distributed to insiders at and following the original closing of the loan transaction in June 2006, $109,453,300.09 of that amount was distributed "pursuant to the terms" of the Lead Tesoro Debtor's operating agreement as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits," and was credited against the Tesoro Debtors' capital accounts (the "Tesoro Distribution").

173.     The Tesoro Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the Credit Suisse loans, and, therefore, had a legal or equitable interest in the $109,453,300.09 of loan proceeds upstreamed to insiders through the Tesoro Distribution.

174.     The Tesoro Debtors did not receive reasonably equivalent value in exchange for the transfer of the $109,453,300.09 of loan proceeds comprising the Tesoro Distribution.

175.     The Tesoro Debtors were insolvent at the time of the Tesoro Distribution or became insolvent as a result of the Tesoro Distribution; were engaged in a business for which the property remaining in their hands following the Tesoro Distribution was unreasonably small in relation to the capital requirements of that business; and, at the time of the Tesoro Distribution,

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

176.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the Tesoro Distribution holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Tesoro Distribution was voidable under applicable law, including Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding the Tesoro Distribution, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM  TOWER, 150  WEST  FLAGLER  STREET,  MIAMI,  FLORIDA  33130  ·  TELEPHONE  (305) 789-3200

## COUNT III
## RECOVERY OF FRAUDULENT TRANSFER
## TESORO DISTRIBUTION
## (11 U.S.C. § 550(a))

177.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 162, 164 through 169, and 171 through 176, as if fully set forth herein.

178.    This is an action to recover for fraudulent transfers of Tesoro Debtor property pursuant to 11 U.S.C. § 550(a).

179.    With respect to the Tesoro Distribution, each of the Defendants herein was either an initial transferee or entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

180.    To the extent that any Defendant was or is found to be an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2), such Defendant was not a transferee who took for value, in good faith, without knowledge of the voidability of the transfer, within the meaning of 11 U.S.C. § 550(b)(1); or an immediate or mediate good faith transferee thereof within the meaning of 11 U.S.C. § 550(b)(2).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Tesoro Debtors' Estates, recovery of the Tesoro Distribution, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

-63-

## COUNT IV
## AVOIDANCE OF FRAUDULENT TRANSFER
## QUAIL WEST DISTRIBUTION
### (11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))

181.     Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 162, as if fully set forth herein.

182.     This is an action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and applicable Florida law, the portion of the Credit Suisse loan proceeds distribution to insiders which was allocated to the Quail West Debtors and credited against their capital accounts.

183.     According to Ginn and Lubert-Adler records and sworn interrogatory answers, of the more than $325 million in Credit Suisse loan proceeds distributed to insiders at and following the original closing of the loan transaction in June 2006, $39,374,898.05 of that amount was distributed "pursuant to the terms" of the Lead Quail West Debtor's operating agreement as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits," and was credited against the Quail West Debtors' capital accounts (the "Quail West Distribution").

184.     The Quail West Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the Credit Suisse loans, and, therefore, had a legal or equitable interest in the $39,374,898.05 of loan proceeds upstreamed to insiders through the Quail West Distribution.

185.     Thus, whether the Quail West Debtors are found to have acted directly or indirectly, voluntarily or involuntarily, the transfer of that $39,374,898.05 of loan proceeds to insiders was "[a] transfer of an interest of the debtor[s] in property" within the meaning of 11 U.S.C. § 544(b)(1), as well as "[a] mode, direct or indirect, . . . voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset [of the debtors]" within the meaning of  Fla. Stat. § 726.102(12).

