## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division
### www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>GINN-LA ST. LUCIE LTD., LLLP, *et al.*,<br><br>     Debtors. | : **CASE NO. 08-29769(PGH)**<br>: All Cases Jointly Administered<br>:<br>: |
| In re:<br>GINN-LA QUAIL WEST., LTD, LLLP, *et al.,*<br><br>     Debtors. | :<br>: Chapter 7<br>:<br>: |
| DREW M. DILLWORTH, Chapter 7 Trustee,<br><br>     Plaintiff,<br><br>     vs.<br><br>EDWARD R. GINN III, *et al.*,<br><br>     Defendants. | : **ADV. PRO. NO. 10-02976-PGH**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**THE LUBERT-ADLER DEFENDANTS' MOTION, INCLUDING
MEMORANDUM OF LAW, PURSUANT TO RULE 7012(b)(6) OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE TO DISMISS THE
TRUSTEE'S THIRD AMENDED COMPLAINT FOR THE AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFERS AND JOINDER IN THE
INVESTOR DEFENDANTS' MOTION TO
<u>DISMISS COUNTS III AND VI OF THE THIRD AMENDED COMPLAINT</u>**

Lubert-Adler Management Co., L.P.; Lubert-Adler Real Estate Fund III, L.P.;

Lubert-Adler Real Estate Parallel Fund III, L.P.; Lubert-Adler Capital Real Estate Fund

III; Lubert-Adler Real Estate Fund IV, L.P.; Lubert-Adler Real Estate Parallel Fund IV,

L.P.; Lubert-Adler Capital Real Estate Fund IV, L.P.; Lubert-Adler Group III, L.P.,

Lubert-Adler Group IV, L.P., Ira M. Lubert, and Dean S. Adler (collectively, the

"Lubert-Adler Defendants"), by undersigned counsel, respectfully move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") made applicable in this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure for an order dismissing the *Trustee's Third Amended Complaint For Avoidance and Recovery of Fraudulent Transfers* (the "Third Amended Complaint" or "TAC").   In addition, the Lubert-Adler Defendants join in the Investor Defendants' Motion to Dismiss Counts III and VI of the Third Amended Complaint.

I.    **INTRODUCTION**

In the Second Amended Complaint, the Trustee attempted to assert fraudulent conveyance claims pursuant to 11 U.S.C. §§ 544(b)(1) and 550 and applicable Florida fraudulent transfer law ("FUFTA") as to $148,000,000 of the Credit Suisse June 2006 loan proceeds (the "Loan Proceeds").[1]   In that pleading, the Trustee alleged that the Debtors were "credited" with the Loan Proceeds and that the Debtors "were serving as full recourse co-borrowers."   [D.E. 39, ¶¶ 8, 10, 68]. The pleading contained no allegation that the Loan Proceeds were ever property of the Debtors' estates.

On December 10, 2010, this Court entered its *Order Granting Without Prejudice the Lubert-Adler and the Investor Defendants' Motion to Dismiss the Trustee's Second Amended Complaint and Granting Trustee 20 Days Leave To Amend Complaint.*  [D.E. 154 (the "MTD Order")].   Because the Debtors served as guarantors and not as the "Borrower," the Trustee had not satisfied the requirement that it plead that the Debtors had a legally cognizable interest in the $148 million of Loan Proceeds at issue.   The Court, however, gave the Trustee leave to file an amended complaint that pleaded facts

---

[1] The Trustee had also asserted claims under the New York fraudulent conveyance statute but subsequently agreed to their dismissal.

substantiating the Trustee's contention that the Debtors were "serving as full recourse co-borrowers" and/or that sufficiently pleaded the "collapsing" argument that the Trustee had raised in opposition to the Lubert-Adler Defendants' motion to dismiss.  [MTD Order at pages 10 and 13].

On December 30, 2010, in an attempt to cure the deficiencies of his prior pleading, the Trustee filed his Third Amended Complaint asserting claims pursuant to 11 U.S.C. §§ 544(b)(1) and 550 and FUFTA.  [D.E. 163].  In derogation of the pleading standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, __ U.S.__, 129 S. Ct. 1937 (2009), however, the Trustee makes naked assertions and conclusory allegations in an attempt to "plead around" his prior pleading deficiencies.[2]  As demonstrated below, the Third Amended Complaint still fails to state any claims for relief and, accordingly, should be dismissed.

The claims in the Third Amended Complaint are divided into the following two categories:

- Avoidance and Recovery of Loan Proceeds.  In Counts I-VI (hereinafter collectively the "Loan Proceeds Claims"), the Trustee seeks to avoid as fraudulent transfers and recover the $148 million of Loan Proceeds consisting of: (i)  $109,453,300.09 which he defines as the "Tesoro

---

[2] The Third Amended Complaint is 83 pages long and is replete with scurrilous, lengthy, and irrelevant allegations which can only have been designed to prejudice the defendants in the eyes of the Court and attract publicity.  The pleading violates Rule 7008(a)(2) of the Federal Rules of Bankruptcy Procedure which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."

Distribution;" and (ii) $39,374,898.05 which he defines as the "Quail West Distribution."[3]

- <u>Avoidance And Recovery of Guaranty Obligations and Liens</u>.  In Counts VII-XII (hereinafter collectively the "<u>Guaranty/Lien Claims</u>"), the Trustee seeks to avoid as fraudulent transfers the Debtors' obligations under the Subsidiary Guaranties that they executed in favor of Credit Suisse (the "<u>Subsidiary Guaranties</u>") and the liens that the Debtors granted to Credit Suisse (the "<u>Liens</u>") and recover the value of the Liens as of the time they were issued.

### A.    <u>The Trustee Still Has Not Stated A Claim As To The Loan Proceeds</u>

In the Third Amended Complaint, the Trustee acknowledges: that the Debtors were not named "Borrowers" under the Credit Agreements (defined below) and did not sign the Credit Agreements; and that the Debtors signed Subsidiary Guaranties (which define the Debtors as "Guarantors").  (TAC, ¶ 82).  In an effort to overcome the hurdle these facts present to the Trustee's ability to plead that the Loan Proceeds constituted "property of the Debtors' estates" (an essential element of the Loan Proceeds Claims), the Trustee asserts two untenable theories previewed in his prior opposition to the Lubert-Adler Defendants' previous motion to dismiss: (1) that the Debtors were "substantively borrowers" (TAC, ¶¶ 82-89); and (2) that somehow the transaction can be recharacterized to "reflect ... that the Debtors were substantively 'borrowers' – not mere 'guarantors' – with respect to the loans" (TAC, ¶¶ 90-96).  Although the Trustee refers to his theory as a

---

[3] The Trustee's use of defined terms "Tesoro Distribution" and "Quail West Distribution" does not correspond to the facts.  Indeed, there are no allegations that any of the Loan Proceeds were distributed to or from the Tesoro or Quail West Debtors. The Loan Proceeds were conveyed by the lender to non-debtor borrowers and then by the non-debtor borrowers to non-debtor entities.

"collapsing" theory, it is nothing of the sort. As discussed more fully discussed in Sections IV.A. and B. below, neither theory has any legal merit.

**1.    The Debtors Cannot Be Characterized As "Substantively Borrowers"**

The Trustee acknowledges that the Debtors were not the named contractual "Borrower" under the Credit Agreements but alleges that the Debtors were "substantively borrowers," whatever that means. *See* TAC, ¶¶ 82-89. [4]  The Trustee's naked assertion that the Debtors were not really guarantors is an unwarranted deduction that is not sustainable as a matter of fact or law: the Trustee's position is contradicted by the clear language of the Credit Agreements and the Subsidiary Guaranties as well as by specific factual allegations contained in the Third Amended Complaint.

For instance, the Trustee alleges that the language contained in the Subsidiary Guaranties providing that the Debtors' liability thereunder "is primary and not secondary in the full amount [of the loan]" and that the provisions in the loan documents that the Borrower and the Debtors "were collectively liable" legally transform the Debtors' status from that of guarantors to that of borrowers, *i.e.* that the Subsidiary Guaranties were not really guaranties. [TAC, ¶ 82].  Moreover, the Trustee alleges that his "substantive borrowers" theory is supported by the fact that Credit Suisse conditioned the loans on receipt of the Subsidiary Guaranties and Liens against the Debtors' assets and appraised the property underlying those Liens in the underwriting process.  [TAC, ¶¶ 71, 72, 82].

There is nothing about these facts that supports the Trustee's conclusory leap that these facts negate the Debtors' status as guarantors.  Quite the contrary, lenders routinely

require guaranties and security from guarantors as a condition for extending a loan to a borrower and appraise the collateral to be pledged by the guarantors. Moreover, there is nothing the least bit inconsistent between the language of the Subsidiary Guaranties and the law of guaranties: the provision stating that the Debtors were "primarily" liable for the full amount of the Borrower's debt is entirely consistent with New York, Florida and other states' common law on "guaranties of payment."  Under a guaranty of payment, the guarantor is <u>primarily liable</u> and waives any requirement that the holder of the note take action against the borrower as a condition precedent to his liability on the guaranty.  *See, e.g.*, *Live Nation Worldwide, Inc. v. GTA, Inc.*, No. 07-CV-483, 2007 WL 1489761, at *4 (S.D.N.Y. May 18, 2007) (citing *General Phoenix Corp. v. Cabot*, 89 N.E.2d 238, 241-42, 300 N.Y. 87 (1949)).  As the Court stated in *Culkin v. Smith*:

> <u>there are...suretyship relationships, which are of the type involved here, where the surety's obligation may run directly to the creditor insofar as the creditor is concerned constituting a primary and absolute obligation, although the surety's liability is equitably secondary to that of his principal</u>.

