## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>GINN-LA ST. LUCIE LTD., LLLP, *et al.*,<br><br>Debtors.<br>_____/ | **CASE NO. 08-29769-PGH**<br>All Cases Jointly Administered<br><br>Chapter 7<br><br>(4 Cases Substantively Consolidated Under<br>Lead Case No. 08-29769-PGH)[1]<br><br>(3 Cases Substantively Consolidated Under<br>Lead Case No. 08-29774-PGH)[2] |
| In re:<br>GINN-LA QUAIL WEST LTD., LLLP, *et al.*,<br><br>Debtors.<br>_____/ | |
| DREW M. DILLWORTH, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>EDWARD R. GINN, III, et al.<br><br>Defendants.<br>_____/ | **ADV. PRO. NO. 10-02976-PGH** |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE "GINN," "LUBERT-ADLER," AND "INVESTOR" DEFENDANTS' MOTIONS TO DISMISS THIRD AMENDED COMPLAINT

Plaintiff Drew M. Dillworth ("Trustee Dillworth"), in his capacity as Chapter 7 Trustee for the Tesoro and Quail West Debtors' Estates, hereby files this memorandum in opposition to the Ginn, Lubert-Adler, and Investor Defendants' second Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) [ECF Nos. 165, 172, 174].

_____

[1] The "Tesoro Debtors' Estates" (Nos. 08-29769-PGH, 08-29770-PGH, 08-29772-PGH, and 08-29773-PGH) are substantively consolidated into Lead Case No. 08-29769-PGH. Order [ECF No. 308/309]. The "Tesoro Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA St. Lucie Ltd., LLLP – 5632; (ii) Ginn-St Lucie GP, LLC – 0983; (iii) Tesoro Golf Club Condo., LLC – 4385; and (iv) The Tesoro Club, LLC – 1917. *See* 11 U.S.C. § 342(c)(1).

[2] The "Quail West Debtors' Estates" (Nos. 08-29774-PGH, 08-29775-PGH, and 08-29776-PGH) are substantively consolidated into Lead Case No. 08-29774-PGH. Order [ECF No. 34]. The "Quail West Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA Quail West Ltd., LLLP – 2397; (ii) Ginn-Quail West Beach, LLC – 9142; and (iii) Ginn-Quail West GP, LLC – 6313. *See* 11 U.S.C. § 342(c)(1).

For convenience, the Ginn, Lubert-Adler, and Investor Defendants who have filed or joined in the Motions enumerated above are collectively referred to herein as the "Moving Defendants." The following Lubert-Adler Fund III and IV Investor Defendants have declined to join in the Motions, and have instead filed Answers to the Third Amended Complaint:

- The President and Fellows of Harvard College;

- Yale University;

- Yale University Retirement Plan for Staff Employees;

- Yale University Retiree Health Benefits Coverage Trust;

- The Trustees of Princeton University; and

- Washington University in St. Louis.

Other Investor Defendants have separately asserted a defense of sovereign immunity, which will be addressed in a separate filing.

## BACKGROUND

In this adversary proceeding, Trustee Dillworth seeks to avoid and recover for a series of fraudulent transfers of Tesoro and Quail West Debtor property, made to or for the benefit of Edward R. "Bobby" Ginn III ("Ginn"), Lubert-Adler Management Company, L.P. ("Lubert-Adler"), and other persons and entities involved in the financing and development of the two Debtor projects, the luxury master-planned residential communities known as "Tesoro" and "Quail West," located in Port St. Lucie and near Naples, Florida, respectively.

During the time periods in question, Ginn and the Lubert-Adler-managed equity funds commonly referred to as "Lubert-Adler Funds III & IV" held equity ownership interests in the Tesoro and Quail West Debtors – *i.e.*, the "project-level" subsidiary entities created to hold, develop, and operate the Tesoro and Quail West Projects.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

By Order dated December 10, 2010, Trustee Dillworth's Second Amended Complaint herein was dismissed without prejudice, for "fail[ing] to adequately allege the facts and theories" relied upon to establish that:

(1)     The transfers of Credit Suisse loan proceeds complained of were transfers of Debtor property;

(2)     The loan transaction may alternatively be "collapsed" so as to reflect that economic reality; and

(3)     Notwithstanding the Court's earlier interim "Challenge Order," recovery may be sought from the Defendants for the value of the liens issued in connection with the loan transaction.

Order on Motions to Dismiss, 12/10/10 [ECF No. 154].

As to the first issue, the Court observed that, in the *In re Chase & Sanborn* line of decisions, the Eleventh Circuit adopted a "very flexible, pragmatic" test for determining whether a debtor had an interest in property, and that the Trustee had advanced a theory that appeared to be consistent with governing law but was not alleged in his Complaint:

[T]he strict 'control' test urged by the Movants in this case belies the Eleventh Circuit's characterization of the test as a "very flexible, pragmatic one." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988).

[T]he Trustee argued that Credit Suisse would not have made a loan to the 'technical' borrowers, one of whom is the shell parent company of the Debtors, without the Debtors having primary liability for repayment of the loans. Thus, the Trustee's Response advances a theory that appears to be consistent with Fla. Stat. § 726.102(12)'s definition of a transfer, in which the Debtors were substantively borrowers – not mere guarantors – with primary liability for repayment of the Credit Suisse loan, even if they were not defined as 'Borrowers' under the Credit Agreements. However, this theory is not alleged in the Complaint. . . .

*Id.* at 9-11.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

As to the second issue, the Court recognized that other courts have "collapsed" transactions to reflect their economic reality, but the Trustee had not pled such a "theory" in his Complaint:

> Some courts have "collapsed" transactions in order to evaluate an allegedly fraudulent conveyance in context to arrive at the substance of the transaction. *See e.g. Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) . . .; [etc.].

> Although the Court is unaware of any Eleventh Circuit case formally acknowledging the propriety of collapsing transactions to determine their economic reality, the Eleventh Circuit has stated that consistent with the equitable concepts underlying bankruptcy law, the court must "look beyond the particular transfers in question to the entire circumstance of the transactions" in determining whether the debtor possessed property recoverable in a fraudulent transfer action. *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1199 (11th Cir. 1988).

> [T]he Trustee argue[s] that Credit Suisse would not have lent $675,000,000 to the newly created shell entity borrowers without the Debtors and the other project entities having primary liability for repayment of the loans. . . . If the Trustee wishes to pursue a theory of fraudulent transfer that requires collapsing the transaction to determine its economic reality, the theory must be pled in the Complaint. . . .

*Id.* at 11-13.

