## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division
### www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | : | **CASE NO. 08-29769(PGH)** |
| GINN-LA ST. LUCIE LTD., LLLP, *et al.*, | : | All Cases Jointly Administered |
|  | : |  |
| Debtors. | : |  |
|  | : |  |
| In re: | : |  |
| GINN-LA QUAIL WEST., LTD, LLLP, *et al.,* | : | Chapter 7 |
|  | : |  |
| Debtors. | : |  |
|  | : |  |
| DREW M. DILLWORTH, Chapter 7 Trustee, | : | **ADV. PRO. NO. 10-02976-PGH** |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| EDWARD R. GINN III, *et al*., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

## THE LUBERT-ADLER DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF THEIR MOTION TO DISMISS THE
## TRUSTEE'S THIRD AMENDED COMPLAINT

The Lubert-Adler Defendants[1] file this Reply Memorandum to address the arguments raised in the Trustee's Memorandum (the "Response") [ECF No. 186] as well as to address the applicability of the District Court's recent decision in *3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors of Tousa, Inc. (In re Tousa, Inc.)*, No. 10-cv-60016-ASG, slip op. D.E. 31 (S.D. Fla. Feb. 11, 2011) (hereinafter "*Tousa II*")

---

[1] Unless otherwise stated, defined terms herein shall have the same meaning as in the Lubert-Adler Defendants' Motion To Dismiss the Trustee's Third Amended Complaint.

which reversed the Bankruptcy Court's decision in *In re TOUSA, Inc.,* 422 B.R. 783, 873 (Bankr. S.D. Fla. 2009) (hereinafter "*Tousa I*").

As to his "substantive borrowers" allegations, the Trustee skirts the arguments made by the Lubert-Adler Defendants in their Motion To Dismiss (the "MTD") [ECF 165] and argues without basis that the language of the Credit Agreements and the Subsidiary Guaranties should be ignored.

Moreover, even if the label "borrowers" could be applied to the Debtors notwithstanding the undisputed fact that they executed "Subsidiary Guaranties" and not the Credit Agreements, the Trustee's argument would still fail. Based on the control test articulated by the Eleventh Circuit in *Norberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir. 1987) (hereafter "*Chase & Sanborn*") and the recent *Tousa II* opinion, the issue of whether the Debtors had a property interest in the Loan Proceeds for § 544 purposes does not turn on whether or not the Debtors can be labeled a "substantive borrower" or "guarantor." Rather, it turns on whether the Debtors had any control of the Loan Proceeds. Where, as here, the Credit Agreements at Section 2.9 indisputably direct how the Loan Proceeds were to be used,[2] and the Debtors never controlled the Loan Proceeds in any way, the Trustee cannot plead that the Debtors had the requisite control to establish they had a property interest in the Loan Proceeds.

Similarly, the Trustee has not offered any legitimate authority for his contention that, through the use of a "collapsing" doctrine, the transaction can be recharacterized so

---

[2] The Trustee himself admits that the Credit Agreements dictated how the loan proceeds were to be disbursed. In the TAC at paragraph 77, the Trustee admits that the Credit Agreements at section 2.9 stated how the proceeds were "*required to be 'applied.'.*" Similarly, the Trustee, in his Response at page 16, admits that : "…the First and Second Lien Credit Agreements *dictated* that roughly $325 million of loan proceeds '*shall* be applied' to make 'distributions' to insiders of the Debtors and the Other Project Entities."

as to manufacture the result that the Debtors had a property interest in the Loan Proceeds. None of the Eleventh Circuit "control" cases cited by the Trustee provides that a property interest can be manufactured. As the Trustee himself admits, the Eleventh Circuit has not endorsed the collapsing doctrine. Moreover, the collapsing doctrine cannot otherwise be applied to the facts of this case because the Debtors never received, transferred or otherwise controlled the Loan Proceeds.

The Trustee's attempt to argue that he has adequately pleaded the Guaranty/Lien Claims is also without merit. The Trustee (1) fails to address the language of the Challenge Order relating to the nonavoidability of the First Liens, (2) fails to address the issues relating to the fact that the underlying collateral was not sold until after the Petition Date, and (3) fails to refute how the defendants can be viewed as transfer beneficiaries of security interests under § 550(a)(1) where, as here, the defendants are alleged to be actual transferees of the Loan Proceeds.

Finally, as discussed in the Investor Defendants' Reply Memorandum [ECF 197] (which is hereby incorporated herein by reference), the Trustee's Rule 12(g) argument is without merit.

## I.     THE TRUSTEE HAS NOT STATED A CLAIM AS TO THE LOAN PROCEEDS (COUNTS I-VII)

### A.     The Trustee Cannot Adequately Plead That The Debtors Had A Property Interest in the Loan Proceeds

#### 1.     The Subsidiary Guaranties Contain Standard Language

The Trustee does not and cannot refute that the Credit Agreements and Subsidiary Guaranties are to be construed in accordance with New York law. Nor does the Trustee even attempt to address, let alone refute, the substantial New York case law cited at pages 18-19 of the MTD, which reflects and confirms that it is customary and consistent with

applicable state law for a guaranty of payment to provide for guarantor liability that is "primary and not secondary," absolute and unconditional in the full amount of the guaranteed obligations even if the borrower's underlying debt is later deemed invalid and the borrower itself escapes liability.

The Trustee does not provide the Court with any authority to disregard the plain language of the loan documents. Instead, he cites to only one case decided by an intermediate appellate court in another state: *North Carolina Nat'l Bank v. Johnson Furniture Co., of Mount Airy, Inc.*, 34 N.C. App. 134, 237 S.E. 2d 313 (N.C. App. 1977). That case has no application here. First, it was decided under North Carolina law. Second, the court's holding that the instrument at issue was not a "guaranty of payment" is at odds with New York law, which controls in this case. Third, it is inapposite.[3]

### 2.    It Is Common For Lenders To Require Subsidiary Guaranties

The Trustee offers no legal support for his contention that the Debtors should be viewed as "substantive borrowers" because, but for the Subsidiary Guarantors' agreement to have primary liability, Credit Suisse and the syndicated lenders would not have extended the financing.

As stated in the MTD, there is nothing unusual about a lender requiring subsidiary guaranties of payment to support the underwriting of a loan. Indeed, in *TOUSA*, the

---

[3] In *Johnson Furniture*, the individual defendants had signed a guaranty relating to credit extended by the plaintiff bank to the defendant furniture company. Several days later, the individual defendants conveyed a tract of land to their daughters (the "Land Transfer"). A year later, the bank obtained a judgment against the defendants and, thereafter, brought a fraudulent conveyance action to set aside the Land Transfer. One of the individual defendants sought to defend the fraudulent conveyance action on the ground that she was a guarantor of payment and, therefore, her liability for the debt began only at maturity and did not exist at the time of the Land Transfer. The court ruled that since by the terms of the guaranty she signed she agreed to be primarily liable, the contract established her as a "primary debtor." The court was not asked to and did not determine whether the individual defendants were "substantively borrowers" or whether they had a property interest in the loan proceeds.

