**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>GINN-LA ST. LUCIE LTD., LLLP, *et al.*,<br><br>　　　　　　　　　　　　Debtors.<br>_____/ | **CASE NO. 08-29769-PGH**<br>All Cases Jointly Administered<br><br>Chapter 7<br><br>(4 Cases Substantively Consolidated Under Lead Case No. 08-29769-PGH)[1/] |
| In re:<br>GINN-LA QUAIL WEST LTD., LLLP, *et al.*,<br><br>　　　　　　　　　　　　Debtors.<br>_____/ | (3 Cases Substantively Consolidated Under Lead Case No. 08-29774-PGH)[2/] |
| DREW M. DILLWORTH, Chapter 7 Trustee,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>EDWARD R. GINN, III, et al.<br><br>　　　　　　　　　　　　Defendants.<br>_____/ | **ADV. PRO. NO. 10-02976-PGH** |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
THE "GINN," "LUBERT-ADLER," AND "INVESTOR" DEFENDANTS'
MOTIONS TO DISMISS THIRD AMENDED COMPLAINT,
ADDRESSING *IN RE TOUSA* (S.D. FLA. FEB. 11, 2011) (GOLD, J.)**

　　　　Plaintiff Drew M. Dillworth ("Trustee Dillworth"), in his capacity as Chapter 7 Trustee for the Tesoro and Quail West Debtors' Estates, files this supplemental memorandum in opposition to the Ginn, Lubert-Adler, and Investor Defendants' Motions to Dismiss [ECF Nos. 165, 172, 174].

---

[1/] The "Tesoro Debtors' Estates" (Nos. 08-29769-PGH, 08-29770-PGH, 08-29772-PGH, and 08-29773-PGH) are substantively consolidated into Lead Case No. 08-29769-PGH. Order [ECF No. 308/309]. The "Tesoro Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA St. Lucie Ltd., LLLP – 5632; (ii) Ginn-St Lucie GP, LLC – 0983; (iii) Tesoro Golf Club Condo., LLC – 4385; and (iv) The Tesoro Club, LLC – 1917. *See* 11 U.S.C. § 342(c)(1).

[2/] The "Quail West Debtors' Estates" (Nos. 08-29774-PGH, 08-29775-PGH, and 08-29776-PGH) are substantively consolidated into Lead Case No. 08-29774-PGH. Order [ECF No. 34]. The "Quail West Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA Quail West Ltd., LLLP – 2397; (ii) Ginn-Quail West Beach, LLC – 9142; and (iii) Ginn-Quail West GP, LLC – 6313. *See* 11 U.S.C. § 342(c)(1).

-2-

## SUPPLEMENTAL ARGUMENT

On the same day that Trustee Dillworth submitted his initial memorandum in opposition to the Motions to Dismiss listed above [ECF No. 186], the first of the *In re Tousa* appeals was decided in a lengthy Opinion by District Judge Alan S. Gold. *See In re Tousa, Inc.*, Case No. 10-cv-60017, ECF No. 131 (S.D. Fla. Feb. 11, 2011) (Gold, J.) (hereafter, "*Tousa* Opinion" or "Op.").

In anticipation of the upcoming hearing on Defendants' Motions to Dismiss later this week, this supplemental memorandum addresses three issues relating to the *Tousa* opinion:

- A. Did Judge Gold correctly interpret the Eleventh Circuit test for determining whether a debtor had an interest in transferred property;

- B. Is Judge Gold's interpretation of that test binding on this Court in the present case; and

- C. What impact, if any, does Judge Gold's opinion have on the outcome of the pending Motions to Dismiss herein?

We submit the answer to the first two questions is "no," and the answer to the third is "little, if any."

### A. In *In re Tousa*, Judge Gold Misinterpreted The Eleventh Circuit Test For Determining Whether A Debtor Had An Interest In Transferred Property

In the wake of the now-reported decision in *In re Harwell*, 628 F.3d 1312 (11th Cir. 2010), there should not be any debate as to what the Eleventh Circuit believes to be the applicable test for determining whether a debtor had a sufficient interest in transferred property to permit avoidance of the transfer for the benefit of the debtor's estate. Referencing its *In re Chase & Sanborn* decisions, the Eleventh Circuit stated in pertinent part:

> [We have] adopted a flexible, pragmatic, equitable approach of looking beyond the particular transfer in question to the circumstances of the transaction in its entirety.
>
> * * *
>
> "*[T]he conrol test . . . simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable*."

