# EXHIBIT 5

CREDIT SUISSE LOAN DOCUMENT
CLOSING BINDER TAB 85

CLOSING CERTIFICATE OF
GINN-LA WEST END LTD., LLLP

# CLOSING CERTIFICATE

The undersigned, who is the Secretary of Ginn-West End GP, LLC, the general partner (the "**General Partner**") of Ginn-LA West End Ltd., LLLP, a Georgia limited liability limited partnership (the "**Partnership**"), does hereby certify that he is the duly elected and qualified Secretary of the General Partner of the Partnership.  In connection with that certain First Lien Credit Agreement, dated as of ⎭June 8⎭ , 2006 (the "**First Lien Credit Agreement**") by and among the Ginn-LA CS Borrower, LLC, Ginn-LA Conduit Lender, Inc., Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent, and Credit Suisse Securities (USA) LLC, as paying agent, fronting bank, sole lead arranger and sole bookrunner and the lenders party thereto and that certain Second Lien Credit Agreement, dated as of ⎭June 8⎭ , 2006 (the "**Second Lien Credit Agreement**", together with the First Lien Credit Agreement, the "**Credit Agreements**", capitalized terms used but not otherwise defined in this certificate shall have the meanings given to them in the Credit Agreements as the context may require) by and among the Ginn-LA CS Borrower, LLC, Ginn-LA Conduit Lender, Inc., Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent, and Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner and the lenders party thereto, the undersigned hereby further certifies that:

1.     Attached hereto as Exhibit A is a true and correct copy of the Partnership's Organizational Certificate, in full force and effect as of the Effective Date.

2.     Attached hereto as Exhibit B are true and correct copies of the Partnership's Organizational Documents, in full force and effect as of the Effective Date.

3.     Attached hereto as Exhibit C are true and correct copies of the good standing certificates from the applicable Governmental Authority of the Partnership's jurisdiction of incorporation, organization or formation, each other state or jurisdiction in which any of the Partnership's Real Property Assets are located, and each other state or jurisdiction in which the Partnership is qualified as a foreign corporation or other entity to do business.

4.     Attached hereto as Exhibit D are true and correct copies of the Partnership's Organizational Authorizations approving and authorizing the execution, delivery and performance of the each of the applicable Loan Documents; such Organizational Authorizations remain in full force and effect without Modification.

5.     Attached hereto as Exhibit E is a correct list of the names and offices and true specimens of the signatures of the duly elected, qualified and acting officers of the General Partner authorized to execute and deliver on behalf of the Partnership the documents and instruments to be executed by the Partnership in connection with the transactions contemplated by the Credit Agreements.

[Remainder of page intentionally left blank]

#1473496

**IN WITNESS WHEREOF**, the undersigned has executed this certificate in his aforesaid capacity, as of the Effective Date.

GENERAL PARTNER:

Ginn-West End GP, LLC

Signature: _____

Printed Name: _____ John Gray _____

Title: _____ Secretary _____

EXHIBIT A

Control No.   **0465594**

# STATE OF GEORGIA
## Secretary of State
Corporations Division
315 West Tower
#2 Martin Luther King, Jr. Dr.
Atlanta, Georgia 30334-1530

## Certified Copy

I, Cathy Cox, Secretary of the State of Georgia, do hereby certify under the seal of my office that the attached documents are true and correct copies of documents filed under the name of

### GINN-LA WEST END LTD., LLLP

**Domestic Limited Partnership**

Said entity was formed in the jurisdiction set forth above and has filed in the Office of Secretary of State on the 2nd day of November, 2004 its certificate of limited partnership, articles of incorporation, articles of association, articles of organization or application for certificate of authority to transact business in Georgia. This Certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence of the existence or nonexistence of the facts stated herein.



WITNESS my hand and official seal of the City of Atlanta and the State of Georgia on 26th day of May, 2006

Cathy Cox
Secretary of State

# Secretary of State

## Corporations Division
## 315 West Tower
## #2 Martin Luther King, Jr. Dr.
## Atlanta, Georgia 30334-1530

CONTROL NUMBER : 0465594
EFFECTIVE DATE : 11/02/2004
COUNTY        : GEORGIA
REFERENCE     : 0167
PRINT DATE    : 11/09/2004
FORM NUMBER   : 327

MORRIS, MANNING & MARTIN, LLP
VALERIE L. DIAMOND
3343 PEACHTREE ROAD, STE 1600
ATLANTA, GA  30326

## CERTIFICATE OF LIMITED PARTNERSHIP FILING

I, Cathy Cox, the Secretary of State of the State of Georgia, do hereby certify under the seal of my office that the domestic limited partnership

### GINN-LA WEST END LTD., LLLP
### A DOMESTIC LIMITED PARTNERSHIP

has filed, as of the effective date stated above, its Certificate of Limited Partnership with the Secretary of State and has paid all fees as required by Title 14 of the Official Code of Georgia Annotated.

WITNESS my hand and official seal in the City of Atlanta and the State of Georgia on the date set forth above.

Cathy Cox
Secretary of State

## GINN-LA WEST END LTD., LLLP
## CERTIFICATE OF LIMITED PARTNERSHIP

The undersigned, being desirous of forming a Limited Partnership under the Georgia Revised Uniform Limited Partnership Act as adopted by the State of Georgia, O.C.G.A. § 14-9-100, et seq., does hereby execute this Certificate of Limited Partnership.

I.      NAME.   The name of the Limited Partnership is Ginn-LA West End Ltd., LLLP (hereinafter "Partnership").

II.     REGISTERED AGENT AND REGISTERED OFFICE.   The address of the Partnership's registered office in the State of Georgia is:

> 3343 Peachtree Road, Ste. 1600
> Atlanta, Georgia 30326

The name and address of the Partnership's registered agent for service of process in the State of Georgia is:

> John G. Morris, Esq.
> 3343 Peachtree Road, Ste. 1600
> Atlanta, Georgia 30326

III.    IDENTITY OF GENERAL PARTNER.   The name and business address of the General Partner is:

> Ginn-West End GP, LLC
> 215 Celebration Place, Suite 200
> Celebration, Florida 34747

IV.     LLLP ELECTION.   Pursuant to, and in accordance with, OCGA Section 14-8-52(g), the Partnership hereby elects to become, and shall hereafter be, a limited liability limited partnership.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Limited Partnership, this 2ⁿᵈ day of _November_ , 2004.

GENERAL PARTNER:

Ginn-West End GP, LLC

_____(SEAL)
Edward R. Ginn, III, Manager

CORPORATIONS DIVISION

2004 NOV -2 P 5: 42

SECRETARY OF STATE

-2-



**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
315 West Tower, #2 Martin Luther King, Jr. Drive
Atlanta, Georgia 30334-1530
(404) 656-2817
Registered agent, officer, entity status information via the Internet
http://www.georgiacorporations.org

WARREN RARY
Director

ENRICO M. ROBINSON
Assistant Director

CATHY COX
Secretary of State

**GEORGIA LIMITED PARTNERSHIP TRANSMITTAL FORM**

DO NOT WRITE IN SHADED AREA - SOS USE ONLY

| DOCKET # | PENDING # | CONTROL # |
|---|---|---|
| DOCKET CODE  327 | DATE FILED  11·2·04 | AMOUNT RECEIVED  100— | CHECK/ RECEIPT #  GaNet |
| TYPE CODE  7D | EXAMINER | JURISDICTION CODE  60 |

NOTICE TO APPLICANT:  PRINT PLAINLY OR TYPE REMAINDER OF THIS FORM

1. 043130141

Limited Partnership Name Reservation Number (if one has been obtained; if articles are being filed without prior reservation, leave this line blank)

Ginn-LA West End Ltd., LLLP

Limited Partnership Name (List exactly as it appears in articles)

2. Valerie L. Diamond/Morris, Manning & Martin, LLP                     404/233-7000

Name of person filing articles (certificate will be mailed to this person, at address below)          Telephone Number

3343 Peachtree Road, NE, Suite 1600

Address

| Atlanta | GA | 30326-1044 |
|---|---|---|
| City | State | Zip Code |

3. 215 Celebration Place, Suite 200

Principal Office Mailing Address  (Unlike registered office address, this may be a post office box)

| Celebration | FL | 34747 |
|---|---|---|
| City | State | Zip Code |

4. John G. Morris

Name of Registered Agent in Georgia

3343 Peachtree Road, NE, Suite 1600

Registered Office Street Address in Georgia (Post office box or mail drop not acceptable for registered office address)

| Atlanta | Fulton | GA | 30326-1044 |
|---|---|---|---|
| City | County | State | Zip Code |

5. For Limited Partnerships formed prior to July 1, 1988 ONLY:

| Date Formed: | County: | Book No: | Page No: |
|---|---|---|---|

6. **NOTICE: THIS FORM DOES NOT REPLACE THE CERTIFICATE OF LIMITED PARTNERSHIP REQUIRED BY TITLE 14 OF THE OFFICIAL CODE OF GEORGIA ANNOTATED . Mail or deliver this Transmittal Form, the original and one copy of the Certificate of Limited Partnership, and the filing fee of $100.00 payable to "Secretary of State" at the above address. Filing fees are NON-refundable**

I understand that the information on this form will be entered in the Secretary of State business entity database, and I verify that the above information is true and correct to the best of my knowledge.

Valerie L. Diamond                          11/2/04

Authorized signature of person filing documents                          Date

Request certificates and obtain entity information via the Internet: http://www.georgiacorporations.org

FORM 246

*EXHIBIT B*

# AMENDMENT TO THE
## AGREEMENT OF LIMITED PARTNERSHIP OF
## GINN-LA WEST END LTD., LLLP

THIS AMENDMENT, dated as of June ___, 2006 (this "Amendment"), to that certain Agreement of Limited Partnership, dated as of August 5, 2005 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Partnership Agreement", as modified hereby and as further amended, restated, supplemented or otherwise modified and in effect from time to time, the "Partnership Agreement"), of Ginn-LA West End Ltd., LLLP (the "Partnership"), a Georgia limited liability limited partnership, is made and entered by and among the persons executing this Amendment below, the general partner and limited partners of the Partnership.

1.    **Amendments**.    The Existing Partnership Agreement is hereby amended by inserting the following Articles XVII and XVIII immediately following Article XVI:

## ARTICLE XVII
## SEPARATE LEGAL EXISTENCE

17.1    Separate Legal Existence.    Pursuant to that certain First Lien Credit Agreement, dated as of June ___, 2006 (the "First Lien Credit Agreement") by and among the Ginn-LA CS Borrower, LLC, Ginn-LA Conduit Lender, Inc., Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent, and Credit Suisse Securities (USA) LLC, as paying agent, fronting bank, sole lead arranger and sole bookrunner and the lenders party thereto and that certain Second Lien Credit Agreement, dated as of June ___, 2006 (the "Second Lien Credit Agreement", together with the First Lien Credit Agreement, the "Credit Agreements", capitalized terms used but not otherwise defined in this Article XVII shall have the meanings given to them in the Credit Agreements as the context may require) by and among the Ginn-LA CS Borrower, LLC, Ginn-LA Conduit Lender, Inc., Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent, and Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner and the lenders party thereto, the Company and its Subsidiaries:

(a)    will not own any asset or property other than their respective interests in each Project and additional Real Property Collateral permitted to be purchased as provided in Section 2.8B(ii)(b) of the Credit Agreements, and together with incidental personal property reasonably necessary for the ownership or operation of each Project;

(b)    will not engage in any business other than the ownership, management and operation of each Project, and incidental personal property reasonably necessary thereto and will conduct and operate its business in all material respects as presently conducted and operated;

#1474275

(c)     except to the extent permitted by the Credit Agreements, will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity;

(d)     except to the extent permitted by the Credit Agreements, shall not acquire obligations or securities of its Affiliates or any constituent party of Borrower or its Subsidiaries;

(e)     will remain solvent and will pay its debts and liabilities from its assets as the same shall become due;

(f)     will do all things necessary to observe organizational formalities and preserve its existence, and will not materially amend, Modify or otherwise change its Organizational Documents in any manner which could reasonably be expected to be adverse to the interests of the Lenders, and in connection with any non-material amendment of any such Organizational Documents, shall forward a copy of such amendment to the Administrative Agent promptly after the execution or filing thereof,

(g)     will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party and will file its own tax returns except to the extent that (A) a consolidated tax return is permitted by Applicable Law or (B) a tax return is not required by Applicable Law;

(h)     will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any other Borrower and any Affiliate of any Borrower), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall not identify itself or any of its Affiliates as a division or part of the other;

(i)     will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(j)     will not, and will not permit any constituent party to, seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of such entity;

(k)     will not commingle its funds and other assets with those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person;

(l)     will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person; and

   (m) will not hold itself out to be responsible for the debts or obligations of any other Person (except for the Loans and Permitted Indebtedness).

## ARTICLE XVIII
## REPAYMENT OF INTERCOMPANY LOANS/CLAWBACK OBLIGATIONS

  18.1 <u>Defined Terms/Application</u>.  Capitalized terms used in this Article XVIII that are not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Limited Liability Company Agreement of Ginn-LA CS Holding Company, LLC, as such agreement may be amended from time to time (the "<u>Holdings LLC Agreement</u>").  Notwithstanding anything to the contrary contained in Article IV hereof, a Partner will be required to make a Capital Contribution to the Company to the extent required by Section 18.3.

  18.2 <u>Repayment of Amounts Above the Allocated Loan Amounts</u>.  If Bahamas Owner pays an amount above its Allocated Loan Amount (any such amount above Bahamas Owner's Allocated Loan Amount being an "<u>Excess Amount</u>") to the Lenders, then (a) the Partners will be deemed to have made a Capital Contribution to the Partnership of any such Excess Amount paid by Bahamas Owner to the Lenders and (b) any such deemed Capital Contribution will be deemed made on the date(s) the applicable Excess Amount(s) are paid by Bahamas Owner to the Lenders and will equal with respect to each Partner the product of the applicable Excess Amount multiplied by each Partner's Percentage Interest.  If Bahamas Owner is deemed to have borrowed an Intercompany Loan under Section 4.5 of the Holdings LLC Agreement, then no distribution will be made under Section 5.1 of this Agreement until all Intercompany Loans payable by Bahamas Owner have been paid in full.

  18.3 <u>Clawback</u>.  If, there is a Deficiency with respect to Bahamas Owner upon the first to occur of (a) the date that all of the Property held by Bahamas Owner is sold or (b) the date of the dissolution or liquidation of the Partnership or Bahamas Owner (the first to occur of any of such events in (a) and (b) being the "<u>Determination Date</u>"), then each Partner shall, within thirty (30) days of its receipt of notice from any Partner or from any member of Ginn-LA CS Holding Company, LLC requesting contribution pursuant to this Section 18.3, make a Capital Contribution to the Partnership in an amount equal to its Clawback Amount.  Additionally, if at any time and from time to time there is an additional Deficiency with respect to Bahamas Owner following the Determination Date with respect to Bahamas Owner (i.e., a Deficiency other than that set forth in clause (a) of the definition of "Deficiency" in the Holdings LLc Agreement), then each Partner shall, within thirty (30) days of its receipt of notice from any Partner requesting contribution pursuant to this Section 4.6, make a Capital Contribution to the Partnership in an amount equal to its Clawback Amount with respect to such Deficiency.  If a Partner contributes all of its Clawback Amount with respect to a Deficiency, then it will have no further

obligation to contribute any other amount of such Deficiency following the date of such contribution, it being acknowledged that if one or more other Deficiencies arise or exist, then such Partner will have an obligation to contribute to the Partnership its Clawback Amount with respect to each other Deficiency(ies).

For purposes of this Agreement, "Clawback Amount" means with respect to each Partner, its share of the applicable Deficiency with respect to Bahamas Owner as of the relevant date. A Partner's share of a Clawback Amount shall be computed as follows:

(i) if the applicable Deficiency is equal to or less than the amount distributed to all Partners pursuant to Section 5.1(c), the product of (A) the applicable Deficiency multiplied by the quotient of (B) the aggregate distributions to such Partner pursuant to Section 5.1(c) divided by the aggregate distributions to all of the Partners pursuant to Section 5.1(c);

(ii) if the applicable Deficiency exceeds the total amount distributed to all of the Partners pursuant to Section 5.1(c) but is less than the sum of the aggregate distributions made to all of the Partners pursuant to Sections 5.1(b) and 5.1(c), the sum of (A) the amount that would be the Clawback Amount with respect to such Partner pursuant to clause (i) above if the applicable Deficiency equaled the aggregate distributions to the Partners pursuant to Section 5.1(c) and (B) the product of (1) the difference between the applicable Deficiency and the aggregate amounts distributed to all of the Partners pursuant to Section 5.1(c), multiplied by (2) the quotient of the aggregate distributions to such Partner pursuant to Section 5.1(b) divided by the aggregate distributions to all of the Partners pursuant to Section 5.1(b); and

(iii) if the applicable Deficiency exceeds the total amount distributed to all of the Partners pursuant to Sections 5.1(b) and 5.1(c), the sum of (A) the amount that would be the Clawback Amount with respect to such Partner pursuant to clause (ii) above if the applicable Deficiency equaled the aggregate distributions to the Partners pursuant to Sections 5.1(b) and 5.1(c) and (B) the product of (1) the difference between the applicable Deficiency and the aggregate amounts distributed to all of the Partners pursuant to Sections 5.1(b) and 5.1(c), multiplied by (2) the quotient of the aggregate distributions to such Partner pursuant to Section 5.1(a) divided by the aggregate distributions to all of the Partners pursuant to Section 5.1(a).

