**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br>GINN-LA ST. LUCIE LTD., LLLP, *et al.*,<br><br>                   Debtors.<br>_____/ | **CASE NO. 08-29769-PGH**<br>All Cases Jointly Administered<br><br>Chapter 7<br><br>(4 Cases Substantively Consolidated Under Lead Case No. 08-29769-PGH)[1] |
| In re:<br>GINN-LA QUAIL WEST LTD., LLLP, *et al.*,<br><br>                   Debtors.<br>_____/ | (3 Cases Substantively Consolidated Under Lead Case No. 08-29774-PGH)[2] |
| DREW M. DILLWORTH, Chapter 7 Trustee,<br><br>                   Plaintiff,<br><br>    vs.<br><br>EDWARD R. GINN, III, et al.<br><br>                   Defendants.<br>_____/ | **ADV. PRO. NO. 10-02976-PGH** |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE THIRD AMENDED COMPLAINT, ADDRESSING NEW ARGUMENT RAISED IN REPLY**

Plaintiff Drew M. Dillworth ("Trustee Dillworth"), in his capacity as Chapter 7 Trustee for the Tesoro and Quail West Debtors' Estates, files this supplemental memorandum in opposition to the Ginn, Lubert-Adler, and Investor Defendants' Motions to Dismiss [ECF Nos. 165, 172, 174], in accordance with the Order Setting Deadline to File Response to New Argument [ECF No. 220].

---

[1]/The "Tesoro Debtors' Estates" (Nos. 08-29769-PGH, 08-29770-PGH, 08-29772-PGH, and 08-29773-PGH) are substantively consolidated into Lead Case No. 08-29769-PGH. Order [ECF No. 308/309]. The "Tesoro Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA St. Lucie Ltd., LLLP – 5632; (ii) Ginn-St Lucie GP, LLC – 0983; (iii) Tesoro Golf Club Condo., LLC – 4385; and (iv) The Tesoro Club, LLC – 1917. *See* 11 U.S.C. § 342(c)(1).

[2]/The "Quail West Debtors' Estates" (Nos. 08-29774-PGH, 08-29775-PGH, and 08-29776-PGH) are substantively consolidated into Lead Case No. 08-29774-PGH. Order [ECF No. 34]. The "Quail West Debtors," and the last four digits of their respective tax identification numbers, are: (i) Ginn-LA Quail West Ltd., LLLP – 2397; (ii) Ginn-Quail West Beach, LLC – 9142; and (iii) Ginn-Quail West GP, LLC – 6313. *See* 11 U.S.C. § 342(c)(1).

## ARGUMENT

A shade over forty-eight hours before the hearing on the Defendants' Motions to Dismiss, the Lubert-Adler Defendants raised a new argument – in which the other Defendants joined – directed to the claims to avoid and recover for the transfers of the Tesoro and Quail West Liens. That new argument, based on *In re Tousa, Inc.*, posits that:

> Under *Tousa II*, the Trustee is not Entitled to Recover from the Defendants Under [11 U.S.C.] § 550(a)(1) and is Limited to Seeking Recovery Under § 550(a)(2).
>
> * * *
>
> Applying the reasoning of *Tousa II* to the facts of this case, the Trustee cannot seek recovery from the Defendants under § 550(a)(1) as entities "for whose benefit" the liens and guaranties were transferred because the Trustee alleges that the Defendants were transferees of the Loan Proceeds in connection with the underlying liens that the Debtors had issued.

L.A. Reply [ECF No. 198], p. 26 (citing S.D. Fla. Case No. 10-cv-60017, ECF No. 131, pp. 100-01).

"[I]n the interest of efficiently using the resources of the Court and [the] parties," the Court has advised that it will exercise its discretion to consider that eleventh-hour argument, and has ordered the filing of a supplemental responsive brief directed to the following issue: "Whether the defendants are entities for whose benefit the liens were transferred?" [ECF No. 220]. We respectfully submit that the answer is "Yes."

