# EXHIBIT "1"

Case 10-02976-PGH   Doc 223-1   Filed 04/01/11   Page 1 of 12

# MEMO

DRAFT



To: Advisory Board – Lubert-Adler Fund III
Advisory Board – Lubert-Adler Fund IV

From: Dean Adler, Stuart Margulies

Date: April 24, 2006

Re: Ginn Clubs and Resorts
$385,000,000 Senior Secured First Lien Term Loan Facility
$165,000,000 Senior Secured Synthetic Revolving Credit Facility
$125,000,000 Senior Secured Second Lien Term Loan Facility

## Executive Summary

Lubert-Adler and GDC develop amenitized residential resort communities aimed at the "Baby Boomer" second and retirement home markets. Since 1997, Lubert-Adler and GDC have invested in 23 residential resort communities that will total over 25,000 lots and condominiums when complete.

In each stage of the development, the JV is focused on managing risk in order to protect the downside, as well as positioning for upside opportunities. The JV seeks to generate its primary returns from the sale of real estate. GDC generates substantial income from the pre-sale of single family unimproved lots. Ginn sells directly to users/investors – not to homebuilders. The JV is able to close on lots prior to infrastructure and amenities because the JV posts performance bonds.

The JV has acquired each of the communities in separate entities, which are owned 80% by the investing Lubert-Adler Fund and 20% by Bobby Ginn. Lubert-Adler provides 100% of the investor capital, and receives a compounded priority return of 10% and its capital back prior to any distributions to Bobby Ginn.

Each investment partnership is capitalized separately. The JV has historically financed the horizontal infrastructure and amenities at each community via:

1) Lubert-Adler capital;
2) Lot pre-sales proceeds; and
3) Acquisition & horizontal development loan facilities, which are typically
   a. Low loan-to-values
   b. Secured by unsold real estate inventory and amenities;
   c. Fully recourse to Bobby Ginn
   d. Limited recourse (20%-50%) to the Lubert-Adler Funds

May 22, 2006

While the existing investment structure has allowed each Lubert-Adler Fund to invest and track its capital, and legally separate one property from another, it has been somewhat inefficient from a capitalization (debt/equity) standpoint. Because the "Company" is essentially a collection of stand-alone properties, the JV has not been able to take advantage of entity-level financing options, which would i) allow a more favorable debt/equity ratio; ii) fund a portion of predevelopment costs; and iii) reduce or eliminate recourse to the Funds and Bobby Ginn. Accordingly, Lubert-Adler is often faced with executing guarantees for acquisition-only financing and funding 100% of the ongoing permitting and development costs through lot sales. This often results in an over-funding of Lubert-Adler's capital commitments until lot sales are sufficient to fund ongoing costs.

The JV is negotiating with Credit Suisse Securities (USA) LLC for a pooled financing for five entitled communities. The pooled financing would necessitate the contribution of the ownership interests of five separately owned limited partnerships to a new entity, which would, in turn, own all five properties as one. Sales proceeds from any property would pay down the outstanding debt and provide funds to replenish a revolving loan facility to build the horizontal infrastructure and amenities at all of the communities. In other words, the properties will all be cross-collateralized.

The objectives of the pooled financing are threefold:

1) Eliminating loan guarantees by paying off all existing recourse debt
2) Providing a revolving credit facility to fund the horizontal development and amenity costs at each community; and
3) Mitigating capital risk through an immediate dividend of $333,125,000, which would a) return all of the Lubert-Adler capital; and b) provide a reserve for potential future capital needs; and c) provided an earlier than anticipated profit distribution

The five properties include two Fund III investments, one which is shared equally between Funds III and IV, and two which are Fund IV investments. While the JV intends to continue tracking the revenues, costs and profitability of each of these investments separately, and target future distributions to each Fund based on the performance of each property under the original economics, any poorly performing properties would be supported by the other properties.