-64-

186.    The Quail West Debtors' transfer of that $39,374,898.05 was made with actual intent to hinder, delay, and/or defraud creditors of the Quail West Debtors which existed at the time of the transfer, and persons and entities which became creditors of the Quail West Debtors thereafter, as evidenced by, *inter alia*, the following "badges of fraud":

(a)    The Quail West Debtors' transfer of that $39,374,898.05 was channeled through insiders (Ginn-LA CS Borrower and Ginn-LA CS Holding Co.) to other insiders (the Ginn and Lubert-Adler Defendants);

(b)    The Quail West Distribution effectively looted the Quail West Debtors and shifted the risks associated with the Quail West Project to creditors, leaving those creditors with a virtual certainty of loss;

(c)    The Quail West Debtors did not receive reasonably equivalent value in exchange for the transfer of loan proceeds comprising the Quail West Distribution;

(d)    The Quail West Debtors were insolvent at the time of the Quail West Distribution or became insolvent as a result thereof; and

(e)    The Quail West Distribution was made in connection with a transaction through which a substantial debt was incurred.

187.    Each Quail West Debtor had at least one actual creditor as of the time of the Quail West Distribution holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Quail West Distribution was voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Distribution, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

-65-

## COUNT V
### AVOIDANCE OF FRAUDULENT TRANSFER
### QUAIL WEST DISTRIBUTION
### (11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.105(1)(b), 726.106(1), 726.108(1)(a))

188.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 162, as if fully set forth herein.

189.    This is an action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and applicable Florida law, the portion of the Credit Suisse loan proceeds distribution to insiders which was allocated to the Quail West Debtors and credited against their capital accounts.

190.    According to Ginn and Lubert-Adler records and sworn interrogatory answers, of the more than $325 million in Credit Suisse loan proceeds distributed to insiders at and following the original closing of the loan transaction in June 2006, $39,374,898.05 of that amount was distributed "pursuant to the terms" of the Lead Quail West Debtor's operating agreement as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits," and was credited against the Quail West Debtors' capital accounts (the "Quail West Distribution").

191.    The Quail West Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the Credit Suisse loans, and, therefore, had a legal or equitable interest in the $39,374,898.05 of loan proceeds upstreamed to insiders through the Quail West Distribution.

192.    Thus, whether the Quail West Debtors are found to have acted directly or indirectly, voluntarily or involuntarily, the transfer of that $39,374,898.05 of loan proceeds to insiders was "[a] transfer of an interest of the debtor[s] in property" within the meaning of 11 U.S.C. § 544(b)(1), as well as "[a] mode, direct or indirect, . . . voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset [of the debtors]" within the meaning of Fla. Stat. § 726.102(12).

-66-

193.    The Quail West Debtors did not receive reasonably equivalent value in exchange for the transfer of the $39,374,898.05 of loan proceeds comprising the Quail West Distribution.

194.    The Quail West Debtors were insolvent at the time of the Quail West Distribution or became insolvent as a result of the Quail West Distribution; were engaged in a business for which the property remaining in their hands following the Quail West Distribution was unreasonably small in relation to the capital requirements of that business; and, at the time of the Quail West Distribution, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

195.    Each Quail West Debtor had at least one actual creditor as of the time of the Quail West Distribution holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Quail West Distribution was voidable under applicable law, including Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding the Quail West Distribution, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT VI
## RECOVERY OF FRAUDULENT TRANSFER
## QUAIL WEST DISTRIBUTION
## (11 U.S.C. § 550(a))

196.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 162, 182 through 187, and 189 through 195, as if fully set forth herein.

197.    This is an action to recover for fraudulent transfers of Quail West Debtor property pursuant to 11 U.S.C. § 550(a).

198.    With respect to the Quail West Distribution, each of the Defendants herein was either an initial transferee or entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).

199.    To the extent that any Defendant was or is found to be an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2), such Defendant was not a transferee who took for value, in good faith, without knowledge of the voidability of the transfer, within the meaning of 11 U.S.C. § 550(b)(1); or an immediate or mediate good faith transferee thereof within the meaning of 11 U.S.C. § 550(b)(2).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Quail West Debtors' Estates, recovery of the Quail West Distribution, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

-68-

**COUNT VII**
**AVOIDANCE OF FRAUDULENT TRANSFER**
**TESORO LIENS**
**(11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))**

200.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 7, 15 through 17, 19 through 81, and 97 through 162, as if fully set forth herein.