57 Misc.2d 901, 904, 293 N.Y.S.2d 913 (N.Y. Sup. 1968) (citations omitted) (underlining added); *see also,* 63 N.Y. Jur. 2d Guaranty and Suretyship § 6.

To accept the Trustee's naked assertions as true and allow this case to proceed under the guise that a guarantor is "substantively" a borrower would turn the law of guaranties and the law of contract interpretation on their heads.  Here, the principal loan transaction documents were the First Lien Credit Agreement, the Second Lien Credit Agreement and corresponding Subsidiary Guaranties, each of which contained New York

---

[4] The First Lien Credit Agreement, the Second Lien Credit Agreement and a sample Subsidiary Guaranty are attached to the previously filed Declaration of Stuart Margulies as Exhibits A, B, and C respectively. [D.E. 76-1].

choice of law provisions (TAC, ¶ 68).  Although these contracts unambiguously reflect that the Debtors were serving as guarantors, the Trustee wrongfully seeks to rewrite the Debtors' status under the agreements to that of "substantive[] borrowers."  Here, the intention of the parties is clear: the Debtors were serving as guarantors.

Given the fact that the Debtors were only guarantors, the Trustee cannot allege that the Debtors were borrowers and, therefore, cannot allege the Loan Proceeds were property of the Debtors.  Nor can the Trustee allege that the Debtors either received or conveyed the $148 million of Loan Proceeds.[5]  Accordingly, as a matter of law, the transfer of the Loan Proceeds did not diminish the Debtors' estates or strip the Debtors of any assets.  Given these facts which cannot be disputed, the Trustee has not stated a legally cognizable claim to avoid the transfer of the Loan Proceeds as a fraudulent transfer.  As the Eleventh Circuit has held, the proper inquiry in a fraudulent conveyance action is "not whether the property went to the alleged transferee[s], but whether it came from the [bankrupt] debtor, the alleged transferor."  *In re Harwell,* No. 09-14997, 2010 WL 5374340, at *6 (11th Cir. Dec. 29, 2010) (reversing J. Williamson) (citing *In re Chase & Sanborn Corp.,* 848 F.2d 1196, 1199 (11th Cir. 1988)).

## 2.    The Trustee's Collapsing Theory Fails As a Matter of Law

The Trustee also tries to salvage his Loan Proceeds Claims by pleading that the loan transaction should be "collapsed" to reflect the "economic reality" that the Debtors were not "mere guarantors" and thus had an interest in the Loan Proceeds.  (TAC, ¶ 90).  The Trustee's reliance on the collapsing doctrine is misplaced because the doctrine is inapplicable here and cannot be used as a means to create a property interest where none

---

[5] See footnote 7 and related chart *infra*.

exists. Rather, the collapsing doctrine, when properly applied, is a mechanism used to treat multiple steps in a transaction as a single transaction.

The Trustee's invocation of the doctrine does not make it applicable to the facts of this case. This is not a leveraged buyout case.  The Trustee does not and cannot allege facts to satisfy the "paradigmatic" collapsing scheme test applicable to non-leveraged buyout fraudulent conveyance actions.  That test requires that:

> [O]ne transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee.   The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.

*HBE Leasing Corp., v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).

Here, the Trustee fails to allege the elements necessary to apply the collapsing doctrine. The Trustee does not allege that the Debtors received something for fair value which they then gratuitously conveyed to a third party. Rather, the only part of the transaction that closed in June, 2006 in which the Debtors are alleged to have been involved were their incurring of obligations under the Subsidiary Guaranties and their granting the Liens to Credit Suisse.  The Trustee alleges that the obligations were incurred and liens were granted for less than fair value.  Indeed, in Counts VII-XII of his Third Amended Complaint, the Trustee seeks to avoid those transfers. The Trustee does not allege that the Debtors had a property interest in the Loan Proceeds, let alone conveyed the Loan Proceeds. In other words, since there are no conveyances of the $148 million of Loan Proceeds by the Debtors, there are no conveyances that can be collapsed or recovered.

### B.   The Trustee  Has Not Stated A Claim To Avoid the Guaranties and Liens

As discussed below in Section IV.C.,  the Trustee's Guaranty/Lien Claims fail.

The claims relating to the Guaranties and Liens given in connection with the First Lien Credit Agreement (the "First Loan Guaranties and Liens") fail because: (1) as to the First Loan Guaranty, it is an *obligation* incurred (not *property transferred*) and, unlike a *transfer of property*, cannot be "recovered" under § 550; and (2) as to the First Loan Liens, the Trustee cannot establish that they are avoidable under § 544 because it is the law of the case that the First Loan Liens are unavoidable.   Accordingly, because avoidability of the First Loan Liens is a prerequisite to recovery under § 550, the Trustee cannot recover the value of the First Loan Liens under § 550.

Similarly, the claims relating to the Guaranties and Liens given in connection with the Second Lien Credit Agreement (the "Second Loan Guaranties and Liens") fail because: (1) as to the Second Loan Guaranties, as stated in the preceding paragraph, guaranties are *obligations* incurred and § 550 does not provide for recovery as to voidable obligations; and (2) as to the Second Loan Liens, the appropriate remedy applicable to voided liens is set forth in § 551 of the Bankruptcy Code: the preservation of those liens for the benefit of the Debtors' estates.  As discussed below, permitting the Trustee to recover the value of the Second Loan Liens under § 550(a) makes no sense and would result in a windfall to the Debtors' estates because: (i) at the time of the filing of the Petitions (December 23, 2008), the Debtors' estates were in possession of the collateral which was encumbered by the Second Loan Liens; and (ii) as determined by the Sale Orders dated March 20, 2009 (defined below), the value of that collateral has been conclusively established in this case to be only a fraction of the debt owing under the First Credit Agreement. In other words, via the bankruptcy sale, it has been determined in

this case that the Second Loan Liens have no value. *See In re Levitt & Sons, LLC*, 384

B.R. 630 (Bankr. S.D. Fla. 2008).

## II.    FACTUAL BACKGROUND

Lubert-Adler Fund III ("Fund III") and Lubert Adler Fund IV ("Fund IV") are

private equity funds comprised of the various Lubert-Adler defendant investment limited

partnerships.    Defendant Edward R. Ginn III is a developer of residential resort

properties.  Prior to 2006, Fund III and Fund IV formed joint ventures with affiliates of

Mr. Ginn for the purpose of developing residential communities in (i) Port St. Lucie,

Florida (the "Tesoro Project"); (ii) Naples, Florida (the "Quail West Project"); (iii) Palm

Coast Florida (the "Bulow Project"); (iv) Boone, North Carolina (the "Laurelmor

Project"); and (v) Grand Bahama Island (the "Ginn Sur Mer Project") (collectively, the

"Projects").  The Laurelmor Project, the Bulow Project and the Ginn Sur Mer  Project are

collectively referred to as the "Other Projects."

### A.    The Credit Suisse Loan Closing

This adversary proceeding concerns a loan transaction which closed on June 8,

2006 (the "Credit Suisse Transaction") consisting of two term loans in the aggregate

amount of $510 million (the "CS Term Loans") and a line of credit in the amount of $165

million. (TAC, ¶¶ 65-70). The Credit Suisse Transaction was documented via two "Lien

Credit Agreements" (collectively the "Credit Agreements").  In those Credit Agreements,

Ginn-LA CS Borrower, LLC ("CS Borrower") and Ginn-LA Conduit Lender, Inc.

("Conduit Lender") were defined collectively as the "Borrower."

CS Borrower was the parent of four (4) subsidiaries: it owned a 100% interest in

the Debtor Ginn-LA Quail West, Ltd., LLLP, a 100% interest in the Debtor Ginn-LA St.

Lucie Ltd., LLLP; and a 100% interest in two non-debtor entities: Ginn-LA Bulow Ltd.,

LLLP (the developer of the Bulow Project) and Ginn-LA Laurel Creek Ltd., LLLP (the developer of the Laurelmor Project). (TAC, ¶ 66). Conduit Lender was an affiliate of Ginn-LA West End Ltd., LLLP, the developer of the Ginn sur Mer Project. (TAC, ¶ 67).

The Debtors were not parties or signatories to the Credit Agreements and were not defined therein as a "Borrower." Rather, the Debtors and the Other Project Entities were defined in the Credit Agreements as "Subsidiaries" of the Borrower and each signed a "Subsidiary Guaranty" which contained standard surety language (collectively the "Subsidiary Guaranties"). The Borrower pledged their equity interests in the Projects to the lenders as collateral. The Debtors and the Other Project Entities also granted liens on their respective property in favor of Credit Suisse as Administrative Agent and Collateral Agent. (TAC, ¶ 74). In other words, the Credit Suisse Loan was secured through cross-collateralization of the diversified asset base from the five separate Projects located in five separate markets – Tesoro, Quail West, Bulow, Laurelmor and Ginn Sur Mer.

The CS Term Loans were governed by the Credit Agreements, and the proceeds of the CS Term Loans were disbursed to the Borrower and distributed at the closing held on June 8, 2006.[6] The term loan proceeds were distributed as follows: (a) $23,446,764.00 for the payment of loan fees and closing costs, including significant costs paid to Credit Suisse; (b) $158,291,252.86 for the payment of existing debt of the Projects (e.g., prior mortgages and notes relating to the Projects); and (c) $328,261,982.20 of remaining Term Loan proceeds paid directly to the Borrower (the "Net Borrower Proceeds"). (TAC, ¶ 79).

---

[6] No portion of the line of credit was advanced at the closing (TAC, ¶ 79). The Line of Credit was drawn upon during the term of the loan and the proceeds thereof were separate and distinct from the Net Borrower Proceeds.