Finally, as to the third issue, concerning the Challenge Order, the Court "note[d] that the releases and waivers were granted only to Credit Suisse and the First Lien Lenders who provided post-petition financing to the Debtors, no claims were released with respect to any third parties." *Id.* at 14. Once again, however, the Court directed that any subsequent amendment to the Complaint should more clearly allege the facts on which the claims against the Defendants were premised. *Id.*

Consistent with the Court's directions, the Trustee's litigation counsel subsequently filed a Third Amended Complaint ("TAC") which expanded on existing allegations, and added new ones, detailing the facts and theories advanced as to each of the foregoing issues. *See* TAC, ¶¶ 1, 6-11, 65-96, 164-68, 171-73, 182-86, 189-92, 201-11, 213-24, 229-39, 241-52 [ECF No. 163].

In the interim, the Eleventh Circuit also handed down a soon-to-be-reported decision providing further support for this Court's analysis as to the first and second issues referenced above. *In re Harwell (Martinez v. Hutton)*, __ F.3d __, 2010 WL 5374340 (11th Cir. Dec. 29, 2010).

S T E A R N S   W E A V E R   M I L L E R   W E I S S L E R   A L H A D E F F   &   S I T T E R S O N ,   P . A .
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

In *In re Harwell*, which the Moving Defendants cite only in passing, the Eleventh Circuit reviewed and ratified the *In re Chase & Sanborn* "test" for determining whether a debtor had an interest in transferred property, stating:

- "[T]his Court has adopted a flexible, pragmatic, equitable approach of looking beyond the particular transfer in question to the circumstances of the transaction in its entirety";

- "*[The] test . . . simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable*"; and

- "*[T]his approach is consistent with the equitable concepts underling bankruptcy law.*"

*Id*. at *4-7, 10 (citing/quoting *Nordberg v. Sanchez*, 813 F.2d 1177, 1181-82 (11th Cir. 1987); *Nordberg v. Societe Generale*, 848 F.2d 1196, 1199 (11th Cir. 1988)) (emphasis in original).

The *Harwell* Court also clarified that, in the first of the *In re Chase & Sanborn* decisions, "[the Court] decided the debtor did not control the $350,000 transferred to Sanchez" for what amounts to three reasons:

(1) the *source* of the funds was Duque's personal loan from the Arab National Bank; (2) the eventual *use* of the funds transferred to Sanchez was to repay a loan obtained for Duque by Carlos Londono from the City National Bank; (3) "the actual *connection* between the funds and the debtor [Chase & Sanborn] was quite tangential: a two-day layover in a special account then only recently opened and soon thereafter closed" [which had been] "opened under a name that the debtor no longer used."

*Id.* at 5 (quoting *Sanchez*, 813 F.2d at 1182) (first alteration in original) (emphasis added).

In the present case, by contrast, Trustee Dillworth's Third Amended Complaint contains detailed allegations reflecting that:

(1)    The source of the funds at issue was a pair of Credit Suisse syndicated loans totaling $675 million which the Debtors and Other Project Entities had "primary" liability to repay, and which were expressly "condition[ed]" upon the granting of mortgages and liens on substantially all of their real property and other assets;

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

(2)     The "term" loan portion of that amount – $510 million – was used to pay closing fees and other transaction costs in the amount of $23,446,764, to pay off existing indebtedness of the Debtors and Other Project Entities in the amount of $158,291,252, and to fund distributions to insiders of the Debtors and Other Project Entities in the amount of $328,261,982, as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits"; and

(3)     There was a *direct* connection between the distributions to insiders sought to be avoided herein and the Debtors.  The Ginn and Lubert-Adler Defendants have each served sworn interrogatory answers unequivocally attesting that the transfers at issue "were made pursuant to the terms of" the Lead Debtors' Agreements of Limited Partnership (*i.e.*, their operating agreements).

TAC, ¶¶ 65-74, 76-79, 80-81, 87-89.

Nevertheless, the Moving Defendants – led by Lubert-Adler – persist in arguing that, because the initial Credit Suisse Loan Documents did not label the Debtors as "Borrowers," the distributions of loan proceeds complained of cannot be deemed transfers of Debtor "property," and the Court may not equitably "collapse" the loan transaction to reflect that economic reality. Lubert-Adler Defendants' Motion to Dismiss ("L.A. Motion") [ECF No. 165], pp. 5-7, 16.

In making these arguments, the Moving Defendants notably do *not* appear to contend that the Debtors lacked an interest in *any* of the loan proceeds.  They at least implicitly acknowledge that the Debtors had an interest in: (A) the $165 million synthetic revolving loan proceeds earmarked for "working capital needs of the Borrower and its Subsidiaries" and other "Project Expenses"; and (B) the portion of the $158,291,252 of term loan proceeds allocated to existing indebtedness which went to pay off the Debtors' then-existing $81,896,709.10 of debt.  L.A. Motion, 11 & n. 6; First / Second Lien Credit Agreement, Recitals A & B, ¶ 2.9, Sch. 1.1(b).

Rather, it is the Defendants' position that *those* loan proceeds are somehow *different* than the $148,828,198 of loan proceeds which were upstreamed to insiders of the Debtors and credited against the Debtors' capital accounts.  We disagree.

-6-

## ARGUMENT

**I.    TRUSTEE DILLWORTH'S THIRD AMENDED COMPLAINT MORE THAN ADEQUATELY STATES A CLAIM AS TO "THE LOAN PROCEEDS"**

> **A.    Under The Credit Suisse Loan Documents, The Debtors Were Substantively "Borrowers" – Not Mere "Guarantors" – And Had An Interest In The Loan Proceeds Upstreamed To Insiders**

Although the initial Credit Suisse Loan Documents did not label the Debtors "Borrowers," the facts alleged in TAC ¶¶ 6-11 and 65-89 evidence that the Debtors were substantively "borrowers" with respect to the loans, and, therefore, had a legal or equitable interest in the $148,828,198 of loan proceeds upstreamed to insiders which were credited against their capital accounts.

<u>First</u>, contrary to the Moving Defendants' position, the entities which the Credit Agreements labeled as the "Borrowers" – Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. – were not your typical corporate borrowers.  They were the very definition of "shell" entities.

Formed in connection with the Credit Suisse loan transaction for the sole purpose of "pooling" and "cross-collateralizing" the assets of the Debtors and the Other Project Entities, the two technical "Borrowers" had no independent assets – or business operations – of their *own*; they merely served as a vehicle to facilitate the structuring and consummation of the loan transaction, and as conduits for the loan proceeds which were upstreamed to insiders.  TAC, ¶¶ 6, 65-67, 80-81; *see generally Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 737 (7th Cir. 2008) ("shell" entities are companies with "no significant assets or operations," sometimes used as a front "to advance fraud"); Black's Law Dictionary, 394 (9th ed. 2009)  ("shell corporation" means "[a] corporation that has no active business [and] exists only in name as a vehicle for another company's business operations"); Wikipedia Online Encyclopedia, http://en.wikipedia.org/wiki/shell_corporation (updated 12/27/10) ("A shell corporation is a company which serves as a vehicle for business transactions without itself having any significant assets or operations. [T]hey are a main component of the underground economy, especially those based in tax havens.").