Conveying Subsidiaries executed a "Subsidiary Guaranty" in connection with various bond indentures and "Carve Out and Completion Guarantees" in connection with the Transeastern Credit Agreements.  *See Tousa II*, slip op. D.E. 31 at 7 and 18.[4]  The "Subsidiary Guaranty" provided that "Each Subsidiary Guarantor agrees that this is a guarantee of payment and not a guarantee of collection ... [and] that its Obligations with regard to this Subsidiary Guaranty shall be absolute and unconditional." *Id.* at 7.  The "Carve Out and Completion Guarantees" provided "an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection." *Id.* at 18.

The court in *Tousa II* found the subsidiary guaranties to be part of a normal and usual financing transaction and wrote,  "...[the] subsidiary guaranties played a critical role in the bond offering because the subsidiaries provided a rich cash flow to the TOUSA enterprise... As such, the bondholders dealt with TOUSA and its subsidiaries 'as a consolidated enterprise that was interdependent, both in terms of structure and the flow of money.'").  *Id.* at 7-8.

### 3.    The Trustee Has Not Alleged That The Named "Borrower" Under The Credit Agreements Were "Shell Entities"

As to his "shell entity" theory, the Trustee does not refute that, at the time of the Credit Suisse loan closing, CS Borrower owned all of the membership interests in the Debtors and Other Project Entities that were actively developing numerous residential communities and that these valuable membership interests were pledged as collateral for the CS Loan.  Nor does the Trustee cite any legal authority for the proposition that a

---

[4] In *Tousa*, in addition to being guarantors as discussed above, the Conveying Subsidiaries were co-borrowers in connection with the "New Loan agreement" executed in July, 2007: "Unlike in the Transeastern Credits Agreements, both of these New Loan agreements named all of the Conveying Subsidiaries as 'Subsidiary Borrowers.'" *Tousa II*, slip op. D.E. 31 at 26.

company that owns all the membership interests in four active companies, is a "shell entity."  He only cites to the case of *Nautilus Ins. Co. v. Reueter*, 537 F.3d 733 (7th Cir. 2008),[5] Wikipedia Online Encyclopedia[6] and Black's Law Dictionary for the general proposition that a shell corporation has "no significant assets or operations."  Here, however, the Borrowers, as acknowledged by the Trustee in his pleading (TAC, ¶ 66), did have significant assets and, together with their affiliates, operated as a consolidated enterprise.

The fact that the subsidiaries/affiliates of CS Borrower and Conduit Lender pledged their assets to  collateralize the Credit Suisse loan transaction [Response at p. 7], does not support the Trustee's "shell entity" allegation.  Rather, this fact merely supports the conclusion that the Borrowers, Debtors and Other Project Entities operated as a "consolidated enterprise" as did the TOUSA companies.  *See Tousa II*, slip op. D.E. 31 at 8.  There is nothing unusual about related companies operating as a consolidated enterprise.

### 4.    The Master Restructure Agreement Does Not Support The Trustee's Position

The Trustee seeks to recharacterize the Debtors' status under the Subsidiary Guaranties by invoking an undefined term of convenience in the Master Restructuring

---

[5] The *Nautilus* case is not on point: it involved an appeal from a summary judgment in favor of an insurance carrier.  The issue was whether insurance was available in a series of negligent hiring suits relating to door-to-door salesmen.  As to certain policies, the court of appeals remanded the matter in light of conflicting evidence as to whether corporations that provided salesmen (who assaulted the plaintiffs) were "shells" of the magazine clearinghouse with which they did business.  The court of appeals made no findings as to whether the entities in question were, or were not, shell entities.

[6] Needless to say, Wikipedia is not considered as a reliable source for definitive authority. *Salta Group, Inc., v. McKinney*, 380 B.R. 515, 524 n.7 (C.D. Ill. 2008*). *See also, In re Darosa*, 2010 WL 4777548 at *4 (Bankr. D. Mass. Nov. 17, 2010) (noting that Wikipedia is a participatory cite which "allows anyone to input or change specific entries"); *In re Uni-Marts, LLC*, 404 B.R. 767, 777 n.3 (Bankr. D. Del. 2009) (noting that Wikipedia entry is not admissible as evidence under Fed. R. Evid. 802).

Agreement (the "MRA") signed two and a half years after the Credit Suisse loan closing and well after the Credit Suisse loans had gone into default and the guarantors' obligations under the loan documents had matured.  The argument is disingenuous at best.

The loan originated in June 2006 under the terms of two Credit Agreements which are part of the record. [ECF 76-1].  Those agreements *define* the "Borrower" as Ginn-LA CS Conduit Lender and Ginn-LA CS Borrower.[7]  The Subsidiaries are defined in the Credit Agreement as "Subsidiary Guarantors."[8]  As part of the loan closing, Subsidiary Guaranties were signed, which again defined the Borrower as CS Conduit Lender and CS Borrower and restated the relevant distinction between the Borrower and Guarantors.[9]  This relationship never changed.

In June 2008, two years after the loan originated, the Borrower defaulted. As acknowledged in the Forbearance Agreement (described below), an "Event of Default" triggered the full recourse obligation of the Guarantors. At the time of default, the parties executed an "Acknowledgement and Forbearance Agreement" (the "Forbearance Agreement"). [10]  (Ex. A to the Declaration of Stuart Margulies being filed concurrently

---

[7] The complete Credit Agreements are filed at ECF 76-1. The introductory paragraph of the Credit Agreements defines the "Borrower" as Ginn-LA CS Conduit Lender and Ginn-LA CS Borrower. The definition section of the Credit Agreement defines the "Borrower" "as described in the introductory paragraph." An excerpt from the Credit Agreements containing that language is attached hereto as Exhibit A.  For reasons that will be obvious, the Trustee did not include that definition page as part of the Credit Agreement excerpts he provided to the court. [ECF-140-1].

[8] An excerpt from the Credit Agreements containing this language is attached hereto as Exhibit B.

[9] The complete Subsidiary Guaranties are filed at ECF 76-1.  An excerpt containing that language is attached hereto as Exhibit C.