*Id*. at 1318-19, 1322 (citing/quoting *Nordberg v. Sanchez*, 813 F.2d 1177, 1181-82 (11th Cir. 1987); *Nordberg v. Societe Generale*, 848 F.2d 1196, 1199 (11th Cir. 1988)) (emphasis in original).

Nonetheless, in *In re Tousa*, Judge Gold interpreted the Eleventh Circuit's control test to be far more defined and restrictive. In his words:

> The Eleventh Circuit's control test *encompasses two elements*: (1) the power to designate which party will receive the funds, and (2) the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

Op., 50-51 (emphasis added).

Notably, the lone authority cited for that proposition was *not* an Eleventh Circuit decision, but, rather, a Bankruptcy Court decision in a preference action involving the "earmarking" doctrine. *In re Safe-T-Brake of S. Fla., Inc. (Tolz v. Barnett Bank of S. Fla., N.A.)*, 162 B.R. 359 (Bankr. S.D. Fla. 1993). There, after lamenting that prior decisions "offer[ed] no parameters for determining just how much control by the debtor is 'enough' to give rise to an 'interest in property,'" visiting Bankruptcy Judge Robert E. Ginsberg took it upon himself to "fill[] th[at] gap" with "a more concrete test" advocated in a Seventh Circuit dissent:

> In his dissent in *Smith*, Judge Flaum set forth a logical approach for determining when a debtor exercises sufficient 'control' over property to give rise to an interest in that property . . . in the earmarking context:
>
> "[C]ontrol has two components: first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid."

*Id.* at 365 (quoting *Matter of Smith*, 966 F.2d 1527, 1539 (7th Cir. 1992) (Flaum, J., dissenting)).

Visiting Judge Ginsberg then went on to observe that his reliance on that dissent was "ironic" in light of where he was visiting *from*:

> This is ironic since were this court sitting in its home district, the Northern District of Illinois, it would be bound by the majority in *Smith* and could not rely on Judge Flaum's dissent. Fortunately, the court suffers from no such *disability* while sitting in the Southern District of Florida.

*Id.* at 365 n. 2 (emphasis added).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

In other words, what Judge Gold characterized as "the Eleventh Circuit's control test" is *not* the Eleventh Circuit's test. It is, ironically, a test adopted by a Bankruptcy Judge from Illinois in reliance on a "suggest[ion]" made in a Seventh Circuit dissenting opinion authored by Judge Flaum. *See Matter of Smith*, 966 F.2d at 1539 (Flaum, J., dissenting).

Nor can what Judge Gold termed "the Eleventh Circuit's control test" be read as *consistent* with Eleventh Circuit precedent. As this Court stated in rejecting the Movants' earlier argument that "[t]o establish 'control,' the Trustee must be able to satisfy [Judge Flaum's] two prong test" [ECF No. 76, p. 24]:

> [T]he strict 'control' test urged by the Movants in this case belies the Eleventh Circuit's characterization of the test as a "very flexible, pragmatic one."
>
> * * *
>
> [T]he Eleventh Circuit has stated that consistent with the equitable concepts underlying bankruptcy law, the court must "look beyond the particular transfers in question to the entire circumstance of the transactions" in determining whether the debtor possessed property recoverable in a fraudulent transfer action.

Order on Motions to Dismiss [ECF No. 154], p. 9 (quoting *Societe Generale*, 848 F.2d at 1199).

Indeed, what Judge Gold termed "the Eleventh Circuit's control test" is *squarely at odds* with Eleventh Circuit precedent; if applied to the facts of *Sanchez*, Judge Flaum's "two prong test" would have compelled the *opposite* result. For in *Sanchez*, the debtor *had* the power to designate which party would receive the funds at issue and to actually disburse the funds to that party: "[Duque had] placed the funds in an account of the debtor *with no express restrictions on their use*." *Sanchez*, 813 F.2d at 1181 (emphasis added); *see also Societe Generale*, 848 F.2d at 1199 (same).

The question, then, is whether, in light of Judge Gold's decision, this Court is now "bound" to follow his erroneous interpretation of the control test. We believe the answer is "no."

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

### B. The *Tousa* Opinion Is Not Binding On This Court

Although no Supreme Court or Court of Appeals decision has squarely addressed the issue, the majority rule among district and bankruptcy courts has long been that:

> [A]t least in non-single court districts such as the Southern District of Florida, district court opinions may be persuasive, but they are not binding precedent [as to other district or bankruptcy courts].