For purposes of this definition, any interest paid on any Partner Loan to an Limited Partner on or after the date hereof shall be deemed to be a distribution pursuant to Section 5.1(a) and any principal paid on a Partner Loan on or after the date hereof shall be deemed to be a distribution pursuant to Section 5.1(b).

2.    **Effectiveness**.  Except as hereby amended, the Partnership Agreement shall continue in full force and effect in accordance with its original terms.

3.    **Counterparts**.  This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original. This Agreement shall become

binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

[SIGNATURES FOLLOW]

**IN WITNESS WHEREOF,** the undersigned have caused this Amendment to be duly adopted as of the date first above written.

**GENERAL PARTNER**

GINN-WEST END GP, LLC

By: _____
    Name: Robert F. Masters
    Title: President

**LIMITED PARTNERS**

LUBERT-ADLER    REAL    ESTATE
    FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general
    partner

By: Lubert-Adler Group IV, LLC, its general
    partner

By: _____
    Name:
    Title:

LUBERT-ADLER    REAL    ESTATE
    PARALLEL FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general
    partner

By: Lubert-Adler Group IV, LLC, its general
    partner

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF,** the undersigned have caused this Amendment to be duly adopted as of the date first above written.

**GENERAL PARTNER**

GINN-WEST END GP, LLC

By:_____
    Name:
    Title:

**LIMITED PARTNERS**

LUBERT-ADLER    REAL    ESTATE FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general partner

By: Lubert-Adler Group IV, LLC, its general partner

By:_____
R. Eric Emrich, CFO and Vice President

LUBERT-ADLER    REAL    ESTATE PARALLEL FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general partner

By: Lubert-Adler Group IV, LLC, its general partner

By:_____
R. Eric Emrich, CFO and Vice President

LUBERT-ADLER     CAPITAL     REAL
ESTATE FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general
partner

By: Lubert-Adler Group IV, LLC, its general
partner

By: _____
R. Eric Emrich, CFO and Vice President

## AGREEMENT OF LIMITED PARTNERSHIP OF
## GINN-LA WEST END LTD., LLLP

**THIS AGREEMENT OF LIMITED PARTNERSHIP** (this "<u>Agreement</u>") is made and entered into as of August 5, 2005, by and among **GINN-WEST END GP, LLC**, a Georgia limited liability company (the "<u>General Partner</u>"), **LUBERT-ADLER REAL ESTATE FUND IV, L.P.**, a Delaware limited partnership ("<u>Fund IV</u>"), **LUBERT-ADLER REAL ESTATE PARALLEL FUND IV, L.P.**, a Delaware limited partnership ("<u>Parallel Fund IV</u>"), and **LUBERT-ADLER CAPITAL REAL ESTATE FUND IV, L.P.**, a Delaware limited partnership ("<u>Capital Fund IV</u>") (Fund IV, Parallel Fund IV, and Capital Fund IV are individually referred to as a "<u>Limited Partner</u>" and collectively referred to as the "<u>Limited Partners</u>").

## BACKGROUND STATEMENT

The Partnership was duly formed as a limited partnership pursuant to the GRULPA by the filing of a Certificate of Limited Partnership with the Georgia Secretary of State on November 2, 2004. Pursuant to, and in accordance with, Official Code of Georgia Annotated Section 14-8-62, the Partners have agreed (by execution of this Agreement) that the Partnership shall elect to be a limited liability limited partnership. In furtherance thereof, the Partnership's Certificate of Limited Partnership contains a provision that provides for such election.

Now, therefore, the parties hereto do hereby agree as follows:

## ARTICLE I
## FORMATION

1.1    <u>Formation</u>. Pursuant to the GRULPA, the Partnership was formed by the filing and recording with the Secretary of State of Georgia of its Certificate of Limited Partnership on November 2, 2004. The Partnership shall be governed by GRULPA.

1.2    <u>LLLP Election</u>. Pursuant to, and in accordance with, Official Code of Georgia Annotated Section 14-8-62(g), the Partners hereby agree that the Partnership shall elect to be a limited liability limited partnership. In connection therewith, the Partners hereby approve (a) the inclusion in the Certificate of Limited Partnership of the Partnership of a statement of such election, and (b) all such other acts as the General Partner deems necessary to effect and maintain the Partnership's status as a limited liability limited partnership. Furthermore, the Partners hereby ratify any and all actions taken by the General Partner prior to the Effective Date in furtherance of the foregoing.

1.3    <u>Name</u>. The name of the Partnership shall be Ginn-LA West End Ltd., LLLP, or such other name as may hereafter be chosen from time to time by the General Partner, subject to the Approval of the Limited Partners, and all Partnership business shall thereafter be conducted in such name.

1.4    <u>Principal Place of Business and Agent</u>.    The Partnership shall maintain its principal office at 215 Celebration Place, Suite 200, Celebration, Florida 34747 or at such other place as the General Partner may from time to time designate.    The Registered Office of the Partnership in the State of Georgia is Morris, Manning & Martin, L.L.P., 1600 Atlanta Financial Center, 3343 Peachtree Road, Atlanta, Georgia 30326, and the agent for service of process at such address is John G. Morris, Esq. The Partnership may maintain such different or additional offices as the General Partner may determine, subject to the Approval of the Limited Partners.

1.5    <u>Term</u>.    The term of the Partnership shall commence upon the filing of the Partnership's Certificate of Limited Partnership with the Secretary of State of Georgia, and shall continue until the Partnership is dissolved in accordance with the provisions of this Agreement or as otherwise required by GRULPA.

**ARTICLE II**
**DEFINITIONS**

The following defined terms used in this Agreement shall have the meanings specified below:

"<u>Adjusted Capital Account Deficit</u>" means, with respect to each Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the applicable Fiscal Year or other referenced period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provisions of this Agreement (including without limitation Section 10.3 hereof) or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(b)    Debit to such Capital Account the items described in (4), (5) and (6) of Section 1.704-1(b)(2)(ii)(d) of the Regulations.

"<u>Affiliate</u>" means, with respect to any Partner, any Person related by blood or marriage to such Partner or any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Partner. For the purpose of this definition the term "control" shall mean, with respect to any Person, and without limit thereto, either a general partnership interest in, a managing member of, or the beneficial ownership of or voting control of twenty-five percent (25%) or more of the equity or voting interests in such Person.

"<u>Agreement</u>" means this Agreement of Limited Partnership of Ginn-LA West End Ltd., LLLP, as amended from time to time.

"<u>Approve, Approved, or Approval</u>" means, as to the subject matter thereof and as the context may require or permit, an express approval or consent contained in a statement signed by an approving entity or an Authorized Representative.

-2-

"Authorized Representative" for each of the Limited Partners means Dean S. Adler or such other Person from time to time designated by the Limited Partners by notice given to the General Partner. For purposes of granting or denying any Approval under this Agreement, the Limited Partners shall act as a single party (except where the Approval of only one of the Limited Partners is required), acting through their Authorized Representative. Any such Approval or refusal of Approval shall be binding on all Limited Partners. The Authorized Representative for the General Partner means Edward R. Ginn, III, or such other Person from time to time designated by the General Partner by notice given to the Lubert-Adler Group.

"Bankruptcy" means an adjudication of bankruptcy or the entry of an order for relief or the filing of a voluntary case or petition under the federal bankruptcy law or any state or local bankruptcy law and, in addition, any other status constituting bankruptcy within the meaning of GRULPA of the state of organization of the Partnership.

"Business Day" means a day of the year on which banks are not required or authorized to close in Atlanta, Georgia.

"Buy-Sell Closing" shall have the meaning ascribed to such term in Section 12.4.

"Buy-Sell Notice" shall have the meaning ascribed to such term in Section 12.1.2.

"Buying Partner" shall have the meaning ascribed to such term in Section 12.1.5.

"Capital Account" means, with respect to each Partner, the capital account maintained in accordance with the rules set forth in Regulation Section 1.704-1(b)(2)(iv), as amended from time to time. Subject to the foregoing, a Partner's Capital Account shall consist of the cash or the fair market value of property (net of liabilities that the Partnership is considered to have assumed or taken subject to under Section 752 of the Code) contributed to the Partnership by such Partner, increased by such Partner's share of items set forth in Section 705(a)(1) of the Code including, without limitation, such Partner's share of Partnership income, less (i) all cash distributions to and cash withdrawals by such Partner, (ii) the fair market value of property distributed to such Partner by the Partnership (net of liabilities that such Partner is considered to have assumed or taken subject to under Section 752 of the Code), and (iii) such Partner's share of items set forth in Section 705(a)(2) of the Code including, without limitation, such Partner's share of Partnership losses. Upon the transfer of an interest in the Partnership, the transferee shall succeed to the capital account of the transferor with respect to the transferred partnership interest unless such transfer results in a termination of the Partnership pursuant to Section 708 of the Code.

"Capital Contribution" means with respect to any Partner the total amount of money and the initial Gross Asset Value of any property (other than money) now or hereafter contributed or agreed to be contributed, as the context requires, to the Partnership. Any reference to the Capital Contribution of a Partner shall include the Capital Contribution made by any predecessor holder of the Partnership Interest of such Partner allocable to such Partnership Interest.

-3-

"Capital Event" means (i) any sale, exchange or other disposition of all or substantially all of the assets of the Partnership, (ii) any financing or refinancing of any Partnership assets, other than the initial financing, (iii) any casualty to any Partnership property, (iv) a condemnation of any Partnership property, or (v) any other capital event with respect to any Partnership property.

"Capital Fund IV" means Lubert-Adler Capital Real Estate Fund IV, L.P., a Delaware limited partnership.

"Closing Date" shall have the meaning ascribed to such term in Section 12.4.2.

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute. All references to specific sections of the Code shall be deemed to include any provisions of the Code which replace or supersede the sections in effect at the time of execution of this Agreement.

"Cure Election" shall have the meaning ascribed to such term in Section 7.8.2.

"Cure Notice" shall have the meaning ascribed to such term in Section 7.8.2.

"Default Election Notice" shall have the meaning ascribed to such term in Section 13.5.1.

"Deposit" shall have the meaning ascribed to such term in Section 13.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner with the prior Approval of the Limited Partners.

"Development Agreement" means that certain development agreement for the development of the Property, by and between the Property Owner and GDC or an Affiliate of GDC.

"Effective Date" means the date first above written.

"ERISA Plan" shall have the meaning ascribed to such term in Article XIV.

"Fiscal Year" means (i) the period commencing on the Effective Date of this Agreement and ending on December 31 in the year in which the Effective Date occurs, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, and (iii) any

#1251694 v3 - West End LPA

portion of the period described in clause (ii) for which the Partnership is required to allocate Net Profits, Net Losses, and other items of Partnership income, gain, loss, or deduction pursuant to Article VI hereof.

"Fund IV" means Lubert-Adler Real Estate Fund IV, L.P., a Delaware limited partnership.

"Funds from a Capital Event" shall mean those funds arising in connection with a Capital Event decreased by the sum of (i) the amount of such proceeds applied by the Partnership, in its capacity as the sole shareholder of the Subsidiary, in its capacity as the sole shareholder of the Property Owner, to pay debts and liabilities encumbering the Property, including, without limitation, the amount of any release prices paid by the Partnership to its, the Subsidiary's or the Property Owner's lenders in connection with a sale of any portion of the Property; (ii) the amount of such proceeds used by the Partnership, in its capacity as the sole shareholder of the Subsidiary, in its capacity as the sole shareholder of the Property Owner, for restoration and repair in the event of damage or destruction to the Property; (iii) any incidental or ancillary expenses, costs, or liabilities incurred by the Partnership in effecting or obtaining any such Capital Event or the proceeds thereof (including, without limitation, attorneys' and accountants' fees, court costs, recording fees, transfer taxes and fees, appraisal costs, brokerage fees, and the like), all of which expenses, costs, and liabilities shall be paid from the cash amount of such funds; (iv) the amount applied to fund any deficit in Partnership reserves; and (v) the payment of such other Partnership debts and liabilities as the Limited Partners shall approve in writing in advance.

"Funds from Operations" means those funds of the Partnership from any source (other than those funds arising from (a) a Capital Event, (b) Capital Contributions by Partners, or (c) loans by Partners) remaining after (i) the payment of all sums then due and payable in connection with the ownership and operation of the Property, including, without limitation, amounts expended or incurred with respect to obligations of the Partnership, the Subsidiary or the Property Owner under contracts, loans to the Partnership, and other agreements, and (ii) the establishment of appropriate reserves for real estate and personal property ad valorem taxes, tenant improvements and retrofit, maintenance, repairs, capital additions and replacements of any improvements, leasing commissions, tenant security deposits, debt service on loans to the Partnership and other expenses and capital requirements of the Partnership which are necessary to enable the Partnership to maintain the Partnership's property.

"GDC" means Ginn Development Company, LLC, a Georgia limited liability company.

"General Partner" means Ginn-West End GP, LLC, in its capacity as general partner of the Partnership and its successors as general partner of the Partnership, and any other Person admitted to the Partnership as an additional general partner or a replacement general partner (including without limitation a New General Partner) pursuant to this Agreement, and their respective successors as general partners of the Partnership.

"Ginn GP" shall have the meaning ascribed to such term in Section 7.8.

"Ginn GP Default" shall have the meaning ascribed to such term in Section 7.8.1.

"GP Conduct Obligations" means the Recourse Obligations of the Partnership that result from the General Partner's or its Affiliates' conduct acting outside the scope of their authority under this Agreement or any other agreement, or arising out of the fraud, gross negligence or willful misconduct of the General Partner or its Affiliates.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the value of such asset, as agreed to in writing by the Partners, and with respect to any asset purchased by the Partnership, shall be the purchase price paid by the Partnership;

(b)     The Gross Asset Value of all Partnership assets shall be adjusted from time to time to equal their respective gross fair market values, as determined by the Partners, as of the following events: (i) the acquisition of an additional Partnership Interest by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution; (ii) the distribution by the Partnership to a Partner of more than a *de minimis* amount of property as consideration for a Partnership Interest; and (iii) the liquidation of the Partnership within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the General Partner, with the prior Approval of the Limited Partners, reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interest of the Partners in the Partnership;

(c)     The Gross Asset Value of any Partnership asset distributed to any Partner shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Partners; and

(d)     The Gross Asset Values of the Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and 6.5 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph (d) to the extent that the General Partner determines that an adjustment pursuant to paragraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment in accordance with this paragraph (d). If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (b) or (d), then such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"GRULPA" means the Georgia Revised Uniform Limited Partnership Act, Official Code of Georgia Annotated Section 14-9-100 et seq.

-6-

"Initiator" shall have the meaning ascribed to such term in Section 12.1.1.

"Initiator's PSI Value" shall have the meaning ascribed to such term in Section 12.1.4.

"Limited Partners" means Fund IV, Parallel Fund IV, Capital Fund IV and any other Person admitted to the Partnership as a limited partner pursuant to this Agreement, and their respective assigns and successors as substitute limited partners of the Partnership.

"Liquidating Distributions" shall have the meaning ascribed to such term in Section 10.2(a).

"Liquidator" means the General Partner or, if there is none at the time in question, such other Person who may be appointed in accordance with this Agreement or applicable law and who shall be responsible for taking all action necessary or appropriate to wind up the affairs of, and distribute the assets of, the Partnership upon its dissolution.

"Lubert-Adler Group" collectively refers to Fund IV, Parallel Fund IV, and Capital Fund IV and their respective assigns and successors.

"Match Election" shall have the meaning set forth in Section 13.1.3.

"Match Period" shall have the meaning set forth in Section 13.1.3.

"Net Capital Contributions" means an account maintained for each Partner equal to (i) the aggregate Capital Contributions to the Partnership made by such Partner, less (ii) the aggregate distributions to such Partner pursuant to Section 5.1(b) of this Agreement.

"Net Losses" and "Net Profits" shall have the meanings ascribed to such terms in Section 6.1.

"New General Partner" shall have the meaning ascribed to such term in Section 7.8.3.