### A. In *In re Air Conditioning, Inc.*, The Eleventh Circuit Held That, Where – As Here – A Debtor Pledges A Security Interest In Property To Induce An Extension Of Credit, The Beneficiary Of That Extension Of Credit Is An Entity "For Whose Benefit" The Transfer Of The Security Interest Was Made Within The Meaning Of 11 U.S.C. § 550(a)(1)

In *In re Air Conditioning, Inc. (American Bank of Martin County v. Leasing Serv. Corp.)*, 845 F.2d 293 (11th Cir. 1988), the Eleventh Circuit's seminal decision on indirect transfers, the Court endorsed a practical, common-sense approach to determining whether an entity is a transfer "beneficiary" under the Bankruptcy Code.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

In that case, the debtor – "ACI" – had pledged a security interest in a certificate of deposit to American Bank in order to induce the Bank to issue a letter of credit to defendant "LSC," one of the debtor's creditors. The central issue on appeal was whether the transfer of that security interest was made "for the benefit" of LSC within the meaning 11 U.S.C. § 547(b)(1), and could be recovered from LSC as the entity "for whose benefit" such transfer was made under § 550(a)(1)? Citing to *In re Compton Corp. (Kellogg v. Blue Quail Energy, Inc.)*, 831 F.2d 586 (5th Cir. 1987), which the Eleventh Circuit observed "contains an excellent, scholarly discussion of this issue[,]" the Eleventh Circuit affirmed the judgment entered against LSC, stating:

> We agree [with the Fifth Circuit] that an indirect transfer arising from a debtor's pledge of security to a third party bank "may constitute a voidable preference as to the creditor who indirectly benefitted from the direct transfer to the third party." [*In re Compton*, 831 F.2d] at 591-92. The district court in this case correctly held that "although the transfer of the certificate of deposit (the debtor's property) was made to American Bank it was clearly 'for the benefit' of LSC because it indirectly secured payment of an undersecured antecedent debt owed by ACI." 72 B.R. at 661. *In addition the promised transfer of the certificate of deposit induced American Bank to issue the letter of credit in the first place. We hold therefore that LSC did receive a benefit* under section 547(b)(1). . . .
>
> * * *
>
> [T]he district court [also] correctly allowed the trustee to recover from LSC the property transferred: the certificate of deposit. The Bankruptcy Code explicitly provides for this by allowing the trustee to recover a preferential transfer from "the initial transferee of such transfer *or the entity for whose benefit such transfer was made*[.]" 11 U.S.C. § 550(a)(1). . . .

*In re Air Conditioning, Inc.*, 845 F.2d at 296-97, 299 (initial emphasis added; balance in original); *see also In re Compton*, 831 F.2d at 595 ("[Courts should] look through the form of a transaction and determine which entity actually benefitted from the transfer [at issue in applying § 550(a)(1)]. . . . The bankruptcy and district courts erred in failing to analyze properly the transfer of debtors' property that occurred when Compton pledged its assets to obtain the letter of credit.") (remanding for entry of judgment against defendant, as entity for whose benefit transfer was made within the meaning of § 550(a)(1)).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

The same analysis and reasoning apply equally to the present set of facts – if not *more* so. In the present case, although the Debtors transferred the First and Second Liens "to" Credit Suisse, the transfers were clearly "for the benefit" of the Defendants insofar as they "induced" Credit Suisse to extend a $675 million loan which Lubert-Adler described to Fund III & IV Investors as having the following "objectives":

- "The removal of all guarantee exposure to Bobby Ginn, Lubert-Adler Fund III and Lubert-Adler Fund IV," by "paying off all existing recourse debt" and replacing it with debt that was recourse only at the Project level;

- The "pooling" and "cross-collateralization" of Project assets, so as to achieve "economic advantages," such as "greater loan proceeds"; and

- The funding of "an immediate dividend" of more than $325 million, which would result in "[the] mitigation of 100% of the capital risk, through the repayment of all invested equity and bridge fundings," and allow for "the harvesting of profits" on an "accelerated" basis.