The five communities include:

| Community | Location | Lubert-Adler Fund |
|---|---|---|
| Tesoro | Port St. Lucie, FL | III |
| Hammock Beach River Club | Flagler Beach, FL | III |
| Quail West | Naples, FL | III – 50%<br>IV – 50% |
| Laurelmor | Boone, NC | IV |
| Grand Bahama – West End | Grand Bahama Island | IV |

- Page 2

May 22, 2006

## The Properties

The chart below contains some salient facts for each of the properties. The projected revenues, expenses and net values are based upon Ginn's estimate of the remaining revenues and costs to complete each community. A brief description of the status of each community appears on the following pages.

TO BE UPDATED MONDAY – CONFORM TO CSFB FINAL #'s

|  | Tesoro | Quail West | River Club | Laurelmor | Grand Bahama | Total |
|---|---|---|---|---|---|---|
| Acreage | 1,400 | 1,180 | 2,053 | 6,000 | 1,957 | 12,590 |
| # Lots | 940 | 348 | 453 | 1,500 | 1,836 | 5,077 |
| # Condos | 100 | - | - | 300 | 4,396 | 4,796 |
| Sales Commencement | 2002 | 2005 | 2007 | 4Q2006 | 4Q2006 |  |
| Estimated Lot Sellout Date | 2009 | 2008 | 2010 | 2010 | 2010 |  |
| Lots Closed | 543 | 58 | - | - | - | 601 |
| Unsold Lots | 397 | 290 | 453 | 1,500 | 1,836 | 4,476 |
| Estimated Avg. Lot Price | $834,000 | $1,045,000 | $695,000 | $750,000 | $732,000 | $764,000 |
| Total Projected Revenues | $323 mm | $273 mm | $279 mm | $1,009 mm | $1,564 mm | $3,449 mm |
| Total Projected Development Costs | $148 mm | $129 mm | $184 mm | $573 mm | $961 mm | $1,995 mm |
| Total Projected Net Value | $175 mm | $144 mm | $95 mm | $436 mm | $603 mm | $1,453 mm |

### *Tesoro*



- Private community and club on 1,400 acres in Port St. Lucie, FL
- Project planned for:
  - 940 single family lots and 100 condominiums
- Scheduled completion of Florida Turnpike Interchange in Q4 2006
  - 30 minutes to West Palm Beach
- 36 Signature golf holes – designed by Palmer and Watson
- Amenities including 60,000 sf clubhouse, beach club on nearby Hutchinson Island, spa/fitness, tennis, pools

*Status*

- 543 of 940 lots closed
- West side infrastructure and Palmer course complete
- East side infrastructure and Watson course underway
- Clubhouse under construction

May 22, 2006

### *Quail West*

- Private community and club on 1,180 acres in Naples, Florida
- Project planned for:
  - 564 total homesites – JV acquired 348 unsold lots
- 36 Signature golf holes – designed by Arthur Hills
- Amenities including 70,000 sf clubhouse, restaurants, beach club, spa/fitness, tennis, pools

*Status*

- 47 lots closed - $40.6 mm
  - 13 lots under agreement for $13.7 mm
  - 186 site-specific reservations for $185.6 mm pending final plat recording
- All entitlements received
- Enhancements to clubhouse, golf and entryway to commence shortly
- Parcels acquired in Bonita Beach for a beach club and marina



### *Hammock Beach River Club*

- Private club on 2,053 acres located along the Intracoastal Waterway in Flagler Beach, FL
- Project entitled and planned for 453 single family lots and 200,000 sf of commercial use along State Road 100
- 18-hole Fred Couples signature golf course
- All residents will have privilege of membership in The Club at Hammock Beach and use of all amenities
- Beautiful views of Inter Coastal waterway and Bulow Creek

*Status*

- Entitlements received from Flagler County during 4Q2005
- Permitting and platting ongoing
  - Water & environmental and final plats targeted 9/06
  - HUD registration planned 11/06
- Launch targeted for 1Q2007



MMMTQW01_009989

May 22, 2006

### Laurelmor

- Private club on 6,000+ acres in the Blue Ridge Mountains of North Carolina, located off the Blue Ridge Parkway
- Project planned for:
  - 1,500 single family lots
  - 300 condominiums
- Amenities to include two golf courses, clubhouse, restaurants, indoor water park, swimming pavilion, spa/fitness, tennis, walking & biking trails, and equestrian