201.    This is an alternative action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and Florida law, the Tesoro Debtors' transfers of First and Second Lien "Subsidiary Guaranties," mortgages, and liens in connection with the Credit Suisse loan transaction (the "Tesoro Liens").

202.    The Tesoro Debtors' transfer of the Tesoro Liens was made with actual intent to hinder, delay, and/or defraud creditors of the Tesoro Debtors which existed at the time of the transfer, and persons and entities which became creditors of the Tesoro Debtors thereafter, as evidenced by, *inter alia*, the following "badges of fraud":

(a)    The Tesoro Debtors transferred the Tesoro Liens for the benefit of insiders (the Ginn and Lubert-Adler Defendants);

(b)    The Tesoro Debtors' transfer of the Tesoro Liens effectively looted the Tesoro Debtors and shifted the risks associated with the Tesoro Project to creditors, leaving those creditors with a virtual certainty of loss;

(c)    The Tesoro Debtors did not receive reasonably equivalent value for the transfer of the Tesoro Liens;

(d)    The Tesoro Debtors were insolvent at the time the Tesoro Liens were issued or became insolvent as a result thereof; and

(e)    The Tesoro Liens were issued in connection with a transaction through which a substantial debt was incurred.

203.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the transfer of the Tesoro Liens holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Tesoro Liens were voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

-69-

204.    After Trustee Dillworth was appointed Chapter 7 Trustee for the Debtors' Estates, Ginn and Lubert-Adler representatives supplied him with short-term budgets for the Debtor Projects reflecting an immediate need for a significant infusion of cash, to keep those Projects "alive."

205.    The Debtors' equity sponsors had opted for Chapter 7 filing rather than provide that needed cash, and were unwilling to provide additional funding on a post-petition basis.

206.    Absent a significant infusion of cash, the Debtors would have been compelled to cease operations as going concerns – *i.e.*, go "dark" – prior to a sale of Project assets, further impairing the value of those assets, and increasing homeowner damages.

207.    In the weeks that followed, the Trustee made inquiries of several potential lenders in an effort to obtain post-petition financing for the Projects, but found the debt markets in turmoil amidst the global financial crisis.

208.    Credit Suisse and the First Lien Lenders – the entities holding the First Lien debt – were the only potential lenders willing to provide such financing, and only on the condition that they be released from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

209.    Accordingly, the Trustee agreed to release Credit Suisse and the First Lien Lenders from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

210.    That agreement, which was subsequently ratified by the Court in its Challenge Order, did *not* operate to release any *third-parties* from any claims relating to the First Lien Obligations or the liens granted to secure the First Lien Obligations; or, for that matter, any claims relating to the Second Lien Obligations or the liens granted to secure the Second Lien Obligations. Challenge Order, ¶¶ 7-8, Case No. 08-29769-PGH [ECF Nos. 77, 88].

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

211.    Quite the contrary, the Challenge Order expressly provided for an "Estate Carve Out" pursuant to which $250,000 was made available for the investigation and pursuit of "litigation," such as the present case.  Challenge Order, ¶ 15, Case No. 08-29769-PGH [ECF Nos. 77, 88].

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding, as to the Defendants, the transfers of the Tesoro Liens, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT VIII
## AVOIDANCE OF FRAUDULENT TRANSFER
## TESORO LIENS
## (11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.105(1)(b), 726.106(1), 726.108(1)(a))

212.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 7, 15 through 17, 19 through 81, and 97 through 162, as if fully set forth herein.

213.    This is an alternative action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and Florida law, the Tesoro Debtors' transfers of First and Second Lien "Subsidiary Guaranties," mortgages, and liens in connection with the Credit Suisse loan transaction (the "Tesoro Liens").