The Debtors never received and did not have any right to receive any portion of the $148 million of Loan Proceeds. As demonstrated by the following chart and the indisputable facts in footnote 7,[7] the Loan Proceeds were transferred by Credit Suisse to the non-debtor Borrower's bank accounts and thereafter to bank accounts of non-debtors, including some of the defendants. No funds were transferred to the Debtors or passed through any accounts owned by the Debtors. The following diagram illustrates the flow of the Net Borrower Proceeds. None of the Debtors appears on this chart because none of the Net Borrower Proceeds ever were transferred to or from the Debtors (as the Trustee acknowledges in his pleading (TAC, ¶ 80)):

---

[7] At the June 8, 2006 closing, Credit Suisse wired the full amount of the Net Borrower Proceeds ($328,261,982.20) to the Borrowers as follows: (a) Credit Suisse wired the sum of $89,961,281.49 to Ginn-LA Conduit Lender, Inc.'s account #8044845538 at Colonial Bank in Florida (the "Conduit Lender Account"); and (b) Credit Suisse wired to CS Borrower the sum of $238,300,700.71 to CS Borrower's account #8044845512 at Colonial Bank in Florida (the "CS Borrower Account"). After Credit Suisse wired the $238,300,700.71 to the CS Borrower Account, CS Borrower wired $237,550,700.71 of those funds to an account of Ginn-LA CS Holding Company, LLC ("CS Holding"), account #8044845520 at Colonial Bank in Florida (the "CS Holding Account"), as follows: $37,550,700.71 on June 12, 2006 and $200,000,000 on June 13, 2006. After Credit Suisse wired the $89,961,281.49 to the Conduit Lender Account, on June 12, 2006, Conduit Lender wired those funds to Ginn-LA West End Limited's Account # 20059960 at First Caribbean International Bank (the "West End LP Account"). Of those funds: (a) on June 13, 2006, Ginn-LA West End Limited wired $75,456,716.63 to Ginn-LA West End Ltd. LLLP's Account #8044845199 at Colonial Bank in Florida (the "West End LLLP Account"); and (b) on June 14, 2006, Ginn-LA West End Limited wired $14,504,764.86 to the CS Holding Account. Of the funds transferred to the CS Holding Account and the West End LLLP Account, approximately $316,121,255.75 was distributed to the Lubert-Adler CS Fund III Investment Partnerships and Lubert-Adler Fund IV Investment Partnerships, and approximately $7,142,726.48 was distributed to certain of the Ginn Defendants. The respective June 2006 account statements of the foregoing accounts are attached as <u>Exhibits D-H</u> to the Margulies Declaration.



## B. RELEVANT BACKGROUND FACTS OF THE UNDERLYING BANKRUPTCY CASES

On December 23, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 7 of the Bankruptcy Code. As of the Petition Date, the Debtors still owned their respective projects and the related assets secured by the Liens.

On January 16, 2009, the Court entered an Order (the "Challenge Order"), [8] giving all parties in interest until February 23, 2009 (the "Challenge Period Termination Date") to contest the validity and unavoidability of the transfer of the First Loan Liens from the Debtors to Credit Suisse. [D.E. 77 at 2, 15]. In that regard, the Challenge Order provided that, absent a timely objection:

> The First Lien Obligations, and the First Lien Agent's and
> the First Lien Lenders' Liens in the First Lien Collateral

---

[8] The Order was titled "Interim Order Pursuant to 11 U.S.C. §§105, 361, 362, 363 and 364 (1) Approving Post-Petition Financing, (2) Auhtoirizng Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Authorizing Payment of Claims of First Lien Lenders in Limited Circumstances, (5) Modifying Automatic Stay, and (6) Setting Final Hearing Under Federal Rule of Bankruptcy Procedure 4001.

> shall be valid, perfected, **nonavoidable,** and in full force
> and effect, not subject to any claims, counterclaims, setoffs
> or defenses . . .

[D.E. 77 at 15-16] (bold added).

On February 6, 2009, prior to the Challenge Period Termination Date, the Trustee filed a motion seeking authority to sell the Debtors' real property and assets free and clear of liens, claims and encumbrances, including the First Loan Liens of Credit Suisse and the Second Loan Liens of Wilmington Trust (the "Sale Motion").  [D.E. 104].

Neither the Trustee nor any party in interest filed an objection or adversary proceeding challenging the validity of the Credit Suisse's First Loan Liens prior to the Challenge Period Termination Date of February 23, 2009.

On March 12, 2009, the Trustee filed a *Third Supplement and Additional Proposed Amendment to the Sale Motion* in which the Trustee confirmed the validity and nonavoidability  of the First Loan Liens granted in connection with the Credit Suisse Loan, stating:

> The date established in the Final Financing Order by which
> Trustee Dillworth and any creditors or other parties in
> interest could challenge the validity and priority of Credit
> Suisse's liens and security interests upon virtually all of the
> Debtors' assets passed without any challenge being made.
> Accordingly, pursuant to the Final Financing Order, **Credit
> Suisse's liens have been conclusively established in this
> case as constituting valid first liens encumbering
> virtually all of the Debtors assets**. . . .

[D.E. 163, ¶ 4] (bold added).

On March 20, 2009, the Court approved the Trustee's Sale Motion in three orders which authorized three separate sales of the Debtors' Property (collectively the "Sale Orders").  [D.E. 185, 188, 189].  The first Sale Order authorized the free and clear sale of

several beach lots belonging to the Quail West Debtors' estates to the approved buyer for the gross sum of $2,650,000, with the net proceeds of the sale (excluding $50,000 to be used by the Trustee for post-closing operational expenses) to be paid to Credit Suisse. [D.E. 185].  The second Sale Order  authorized the free and clear sale of the property of the Tesoro Debtors' estates to the approved buyer for the gross sum of $10,990,000, with the net proceeds of the sale (excluding $150,000, which the Trustee was authorized to use to cover post-closing operational expenses) to be paid to Credit Suisse.  [D.E. 188].  The Third Sale Order authorized the free and clear sale of the remaining real property of the Quail West Debtors to the approved buyer for the gross sum of $13,500,000, with the net proceeds (excluding $50,000, which the Trustee was authorized to use to cover post-closing operational expenses) to be paid to Credit Suisse at closing.  [D.E. 189].

## III.   THE MOTION TO DISMISS STANDARD

The standard for review (including the Court's ability to take judicial notice of filings and orders entered in the underlying bankruptcy cases as well as documents that are intrinsic to the pleading) is set forth at pages 5-7 of the MTD Order.  [D.E. 154].

## IV.   ARGUMENT

Notwithstanding the rhetoric and length of the Third Amended Complaint, the pleading is legally deficient and should be dismissed.

### A.   PURSUANT TO RULE 12(b)(6), COUNTS I-VI OF THE THIRD AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM BECAUSE THE LOAN PROCEEDS AT ISSUE WERE NOT PROPERTY OF THE DEBTORS' ESTATES

#### 1.   The Debtors Were Not Borrowers – "Substantively" or Otherwise

Section 544 of the Bankruptcy Code provides in pertinent part:

> (a) The Trustee ... may avoid any *transfer of property of the debtor or any obligation incurred by the debtor* that is voidable by— …

11 U.S.C. § 544(a) (italics added).  Put another way, under § 544(a) the Trustee may only avoid a transfer of "property of the debtor" or "obligations incurred by the debtor."  *Id.*

In the Third Amended Complaint, the Trustee attempts to overcome the "property of the debtor" pleading deficiency of his dismissed Second Amended Complaint by alleging that unambiguous documents should be rewritten so as to recast the Debtors' role from that of guarantors to that of borrowers.   Despite the fact that the loan documents clearly identify the Debtors as guarantors, the Trustee pleads that:

> the Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the loans, and, therefore, had a legal or equitable interest in the $148,828,198.14 of Credit Suisse loan proceeds [at issue in this case].

(TAC, ¶ 82).  In support of this conclusory and naked allegation, the Trustee, citing to the Credit Agreements, alleges that the Debtors were "substantively borrowers" because:

> Unlike a typical loan transaction, however, the purported "Subsidiary Guaranties" which each of the Debtors and other Project Entities were required to execute specifically provided for "primary" liability for the full $675 million loan amount...

(TAC, ¶ 71) (underlining added); *see also* TAC, ¶ 82 (Trustee again refers to the "primary and not secondary" liability language in the Subsidiary Guaranties, as well as other language therein demonstrating the Debtors' responsibility to repay the Borrower's debt).

The Trustee's position is based on a flagrant disregard of the law of guaranties which is based on the existence of three distinct entities: the borrower, the guarantor, and

the creditor. *Chemical Bank v. Meltzer*, 712 N.E. 656, 660, 93 N.Y.2d 296 (1999) ("The arrangement is, at its core, the confluence of three distinct, yet interrelated, obligations. These obligations are embodied in the tripartite relationship of principal obligor and obligee; obligee and secondary obligor; and secondary obligor and principal obligor.").

The interpretation of a contract of guaranty is governed by the standard that governs the interpretation of contracts in general. *General Phoenix Corp.*, 89 N.E.2d at 241-42; *see also Village of Hempstead Cmty. Dev. Agency v. Colonia Ins. Co.,* No. 25576-98, 2004 WL 784546, at *4 (N.Y. Sup. Ct. Apr. 2., 2004).