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130  ·  TELEPHONE (305) 789-3200

The real "Borrowers" in interest were the entities labeled "Subsidiary Guarantors," *i.e.*, the Debtors and Other Project Entities whose real property and other assets were pledged as collateral for the loan, and whose equity was replaced with debt. TAC, ¶¶ 6-10, 74, 80-81. Accordingly, unlike a typical loan transaction, in this instance, the Loan Documents were drafted so as to render *both* the "Borrowers" *and* the purported "Subsidiary Guarantors" primarily liable for all obligations under the Loan Documents. TAC, ¶¶ 6, 71-74, 83.

Under the text of the Credit Agreements, both "the Borrower[s] *and [their] Subsidiaries*," the purported "Guarantors," were responsible for loan repayment, with "Guarantor" assets serving as *the principal source of loan repayment*:

- "The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, rental programs, club, golf club memberships or otherwise) . . . into the Company's Operating Account," *i.e.*, a depository or securities account "subject to a Control Agreement in favor of [Credit Suisse]";

- "Concurrently with the consummation of any [Borrower or Subsidiary] Asset Sale [as defined below], the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs. . . ."

- "'Asset Sale' means the sale, lease, [etc.] by the Borrower or any of its Subsidiaries . . . to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible . . . ."

TAC, ¶ 73 (quoting First / Second Lien Credit Agreements, ¶¶ 1.1, 2.8(B)(ii)(e), 3.3(B)(ii)).

Likewise, the so-called Subsidiary Guaranties which the Debtors and Other Project Entities were required to execute specifically provided for "primary and not secondary" liability for the full $675 million loan amount:

Nature and Scope of Liability. Guarantor's liability under this Guaranty shall be *primary* and *not secondary,* in *the full amount* of the Guarantied Obligations [defined as "all Obligations" under the Loan Documents].

TAC, ¶ 71 (quoting First / Second Lien Subsidiary Guaranties, ¶ 3) (emphasis added).

-8-

In fact, in this case, the entire loan transaction was expressly "condition[ed]" upon the Debtors' and Other Project Entities' execution and delivery of the so-called Guaranties, and the granting of mortgages and liens on substantially all of their real property and other assets:

- "The Lenders would not make, and would not be obligated to make, the Loan to Borrower unless Guarantor executed this Guaranty. This Guaranty is therefore delivered to Lenders, acting through Administrative Agent, to induce the Lenders to make the Loan. . . ."

- "The First [and Second] Lien Credit Agreement[s] require[] that the obligations of the Borrower . . . be secured by liens and security interests covering, among other things, Mortgagor's interest in the Fee Property and the Leased Property. In connection therewith, Mortgagor is executing and delivering this Mortgage . . . ."

- "It is a condition precedent of the obligation of Lenders to make the Loans to the Borrower under the Credit Agreement[s], that Grantor shall have executed and delivered this [Security] Agreement [granting] a security interest in, all of Grantor's right, title and interest in and to all of the personal property of Grantor, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired, wherever the same may be located . . . ."

TAC, ¶ 74 (quoting First / Second Lien Subsidiary Guaranties, Recital F, ¶ 9; First / Second Lien Mortgages, Security Agreements, Assignments of Rents and Leases and Fixture Filing, Rec. C & D; First / Second Lien Security Agreements, Rec. B & ¶ 1).

This was no accident. "Credit Suisse and the syndicated lenders would not have extended $675 million in financing to the two shell holding entities which served as the technical 'Borrowers' – roughly $325 million of which was to be applied to make 'distributions' to insiders of the Debtors and Other Project Entities – *without* the Debtors and Other Project Entities' having 'primary' liability for repayment of the loans, and without their granting mortgages and liens on substantially all of their real property and other assets." TAC, ¶ 83 (emphasis in original).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

The Lubert-Adler Defendants' Motion does not address the Credit Agreement provisions which establish that both "the Borrower *and its Subsidiaries*" were responsible for loan repayment, with the Subsidiaries' real property and other assets serving as the principal source of repayment. It conveniently ignores those inconvenient facts. *See* L.A. Motion, 5-7, 21-22 & n. 12.

The Motion does, however, address Subsidiary Guaranty ¶ 3, which provides that "Guarantor's liability under this Guaranty shall be *primary* and *not secondary*, in *the full amount* of the Guarantied Obligations [defined as "all Obligations" under the Loan Documents]." According to the Motion, that paragraph did not render the Subsidiaries "primar[il]y" liable for the underlying loan obligations *themselves*; the paragraph merely operated to convey that the Guaranties were "guaranties of payment," not "guaranties of collection." L.A. Motion, 6-7, 17.

There are several problems with that interpretation, beginning with the fact that, if accepted, it would render Subsidiary Guaranty ¶ 3 superfluous. For as acknowledged *later* in the L.A. Motion, the Guaranties contain a *separate* provision, entitled "Nature of Guaranty," which begins:

> Subject to the terms of this Guaranty and subject to the Preserved Defenses, Guarantor's liability under this Guaranty is *a guaranty of payment* and performance of the Guarantied Obligations, and *not a guaranty of collection* or collectibility.

Subsidiary Guaranties, ¶ 5 (emphasis added).

Under New York law, it is well-settled that a contract may *not* be interpreted in a way that would render one of its provisions superfluous or without meaning. *See, e.g., Lawyers' Fund for Client Protection of N.Y. v. Bank Leumi Trust Co. of N.Y.*, 94 N.Y.2d 398, 403-04 (N.Y. 2000) ("Bank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation."); *UBS Securities LLC v. Red Zone LLC*, 910 N.Y.S.2d 55, 59 (N.Y. App. Div. 2010) ("Red Zone's argument is thus flawed because a contract should not be interpreted so as to render any of its clauses meaningless[.]") (citation omitted).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

The fact of the matter is, consistent with the Credit Agreement provisions referenced above, the Subsidiary Guaranties contained *non*-standard language which operated to render the Subsidiaries "primar[il]y" liable for the loan obligations themselves. The "Guaranties" did not merely obligate the Subsidiaries "to pay immediately upon [a] default of [those loan obligations]" (L.A. Motion, 17), they specifically provided that, "*even if [the] Borrower[s] had no liability at the time of execution of the Loan Documents*," each of the "Guarantors" had "primary and not secondary" liability for "all Obligations" under the Loan Documents. Subsidiary Guaranties, ¶¶ 3, 5 (emphasis added).