[10] The Forbearance Agreement is a loan document that is cited in the MRA and may be reviewed by the Court as part of this motion to dismiss as noted in the court order dismissing the Trustee's Second Amended Complaint. (DE 154  p.5-7).

herewith). The Forbearance Agreement reiterated the distinction between the "Borrower" and the subsidiary guarantors and acknowledged the default and the guarantors' now matured obligation to repay the loan.[11]  As a matter of convenience the guarantors, but not the Borrower, were described in the Forbearance Agreement as "FULL RECOURSE BORROWER PARTIES OTHER THAN THE BORROWERS." (*See* Exhibit E, Schedule 1 to the Forbearance Agreement).  While the nomenclature is awkward, it literally describes the status of the guarantors after the default.  Following the default, the guarantors were for the first time grouped "together with" the Borrower as parties that were obligated to pay the loan in full. ("FULL RECOURSE BORROWER PARTIES"). This was never a term in the Credit Agreement and the phrase never existed until the after the loan went into default.

Six months later, the parties executed the MRA. This is the document from which the Trustee culls the phrase "FULL RECOURSE BORROWERS" which he ascribes to the Debtors to support his proposition that the guarantors were "borrowers" *ab initio*. However, the MRA extracted this term from the Forbearance Agreement. The MRA, like the Forbearance Agreement and the Credit Agreements defines the same "Borrower" (CS Conduit Lender and CS Borrower) and repeats the definition of "FULL RECOURSE BORROWERS OTHER THAN BORROWERS" as the description of the guarantors, even including the same Schedule I as in the Forbearance Agreement (Ex. F).  Finally, the signature pages of the MRA[12] specifically note that by signing the agreements the parties are not changing their obligations as set out in the original loan agreement.

---

[11] An excerpt from the Forbearance Agreement containing this language is attached hereto as Exhibit D.
[12]  A copy of the signature page is attached hereto as Exhibit G.  The Trustee filed excerpts of the MRA at ECF 140-2 but did not include the signature page.

In short, the separate status of the Debtors/Guarantors in relation to the Borrower never changed from inception of the loan through default or the execution of the MRA. Each agreement over this time frame is specific in defining the Borrower separately from the guarantors. The post default label describing the guarantors as "FULL RECOURSE BORROWERS OTHER THAN BORROWERS"  cannot support the Trustee's out of context, incomplete ("FULL RECOURSE BORROWERS") mischaracterization that the guarantors were "borrowers" from the beginning.

### 5.    The Interrogatory Responses Do Not Support The Trustee's Position

The Trustee, in an effort to manufacture an argument that the defendants have admitted that the Loan Proceeds were property of the Debtors' estates, selectively quotes and mischaracterizes the Lubert-Adler Defendants' response to interrogatory Number 8, by providing a partial answer without even quoting the question. The response to the question asked does not concede, "effectively" or otherwise, that the Debtors had a "legal or equitable interest" [Response, p.13] in the Loan Proceeds or that the Loan Proceeds were treated as "*Debtor property*" [Response p.14, emphasis in the original]. The question and response at issue are reprinted in full:[13]

**QUESTION**:

8.    Regarding the transfers to Ginn and Lubert-Adler entities of Credit Suisse Loan Proceeds, and the guaranties and liens issued in connection with the loan transaction, please identify the consideration or value, if any, received by the Tesoro Debtors in exchange for:

---

[13] The complete interrogatory questions and answers, along with the supplemental answers to interrogatories 8 and 9 were filed by the Trustee at DE 140-2 (ex. 7).

(a)    the portion of the loan proceeds distribution credited to the Tesoro Debtors;

(b)    the guaranties they issued in connection with the loan transaction; and

(c)    the liens they issued in connection with the loan transaction.

**RESPONSE:**

In addition to the foregoing General Objections which are incorporated herein by reference, the Lubert-Adler Defendants object to this Interrogatory as being confusing. Subject to the objections asserted above, the Lubert-Adler Defendants respond as follows:

The transfers to the LA Fund III investment limited partnerships and Ginn were made pursuant to the terms of the Second Amended and Restated Agreement of Limited Partnership of Ginn-LA St. Lucie Ltd., LLLP which provided for distributions in the following order of priority:

1.    To the limited partners in repayment of their loans to Debtor Ginn-LA St. Lucie Ltd., LLLP, including interest thereon;

2.    To the limited partners, in proportion to their respective preferred return account balances;

3.    To the partners in proportion to the balance of their unreturned capital contributions; and

4.    The balance to the partners in proportion to their respective percentage interests (i.e., 20% to the general partner and 80% to the limited partners).

The question asked what was the consideration for the loan proceeds *credited* to Debtors. By its very terms, the question acknowledges that some entity <u>other than the Debtors</u> ascribed a portion of the loan proceeds for accounting purposes to the Debtors' projects. The interrogatory response merely describes the methodology that was used to internally allocate the Loan Proceeds to the separate Debtor Project Entities.

Subsequently, the Lubert-Adler Defendants filed a supplemental answer to this interrogatory, a fact not mentioned by the Trustee, describing the consideration for the liens and guarantees transferred. (DE 140-2, Ex.7). The supplemental response also did not mention, much less "admit," that the Loan Proceeds were the property of Debtor.

The answer was consistent with the other discovery responses provided to Trustee, and was also consistent with the Trustee's allegations in the TAC that none of the Loan Proceeds ever were property of the Debtors.

Notably, the Trustee ignores interrogatory 7 which requested, *inter alia*, a detailed breakdown of the "transfers of Credit Suisse Proceeds," the recipients of the funds and how the funds were "credited among the Projects."

As to the transfers of the Loan Proceeds, the Credit Agreements directed how the monies distributed at the June 8, 2006 loan closing were to be used, and provided that they:

> shall be applied... (i) to repay the Existing Indebtedness of the Borrower, its Subsidiaries and Bahamas Owner, (ii) to make certain distributions to the holders of Capital Stock in the Borrower in the amount of $333,125,000, and (iii) to pay the Transaction Costs.

*See* Section 2.9 of both Credit Agreements attached as Exhibits A and B to the Declaration of Stuart Margulies [D.E. 76-1].  In the Third Amended Complaint, the Trustee seeks to recover approximately $148,000,000 of the loan proceeds discussed in the above cited Section 2.9(ii) of the Credit Agreements (i.e., distributions in connection with "Capital Stock in the Borrower", not the Debtors) [14]  despite the fact that the Credit Agreements did not provide that the Debtors were  entitled to any portion of those funds.