*In re Bank United Fin. Corp. (Official Comm. of Unsec. Creditors of Bank United Fin. Corp. v. F.D.I.C.)*, __ B.R. __, 2010 WL 5652772, at *5 n. 7 (Bankr. S.D. Fla. Nov. 15, 2010) (Isicoff, J.). The reason is straightforward: "[B]ecause district judges within a district do not bind each other, such a requirement could [operate to] subject[] bankruptcy courts to a non-uniform body of law." *In re Silverman (State Comp. Ins. Fund v. Zamora)*, 616 F.3d 1001, 1005 n. 3 (9th Cir. 2010) (dicta); *see also In re Villarreal (Villarreal v. Showalter)*, 413 B.R. 633, 640-41 (Bankr. S.D. Tex. 2009); *In re Romano*, 350 B.R. 276, 277-81 (Bankr. E.D. La. 2005).

To quote the Lubert-Adler Defendants' lead voice in this matter, from a journal article which "explore[d] whether bankruptcy courts are bound by decisions of a single district court judge in a multi-judge district":

> While there is a split of authority on this issue, the majority of courts hold that a bankruptcy court is *not* bound by the decision of a single district judge in a multi-judge district.
>
> * * *
>
> [I]n the bankruptcy context, district courts . . . are given jurisdiction to review bankruptcy court decisions, but the bankruptcy court is not necessarily considered an "inferior" court because 28 U.S.C. § 151 provides that a bankruptcy court acts as a "unit" of the district court – *i.e.*, bankruptcy courts exercise the district courts' powers and therefore operate on an equal (as opposed to an inferior) basis. Based on § 151 and the fact that district court decisions are not binding on other district court judges in the same district, and [considering that most federal districts] are multi-judge districts, *the authors believe that the majority rule is correct*. . . .

Paul S. Singerman & Paul A. Avron, "Of Precedents and Bankruptcy Court Independence," Am. Bankr. Inst. J. 1, 55-56 (July/Aug 2003) (emphasis added).

We concur. Because the *Tousa* Opinion represents the decision of a single district judge in a multi-judge district, Judge Gold's erroneous interpretation of the Eleventh Circuit's control test is not "binding" on this Court. At most, the opinion could conceivably be considered "persuasive," though in our view – despite its source – it ought *not* be. In addition to being wrong on the law, there are good reasons why the opinion ought not dictate a particular outcome in the present case.

### C. There Are Significant Differences Between The Facts Of *In re Tousa* And The Facts Of The Present Case, Rendering the *Tousa* Opinion Inapposite As To The Issue Of "Control" In This Case

As the Movants have acknowledged, "[t]he facts present in *Tousa* [are] distinguishable from and not analogous to the facts presented in this case," in several key respects. L.A. Motion, 25.

First, in *Tousa*, Judge Gold found it significant that TOUSA management and advisors believed "the Transeastern [L]itigation presented an existential threat to the TOUSA enterprise because of the default provisions in the Revolver [Agreement] and the bond indentures." Op., 35.

Here, there was no litigation which posed an "existential threat" to the Ginn-LA enterprise. The threat was the market collapse, and the response was *not* to put money *in* to save the Projects, but to take hundreds of millions of dollars *out*, as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits." TAC, ¶¶ 4, 6, 57-58, 80, 102.

Second, in *Tousa*, Judge Gold also found significant that the Conveying Subsidiaries all had independent directors "[who] concluded that [it] was in the best interests" of the Subsidiaries to approve the Transeastern Settlement; for, otherwise, they could not obtain their own financing, and the entire enterprise could have ended up in bankruptcy. Op., 35, 58, 78, 81-82.

Here, it was Ginn and Lubert-Adler officers who provided the "consent" and "approval" of the Debtors to enter the Credit Suisse loan transaction. From top to bottom, it was "an inside job." There were no "independent directors," and, even if there had been, *no one* could reasonably have concluded that it was "in the best interests" of the Debtors to approve the deal. TAC, ¶¶ 55-81.

To quote Dean Adler, "[t]he reality is," they took Tesoro, Quail West, and two other "*financeable* properties and us[ed] them as *fodder* in order to get financing for the Bahamas [Project]," which was viewed internally as the Project with the greatest potential for profit. TAC, ¶ 64, 135 (quoting Email, D. Adler to R. Rosenberg, 06/06/06, Fwd. to J. Brannon, 06/06/06, LA048225 - 048226) (emphasis added).