"Nonrecourse Deductions" shall have the meaning set forth in Sections 1.704-2(b)(1) and 1.704-2(c) of the Regulations. Subject to the preceding sentence, the amount of Nonrecourse Deductions for a Partnership fiscal year equals the excess, if any, of the net increase, if any, in the amount of Partnership Minimum Gain during that fiscal year (determined under Section 1.704-2(d) of the Regulations) over the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Partnership Minimum Gain ( determined under Section 1.704-2(h) of the Regulations).

"Nonrecourse Liability" shall have the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Operating Budget" means the Approved annual operating budget for the operations of the Partnership with respect to each Fiscal Year, as more particularly described in Section 7.2.2.

"Parallel Fund IV" means Lubert-Adler Real Estate Parallel Fund IV, L.P., a Delaware limited partnership.

"Partner" means any General Partner or any Limited Partner.

"Partner Loans" shall mean any amounts advanced to the Partnership by a Partner pursuant to Section 4.4.

"Partner Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability.

"Partner Nonrecourse Debt" shall have the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(i) of the Regulations. Subject to the foregoing, the amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for a Partnership fiscal year equals the excess, if any, of the net increase, if any, in the amount of Partner Minimum Gain attributable to such Partner Nonrecourse Debt during that fiscal year over the aggregate amount of any distribution during that fiscal year to the Partner that bears the economic risk of loss for such Partner Nonrecourse Debt to the extent such distributions are from the proceeds of such Partner Nonrecourse Debt and are allocable to an increase in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i) of the Regulations.

"Partnership" means Ginn-LA West End Ltd., LLLP, the partnership formed as described in Section 1.1 of this Agreement.

"Partnership Interest" or "Partner's interest in the Partnership" means with respect to each Partner, all such Partner's right, title and interest in the Partnership, as the same may vary from time to time pursuant to the terms of this Agreement, including, without limitation, the right of a Partner to Net Profits, Net Losses, distributions of Funds from Operations and Capital Events, Preferred Return, return of Capital Contributions, repayment of Partner Loans, distributions of the Partnership's property and all other rights under or interest in this Agreement, the Property and all other assets of the Partnership.

"Partnership Minimum Gain" shall have the meaning set forth in Section 1.704-2(d) of the Regulations. Subject to the foregoing, Partnership Minimum Gain shall equal the amount of gain, if any, which would be recognized by the Partnership with respect to each Nonrecourse Liability of the Partnership if the Partnership were to transfer the Partnership's property which is subject to such Nonrecourse Liability in full satisfaction thereof.

"Percentage Interests" shall be the following ratios expressed as a percentage, with respect to each Partner.

| Partner | Percentage Interest |
|---|---|
| General Partner | 20.00000% |
| Limited Partners: | |
| Fund IV | 72.96920% |
| Parallel Fund IV | 2.24032% |
| Capital Fund IV | 4.79048% |
| | 100.0000% |

"Person" means any individual, trust, corporation, limited liability company, proprietorship or any other entity.

"Preferred Return" means a cumulative annual return (compounded quarterly and calculated like interest) equal to ten percent (10%) per annum on each such Limited Partner's Net Capital Contributions balance outstanding from time to time.

"Preferred Return Account" means an amount for each Limited Partner equal to (i) such Partner's Preferred Return, less (ii) the aggregate distributions made to such Limited Partner pursuant to Section 5.1(a) of this Agreement.

"Promissory Note" means that certain Promissory Note dated July 29, 2005, evidencing the loan made to the Subsidiary by the Partnership in the original principal amount set forth therein.

"Property" means that certain tract of land consisting of approximately 1700 acres located on West End, Grand Bahamas Island, The Bahamas, being owned by the Property Owner on the Effective Date, together with related improvements located thereon or to be constructed thereon in the future.

"Property Owner" means Grand Bahama Hotel Co., a Delaware corporation, which is an entity that owns the Property, and any successor entity.

"Qualified Affiliate" means any Affiliate of the Lubert-Adler Group which the Lubert-Adler Group represents and warrants to the General Partner is adequately capitalized for the purpose of assuming the Recourse Obligations and indemnifying the General Partner from the Recourse Obligations.

"Recipient" shall have the meaning ascribed to such term in Section 12.1.1.

"Recipient's Election Notice" shall have the meaning ascribed to such term in Section 12.1.4.

"Recipient's PSI Value" shall have the meaning ascribed to such term in Section 12.1.4.

#1251694 v3 - West End LPA

"Recourse Obligations" means all the recourse covenants, liabilities and obligations of the Partnership which are also recourse to the General Partner.

"Regulations" means the Federal Income Tax Regulations (including Temporary Regulations) as in effect on the Effective Date of the Agreement or any succeeding provision thereof.

"Removal Date" has the meaning set forth in Section 7.8.1 hereof.

"Removal Notice" has the meaning set forth in Section 7.8.1 hereof.

"Sale Approval Notice" has the meaning set forth in Section 13.1.3.

"Sale Closing Date" has the meaning set forth in Section 13.3.

"Sales Notice" has the meaning set forth in Section 13.6.1.

"Sales Price" has the meaning set forth in Section 13.6.1.

"Selling Partner" has the meaning ascribed to such term in Section 12.1.5.

"Stated Amount" has the meaning set forth in Section 12.1.3.

"Subordination Agreement" means that certain Subordination Agreement entered into by and between the Subsidiary and West End Resorts, Ltd.

"Subsidiary" means Ginn-LA International Business Company, Ltd., a Bermuda company, which is an entity that will acquire all of the shares of the Property Owner on or about the Effective Date.

"Tax Liability" means the income tax liability of the General Partner with respect to its allocable share of Net Profits of the Partnership for any Fiscal Year calculated at a rate of forty percent (40%) of such General Partner's allocable share of the Net Profits for the applicable Fiscal Year as reflected in the tax return of the Partnership filed with respect to such Fiscal Year. As to any Fiscal Year as to which the Partnership's tax returns have not been filed, such Tax Liability shall be computed based on a reasonable estimate by the Lubert-Adler Group of the Net Profits for such Fiscal Year.

"Tax Matters Partner" has the meaning set forth in Section 11.4 hereof.

"Third Party Offer" shall have the meaning set forth in Section 13.1.1.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, or otherwise dispose of.

#1251694 v3 - West End LPA

## ARTICLE III
## PURPOSES AND BUSINESS OF THE PARTNERSHIP

3.1    Purposes of the Partnership. The purposes of the Partnership's business shall be to hold and invest in various assets, investments and funds and to do any and all lawful businesses permitted to partnerships under the law of the State of Georgia, including but not limited to the financing, refinancing, acquisition, ownership, operation, exchange, maintenance, development, lease and disposition of the Property (either directly or indirectly through the ownership of all of the shares in the Subsidiary, which owns all of the shares in the Property Owner). In accordance with the foregoing, the Partnership has formed or will form the Subsidiary to acquire all of the shares in the Property Owner, which owns the Property. To the extent the context so requires, any reference to the Property elsewhere in this Agreement shall be interpreted in accordance with the preceding sentence.

3.2    Authority of the Partnership. In order to carry out its purpose, and not in limitation thereof, the Partnership is empowered and authorized, either directly or through the Subsidiary, in its capacity as the sole shareholder of the Property Owner, subject in each case to any and all approval rights granted to the Partners pursuant to this Agreement, to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of its purposes, including, but not limited to, the following:

(a)    design, develop, construct, operate, maintain, improve, buy, own, sell, convey, assign, or otherwise dispose of, mortgage, finance, refinance, rent or lease the Property;

(b)    borrow money and issue evidences of indebtedness in furtherance of the Partnership business and secure any such indebtedness by mortgage, security interest or other lien, any or all of which debt instruments may contain confessions of judgment against the Partnership if the General Partner consents thereto;

(c)    maintain and operate the Partnership's assets;

(d)    negotiate for and conclude agreements for the sale, exchange or other disposition of all or any part of the property of the Partnership;

(e)    hire and compensate employees, agents, independent contractors, attorneys and accountants and other consultants; and

(f)    engage in any kind of activity, and perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership.

3.3    [Intentionally Deleted].

3.4    Authority of the General Partner. Without limiting the generality of Section 3.2 hereof, the Limited Partners hereby acknowledge that they have reviewed the Development

-11-

Agreement and documentation relating to the acquisition of the Property through the stock purchase by the Subsidiary of all shares of the Property Owner, and have consented to and hereby authorize the General Partner to:

(a) cause the Partnership to (i) acquire all of the shares of the Subsidiary through a subscription agreement and (ii) make an election in accordance with §338(h)(10) of the Code to treat the purchase of all of the Property Owner's shares by the Subsidiary as a purchase of the Property Owner's assets for federal income tax purposes; and

(b) take the following actions on behalf of the Partnership and the Subsidiary: (i) close the stock acquisition of all of the shares in the Property Owner utilizing the Capital Contributions of the Limited Partners, (ii) execute the Promissory Note, (iii) execute the Subordination Agreement and (iv) execute the Development Agreement. Further, the General Partner is hereby authorized to execute and deliver on behalf of the Partnership any and all documents, instruments, agreements and certificates required to effect the foregoing.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.1     Initial Capital Contributions.

(a)     General Partner.  On or shortly after the Effective Date, the General Partner shall make a Capital Contribution to the Partnership in the amount of $1,000.

(b)     Limited Partners.  On or shortly after the Effective Date, the Limited Partners in proportion to their respective Percentage Interests, shall make Capital Contributions to the Partnership in the amount of $4,000.

Prior to the date hereof, GDC was advanced funds ("Pursuit Funds") from an Affiliate of the Limited Partners for the purpose of investigating and pursuing the acquisition of the Property, which included, but was not limited to, matters relating to zoning, surveys, engineering, environmental studies, earnest money deposits, and legal work. Upon a final determination of the precise amount of Pursuit Funds advanced (as mutually determined by the General Partner and the Limited Partners), and to the extent not already taken into account for purposes of Section 4.1, such Pursuit Funds shall be credited to the Limited Partners' Capital Accounts as Capital Contributions in proportion to the Limited Partners' respective Percentage Interests.

4.2     Additional Capital Contributions.

(a)     General.  Except as specifically provided elsewhere in this Agreement (including, without limitation, this Section 4.2 and Section 10.3), no Partner shall be obligated to the Partnership or any of the Partners to make any Capital Contributions to the Partnership. A Limited Partner may, from time to time, in its sole and exclusive discretion, agree to make additional Capital Contributions to the Partnership.

(b)    Capital Contributions to Pay Partnership Costs and Expenses.    The Limited Partners hereby agree to make additional Capital Contributions to the Partnership (in proportion to their respective Percentage Interests) in such amounts and at such times as specifically agreed to by the Limited Partners in connection with the Approval of the Operating Budget.  Notwithstanding the foregoing, in lieu of making additional Capital Contributions as required by this Section 4.2(b), the Limited Partners may advance some or all of such additional funds in accordance with Section 4.4 below.

(c)    Capital Contributions to Satisfy Indebtedness.    The Limited Partners hereby agree to contribute to the capital of the Partnership in proportion to their respective Percentage Interests such amounts as the Partnership may require from time to time to pay interest or principal due under any Approved Partnership indebtedness.  All such funds shall be paid into the Partnership within ten (10) days of notice from the General Partner specifying the amount required of each Partner.  All amounts paid by a Partner to the holder of any such indebtedness shall be credited to such Partner's Capital Account and Net Capital Contributions account in the same manner as if such amounts had been contributed to the Partnership.  Notwithstanding the foregoing, in lieu of making additional Capital Contributions as required by this Section 4.2(c), the Limited Partners may advance some or all of such additional funds in accordance with Section 4.4 below.

4.3    Return of Capital Contributions.    Except as specifically provided in this Agreement, no Partner shall be entitled to demand or receive the return of its Capital Contributions.    Except as specifically provided in this Agreement, upon dissolution and liquidation of the Partnership, the Partners shall look solely to the Partnership assets for the return of their respective Capital Contributions, and no Partner shall be liable for such return, even if such Partnership assets are insufficient to return the full amount of such Capital Contributions.

4.4    Partner Loans.    To the extent the Partnership requires any additional capital for any reason, (i) the Lubert-Adler Group may unilaterally advance some or all of such funds to the Partnership, or (ii) with the prior Approval of the Lubert-Adler Group, the General Partner may advance all or a portion of any such funds to the Partnership.  Any funds so advanced pursuant to this Section 4.4 shall be treated as a loan to the Partnership and shall bear interest at the rate of 10% per annum, unless determined otherwise in the sole discretion of the Limited Partners.

## ARTICLE V
## DISTRIBUTIONS

5.1    <u>Distributions of Funds from Operations and Funds from a Capital Event</u>.    After giving effect to Section 5.2, Funds from Operations (which shall be distributed quarterly) and Funds from a Capital Event shall be distributed among the Partners in the following manner and order of priority:

(a)    First, to the Limited Partners in proportion to their respective Preferred Return Account balances, until such balances are reduced to zero;

(b)    Next, to the Partners in proportion to their respective Net Capital Contributions balances until such Net Capital Contributions balances are reduced to zero; and

(c)    The balance to the Partners in proportion to their respective Percentage Interests.

5.2    <u>Tax Advance to the General Partner</u>.    The Partnership, to the extent it has available funds, shall advance funds to the General Partner as necessary to enable the General Partner to pay its Tax Liability.  Each such advance shall be limited to the amount by which the General Partner's aggregate Tax Liability since inception of the Partnership exceeds the aggregate distributions to the General Partner since such inception.  All such advances shall be credited against the General Partner's Capital Account and shall be offset against future distributions payable by the Partnership to the General Partner.

## ARTICLE VI
## ALLOCATIONS OF PROFITS AND LOSSES

6.1    <u>Calculation of Net Profits and Net Losses</u>.  "<u>Net Profits</u>" and "<u>Net Losses</u>" means, for each Fiscal Year or other period, an amount equal to the Partnership's taxable loss or income, respectively, for such year or period, determined in accordance with Section 703(a) of the Code (and for this purpose, all items of income, gain, loss, or reduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section 6.1 shall be added to such taxable income or loss;

(b)    Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section 6.1 shall be subtracted from such taxable income or loss;

-14-

(c)     In the event the book value of any Partnership asset is adjusted in compliance with Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(d)     Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its book value;

(e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, whenever the book value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of a fiscal year or period, depreciation, amortization or other cost recovery deductions allowable with respect to an asset shall be an amount which bears the same ratio to such beginning book value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, if the federal income tax depreciation, amortization , or other cost recovery deduction for such year is zero, depreciation, amortization or other cost recovery deduction shall be determined with reference to the book value of the asset using any reasonable method selected by the General Partner; and

(f)     Notwithstanding any other provision of this Section 6.1, any items which are specially allocated pursuant to Section 6.5 shall not be taken into account in computing Net Profits or Net Losses.

6.2    General Allocations.

6.2.1    Allocation of Net Profits.  For each Fiscal Year of the Partnership, and after appropriately taking into consideration distributions pursuant to Article V hereof that are properly attributable to such Fiscal Year, the Net Profits of the Partnership shall be allocated, after further taking into account the special allocations pursuant to Section 6.5 and subject to the overall directions of Section 6.4, as follows:

(a)     First, to the Partners, until the aggregate amount of Net Profits allocated to them for such Fiscal Year and all prior Fiscal Years is equal to the aggregate amount of Net Losses allocated to them pursuant to Section 6.2.2(c) hereof for all prior Fiscal Years; such allocation to be in the proportion that the Net Losses allocated to each of them pursuant to that Section 6.2.2(c) hereof bears to the Net Losses allocated to all of them pursuant to that Section 6.2.2(c) hereof;

(b)     Next, to the Partners, until the aggregate amount of Net Profits allocated to them for such Fiscal Year and all prior Fiscal Years is equal to the sum of (i) their aggregate cumulative Preferred Returns, plus (ii) the aggregate amount of Net Losses allocated to them pursuant to Section 6.2.2(b) hereof for all prior Fiscal Years (such allocation to be in the

-15-

proportion that the sum of said Preferred Returns and Net Losses allocated to each of them bears to the sum of said Preferred Returns and Net Losses allocated to all of them); and

(c)    All remaining Net Profits shall be allocated among the Partners pro rata in accordance with their respective Percentage Interests as of the end of the period with respect to which such Net Profits relate or, in the case of any Net Profits derived from the sale, exchange or other disposition of the Property, as of the date of such sale, exchange or other disposition of the Property.

For purposes of determining the amount of Net Profit to be allocated pursuant to Section 6.2.1 for any year, the Capital Account of each Partner shall be increased by such Partner's share of Partnership Minimum Gain as of the last day of such year, determined pursuant to Regulation Section 1.704 -2(g)(1), and by such Partner's share of Partner Minimum Gain as of the last day of such year, determined pursuant to Regulation Section 1.704-2(i)(5).