Third Amended Complaint ("TAC") [ECF No. 163], ¶ 104 (quoting "Memo" from Lubert-Adler to the Fund III & IV Advisory Boards, 05/22/06, pp. 2, 6, 8, 10, MMMTQW01_009986 - 009996) (the TAC references two versions of the "Memo"; they are attached as Exhibits "1" and "2").

As in *In re Air Conditioning*, where "the promised transfer of the certificate of deposit induced American Bank to issue the letter of credit in the first place," 845 F.2d at 296, here, the Debtors' execution of the so-called Guaranties, and the granting of mortgages and liens on substantially all of their assets, were expressly required "to induce the Lenders to make the Loan":

- "The Lenders *would not make*, and would not be obligated to make, the Loan to Borrower unless Guarantor executed this Guaranty. This Guaranty is therefore delivered to Lenders, acting through Administrative Agent, *to induce the Lenders to make the Loan*. . . ."

- "The First [and Second] Lien Credit Agreement[s] *require*[] that the obligations of the Borrower . . . be secured by liens and security interests covering, among other things, Mortgagor's interest in the Fee Property and the Leased Property. In connection therewith, Mortgagor is executing and delivering this Mortgage . . . ."

-4-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

- "It is a *condition precedent* of the obligation of Lenders to make the Loans to the Borrower under the Credit Agreement[s], that Grantor shall have executed and delivered this [Security] Agreement [granting] a security interest in, all of Grantor's right, title and interest in and to all of the personal property of Grantor, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired, wherever the same may be located . . . ."

TAC, ¶ 74 (quoting First / Second Lien Subsidiary Guaranties, Recital F, ¶ 9; First / Second Lien Mortgages, Security Agreements, Assignments of Rents and Leases and Fixture Filing, Rec. C & D; First / Second Lien Security Agreements, Rec. B & ¶ 1) (Exhibits "3" to "8") (emphasis added).

Simply stated, "Credit Suisse and [its] syndicated lenders would not have extended $675 million in financing to the two shell holding entities which served as the technical 'Borrowers' – roughly $325 million of which was to be applied to make 'distributions' to insiders of the Debtors and Other Project Entities – *without* the Debtors and Other Project Entities' having 'primary' liability for repayment of the loans, and *without* their granting mortgages and liens on substantially all of their real property and other assets." TAC, ¶ 83 (emphasis added).

The organizational documents for Ginn-LA CS Holding Company, LLC executed in connection with the closing of the Credit Suisse loan transaction in June 2006 further make clear that the mortgages and liens which "induced" the loans were issued "for the benefit" of the Defendants. Within the Ginn-LA corporate hierarchy, Ginn-LA CS Holding Company was a shell entity formed to serve as the immediate parent of Ginn-LA CS Borrower, to create a more beneficial tax structure in connection with the "Roll-Up" of the Debtors and the Other Project Entities. TAC, ¶ 96 & n. 6. Its formative LLC Agreement evidences that the principal objective of the Credit Suisse "Loan" was to trigger a "Capital Event" under the Tesoro, Quail West, and other Project LLLPs' respective Agreements of Limited Partnership, which would require the pay-off of existing Project debt and a distribution to the equity owners of the Projects.

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

The LLC Agreement begins with a "Background Statement" which discusses the "Loan" and the "Roll-Up" of the Tesoro, Quail West, and other Project LLLPs, which are collectively defined as the "Property Owners." It states that:

> [I]t is the intention of the Members that all distributions, capital calls, buy-sell rights, other economic rights and management rights with respect to each Property Owner and Property continue to be separate from each other as they were prior to the date of this Agreement so that only the Investor Members that held an interest in a Property Owner prior to the Roll-Up are entitled to such rights through the Company and so that the management and performance of each Property Owner and Property is accounted for separately and not collectively with the Other Property Owners and Properties.

Ginn-LA CS Holding Company LLC Agreement, Background Statement, pp. 1-2 (Exhibit "9").