*Status*

- Final plats for 75 lots, preliminary plats for 801 lots
- 72,000 lineal feet of temporary roadway constructed to support sales launch
- All utility agreements in hand. Utility installation to begin 2Q2006
- Ancillary properties being identified to enhance access and amenities, and support future development activities

### Grand Bahama – West End



- 1,957 acres on the West End of Grand Bahamas Island
- Planned for exclusive resort less than 60 miles from the Florida coast
  - 1,850 lots
  - 4,400 condominiums
- Tax treaty with Bahamian government
- Amenities include two golf courses, private airport, water park, marinas, spa/fitness, casino, tennis and conference

*Status*

- Land clearing underway
- JV has requested the re-opening of the airstrip to support sales and development activities
- Summer 2006 sales event targeting 400 oceanfront and 2nd row lots
- Programming for resort amenities underway

- Page 5

May 22, 2006

**The Facilities**    TO BE UPDATED MONDAY – CONFORM TO CSFB FINAL #'s

Lubert-Adler Funds III and IV, and Ginn Clubs and Resorts, have obtained a term sheet from Credit Suisse Securities (USA) LLC, for three facilities totaling $675,000,000. The proceeds of the loans made under the First Lien Facility and the Second Lien Facility, along with cash contributed by Borrower will be used by Borrower,

1. To repay certain existing indebtedness of Borrower in the approximate amount of $160,000,000 (the "***Existing Debt***");
2. To fund a one-time distribution in the approximate amount of $333,125,000; and
3. To pay a portion of the development and construction costs associated with the completion of the projects commonly known as Quail West, Tesoro, Hammock Beach River Club, Laurelmor and Grand Bahama (West End), (collectively, the "***Projects***").

The proceeds of loans made under the Revolving Facility will be used from time to time by Borrower to finance a portion of the development and construction costs associated with the Projects and to provide certain working capital for Borrower.

First Lien Facility - The First Lien Facility will mature on the date that is five (5) years after the Closing Date, and will amortize in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of the First Lien Facility with the balance payable on the maturity date of the First Lien Facility.

Revolving Facility - The Revolving Facility will mature and the commitments thereunder will terminate on the date that is five (5) years after the Closing Date.

Loans under the Facilities shall be prepaid with:

a) 100% of Excess Cash Flow, it being understood and agreed that 100% of Excess Cash Flow will be used first to pay down any outstanding borrowings under the Revolving Facility and in the event that (i) all such borrowings have been repaid, (ii) 50% of the principal amount of the First Lien Facility has been repaid, (iii) Borrower has provided evidence of compliance with the financial covenants under the Facilities and (iv) there is an absence of defaults or events of default, then such amount of Excess Cash Flow required to be used to repay the Facilities will be reduced to 50%;
b) 100% of the net cash proceeds of all asset sales or other dispositions of property by Borrower and its subsidiaries to the extent such net cash proceeds do not constitute Excess Cash Flow
c) 100% of the net cash proceeds of any casualty or condemnation event;
d) 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of Borrower and its subsidiaries (subject to exceptions for permitted indebtedness to be agreed upon); and
e) 50% of the net cash proceeds of issuances of equity securities of Borrower and its subsidiaries.

The mandatory prepayments shall be applied pro rata to any outstanding borrowings under the Revolving Facility, then to the remaining amortization payments under the First Lien Facility, and thereafter will be applied to repay the outstanding term loans under the Second Lien Facility.

● Page 6

May 22, 2006

The interest rates under the Facilities will be as follows:

- If the Facilities shall have received a rating of Ba3 or higher from Moody's and BB- or higher from S&P, Adjusted LIBOR plus 2.75% or ABR plus 1.75% (ABR is the Alternate Base Rate, which is the higher of CS's Prime and the Fed Funds Effective Rate plus 1/2 of 1.0%.).