214.    The Tesoro Debtors did not receive reasonably equivalent value in exchange for the transfer of the Tesoro Liens.

215.    The Tesoro Debtors were insolvent at the time the Tesoro Liens were issued or became insolvent as a result of the Tesoro Liens; were engaged in a business for which the property remaining in their hands after the Tesoro Liens were issued was unreasonably small in relation to the capital requirements of that business; and, at the time the Tesoro Liens were issued, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

216.    Each of the Tesoro Debtors had at least one actual creditor as of the time of the transfer of the Tesoro Liens holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Tesoro Liens were voidable under applicable law, including Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

217.    After Trustee Dillworth was appointed Chapter 7 Trustee for the Debtors' Estates, Ginn and Lubert-Adler representatives supplied him with short-term budgets for the Debtor Projects reflecting an immediate need for a significant infusion of cash, to keep those Projects "alive."

218.    The Debtors' equity sponsors had opted for Chapter 7 filing rather than provide that needed cash, and were unwilling to provide additional funding on a post-petition basis.

219.    Absent a significant infusion of cash, the Debtors would have been compelled to cease operations as going concerns – *i.e.*, go "dark" – prior to a sale of Project assets, further impairing the value of those assets, and increasing homeowner damages.

220.    In the weeks that followed, the Trustee made inquiries of several potential lenders in an effort to obtain post-petition financing for the Projects, but found the debt markets in turmoil amidst the global financial crisis.

221.    Credit Suisse and the First Lien Lenders – the entities holding the First Lien debt – were the only potential lenders willing to provide such financing, and only on the condition that they be released from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

222.    Accordingly, the Trustee agreed to release Credit Suisse and the First Lien Lenders from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

223.    That agreement, which was subsequently ratified by the Court in its Challenge Order, did *not* operate to release any *third-parties* from any claims relating to the First Lien Obligations or the liens granted to secure the First Lien Obligations; or, for that matter, any claims relating to the Second Lien Obligations or the liens granted to secure the Second Lien Obligations. Challenge Order, ¶¶ 7-8, Case No. 08-29769-PGH [ECF Nos. 77, 88].

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

224.    Quite the contrary, the Challenge Order expressly provided for an "Estate Carve Out" pursuant to which $250,000 was made available for the investigation and pursuit of "litigation," such as the present case.  Challenge Order, ¶ 15, Case No. 08-29769-PGH [ECF Nos. 77, 88].

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding, as to the Defendants, the transfers of the Tesoro Liens, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT IX
## RECOVERY OF FRAUDULENT TRANSFER
## TESORO LIENS
## (11 U.S.C. § 550(a))

225.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 7, 15 through 17, 19 through 81, 97 through 162, 201 through 211, and 213 through 224, as if fully set forth herein.

226.    This is an alternative action to recover for fraudulent transfers of Tesoro Debtor property pursuant to 11 U.S.C. § 550(a).

227.    With respect to the transfers of the Tesoro Liens, each of the Defendants herein was an entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Tesoro Debtors' Estates, recovery of the value of the Tesoro Liens, as of the time they were issued, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT X
## AVOIDANCE OF FRAUDULENT TRANSFER
## QUAIL WEST LIENS
## (11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.106(1)(a), 726.108(1)(a))

228.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 7, 15 through 17, 19 through 81, and 97 through 162, as if fully set forth herein.

229.    This is an alternative action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and Florida law, the Quail West Debtors' transfers of First and Second Lien "Subsidiary Guaranties," mortgages, and liens in connection with the Credit Suisse loan transaction (the "Quail West Liens").

230.    The Quail West Debtors transferred the Quail West Liens with actual intent to hinder, delay, and/or defraud creditors of the Quail West Debtors which existed at the time of the transfer, and persons and entities which became creditors of the Quail West Debtors thereafter, as evidenced by, *inter alia*, the following "badges of fraud":

(a)    The Quail West Debtors transferred the Quail West Liens for the benefit of insiders (the Ginn and Lubert-Adler Defendants);

(b)    The Quail West Debtors' transfer of the Quail West Liens effectively looted the Quail West Debtors and shifted the risks associated with the Quail West Project to creditors, leaving those creditors with a virtual certainty of loss;

(c)    The Quail West Debtors did not receive reasonably equivalent value for the transfer of the Quail West Liens;

(d)    The Quail West Debtors were insolvent at the time the Quail West Liens were issued or became insolvent as a result thereof; and

(e)    The Quail West Liens were issued in connection with a transaction through which a substantial debt was incurred.