Whether a guarantor is a "guarantor of payment" or a "guarantor of collection" depends on the intention expressed in the contract. *In re Wilson,* 9 B.R. 723, 725 (Bankr. E.D.N.Y. 1981) (citing *General Phoenix Corp.*, 89 N.E.2d at 241). If a guarantor binds himself to pay immediately upon default of a debtor, he becomes a guarantor of payment, whereas if he binds himself to pay only after all attempts to obtain payment from the debtor have failed, he is a guarantor of collection. *Federal Deposit Ins. Corp. v Schwartz,* 78 A.D.2d 867, 901, 432 N.Y.S.2d 899 (N.Y. App. Div. 1980) (citing *General Phoenix Corp.*, 89 N.E.2d at 241).

Where, as here, the parties' intent can be determined from the four corners of the contract, interpretation of the contract is a question of law. *HSH Nordbank Ag New York Branch v. Swerdlow,* 672 F. Supp. 2d 409, 417 (S.D.N.Y. 2009) (citing *Am. Home Assur. Co. v. Hopag Lloyd Container Linie GmbH,* 446 F.3d 313, 316 (2d Cir. 2006). Construing an unambiguous contract is a function of the court and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument. *See Teitelbaum Holdings, Ltd. v. Gold,* 396 N.E.2d

1029, 1031-32, 48 N.Y.2d 51 (1979).  Further, the Second Circuit has noted that "[u]nder New York law, guaranty agreements are construed strictissimi juris[9]."  *HSH Nordbank,* 612 F. Supp. 2d at 417 (citing *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce Fenner & Smith Inc,* 188 F.3d 31, 34 (2d Cir. 1999)). *See also Scott v. City of Tampa,* 30 So.2d 300, 302, 158 Fla. 712 (Fla. 1947).  As such, this Court should not allow the Trustee an interpretation of the language of the Subsidiary Guaranties different from the language presented therein.

It is customary and consistent with applicable state law for a guaranty of payment to provide for liability that is "primary and not secondary," absolute and unconditional in the full amount of the guaranteed obligations.    *See, e.g.*, *Bank Leumi Trust Co., v. D'Evori Int'l, Inc.,* 163 A.D.2d 26, 34, 558 N.Y.S.2d 909 (N.Y. App. Div. 1990) (guaranty provided that "this guaranty is a primary obligation of the undersigned");  *First New York Bank For Business v. Nicholas DeMarco,* 130 B.R. 650, 653 (S.D.N.Y. 1991) (guaranty provided "[t]he obligations of Guarantor under this Agreement are primary, absolute, independent, irrevocable and unconditional"); *In re Richard Tikijian*, 76 B.R. 304, 312 (S.D.N.Y. 1987) (guaranty provided "[t]he obligations of Guarantor under this Agreement are primary, absolute, independent, irrevocable and unconditional"). Moreover, a hallmark of a payment guaranty is the guarantor's obligation to pay the borrower's debt even if that underlying debt is later deemed invalid and the borrower itself escapes liability.  *E.g., Beal Bank, SSB v. Sandpiper Resort Corp.*, 251 A.D.2d 360, 361, 674 N.Y.S.2d 83 (N.Y. App. Div. 1998); *Manufacturers Hanover Trust Co. v.*

---

[9] The 2009 Ninth Edition of Black's Law Dictionary defines "strictissimi juris" as Latin for "the strictest right or law, to be interpreted in the strictest manner."

*Green*, 95 A.D.2d 737, 737, 464 N.Y.S.2d 474 (N.Y. App. Div. 1983); *Bank of N. Am. v. Shapiro*, 31 A.D.2d 465, 466, 298 N.Y.S.2d 399 (N.Y. App. Div. 1969).

The law on payment guaranties is not peculiar to New York.  In fact, a Florida District Court (in the Southern District of Florida) recently noted that (under Texas law),

> a guaranty of payment is an obligation to pay the debt if the debtor does not. A guarantor of payment is **primarily liable** and waives any requirement that the holder of the note take action against the maker as a condition precedent to his liability on the guaranty.

*Chicago Title Ins. v. Lerner*, 435 B.R. 732, 737 (S.D. Fla. 2010) (internal quotation marks and citation omitted).  *See also Agarwal v. Pinnacle Realty Mgmt. Co.*, 718 So.2d 947 (Fla. Dist. Ct. App. 1998) (guaranty provided that the guarantor's liability was "primary, direct and immediate and not conditional or contingent upon pursuit by Landlord of any remedies it may have against any other guarantors or Tenant"); *CapitalSource Finance, LLC v. Delco Oil, Inc.*, 608 F. Supp. 2d 655, 663 (D. Md. 2009) (guaranty provided that "[t]he liability of Guarantor under this Guaranty shall be primary and direct and not conditional or contingent upon the enforceability of any obligation"); *In re Lemco Gypsum, Inc.,* 108 B.R. 831, 833 (Bankr. S.D. Ga. 1988) (guaranty provided "[t]his guaranty is a primary and original obligation of each of the Guarantors, jointly and severally, and is an absolute, unconditional, continuing and irrevocable guaranty of payment and not of collectability or performance"), *rev'd in part on other grounds*, 911 F.2d 1553 (11th Cir. 1990).

Applying the foregoing well settled law regarding guaranties and contract interpretation to the unambiguous language of the Credit Agreements and Subsidiary Guaranties, it is clear that, as a matter of law, the loan agreements cannot be interpreted to metamorphize the Debtors into borrowers, "substantive" or otherwise.  The Credit

Agreements plainly provide that CS Borrower and Conduit Lender are the "Borrower." The Subsidiary Guaranties bear the classic hallmarks of a guaranty arrangement by which the Debtors were intended to fulfill the explicit role of guarantor for the Borrower in connection with its obligations under the Credit Agreements.  Indeed, in addition to the fact that the Subsidiary Guaranties are titled "Guaranty" and the signatory Debtors are referred to therein as "Guarantors," the text of the guaranties provides:

- that the "Lenders, acting by and through their Administrative Agent, are making certain loans (the "Loan")...to the [Borrower]." (Subsidiary Guaranty, Recital A);

- that the "Lenders would not make, and would not be obligated to make, the Loans to Borrower unless Guarantor executed this Guaranty.  This Guaranty is therefore delivered to Lenders, acting through the Administrative Agent, to induce the Lenders to make the Loan." (Subsidiary Guaranty, Recital F);

- that the obligations under the Subsidiary Guaranties are "primary and not secondary in the full amount of the Guarantied Obligations" (Subsidiary Guaranty, ¶ 3);

- that "Guarantor's liability under this Guaranty is a guaranty of payment and performance of the Guarantied Obligations, and not a guaranty of collection or collectability" (Subsidiary Guaranty, ¶ 5);

- that "Guarantor is fully obligated under this Guaranty even if Borrower had no liability at the time of the execution of the Loan Documents or later

ceases to be liable under any Loan Documents" (Subsidiary Guaranty, ¶ 5);

- that Guarantor waives certain rights and defenses that are available to guarantors, including, *inter alia*, those of exoneration, subrogation, and reimbursement,[10] impairment, release, extension of time, and modification. (Subsidiary Guaranty, ¶¶ 4, 5, 6, 8, 23).[11]

- That the Subsidiary Guaranties provide that the Debtors' obligations will continue even if the Borrowers escape liability, the underlying debt is later declared void, or if the Borrowers have no liability at the time of the Debtors' undertaking. (Subsidiary Guaranties, ¶ 5).

The Trustee's allegation that the Debtors were "substantively borrowers" because the operative loan documents specified that the Borrower and the Debtors "were collectively responsible for loan repayment" does not hold water. (TAC, ¶ 82). While the Borrower and Debtors were collectively liable for repayment obligations, the responsibilities of the Borrower and Debtors were distinct: the Borrower was responsible for keeping the loan from going into default and for loan repayment in its capacity as borrower under the Credit Agreements; the Debtors were responsible for loan repayment in their capacity as guarantors.

- **The Trustee's Other "Substantive Borrower" Allegations Are Equally Unavailing**

---

[10] Three classic rights afforded to guarantors include (1) exoneration, (2) subrogation, and (3) reimbursement. *See, e.g., Firemen's Ins. Co. v. Keating*, 753 F. Supp. 1146, 1155 (S.D.N.Y. 1990); *In re J.T. Moran Financial Corp.*, 119 B.R. 447 (S.D.N.Y. 1990); *In re Robbins Int'l, Inc*., 275 B.R. 456, 470 (S.D.N.Y. 2002).

[11] New York law provides a guarantor with certain defenses against a principal obligor, among them impairment, release, extension of time, and modification. *See* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY §§ 37, 39, 40, 41.

In addition to his meritless attack on the classic guaranty language in the Subsidiary Guaranties, the Trustee tries to support his "substantive borrower" theory through a series of other equally meritless allegations.

*First*, the Trustee misuses the term "shell entities" to describe CS Borrower and Conduit Lender. (TAC, ¶ 82). A shell entity is one with minimal assets. *In re Bicoastal Holding Co.*, 402 B.R. 916, 920 (Bankr. M.D. Fla. 2009); *S.E.C. v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, at *14 (S.D. Fla. Sept. 24, 2008); *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 130 (2d Cir. 2009); *S.E.C. v. Cavanagh*, 445 F.3d 105, 108 n.4 (2d Cir. 2006); BLACK'S LAW DICTIONARY 343 (6th ed. 1990) (a shell entity is a "corporate frame, containing few, if any, assets, kept alive by required filings, generally for future use").