In *North Carolina Nat'l Bank v. Johnson Furniture Co. of Mount Airy, Inc.*, 237 S.E.2d 313 (N.C. Ct. App. 1977), the court confronted a similar issue. There, the "Guaranty" provided that: "This obligation and liability on the part of the undersigned shall be a primary and not a secondary obligation and liability, payable immediately upon demand," without regard to the principal obligors' liability. *Id.* at 314-315. The guarantor argued that the effect of that provision was merely to render her "a guarantor of payment so that her liability for the debt would begin only at maturity when the primary debtors did not pay." *Id.* at 314. The court, however, disagreed, stating:

> Donna Lee Johnson was not a guarantor of payment . . . since by the terms of the agreement [she] was primarily liable to the [lender] . . . .
>
> Although the agreement is captioned "GUARANTY," the clear language of the contract establishes Donna Lee Johnson *as a primary debtor of the [lender]*.

*Id.* at 314-15 (emphasis added).

The same result follows here. Although misleadingly captioned "Subsidiary Guaranties," the clear language of those agreements established the Debtors and Other Project Entities as "primary and not secondary" obligors as to "all Obligations" under the operative Loan Documents. Like Ms. Johnson, they were "primary debtor[s] of the [lenders]," not mere "guarantors." Credit Suisse and the underlying syndicated lenders simply would not have extended the loans otherwise. TAC, ¶¶ 71-72, 83.

-11-

<u>Second</u>, in addition to the foregoing analysis, subsequent Credit Suisse Loan Documents, including the Master Restructuring Agreement dated as of December 19, 2008 ("MRA"), provide further evidence that the Debtors were substantively "borrowers" with respect to the loans.

In the MRA, the Debtors and Other Project Entities were expressly identified and referenced as "Full Recourse Borrower Parties" – *not* mere "Guarantors" – and were explicitly called upon to "*reaffirm*[] and acknowledge[] the obligations to pay, when due, all principal, interest and fees" owed under the Loan Documents.  TAC, ¶¶ 85 (quoting MRA, p. 1, ¶ 2, Sch. 1) (emphasis added); Order on Motions to Dismiss, 12/10/10 [ECF No. 154], p. 10 n. 9 ("Both sides acknowledge that the Debtors are identified as 'Full Recourse Borrower Parties' in the Master Restructuring Agreement [and] agree that the MRA did not recharacterize the liabilities and position of the parties from the initial loan agreements.").

The Moving Defendants do not dispute that fact, but dismiss it as insignificant in light of the parties' stipulation that the MRA "did *not* recharacterize the parties' liabilities or position" relative to the initial loan agreements.  L.A. Motion, 23-24 (quoting TAC, ¶ 86) (emphasis added). That argument has it exactly *backwards*.  It is precisely *because* the MRA did *not* recharacterize the parties' liabilities relative to the initial loan agreements that it ultimately has relevance here. Why would the parties to the loan transaction have identified the Debtors and Other Project Entities as "Full Recourse Borrower Parties" if that is not what they truly were?

Respectfully, it would be improper for the Court *not* to draw that reasonable inference, particularly on a motion to dismiss.  *See Rehberg v. Paulk*, 611 F.3d 828, 835 n. 1 (11th Cir. 2010); *In re First NLC Financial Services, LLC (Menotte v. NLC Holding Corp.)*, 396 B.R. 562, 565 (Bankr. S.D. Fla. 2008) ("[On] a motion to dismiss under Rule 12(b)(6)[,] 'the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.'") (citations omitted).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Third, and perhaps most significantly, the Ginn / Lubert-Adler Defendants have each served sworn interrogatory answers attesting that the transfers of the $148,828,198 of loan proceeds at issue "were made pursuant to the terms of" the Lead Debtors' Agreements of Limited Partnership:

> The transfers [at issue] were made pursuant to the terms of the Second Amended and Restated Agreement of Limited Partnership of [Debtor] Ginn-LA St. Lucie Ltd., LLLP which provided for distributions in the following order of priority:
>
> 1.    To the limited partners in repayment of their loans to Debtor Ginn-LA St. Lucie Ltd., LLLP, including interest thereon;
>
> 2.    To the limited partners, in proportion to their respective preferred return account balances;
>
> 3.    To the partners in proportion to the balance of their unreturned capital contributions; and
>
> 4.    The balance to the partners in proportion to their respective percentage interests (i.e., 20% to the general partner and 80% to the limited partners).
>
> * * *
>
> The transfers [at issue] were made pursuant to the terms of the Amended and Restated Agreement of Limited Partnership of Debtor Ginn-LA Quail West Ltd., LLLP which provided for distributions in the following order of priority:
>
> 1.    To the limited partners in repayment of their loans to Debtor Ginn-LA Quail West Ltd., LLLP, including interest thereon;
>
> 2.    To the limited partners, in proportion to their respective preferred return account balances;
>
> 3.    To the partners in proportion to the balance of their unreturned capital contributions; and
>
> 4.    The balance to the partners in proportion to their respective percentage interests (i.e., 20% to the general partner and 80% to the limited partners).

TAC, ¶ 88 (quoting Ginn / Lubert-Adler Defendants' Resp. to First Set of Ints., Int. Nos. 8-9).

Needless to say, how can the Debtors be found to have lacked a legal or equitable interest in the $148,828,198 of loan proceeds at issue in this case if the transfers of those loan proceeds "were made pursuant to the terms of" the Lead Debtors' respective operating agreements?

-13-

The Moving Defendants notably do not even *attempt* to answer that critical question. They simply pretend that "the full interrogatory responses do not in any way identify the Debtors as borrowers or transferees of the Loan Proceeds." L.A. Motion, 24.

The Moving Defendants are mistaken.  The full interrogatory responses do *more* than "identify the Debtors as borrowers or transferees" of the $148,828,198 of loan proceeds at issue. They evidence that the *Defendants themselves* treated those loan proceeds as *Debtor property* which was distributable to insiders pursuant to the Lead Debtors' respective operating agreements. TAC, ¶ 89; Ginn / Lubert-Adler Defendants' Resp. to First Set of Ints., Int. Nos. 8-9.[3/]

\* \* \*

Under *In re Harwell* and the earlier *In re Chase & Sanborn* decisions it ratified, all of which support this Court's initial conclusions of law on this issue, the foregoing allegations and admissions more than suffice to establish that the Debtors had a legal or equitable interest in the $148,828,198 of loan proceeds upstreamed to insiders which were credited against their capital accounts.