The Lubert-Adler Defendants' response to interrogatory 7 (which the Trustee ignores) provides a detailed tracking of the flow of funds (identical to that discussed on

---

[14] The Trustee tries to muddy the waters by devoting two paragraphs on page 6 of his brief to conjecturing as to what the defendants "do *not* appear to contend" or "implicitly acknowledge" as to the Debtors' interest in the loan proceeds that are not the subject of this litigation (i.e. the funds that the Trustee is not seeking to recover).  Since those other proceeds are not relevant to the MTD, there has been no briefing relating to the Debtors' interest in those funds.  Indeed, it is for that reason that the best the Trustee can do is conjecture as to what the defendants "do *not* appear to contend" or "implicitly acknowledge."

pages 11-13 of the MTD) that demonstrates that on June 8, 2006, the loan proceeds were disbursed exactly as prescribed by the Credit Agreements: to pay transaction costs, existing indebtedness of "the Borrower, its Subsidiaries, and "Bahama Owner," and to holders of capital stock in the Borrower. It further demonstrates the debtors never received any of the loan proceeds  Indeed, the Trustee admits in paragraph 79 of the Third Amended that this is exactly how the monies were distributed.

The Trustee improperly seeks to extrapolate the reference (in interrogatory response 8) to the partnership agreements into an admission that the Debtors had an interest in the loan proceeds referenced in Section 2.9(ii) of the Credit Agreements. There was no such admission.

### 6.    The Trustee's Invocation of *Harwell* Is Of No Avail

In support of his position, the Trustee invokes the case of *Martinez v. Hutton (In re Harwell),* 628 F.3d 1312 (11th Cir. 2010).  *Harwell*, however, supports the defendants' position and not that of the Trustee. In *Harwell,*  the Eleventh Circuit reaffirmed that the "control" test it articulated in *Chase & Sanborn* remains good law and means what it says:  that to satisfy § 544's "property of the debtor" requirement, the debtor must have had control over the property that is the subject of a fraudulent transfer action.  *Harwell*, 628 F.3d at 1317-1318.

Otherwise, the specific facts and legal issues decided in *Harwell* are distinguishable from  those presented in this case.  In *Harwell,* the court considered the issue of whether an "initial transferee" held a property interest in the transferred funds or was instead merely a conduit.  Unlike here, the case did not involve the question of whether a debtor had a property interest in the transferred funds.  The court held that if a

transferee wants to take advantage of the "mere conduit" exception to liability as an initial transferee, it must have acted in good faith.

In *Harwell,* the debtor Harwell had settled disputes with two entities and had them send Harwell's settlement proceeds directly to Hutton, Harwell's attorney. Hutton deposited those funds into his attorneys' trust account and immediately thereafter sent the funds to subsequent transferees by issuing checks on his trust account. The plaintiff (Martinez) brought a fraudulent conveyance case under 11 U.S.C. § 548 and sought recovery against Hutton as an initial transferee under 11 U.S.C. § 550(a). Hutton tried to escape liability as an initial transferee by arguing that he was a mere conduit because he had no control of the funds in his trust account because they were client funds. The Eleventh Circuit, following a discussion of its prior "control" decisions, held that:

> [I]nitial recipients of the debtor's fraudulently-transferred funds who seek to take advantage of equitable exceptions to § 550(a)(1)'s statutory language must establish (1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were actually under the control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer.

*Id.* at 1323. Based on this standard and "given the bankruptcy court's assumptions about Hutton's major role in the fraudulent transfer of these funds at issue," the Eleventh Circuit reversed the district court's grant of summary judgment in favor of the attorney and remanded the case for further proceedings consistent with the opinion. *Id.* at 1324.

7.    The Other Eleventh Circuit "Control" Decisions Do Not
Support The Trustee's Position; The Language of the Credit
Agreements Directing the Use of the Loan Proceeds Precludes
a Finding of Control

The other Eleventh Circuit "control" cases discussed in *Harwell* and relied upon by the Trustee also do not further the Trustee's cause. While each of those cases discussed the issue of "control" for the purpose of determining whether a debtor or a transferee had a property interest in the transferred property, only *Chase & Sanborn*[15] discussed the control test as it relates to whether transferred property was "property of the debtor." 813 F.2d at 1181.[16]

In that regard, the Eleventh Circuit in *Chase & Sanborn* specifically recognized that the purpose of a fraudulent conveyance action "is to prevent a debtor from diminishing, to the detriment of some or all creditors, funds that are generally available for distribution to creditors." *Id.*   Accordingly, the Eleventh Circuit held that in determining whether property is "property of the debtor" for fraudulent transfer purposes, courts look to "the entire circumstance of the transactions" and "[t]he dispositive question is whether the Debtor had *control* over the subject funds."  *Id.* at 1181-82.  In applying this test, the Eleventh Circuit found that the debtor never had control of the funds even though they were on deposit for two days in an account titled in its name.  The Court stated,  " ...neither the use by the debtor of some of the funds for its own purposes nor the fact that the debtor's president [Duque] ordered the transfer can overcome the

---

[15] *Chase and Sanborn* involved a claim brought under sections §§ 544 and 548.

[16] *Nordberg v. Societe Generale Corp. (In re Chase & Sanborn)*, 848 F.2d 1196 (11th Cir. 1988), *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689 (11th Cir. 2005), and *Adreini & Co. v. Pony Express Delivery Services, Inc.)*, 440 F.3d 1296 (11th Cir. 2006), like *Harwell*, were each "conduit" cases

overwhelming evidence that Duque, not Chase & Sanborn, controlled the transfer at issue." *Chase & Sanborn*, 813 F.2d at 1182.

The Lubert Adler Defendants, in their prior Motion To Dismiss the Second Amended Complaint [ECF 76], invoked the control test articulated by the Eleventh Circuit in *Chase & Sanborn*. This Court, however, relying on *Tousa I*, rejected the applicability of the *Chase & Sanborn* control test, stating:

> Substantially similar legal arguments, as those advanced by the Movants, were rejected by Judge Olson in *In re TOUSA, Inc.,* 422 B.R. 783, 873 (Bankr. S.D. Fla. 2009). In *TOUSA,* as here, the defendants relied on *Norberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir. 1987), to argue that the conveying subsidiary debtors had no property interest in loan proceeds because they did not "control" the property. *Id.* Citing several examples of interest in property that do not encompass control of the disposition of the property, Judge Olson noted that the broad "control test" urged by the defendants would "negate the paradigmatic example of a fraudulent transfer, in which the owner of an insolvent corporation transfers corporate funds to a personal account for his personal use." *TOUSA,* 422 B.R. at 874.

*Opinion*, at p. 8.

Recently, however, *Tousa II* reversed *Tousa I* on this exact issue. The District Court specifically held:

> The Bankruptcy Court erred by failing to apply the Eleventh Circuit's control test to the totality of the circumstances as established by the actual documents governing the transactions. Rather it dismissed the test, expressly rejecting as "clearly wrong" the proposition that 'control' is an essential element of any property interest under Section 548. [Op., p.157]. The Bankruptcy Court expressed the view that a control test "would negate the paradigmatic example of a fraudulent transfer, in which the

---

wherein the Eleventh Circuit considered whether the trustee could recover against a transferee party under § 550(a).