Third, in *Tousa*, Judge Gold found that TOUSA, Inc. – the publicly-traded parent entity – "as the primary borrower, was the only party with actual authority under the New Loan documents to control the loan proceeds' distribution," applying the incorrect test discussed above. Op., 51-52. In this case, by contrast:

- The two technical "Borrowers" were "shell" entities formed for the sole purpose of "pooling" Project assets, and did not become part of the "consolidated enterprise" until the moment the loan transaction closed;

- The real "Borrowers" in interest were the purported "Subsidiary Guarantors," *i.e.*, the Debtors and Other Project Entities; and

- The loan proceeds disbursements were "controlled" by the Lead Debtors' and Other Project Entities' Agreements of Limited Partnership, which were incorporated in the Loan Documents.

TAC, ¶¶ 6, 65-74, 78, 88-89; Loan Closing Binder Tabs 81-85 [attached hereto as Exhibits 1-5]; Ginn / Lubert-Adler Resp. to First Set of Ints., Int. Nos. 8-9 [ECF No. 140-2, pp. 25-27, 44-46].

Under the Lead Debtors' and Other Project Entities' Agreements of Limited Partnership, before "Funds from a Capital Event" (such as "a financing or refinancing of any Partnership assets") could be distributed to the Partners, the Partnerships were first required to pay any costs incurred by the Partnership[s] in effecting or obtaining any such Capital Event or the proceeds thereof," as well as any then-existing "debts and liabilities encumbering the [Partnership] Property." Only then could "Funds from a Capital Event" be distributed to the Partners, in which case, the funds were required to be distributed as follows:

-7-

>Funds from a Capital Event shall be distributed among the Partners in the following manner and order of priority:
>
>(a)   First, to the Limited Partners in proportion to their respective Preferred Return Account balances, until such balances are reduced to zero;
>
>(b)   Next, to the Partners in proportion to their Net Capital Contributions balances until such Net Capital Contributions balances are reduced to zero; and
>
>(c)   The balance to the Partners in proportion to their respective Percentage Interests.

Exhibit 1, pp. 17-61, Lead Debtor Ginn-LA St. Lucie Ltd., LLLP Agreement of Limited Partnership, Article II (Definitions of "Capital Event" / "Funds from a Capital Event"), ¶ 5.2 ("Distributions"); *see also* Ex. 2, pp. 8-56; Ex. 3, pp. 9-53; Ex. 4, pp. 6-52; Ex. 5, pp. 16-62 (same).

It is for that very reason that the Credit Agreements required the "term" loan proceeds to be used "to pay the Transaction Costs" and "Existing Indebtedness" before making "distributions." TAC, ¶¶ 6, 77, 79; First and Second Lien Credit Agreements, Recitals A & B, ¶ 2.9, Sch. 1.1(b). And it is also why the Ginn and Lubert-Adler Defendants have admitted in interrogatory answers that the $148,828,198 in term loan proceeds distributed to the Lead Debtors' equity Partners was distributed "pursuant to the terms of" the Lead Debtors' respective operating agreements. TAC, ¶¶ 88; Resp. to First Set of Ints., Int. Nos. 8-9 [ECF No. 140-2, pp. 25-27, 44-46].

Respectfully, under the Eleventh Circuit's control test, those sworn acknowledgments are, by definition, evidence of sufficient "control" to establish an interest in the $148,828,198, and should end any debate on this issue.[3/]

---

[3/] This case presents the inverse of *Sanchez*. In that case, Duque, who lacked possession of the funds at issue, was found to have "control," while the debtor, who had possession, was found to lack "control." 813 F.2d at 1181-82. Here, Ginn-LA CS Borrower, LLC reportedly had possession of the $148,828,198 at issue before it was distributed to the Lead Debtors' equity Partners; but it did not have "control." By the Ginn and Lubert-Adler Defendants' own admission, the distributions were made "pursuant to the terms of" the Lead Debtors' respective operating agreements. TAC, ¶ 88; Resp. to First Set of Ints., Int. Nos. 8-9 [ECF No. 140-2, pp. 25-27, 44-46].

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Fourth, in *Tousa*, Judge Gold repeatedly pointed out – in excess of ten times, in fact – that the transfer of loan proceeds in question had been "paid in satisfaction of a valid antecedent debt." Op., 47, 48, 53, 79, 95, 97, 101, 102, 106, 107.

In our case, the Trustee is *not* seeking to avoid the transfers of Credit Suisse loan proceeds which went to pay off the Debtors' then-existing $81,896,709 of valid antecedent third-party debt. He is seeking to avoid the transfers of loan proceeds made to the Lead Debtors' equity Partners as "return of capital contributions," "interest," "preferred return," and hypothetical future "profits." TAC, ¶¶ 6, 18, 164, 171, 182, 189.