6.2.2    Allocation of Net Losses.    For each Fiscal Year of the Partnership, and after appropriately taking into consideration distributions pursuant to Article V hereof that are properly attributable to such Fiscal Year, the Net Losses of the Partnership shall be allocated, after further taking into account the special allocations pursuant to Section 6.5 and subject to the overall directions of Section 6.4, as follows:

(a)    First, to the Partners, until the aggregate amount of Net Losses allocated to them for such Fiscal Year and all prior Fiscal Years is equal to the aggregate amount of Net Profits allocated to them pursuant to Section 6.2.1(c) hereof for all prior Fiscal Years; such allocation to be in the proportion that the Net Profits allocated to each of them pursuant to that Section 6.2.1(c) hereof bears to the Net Profits allocated to all of them pursuant to that Section 6.2.1(c) hereof;

(b)    Next, to the Partners, until the aggregate amount of Net Losses allocated to them for such Fiscal Year and all prior Fiscal Years is equal to the aggregate amount of Net Profits allocated to them pursuant to Section 6.2.1(b) hereof for all prior Fiscal Years; such allocation to be in the proportion that the Net Profits allocated to each of them pursuant to that Section 6.2.1(b) hereof bears to the Net Profits allocated to all of them pursuant to that Section 6.2.1(b) hereof; and

(c)    All remaining Net Losses shall be allocated among the Partners pro rata in accordance with their respective Percentage Interests.

For purposes of determining the amount of Net Losses to be allocated pursuant to Section 6.2.2 for any year, the Capital Account of each Partner shall be increased by such Partner's share of Partnership Minimum Gain as of the last day of such year, determined pursuant to Regulation Section 1.704-2(g)(1), and by such Partner's share of Partner Minimum Gain as of the last day of such year, determined pursuant to Regulation Section 1.704-2(i)(5).

#1251694 v3 - West End LPA

6.3    <u>Limitation on Loss Allocations</u>.  Notwithstanding anything in this Agreement to the contrary, no loss or item of deduction shall be allocated to a Partner if such allocation would cause such Partner to have an Adjusted Capital Account Deficit as of the last day of the Fiscal Year or other period to which such allocation relates.  Any amounts not allocated to a Partner pursuant to the limitations set forth in this paragraph shall be allocated to the other Partners to the extent possible without violating the limitations set forth in this paragraph, and any amounts remaining to be allocated shall be allocated among the Partners in accordance with their Percentage Interests.

6.4    <u>Intention and Construction of Allocations</u>.  It is the intention of the Partners to allocate Net Profits and Net Losses in such a manner as to cause each Partner's Capital Account to always equal the amount of cash such Partner would be entitled to receive if the Partnership sold its assets for their respective book values and, after satisfying all Partnership liabilities, the proceeds from such sale, as well as all other funds of the Partnership, were then distributed to the Partners pursuant to Section 5.1.  It is also the intent of the Partners that each Partner's distributive share of income, gain, loss, deduction, credit (or item thereof) be determined and allocated consistently with the provisions of the Code, including Sections 704(b) and 704(c) of the Code. The provisions herein shall be so interpreted as necessary to accomplish the foregoing. If, for any reason, the General Partner deems it necessary in order to comply with the Code, the General Partner may, and hereby is, authorized and directed to allocate income, gain, loss, deduction or credit (or items thereof) arising in any year differently than as provided for in this Article VI if, and to the extent, (i) that allocating income, gain, loss, deduction or credit (or item thereof) would cause the determinations and allocations of each Partner's distributive share of income, gain, loss, deduction or credit (or item thereof) not to be permitted by the Code and any Regulations promulgated thereunder, or (ii) such allocation would be inconsistent with a Partner's interest in the Partnership taking into consideration all facts and circumstances. Any allocation made pursuant to this Section 6.10 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Agreement, and no further amendment of this Agreement or approval by any Partner shall be required to effectuate such allocation.  In making any such allocations ("New Allocations") under this Section, the General Partner is authorized to act in reliance upon advice of counsel to the Partnership or the Partnership's regular certified public accountants that, in their opinions after examining the relevant provisions of the Code and any current or future proposed or final Regulations thereunder, the New Allocations are necessary in order to ensure that, in either the then-current year or in any preceding year, each Partner's distributive share of income, gain, loss, deduction or credit (or items thereof) are determined and allocated in accordance with the Code and the Partner's interests in the Partnership.  New Allocations made by the General Partner in reliance upon the advice of counsel and accountants as described above shall be deemed to be made in the best interests of the Partnership and all of the Partners consistent with the duties of the General Partner hereunder and any such New Allocations shall not give rise to any claim or cause of action by any Partner against the Partnership or the General Partner.

6.5    <u>Special Allocations</u>.  The following special allocations shall be made in the following order:

6.5.1    <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Section 1.704-2(f) of the Regulations, in the event there is a net decrease in Partnership Minimum Gain during a Partnership taxable year, each Partner shall be allocated (before any other allocation is made pursuant to this Article VI) items of income and gain for such year (and, if necessary, for subsequent years) equal to that Partner's share of the net decrease in Partnership Minimum Gain.

(a)    The determination of a Partner's share of the net decrease in Partnership Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(g).

(b)    The items to be specially allocated to the Partners in accordance with this Section 6.5.1 shall be determined in accordance with Regulation Section 1.704-2(f)(6).

(c)    This Section 6.5.1 is intended to comply with the Minimum Gain chargeback requirement set forth in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

6.5.2    <u>Partner Minimum Gain Chargeback</u>:  Except as otherwise provided in Section 1.704-2(i)(4), in the event there is a net decrease in Partner Minimum Gain during a Partnership taxable year, each Partner who has a share of that Partner Minimum Gain as of the beginning of the year, to the extent required by Regulation Section 1.704-2(i)(4) shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) equal to that Partner's share of the net decrease in Partner Minimum Gain. Allocations pursuant to this Section 6.5.2 shall be made in accordance with Regulation Section 1.704-2(i)(4).  This Section 6.5.2 is intended to comply with the requirement set forth in Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

6.5.3    <u>Qualified Income Offset Allocation</u>.  In the event any Partner unexpectedly receives any adjustments, allocations or distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) which would cause such Partner to have an Adjusted Capital Account Deficit, items of Partnership income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.  This Section 6.5.3 is intended to constitute a "qualified income offset" in satisfaction of the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

6.5.4    <u>Gross Income Allocation</u>.  In the event any Partner has a deficit Capital Account at the end of any Partnership Fiscal Year which is in excess of the sum of (i) any amounts such Partner is obligated to restore pursuant to this Agreement, plus (ii) such Partner's distributive share of Partnership Minimum Gain as of such date, plus (iii) such Partner's share of Partner Minimum Gain determined pursuant to Regulation Section 1.704-2(i)(5), each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 6.5.4 shall be made only if and to the extent that such Partner would have a deficit Capital Account in excess of

-18-

such sum after all other allocations provided for in this Article VI have been made, except assuming that Section 6.5.3, and this Section 6.5.4 were not contained in this Agreement.

6.5.5    Allocation of Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated to the Partners in accordance with their respective Percentage Interests.

6.5.6    Allocation of Partner Nonrecourse Deductions.    Partner Nonrecourse Deductions shall be allocated as prescribed by the Regulations.

6.6    Built-In Gain or Loss/Section 704(c) Tax Allocations.    In the event that the Capital Account of any Partner is credited with or adjusted to reflect the fair market value of a Partnership property or properties, the Partners' distributive shares of depreciation, depletion, amortization, and gain or loss, as computed for tax purposes, with respect to such property, shall be determined pursuant to Section 704(c) of the Code and the Regulations thereunder, so as to take account of the variation between the adjusted tax basis and book value of such property. Any deductions, income, gain or loss specially allocated pursuant to this Section 6.6 shall not be taken into account for purposes of determining Net Profits or Net Losses or for purposes of adjusting a Partner's Capital Account.

6.7    Recapture.  Ordinary taxable income arising from the recapture of depreciation and/or investment tax credit shall be allocated to the Partners in the same manner as such depreciation and/or investment tax credit was allocated to them.

6.8    Prohibition Against Retroactive Allocations.  Notwithstanding anything in this Agreement to the contrary, no Partner shall be allocated any loss, credit or income attributable to a period prior to his admission to the Partnership.  In the event that a Partner transfers all or a portion of his Partnership interest, or if there is a reduction in a Partner's Percentage Interest due to the admission of new Partners or otherwise, each Partner's distributive share of Partnership items of income, loss, credit, etc., shall be determined by taking into account each Partner's varying interests in the Partnership during the Partnership's taxable year.  For this purpose, unless the General Partner, in its sole discretion, elects to provide for an interim closing of the Partnership's books, each Partner's distributive share shall be estimated by taking the pro rata portion of the distributive share such Partner would have included in his taxable income had he maintained his Percentage Interest throughout the Partnership year.  Such proration shall be based upon the portion of the year during which such Partner held the Percentage Interest, except that extraordinary, non-recurring items shall be allocated to the Persons holding Partnership interests at the time such extraordinary items occur.

6.9    Allocation of Nonrecourse Liabilities.  The "excess nonrecourse liabilities" of the Partnership (within the meaning of Section 1.752-3(a)(3) of the Regulations) shall be shared by the Partners in accordance with their respective Percentage Interests.

6.10    Fractions Rule.  If for any Fiscal Year an allocation under this Article VI would cause a violation of the "fractions rule" as defined in Section 514(c)(9)(E) of the Code, then, notwithstanding any other provision in this Agreement to the contrary, the allocation shall be

-19-

adjusted as the Partners may agree so as to be consistent with the requirements of Code Section 514(c)(9)(E) and shall be utilized for such Fiscal Year in filing the federal and state income tax returns for the Partnership. In the event the Partners are unable to agree within a reasonable period of time, the allocation shall automatically adjust so as to be consistent with the requirements of Code Sections 704(b) and 514(c)(9)(E) and shall be utilized for such Fiscal Year in filing federal and state income tax returns for the Partnership.

## ARTICLE VII
## MANAGEMENT AND REMOVAL OF GENERAL PARTNER

7.1    <u>Management Authority of the General Partner</u>.

  7.1.1    <u>General</u>.  The day-to-day management of the business and affairs of the Partnership shall be vested in the General Partner. Subject to the limitations set forth in Section 7.1.2, the General Partner shall have full, complete and exclusive discretion to take, without the consent of the Limited Partners, any and all action of whatsoever type that the Partnership is authorized to take and to make all decisions with respect thereto in furtherance of the purposes of the Partnership. By way of illustration and not limitation, the General Partner may, on behalf of the Partnership and as part of its business, and without the consent of the Limited Partners, except as expressly set forth in Section 7.1.2 of this Agreement, sell, encumber or otherwise transfer any or all of the Partnership property, including its goodwill, sign and deliver deeds, evidences of indebtedness, mortgages and other security instruments, easements, leases, service agreements, design contracts, construction contracts, management agreements, submit a Partnership claim or liability to arbitration and execute documents authorizing a third party to confess a judgment against the Partnership, and all of the Limited Partners hereby consent to the taking of any such action by the General Partner.

  7.1.2    <u>Management Rights of the Limited Partners</u>.  Notwithstanding the provisions of Section 7.1.1 hereof, each of the Limited Partners shall have the right to substantially influence the management of the Partnership. For purposes of this Section 7.1.2, unless the context clearly requires otherwise, all references to the Partnership shall include the Subsidiary and the Property Owner. Fund IV shall have the right to materially participate in the management activities enumerated in Sections 7.1.2(a)-(g) below and Parallel Fund IV shall have the right to materially participate in the management activities enumerated in Sections 7.1.2(h)-(n) below and Fund IV and Parallel Fund IV, as the case may be, shall exercise such right by providing or withholding its Approval (the Approval of Fund IV or Parallel Fund IV, as the case may be, for any of the foregoing activities is required prior to the General Partner engaging in any such activity).

  (a)    <u>Budget Amendments or Variations</u>.  Amend or modify any Operating Budget or vary from the limitations thereof except in the case of (i) emergency repairs to the Property (i.e., repair which, if not made prior to the approval of the Limited Partners, threaten material injury to the Property, to the Partnership or to any other Persons or property); (ii) expenditures for utilities, real estate taxes and assessments and insurance premiums with respect to the Property; and (iii) expenditures that would not cause the aggregate expenditures

-20-

described in the Operating Budget to exceed one hundred five percent (105%) of the aggregate expenditures set forth therein for any Fiscal Year.

(b)    Acquisition or Sale of Property.    Sell, exchange or otherwise transfer all or any portion of the Partnership's property, or acquire additional Partnership property or any interest therein; provided, however, that without any such prior written approval, the General Partner may make incidental purchases, sales, exchanges, conveyances or transfers of Partnership tangible personalty or fixtures if such transaction, together with all other such transactions in such Fiscal Year, involves property having a value or sales price of less than $10,000 in the aggregate, and the General Partner may grant utility and other similar easements with respect to the Partnership's property, as the General Partner shall determine to be necessary or advisable.

(c)    Leases.    Enter into any lease of any portion of the Property, or amend, modify, extend or terminate any ground lease with respect to any portion of the Property except for any non-material amendments or modifications in the ordinary course of business.

(d)    Encumbrances.    Except for liens arising by operation of law and securing Partnership debts which are not then currently due or payable (i.e., real estate taxes) and any easements or restrictions necessary or appropriate in connection with the acquisition or development of the Property, subject all or any portion of the Property to any mortgage, lien or other encumbrance.

(e)    Borrowings.    Effect (i) any mortgage loan, or (ii) any other borrowing or execute any other promissory note, evidence of indebtedness, guaranty or the like (other than any Approved refinancing or replacement thereof).

(f)    Contracts.    Enter into any contracts or agreements obligating the Partnership for any amount in excess of $50,000, unless such contract or agreement is pursuant to an Approved Operating Budget.

(g)    Legal Actions.    Prosecute, waive, settle or compromise any claims or causes of action of the Partnership against any third party (or parties) with values in excess of $10,000, in the aggregate, during any Fiscal Year, nor agree on behalf of the Partnership to pay any disputed claims or causes of action against the Partnership in excess of $10,000, in the aggregate, during any Fiscal Year.

(h)    Business of Partnership.    Except as otherwise provided herein, do any act which would make it impossible to carry on the ordinary business of the Partnership or engage any manager, developer, attorney, accountant, broker, insurer, title agency, title insurer or contractor.

(i)    Confess Judgments.    Confess a judgment against the Partnership.

#1251694 v3 - West End LPA

(j)     Possess Property.  Possess property of the Partnership, or assign the rights of any Partner in any Partnership property, for other than a Partnership purpose.

(k)     Tax Matters.  Extend any federal or state statute of limitations with respect to income taxation of a "partnership item", as defined in Code Section 6231(a)(3) and the Regulations thereunder, agree to the settlement of a tax controversy concerning a partnership item with any federal, state or local taxing authority, or make tax elections and other decisions affecting the tax treatment of a Partner.

(l)     Reserves.  Establish, increase or decrease a reserve, except as required to avoid an event of default under any Partnership loan.

(m)     Business with Partners or Affiliates.  Enter into any contract or agreement between the Partnership and a Partner or an Affiliate of a Partner.

(n)     Amendments to Approved Contracts or Agreements.  Alter, amend or modify any material term or condition of any Approved agreement or contract to which the Partnership is a party.

7.2     Budgets.  Capital Fund IV shall have the management rights set forth below in this Section 7.2 and shall exercise such rights by reviewing, commenting on and Approving the Operating Budgets.

7.2.1   [Reserved].

7.2.2   Operating Budget.

(a)     Initial Operating Budget.  Within ninety days following the Effective Date, the General Partner shall prepare and deliver to each of the Limited Partners for Approval by Capital Fund IV the initial operating budget for the Partnership for the period beginning on the Effective Date through December 31st of the year in which the Effective Date occurs (such initial operating budget (once Approved by Capital Fund IV) and any future operating budget (once Approved by Capital Fund IV) referred to herein as the "Operating Budget").

(b)     Future Operating Budgets.  At least ninety (90) days prior to the commencement of each Fiscal Year of the Partnership (beginning for the Fiscal Year following the year in which the Effective Date occurs), the General Partner shall cause to be prepared and shall submit to each of the Limited Partners a budget and business plan setting forth the estimated receipts and disbursements (capital, operating and other) on a cash basis for such Fiscal Year and a business plan for the Fiscal Year.  At any time, upon the request of any of the Limited Partners, the General Partner will meet at the offices of the requesting Limited Partner to discuss the proposed budget and business plan.  The Limited Partners shall consider such proposed budget and business plan.  At least sixty (60) days prior to the commencement of the upcoming Fiscal Year, Capital Fund IV shall Approve such proposed budget and business plan with such

-22-

additions, deletions and revisions as it deems appropriate. Once Approved by Capital Fund IV, the proposed budget and business plan for each Fiscal Year shall become the new Operating Budget, and the General Partner shall be authorized to make the expenditures and incur the obligations set forth therein, without further Approval from any of the Limited Partners. Until final Approval by Capital Fund IV of a proposed budget for any Fiscal Year, the General Partner shall be authorized to operate the Partnership on the basis of the previous Fiscal Year's Operating Budget, together with an increase in such budget equal to the actual increase in expenses associated with real estate taxes and assessments, insurance premiums and utilities relating to the Property. The General Partner may amend the Operating Budget only with the prior written Approval of the Limited Partners.