The LLC Agreement then goes on to specify that the "Loan" would be a "Capital Event" which would require the pay-off of existing Project debt and generate "Distributable Proceeds" that would be deemed "Funds from a Capital Event *originating from* [the] Property Owner[s]":

> "Capital Event" means [among other things] any sale, . . . financing or refinancing of any Property Owner assets . . . .
>
> * * *
>
> "Funds from a Capital Event" shall mean those funds arising in connection with a Capital Event with respect to a Property Owner decreased by [*inter alia*] the amount of such proceeds applied . . . to pay debts and liabilities encumbering the Company, Borrower, the applicable Property Owner or the Property owned by the applicable Property Owner . . . .
>
> * * *
>
> Special Distribution of Loan Proceeds. On or about the date of the closing of the Loan, an amount of the proceeds from the Loan agreed upon by all of the Members (such amount of proceeds being the "Distributable Proceeds") *will be distributed* by the Borrower to the Company and then distributed by the Company to the Members. The Distributable Proceeds shall be allocated among the Property Owners in such amounts as are agreed by all of the Members. *The amount of the Distributable Proceeds allocated to each Property Owner shall be deemed to be Funds from a Capital Event originating from such Property Owner that are distributable [to the Members] and shall be distributed to the Members [according to their interests in] each such Property Owner.*

Ginn-LA CS Holding Company LLC Agreement, Art. II (pp. 6, 9), Art. V ¶ 5.2 (emphasis added).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

To complete the circle, the Property Owners' operative Agreements of Limited Partnership go on to specify that the "Funds from [the] Capital Event" remaining after the pay-off of Project debt would be distributed to the Partners in accordance with the following "waterfall":

> Funds from a Capital Event shall be distributed among the Partners in the following manner and order of priority:
>
> (a) First, to the Limited Partners in proportion to their respective Preferred Return Account balances, until such balances are reduced to zero;
>
> (b) Next, to the Partners in proportion to their Net Capital Contributions balances until such Net Capital Contributions balances are reduced to zero; and
>
> (c) The balance to the Partners in proportion to their respective Percentage Interests.

Property Owners' Agreements of Limited Partnership, Art. II, Art. V ¶ 5.2 (Exhibits "10" - "14"); *see also* Ginn / Lubert-Adler Defendants' Responses to First Set of Interrogatories, Int. Nos. 8-9. (acknowledging that the transfers of Credit Suisse loan proceeds sought to be avoided in this matter "were made pursuant to the terms of" the Lead Debtors' Agreements of Limited Partnership, in accordance with the "waterfall" referenced above) (Exhibits "15" and "16").

Needless to say, but for the Debtors' and Other Project Entities' grant of the Liens, the Capital Event which prompted the distributions at issue in this case would never have occurred. As the Lubert-Adler Defendants explained in correspondence to the Fund III and IV Investors enclosing their "share[s]" of those distributions, "[the] distribution[s] w[ere] *generated* by . . . : the *refinance* of Tesoro, Port St. Lucie, FL; [and] the *refinance* of Quail West, Naples, FL." Ltrs., Lubert-Adler to Fund III & IV Investors, 06/06, LA043343 - 043345, LA043594 - 043596 (Exhibit "17" and "18") (emphasis added).

Thus, as in *In re Air Conditioning*, there is an ample legal and factual basis to conclude that the Defendants herein were the entities "for whose benefit" the transfers of the Liens were made within the meaning of § 550(a)(1).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

## B. In Light Of *In re Air Conditioning*, And Other Factors, The Defendants' Reliance On *Tousa II* Is Misplaced

At the recent hearing on the Defendants' Motions to Dismiss the Third Amended Complaint, the Lubert-Adler Defendants' lead counsel conceded that *Tousa II* is "not binding" on this Court, but urged that it should be considered "persuasive authority" with respect to various issues, including the issue to which this filing is directed. Tr. of Hrg., 02/24/11 [ECF No. 213], pp. 22, 77. We disagree.