- If the Facilities shall have received a rating of B1 or higher from Moody's and B+ or higher from S&P, Adjusted LIBOR plus 3.00 % or ABR plus 2.00%.

Commitment fees are 2.75% per annum if the Revolving Facility shall have received a rating of Ba3 or higher from Moody's and BB- or higher from S&P and 3.00% per annum if the Revolving Facility shall have received a rating of B1 or higher from Moody's and B+ or higher from S&P, in each case, on the undrawn portion of the commitments in respect of the Revolving Facility, payable quarterly in arrears after the Closing Date and upon the termination of the commitments, calculated based on the number of days elapsed in a 360-day year.

Selected financial covenants to be usual for facilities of this type (with financial definitions, levels and test periods to be agreed upon), including, without limitation: (a) LTV (maximum ratio of Total Debt to Appraised Value), (b) 1st Lien LTV (maximum ratio of First Lien Debt to Appraised Value), (c) Minimum Liquidity for Borrower and its subsidiaries, and (d) aggregate consolidated net indebtedness of Borrower and its subsidiaries shall not exceed amounts to be agreed upon.

**Proposed Uses of Funds**     TO BE UPDATED MONDAY – CONFORM TO CURRENT EQUITY #'S

The chart below summarizes equity commitments, targeted Lubert-Adler investment returns and the proposed allocation of proceeds from the CSFB financing:

|  | Tesoro | Quail West | Bulow | Laurelmor | Grand Bahama | Total |
|---|---|---|---|---|---|---|
| Equity Commitments (Aggregate) | 17,156,058 | 25,000,000 | 20,000,000 | 25,000,000 | 50,000,000 | 137,156,058 |
| Targeted Multiple | 5.0 | 3.2 | 2.5 | 2.5 | 3.0 | |
| Targeted Total Return | 85,780,290 | 81,000,000 | 50,000,000 | 62,500,000 | 150,000,000 | 429,280,290 |
| Realized to date | 18,714,065 | - | - | - | - | 18,714,065 |
| Balance to be received | 67,066,225 | 81,000,000 | 50,000,000 | 62,500,000 | 150,000,000 | 410,566,225 |
| Plus Bridge Return | 55,737,554 | 3,074,924 | 7,039,220 | 30,831,633 | 824,774 | 97,508,106 |
| Total remaining distributions | 122,803,779 | 84,074,924 | 57,039,220 | 93,331,633 | 150,824,774 | 508,074,331 |
| Targeted CSFB Distribution | | | | | | |
| Fund III Equity | 4,334,836 | 12,500,000 | 20,000,000 | | | 36,834,836 |
| Fund III Bridge | 55,737,554 | 1,537,462 | 7,039,220 | | | 64,314,236 |
| Fund III Profit | 36,282,058 | | | | | 36,282,058 |
| Total to Fund III | 96,354,448 | 14,037,462 | 27,039,220 | - | - | 137,431,130 |
| Fund IV Equity | | 12,500,000 | | 25,000,000 | 50,000,000 | 87,500,000 |
| Fund IV Bridge | | 1,537,462 | | 30,831,633 | 824,774 | 33,193,870 |
| Fund IV Profit | | | | | | - |
| Total to Fund IV | - | 14,037,462 | - | 55,831,633 | 50,824,774 | 120,693,870 |
| Total (excluding Preferred Returns) | 96,354,448 | 28,074,924 | 27,039,220 | 55,831,633 | 50,824,774 | 258,125,000 |
| % of Targeted Remaining Distributions | 78.5% | 33.4% | 47.4% | 59.8% | 33.7% | 50.8% |
| **Total CSFB Dividend** | | | | | | 333,125,000 |
| **Reserve for Development Needs or Future Dividends** | | | | | | 75,000,000 |

- Page 7

MMMTQW01_009992

May 22, 2006

TO BE UPDATED MONDAY – CONFORM TO CURRENT EQUITY #'S

Of the $333,125,000 in funds available for distribution, Lubert-Adler is proposing that $258,125,000 be distributed to i) return all outstanding equity funded to each investment (total of $124,334,836); ii) repay all bridge fundings (total of $97,508,106), and distribute $36,282,058 in profits to the most mature investment, Tesoro. Additionally, Lubert-Adler is proposing to hold $75,000,000 in reserve, which would supplement the $165,000,000 synthetic revolving facility, if needed. If development and sales activity occurs as projected, these funds will be distributed to the investors.