231.    Each of the Quail West Debtors had at least one actual creditor as of the time of the transfer of the Quail West Liens holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Quail West Liens were voidable under applicable law, including Fla. Stat. §§ 726.106(1)(a) and 726.108(1)(a).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

232.    After Trustee Dillworth was appointed Chapter 7 Trustee for the Debtors' Estates, Ginn and Lubert-Adler representatives supplied him with short-term budgets for the Debtor Projects reflecting an immediate need for a significant infusion of cash, to keep those Projects "alive."

233.    The Debtors' equity sponsors had opted for Chapter 7 filing rather than provide that needed cash, and were unwilling to provide additional funding on a post-petition basis.

234.    Absent a significant infusion of cash, the Debtors would have been compelled to cease operations as going concerns – *i.e.*, go "dark" – prior to a sale of Project assets, further impairing the value of those assets, and increasing homeowner damages.

235.    In the weeks that followed, the Trustee made inquiries of several potential lenders in an effort to obtain post-petition financing for the Projects, but found the debt markets in turmoil amidst the global financial crisis.

236.    Credit Suisse and the First Lien Lenders – the entities holding the First Lien debt – were the only potential lenders willing to provide such financing, and only on the condition that they be released from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

237.    Accordingly, the Trustee agreed to release Credit Suisse and the First Lien Lenders from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

238.    That agreement, which was subsequently ratified by the Court in its Challenge Order, did *not* operate to release any *third-parties* from any claims relating to the First Lien Obligations or the liens granted to secure the First Lien Obligations; or, for that matter, any claims relating to the Second Lien Obligations or the liens granted to secure the Second Lien Obligations. Challenge Order, ¶¶ 7-8, Case No. 08-29769-PGH [ECF Nos. 77, 88].

-77-

239.    Quite the contrary, the Challenge Order expressly provided for an "Estate Carve Out" pursuant to which $250,000 was made available for the investigation and pursuit of "litigation," such as the present case.  Challenge Order, ¶ 15, Case No. 08-29769-PGH [ECF Nos. 77, 88].

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding, as to the Defendants, the transfers of the Quail West Liens, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## COUNT XI
## AVOIDANCE OF FRAUDULENT TRANSFER
## QUAIL WEST LIENS
## (11 U.S.C. § 544(b)(1) and Fla. Stat. §§ 726.105(1)(b), 726.106(1), 726.108(1)(a))

240.     Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 7, 15 through 17, 19 through 81, and 97 through 162, as if fully set forth herein.

241.     This is an alternative action to avoid, as fraudulent, pursuant to 11 U.S.C. § 544(b)(1) and Florida law, the Quail West Debtors' transfers of First and Second Lien "Subsidiary Guaranties," mortgages, and liens in connection with the Credit Suisse loan transaction (the "Quail West Liens").

242.     The Quail West Debtors did not receive reasonably equivalent value in exchange for the transfer of the Quail West Liens.

243.     The Quail West Debtors were insolvent at the time the Quail West Liens were issued or became insolvent as a result of the Quail West Liens; were engaged in a business for which the property remaining in their hands after the Quail West Liens were issued was unreasonably small in relation to the capital requirements of that business; and, at the time the Quail West Liens were issued, intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as those debts matured.