The Trustee use of the term "shell entity" is an unwarranted factual deduction: not only has the Trustee failed to allege facts supporting a bare conclusion that the Borrower consisted of "shell entities," but he has alleged just the opposite. Indeed, the Trustee alleges that CS Borrower had assets consisting of (a) all of the membership interests in the Tesoro and Quail West Debtors, the entities that were developing the Tesoro Project and Quail West Projects and (b) all of the membership interest in the Project Entities that were developing the Laurelmor Project and the River Club/Gardens Project. (TAC, ¶ 66). In other words, the Trustee pleads that CS Borrower owned several companies that were developing different real estate communities. *Id.* Therefore, based on the Trustee's own factual allegation that the Borrower owned substantial assets, his "shell entity allegation" is an "unwarranted deduction[] of fact" that cannot be "admitted as true for the purpose of testing the sufficiency of plaintiff's allegations." *Sinaltrainal v. Coca-*

*Cola Co.* 578 F.3d 1252, 1260 (11th Cir. 2009) (citing *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) and *Iqbal,* 129 S.Ct. at 1951 (stating conclusory allegations are "not entitled to be assumed true")).

*Second*, the Trustee seems to think it is significant to the analysis that the loan transaction was conditioned upon the execution of the Subsidiary Guaranties and Liens and that the lenders appraised the proposed underlying collateral as part of their underwriting process. (TAC, ¶¶ 74, 82 and 83). These allegations are legally insufficient to recast the Debtors' status to that of borrowers. The Trustee has done no more than allege that Credit Suisse did what lenders routinely do: (i) require guaranties and collateral from guarantors; and (ii) appraise that collateral during the underwriting process. There is no authority for the proposition that because a lender has required guaranties as a condition to a loan, the guarantors should be viewed as borrowers.[12]

*Third,* the Trustee alleges that the Debtors were "substantively borrowers" because the Master Restructuring Agreement ("MRA"), which was executed in December, 2008 (over two years after the loan closing) when the Borrower and Debtors were in default of their respective obligations under the loan documents, identified the Debtors as "Full Recourse Borrower Parties." (TAC, ¶ 85). This allegation fails to support the Trustee's theory because, as the Trustee admits in his pleading, all parties

---

[12] On a related note, the Trustee's contention that the Debtors were "substantively borrowers" because the Debtors' assets were the "only assets appraised in connection with the loans -- serving as the principal source of repayment" (TAC, ¶ 82) is otherwise belied by the Trustee's allegations and the Credit Agreements. As noted above, the Borrower owned the equity in the Debtors and the Other Project Entities. (TAC, ¶ 66). These equity interests were pledged to Credit Suisse as collateral to secure the Borrower's obligations under the loan agreement. In the event of a default, Credit Suisse could, therefore, foreclose on the equity (owned by the Borrower) or the assets of the underlying guarantors. Moreover, in addition to the Debtors, the Other Project Entities also signed Subsidiary Guaranties and pledged collateral (TAC, ¶¶ 71, 74). Thus, contrary to the Trustee's allegation, the Debtors' assets were not the only assets appraised in connection with the loans. In any event, there is nothing unusual about a lender wishing to appraise its collateral, whether it was pledged by a borrower or a guarantor.

have agreed that "the MRA did not recharacterize the parties' liabilities or position from the initial loan agreements." (TAC, ¶ 86).   Thus, the Trustee cannot use the subsequent MRA to support his recharacterizaation theory where, as here, it is clear from the loan documents executed in 2006 that the Debtors were guarantors and not the Borrower.

*Fourth*, the Trustee, referring to matters outside the pleadings (interrogatory responses), alleges that the Debtors were "substantively borrowers" because the Ginn and Lubert Adler Defendants "effectively conceded" as much in their interrogatory answers. (TAC, ¶ 88).   The responses referred to do nothing of the sort.   In fact, the full interrogatory responses do not in any way identify the Debtors as borrowers or transferees of the Loan Proceeds.

- **The Debtors' "Substantive Borrower" Theory Is Otherwise Not Supportable**

In its MTD Order, the Court noted that, while the Second Amended Complaint should be dismissed because the Trustee failed to plead the Debtors had a property interest in the Credit Suisse Loan proceeds, such an interest could potentially be pleaded. In support, (1) the Court discussed the fact that the *Tousa* court found that an interest in property could be established notwithstanding an inability to satisfy the so-called "control test;" and (2) the Court stated that the Trustee's theory "appears to be consistent with Fla. Stat. § 726.102(12) definition of a transfer."

- o   **The Analysis Used by the *Tousa* Court is Inapplicable**

As to the first point, the Lubert-Adler Defendants respectfully disagree that the *Tousa* case is applicable to this case.   The *Tousa* defendants had asserted that the debtors therein, who were co-borrowers, had no interest in the loan proceeds because the debtors

lacked the ability to "control" the disposition of the proceeds. *In re Tousa,* 422 B.R. 783, 783 (Bankr. S.D. Fla. 2009). The *Tousa* court rejected the defendants' argument finding that the ability to control alone, does not determine a debtor's interest in property. *Id.* at 784. The court reasoned that to hold that control alone was the deciding factor, "would negate the paradigmatic example of a fraudulent transfer, in which the owner of an insolvent corporation transfers *corporate funds* to a personal account for his personal use." *Id.*

The facts present in *Tousa* and the facts set forth in the paradigmatic example cited by *Tousa* are factually distinguishable from and not analogous to the facts presented in this case. First, with regard to the paradigmatic example, implicit in the example is an understanding that the transfer involved a transfer of *corporate funds* (i.e. property of the debtors). Here, there is no allegation that the $148 million of Loan Proceeds constituted funds or property of the Debtors. As such, the paradigmatic example is inapplicable. Second, the debtors in *Tousa* were co-borrowers and the *Tousa* court correctly noted that there is legal authority for the proposition that, regardless of whether they have control of the loan proceeds, co-borrowers clearly have a property interest in co-borrowed funds. There is no legal authority that guarantors have a property interest in the proceeds of a loan that they guaranteed.

In sum, *Tousa* is inapplicable because the *Tousa* court did not opine at all on whether a debtor, who was a mere guarantor, had an interest in loan proceeds. Rather, the *Tousa* court examined the question of whether the debtors, who were co-borrowers who allegedly had no control over loan proceeds, could nonetheless have a property

interest in the loan proceeds.  *In re Tousa,* 422 B.R. at 872-873.  As such, the analysis used in *Tousa* is inapplicable to the facts presented herein.

- ### The Definition of "Transfer", as Set Forth in FUFTA § 726.102(12) Does Not Authorize the Recharacterization of Non-Debtor Property into Debtor Property

The Court's MTD Order notes that the Trustee's "technical borrower" argument advances a theory that appears to be consistent with Fla. Stat. § 726.102 (12)'s definition of a transfer.  [MTD Order at p. 10].

Florida Statute  § 726.102 (12) defines a "Transfer" as follows:

> "Transfer" means every mode, direct and indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an **asset or an interest in an asset**, and includes payment of money, release, lease, and creation of a lien or other encumbrance.

Fla. Stat. § 726.102 (12) (bold added).   The above definition is contingent on the definition of the term "Asset", which is defined by the Florida Statute as follows:

> "Asset" means property[13] of a debtor, but the term does not include:
>
> (a)   Property to the extent it is encumbered by a valid lien;
> (b)   Property to the extent it is generally exempt under non-bankruptcy law; or
> (c)   An interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

Fla. Stat. § 726.102 (2).

Pursuant to the above definitions, in order to properly state a claim as to a "Transfer" under FUFTA § 726.102 (12), the Trustee must effectively plead that the Debtors disposed of or parted with an "Asset," *i.e.,*  property they owned. As discussed

---

[13] "Property" is defined by the Florida Statute as "anything that may be the subject of ownership."  Fla. Stat. § 726.102 (10).

above, the Trustee has not pled facts which can establish that the Debtors were "technical" or "substantively" borrowers or that the Loan Proceeds were an "Asset" (*i.e.*, property) of the Debtors. Therefore, because a "Transfer" of the Loan Proceeds did not constitute a transfer of any Asset of the Debtors, the definition of Transfer does not further the Trustee's argument that he may recover those proceeds under § 544 or FUFTA.[14]

As the discussion in this Section IV.A. demonstrates, the Trustee, notwithstanding his bare allegations and rhetoric, has failed to allege that the Debtors had "served" as full recourse borrowers.

### 2.    The Collapsing Doctrine Does Not Apply

In an alternate attempt to circumvent the fatal "property of the estate" deficiency of his "Loan Proceeds Claims," the Trustee attempts to plead that the "collapsing" doctrine should be used:

> to reflect the economic reality that the Debtors were substantively "borrowers" – not mere "guarantors" – with respect to the loans, and, thus, had a legal or equitable interest in the $148,828,198.14 of Credit Suisse loan proceeds upstreamed to insiders which were credited against their capital account.

TAC, ¶90. In other words, the Trustee seeks to use the collapsing doctrine to recharacterize the Debtors' role in the transaction from that of guarantors to that of "substantive borrowers" and then, based on that recharacterization, find that the Debtors can be deemed to have had a legal or equitable interest in the Credit Suisse Loan Proceeds. *Id.*

---

[14] Accordingly, Florida law is consistent with federal law that avoidance actions must concern property of the debtor.

The Trustee is trying to fit a square peg into a round hole.  The Trustee may not successfully invoke the collapsing doctrine to avoid dismissal without meeting the requirements to support the application of the doctrine.   There is no authority for the Trustee's novel use of the collapsing doctrine to manufacture a debtor's interest in property.  While it is true that the Eleventh Circuit has stated that a court must "look beyond the particular transfers in question to the entire circumstance of the transactions" in determining whether a debtor possessed property recoverable in a fraudulent transfer action, *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1199 (11th Cir. 1988) (internal quotation marks omitted),   the Eleventh Circuit has never authorized the recharacterization of property that never belonged to a debtor into property that had belonged to a debtor so as to provide a recovery for the estate.  To the contrary, the Eleventh Circuit has admonished that the proper inquiry in a fraudulent conveyance action is "not whether the property went to the alleged transferee[s], but whether it came from the [bankrupt] debtor, the alleged transferor."  *In re Harwell,* 2010 WL 5374340, at *6 (citing *In re Chase & Sanborn Corp.*, 848 F.2d at 1199).