While the Defendants would have this Court believe that the transfers at issue did not involve Debtor "property," and "did not diminish the Debtors' estates or strip the Debtors of any assets," the reality is, "through the Credit Suisse loan transaction, insiders in control of the Debtors took out $148,828,198.14 of 'capital' and replaced it with $148,828,198.14 of loan debt," rendering each of the Debtors significantly insolvent and much too thinly capitalized to survive. TAC, ¶¶ 9, 14, 80-81, 136-39.

To borrow the Lubert-Adler Defendants' apt turn of phrase, the Defendants' position "simply does not hold water." L.A. Motion, 21.[4/]

---

[3/]Though the Defendants purport to take comfort in "the full interrogatory responses," they notably fail to attach copies as exhibits or direct the Court to where they may be found: ECF No. 140-2, pp. 10-55.

[4/]Indeed, in light of the Ginn and Lubert-Adler Defendants' interrogatory answers, we respectfully submit that it is frivolous.

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
**MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200**

**B.    The Court May Alternatively "Collapse" the Loan Transaction to Reflect the Economic Realities Thereof**

The Moving Defendants' argument concerning the applicability of the "collapsing" doctrine is also belied by *In re Harwell* and prior precedents it ratified.

Although the Eleventh Circuit has not yet formally endorsed the "collapsing" doctrine, it has now thrice stated that, in determining whether a debtor had an interest in transferred property, courts must look beyond the transfers in question "to the entire circumstance of the transactions." *In re Harwell*, 2010 WL 5374340, at *5, 10; *In re Chase & Sanborn (Sanchez)*, 813 F.2d at 1181-82; *In re Chase & Sanborn (Societe Generale)*, 848 F.2d at 1199.

The Eleventh Circuit has also now twice "stressed that the *purpose* of a fraudulent transfer 'is to *expose* fraudulent dealings.'" *In re Harwell*, 2010 WL 5374340, at *8, 10 (emphasis added); *In re Int'l Admin. Servs., Inc. (IBT Int'l, Inc. v. Northern)*, 408 F.3d 689, 706 (11th Cir. 2005).

The "collapsing" doctrine is premised on the same equitable concepts.  It embraces the notion that:

> In equity, "substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 305, 60 S. Ct. 238, 84 L. Ed. 281 (1939); . . . . Thus, an allegedly fraudulent conveyance must be evaluated in context; "[w]here a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'" . . .

*Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (alterations in original) (citations omitted); *see also Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793-94 (7th Cir. 2009) (Posner, J.) ("Fraudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights . . . .") (quoting Douglas G. Baird, Elements of Bankruptcy, pp. 153-54 (4th ed. 2006)); *In re Mervyn's Holdings, LLC (Mervyn's LLC v. Lubert-Adler Group IV, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010) ("Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors.").

-15-

In this case, the transfers at issue were part of "a general plan" which was in many respects *more* egregious than the leveraged buyout transaction structure to which the "collapsing" doctrine is most frequently applied.

The Ginn and Lubert-Adler Defendants did not merely have "constructive" knowledge of the transactions that were going to take place after the shell "Borrower" entities received the loans, the First and Second Lien Credit Agreements *dictated* that roughly $325 million of loan proceeds "*shall* be applied" to make "distributions" to insiders of the Debtors and the Other Project Entities. TAC, ¶ 92; First / Second Lien Credit Agreements, ¶ 2.9(A).

Likewise, the loans and "distributions" at issue were not merely dependent on one another, the entire series of transactions was "condition[ed]" on the Debtors' and Other Project Entities' acceptance of "primary and not secondary" liability for the full $675 million loan amount, and the granting of mortgages and liens on substantially all of their real property and other assets. TAC, ¶ 93; First / Second Lien Subsidiary Guaranties, Recital F, ¶ 9; First / Second Lien Mortgages, Security Agreements, Assignments of Rents and Leases and Fixture Filing, Recitals C & D; First / Second Lien Security Agreements, Recital B & ¶ 1.

"The Credit Suisse loan transaction was [ultimately], in effect, '[a] *cash out* Mortgage,' through which 'equity' was paid before creditors," in the midst of what Ginn himself described as the biggest market collapse he has seen in 40 years:

> The market crashed from the end of 2005 to – or to July of 2006 was as big a falloff in housing as I have ever seen in 40 years.  And it ha[s]n't gotten better, it's gotten a little worse . . . .
>
> * * *
>
> The market was going bad from the end of 2005 through the entire year of 2006, but the first six months of 2006 was brutal.  I mean it's like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall. . . .

TAC, ¶¶ 102, 124 (quoting Transcript of Ginn Resorts Conference Call, 07/23/08, MMMTQW01_074772 - 074858, pp. 9, 18).

-16-

Contrary to the Moving Defendants' suggestion, there is no bright-line collapsing "test" either in the LBO context or otherwise.  In *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995), which the Defendants assert as controlling, what the Court referred to as the "paradigmatic scheme" was nothing more than an "example":

> [The *HBE Leasing*] paradigm is simply an example  –  it does not, by itself, define the exclusive elements of a claim to recover a fraudulent transfer based on a "collapsing" theory. . . .

*In re Allou Distribs., Inc. (Silverman v. K.E.R.U. Rty. Corp.)*, 379 B.R. 5, 21 (Bankr. E.D.N.Y 2007).

"In reality, collapsing transactions is little more than an effort on the part of the court to focus not on the formal structure of a transaction, but rather on the knowledge or intent of the parties involved in the transaction."  *In re Best Products Co.*, 157 B.R. 222, 229 (Bankr. S.D.N.Y. 1993); *see also In re Mervyn's Holdings, LLC*, 426 B.R. at 497 (same).

In *In re Best Products Co.*, a non-LBO case, the presiding Bankruptcy Court confronted a situation similar to that presented here:

> From the outset, it is clear that MONY and Best contemplated a loan to Best and that Best California would serve merely as a conduit for the benefit of MONY. [A] MONY loan officer [noted] that the proposed borrower would be a subsidiary of Best that had yet to be formed and that [said] entity's sole asset would consist of the sublease to Best. . . . [He] also noted that MONY was loaning the $2.2 million to a "shell company," . . . which [was] deemed the "technical borrower." . . .

*Id.* at 229.  Relying on the LBO "collapsing" cases, the Court notably went on to rule:

> I *cannot* conclude that Best and MONY intended a loan from MONY to Best California, *a subsidiary with no assets and no accounts*. Rather, at bottom, this transaction was a loan from MONY to Best with Best California serving as a vehicle to "get around" [state] antideficiency rules. . . . *[W]hile the parties to a transaction may intend that, as between themselves, their relationship is to be governed by the labels they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement. . . . This is especially so in bankruptcy, where Congress has defined the legal consequences of commercial relationships. It would be inequitable to allow the parties' choice of label to affect the rights of third parties.*

*Id.* at 229-30 (emphasis added).