> owner of an insolvent corporation transfers corporate funds to a personal account for his personal use" because the owner's *de facto* control over the funds cannot vitiate the corporation's control over and property interest in the funds. [Id. at 158]. The Bankruptcy Court compounded its error in not applying the "control test" by relying on the Bankruptcy Code's definition of "Transfer" and fraudulent transfers as including "involuntary" and "indirect transfers." [*Id.* (citing 11 U.S.C. §§ 101(54)(D), 548(a)(1))]. … The Bankruptcy Court is legally incorrect in its interpretation, and further incorrect in concluding the Conveying Subsidiaries had a property interest sufficient for the Code requirements because they were co-borrowers on the New Loans.

*See Tousa II,* slip op. D.E. 31 at 51-52.

The court in *Tousa II,* applying the Eleventh Circuit's control test, went on to hold, "In determining the totality of the circumstances, control does not exist where the loan from the third party was conditioned on payment to a particular creditor." *Id.* at 51 (citing *Howdeshell of Ft. Myers v. Dunham-Bush, Inc.,* (*In re Howdeshell of Fort Myers),* 55 B.R. 470, 474-75 (Bankr. M.D. Fla. 1985)).[17]

Based on these standards and because the loan documents directed how the loan proceeds were to be used, the court found that the Conveying Subsidiaries – even though they were co-borrowers - did not control the funds at issue because they lacked the ability to direct the use of loan proceeds. The *Tousa II* Court wrote:

> Without any factual dispute in the record, both the First and Second Lien Term Loan Agreements directed that the proceeds of the New Loans be used to satisfy the Transeastern Settlement Specifically, Section 4.12 of the agreements required the proceeds of the loans to be used to fund the "Acquisition," to the Transeastern JV Entities of

---

[17] *See also In re Bankest Capital Corp.* 374 B.R.333, 338-339 (Bankr. S.D. Fla. 2007) (control cannot be found where the debtor did not have the power to designate which party will receive the funds or to actually disburse the funds to that payee) (quoting *In re Safe-T-Brake of S. Fla., Inc.,* 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993)).

> an amount necessary to discharge all amounts of
> outstanding indebtedness of the Transeastern JV Entities.
>
> ...
>
> Here, the circumstances of the transactions clearly
> demonstrate that the Conveying Subsidiaries did not
> control the funds transferred to *TOUSA,* who, as the
> primary borrower, was the only party with actual authority
> under the New Loan documents to control the loan
> proceeds' distribution. . . .
>
> The overwhelming evidence was that TOUSA and not the
> Conveying Subsidiaries, controlled the transfers at issue.
> *See In re Chase & Sanborn,* 813 F.2d at 1182 (finding no
> control by the debtor under similar circumstances).
> Accordingly, I conclude that the funds were not property of
> the debtor…

*Id.* at 49, 52 and 53.

The Lubert-Adler Defendants respectfully submit that based on the control test articulated in *Chase & Sanborn,* the District Court's reversal of *Tousa I,*  the clear language in the Credit Agreements and the admissions of the Trustee that the Credit Agreements dictated how the loan proceeds were to be used, this Court should reconsider its prior decision on the issue of "control" and find that the Trustee has not adequately pleaded "control" and, therefore, has not adequately pleaded that the Debtors had a property interest in the Loan Proceeds within the meaning of 11 U.S.C. § 544.

Even if the Debtors here could be characterized as co-borrowers (like the Conveying Subsidiaries in *TOUSA*), the language of section 2.9 of both Credit Agreements clearly provides that the Debtors had no right to receive or direct the disposition of the Loan Proceeds.   Therefore, the Trustee has failed to allege that the Debtors had a property interest in the Loan Proceeds within the meaning of 11 U.S.C. § 544, a necessary element of his claims.

**B.**   **The Trustee Has Presented No Rebuttal Authority Supporting his Contention that the Collapsing Doctrine Can be Used to Manufacture a Property Interest in the Loan Proceeds**

The Trustee improperly invokes the Eleventh Circuit "control" cases for the proposition that this Court, in an effort "to expose fraudulent dealings" and under the label of "collapsing," may use its equitable powers to rewrite the loan documents and create property interests not otherwise recognized under applicable state law. This Court cannot invoke its equitable powers to create an otherwise unrecognized property interest in favor of the Debtors or to interpret § 544 to include transfers of property of affiliates of the Debtors.[18]

As recognized by the Supreme Court in the seminal case *Butner v. U.S.,* 440 U.S. 48, 99 S. Ct. 914,  59 L.Ed.2d 136 (1979):

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such [property] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving   "a windfall merely by reason of the happenstance of bankruptcy."

99 S. Ct. at 918 (quoting *Lewis v. Manufacturers Nat'l Bank,* 364 U.S. 603, 81 S.Ct. 347, 350 (1961)).

---

[18] The Trustee may not claim, on behalf of the Debtors, the Borrowers' interest in the Loan Proceeds. Congress did not intend to extend a trustee's § 544 strong arm powers to recover property of a debtor's affiliates. The Eleventh Circuit has recognized the statutory canon of interpretation that "Congress is presumed to know the context of existing relevant law," and a court may presume that where Congress was aware of language in one section but consciously chose not to mirror it in another, the omission was intentional. *In re Griffith,* 206 F.3d 1389, 1394 (11th Cir. 2000). Congress, in drafting § 544, did not provide for the avoidance of any transfer "of the property of the debtor or any of its affiliates." Rather, § 544 provides for the avoidance of only any transfer "of the property of the debtor." Congress included a definition of the term "affiliates" in §101(2) and could have, but did not, include this term in §544. It is presumed that Congress knew how to word § 544 to permit a trustee to seek recovery of property of both a debtor and its affiliates but chose not to do so.

Accordingly, it is a fundamental tenet of bankruptcy jurisdiction as a whole, that while bankruptcy courts may be courts of equity, they do not have jurisdiction to create property interests that do not exist under applicable state law. *See First Fidelity Bank N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.),* 59 F.3d 423, 427 (3d Cir. 1995) ("A federal court in bankruptcy is not allowed to upend the property law of the state in which its sits, for to do so would encourage forum shopping and allow a party to receive a windfall merely by reason of the happenstance of bankruptcy.").

There is simply no Eleventh Circuit decision that stands for the proposition that the proper legal mechanism for determining an entity's interest in property – be it a debtor under §§ 544 or 548 or a transferee under § 550(a) — is a collapsing test. To the contrary, the Eleventh Circuit has stated on multiple occasions that the sole and proper test for determining whether an entity has an interest in property for purposes of a fraudulent transfer is the control test.

The Trustee attempts to downplay the fact that the transfer of the Loan Proceeds does not fit within the paradigmatic test articulated in *HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir. 1995)  and its progeny.  But that is precisely the problem with the Trustee's claim. The Loan Proceeds that the Trustee seeks to recover were <u>never</u> property of the Debtors. Collapsing may not be used to deliver to the Debtors property that never belonged to them.