Fifth, and finally, Judge Gold concluded that to permit the Committee to avoid the transfer in question "would confer on the Committee a *windfall* at the expense of a valid antecedent lender who was *innocent* of any intent to diminish the assets of the debtor." Op., 53-54 (emphasis added).

In this case, the opposite is true. The Third Amended Complaint specifically alleges that the Ginn and Lubert-Adler Defendants were *guilty* of an intent to diminish the assets of the Debtors:

- "[T]hrough the loan transaction, Ginn and the Lubert-Adler entities not only enriched themselves and their investors at the expense of the Debtors . . ., they effectively looted the Debtors . . . .";

- "[I]nsiders in control of the Debtors took out $148,828,198.14 of 'capital' and replaced it with $148,828,198.14 of loan debt," rendering the Debtors significantly "insolvent [and] much too thinly capitalized to survive"; and

- "The Debtors' transfers of that $148,828,198.14 were made with actual intent to hinder, delay, and/or defraud creditors of the Debtors . . . ."

TAC, ¶¶ 7, 9, 12, 14, 80-81, 102, 136-39, 168, 186.

Thus, were this Court to permit avoidance of the transfers of that $148,828,198.14, it would *not* confer a windfall on the Debtors' Estates; it would prevent a windfall to the Defendants, who cashed out early, leaving the Debtors and their creditors with a virtual certainty of loss.[4]

---

[4] There are, of course, other significant differences between the facts of *Tousa* and the facts of the present case, but, with respect to the issue of "control," we think the foregoing suffices to make the point.

### D. The *Tousa* Opinion Does Not Address The "Collapsing" Doctrine Or The Arguments Advanced In This Case For Dismissal Of The Alternative Claims Relating To The First And Second Liens

Lastly, for the sake of completeness, it bears noting that, in the *Tousa* adversary proceeding, the Committee did not seek to invoke the "collapsing" doctrine to establish an avoidable transfer, and neither the New Lenders nor the Transeastern Lenders advanced any of the specific arguments asserted here in support of dismissal of the alternative claims based on the First and Second Liens. Thus, Judge Gold's opinion has no impact on either of those aspects of this case.[5]

---

[5] Judge Gold's opinion *does* address the Lubert-Adler Defendants' new argument for dismissal of the claims relating to the First and Second Liens, made in the Reply Memorandum filed late last night [ECF No. 198], namely:

> [T]he Trustee cannot seek recovery from the Defendants under § 550(a)(1) as entities "for whose benefit" the liens and guarantees were transferred because the Trustee alleges that the Defendants were transferees of the Loan Proceeds in connection with the underlying liens that the Debtors had issued.

L.A. Reply, p. 26. However, since the Defendants did not advance that argument in their initial Motions to Dismiss, or even in their Second Motions to Dismiss, it cannot be considered at this stage. *See, e.g.,* Fed. R. Civ. P. 12(h)(2); *Skrtich v. Thornton*, 280 F.3d 1295, 1306-07 (11th Cir. 2002) ("Rule 12(g) *specifically prohibits* a party that previously filed a motion to dismiss from filing a second pre-answer motion to dismiss raising an omitted defense that could have been presented in the first motion to dismiss, 'except [as specifically provided in Rule 12(h)].'") (emphasis added); *Powell v. Carey Int'l, Inc.*, 490 F.Supp.2d 1202, 1206 n. 4 (S.D. Fla. 2006) ("[T]he Court *cannot* consider new arguments raised for the first time in a reply brief.") (citation omitted) (emphasis added).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

WHEREFORE, Trustee Dillworth respectfully submits that the *Tousa* opinion does not affect the outcome of the Defendants' Motions to Dismiss. The motions should be denied in their entirety.

Dated: February 22, 2011

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.

Attorneys for Drew M. Dillworth,
Chapter 7 Trustee of the Tesoro Debtors' Estates
and the Quail West Debtors' Estates

Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

I hereby certify that I am admitted to the Bar of
the United States District Court for the Southern District
of Florida and I am in compliance with the additional
qualifications to practice in this Court set forth in
Local Rule 2090-1(A).

By: /s/ Harold D. Moorefield
    EUGENE E. STEARNS
    Fla. Bar No. 149335
    estearns@stearnsweaver.com
    HAROLD D. MOOREFIELD, JR.
    Fla. Bar No. 239291
    hmoorefield@stearnsweaver.com
    MATTHEW W. BUTTRICK
    Fla. Bar No. 176028
    mbuttrick@stearnsweaver.com
    ANDREW E. STEARNS
    Fla. Bar No. 661651
    astearns@stearnsweaver.com

-11-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200