7.3    Appointment of Employees and Agents. Subject to the limitations set forth in Section 7.1.2, the General Partner may appoint, employ, contract or otherwise deal with any Persons for the transaction of the business of the Partnership, which Persons may, under supervision of the General Partner, perform any acts or services for the Partnership as the General Partner may approve.

7.4    Compensation to the General Partner and Its Affiliates. The General Partner and/or its Affiliates shall not be paid any fees or other compensation except as may be Approved by the Limited Partners from time to time.

7.5    Other Activities. The General Partner shall devote such portions of its time as it deems necessary to the affairs of the Partnership. Any of the Limited Partners may engage in other business ventures of every nature and description, independently or with others, even if such ventures are competitive with the Partnership's business, and the engagement in such activities shall not be deemed to be wrongful or improper. Neither the Partnership nor the General Partner shall have any rights in or to such ventures or the income or profits derived therefrom. The General Partner shall not engage in any other business ventures or activities without the Approval of the Lubert-Adler Group.

7.6    Liability and Indemnification.

7.6.1    The General Partner shall not be liable, responsible or accountable in damages to any of the Limited Partners or the Partnership for any act or omission on behalf of the Partnership performed or omitted in good faith and within the scope of the authority granted to the General Partner by this Agreement.

7.6.2    The Partnership hereby indemnifies and agrees to save the General Partner harmless against losses, damages, expenses (including, without limitation, court costs and attorneys' fees), judgments and amounts paid in settlement or incurred by the General Partner in connection with any threatened or contemplated claim, action, suit or proceeding to which the General Partner is a party or is threatened to be made a party by reason of its capacity as a General Partner or the fact that it was engaged in activities on behalf of the Partnership; provided, however, that the Partnership shall not be required to indemnify the General Partner for

-23-

any loss, expense or damage which the General Partner might suffer as a result of such General Partner's willful misconduct, gross negligence or bad faith.

        7.6.3    <u>Liability to Third Parties</u>.  Pursuant to <u>Official Code of Georgia Annotated</u> Section 14-8-15, and except as otherwise expressly provided herein, no Partner of the Partnership shall be individually liable or accountable, either directly or indirectly by way of indemnification, reimbursement, contribution, assessment, or otherwise, for any debts, obligations, liability of or chargeable to the Partnership or another Partner, whether arising in tort, contract, or otherwise, that are incurred, created or assumed while the Partnership is a limited liability partnership, solely by reason of being such a Partner or acting or omitting to act in such capacity or otherwise participating in the conduct of the activities of the Partnership.  This Section 7.6.3 and other provisions of this Agreement are intended to comply with <u>Official Code of Georgia Annotated</u> Sections 14-8-15(b), (c) and (d) and shall be interpreted and applied in a manner consistent therewith.

        7.7    <u>Reimbursement of Expenses</u>.  Expenses incurred with respect to the organization of the Partnership and acquisition of the Property shall be borne by the Partnership.  Expenses allocable to the operation and management of the Partnership shall be borne by the Partnership to the extent incurred in accordance with the Operating Budget or as otherwise Approved by the Lubert-Adler Group.  The General Partner shall be entitled to reimbursement by the Partnership for its expenses incurred on behalf of the Partnership regarding the operation and management of the Partnership to the extent incurred in accordance with the Operating Budget or as otherwise Approved by the Lubert-Adler Group.

        7.8    <u>Right to Remove and Admit General Partner</u>.  In this Section 7.8, the General Partner, Ginn-West End GP, LLC, shall be referred to as "<u>Ginn GP</u>".

        7.8.1    <u>Right to Remove Ginn GP as General Partner</u>.  The Lubert-Adler Group may remove Ginn GP as General Partner upon the Lubert-Adler Group's good faith determination of (i) the fraud, gross negligence or willful misconduct of Ginn GP in performing its duties as General Partner, or (ii) the failure of Ginn GP or of an Affiliate of Ginn GP to perform any material obligation under this Agreement or any other agreement that causes or exposes the Partnership to substantial damage (any such determination under (i) or (ii) is hereinafter referred to as the "<u>Ginn GP Default</u>").  If the Lubert-Adler Group elects to remove Ginn GP as General Partner, then the Lubert-Adler Group shall exercise such right by giving notice thereof (a "<u>Removal Notice</u>") to Ginn GP.  Any removal of Ginn GP pursuant to this Section 7.8.1 shall be effective as of the date (the "<u>Removal Date</u>") which is five (5) days after the date of the Removal Notice.  Except as provided in Section 7.8.2 below as to Ginn GP's right to cure, nothing in this Section 7.8.1 shall require the consent of Ginn GP.  Effective as of the Removal Date, the Partnership Interest of Ginn GP shall be automatically converted into a Partnership Interest of a special limited partner, as provided in Section 7.8.6 below.

        7.8.2    <u>Optional Cure Right</u>.  If the Lubert-Adler Group determines that a Ginn GP Default has occurred, then the Lubert-Adler Group may, at its option, and in its sole and exclusive discretion, grant Ginn GP the right to cure any such Ginn GP Default by notice ("<u>Cure</u>

-24-

Notice") from the Lubert-Adler Group to Ginn GP, specifying in reasonable detail those actions which the Lubert-Adler Group requires Ginn GP to take to cure the Ginn GP Default and the time periods within which such actions must be taken or performed by Ginn GP. If Ginn GP elects to accept the Lubert-Adler Group's offer to cure any such Ginn GP Default, then Ginn GP shall give notice to the Lubert-Adler Group within two (2) Business Days of the date Ginn GP received the Cure Notice, acknowledging receipt of the Cure Notice and Ginn GP's agreement to undertake, in good faith and within the time periods specified in the Cure Notice, the diligent prosecution of the actions specified in the Cure Notice (the "Cure Election"). If Ginn GP elects the Cure Election, then the Lubert-Adler Group shall not remove Ginn GP pursuant to this Section 7.8.1, provided, that Ginn timely performs and completes all actions set forth in the Cure Notice as determined in the Lubert-Adler Group's sole and absolute discretion. If Ginn GP does not timely and successfully complete all actions set forth in the Cure Notice, then the Lubert-Adler Group shall have the right to remove Ginn GP as though Ginn GP never made the Cure Election.

   7.8.3   Right to Appoint New General Partner. If a Ginn GP Default has occurred, then the Lubert-Adler Group shall have the right and authority to appoint and cause the admission to the Partnership of a new general partner (the "New General Partner") and determine such New General Partner's Percentage Interest. In such event, Ginn GP hereby agrees that its Percentage Interest may be diluted and reduced as the Lubert-Adler Group shall determine, in its sole and exclusive discretion, as may be necessary to induce the New General Partner to become a Partner in the Partnership.

   7.8.4   Liability for Wrongful Removal. Under no circumstances whatsoever shall a Limited Partner incur any liability or responsibility for a wrongful removal of Ginn GP under this Section 7.8. Ginn GP hereby waives and releases any and all claims or causes of action Ginn GP may have against the Lubert-Adler Group as a result of Ginn GP's removal as General Partner. The Lubert-Adler Group shall be entitled to exercise the rights contained in Section 7.8 without first seeking a judicial determination of the validity of such exercise; provided, however, that if removed, Ginn GP shall retain all legal or equitable causes of action (if any) against the Partnership (but not against any Limited Partner) arising from a Ginn GP removal. Upon the appointment of the New General Partner and the removal of Ginn GP, this Agreement shall be amended to the extent necessary to reflect such appointment and removal, and a certificate of amendment to the Certificate of Limited Partnership shall be filed in accordance with the GRULPA. Ginn GP agrees to execute and deliver such amendment and any and all other documents or instruments and do such further acts and things as may be required to carry out the intent of this Section 7.8.4, including without limitation, effectuating the admission to the Partnership of any New General Partner appointed by the Lubert-Adler Group hereunder. Ginn GP's failure or refusal to comply with the requirements of this Section 7.8.4 shall not adversely effect or otherwise limit the right or authority of the Lubert-Adler Group to appoint the New General Partner or to remove Ginn GP as provided herein or the New General Partner's exercise of its rights, duties or obligations as a general partner in accordance with the terms of this Agreement.

7.8.5    Power of Attorney.  Ginn GP hereby irrevocably constitutes and appoints each Limited Partner as its true and lawful attorney in Ginn GP's name, place and stead to (i) execute and deliver any and all documents or instruments necessary or appropriate to effect the removal of Ginn GP pursuant to Section 7.8.1 above and (ii) execute, sign, acknowledge, swear to (where appropriate) and file of record any certificate, document, consent or instrument which may be required to be issued, recorded or filed by the Partnership to (A) evidence the removal of Ginn GP pursuant to Section 7.8.1 above, (B) evidence the admission of the New General Partner to the Partnership pursuant to Section 7.8.3 above, and (C) evidence the dilution and reduction of Ginn GP's Percentage Interest as contemplated in Section 7.8.3 above.  It is expressly understood and intended by each Partner that the grant of the foregoing power of attorney is coupled with an interest and is irrevocable, and that the foregoing power of attorney shall not be affected by the disability, incompetency or incapacity of the Partner on whose behalf any such Partner is acting. The foregoing power of attorney shall in no way cause a Limited Partner to be liable in any manner for the acts or omissions of Ginn GP or any New General Partner.

7.8.6    Consequences of Removal of Ginn GP.  If Ginn GP is removed as provided in Section 7.8.1, then thereafter, Ginn GP's Partnership Interest, as diluted and reduced, shall be converted to a special class of limited partner Partnership Interest with no management, voting or Approval rights whatsoever, and the term "Limited Partners" as used in this Agreement with respect to designating rights of Approval shall not include Ginn GP.  Following the delivery of the Removal Notice, neither Ginn GP nor any of its Affiliates shall be entitled to be paid any fees or other compensation, whether accrued or thereafter owing, except as may thereafter be Approved by the Lubert-Adler Group following the Removal Date.    Notwithstanding any provision herein to the contrary, if the Lubert-Adler Group shall exercise its right to remove Ginn GP, then the Lubert-Adler Group shall comply with the provisions of Section 15.22.

## ARTICLE VIII
## LIMITED PARTNERS

8.1    Management of the Partnership.  The Limited Partners shall have the rights and powers given to the Limited Partners by the terms of this Agreement, which rights and powers are deemed to provide the Limited Partners with the authority to substantially influence the conduct of the management of the Partnership.  Except for those rights and powers specifically provided for herein, no Limited Partner, in its status as such, shall (i) take part in the management or control of the business of the Partnership, (ii) transact any business in the name of the Partnership, or (iii) have the power to bind the Partnership or take any action on its behalf or sign any documents on behalf of the Partnership.  In any matter with respect to which the Limited Partners are entitled to cast a vote under this Agreement or under any applicable law, each Limited Partner shall be entitled to a number of votes equal to such Partner's Percentage Interest.

8.2    Limitation on Liability of Limited Partners.  The liability of each Limited Partner for the debts and obligations of the Partnership shall be limited in the manner specified in GRULPA.

#1251694 v3 - West End LPA

8.3    Right of Limited Partners to Terminate the Development Agreement.    Any Limited Partner may, without the consent of the General Partner, unilaterally exercise the Partnership's right to terminate the Development Agreement in accordance with the terms of the Development Agreement.

## ARTICLE IX
## WITHDRAWAL AND TRANSFER OF INTERESTS

9.1    Statutory Withdrawal of General Partner.    Notwithstanding anything to the contrary contained in GRULPA, as amended, but subject to Article XII and XIII and Section 7.8, in no event shall the General Partner be deemed to have withdrawn from the Partnership or ceased to be a general partner of the Partnership upon the occurrence of any of the events specified in GRULPA, or any events similar thereto.

9.2    Transfer of Partner's Interest; Withdrawal of Partners.

9.2.1    Except as provided in Article XII or XIII hereof, no Partner may, without the written consent of all of the Partners, voluntarily or involuntarily sell, assign, mortgage, pledge, encumber, hypothecate or otherwise transfer all or any part of its Partnership Interest, except as follows:

(a)    In the case of a death or incompetency of a Limited Partner, his/her Partnership Interest shall vest in his/her personal representative and, in the case of death, in his/her beneficiaries.  In the case of Bankruptcy of a Limited Partner, his/her/its Partnership Interest shall vest in the trustee, receiver or administrator of the bankrupt's estate;

(b)    Each Limited Partner who is a natural Person shall have the right to transfer all or any part of his/her Partnership Interest to one or more charities, his/her spouse, parents, and/or issue of any of the foregoing and/or trusts for the benefit of one or more of himself/herself and/or one or more of his/her spouse, parents and/or issue of any of the foregoing; or

(c)    Any member of the Lubert-Adler Group shall have the right to transfer all or any part of its Partnership Interest to one or more Affiliates or entities managed by any entity owned or controlled by Dean S. Adler or Ira Lubert.

9.2.2    Notwithstanding anything herein to the contrary, no transferee of a Limited Partner's Partnership Interest shall become a substituted Limited Partner with respect to the transferred interest, unless and until all of the Partners shall have given their written consent thereto (which written consent may be withheld by any Partner arbitrarily) and the transferee shall have:

(a)    assumed all of the obligations of its predecessor under this Agreement with respect to the interest transferred accruing from and after the effective date of the transfer;

    #1251694 v3 - West End LPA

(b)     delivered to the General Partner a statement, acknowledging the assumption of such liability and that the transferee has read the provisions of this Agreement and intends to be legally bound as a Limited Partner by all the terms and conditions of this Agreement and any amendments or modifications thereof, and shall have executed a counterpart of the Agreement as then in effect;

(c)     paid all reasonable expenses (including, without limitation, legal and accounting fees) incurred by the Partnership in connection with such transfer, including, but not limited to, the cost of the preparation, filing and publishing of any amendment to the Partnership's Certificate of Limited Partnership and any fictitious name or similar registrations necessary or desirable in connection therewith; and

(d)     delivered to the General Partner, if requested by the General Partner, an opinion that (A) such transaction may be effected without registration under the Securities Act of 1933, as amended, or violation of applicable state securities laws and (B) the Partnership will not be required to register under the Investment Company Act of 1940, as in effect at the time of rendering such opinion.

9.2.3   Except as otherwise specifically provided in this Agreement, a Limited Partner may not withdraw from the Partnership or have the right to receive Partnership distributions, the return of his/her/its contribution or the fair value of his/her/its Partnership Interest, at any time prior to the dissolution and winding up of the Partnership.

9.3    Other Prohibitions on Transfers.  Notwithstanding any other provision herein to the contrary, no Partner shall voluntarily or involuntarily sell, assign, mortgage, pledge, encumber, hypothecate or otherwise transfer all or any part of its Partnership Interest without the written consent of all of the other Partners, other than pursuant to Articles XII and XIII, if such transfer would (i) violate any applicable federal or state securities laws (including any investment suitability standards) applicable to the Partnership or the General Partner, (ii) require the Partnership, or the Partnership Interest being transferred, to be registered under, or otherwise to be brought in compliance with, state or federal securities laws, (iii) cause a termination of the Partnership for federal income tax purposes, (iv) cause any of the transactions contemplated by this Agreement to be "prohibited transactions" under the Employee Retirement Income Security Act of 1974, as amended from time to time, or the regulations promulgated thereunder from time to time ("ERISA") or the Code or the Regulations, (v) cause any Partner to become a fiduciary, as that term is defined in ERISA or the Code, with respect to another Partner or cause any member of the Lubert-Adler Group to become a fiduciary, as that term is defined in ERISA or the Code, (vi) cause the Partnership, the Subsidiary or the Property Owner to be in breach of or default under any mortgage, deed of trust or other security agreement encumbering the Property or other Partnership assets, or (vii) cause the Partnership to be classified as other than a "partnership" for federal income tax purposes.

#1251694 v3 - West End LPA

## ARTICLE X
## TERMINATION OF THE PARTNERSHIP

10.1    <u>Dissolution</u>.  The Partnership shall dissolve upon, but not before, the first to occur of the following:

(a)    upon the sale or other disposition of all or substantially all of the Partnership's assets and the receipt of the final payments to be paid by the purchaser or transferee thereof (or a determination by the Liquidator that it is unlikely that any additional payments will be made);

(b)    subject to contrary provisions of Article VII, upon the retirement, withdrawal, dissolution, death, insanity, or Bankruptcy of the General Partner, unless all of the remaining Partners agree within thirty (30) days after such event to continue the Partnership and its business; or

(c)    December 31 in the year that is fifty years from the year in which the Effective Date occurs.