As a threshold matter, there is a conflict between *In re Air Conditioning* and *Tousa II* as to the proper interpretation/application of the "for whose benefit" language in 11 U.S.C. § 550(a)(1). Judge Gold concluded that, "[b]ecause the focus of [*In re*] *Air Conditioning* was on Section 547 – not Section 550 – [it] d[id] not control the outcome" of the matter before him. *Tousa II*, p. 109. Instead, taking sides in a debate as to which other courts are split, he found the matter to be "controlled" by the following legal principles:

- "[T]he 'for whose benefit' language does not apply where the 'benefit' is not the immediate and necessary consequence of the initial transfer, but flows from the manner in which the initial transfer is *used* by its recipient"; and

- "[In addition, an entity] cannot be the 'entity for whose benefit' [an] initial transfer [of property] was made" if the entity was a "subsequent transferee" of said property.

*Tousa II*, pp. 99-101 (citing *Bonded Financial Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895-96 (7th Cir. 1988); *Turner v. Phoenix Fin., LLC*, 299 B.R. 709, 718 (Bankr. D. Me. 2003)); *contra Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991); *In re Global Outreach, S.A. (Global Outreach, S.A. v. YA Global Invest., L.P.)*, 2010 WL 3957501, at *9 (Bankr. D.N.J. 2010) ("[T]he Court finds little support in the text of [Section 550] to justify the limitation imposed . . . in *Bonded Financial* and adopts the [*Max*] *Sugarman* standard.").

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Applying those newly-adopted and controversial legal principles to the facts of the case, Judge Gold reversed the Bankruptcy Court's imposition of liability under § 550(a)(1), stating:

> Here, it is undisputed that the initial transfer for statutory purposes, was the transfer of liens from TOUSA and the Conveying Subsidiaries to the New Lenders *who exercised full legal control over the liens*. . . . It is further undisputed that the liens remained at all times *with the New Lenders* and were never transferred to the Transeastern Lenders. Therefore, the Transeastern Lenders could not qualify as "subsequent transferees" [with respect to the liens].
>
> Essentially, the Bankruptcy Court's theory [wa]s that the Transeastern Lenders received a benefit *flowing from the use to which the initial lien transfer was put; namely, the further transfer of proceeds to TOUSA, which, in turn, transferred the proceeds to the Transeastern Lenders in settlement and payment of a valid, antecedent debt*.
>
> * * *
>
> [T]he "benefit must derive directly from the [initial] transfer, not from the use to which it is put by the transferee." . . . Thus, because the Transeastern Lenders were "subsequent transferees" of the proceeds backed by the liens, the[y] do not qualify as "entities for whose benefit" the transfers were made within § 550(a)(1)'s meaning.

*Tousa II*, pp. 96-97, 100-01 (citations omitted) (emphasis in original).

Respectfully, Judge Gold's analysis of this issue was flawed, and it ought not be followed, for several reasons.

First, *In re Air Conditioning* did "control the outcome," and it compelled a contrary result. As noted above, in that case, the Eleventh Circuit expressly affirmed a lower court judgment imposing "for whose benefit" liability where the "benefit" derived from the "use" to which the initial transfer was put; namely, the subsequent transfer of a letter of credit to defendant LSC. The Eleventh Circuit observed that the Bankruptcy Code "explicitly provides for this," stating:

> [T]he district court [also] correctly allowed the trustee to recover from LSC the property transferred: the certificate of deposit. The Bankruptcy Code *explicitly provides for this* by allowing the trustee to recover a preferential transfer from "the initial transferee of such transfer *or the entity for whose benefit such transfer was made*[.]" 11 U.S.C. § 550(a)(1). . . .

*In re Air Conditioning, Inc.*, 845 F.2d at 299 (first emphasis added; second in original).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

Second, Judge Gold's opinion is internally inconsistent on this point and improperly conflates the claim to avoid and recover for the transfer of the loan proceeds, with the claim to avoid and recover for the transfer of the liens. With respect to the latter claim, it was "undisputed" that:

- "[T]he initial transfer for statutory purposes, was the transfer of liens from TOUSA and the Conveying Subsidiaries to the New Lenders";

- "[T]he liens remained at all times *with the New Lenders* and were never transferred to the Transeastern Lenders"; and

- "Therefore, the Transeastern Lenders *could not qualify* as 'subsequent transferees' [with respect to the liens]."