The proposed $258,125,000 distribution results in:

1) The immediate mitigation of 100% of the capital risk, through the repayment of all invested equity and bridge fundings;

2) The removal of all guarantee exposure to Bobby Ginn, Lubert-Adler Fund III and Lubert-Adler Fund IV, because the facility is non recourse, thereby allowing the JV to pursue the harvesting of profits with no risk of capital loss;

3) Accelerated profit distributions to Fund III of $36,282,000 on account of the investment in Tesoro; and

4) An identified source of funding for development and amenities of $240 million (revolver plus developer reserve), which relieves Funds III and IV of potential future funding obligations for these investments.

## Risk Factors

In considering the proposed financing outlined above, careful consideration should be given to the following issues:

1. Lubert-Adler Funds III and IV will be asked to "pool" their respective investments in Tesoro, Hammock Beach River Club, Quail West, Laurelmor and Grand Bahamas-West End (collectively, the "Projects") so as to provide Credit Suisse with a package of cross-collateralized assets as security for its loans. From Credit Suisse's point of view, this cross-collateralization theoretically diversifies the risk of non-performance by the borrower--thereby making it feasible for Credit Suisse to extend more credit and provide better terms than would generally be available to the JV if each Project were financed individually. However, the principal risk of any cross-collateralized financing is that Project A (e.g., Tesoro), though highly successful on its own, could nevertheless be lost to foreclosure in the event that Project B (e.g., Laurelmor) or Project C (e.g., Grand Bahamas-West End) do not perform well, thereby causing the Credit Suisse loan to go into default. This risk is potentially heightened where--as is the case here--some projects (e.g., Tesoro) are more nearly completed than others (e.g., Laurelmor and Grand Bahamas-West End). Moreover, each of the Projects, taken individually, will have a somewhat different risk profile at the closing of the loans: for example, Tesoro has no remaining entitlement risk, while Grand Bahamas-West

MMMTQW01_009993

May 22, 2006

End is still in the process of obtaining many of its entitlements. The loans have been underwritten to assume that the Projects will perform in accordance with the projections annexed hereto as Exhibit A (the "Projections"). Although Lubert-Adler and GDC believe that the Projections are realistic and can be achieved, there can be no assurance that the Projects will in fact perform in accordance with the Projections. It is also possible that sales will occur at the projected volumes and prices for each Project but at a different (or more erratic) pace than what is forecast in the Projections. In either event, it is possible that the borrower will be unable to remain in compliance with the various financial covenants set forth in the loan documents. As noted above, Lubert-Adler intends to reserve [$75MM] of otherwise distributable loan proceeds as a sort of contingency fund that could be used to "balance" the loans in the event that the Projects collectively fail to perform as anticipated. However, there can be no assurance that [$75MM] will be sufficient to provide complete protection for all such contingencies, and, if sales do not keep pace with the Projections, it may become necessary for the JV to infuse additional capital into the borrower in order to avoid a loan default.

2. If the Projects continue to be developed separately, the owner of each Project will be free to evaluate whether to invest more capital in that particular Project or let it go--solely on the merits of that particular Project. Once the Projects have become part of a cross-collateralized mortgage pool, the common owner of Project A and Project B will, to some degree, be forced to support Project A (performing poorly) in order to protect its equity in Project B (performing well).