244.     Each of the Quail West Debtors had at least one actual creditor as of the time of the transfer of the Quail West Liens holding an unsecured claim which is allowable within the meaning of 11 U.S.C. § 544(b)(1), by whom the Quail  West Liens were voidable under applicable law, including Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM  TOWER, 150  WEST  FLAGLER  STREET,  MIAMI,  FLORIDA  33130  ·  TELEPHONE  (305) 789-3200

245.    After Trustee Dillworth was appointed Chapter 7 Trustee for the Debtors' Estates, Ginn and Lubert-Adler representatives supplied him with short-term budgets for the Debtor Projects reflecting an immediate need for a significant infusion of cash, to keep those Projects "alive."

246.    The Debtors' equity sponsors had opted for Chapter 7 filing rather than provide that needed cash, and were unwilling to provide additional funding on a post-petition basis.

247.    Absent a significant infusion of cash, the Debtors would have been compelled to cease operations as going concerns – *i.e.*, go "dark" – prior to a sale of Project assets, further impairing the value of those assets, and increasing homeowner damages.

248.    In the weeks that followed, the Trustee made inquiries of several potential lenders in an effort to obtain post-petition financing for the Projects, but found the debt markets in turmoil amidst the global financial crisis.

249.    Credit Suisse and the First Lien Lenders – the entities holding the First Lien debt – were the only potential lenders willing to provide such financing, and only on the condition that they be released from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

250.    Accordingly, the Trustee agreed to release Credit Suisse and the First Lien Lenders from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

251.    That agreement, which was subsequently ratified by the Court in its Challenge Order, did *not* operate to release any *third-parties* from any claims relating to the First Lien Obligations or the liens granted to secure the First Lien Obligations; or, for that matter, any claims relating to the Second Lien Obligations or the liens granted to secure the Second Lien Obligations. Challenge Order, ¶¶ 7-8, Case No. 08-29769-PGH [ECF Nos. 77, 88].

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

252.    Quite the contrary, the Challenge Order expressly provided for an "Estate Carve Out" pursuant to which $250,000 was made available for the investigation and pursuit of "litigation," such as the present case.  Challenge Order, ¶ 15, Case No. 08-29769-PGH [ECF Nos. 77, 88].

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, avoiding, as to the Defendants, the transfers of the Quail West Liens, awarding attorneys' fees and expenses, and granting any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

## COUNT XII
## RECOVERY OF FRAUDULENT TRANSFER
## QUAIL WEST LIENS
## (11 U.S.C. § 550(a))

253.    Trustee Dillworth repeats and re-alleges the allegations in paragraphs 1 through 7, 15 through 17, 19 through 81, 97 through 162, 229 through 239, and 241 through 252, as if fully set forth herein.

254.    This is an alternative action to recover for fraudulent transfers of Quail West Debtor property pursuant to 11 U.S.C. § 550(a).

255.    With respect to the transfers of the Quail West Liens, each of the Defendants herein was an entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1).

WHEREFORE, Trustee Dillworth respectfully requests the entry of a Judgment in his favor and against the Defendants, awarding, for the benefit of the Quail West Debtors' Estates, recovery of the value of the Quail West Liens, as of the time they were issued, plus pre- and post-judgment interest, attorneys' fees and expenses, and any further relief deemed equitable and just.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

Dated: December 30, 2010

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.

Attorneys for Drew M. Dillworth,
Chapter 7 Trustee of the Tesoro Debtors' Estates
and the Quail West Debtors' Estates

Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:  (305) 789-3395

I hereby certify that I am admitted to the Bar of
the United States District Court for the Southern District
of Florida and I am in compliance with the additional
qualifications to practice in this Court set forth in
Local Rule 2090-1(A).

By:   /s/  Harold D. Moorefield, Jr.
      EUGENE E. STEARNS
      Fla. Bar No. 149335
      estearns@stearnsweaver.com
      HAROLD D. MOOREFIELD, JR.
      Fla. Bar No. 239291
      hmoorefield@stearnsweaver.com
      MATTHEW W. BUTTRICK
      Fla. Bar No. 176028
      mbuttrick@stearnsweaver.com
      ANDREW E. STEARNS
      Fla. Bar No. 661651
      astearns@stearnsweaver.com