- **In Order To Collapse A Transaction, The Debtors Must Have Received Fair Consideration For An Initial Transfer And Then Gratuitously Transferred The Proceeds of The First Exchange to A Subsequent Transferee**

The collapsing doctrine is a common law mechanism used by courts to collapse multiple related transfers into a single step.  *See In re M. Fabrikant & Sons, Inc.,* 394 B.R. 721, 731 (Bankr. S.D.N.Y. 2008).   The doctrine does not authorize the recharactization of guarantors into substantive borrowers.   Nor does the doctrine

authorize the recharacterization of property that has never belonged to a debtor into property that had belonged to a debtor.  In other words, where, as here, there is no allegation that the Debtors have been stripped of their property, there is no basis to employ collapsing.

Although the collapsing doctrine has been applied most frequently in the context of a leveraged buyout where the target company ultimately becomes insolvent,[15] it has also been applied in fraudulent transfer actions outside the context of leveraged buyouts.[16]  In the non-LBO fraudulent transfer context, the plaintiff is entitled to "collapsing" relief where the facts fall within the following "paradigmatic scheme":

> [O]ne transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee.  The first transferee thereby receives the debtor's property, and the second transferee receives the consideration while the debtor retains nothing.
>
> Under these circumstances, the initial transfer of the debtor's property to the first transferee is constructively

---

[15] *See cases applying the collapsing doctrine to unwind leveraged buyout transactions: In re Joy Recovery Tech. Corp.,* 286 B.R. 54 (Bankr. N.D. Ill. 2002); *U.S. v. Gleneagles Invest. Co.,* 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd sub nom. U.S. v Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir. 1986).

[16] The doctrine has been applied in other contexts as well.  For instance, one court applied the doctrine in a relief from stay proceeding.  *See In re Best Products Co., Inc.,* 157 B.R. 222 (Bankr. S.D.N.Y. 1993).  The *Best Products* case, which is inapposite to this one, involved a relief from stay action where the issue was whether a sublease of real estate between a debtor subsidiary as sublesee, and debtor parent as sublessor, was a "true sublease" or a secured financing vehicle. The subsidiary debtor had granted MONY, its lender, a security interest in the sublease payments as security for a loan.  The court found that it was a secured financing vehicle because over the entire life of the loan, the parties ignored the structure of the sublease, with the debtor-parent sublessor making loan payments on behalf of its subsidiary directly to the lender. Although the court used "collapsing" language in its opinion, the Court's analysis is inapposite to this fraudulent conveyance case. The court did not evaluate whether reasonably equivalent value was given in connection with either the sublease or loan transaction between the sublessor and its lender. Nor did the court consider whether there was any adverse impact on either of the debtors by virtue of any transfers between the debtors or between the debtors and the lender.  The case of *In re Mervyn's,* 426 B.R. 488 (Bankr. D. Del. 2010), is likewise inapposite to this case.  In *Mervyn's,* unlike here, the debtor was allegedly "stripped" of its valuable real estate for no consideration to the detriment of creditors.  Here, the Loan Proceeds were never property of the Debtors and, therefore, unlike in *Mervyn's,* there is no allegation that the Debtors were stripped of the property that the Trustee seeks to recover (*i.e.* the Loan Proceeds).

> fraudulent if two conditions are satisfied. First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors. . . . Second . . ., the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent.

*HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2nd Cir. 1995) (citations omitted). *See also In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (citing the test articulated in *HBE Leasing Corp.*); *In re M. Fabrikant*, 394 B.R. at 731 (quoting *HBE Leasing Corp.*, 48 F.3d at 635).

This paradigmatic scheme has been paraphrased as follows: First, a party seeking to employ the collapsing doctrine must establish that the fair consideration received from the initial transferee was then "reconveyed **by the debtor** for less than fair consideration or with actual intent to defraud creditors." *In re M. Fabrikant,* 394 B.R. at 731 (quoting *HBE Leasing Corp.,* 48 F.3d at 635) (bold added). Second, "the initial transferee must have had actual or constructive knowledge of the entire scheme that renders the exchange with the debtor fraudulent." *Id.*

In the non-leveraged buyout fraudulent conveyance context, "collapsing" has been sought most frequently in cases where a lender (or any other party providing consideration to the debtor in step one of the transaction) is named as a defendant (or as one of the defendants) so as to permit a plaintiff to avoid, as a fraudulent transfer, a debtor's grant of a lien, even when the lender can establish it gave a cash loan in exchange for the lien. Moreover, in such fraudulent conveyance collapsing cases, the debtor has been a party to both of the two steps that the plaintiff seeks to collapse into one. For example, in *HBE Leasing Corp.*, the Second Circuit considered the applicability

of the collapsing doctrine in the context of a fraudulent transfer action commenced by a judgment creditor seeking to set aside two mortgages.  The two mortgages were granted by the debtor in favor of the debtor's former director of the debtor in exchange for a loan. The debtor subsequently transferred the loan proceeds to the former director's son and to a law firm that had defended the former director, her son, her husband and the debtor in a RICO lawsuit.  There was no dispute in that case whether the debtor received the funds in the first transaction and then subsequently transferred those proceeds to third parties. Ultimately, the court found the collapsing doctrine was applicable and avoided at least one of the mortgages, and remanded the issues as to the second mortgage back to the lower court.  *HBE Leasing Corp.,* 48 F.3d at 635.

In *In re Sunbeam Corp.,* the unsecured creditors' committee commenced a fraudulent transfer action against the debtor's former lenders seeking to avoid certain liens held by the lenders. The debtor borrowed $1.6 billion and granted liens to the lenders on substantially all of the debtor's property to secure the loan.  248 B.R. at 371. The debtor then used a portion of loan proceeds to purchase certain companies at prices alleged by the committee to be substantially higher than their fair market value.  *Id.* Because the lender had provided $1.6 billion in exchange for the liens on the debtor's property, the only way the committee could avoid the liens was to convince the court that it should collapse the debtor's two transactions (*i.e.*, the debtor's granting of the lien to the lender and the debtor's purchase of the other companies) into one unified transaction. *See id.* at 371-372.  Again, the primary issue in the case was whether the lenders had given fair value for the $1.6 billion in liens they received from the debtor.

In *In re M. Fabrikant,* a debtor granted liens to a lender in exchange for loan proceeds and then transferred the loan proceeds to insiders. 394 B.R. 721. The unsecured creditors' committee sought to avoid the liens given to debtor's lender on grounds the lender knew that the proceeds of the loans would be fraudulently transferred by the debtor to insiders. Again, in this collapsing case, the debtor had been a party to both of the two steps that the committee sought to collapse and there was no dispute whether the loan proceeds were "property of the debtor" insofar as the loan proceeds had been transferred through the debtor. *See also Orr v. Kinderhill Corporation,* 991 F.2d 31 (2d Cir. 1993), where the Second Circuit applied the collapsing doctrine to collapse a two stepped transaction, the first step of which was a transfer of real property from a parent corporation to its subsidiary, and the second step involved the subsidiary's grant of a mortgage to its lender on the real property it had received from the parent.

- **Application Of The Facts, As Alleged, To The Collapsing Theory**

The Trustee's "collapsing" theory does not meet the paradigmatic scheme articulated in *HBE, Sunbeam and Fabrikant* for collapsing a stepped transactions in the context of a fraudulent conveyance action.

First, the Trustee does not allege that the Debtors received fair value from Credit Suisse for the Subsidiary Guaranties and Liens that the Debtors granted to Credit Suisse. Indeed, the Trustee has alleged just the opposite in his Count VII-XII Claims. (TAC, ¶¶ 202(c), 214, 230(c), 240).

Second, the Debtors never received and never transferred the Loan Proceeds that the Trustee wishes to recover (the $148 million) to any of the defendants or to anyone else for that matter.

The following chart compares the Trustee's allegations and admissions with the elements of the test that must be satisfied in order to properly apply the collapsing doctrine:

| STEP | TEST | FACTS/ALLEGATIONS |
|------|------|-------------------|
| 1 | One transferee gives fair value to the debtor in exchange for the debtor's property | Credit Suisse did not give fair value to the Debtors in exchange for the Debtors' Subsidiary Guaranties, mortgages and liens. |
| 2 | The debtor then gratuitously transfers the proceeds of the first exchange to a second transferee | Nowhere has the Trustee alleged that the debtors received the $148 million in Loan Proceeds in exchange for the Subsidiary and liens. The Borrower received the Loan Proceeds and transferred them to some of the non-debtor defendants. |

Under the facts of this case, because the Trustee alleges that the Debtors did not receive fair value in exchange for the Debtors' transfer of the Subsidiary Guaranties and Liens to Credit Suisse, the Trustee cannot use the collapsing doctrine to recover proceeds that never belonged to the Debtors and that were never transferred by the Debtors.

Here, because the $148 million of Loan Proceeds never were property of the Debtors, let alone gratuitously transferred by the Debtors, the Trustee may not assert that the transfer of those funds should be treated as a component of a stepped transaction to be collapsed.

For the foregoing reasons, the collapsing doctrine does not apply and, thus, Counts I-VI of the Third Amended Complaint should be dismissed.

### 3. Joinder in The Investor Defendants' Motion to Dismiss Counts III and VI of the Third Amended Complaint

In addition, the Lubert-Adler Defendants join in the Investor Defendants' Motion to Dismiss Counts III and VI of the Third Amended Complaint and request that the Count III and VI claims against the Lubert-Adler Defendants be dismissed for the same reasons as set forth in the Investor Defendants' Motion To Dismiss.