-17-

The same conclusion follows here.  In this case, the entities which the Credit Agreements named as the "Borrowers" – Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. – were "shell" entities formed in connection with the loan transaction for the sole and express purpose of "pooling" and "cross-collateralizing" the assets of the Debtors and Other Project Entities. They were "conduits," nothing more.  TAC, ¶ 95.

Indeed, Ginn-LA attorneys expressly recognized as much in a formal "Memorandum" summarizing the federal tax implications of the Credit Suisse loan transaction:

> The Credit Suisse refinancing proceeds were used to repay existing debt and to make distributions to Lubert Adler Funds III and IV and ERG Enterprises. [Ginn-LA] CS Borrower, [LLC] distributed a portion of the loan proceeds to [Ginn-LA] CS Holding Co., [LLC] which in turn distributed the proceeds to the Lubert-Adler Funds and ERG Enterprises.  To the extent these distributions can be traced to the loan proceeds and do not exceed each partner's allocable share of the loan, the distributions should not trigger the disguised sales rules, and CS Holding Co. should not have to separately disclose the distributions to the IRS. . . .
>
> * * *
>
> [T]he following facts provide strong evidence to support the conclusion that no disguised sale occurred.  First, taking into account the direct and indirect ownership interests of the Lubert-Adler Funds and ERG Enterprises, the transaction did not alter the partners' proportionate ownership in the assets of the project partnerships. Second, [if] Credit Suisse had extended the loan directly to each of the project partnerships, and the project partnerships had distributed the loan proceeds directly to the Lubert-Adler Funds and ERG Enterprises, then no disguised sale would have occurred.  *The fact that the loan proceeds were **channeled** through CS Holding Co. and CS Borrower should not change this result.*

TAC, ¶ 96 (quoting Memo., Morris, Manning & Martin, LLP to G. Green, C.P.A., Etc., 03/02/07, MMMTQW01-036133 - 036137) (emphasis added).

That analysis was correct.  The fact that the loan proceeds at issue were "channeled" through a pair of shell entities formed in connection with the loan transaction should not alter the reality that the true "Borrowers" in interest were the underlying "project partnerships."

-18-

Nor can there be any serious dispute that "the overall financial consequence" of the loan transaction to creditors was "devastating." *In re Mervyn's Holdings, LLC*, 426 B.R. at 498. "[T]hrough the loan transaction, Ginn and the Lubert-Adler entities not only enriched themselves and their investors at the expense of the Debtors and Other Project Entities, they effectively looted the Debtors and Other Project Entities and shifted the risks associated with the Projects to creditors, leaving those creditors with a virtual certainty of loss." TAC, ¶ 7; *see also* ¶¶ 65, 71-74, 76-78, 80; *In re Mervyn's Holdings, LLC*, 426 B.R. at 498 (debtor had valid claim under "collapsing" doctrine to recover loan proceeds "borrowed using [d]ebtor's real estate as collateral" where transaction effectively stripped debtor of assets and left it with over $800 million of new debt).

Thus, were there any doubt here, the Court may and should "collapse" the loan transaction so as to reflect the economic reality that the Debtors had an interest in the loan proceeds in question. To paraphrase the Eleventh Circuit, any *other* "conclusion" would not be "logical" or "equitable." *In re Harwell*, 2010 WL 5374340, at *6; *In re Chase & Sanborn (Societe Generale)*, 848 F.2d at 1199; *cf. In re Best Products Co.*, 157 B.R. at 230; *In re Mervyn's Holdings, LLC*, 426 B.R. at 498.[5/]

---

[5/]The Moving Defendants' efforts to distinguish *In re Best Products Co.* and *In re Mervyn's Holdings, LLC* are futile. According to the Defendants, in *In re Best Products*, the Bankruptcy Court invoked the "collapsing" doctrine "because over the entire life of the loan, the parties *ignored the structure of the sublease*, with the debtor-parent sublessor making loan payments on behalf of its subsidiary [the 'technical borrower']." L.A. Motion, 29 n. 16 (emphasis added). Our facts are analogous. Unlike a typical loan transaction, in this case, the Loan Documents were drafted so as to render *both* the "Borrowers" *and* the purported "Subsidiary Guarantors" primarily liable for the full $675 million loan amount, with "Guarantor" asset sales serving as the principal source of loan repayment. TAC, ¶¶ 6, 71-73; *see supra* at pp. 8-9. Similarly, *In re Mervyn's Holdings* is said to be inapposite because, "unlike [that case], there is no allegation [here] that the Debtors were *stripped* of the property [at issue] (*i.e.*, the Loan Proceeds)." L.A. Motion, 29 n. 16 (emphasis added). We beg to differ. The TAC specifically alleges – relying on, *inter alia*, Defendants' *own* interrogatory answers – that the $148,828,198.14 of loan proceeds at issue constituted Debtor "property," and that through the loan transaction, "[Ginn and Lubert-Adler] effectively looted the Debtors . . . and shifted the risks associated with the Projects to creditors, leaving those creditors with a virtual certainty of loss." TAC, ¶¶ 7-14, 80-81, 88-89, 102; *see supra* at pp. 13-14.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## II.    THE TRUSTEE'S THIRD AMENDED COMPLAINT ALSO STATES ACTIONABLE ALTERNATIVE CLAIMS AS TO THE FIRST AND SECOND LIENS

The Moving Defendants advance three arguments for dismissal of Counts VII through XII, what they refer to as the "Guaranty / Lien Claims":

    (1)    While a Trustee may avoid a guaranty under 11 U.S.C. § 544(b), it is not a transfer of property, and, therefore, may not be recovered under § 550;

    (2)    "[T]he Trustee must first avoid the First Loan Liens [as] to Credit Suisse" in order to recover the value of the First Loan Liens from the Defendants, but "cannot do so [given] the law of the case"; and

    (3)    "[P]ermitting the Trustee to recover the value of the Second Loan Liens [measured as of the time they were issued] makes no sense and would result in a windfall to the Debtors' estates because [through] the bankruptcy sale, it has been determined . . . the Second Loan Liens have no value."

L.A. Motion, 9-10, 34-41.

Defendants' first argument is a non-issue.  While the Counts seeking "Avoidance" of the "Guaranties" and "Liens" group the "Guaranties" and "Liens" together for definitional purposes, the Counts seeking "Recovery" were not intended to be construed as seeking recovery for the value of the "Guaranties," as distinct from the "Liens."  No such recovery is being sought herein.