The Trustee's reliance on *In re Best Products, Inc.,* 157 B.R. 222 (Bankr. S.D.N.Y. 1993) for the proposition that other courts have used the collapsing test to create a previously unrecognized legal interest in transferred property is misplaced.  As

discussed more fully at footnote 16 of the MTD, the *Best Products* case was really a "true lease" case. While the court used the term "collapsing test," it did so as a misnomer to describe what the Eleventh Circuit refers to as the "economic realities test."[19] Since the case before this Court is not a true lease case, the *Best Products* case is not applicable.

Likewise, the Trustee's citation to *In re Mervyn's Holdings* for the proposition that the loan transaction should be rewritten so that the Trustee may recover the Loan Proceeds is misplaced. The Trustee has not and cannot allege any "devastating" consequence to the Debtors by virtue of the transfer of the Loan Proceeds. The Debtors never had a property interest in those funds.

## II.    THE TRUSTEE HAS NOT ADEQUATELY PLEADED HIS GUARANTY/LIEN CLAIMS (COUNTS VIII-XII)

### A.    Since The First Loan Liens Are Unavoidable, The Trustee Cannot State A Claim

The Trustee is not entitled to any recovery or remedy in connection with the First Loan Liens because he cannot establish that they are avoidable. The Trustee, however, refuses to acknowledge this basic precept of the Bankruptcy Code. It is the Trustee, not

---

[19] Generally courts analyzing whether a lease is a true lease or secured financing arrangement under 11 U.S.C. §502(b)(6) refer to the federal common law "economic realities test" to determine whether a lease is a disguised financing. *See In re Builders Transport, Inc,,* 471 F.3d 1178, 1187 (11th Cir. 2006); *In re Pillowtex, Inc.,* 349 F.3d 711 (3d Cir. Del. 2003). The economic reality test requires the court to consider the following five significant factors: "(1) whether the lease creates an equity interest in the lessee; (2) whether the lessee is obligated to provide comprehensive insurance in favor of the lessor; (3) whether the lessee pays sales tax, (4) whether the lessee pays all taxes, maintenance, and repairs, and (5) whether the lessee holds the lessor harmless or assumes the risk of loss." *In re Tulsa Port Warehouse Co., Inc.,* 690 F.2d 809, 811 (10th Cir. 1982). The economic realities test has been used  both by lessors and debtors defensively and offensively in bankruptcy cases. For example, lessors will assert that the lease is a secured financing vehicle so as to avoid the limitation on lessor damages under §502(b)(6). *In re Builders Transport, Inc,,* 471 F.3d at 1187. Conversely, debtors will assert that the lease is truly a secured financing vehicle so as to avoid being compelled to make lease payments under 11 U.S.C. §365, and instead only be required to pay adequate protection payments (often an amount less than the lease payments) under § 363 of the Bankruptcy Code. *In re Pillowtex, Inc.,* 349 F.3d at 717-718.

the defendants, who is trying to escape the "intended consequence" of the Challenge Order.  And he should be estopped from doing so.

The Trustee completely disregards the arguments made on page 37 of the MTD. It is of no moment that the Trustee states that he "does not seek to avoid the First Loan Liens as to Credit Suisse or the First Lien Lenders." [Response, page 22].  The First Loans Liens need to be "avoidable" for the Trustee to be able to state a claim under § 544.  *See In re Int'l Admin. Servs., Inc.,* 408 F.3d 689, 706 (11th Cir. 2005).  The Challenge Order, entered by this Court at the request of the Trustee, specifically determined that the transfer of the First Liens did not constitute a voidable transfer and specifically provided that the First Liens are "nonavoidable" --- period. [Case No. 08-29769-PGH at ECF 77 and 88].  Contrary to the Trustee's contention, there is nothing improper in construing the Challenge Order as ruling that the First Loan Liens are "nonavoidable."  That is precisely what this Court's Order says in the plainest of language.  Indeed, the predicate for permitting the Trustee to sell virtually all of the Debtors' assets was this "nonavoidable" finding.

In the Order dismissing the Second Amended Complaint (the "MTD Order") [ECF 154], as to the law of the case argument raised by the Lubert-Adler Defendants in their motion to dismiss the Second Amended Complaint, [ECF 76], this Court focused on the "release and waiver" language contained in the Challenge Order but did not address the lien validation/nonavoidability argument.  *See* MTD Order at p. 14.

Here, however, the Lubert-Adler Defendants do not argue that the releases and waivers the Trustee chose to give to Credit Suisse and the First Lien Lenders preclude the Trustee's claims against the defendants. Instead, the Lubert-Adler Defendants argue that

the Trustee's lien validation admissions and this Court's lien validation findings and rulings—totally separate from the releases and waivers the Trustee chose to give to Credit Suisse and the First Lien Lenders—preclude the Trustee's current claims to avoid the First Loan Liens in Counts VII – XII of the TAC.  Because avoidability of the transfer under § 544 is a prerequisite to the Trustee's entitlement to a remedy, the Trustee's claims to the First Loan Liens fail.[20]

### B.    The Trustee's Position That §550(a) Permits the Recovery of the Full Value of the Liens is Incorrect

#### 1.    Section 551 Is The Appropriate Remedy and The Trustee Waived That Relief By Selling the Collateral

In his response, the Trustee fails to address the fact that the property subject to the liens the Trustee now seeks to avoid was property of the estate as of the Petition Date, and the only reason that that property is not currently property of the estate is because the Trustee voluntarily sold that property.

---

[20] The Lubert-Adler Defendants wish to bring to the Court's attention a Second Circuit opinion that was issued subsequent to the filing of the MTD: *Adelphia Recovery Trust v. HSBC Bank U.S.A. (In re Adelphia Recovery Trust)*, No. 09-0799, 2011 WL 420428 (2d Cir. Feb. 8, 2011) (the "*Adelphia* Case"). That case involved Adelphia's pre-petition purchase from certain banks of several liens encumbering assets of Niagara Frontier Hockey, L.P. ("NFHLP"). Subsequently, Adelphia and NFHLP filed separate bankruptcy cases.  Adelphia participated in NFHLP's § 363 sale of the assets underlying the liens by representing to the NFHLP bankruptcy court that it (Adelphia) held the liens on the assets and that the sale was proper. Subsequent to the NFHLP § 363 sale, Adelphia, in its own bankruptcy case, sued the banks, asserting that Adelphia's purchase of the liens constituted an avoidable fraudulent transfer. The Second Circuit held that, as a result of Adelphia's representation to the NFHLP bankruptcy court that the Adelphia estate was the proper owner of the liens, Adelphia was judicially estopped from thereafter pursuing fraudulent transfer actions against the lenders because Adelphia had "gained a significant unfair advantage: immediate sale of the [assets] but preservation of its ability to bring avoidance actions against the Banks.  The Banks, meanwhile, lots the ability to reclaim their collateral in the event that any fraudulent conveyance action proved successful." *Id.* at *16.  The *Adelphia* Court's analysis is applicable to this case as well.  Here, the Trustee, having previously represented to the Court that the First Loan Liens were valid nonavoidable liens, should be estopped from now arguing otherwise.   To permit the Trustee to flip-flop as to the nonavoidability of the First Loan Liens would undercut the Challenge Order and significantly prejudice the Defendants. The Trustee voluntarily obliterated the collateral and his § 551 remedy.  Indeed, it is for that reason, that the Trustee is seeking a remedy under §550. As discussed in Subsection B,  below, such a remedy  cannot properly be applied in this case.