10.2    <u>Winding Up and Liquidating Distributions</u>.

(a)    In the event of a dissolution of the Partnership pursuant to Section 10.1, the assets of the Partnership shall be liquidated by the Liquidator and, after Partnership obligations (including Partner Loans) shall have been discharged or provisions therefor shall have been made, and any reserves which the Liquidator deems reasonably necessary to provide for contingent or unforeseen liabilities or obligations of the Partnership have been established, the remaining proceeds of such liquidation shall be distributed among the Partners in accordance with the positive balance (if any) in each Partner's Capital Account (as determined after taking into account all Capital Account adjustments for the Partnership's Fiscal Year during which the liquidation occurs) with the balance, if any, being distributed pro rata to the Partners in accordance with their respective Percentage Interests ("<u>Liquidating Distributions</u>").    Where appropriate, Capital Accounts shall be adjusted as if assets in kind held by the Partnership at dissolution were sold for their then fair market value and gain or loss therefrom were allocated under Article VI hereof.

(b)    All Liquidating Distributions shall be made in cash.    However, in connection with the sale by the Partnership and reduction to cash of its assets, although the Partnership has no obligation to offer to sell any properties to the Partners, any Partner, may bid on and purchase any assets; it being agreed, however, that if the Liquidator shall determine that an immediate sale of part or all of the Partnership assets would cause undue loss to the Partners, the Liquidator may defer liquidation of and withhold from distribution for a reasonable time any assets of the Partnership  (except those necessary to satisfy the Partnership's current obligations).

(c)    In connection with the termination of the Partnership, the Partnership's accountants shall prepare and furnish to each Partner a statement setting forth the assets and

liabilities of the Partnership as of the date of complete liquidation. After distribution of all of the assets of the Partnership, the General Partner shall cause to be executed, acknowledged and filed all documents necessary to terminate the Partnership including without limitation termination of the Partnership's Certificate of Limited Partnership and fictitious name certificates, if any.

10.3    General Partner Deficit Make-Up Obligation. If the General Partner has a deficit balance in its Capital Account (determined after taking into account all distributions pursuant to Article V and all allocations pursuant to Article VI for the Partnership's taxable year in which the dissolution occurs) upon the dissolution and liquidation of the Partnership, the General Partner hereby agrees unconditionally that it shall contribute to the Partnership the deficit balance in its Capital Account on or before the later of (i) the end of the Partnership's taxable year in which the Partnership is liquidated or (ii) ninety (90) days after the date the Partnership is liquidated. This provision creates no right with respect to any creditor of the Partnership.

## ARTICLE XI
## BOOKS, RECORDS AND TAX ELECTIONS

11.1    Books and Records. The General Partner shall, at the expense of the Partnership, cause to be kept full and accurate books of the Partnership. All books and records of the Partnership shall be kept at the Partnership's principal office and shall be available at reasonable times for inspection and copying by the Limited Partners or their duly authorized representatives. The books of the Partnership shall be kept on the accrual basis method of accounting in accordance with generally accepted accounting principles. The General Partner shall, at the expense of the Partnership, cause to be prepared by the Partnership's accountants and shall deliver to the Limited Partners the reports described herein or as otherwise requested by the Limited Partners.

11.2    Tax Returns. No later than March 1 of each year, the General Partner will furnish the Lubert-Adler Group with a draft of each of the Partnership's federal, state and local income and other tax returns. Within fifteen (15) days after receipt of such draft, the Lubert-Adler Group will provide notice to the General Partner as to whether the Lubert-Adler Group consents to the filing of the return consistent with the draft or objects to the manner in which one or more partnership items are reflected in the return. The tax advisors of the Limited Partners and the tax advisors of the General Partner will attempt to resolve any differences. If they are unable to do so, the matter will be referred to the chief financial officers of the Partners for resolution and they will jointly resolve any differences. In the event any differences are not resolved prior to the date for filing any of the Partnership's tax returns, then such returns shall be filed in the form requested by the Lubert-Adler Group.

11.2.1    Subject to the Approval of the Lubert-Adler Group, the General Partner shall employ a public accounting firm to prepare at the Partnership's expense the federal and state income tax returns of the Partnership. The General Partner shall further use its best efforts to cause the accounting firm to:

(a)    provide its best estimate of each Partner's distributive share of all income, gains, losses, deductions and credits of the Partnership for each taxable year within ten (10) days following the close of each taxable year, and

(b)    subject to and within the time periods required by Section 11.2, prepare and deliver to each Partner an information reporting return (Form 1065 K-1) reflecting each Partner's distributive share of all income, gains, losses, deductions and credits of the Partnership for the taxable year just ended.

11.3    Capital Accounts.    Except as provided elsewhere in this Agreement (including, without limitation, Section 10.3), no Partner shall have any obligation to eliminate a deficit balance in its Capital Account at any time, or bring its Capital Account into any particular parity with any other Partner's Capital Account at any time.

11.4    Tax Matters Partner.    The General Partner is hereby appointed as the Partnership's "Tax Matters Partner", as that term is used in the Code and the Regulations thereunder.  The General Partner, in performance of its duties as Tax Matters Partner, shall comply with all the duties and restrictions provided for in this Agreement.  Subject to Approval of the Lubert-Adler Group, the General Partner shall cause:

11.4.1  the preparation and timely filing of all Partnership tax returns,

11.4.2  the timely filing of all other writings required by any governmental authority having jurisdiction to require such filing, and

11.4.3  the prompt written notice to each Partner upon receipt of advice that the Internal Revenue Service intends to examine or audit any tax returns of the Partnership.

11.5    Notice of Proceedings, Filings, Meetings.    The Tax Matters Partner shall promptly give written notice to the Partners of the commencement of any administrative or judicial proceedings involving the tax treatment of any items of Partnership income, loss, deduction and credit, and shall further keep the Partners fully informed of, and provide the Partners an opportunity to participate fully in, all material developments involved in such proceedings.  In addition, the Tax Matters Partner shall give the Partners prompt written notice of, and provide the Partners an opportunity to participate in the preparation of any material submission to the Internal Revenue Service or to any Court in connection with any such proceedings.  The Tax Matters Partner shall also give written notice to the Partners of its intention to meet with any representative of the Internal Revenue Service at least thirty (30) days prior to such meeting (or immediately upon arranging such meeting if such meeting is arranged fewer than thirty (30) days prior to such meeting), and shall provide the Partners or their agents, employees or accountants with an opportunity to participate in such meeting (and shall inform any Partners who do not participate in the meeting of the results of the meeting within two (2) Business Days after such meeting).  The Tax Matters Partner shall inform the Partners of the contents of any material communication (oral or written) from or to the Internal Revenue Service within two (2) Business Days of receiving or sending such communication (or on the same day, if any action is required

-31-                              #1251694 v3 - West End LPA

in response to such communication within fewer than thirty (30) days of receipt of such communication).

11.6    Partner Returns. Each Limited Partner shall file tax returns consistent with the tax treatment of the Partnership's tax returns, which tax treatment shall be established by the Lubert-Adler Group prior to the filing of the first required Partnership tax return.

11.7    Tax Elections. Except as otherwise restricted by this Agreement, the General Partner shall cause the Partnership to make such tax elections (including, without limitation, the election under Section 754 of the Code) as may be reasonably requested by the Lubert-Adler Group.

## ARTICLE XII
## BUY-SELL PROVISIONS

12.1    Buy-Sell Provisions.

12.1.1 Exercise of Buy-Sell Rights. From and after three (3) years from the Effective Date, the General Partner on the one hand and the Lubert-Adler Group on the other hand shall each have the right to initiate the buy-sell procedure set forth in this Section 12.1. The party initiating the buy-sell procedure shall hereinafter be referred to as the "Initiator". The party which is not the Initiator is hereinafter referred to as the "Recipient". For purposes of this Article XII, the purchase of the Partnership Interests of the Lubert-Adler Group shall be deemed to constitute the purchase of all the Partnership Interests of all the members of the Lubert-Adler Group.

12.1.2 Initiation of Buy-Sell Rights. To initiate the buy-sell procedure, the Initiator must deliver to the Recipient a written notice stating that the Initiator is initiating the buy-sell procedure pursuant to this Article XII (the "Buy-Sell Notice").

12.1.3 Requirements of Buy-Sell Notice. The Buy-Sell Notice shall set forth at least the following three (3) items:

(a)    A statement that the Initiator is initiating the buy-sell procedure pursuant to Section 12.1 of this Agreement.

(b)    A gross amount (the "Stated Amount") which the Initiator, as a third party buyer, would pay in cash for all of the assets of the Partnership (including without limitation the amount receivable by the Partnership, if any, attributable to the General Partner's deficit make-up obligation set forth in Section 10.3, such deficit make-up obligation, if any, to be determined after adjusting the General Partner's Capital Account in accordance with Article VI to reflect the allocation of Net Profits or Net Losses which would hypothetically result from a sale of the Partnership's assets for an amount equal to the Stated Amount) as of the date of the Buy-Sell Notice, free and clear of all the Partnership's indebtedness. The Stated Amount shall

not be less than the aggregate of all indebtedness owed by the Partnership, including all Partner Loans.

(c) A calculation, in reasonable detail, setting forth the amounts each Partner would be entitled to receive as a Liquidating Distribution if the Partnership had sold all of its assets for a cash purchase price equal to the Stated Amount as of the date of the Buy-Sell Notice, the Partnership satisfied all of its liabilities out of such purchase price, the Partnership had immediately dissolved pursuant to Section 10.1 and Liquidating Distributions had been made to each of the Partners without holding back any reserves for any contingent or unforeseen liabilities or obligations of the Partnership as provided in Section 10.2(a). Such hypothetical Liquidating Distribution for each Partner shall be the specified purchase price of each Partner's Partnership Interest pursuant to the Buy-Sell Notice.

12.1.4 <u>Options of Recipient</u>. The Recipient shall have fifteen (15) Business Days from the date of the Recipient's receipt of the Buy-Sell Notice to notify the Initiator in writing of its election (the "<u>Recipient's Election Notice</u>") to either:

(a) <u>Sell</u>. Sell its Partnership Interest to the Initiator for a purchase price equal to the amount of the Recipient's hypothetical Liquidating Distribution set forth in the Buy-Sell Notice (the "<u>Recipient's PSI Value</u>"); or

(b) <u>Purchase</u>. Purchase the Partnership Interest of the Initiator for a purchase price equal to the amount of the Initiator's hypothetical Liquidating Distribution set forth in the Buy-Sell Notice (the "<u>Initiator's PSI Value</u>").

In the event the Recipient fails to timely give its Recipient's Election Notice, the Recipient shall be conclusively deemed to have elected to sell its Partnership Interest to the Initiator for the Recipient's PSI Value.

12.1.5 <u>Status of Partners</u>. The Partner that becomes obligated to sell its Partnership Interest pursuant to this Section 12.1 shall be the "<u>Selling Partner</u>", and the Partner that becomes obligated to purchase the other Partner's Partnership Interest or the Partnership's assets, as the case may be, shall be the "<u>Buying Partner</u>".

12.1.6 <u>Obligation to Satisfy Deficit Make-Up Obligation</u>. If the Lubert-Adler Group is the Buying Partner, then the General Partner shall contribute to the Partnership an amount of cash equal to its deficit make-up obligation set forth in Section 10.3, if any, after making the adjustments described in Section 12.1.3(b).

12.2 <u>Failures</u>.

12.2.1 <u>Failure of Initiator to Sell</u>. In the event Recipient elects to purchase the Partnership Interest of the Initiator pursuant to Section 12.1.4(b) above and the Initiator fails to fulfill its obligations to consummate the sale of its Partnership Interest to the Recipient, the Initiator shall be treated as a Selling Partner subject to the provisions of Section 12.4.7(a) below.

12.2.2 <u>Failure of Recipient to Purchase</u>.  In the event the Recipient elects to purchase the Partnership Interest of the Initiator pursuant to Section 12.1.4(b) above and the Recipient fails to fulfill its obligations to consummate such purchase in accordance with the provisions of this Agreement, the Initiator shall have the right to treat the Recipient as a Buying Partner subject to the provisions of Section 12.4.7(b) below.

12.2.3 <u>Failure of Recipient to Sell</u>.  In the event the Recipient does not elect to purchase the Partnership Interest of the Initiator pursuant to Sections 12.1.4(a) above and the Recipient fails to consummate the sale of its Partnership Interest to the Initiator, the Recipient shall be treated as a Selling Partner subject to the provisions of Section 12.4.7(a) below.

12.2.4 <u>Failure of Initiator to Purchase</u>.  In the event the Recipient does not elect to purchase the Initiator's Partnership Interest in accordance with Sections 12.1.4(b) above, and the Initiator fails to consummate such purchase in accordance with the provisions of this Agreement, the Recipient shall have the right to treat the Recipient as a Buying Partner subject to the provisions of Section 12.4.7(b).

12.3    <u>Election to Acquire Partnership Assets.</u>  In lieu of purchasing a Partner's Partnership Interest, the Buying Partner may elect by written notice to the Selling Partner, which notice shall be delivered to the Selling Partner at least ten (10) days prior to the Closing Date, to cause the Partnership to convey and transfer all of the assets of the Partnership, to the Buying Partner based upon a purchase price equal to the Stated Amount, provided that: (i) the Buying Partner pays all realty transfer taxes, recording fees and other costs in connection with such conveyance and transfer in excess of those that would have been payable if Partnership Interests had been transferred; and (ii) such conveyances and transfers shall not cause adverse tax or other adverse financial consequences to the Selling Partner in excess of those that would have resulted from a transfer of Partnership Interests, unless the Buying Partner pays to the Selling Partner an amount equal to such adverse tax or other financial consequences.  In the event of the election by the Buying Partner to acquire the Partnership's assets in lieu of the Selling Partner's Partnership Interest, the amount paid to the Selling Partner shall be the same amount as if the Buying Partner had purchased the Selling Partner's Partnership Interest.

12.4    <u>Closing.</u>  The "<u>Buy-Sell Closing</u>" shall occur during normal business hours at the principal place of business of the Partnership or at such other place as the parties to such transactions may mutually agree.

12.4.1 At the Buy-Sell Closing, the Buying Partner shall either satisfy, or cause the Partnership to satisfy, all Partnership obligations (including any Partner Loans of the Selling Partner or any liens on the Property except as permitted by Section 12.7), which become due as a result of such purchase and sale.  Except as provided in Section 12.1.6, no call for a Capital Contribution may be made to provide the Partnership with funds necessary to satisfy any obligation of the Partnership which becomes due as a result of a purchase and sale pursuant to Article XII.

    #1251694 v3 - West End LPA

12.4.2 The time and date of the Buy-Sell Closing shall be specified by the Buying Partner by at least ten (10) days prior written notice to the Selling Partner and shall be on a date not later than sixty (60) days after expiration of the fifteen (15) Business Day period set forth in Section 12.1.4 (the "Closing Date").

12.4.3 At the Buy-Sell Closing, the Selling Partner shall execute such assignments of Partnership Interest and other documents and assurances as the Buying Partner may reasonably require to consummate the sale and vest in the Buying Partner the Selling Partner's Partnership Interest; provided, however, that all instruments executed in connection with the Buy-Sell Closing shall be without recourse, representation or warranty whatsoever except that each Selling Partner shall (as to its own Partnership Interest only) represent that (i) the Partnership Interest being sold by it is free and clear of all liens, encumbrances and rights of others, (ii) it has full right and authority to sell such Partnership Interest, (iii) the sale has been duly authorized and (iv) it has not taken any action in violation of this Agreement.

12.4.4 Pending the Buy-Sell Closing, the Property shall be operated and maintained and the business of the Partnership conducted consistent with prior practices and the then current Budget.

12.4.5 Pending the Buy-Sell Closing, the Partners shall cooperate with respect to the negotiation and execution of any applications and commitments for financing to be secured by Partnership property, provided, that the Selling Partner shall have no liability thereunder and the Buying Partner shall indemnify, defend and hold harmless the Selling Partner and the Partnership from all claims, loss and damages in connection therewith.

12.4.6 Each Partner shall pay for the fees and expenses of its own counsel in connection with any transfers pursuant to this Article XII.

12.4.7 Remedies.

(a)    Selling Partner's Default.  The failure of the Selling Partner to timely consummate the sale of its Partnership Interest at the Buy-Sell Closing shall constitute a default under this Agreement and the Buying Partner shall be entitled, by written notice to the Selling Partner, within thirty (30) days after the date of such failure, to pursue any and all remedies available under this Agreement or at law or equity, including specific performance, or to terminate the buy-sell procedure initiated pursuant to this Article XII.  Failure to give such notice shall be deemed to be a waiver of the Selling Partner's default.