*Tousa II*, pp. 96-97 (footnote omitted) (first emphasis in original; second emphasis added). Yet, the opinion held that, "[b]ecause the Transeastern Lenders were 'subsequent transferees' of the [*loan*] *proceeds* backed by the liens," recovery could only be had – if at all – under § 550(a)(2). *Id.* at 100-01 (emphasis added).

At the risk of stating the obvious, the fact that the Transeastern Lenders may have been "subsequent transferees" of the *loan proceeds* did not justify a finding that, at most, they were "subsequent transferees" of the *liens*. And there is no basis for a corresponding finding here.

Third, in any event, as the Court observed at the hearing on Defendants' Motions to Dismiss, "[the] facts in *Tousa* are completely different than [in] this [case]." Tr. of Hrg., 02/24/11, p. 73. Among other differences:

In *Tousa*, "the Transeastern Lenders clearly d[id] not fit the 'paradigm' classification as an entity for whose benefit a transfer was made because they were not guarantors of the debtor Conveying Subsidiaries[;] . . . they were the holders of a valid antecedent debt." *Tousa II*, p. 95. Here, by contrast, the Defendants fit the "paradigm." A principal objective of the loan transaction was "[t]he removal of all guarantee exposure to Bobby Ginn, Lubert-Adler Fund III and Lubert-Adler Fund IV," by "paying off all existing recourse debt" and replacing it with debt that was recourse

-10-

only at the Project level.  *See* TAC ¶ 104 (quoting Draft "Memo" from Lubert-Adler Mgt. Co. to Fund III & IV Advisory Boards, 05/22/06, pp. 2, 6, 8, 10, MMMTQW01_009986 - 009996).

Likewise, in *Tousa*, Judge Gold found the transaction effected in the Credit Agreements which resulted in the issuance of the liens "could not be viewed as part of the same transaction" as "the payment to the Transeastern Lenders [to settle] a separate, previous debt." *Tousa II*, p. 98-99. In this case, however, "the Credit Agreements *dictated* how the loan proceeds were to be disbursed," L.A. Reply [ECF No. 198], p. 2 & n. 2 (emphasis added); and the entity agreements *specified* that the proceeds would be deemed "Funds from a Capital Event *originating from* the Property Owners" and distributed to the equity owners of the Projects as "return of capital contributions," etc. Ginn-LA CS Holding Company LLC Agreement, Art. II (pp. 6, 9), Art. V ¶ 5.2 (emphasis added); Property Owners' Agreements of Limited Partnership, Art. II, Art. V ¶ 5.2.

Thus, contrary to Defendants' suggestion, *Tousa II* does not compel or justify a finding that, with respect to the Liens, recovery may only be had against the Defendants under § 550(a)(2).[3]

---

[3] As previously indicated, there are other differences between the facts of *Tousa* and the facts of the present case, but, for present purposes, we think the foregoing suffices to make the point.

-11-

STEARNS  WEAVER  MILLER  WEISSLER  ALHADEFF  &  SITTERSON,  P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200

WHEREFORE, Trustee Dillworth respectfully submits that the Defendants' new argument relating to the Liens provides no basis for the relief sought.

Dated: April 1, 2011

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.

Attorneys for Drew M. Dillworth,
Chapter 7 Trustee of the Tesoro Debtors' Estates
and the Quail West Debtors' Estates

Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile:  (305) 789-3395

I hereby certify that I am admitted to the Bar of
the United States District Court for the Southern District
of Florida and I am in compliance with the additional
qualifications to practice in this Court set forth in
Local Rule 2090-1(A).

By: /s/ Harold D. Moorefield
    EUGENE E. STEARNS
    Fla. Bar No. 149335
    estearns@stearnsweaver.com
    HAROLD D. MOOREFIELD, JR.
    Fla. Bar No. 239291
    hmoorefield@stearnsweaver.com
    MATTHEW W. BUTTRICK
    Fla. Bar No. 176028
    mbuttrick@stearnsweaver.com
    ANDREW E. STEARNS
    Fla. Bar No. 661651
    astearns@stearnsweaver.com

-12-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
MUSEUM TOWER, 150 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 789-3200