3. From Credit Suisse's perspective, there will be one common financing secured by a lien for the full amount of the aggregate borrowing against each of the Projects. Functionally speaking, this means that cash generated by, e.g., Tesoro in a particular quarter could be used, in its entirety, to repay the Credit Suisse loans, without regard to the fact that no other Project produced any revenues--or repaid any of the Credit Suisse debt--in that quarter. However, Lubert-Adler intends, for its own internal accounting purposes, to treat each Project as a "stand-alone" development, such that each Project will be deemed to have financial responsibility only for its allocable share of the overall borrowing. That allocable share will be directly related to the percentage of loan proceeds which is allocated, at closing, on account of each Project. In the event that a particular Project (e.g., Tesoro) contributes disproportionately to the repayment of the loans (e.g., Tesoro "owes" 19% of the aggregate loan amount, based upon its receipt of 19% of the original loan proceeds at closing, but contributes 25% to the repayment of the loans), the "excess" payment made to Credit Suisse by such Project (in this example, Tesoro) shall be deemed to have been made for the benefit of the other Projects and, as such, will be treated, for JV accounting purposes, as an interest-bearing loan to such other Projects (in ratable proportion to the imputed benefit conferred upon each such other Project). In essence, Lubert-Adler will be keeping a running account of "due to's" and "due from's" as

- Page 9

MMMTQW01_009994

May 22, 2006

between the different Projects. However, there can be no assurance that the "debtor" Projects will eventually be able to fully repay their "debts" to the "creditor" Projects, and, in such event, the "creditor" Projects, though successful in their own right, will ultimately be dependent upon the eventual success of the "debtor" Projects to insure that the full profit actually earned, in real time, by such "creditor" Projects is in fact received by the investors in such Projects. In practical terms, the investors in the successful "creditor" Projects could end up with investment risk attributable to the "debtor" Projects.

4. Lubert-Adler believes that all of the Projects will be benefited by the cross-collateralized Credit Suisse financing. However, the percentage of loan proceeds which is allocated to each Project will not be based upon a "fairness" opinion or a current fair market appraisal of each Project. Accordingly, the investors in each Project must make a determination as to whether the perceived benefits to that Project from the proposed financing will, on balance, be proportionate to the potential risks assumed by that Project.

5. The Credit Suisse loan documents will not provide for any "tax distributions". All sale proceeds achieved by each Project (net of pre-agreed transaction costs) will have to be used to repay the then outstanding Credit Suisse loan. If a Project realizes taxable income from the sale of its property, it will not be permitted to use related sale proceeds to pay such liability. In that event, the investors in the Project that owes the tax will have to pay such liability with extrinsic funds.

There are risks associated with the continuing development of each Project on a separate, "stand-alone" basis. Among other things, it is clear, based upon Lubert-Adler's ongoing efforts to finance each of the Projects separately, that a "pooled" financing will offer immediate economic advantages (e.g., greater loan proceeds, better terms) that cannot be achieved if the Projects are to be financed on a "one-off" basis. However, a "pooled" or cross-collateralized financing carries with it a variety of new risks, as outlined above. After considering the pros and cons of the proposed financing with Credit Suisse, Lubert-Adler is of the opinion that the incremental risks associated with such a financing will be outweighed by the incremental benefits to each Project.

● Page 10

MMMTQW01_009995

May 22, 2006

## Conclusion

Lubert-Adler and GDC have built a world-class organization and residential resort business. The business has been built through the hard work and dedication of Bobby Ginn and his employees, and facilitated through the capital commitments of the investors in the Lubert-Adler Funds. While each investment has been separately underwritten and capitalized, the ultimate success of each is tied to the fortunes of the company as a whole – the successes of earlier developments enhance the Ginn brand for the benefit of all current and future communities.

It is vitally important that Lubert-Adler, as a fiduciary for its investors, ensure that it assists GDC in appropriately planning and capitalizing the developments – matching prospective uses of funds with sources of funds (both Lubert-Adler Fund capital and third party debt) in a way that minimizes risk. With this prospective facility, which entails tying together five properties in two Funds, Lubert-Adler believes that it has not only accomplished this goal, but done so in a way which eliminates the risk of capital through the return of all equity and bridge outstanding.

Accordingly, Lubert-Adler recommends that the Advisory Boards of Funds III and IV approve this transaction.

MMMTQW01_009996