### B.   COUNTS VII THROUGH XII OF THE THIRD AMENDED COMPLAINT SHOULD BE DISMISSED

In Counts VII through XII of the Third Amended Complaint, the Trustee seeks to avoid the Subsidiary Guaranties and the Liens provided by the Debtors to Credit Suisse in June, 2006, and recover their value under § 550(a).  As discussed in greater detail below, these counts should be dismissed because:

(1)     The Subsidiary Guaranties constitute obligations incurred by the Debtors within the meaning of section § 544 of the Bankruptcy Code.  Section 550(a) of the Bankruptcy Code does not provide for any recovery relating to voidable *obligations*;

(2)     As to the First Loan Liens, the Trustee cannot establish that the transfers of the First Loan Liens from the Debtors to Credit Suisse are avoidable under § 544 because it is the law of the case that the First Loan Liens are unavoidable.  Because avoidability of the First Loan Liens is a prerequisite to recovery under § 550(a), the Trustee cannot recover the value of the First Loan Liens under § 550; and

(3)     As to the Second Loan Liens, the appropriate remedy is set forth in § 551 of the Bankruptcy Code (the preservation of those liens for the benefit of the Debtors' estates), especially when, as here, the Debtors had possession of the underlying collateral as of the Petition Date (December 23, 2008).  The relief requested by the Trustee would not restore the Debtors' estates to their pre-transfer financial condition (which is the purpose of FUFTA), but would instead result in an unfair windfall to the estates because

the Trustee sold the underlying collateral during these bankruptcy cases and the Second Loan Liens were determined to be worthless. Indeed, the Sale Orders valued the collateral at only a fraction of the debt owing under the First Credit Agreement. Moreover, even had the Second Lien Loans had value during these bankruptcy cases, the Trustee opted not to preserve those liens for the benefit of the Debtors' estates. He opted, instead, to sell the Debtors' assets free and clear of those liens and give the net proceeds to Credit Suisse.

1) **The Guaranties Constitute *Obligations* of the Debtor Under § 544 and § 550(a) Does not Authorize the Trustee to Recover the Value of Voidable** <u>**Obligations**</u>

As stated above, § 544 distinguishes between voidable transfers of property and voidable obligations, providing:

> The trustee … may avoid any **transfer of property** of the debtor **or any obligation incurred** by the debtor that is voidable…

11 U.S.C. § 544(a) (bold added).

Section 550(a) of the Bankruptcy Code provides in pertinent part:

> [T]o the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the <u>property transferred</u>, or, if the court so orders, the value of such property...

11 U.S.C. § 550(a) (underlining added). Section 550(a) does not authorize the Trustee to recover the value of voidable obligations. The reason for this limitation is obvious: once an obligation is avoided, there is nothing to redress.

The inability of trustees to recover the value of voidable obligations such as guaranties was discussed in the case *In re Foxmeyer Corp.,* 290 B.R. 229, 234 (Bankr. D.

Del. 2003).  One of the issues in *Foxmeyer* was the ability of a trustee to recover from the

defendant the value of a subsidiary guarantee.  As to that issue the court explained:

> The only thing which the trustee can recover from the
> Defendants via his fraudulent conveyance claim is set forth
> under 11 U.S.C. § 550(a)(1), to wit the property that was
> transferred to the Defendants, or if the Court allows, the
> value of such property, ... the only thing that Fox Corp. [the
> subsidiary debtor] did with respect to the Defendants vis-à-
> vis the June 19, 1996 Transactions was to incur an
> obligation to the Defendants in the form of a guarantee of
> Fox Drug's [the parent debtor] indebtedness to the
> Defendant, <u>such guarantee obligation on Fox Corp.'s part,</u>
> <u>even if the same is avoidable as a fraudulent conveyance,</u>
> <u>cannot result in any recovery to the Trustee under §</u>
> <u>550(a)(1) given that only transfers of property are</u>
> <u>remediable under § 550(a)(1)</u>.

*Id.* at 234 (citations omitted) (underlining added).

Simply put, where a chapter 7 trustee asserts a fraudulent conveyance claim with

respect to a guaranty, he is limited to the remedy of avoiding the obligation under § 544.

There is no remedy available under § 550(a).  Accordingly, because the Trustee is not

entitled to recover the value of the Subsidiary Guaranties, his section 550 claims relating

thereto should be dismissed.

> • **Based on The Law of the Case Doctrine The First Loan Liens**
> **are Not Avoidable**

In considering the law of the case doctrine in connection with the Defendants'

prior motion to dismiss the Second Amended Complaint, the Court, in the MTD Order,

found and focused on the fact that the Cash Collateral Orders and Sale Orders [D.E. 77,

88, 99, 177, 185, 188 and 189] granted releases and waivers only to the Credit Suisse and

First Lien Lenders who provided post-petition financing to the Debtors (the "First Loan

Releases"). [MTD Order at 14]. In considering the applicability of the law of the case doctrine as it relates to the First Loan Liens, however, the focus should be on the language in the prior court filings and orders that provide that those liens are "unavoidable" and not the First Loan Releases. In light of the prior "unavoidable" findings, the Trustee is now precluded from seeking to avoid the First Loan Liens, let alone recover any value relating to those liens.

As this Court held in another case, "[s]ection 550 allows a trustee to recover the transferred property or its value *to the extent the trustee has successfully avoided a voidable transfer.*" *In re Sawran,* 359 B.R. 348, 351 (Bankr. S.D. Fl. 2007) (emphasis added). Put another way, in order for the Trustee to recover the value of the First Loan Liens from the Defendants under § 550(a), the Trustee must first avoid the First Loan Liens to Credit Suisse is an avoidable fraudulent conveyance under § 544 and FUFTA. He cannot do so.

As discussed above in Section II.B., on January 16, 2009, the Court entered the Final Financing Order which gave all parties in interest until February 23, 2009 (the "Challenge Period Termination Date") to contest the validity and unavoidability of the transfer of the First Loan Liens from the Debtors to Credit Suisse. [D.E. 77 at 2, 15]. In that regard, the Final Financing Order provided that, absent a timely objection:

> The First Lien Obligations, and the First Lien Agent's and the First Lien Lenders' Liens in the First Lien Collateral shall be valid, perfected, **nonavoidable,** and in full force and effect, not subject to any claims, counterclaims, setoffs or defenses . . .

[D.E. 77 at 15-16] (bold added).

No timely objection was filed by the Challenge Period Termination Date of February 23, 2009. Thereafter, on March 12, 2009, the Trustee, in his *Third Supplement*

*and Additional Proposed Amendment to Sale Motion,* confirmed the validity and unavoidability of the transfer of the First Loan Liens from the Debtors to Credit Suisse as follows:

> The date established in the Final Financing Order [D.E. 77, 88, 99] by which Trustee Dilworth and any creditors or other parties in interest could challenge the validity and priority of Credit Suisse's liens and security interests upon virtually all of the Debtors' assets passed without any challenge being made. **Accordingly, pursuant to the Final Financing Order, Credit Suisse's liens have been conclusively established in this case as constituting valid first liens encumbering virtually all of the Debtor's assets**. . . .

[D.E. 163, ¶ 4] (bold added).

As correctly noted by the Court in the MTD Order, "The law of the case doctrine requires a court to follow what has been decided explicitly, as well as by necessary implication in an earlier proceeding."  [MTD Order at 13] (citing *In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1550 n.3 (11th Cir. 1990)).    Here, docket entries 77 and 163 demonstrate beyond peradventure that the law of these bankruptcy proceedings is that the First Loan Liens are "nonavoidable." Indeed, it is because the First Lien Loans were held to be valid and unavoidable in this case, that Credit Suisse received virtually all of the net proceeds from the sale of the Debtors' assets.

Accordingly, the Trustee may not now challenge the legitimacy of the First Loan Liens or seek to avoid them.  In other words, as a matter of law, the First Loan Liens from the Debtors to Credit Suisse cannot be found to be voidable transfers under § 544. Because avoidability of the transfer under § 544 is a prerequisite to recovery under § 550(a), the Trustee cannot recover the value of the First Loan Liens.

In light of the above, the Court should dismiss with prejudice Counts VII through XII as they relate to the First Loan Guaranties and First Loan Liens.

### 2.    As To The Second Loan Liens, There Can Be No Recovery Under § 550

The purpose of the recovery and avoidance sections of the Code is to restore the estate to the condition that would have existed had the transfer never occurred, not to use the provisions of the Code to confer a windfall to the debtor's estate. *In re Sawran,* 359 B.R. at 354. When the transfer to be avoided is a non-possessory lien in property that was part of the bankruptcy estate as of the date of the petition, upon avoidance, the estate is automatically made whole pursuant to § 551 of the Bankruptcy Code which preserves for the lien for the benefit of the estate, and § 541(a)(4) of the Code which provides the preserved value is deemed property of the estate. *See In re Bremer,* 408 B.R. 355, 360 (B.A.P. 10th Cir. 2009) (noting that avoidance of a lien is sufficient to recover the transferred property under 551 and a remedy under § 550(a) is unnecessary) (citing 4 NORTON BANK L. & PRACT. 3d 70.3 (2009)); *In re DLC, Ltd.,* 295 B.R. 593, 602 n. 7 (B.A.P. 8th Cir. 2003) (avoidance of a grant on a security interest is sufficient to recover the transferred property), *aff'd,* 376 F.3d 819 (8th Cir. 2004); *In re Sickels,* 392 B.R. 423, 427 (Bankr. N.D. Iowa 2008) (avoidance of mortgage lien constitutes a complete recovery for the estate).