Defendants' second and third arguments are without merit.  In fact, as demonstrated below, they are remarkably disingenuous.

### A.    Notwithstanding The Court's Earlier Interim "Challenge Order," Recovery May Be Sought As To "The First Loan Liens"

As this Court correctly observed in its Order on the prior Motions to Dismiss [ECF No. 154], the Court's earlier interim "Challenge Order," Case No. 08-29769-PGH [ECF Nos. 77, 88], did *not* operate to release any and all claims relating to "the First Loan Liens":

    [R]eleases and waivers were granted only to Credit Suisse and the First Lien Lenders who provided post-petition financing to the Debtors, no claims were released with respect to any third parties.

Order on Motions to Dismiss, p. 14.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

That, of course, makes sense, as *only* Credit Suisse and the First Lien Lenders were providing consideration – post-petition financing – for the aforementioned "releases" and "waivers." As described more fully in the Third Amended Complaint:

> 204. After Trustee Dillworth was appointed Chapter 7 Trustee for the Debtors' Estates, Ginn and Lubert-Adler representatives supplied him with short-term budgets for the Debtor Projects reflecting an immediate need for a significant infusion of cash, to keep those Projects "alive."

> 205. The Debtors' equity sponsors had opted for Chapter 7 filing[s] rather than provide that needed cash, and were unwilling to provide additional funding on a post-petition basis.

> 206. Absent a significant infusion of cash, the Debtors would have been compelled to cease operations as going concerns – *i.e.*, go "dark" – prior to a sale of Project assets, further impairing the value of those assets, and increasing homeowner damages.

> 207. In the weeks that followed, the Trustee made inquiries of several potential lenders in an effort to obtain post-petition financing for the Projects, but found the debt markets in turmoil amidst the global financial crisis.

> 208. Credit Suisse and the First Lien Lenders – the entities holding the First Lien debt – were the only potential lenders willing to provide such financing, and only on the condition that they be released from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

> 209. Accordingly, the Trustee agreed to release Credit Suisse and the First Lien Lenders from claims relating to the First Lien Obligations and the liens granted to secure those Obligations.

> 210. That agreement, which was subsequently ratified by the Court in its Challenge Order, did *not* operate to release any *third-parties* from any claims relating to the First Lien Obligations or the liens granted to secure the First Lien Obligations; or, for that matter, any claims relating to the Second Lien Obligations or the liens granted to secure the Second Lien Obligations. . . .

> 211. Quite the contrary, the Challenge Order expressly provided for an "Estate Carve Out" pursuant to which $250,000 was made available for the investigation and pursuit of "litigation," such as the present case. Challenge Order, ¶ 15, Case No. 08-29769-PGH [ECF Nos. 77, 88].

TAC, ¶¶ 204-11 (emphasis in original); *see also* ¶¶ 217-24, 232-39, 245-52 (same).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Consistent with the Challenge Order, the Trustee's Third Amended Complaint does *not* seek to avoid the First Loan Liens as to Credit Suisse or the First Lien Lenders.  It seeks avoidance and recovery only from the Defendants – the third parties for whose benefit the Liens were granted. TAC, ¶¶ 227, 255.

To construe the Challenge Order as precluding those claims would not only stretch it beyond its negotiated intended consequence, it would result in a dramatic windfall to the Defendants, whose greed resulted in the Debtors' Chapter 7 filings, and who provided no consideration whatsoever for the "releases" and "waivers" referenced above.

### B.    Recovery May Also Be Sought As To "The Second Loan Liens"

The Moving Defendants' argument with respect to "the Second Loan Liens" fares no better. Permitting recovery of the value of the Second Liens as of the time they were issued is in no way inconsistent with the Bankruptcy Code, or, for that matter, common sense.

"Bankruptcy courts have consistently held that 11 U.S.C. § 550 'is designed to restore the estate to the financial condition that would have existed had the transfer [at issue] never occurred.'" *In re Kingsley (Bakst v. Wetzel)*, 518 F.3d 874, 877-78 (11th Cir. 2008) (citations omitted).

"In order for the court to decide whether to award the property itself, or a money judgment, . . . the court must compare the value of the property at the time of conveyance with the value at the time of judgment to determine whether the property has appreciated or depreciated in the interim." *In re American Way Service Corp. (Feltman v. Warmus)*, 229 B.R. 496, 531 (Bankr. S.D. Fla. 1999).

> [I]f the court [were to limit] Trustees to recovery of the property itself, and if the property has declined in value, the estate will have lost the opportunity to dispose of the property prior to its depreciation.  In such a case, [recovery of the property itself] will not, as a practical matter, restore the estate to the condition that it would have been in but for the transfer.

*Id.* at 532; *see also In re Tousa, Inc. (Official Committee of Unsecured Creditors of Tousa, Inc. v. Citicorp North America, Inc.)*, 422 B.R. 783, 883 (Bankr. S.D. Fla. 2009) (same).

-22-

Indeed, in *In re Trout (Rodriguez v. Drive Fin. Servs., L.P.)*, 609 F.3d 1106 (10th Cir. 2010), Defendants' principal cited authority on this issue, the Tenth Circuit recognized the same principles, stating:

> *[O]rdinarily* in the case of an avoided lien, the estate will be returned to its previous position by simply avoiding the preferential lien and no further recovery will be necessary, but there may be circumstances where that remedy will be insufficient and recovery under § 550 [is] needed instead.
>
> * * *
>
> [T]he choice of a § 550 remedy remains in the court's discretion. . . .

*Id.* at 1111, 1113 (emphasis in original).

In this case, as in *In re Tousa*, "[m]erely avoiding the [Liens] will not restore the [Debtors] to the financial condition that would have existed had the transfer [of the Liens] never occurred," *In re Tousa*, 422 B.R. at 883; for the Credit Suisse loan transaction was "[a] *cash out* Mortgage" consummated in the midst of what Ginn himself described as the biggest market collapse he has seen in 40 years, which limited the Debtors' ability to dispose of its property prior to further depreciation. TAC, ¶¶ 102, 124.

Thus, the Trustee is "entitled to recover the diminution in value of the liens [which] occurred since the transfer," plus "[other] costs imposed on the [Debtors] as a direct result of the transfers," such as "the costs of pursuing this litigation." *In re Tousa*, 422 B.R. at 881, 883 (citations omitted).