Further, the cases cited by the Trustee in support of his argument that he is not limited to recovery under § 551 are clearly distinguishable from the facts presented here. The case of *Bakst v. Wetzel (In re Kingsley),* 518 F.3d 874 (11th Cir. 2008), is readily distinguishable for two reasons.  First, the property transferred was cash and not a lien, and therefore recovery under § 551 was necessarily not an available remedy.  Second, the property transferred was not property of the estate at the commencement of the bankruptcy case. *Id*. at 877-78. Given these distinguishing factors, *Kingsley* bears no relevance to this case.  Similarly, in *Feltman v. Warmus (In re America Way Serv. Corp),* 229 B.R. 496 (Bankr. S.D. Fla. 1999), the property transferred - collectible cars, a yacht and an airplane - were not non-possessory liens and, therefore, the *American Way* court could not impose a remedy under § 551.

The final case cited by the Trustee is *Rodriguze v. Drive Fin. Servs. L.P. (In re Trout),* 609 F.3d 1106 (10th Cir. 2010), a case discussed in the MTD.  It is not at all clear why the Trustee cited *Trout*: the Tenth Circuit found the appropriate remedy available to a trustee who has avoided a lien is the remedy provided for by § 551 and rejected the very arguments being made by the Trustee here.  In *Trout,* the trustee asserted that the court should award monetary relief under § 550 to compensate for the fact that the collateral securing the avoided lien had depreciated.  The Tenth Circuit rejected that argument finding that avoidance of the lien alone was sufficient.  Specifically, the Tenth Circuit explained:

> The "property" that was transferred here was the perfected security interest.   The Trustee makes a number of arguments and hypotheticals based on the declining value of the *collateral,* but the vehicle itself was never transferred.  The bankruptcy estate would have had an asset which was declining in value *regardless* of whether the

> debtor transferred the lien during the preference period.
> Rather, by virtue of the transferred security interest, a
> creditor obtained a leg up over unsecured creditors in the
> impending bankruptcy; when that lien was avoided and
> preserved for the benefit of the estate, that creditor had to
> take its place with the general unsecured creditors, and,
> having obtained § 547 and § 551 relief, the Trustee gained
> priority over any junior liens on the same collateral.

*Id.* at 1112 (emphasis in original).

Further, the Tenth Circuit noted that in all cases where diminution in value was considered by the court in awarding monetary relief under §550(a)(1), the "transfer" involved was physical property and not a lien.  *Id.* at n.5.  The Tenth Circuit explained that permitting a monetary award to compensate the trustee for the value of the collateral securing the lien as of the time of the transfer would result in a windfall to the estate and would not be consistent with the Bankruptcy Code explaining:

> The Code does not guarantee that assets recovered will be
> worth what they were at any relevant valuation date; it only
> ensures that the estate will be back in the same place as if
> the transfer had not occurred.  Certainly, depending on the
> passage of time, the collateral may have devalued, but that
> would have happened even if the debtor had never
> transferred the security interest.

*Id* at 1112 (internal citations omitted).  *See also  In re Haberman,* 347 B.R. 411, 417 (10th Cir. B.A.P. 2006)("[T]here is always a risk that any great delay in the recovery of collateral may result in diminution of its value.  That, however, is a risk that any creditor would have, and the Trustee should not be elevated to a higher position.") *aff'd*  516 F.3d 1207 (10th Cir. 2008)).  Finally, the court noted that where the trustee has the ability to sell the property under § 363 and realize the value of the lien he recovers under § 551, an award of a monetary recovery is even less warranted.  *In re Trout,* 609 F.3d at 1113.

In sum, the Trustee has failed to rebut the Defendants' arguments that where (i) the transfer to be avoided is a lien, (ii) the bankruptcy estate possessed the underlying collateral as of the petition date, and (iii) the trustee voluntarily sold that collateral, the trustee is not entitled to recover the value of the lien at the time it was transferred, regardless of whether the collateral securing the lien has depreciated.

At the inception of this case, the Trustee could have sought to avoid the liens and the § 551 remedy available to him would have made him whole. The Trustee opted instead to sell the collateral and walk away from his § 551 remedy. At the hearing before this Court in connection with the Lubert-Adler's prior Motion to Dismiss the Trustee's Second Amended Complaint, the Trustee admitted that (i) at the inception of these bankruptcy cases, he had had a fraudulent transfer claim against Credit Suisse and the First Lien Lenders to avoid the liens that are the subject of the TAC; and (ii) exercising his business judgment, he determined to validate the liens and release Credit Suisse and the First Lien Lenders: the Trustee "believed the better case" was against the Lubert-Adler Defendants and the other defendants. *See Transcript of the hearing on the Motion to Dismiss Second Amended Complaint at pp. 58-59.* And this Court expressed serious concern for the Trustee's choice: "I have to tell you that I'm still just completely puzzled by why you [referring to the Trustee] didn't pursue Credit Suisse. To me, it's a much easier cause of action." *See Transcript of the hearing on the Motion to Dismiss Second Amended Complaint at p. 65.*

The Trustee opted to sell the collateral and walk away from his § 551 remedy. The Trustee, relying heavily on *Tousa I*, made the wrong choice. And the Trustee alone is accountable for his choice.