(b)    Buying Partner's Default. The failure of the Buying Partner to timely consummate the purchase of the Partnership Interest at the Buy-Sell Closing shall constitute a default under this Agreement and the Selling Partner shall be entitled, by written notice to the Buying Partner within thirty (30) days after the date of such failure, to pursue any and all remedies available under this Agreement or at law or equity, including specific performance, or to terminate the buy-sell procedure initiated pursuant to this Article XII. Failure to give such notice shall be deemed to be a waiver of the Buying Partner's default.

-35-                                    #1251694 v3 - West End LPA

12.4.8 <u>Affiliate of Buying Partner</u>.  At the election of the Buying Partner, the Partnership Interest or the Partnership's assets, as the case may be, to be purchased by the Buying Partner may be acquired in the name of an Affiliate of the Buying Partner, <u>provided</u> that (i) the Buying Partner shall have designated such Affiliate by written notice to the Selling Partner given at least five (5) Business Days prior to Closing Date, (ii) the Selling Partner shall have been furnished evidence reasonably satisfactory to it and its counsel that the nature of such Affiliate is not such as to cause the sale to violate ERISA, and (iii) unless the Selling Partner shall otherwise elect, both such Affiliate and the Buying Partner shall be required to join in any indemnities required to be given pursuant to this Article.  In the event the Buying Partner is the Lubert-Adler Group, the Affiliate shall be a Qualified Affiliate.

12.5  <u>Method of Payment.</u>  The purchase price for the Partnership Interest being sold or the Partnership assets, as the case may be, and all other amounts payable in connection with the transactions contemplated hereby shall be payable at the Buy-Sell Closing by federal wire of immediately available funds.

12.6  <u>Opinions of Counsel.</u>  At the Buy-Sell Closing, the Selling Partner and the Buying Partner shall deliver favorable opinions of their respective counsel to the effect that the transactions to occur at the Buy-Sell Closing have been duly authorized.

12.7  <u>Recourse Obligations.</u>  In the event that the Lubert-Adler Group is the Buying Partner, then as a condition precedent to such transaction, the Lubert-Adler Group shall comply with the provisions of Section 15.22.

12.8  <u>Power of Attorney</u>.  Each Partner hereby irrevocably constitutes and appoints each of the other Partners as its true and lawful attorney, in its name, place and stead, to make, execute, sign, acknowledge, swear to (where appropriate), and file of record any certificate, consent, document or instrument which may be required to be issued or filed by the Partnership or any Partner to evidence the transfer of the Selling Partner's Partnership Interest to the Buying Partner pursuant to this Article XII or to evidence the transfer of the Partnership's assets in the event the Buying Partner makes the appropriate election pursuant to Section 12.3 above.  It is expressly understood and intended by each Partner that the grant of the foregoing power of attorney is coupled with an interest and is irrevocable, and that the foregoing power of attorney shall not be affected by the disability, incompetency or incapacity of the Partner on whose behalf any such Partner is acting pursuant to the foregoing power of attorney.

**ARTICLE XIII**
**THIRD PARTY OFFER**

13.1  <u>Third Party Offer</u>.

13.1.1 <u>Notice of Offer</u>.  If, at any time, an unrelated and unaffiliated third party makes a bona-fide offer to buy the Property (a "<u>Third Party Offer</u>"), notice of such offer shall be immediately delivered to the Partners.

-36-

13.1.2  <u>Approval of Offer</u>.  If the Third Party Offer provides that (i) the General Partner shall have no liability for the Partnership's Recourse Obligations following closing of such Third Party Offer, (ii) any such Recourse Obligations shall be assumed by a party that is adequately capitalized to assume such Recourse Obligations, or (iii) the Lubert-Adler Group or a Qualified Affiliate of the Lubert-Adler Group shall assume such Recourse Obligations, then the Lubert-Adler Group shall have the right, in its sole and absolute discretion, to Approve the Third Party Offer.  Otherwise, acceptance of the Third Party Offer shall require the Approval of all the Partners.

13.1.3  <u>Approval Notification and General Partner Election</u>.  In the event (i) all the Partners Approve the Third Party Offer or (ii) the Lubert-Adler Group (pursuant to its unilateral right in Section 13.1.2 above) Approves the Third Party Offer and notifies the General Partner in writing of such approval (the "<u>Sale Approval Notice</u>"), the General Partner shall promptly cause the Partnership to accept the Third Party Offer and diligently proceed to close the transaction evidenced by the Third Party Offer, unless, within ten (10) Business Days (the "<u>Match Period</u>") after the General Partner's receipt of the Sale Approval Notice, the General Partner, by notice to the Lubert-Adler Group, either elects (the "<u>Match Election</u>") to (A) buy the Property, on substantially the same terms and conditions as set forth in such Third Party Offer (except as the terms and conditions of the Third Party Offer must be modified to waive any due diligence inspection periods and to post the Deposit provided in Section 13.2), or (B) purchase all of the Partnership Interests of the members of the Lubert-Adler Group for an amount equal to the Liquidating Distributions that such members of the Lubert-Adler Group would have received had the Property been sold pursuant to the Third Party Offer and the Partnership dissolved and liquidated pursuant to Section 10.2 without holding back any reserves for contingent or unforeseen liabilities or obligations of the Partnership as provided in Section 10.2(a).

13.2  <u>Deposit</u>.  In the event the General Partner elects to either purchase the Property or purchase the Partnership Interests of all of the members of the Lubert-Adler Group pursuant to Section 13.1.3 above, the General Partner shall, within ten (10) Business Days after the date of the Match Election, pay a cash deposit or post an irrevocable sight draft letter of credit or certificate of deposit equal to five percent (5%) of the aggregate proceeds that are to be paid to the Lubert-Adler Group (including Partner Loans by the Lubert Adler Group) pursuant to Section 13.1 above (the "<u>Deposit</u>").  Any cash portion of the Deposit shall be placed in an interest bearing account maintained by the Lubert-Adler Group at a bank acceptable to the Lubert-Adler Group and any interest on such cash or on any certificate of deposit shall be added to, and constitute a portion of, the Deposit for purposes of this Section 13.2.  If the General Partner fails to make the Deposit as provided herein, the General Partner shall be in default.  In such event the Lubert-Adler Group, at its election, shall have the right to direct that the General Partner shall promptly cause the Partnership to accept the Third Party Offer and to diligently proceed to close the transaction evidenced by the Third Party Offer.

13.3  <u>Closing</u>.  The closing of the (i) the purchase of the Property by the General Partner, or (ii) the purchase by the General Partner of all of the Partnership Interests of the Lubert-Adler Group, as the case may be, shall occur on or before the ninetieth (90th) day after the

expiration of the Match Period, or at such earlier date as the General Partner may specify by ten (10) Business Days prior written notice (the "Sale Closing Date").  The purchase price (as determined pursuant to Section 13.1 above) shall be paid on the Sale Closing Date at the principal business office of the Lubert-Adler Group.  At such closing, the Partnership Interest shall be duly conveyed by the members of the Lubert-Adler Group free and clear of all liens and encumbrances, and the purchase price shall be paid by wire transfer of immediately available federal funds.

13.4    Nominee of General Partner.    At the election of the General Partner, the Partnership Interests or the Property, as the case may be, to be purchased by the General Partner may be acquired in the name of a nominee (whether such nominee is an Affiliate of the General Partner), provided, that (i) the General Partner shall have designated such nominee by written notice given at least five (5) Business Days prior to the Sale Closing Date, (ii) the Lubert-Adler Group shall have been furnished evidence reasonably satisfactory to it and their counsel that the nature of such nominee is not such as to cause the sale to violate ERISA, and (iii) unless the Lubert-Adler Group shall otherwise elect, both such nominee and the General Partner shall be required to join in any indemnities required to be given pursuant to this Article.

13.5    Failure.

13.5.1  Failure of Lubert-Adler Group.  In the event of the failure of the members of the Lubert-Adler Group to timely close the sale of their Partnership Interests at the closing provided in this Article XIII, the same shall constitute a default under this Agreement and the General Partner shall be entitled at its election, by written notice to the Lubert-Adler Group within thirty (30) days after the date of such failure (the "Default Election Notice"), to pursue any and all remedies available under this Agreement or at law or equity, including without limitation specific performance.  In the event the General Partner fails to timely deliver the Default Election Notice to the Lubert-Adler Group, such failure shall be deemed to constitute a release by the General Partner of all the obligations of the members of the Lubert-Adler Group to timely sale and transfer their Partnership Interests to the General Partner.

13.5.2  Failure of General Partner – Liquidated Damages.  In the event of the failure of the General Partner to timely close the purchase of the Partnership Interests or the purchase of the Property, as the case may be, at the closing provided in this Article XIII, the General Partner shall be in default and the Lubert-Adler Group's sole and exclusive remedy with respect to such default shall be to receive and retain the Deposit as liquidated damages.  It is hereby agreed by the Partners that the Lubert-Adler Group's damages will be difficult to ascertain and to determine and that the Deposit constitutes a reasonable estimation thereof and is intended not as a penalty, but as full liquidated damages pursuant to Official Code of Georgia Annotated Section 13-6-7 (1982).

13.6    Marketing the Property.

13.6.1  Unilateral Right of Lubert-Adler Group to Initiate Sale of Property.  If, at any time the Lubert-Adler Group determines, in its sole and absolute discretion, that the

-38-

Partnership, in its capacity as the sole shareholder of the Subsidiary, in its capacity as the sole shareholder of the Property Owner, should sell the Property, the Lubert-Adler Group shall so notify (the "Sales Notice") the General Partner. In the Sales Notice, the Lubert-Adler Group shall specify the sales price ("Sales Price") for which the General Partner shall cause the Partnership to cause the Subsidiary to cause the Property Owner to offer the Property for sale. If the General Partner has no objection to the Sales Price specified in the Sales Notice, the General Partner shall within thirty (30) days of the Sales Notice commence the marketing of the Property and continue to diligently prosecute the marketing and sale of the Property. The Lubert-Adler Group may terminate the marketing of the Property at any time.

13.6.2  Sales Price - Appraisal Alternative.  If the General Partner objects to such Sales Price, the Sales Price shall be determined as provided in this Section 13.6.2. The fair market value of the Property shall be determined by two M.A.I. appraisers, with one appraisal performed by an appraiser selected by the General Partner and the second appraisal performed by an appraiser selected by the Lubert-Adler Group. Both appraisers shall be selected within forty (40) days of the date of the Sales Notice. Failure of either the Lubert-Adler Group or the General Partner to select its appraiser within such forty (40)-day period shall be deemed to a waiver of such Partner's right to appoint an appraiser and in such event the fair market value shall be as determined by the one appraiser. In the event two (2) appraisers are appointed, both appraisers shall be instructed to complete their appraisals within ninety (90) days of the date of the Sales Notice. If either of such appraisals is not completed within such period, the fair market value shall be as determined by the appraisal first completed and in such event the other appraisal shall not be considered in determining the fair market value of the Property. If both appraisals are timely completed, the fair market value of the Property shall be the average of the two (2) appraisals. If the fair market value of the Property, as determined herein, is less than the Sales Price, the Sales Price shall not be adjusted and the General Partner's objection shall be deemed to be waived. If the fair market value, as determined herein, is greater than the Sales Price specified in the Sales Notice then the Sales Price shall be the higher of the Sales Price in the Sales Notice or an amount equal to ninety percent (90%) of the fair market value. The costs of all appraisals shall be a Partnership expense.

## ARTICLE XIV
## PENSION OR PROFIT SHARING PLANS

14.1    Limited Partner Representation and Covenant.  Each Limited Partner represents and warrants that it is not and agrees that it shall not become an employee benefit plan as defined in Section 3(3) of ERISA (an "ERISA Plan"), nor will any assets which it has invested or may in the future invest in the Partnership be "plan assets" within the meaning of the Department of Labor Regulations promulgated under ERISA at 29 CFR 2510.3-101 (the "Plan Assets Regulation").

14.2    General Partner Covenant.  The General Partner covenants that it shall use its best efforts to operate the Partnership so as to qualify it at all times as a real estate operating company ("REOC") within the meaning of Section 2510.3-101(e) of the Plan Assets Regulation. In order

-39-

to continue to qualify under the Plan Assets Regulation as a REOC after the date on which the Partnership makes its initial long term investment of funds (the "Initial Valuation Date"), the Partnership must qualify as a REOC (i) on any date within a period not in excess of ninety (90) days (the "Annual Valuation Period") beginning not later than one (1) year after the Initial Valuation Date, and (ii) on any date within each subsequent Annual Valuation Period. The Lubert-Adler Group shall have the unilateral right, on behalf of the Partnership, to adopt the Annual Valuation Period.

## ARTICLE XV
## GENERAL PROVISIONS

15.1    Amendments. Except as otherwise provided in this Agreement, no amendment of this Agreement shall be binding unless signed by the party against whom it is to be enforced.

15.2    Indulgences, Etc. Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

15.3    Controlling Law. This Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by and construed in accordance with the substantive laws of the State of Georgia, notwithstanding any conflict of law provisions to the contrary.

15.4    Notices.

15.4.1 All Approvals, notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received only when delivered (personally, by courier service such as Federal Express, or by other messenger) or three (3) days after being deposited in the United States mails, registered or certified mail, postage prepaid, return receipt requested, addressed to the Partnership at its principal place of business or addressed to any Partner at the address shown for such Partner on the Partnership's books.

15.4.2 Any party may alter his address on the Partnership's books by giving notice thereof to the General Partner, but such change shall not be effective unless and until such notice is actually received by the General Partner.

15.5    Exhibits. All Exhibits attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.

15.6   <u>Binding Nature of Agreement</u>.  This Agreement shall be binding upon and inure to the benefit of the Partners and their respective heirs, personal representatives, successors and assigns, except that no Partner may assign or transfer its rights or obligations under this Agreement in any manner other than as provided in this Agreement.

15.7   <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Partners.

15.8   <u>Provisions Separable</u>.  The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

15.9   <u>Entire Agreement</u>.  This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained.  The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing executed by all the Partners, or in counterparts.

15.10   <u>Paragraph Headings</u>.   The paragraph headings in this Agreement are for convenience only; they form no part of this Agreement and shall not affect its interpretation.

15.11   <u>Gender, Etc</u>.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

15.12   <u>Number of Days</u>.   In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or holiday.

15.13   <u>Interpretation</u>.  No provision of this Agreement is to be interpreted for or against either party because that party or that party's legal representative or counsel drafted such provision.

15.14   <u>Reliance</u>.  Except as specifically provided for herein, each party acknowledges that, in entering into this Agreement and making any capital contributions pursuant hereto, it is relying solely upon its own investigation and the contents of this Agreement and any agreements executed concurrently herewith and not upon any statements made or materials produced by any other party or such other party's representatives.

-41-

15.15 <u>Further Assurances</u>. In addition to the documents and instruments to be delivered as herein provided, each of the parties hereto shall, from time to time at the request of any Partner, execute and deliver such instruments and shall take such other action as may be required to carry out more effectively the terms of this Agreement.

15.16 <u>Corporate Authority</u>. Each entity signing this Agreement represents and warrants that the execution, delivery and performance of this Agreement by such entity has been duly authorized by all necessary corporate or other appropriate action and is valid and binding upon such entity.

15.17 <u>No Third-Party Beneficiaries</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement is intended to benefit any party other than the Partnership, the signatories hereto and their permitted successors and assigns nor shall any such provision be enforceable by any other party.

15.18 <u>Waiver of Partition</u>. Each party does hereby waive any right to partition or the right to take any other action which might otherwise be available to such party outside of the provisions of this Agreement for the purpose of severing his relationship with the Partnership or such party's interest in the property held by the Partnership from the interests of the other parties until the end of the term of both this Partnership and any successor partnership formed pursuant to the terms hereof.

15.19 <u>Controversies With Internal Revenue Service</u>. In the event of any controversy with the Internal Revenue Service or any other taxing authority involving the Partnership or any Partner or Partners, the outcome of which may adversely affect the Partnership, directly or indirectly, or the amount of allocation of Net Profits, gains, credits or Net Losses of the Partnership to one or more Partners, the Partnership shall, with respect to such controversy, subject to the Approval by the Limited Partners, incur the expenses necessary or advisable in the interest of the Partnership or the Partners to contest and resolve such controversy, including, without limitation, attorneys' and accountants' fees.

15.20 <u>Failure to Respond</u>. Except as otherwise provided in this Agreement, if any Partner shall fail to respond to a written request for Approval hereunder within twenty (20) calendar days after such written request is received (or such different time period as may be specified herein for such Approval), such Partner shall be deemed to have given the requested Approval; provided, however, that this Section 15.20 shall be applicable only if such written request expressly recites that the Approval will be deemed given if not Approved within such twenty (20) calendar day period or such different time period as may be specified herein for such Approval.