Section 551 of the Bankruptcy Code is recognized as the default remedy available to a trustee who has successfully avoided a lien under § 544. *In re Trout,* 609 F.3d 1106, 1113 (10th Cir. 2010) (finding that default rule for avoidance of a lien is recovery under § 551 and denying recovery under § 550(a) to the extent the trustee had not established "compelling" reason to deviate from default rule). In rare circumstances where the

remedy under § 551 is inadequate, the court has discretion to permit recovery under § 550(a).  *Id.* at 1111 (citing *In re Burns,* 322 F.3d 421, 427 (6th Cir. 2003) (noting that "the trustee's remedy of recovery is necessary only where the remedy of avoidance is inadequate" and that in cases involving non-possessory creditors trustees will generally not have to seek recovery" under § 550)).  Courts have held that where the property subject to the non-possessory lien was property of the estate as of the petition date, the trustee is not entitled to the value of the avoided lien under § 550(a).  *See In re Trout,* 609 F.3d at 1114 (holding trustee was not entitled to value of avoided non-possessory lien under § 550(a), but was limited to recovery under § 551 where lien avoided was on a vehicle still owned by the estate on the petition date).

Cases awarding recovery under § 550(a) generally do so on grounds that the property that was transferred is no longer property of the estate as of the petition date, or because the lien to be avoided had been satisfied prior to the petition date. In the few cases where courts have allowed a recovery under § 550, they have done so most often where the property subject to the lien was not property of the estate as of the petition date.  In other words, there was nothing left that could be preserved under § 551.  *See, e.g., In re Blackburn,* 90 B.R. 569, 573 (Bankr. M.D. Ga. 1987) (lien avoided was on a truck which had been repossessed by the defendant pre-petition and sold to a second purchaser, to the extent the lien could not be preserved for the estate under § 551 the court awarded the value of the avoided lien under § 550(a)); *In re Beck,* 25 B.R. 947 (Bankr. N.D. Ohio 1982) (when property avoided was a tractor that had been repossessed by the defendant pre-petition and subsequently sold, § 550(a) remedy was appropriate

since the tractor could not be returned to the debtor's estate.); *contra In re Taylor,* 599 F.3d 880 (9th Cir. 2010).

In this case, permitting the Trustee to recover the "value" of the Second Loan Liens under § 550(a): (a)  makes no sense in light of the Sale Orders affirmatively sought by the Trustee in the underlying bankruptcy cases; and (b) would otherwise grant a windfall to the Debtors' estates.  As of the Petition Date (December 23, 2008), the Debtors' estates were in possession of the collateral encumbered by the Second Loan Liens.  As determined by the Sale Orders dated March, 20 2009 [D.E. 185, 188, 189], the gross sale price for all the Debtors' properties was approximately $27,000,000 (*i.e.,* only a fraction of the debt owing under the First Credit Agreement).  In other words, via the bankruptcy sale, it has been determined in this case that the Second Loan Liens have no value.  *See In re Levitt*, 384 B.R.  at 639-640.  If the Trustee had avoided the Liens before selling the underlying assets, the recovery for the benefit of the estate would have been limited to, at most, the value of the collateral as of the Petition Date or thereafter (about $27M).  Here, by seeking a recovery under § 550(a) for the value of the liens at the time of the transfers (*i.e.,* as of June 8, 2006), the windfall to the Trustee would be enormous.

Moreover, even had the Second Loan Liens had any value as of the Petition Date, it was within the Trustee's power to preserve those liens for the benefit of the Debtors' estates. He chose not to do so.  Instead, he opted to sell the Debtors' assets free and clear of the Second Loan Liens and give the net sales proceeds to Credit Suisse.  As such, he should not now be able to recover the alleged "value" of Second Loan Liens which he already confirmed were valueless by failing to object to the Sale Orders which provided the Second Lien Loans had no value.

Accordingly, the Trustee's Count VII through XII claims seeking recovery under § 550(a) for the value of the Second Liens should be dismissed.

## V.   <u>CONCLUSION</u>

For all the reasons set forth above, the Third Amended Complaint in its entirety should be dismissed.

<u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of The Lubert-Adler Defendants' Motion, Including Memorandum of Law, Pursuant to Rule 7012(b)(6) of the Federal Rules of Bankruptcy Procedure to Dismiss the Trustee's Third Amended Complaint for the Avoidance and Recovery of Fraudulent Transfers and Joinder in the Investor Defendants' Motion to Dismiss Counts III and VI of the Third Amended Complaint  was served upon (i) those parties registered to receive Notices of Electronic Filing in this case as indicated on the Service List attached here to as **Exhibit A**; and (ii) by First Class Mail upon those parties indicated on the Service List attached hereto as **Exhibit B,** on this 19th day of January, 2011.

Dated: January 19, 2011                                   Respectfully submitted,


                                                          BERGER SINGERMAN, P.A.
                                                          Counsel to Lubert-Adler Management Co.,
                                                          L.P., Lubert-Adler Real Estate Fund III,
                                                          L.P., Lubert-Adler Real Estate Parallel Fund
                                                          III, L.P., Lubert-Adler Capital Real Estate
                                                          Fund III, L.P., Lubert-Adler Real Estate
                                                          Fund IV, L.P., Lubert-Adler Real Estate
                                                          Parallel Fund IV, L.P., Lubert-Adler Capital
                                                          Real Estate Fund IV, L.P., Ira M. Lubert,
                                                          and Dean S. Adler


                                                          200 South Biscayne Boulevard
                                                          Suite 1000
                                                          Miami, Florida  33131
                                                          (305) 755-9500
                                                          Fax: (305) 714-4340


                                                          By: <u>*s/ Paul Steven Singerman*</u>
                                                          Paul Steven Singerman
                                                          Fla. Bar No. 378860
                                                          singerman@bergersingerman.com

                                                          - AND -

KLEHR HARRISON HARVEY
BRANZBURG LLP

William A. Harvey
Rona J. Rosen
1835 Market Street
Philadelphia, PA  191103
(215) 568-6060
Fax: (215) 568-6603
*Admitted pro hac vice*

## EXHIBIT A - SERVICE LIST

Pursuant to the Court's Electronic Mailing Notice List, the following parties are currently registered to receive Notice of Electronic Filings in this adversary proceeding:

**Scott L Baena , Esq.**
sbaena@bilzin.com
eservice@bilzin.com
lflores@bilzin.com
abeck@bilzin.com

**Harold D Moorefield Jr.**
hmoorefield@stearnsweaver.com
cgraver@stearnsweaver.com
larrazola@stearnsweaver.com
rross@stearnsweaver.com
mmesones-mori@stearnsweaver.com

**Stephen D. Busey, Esq.**
Allan E. Wulbern, Esq.
awulbern@smithhulsey.com
kgammill@smithhulsey.com
jbolling@smithhulsey.com
asyed@smithhulsey.com

**Robert N Gilbert, Esq.**
rgilbert@carltonfields.com
kdemar@carltonfields.com

**Lynn F. Chandler, Esq.**
lynn.chandler@smithmoorelaw.com
jeff.macharg@smithmoorelaw.com
jon.heyl@smithmoorelaw.com
johanne.bloom@smithmoorelaw.com
devire.robinson@smithmoorelaw.com

**Matthew W. Buttrick, Esq.**
mbuttrick@stearsnweaver.com
cgraver @stearsnweaver.com
mmesones-mori@stearnsweaver.com
stamm@stearnsweaver.com

**Charles W. Thorckmorton, Esq.**
cwt@kttlaw.com
lf@kttlaw.com
la@kttlaw.com

## EXHIBIT B -SERVICE LIST

Copies will be provided via regular U.S. mail upon the following:

Eugene E. Stearns, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL  33130

Harold D. Moorefield, Jr., Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL  33130

Robert Gilbert, Esq.
525 Okeechobee Boulevard
Suite 1200
West Palm Beach, FL  33401

Scott L. Baena, Esq.
Jay M. Sakalo, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-5340

Stephen B. Busey, Esq.
Allan E. Wulbern, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202

Andrew Stearns, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL  33130

Lynn F. Chandler, Esq.
Smith Moore Leatherwood LLP
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202

Charles W. Throckmorton, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134

Matthew W. Buttrick, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL  33130

Rona J. Rosen, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

William A. Harvey, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

Sally McDonald Henry, Esq.
Four Times Square
New York, NY  10036

Ropes & Gray
D. Ross Martin, Esq.
Peter L. Welsh, Esq.
Keith H. Wofford, Esq.
One International Place
Boston, MA 02110-2624

Blackacre Capital Partners, L.P.
299 Park Avenue
New York, New York  10171

City of Philadelphia Sinking Fund
Commission, Trustee for the Philadelphia
Gas Works Retirement Reserve Fund
1401 John F. Kennedy Boulevard
Suite 640
Philadelphia, PA  19102-1678

Mellon Trust of New England, N.A. As Trustee for Kodak
Retirement Income Plan Trust
135 Santilli Highway
Everett, MA  02149-1950

Miriam D. Glantz
50 Belmond Avenue
Suite 310
Bala Cynwyd, PA 19004

Terry K. Watanabe
TKW Enterprises
2033 Gateway Place, Suite 670
San Jose, CA  95110

Joan Cloetingh
P.O. Box 685
Kimberton, PA  19442

Bonnie Kay Marks
1070 Mill Road Circle
Rydal, PA

Carolyn McCulloch
Five Radnor Corporate Center
MPS Capital, Inc., Suite 520
Radnor, PA  19087

Patricia I. Chen, Esq.
Alison Mclaughlin, Esq.
800 Boylston Street
Boston, MA  02199

Donald Lewis
Four Time Square
New York, NY  10036