Permitting such recovery herein would not "result in a windfall to the Debtors' [E]states," it would do just the opposite. It would prevent a windfall to the Defendants, who cashed out early, and shifted the risks associated with the Projects to creditors, leaving Project creditors with the entire risk of loss.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

### III.    THE INVESTOR DEFENDANTS' MOTION IS PROCEDURALLY IMPROPER – AMONG OTHER DEFICIENCIES – AND SHOULD BE DENIED

Finally, the Moving Defendants, through the Investor Defendants' Motion [ECF No. 172], advance an argument *not* made in the initial Motions to Dismiss: that the Counts for "Recovery" should be dismissed to the extent they seek recovery from Defendants under 11 U.S.C. § 550(a)(1). This argument may be dispensed with quickly.

Federal Rule of Civil Procedure 12(g)(2), entitled "Limitation on Further Motions," made applicable by Rule of Bankruptcy Procedure 7012(b), specifically states that:

> Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule *must not make* another motion under this rule  raising a defense or objection that was available to the party but *omitted* from its earlier motion.

Fed. R. Civ. P. 12(g)(2) (emphasis added).

In the case of a motion to dismiss for failure to state a claim, an argument omitted from an earlier motion may *only* be made:

> (A)    in any pleading allowed or ordered under Rule 7(a);
>
> (B)    by a motion under Rule 12(c); or
>
> (C)    at trial.

Fed. R. Civ. P. 12(h)(2); *see, e.g., Skrtich v. Thornton*, 280 F.3d 1295, 1306-07 (11th Cir. 2002) ("Rule 12(g) *specifically prohibits* a party that previously filed a motion to dismiss from filing a second pre-answer motion to dismiss raising an omitted defense that could have been presented in the first motion to dismiss, 'except [as specifically provided in Rule 12(h)].'") (emphasis added); *Contrad v. Phone Directories Co., Inc.*, 585 F.3d 1376, 1383 n. 2 (10th Cir. 2009) ("Rule 12(g)(2) *bars* a party from making 'another motion under this rule' based on an argument omitted from a prior Rule 12 motion.") (emphasis added).

-24-

Here, the Investor Defendants' "initial" vs. "subsequent" transferee argument, such as it is, was clearly "available" to the Defendants at the time they filed their previous motions to dismiss. The allegation to which the Defendants now purport to object was incorporated *verbatim* from the prior version of the Complaint:

| Second Amended Complaint | Third Amended Complaint |
| --- | --- |
| With respect to the transfers for which avoidance and recovery is sought in this case, each of the individuals and entities named as Defendants herein was either an initial transferee or entity for whose benefit a transfer was made within the meaning of 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).<br><br>SAC, ¶ 39. | With respect to the transfers for which avoidance and recovery is sought in this case, each of the individuals and entities named as Defendants herein was either an initial transferee or entity for whose benefit a transfer was made within the meaning of 11 U.S.C. § 550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of 11 U.S.C. § 550(a)(2).<br><br>TAC, ¶ 44. |

Thus, the Investor Defendants' Motion to Dismiss is procedurally improper, and should be denied. Fed. R. Civ. P. 12(g)(2); *Skrtich*, 280 F.3d at 1306-07 (affirming denial of motion to dismiss); *Manns v. City of Atlanta*, 2006 WL 2466836, at *3-5 (N.D. Ga. 2006) ("Defendants' second pre-answer motion to dismiss [pursuant to Rule 12(b)(6)] is barred by Rule 12(g).") (motion denied); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2008 WL 2178150, at *1, 3 (N.D. Ill. 2008) ("Under Rule 12(g)(2), 'a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense . . . that was available to the party but omitted from its earlier motion.' . . . Defendants motion is denied on this ground.") (first alteration and omission in original) (citations omitted).

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.

MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Indeed, as a practical matter, it is difficult to fathom how the Moving Defendants could even *contemplate* making this argument in light of the procedural posture of this case.

In *In re Harwell*, the Court endorsed a "malleable," *fact-intensive* approach to § 550(a), which considers, among other things, whether entities which might be deemed initial transferees "simply held the [transferred] property as agents or conduits for one of the real parties to the transaction." *In re Harwell*, 2010 WL 5374340, at *6-10 (reversing grant of summary judgment); *In re Chase & Sanborn*, 848 F.2d at 1199-1200; *In re Int'l Admin. Servs., Inc.*, 408 F.3d at 705-06; *In re Pony Express Delivery Servs., Inc. (Andreini & Co. v. Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006) ("Under this test, a recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee.").

Likewise, in addition to the "conduit" rule, courts have also invoked the "collapsing" doctrine as a means of identifying initial transferees and entities for whose benefit such transfers were made. *See, e.g., Boyer*, 587 F.3d at 796-97; *In re Allou Distribs., Inc. (Silverman)*, 379 B.R. at 20, 24.

In the present case, however, we are not yet in a position to fully address the § 550(a) issues. While the Ginn and Lubert-Adler Defendants have committed to produce information pertinent to those issues on behalf of both themselves and the Investor Defendants, they have not yet completed their respective productions. They requested and were granted an extended period of time to do so, which has not yet elapsed. *See* Case Management and Scheduling Order, 12/09/10 [ECF No. 156], p. 2, ¶ I(A) (establishing deadline of February 28, 2011).

Thus, the Defendants can hardly be heard to complain that the TAC – like its predecessor – simply pleads § 550(a)(1) and (2) in the alternative.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

WHEREFORE, Trustee Dillworth respectfully requests that this Court enter an Order denying the Ginn, Lubert-Adler, and Investor Defendants' Motions to Dismiss.

Dated: February 11, 2011                        Respectfully submitted,

                                               STEARNS WEAVER MILLER WEISSLER
                                                 ALHADEFF & SITTERSON, P.A.

                                               Attorneys for Drew M. Dillworth,
                                               Chapter 7 Trustee of the Tesoro Debtors' Estates
                                               and the Quail West Debtors' Estates

                                               Museum Tower, Suite 2200
                                               150 West Flagler Street
                                               Miami, Florida 33130
                                               Telephone: (305) 789-3200
                                               Facsimile:  (305) 789-3395

                                               I hereby certify that I am admitted to the Bar of
                                               the United States District Court for the Southern District
                                               of Florida and I am in compliance with the additional
                                               qualifications to practice in this Court set forth in
                                               Local Rule 2090-1(A).


                                               By: /s/ Harold D. Moorefield
                                                     EUGENE E. STEARNS
                                                     Fla. Bar No. 149335
                                                     estearns@stearnsweaver.com
                                                     HAROLD D. MOOREFIELD, JR.
                                                     Fla. Bar No. 239291
                                                     hmoorefield@stearnsweaver.com
                                                     MATTHEW W. BUTTRICK
                                                     Fla. Bar No. 176028
                                                     mbuttrick@stearnsweaver.com
                                                     ANDREW E. STEARNS
                                                     Fla. Bar No. 661651
                                                     astearns@stearnsweaver.com

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200