>    2.    **Under *TOUSA II*,  the Trustee is Not Entitled to Recovery From the Defendants Under §550(a)(1) and is Limited to Seeking Recovery Under §550(a)(2)**

As set forth above, subsequent to the filing of the motion to dismiss, the *Tousa II* opinion was published.  In *Tousa II,* the court held that when a trustee seeks to recover the proceeds of a loan which was secured by avoidable liens, the trustee is limited to seeking recovery under § 550(a)(2) from the entity that received the proceeds the loan. *Tousa II,* slip op. D.E. 31 at 100-101.  In other words, where it is alleged that an entity received the proceeds of the loan, no recovery can be had against it under § 550(a)(1) as an "entity for whose benefit" the underlying liens were given.  *Id*.  As the *Tousa II* Court explained:

> the "for whose benefit" language does not apply where the "benefit" is not the immediate and necessary consequence of the initial transfer, but flows from the manner in which the transfer is *used* by its recipient – the "benefit must derive directly from the [initial] transfer, not from the use to which it is put by the transferee…" **Thus because the Transeastern Lenders [the defendants] were "subsequent transferees" of the proceeds backed by the liens,** the Senior Transeastern Lenders do not qualify as "entities for whose benefit" the transfers were made within §55(a)(1)'s meaning.

*Tousa II,*  slip op. D.E. 31 at 100-101 (bold added).

Applying the reasoning of *Tousa II* to the facts of this case, the Trustee cannot seek recovery from the Defendants under § 550(a)(1) as entities "for whose benefit" the liens and guarantees were transferred because the Trustee alleges that the Defendants were transferees of the Loan Proceeds in connection with the underlying liens that the Debtors had issued.

### III.    MOVANTS' ARGUMENTS ARE NOT PRECLUDED BY RULES 12(g) AND (h)

The Lubert-Adler Defendants request that this Court reject the Trustee's argument that the Defendants' arguments relating to their § 550(a)(1) defense should be barred under Rules 12(g)(2) and (h)(2).  In support, the Lubert-Adler Defendants incorporate herein by reference the Investor Defendants' Reply Memorandum in Support of Their Motion To Dismiss.  [ECF 197].

### IV.    CONCLUSION

For all the reasons set forth in the MTD and above, the Third Amended Complaint should be dismissed in its entirety.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 21st day of February, 2011, upon those parties registered to receive Notices of Electronic Filing in this case as indicated on the Service List attached here to as **Exhibit A**; and by First Class Mail upon those parties indicated on the Service List attached hereto as **Exhibit B**.

Dated: February 21, 2011                    Respectfully submitted,

                                            BERGER SINGERMAN, P.A.
                                            Counsel to Ira M. Lubert, Dean S. Adler
                                            Lubert-Adler Management Co., L.P.,
                                            Lubert-Adler Group IV, L.P., Lubert-Adler
                                            Real Estate Fund IV, L.P., Lubert-Adler
                                            Real Estate Parallel Fund IV, L.P., Lubert-
                                            Adler Capital Real Estate Fund IV, L.P.,
                                            200 South Biscayne Boulevard, Suite 1000
                                            Miami, Florida  33131
                                            Tel.: (305) 755-9500/Fax: (305) 714-4340

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A)

By: _s/ Paul Steven Singerman_
Paul Steven Singerman
Fla. Bar No. 378860
singerman@bergersingerman.com

- AND -

KLEHR HARRISON HARVEY BRANZBURG LLP
William A. Harvey
Rona J. Rosen
1835 Market Street
Philadelphia, PA 191103
(215) 568-6060
Fax: (215) 568-6603
_Admitted pro se_

## EXHIBIT A - SERVICE LIST

Pursuant to the Court's Electronic Mailing Notice List, the following parties are currently registered to receive Notice of Electronic Filings in this adversary proceeding:

**Scott L Baena , Esq.**
sbaena@bilzin.com
eservice@bilzin.com
lflores@bilzin.com
abeck@bilzin.com

**Harold D Moorefield Jr.**
hmoorefield@stearnsweaver.com
cgraver@stearnsweaver.com
larrazola@stearnsweaver.com
rross@stearnsweaver.com
mmesones-mori@stearnsweaver.com

**Stephen D. Busey, Esq.**
Allan E. Wulbern, Esq.
awulbern@smithhulsey.com
kgammill@smithhulsey.com
jbolling@smithhulsey.com
asyed@smithhulsey.com

**Robert N Gilbert, Esq**.
rgilbert@carltonfields.com
kdemar@carltonfields.com

**Lynn F. Chandler, Esq.**
lynn.chandler@smithmoorelaw.com
jeff.macharg@smithmoorelaw.com
jon.heyl@smithmoorelaw.com
johanne.bloom@smithmoorelaw.com
devire.robinson@smithmoorelaw.com

**Matthew W. Buttrick, Esq.**
mbuttrick@stearsnweaver.com
cgraver @stearsnweaver.com
mmesones-mori@stearnsweaver.com
stamm@stearnsweaver.com

**Charles W. Thorckmorton, Esq.**
cwt@kttlaw.com
lf@kttlaw.com
la@kttlaw.com

## EXHIBIT B -SERVICE LIST

## Copies will be provided via regular U.S. mail upon the following:

Eugene E. Stearns, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL 33130

Harold D. Moorefield, Jr., Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL 33130

Robert Gilbert, Esq.
525 Okeechobee Boulevard
Suite 1200
West Palm Beach, FL 33401

Scott L. Baena, Esq.
Jay M. Sakalo, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-5340

Stephen B. Busey, Esq.
Allan E. Wulbern, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202

Andrew Stearns, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL 33130

Lynn F. Chandler, Esq.
Smith Moore Leatherwood LLP
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202

Charles W. Throckmorton, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134

Matthew W. Buttrick, Esq.
Stearns Weaver Miller et al.
150 West Flagler, Suite 2200
Miami, FL 33130

Rona J. Rosen, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

William A. Harvey, Esq.
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

Sally McDonald Henry, Esq.
Four Times Square
New York, NY 10036

Ropes & Gray
D. Ross Martin, Esq.
Peter L. Welsh, Esq.
Keith H. Wofford, Esq.
One International Place
Boston, MA 02110-2624

Blackacre Capital Partners, L.P.
299 Park Avenue
New York, New York 10171

City of Philadelphia Sinking Fund
Commission, Trustee for the Philadelphia
Gas Works Retirement Reserve Fund
1401 John F. Kennedy Boulevard
Suite 640
Philadelphia, PA 19102-1678

Mellon Trust of New England, N.A. As Trustee for Kodak
Retirement Income Plan Trust
135 Santilli Highway
Everett, MA 02149-1950

Miriam D. Glantz
50 Belmond Avenue
Suite 310
Bala Cynwyd, PA 19004

Terry K. Watanabe
TKW Enterprises
2033 Gateway Place, Suite 670
San Jose, CA 95110

Joan Cloetingh
P.O. Box 685
Kimberton, PA 19442

Bonnie Kay Marks
1070 Mill Road Circle
Rydal, PA

Carolyn McCulloch
Five Radnor Corporate Center
MPS Capital, Inc., Suite 520
Radnor, PA 19087

Patricia I. Chen, Esq.
Alison Mclaughlin, Esq.
800 Boylston Street
Boston, MA 02199

Donald Lewis
Four Time Square
New York, NY 10036