15.21 <u>Investment Limitations</u>. Notwithstanding any other provisions of this Agreement, the Partnership shall not acquire or purchase securities of any issuer, if as a result thereof the Partnership would be classified as an Investment Company under Section 351 of the Code or subject to the Investment Company Act of 1940.

#1251694 v3 - West End LPA

15.22  Recourse Obligations.  If the Lubert-Adler Group has the right to appoint a New General Partner and remove Ginn GP as a General Partner or purchase the Partnership Interest of the General Partner pursuant to any provision of this Agreement, then as a condition either of the removal of Ginn GP or the closing of any such purchase, the Lubert-Adler Group shall either obtain a complete release of the General Partner and/or its Affiliates from the Recourse Obligations (except the GP Conduct Obligations arising prior to the date of any such removal or purchase) or the Lubert-Adler Group or a Qualified Affiliate shall assume, indemnify and hold harmless the General Partner and its Affiliates from the Recourse Obligations (except the GP Conduct Obligations arising prior to the date of any such removal or purchase).

## ARTICLE XVI
## REPRESENTATIONS AND WARRANTIES

16.1  Authority.  Each Partner hereby represents and warrants and agrees, as of the date first above written, as follows:

(a)  Each Partner which is a corporation, a partnership, or limited liability company is validly existing and in good standing under the laws of the state in which it was formed and is qualified to do business in any foreign states in which such qualification is required, and shall continue to be in good standing and maintain such qualification throughout the term of this Agreement;

(b)  Each Partner has the right, power and authority to enter into this Agreement and all other documents contemplated by this Agreement (including, without limitation, all documents relating to the acquisition of the Property; and

(c)  Each Person signing this Agreement on behalf of any Partner has full power and authority to sign this Agreement on behalf of such Partner.

16.2  Investment Representations and Warranties.  Each Limited Partner hereby represents and warrants and agrees, as of the Effective Date, as follows:

(a)  Investment Intent.  EACH LIMITED PARTNER REPRESENTS THAT ITS INTEREST IN THE PARTNERSHIP WILL BE PURCHASED SOLELY FOR ITS OWN ACCOUNT, FOR INVESTMENT PURPOSES ONLY, AND THAT SUCH SECURITY IS NOT BEING OBTAINED WITH A VIEW TO OR FOR THE RESALE, DISTRIBUTION, SUBDIVISION OR FRACTIONALIZATION THEREOF; AND IT HAS NO PRESENT PLANS TO ENTER INTO ANY SUCH CONTRACT, UNDERTAKING, AGREEMENT OR ARRANGEMENT FOR SUCH PURPOSE.  EACH LIMITED PARTNER HEREBY ACKNOWLEDGES AND UNDERSTANDS THAT ITS PARTNERSHIP INTEREST IS A SPECULATIVE INVESTMENT WITH NO GUARANTEES.  EACH LIMITED PARTNER REPRESENTS THAT IT CAN BEAR THE ECONOMIC RISKS OF SUCH AN INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

-43-

(b)    <u>Access</u>.  Each Limited Partner has been informed that the books and records of the Partnership and the books and records of the General Partner relating to the Property and the Partnership are available to such Limited Partner for inspection and continue to be available for inspection by such Limited Partner and such Limited Partner's advisors.  Each Limited Partner has had discussions with representatives of the General Partner relating to such Limited Partner's purchase of its Partnership Interest and an opportunity to review, comment upon, and ask questions about all documents affecting the Partnership in general and the Property in particular.  Each Limited Partner has received all information and data with respect to the Partnership, the General Partner, the Property, and the investment in the Partnership which such Limited Partner deems relevant in evaluating the merits and risks of such Limited Partner's investment in the Partnership, and such Limited Partner does not desire any further information or data with respect to the Partnership, its proposed activities, the Property or the General Partner.

(c)    <u>Nature of Investment</u>.  Each Limited Partner represents and warrants that such Limited Partner is familiar with the proposed business of the Partnership and realizes that the purchase of an interest in the Partnership is a speculative investment involving a high degree of risk for which there is no assurance of any preservation of capital, income or return.  Each Limited Partner represents and warrants that it has such knowledge and experience in financial and business matters that such Limited Partner is capable of determining the information necessary to make an informed investment decision, of requesting such information from the Partnership, and of utilizing the information that such Limited Partner has received from the Partnership and the General Partner to evaluate the merits and risks of such Limited Partner's investment in the Partnership and to make an informed investment decision; and Limited Partner represents and warrants that it has done so.

(d)    <u>Financial Suitability</u>.  Each Limited Partner represents and warrants that such Limited Partner's purchase of an interest in the Partnership is in accord with the nature and size of such Limited Partner's present investments and net worth, that such Limited Partner is financially able to bear the economic risks of such Limited Partner's investment in the Partnership for an indefinite period of time, and such Limited Partner's net worth and investment portfolio justify such Limited Partner's investing in a highly speculative venture of the type represented by the Partnership.

(e)    <u>Indemnification</u>.  Each Limited Partner shall indemnify and hold harmless the Partnership, the General Partner, and any professional advisors thereto, from and against any and all loss, damage, liability or expense, including costs and reasonable attorneys' fees, to which they may become subject or incur by reason of or in connection with any misrepresentation made by such Limited Partner in this Article XVI.

(f)    <u>Unregistered Interest</u>.  Each Limited Partner hereby acknowledges that such Limited Partner is aware that the interest in the Partnership acquired by such Limited Partner has not been registered (i) under the U.S. Securities Act of 1933, as amended (the "<u>Federal Act</u>"), in reliance upon exemptions thereunder including Section 4(2) thereof, (ii) under

#1251694 v3 - West End LPA

the Georgia Securities of 1973, as amended (the "Georgia Act"), or (iii) under any other applicable state securities laws (the "State Acts") in reliance upon exemptions thereunder. Each Limited Partner further understands and acknowledges that the representations and warranties contained in this Agreement are being relied upon by the Partnership and by the General Partner as the basis for the exemption of such Limited Partner's interest in the Partnership from the registration requirements of the Federal Act, the Georgia Act and the State Acts. In this connection, EACH LIMITED PARTNER HEREBY COVENANTS AND AGREES THAT, FOLLOWING PURCHASE OF ITS PARTNERSHIP INTEREST, IT WILL NOT, EXCEPT IN ACCORDANCE WITH THIS AGREEMENT, OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY AT ANY TIME UNLESS AND UNTIL THE SECURITY IS REGISTERED PURSUANT TO THE FEDERAL ACT AND THE LAWS OF ALL JURISDICTIONS WHICH IN THE REASONABLE OPINION OF THE GENERAL PARTNER ARE APPLICABLE OR UNLESS THE SECURITY IS OTHERWISE EXEMPT FROM REGISTRATION THEREUNDER. The General Partner shall be entitled to rely upon an opinion of counsel reasonably satisfactory to it with respect to compliance with the above laws. Each Limited Partner further acknowledges that, except in accordance with this Agreement, the Partnership and the General Partner will not and have no obligation to recognize any transfer of all or any part of such Limited Partner's interest in the Partnership to any Person unless and until the applicable provisions of this Agreement have been fully satisfied, which include a requirement that an Limited Partner furnish to the General Partner such assurances as the General Partner may request, including, without limitation, an opinion of counsel satisfactory to the General Partner, that the interest to be transferred has been registered for sale under the Federal Act, the Georgia Act and the applicable State Acts or that such registration under such acts is not required. Each Limited Partner also further acknowledges and agrees that the Partnership is not obligated, and does not ever intend, to register any interest in the Partnership under the Federal Act, the Georgia Act or any State Acts.

(g)     Advisors' Review. Each Limited Partner has had ample opportunity to discuss with its legal and financial advisors all documents and information furnished to it and to ask such advisers questions about such documents and information and the risks associated with its investment in the Partnership. Each Limited Partner has thoroughly evaluated the risks and merits of its investment in the Partnership.

*[SIGNATURES BEGIN ON FOLLOWING PAGE]*

#1251694 v3 - West End LPA

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement under seal as of the date first above written.

GENERAL PARTNER:

**GINN-WEST END GP, LLC**, a Georgia limited liability company

By: _____
        Robert F. Masters, Manager

*[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]*

*[SIGNATURES CONTINUED FROM THE PRECEDING PAGE]*

**LIMITED PARTNERS:**

**LUBERT-ADLER REAL ESTATE FUND IV,
L.P.**, a Delaware limited partnership

By:  Lubert-Adler Group IV, L.P., its general
partner

By: Lubert-Adler Group IV, LLC, its general
partner

By: _____
R. Eric Emrich, CFO and V.P.


**LUBERT-ADLER REAL ESTATE
PARALLEL FUND IV, L.P.**, a Delaware limited
partnership

By:  Lubert-Adler Group IV, L.P., its general
partner

By: Lubert-Adler Group IV, LLC, its general
partner

By: _____
R. Eric Emrich, CFO and V.P.


**LUBERT-ADLER CAPITAL REAL ESTATE
FUND IV, L.P.**, a Delaware limited partnership
By:  Lubert-Adler Group IV, L.P., its general
partner

By: Lubert-Adler Group IV, LLC, its general
partner

By: _____
R. Eric Emrich, CFO and V.P.

EXHIBIT C

Control No.   **0465594**

# STATE OF GEORGIA
## Secretary of State
Corporations Division
315 West Tower
#2 Martin Luther King, Jr. Dr.
Atlanta, Georgia 30334-1530

# CERTIFICATE
# OF
# EXISTENCE

I, Cathy Cox, Secretary of State and the Corporations Commissioner of the state of Georgia, hereby certify under the seal of my office that

### GINN-LA WEST END LTD., LLLP

**Domestic Limited Partnership**

was formed or was authorized to transact business on 11/02/2004 in Georgia. Said entity is in compliance with the applicable filing and annual registration provisions of Title 14 of the Official Code of Georgia Annotated and has not filed articles of dissolution, certificate of cancellation or any other similar document with the office of the Secretary of State.

This certificate relates only to the legal existence of the above-named entity as of the date issued. It does not certify whether or not a notice of intent to dissolve, an application for withdrawal, a statement of commencement of winding up or any other similar document has been filed or is pending with the Secretary of State.

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence that said entity is in existence or is authorized to transact business in this state.



WITNESS my hand and official seal of the City of Atlanta and the State of Georgia on 25th day of May, 2006

*Cathy Cox*

Cathy Cox
Secretary of State

Certification Number: 72798-1    Reference:
Verify this certificate online at http://corp.sos.state.ga.us/corp/soskb/verify.asp

# *State of Florida*
## *Department of State*

I certify from the records of this office that GINN-LA WEST END LTD., LLLP is a limited partnership organized under the laws of Georgia, authorized to transact business in the State of Florida, filed on August 15, 2005.

The document number of this limited partnership is B05000000350.

I further certify that said limited partnership has paid all fees due this office through December 31, 2006, and its status is active.

*Given under my hand and the Great Seal of Florida, at Tallahassee, the Capital, this the Twenty Fifth day of May, 2006*

*Sue M. Cobb*

## *Secretary of State*



| |
|---|
| Authentication ID: **000075293810-052506-B05000000350** |
| To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed. **www.sunbiz.org/auth.html** |

*EXHIBIT D*

## GINN-LA WEST END LTD., LLLP

## WRITTEN CONSENT OF THE PARTNERS

Effective as of June ___, 2006, the undersigned, being all of the partners (the "**Partners**") of Ginn-LA West End Ltd., LLLP, a Georgia limited liability limited partnership (the "**Partnership**"), hereby adopt the following resolutions, waive the right to hold a meeting of the partners, waive all requirements of notice and direct that this action taken by written consent (the "**Consent**") be filed with the minutes of the proceedings of the Partnership.

### Approval of Amendment to the Partnership Agreement

**RESOLVED**, that the Amendment to the Agreement of Limited Partnership (the "**Partnership Agreement**") of the Partnership attached hereto as <u>Exhibit A</u> is hereby ratified, approved and adopted, and the Partnership's general partner (the "**General Partner**") is hereby directed to place a copy of the Amendment to the Partnership Agreement in the minute book of the Partnership.

### Approval of Credit Facilty and Related Matters

**WHEREAS**, the Partnership owns one hundred percent (100%) of the outstanding shares of Ginn-LA Conduit Lender, Inc., a Delaware corporation ("**GL Conduit Lender**"); and

**WHEREAS**, that certain First Lien Credit Agreement, dated as of June ___, 2006, by and among Ginn-LA CS Borrower, LLC, a Delaware limited liability company ("**GLC Borrower**"), GL Conduit Lender, Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent, and Credit Suisse Securities (USA) LLC, as paying agent, fronting bank, sole lead arranger and sole bookrunner and the lenders party thereto, in substantially the form attached hereto as <u>Exhibit B</u> (the "**First Lien Credit Agreement**"), and that certain Second Lien Credit Agreement, dated as of June ___, 2006, by and among GLC Borrower, GL Conduit Lender, Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent, and Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner and the lenders party thereto, in substantially the form attached hereto as <u>Exhibit C</u> (the "**Second Lien Credit Agreement**", together with the First Lien Credit Agreement, the "**Credit Agreements**"), provide for, among other things, financing loans of up to $675,000,000 to GLC Borrower and GL Conduit Lender (the "**Financing**"); and

**WHEREAS**, pursuant to the Credit Agreements, the Partnership is required to enter into certain agreements related to the transactions contemplated therein, including: (i) a Pledge Agreement and Limited Recourse Guaranty (as such is defined in the Credit Agreements) and (ii) such other agreements and instruments relating to the Financing that the General Partner may deem necessary, appropriate or desirable (together, the "**Transaction Documents**").

**RESOLVED**, that the Partnership is hereby authorized to enter into and perform the Transaction Documents; and that the Transaction Documents with such additions, deletions, amendments and modifications as the General Partner may approve (such approval to be conclusively, but not exclusively, evidenced by their execution and delivery of the Transaction Documents) be, and the same hereby are, adopted and approved and determined to be binding

obligations of the Partnership, enforceable against the Partnership in accordance with their terms; and that the General Partner be, and hereby is, authorized, empowered and directed to execute and deliver, in the name and on behalf of the Partnership, the Transaction Documents and any amendments thereto and such further documents and agreements, including, without limitation, financing statements, as they deem necessary, desirable or appropriate in connection with the Financing.

## Authority to Execute Resolutions

**WHEREAS**, the Partnership is the sole stockholder of GL Conduit Lender.

**RESOLVED**, that the General Partner of the Partnership is hereby authorized and directed to execute on behalf of the Partnership that certain Joint Written Consent of the Board of Directors and the Sole Stockholder, dated as of June 9, 2006; and be it

## General Authority

**RESOLVED**, that all actions heretofore taken and all documentation heretofore delivered by the General Partner is hereby ratified, adopted, approved and confirmed and declared to be binding and enforceable obligations of the Partnership in accordance with the respective terms and provisions thereof; and be it

**FURTHER RESOLVED**, that the General Partner be, and hereby is, authorized, empowered and directed, in the name and on behalf of the Partnership, to take, or cause to be taken, any and all other such acts and actions and to prepare, execute, deliver and file, or cause to be prepared, executed, delivered and filed, any and all such other documents or instruments as, with the advice of counsel, they may deem necessary, desirable or appropriate to carry out the full intent and purpose of the foregoing resolutions.

[SIGNATURES FOLLOW]

**IN WITNESS WHEROF**, the undersigned have executed this Consent as of the date hereof.

<u>**GENERAL PARTNER:**</u>

GINN-WEST END GP, LLC

By: _____
Robert F. Masters, its President

<u>**LIMITED PARTNERS:**</u>

LUBERT-ADLER      REAL      ESTATE
FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general
partner

By: Lubert-Adler Group IV, LLC, its general
partner

By: _____
R. Eric Emrich, CFO and Vice President

LUBERT-ADLER      REAL      ESTATE
PARALLEL FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general
partner

By: Lubert-Adler Group IV, LLC, its general
partner

By: _____
R. Eric Emrich, CFO and Vice President

#1474991

**LIMITED PARTNERS:**

LUBERT-ADLER   CAPITAL   REAL
   ESTATE FUND IV, L.P.

By: Lubert-Adler Group IV, L.P., its general
   partner

By: Lubert-Adler Group IV, LLC, its general
   partner

By: _____
   R. Eric Emrich, CFO and Vice President

#1474991

**Exhibit A – See Exhibit B to Closing Certificate**

**Exhibit B – See Tab 1 herein**

**Exhibit C – See Tab 4 herein**

## EXHIBIT E

**Incumbency**

| Name | Title | Signature |
|------|-------|-----------|
| Robert F. Masters | President, & Secretary | *Robert F Masters* |
| John P. Klumph | Chief Financial Officer & Executive Vice President | |

#1473496