# EXHIBIT "2"

# MEMO

To: Advisory Committee – Lubert-Adler Fund III
Executive Board of the Advisory Committee
– Lubert-Adler Fund IV

From: Dean Adler, Stuart Margulies, Robert Rosenberg

Date: June 2, 2006

Re: The Ginn Companies LLC - $675,000,000 Financing
$385,000,000 Senior Secured First Lien Term Loan Facility
$165,000,000 Senior Secured Synthetic Revolving Credit Facility
$125,000,000 Senior Secured Second Lien Term Loan Facility



### Executive Summary

Lubert-Adler and the Ginn Companies LLC (the "JV") develop amenitized residential resort communities aimed at the "Baby Boomer" second and retirement home markets. Since 1997, the JV has invested in 23 separately owned and financed residential resort communities that will total over 25,000 lots and condominiums when complete.

In each stage of development, the JV is focused on managing risk in order to protect the downside, as well as positioning for upside opportunities. The JV seeks to generate its primary returns from the sale of real estate. The JV generates substantial funding from the pre-sale of single family unimproved lots. The JV sells directly to users/investors – not to homebuilders. The JV is able to close on lots prior to the completion of all related infrastructure and amenities because the JV posts performance bonds, which provide assurance of infrastructure completion to lot purchasers.

The JV acquired each of the communities in separate entities, which are owned 80% by the investing Lubert-Adler Fund and 20% by Ginn. The Lubert-Adler fund receives a compounded priority return of 10% and its capital back prior to any distributions to Ginn.

Each investment partnership is capitalized separately. The JV has historically financed the horizontal infrastructure and amenities at each community via:

1) Lubert-Adler capital – equity and bridge loans;
2) Lot pre-sales proceeds; and
3) Acquisition and horizontal development loan facilities, which are typically
   a. Low loan-to-values
   b. Fully secured, and often-time, over-secured, by unsold real estate inventory
   c. Fully recourse to Bobby Ginn, personally
   d. Limited recourse – 20% to 50% – to the applicable Lubert-Adler Funds

June 2, 2006

While the existing investment structure has allowed each Lubert-Adler Fund to invest and track its capital, and to legally separate one property from another, it has been somewhat inefficient from a capitalization standpoint. Because the "Company" is essentially a collection of stand-alone properties, the JV has not been able to take advantage of favorable entity-level financing options, which would:

- Allow for a more favorable debt/equity ratio and lower interest costs;
- Allow for a greater duration for the loans;
- Fund a greater portion of predevelopment and development costs; and
- Reduce or eliminate recourse to the Funds and Bobby Ginn.

By not having entity-level abilities, Ginn is fully-recourse on loans, and Lubert-Adler is often faced with executing limited guarantees for acquisition-only financing and funding a substantial portion of the ongoing permitting and development costs. This often results in an over-funding of Lubert-Adler's capital commitments until lot sales are sufficient to retire existing indebtedness and fund ongoing costs.

Lubert-Adler has considered various options over the years to capitalize on the benefits of entity-level financing - i.e. roll-up of all properties into one company. The negative impact to this is that all of the investments would be cross-collateralized for financing purposes. A second option, and more favorable in our judgment, is to establish a series of mini-pools, which would allow for the benefits of pooled financing, while limiting the number of assets crossed at any one time.

Lubert-Adler is now considering establishing two separate financing pools:

1) **Development Pool** – consisting of five properties (two in Fund III, two in Fund IV and one shared equally by Fund III and Fund IV); and

2) **Pre-Entitlement Pool** – consisting of five properties in the pre-development phase

This memorandum will address the Development Pool only. A follow-on memorandum will address the Pre-Entitlement Pool.

To date, the JV has received a "best efforts" commitment from Credit Suisse Securities (USA) LLC ("Credit Suisse") for a pooled, cross-collateralized financing with respect to five fully or partially entitled communities. The pooled financing would necessitate the contribution of the ownership interests of five separately owned limited partnerships to a new entity, which would, in turn, own all five properties as one. Sales proceeds from any property would pay down the outstanding debt and provide funds to replenish a revolving loan facility, which will be used to build the horizontal infrastructure and amenities at all of the communities

LA043328

June 2, 2006

The objectives of the pooled financing include:

1) Eliminating loan guarantees by paying off all existing recourse debt with new non-recourse financing;
2) Providing a revolving credit facility to fund the horizontal development and amenity costs at each community;
3) Creating a loan with a five-year duration, which, subject to covenant compliance, provides for "staying power" in the event of a downturn; and
4) Mitigating Lubert-Adler capital risk through a dividend of $325 million, which would a) return all currently outstanding Lubert-Adler capital and preferred returns at all five communities of $285 million; and b) provide a $51 million reserve for potential future capital needs.

The five properties (collectively the "Developments") include two Fund III investments (Tesoro and Hammock Beach River Club), one which is shared equally between Funds III and IV (Quail West) and two which are Fund IV investments (Laurelmor and Grand Bahama). Even though the properties will be combined for financing purposes, the JV intends to continue tracking the revenues, costs and profitability of each of these investments separately and make distributions based upon the profitability and liquidity of each separate investment.

| Community | Location | Lubert-Adler Fund |
|---|---|---|
| Tesoro | Port St. Lucie, FL | III |
| Hammock Beach River Club | Flagler Beach, FL | III |
| Quail West | Naples, FL | III – 50%<br>IV – 50% |
| Laurelmor | Boone, NC | IV |
| Grand Bahama | Grand Bahama Island | IV |

## The Developments

The chart below contains some salient facts for each of the Developments. A brief description of the status of each community appears on the following pages.

|  | Tesoro | Quail West | River Club | Laurelmor | Grand Bahama | Total |
|---|---|---|---|---|---|---|
| Acreage | 1,400 | 1,180 | 2,053 | 6,000 | 1,957 | 12,590 |
| # Lots | 940 | 348 | 453 | 1,500 | 1,836 | 5,077 |
| # Condos | 100 | -- |  | 300 | 4,396 | 4,796 |
| Sales Commencement | 2002 | 2005 | 2007 | 4Q2006 | 4Q2006 |  |
| Estimated Lot Sellout Date | 2009 | 2008 | 2010 | 2010 | 2010 |  |
| Lots Closed | 545 | 60 |  |  | -- | 605 |

LA043329

June 2, 2006

## The Developments – Fund III

### *Tesoro*

- Private community and club on 1,400 acres in Port St. Lucie, FL
- 940 single family lots and 100 condominiums
- Scheduled completion of Florida Turnpike Interchange in Q4 2006
- 36 Signature golf holes – designed by Palmer and Watson
- 60,000 sf clubhouse, beach club on nearby Hutchinson Island, spa/fitness, tennis, pools

*Status*
- 545 of 940 lots closed
- West side infrastructure and Palmer course complete
- East side infrastructure and Watson course underway
- Clubhouse under construction

*Timing of Future Distributions – Without CSFB Financing*
- Up to $40 million of bridge return targeted by 4Q2006
- Remaining distributions estimated to occur from 2007-09



### *Hammock Beach River Club*

- Private club on 2,053 acres located along the Intracoastal Waterway in Flagler Beach, FL
- 453 single family lots and 200,000 sf of commercial
- 18-hole Fred Couples signature golf course (planned)
- All residents will have privilege of membership in The Club at Hammock Beach and use of all amenities
- Beautiful views of Intracoastal waterway and Bulow Creek

*Status*
- PUD for 453 lots and 18-hole golf course received from Flagler County during 4Q2005
- Permitting and platting ongoing
  - Water and environmental and final plats targeted 9/06
  - HUD registration planned for 11/06
- Launch targeted for 1Q2007

*Timing of Future Distributions – Without CSFB Financing*
- Equity and profits distributions estimated to occur from 2007-09



z Page 4

LA043330

June 2, 2006

# The Developments – Fund III and IV

### *Quail West*

- Private community and club on 1,180 acres in Naples, FL
- 564 total homesites – JV acquired 348 unsold lots
- 36 Signature golf holes – designed by Arthur Hills
- 70,000 sf clubhouse, restaurants, beach club, spa, tennis, pools

### *Status*

- 60 lots closed - $46 mm
  - 10 lots under agreement for $11 mm
  - 180 site-specific reservations pending final plat recording
- All entitlements received
- Enhancements to clubhouse, golf and entry to underway
- Parcels acquired in Bonita Beach for a beach club

### *Timing of Future Distributions – Without CSFB Financing*

- Equity and profits distributions estimated to occur from 2007-09



LA043331

Case 10-02976-PGH    Doc 223-2    Filed 04/01/11    Page 7 of 12

June 2, 2006

## The Developments – Fund IV

### *Laurelmor*

- Private club on 6,000+ acres in the Blue Ridge Mountains of North Carolina, located off the Blue Ridge Parkway
- 1,500 single family lots and 300 condominiums
- Two golf courses, clubhouse, restaurants, indoor water park, swimming pavilion, spa/fitness, tennis, walking and biking trails, and equestrian

*Status*
- Final plats for 75 lots, preliminary plats for 801 lots
- 72,000 lineal feet of temporary roadway constructed to support sales launch
- Utility installation underway
- Ancillary properties being identified to enhance access and amenities, and to support future development activities

*Timing of Future Distributions – Without CSFB Financing*
- Equity and profits distributions estimated to occur from 2007-11



### *Grand Bahama – West End*

- 1,957 acres on the West End of Grand Bahama Island
- Exclusive resort less than 60 miles from the Florida coast
- 1,850 lots and 4,400 condominiums
- Tax treaty with Bahamian government
- Two golf courses, private airport, water park, marinas, spa/fitness, casino, tennis and conference

*Status*
- Land clearing underway
- JV has requested the re-opening of the airstrip to support sales and development activities
- Targeting 200 oceanfront and 2nd row lots by 4Q2006

*Timing of Future Distributions – Without CSFB Financing*
- Equity and profits distributions estimated to occur from 2008-13



LA043332

June 2, 2006

## The Proposed Loans

The JV is negotiating with Credit Suisse for three separate but related facilities totaling $675,000,000.

| Facility | Loan Amount | Interest Rate | Amortization | Maturity | Uses |
|---|---|---|---|---|---|
| First Lien Loan | $385,000,000 | LIBOR + 300 | 1% per annum | 5 years | • Repayment of debt ($158mm)<br>• Transaction Costs ($27mm)<br>• Dividend to Equity ($200mm) |
| Revolving Loan | 165,000,000 | LIBOR + 300 | N/A | 5 years | • Fund development costs and working capital |
| Second Lien Loan | 125,000,000 | LIBOR + 700 | N/A | 6 years | • Dividend to Equity ($125mm) |
| | $675,000,000 | 9.00%* | | 5 years | |

* Note: average interest based upon 50% of debt floating at LIBOR (5.11% today) plus the applicable spread and 50% at the LIBOR Swap Rate of 5.33% plus the applicable spread

## Waterfalls

The loans will be repaid as follows:

(a) 100% of all excess cash flow will be applied first to the Revolver and then to the First Lien Loan until the First Lien Loan has been reduced to 50% of its original principal amount.
(b) Thereafter, 50% of all excess cash flow will be applied first to repay in full the First Lien Loan and then the Second Lien Loan, with the remaining 50% to the JV;
(c) 100% of the net cash proceeds of all asset sales or other dispositions of property;
(d) 100% of the net cash proceeds of any casualty, condemnation event or new issuances;

## Covenants

The JV has agreed to the following financial covenants:

1) *Loan-to-Value* - maximum ratio of Total Debt to Appraised Value – starts at 50% and declines, in intervals, to 25% at maturity;
2) *First Lien Loan-to-Value* - maximum ratio of First Lien Debt to Appraised Value – starts at 40% and declines, in intervals, to 15% at maturity;
3) **$25,000,000 Minimum Liquidity** - for the borrower entity and its subsidiaries;
4) *Aggregate Net Debt Level* – starts at $650 mm and declines, in intervals, to $100 mm at maturity;
5) *Net Debt Interest Rate Increase Level* – starts at $650 million and declines, in intervals, to $300 million through Q4 2008
    a. If this covenant is not met in any period, there is no event of default, but the interest rate on all facilities will increase by 0.25%, capped at a maximum increase of 0.50%.

June 2, 2006

## Proposed Use of Funds

Pending final adjustments, the chart below summarizes Lubert-Adler equity commitments, targeted investment returns and the proposed allocation of proceeds from the Credit Suisse financing:

| | Tesoro | QuailWest | Bulow | Laurelmor | Grand Bahama | Total |
|---|---|---|---|---|---|---|
| **Equity Commitments** | 17,156,058 | 25,000,000 | | 25,000,000 | 50,000,000 | 137,156,058 |
| **Targeted Multiple** | 5.0 | 3.2 | 2.5 | 2.5 | 3.0 | |
| **Targeted Total Return** | 85,780,290 | 80,000,000 | | 62,500,000 | 150,000,000 | |
| **Realized to date** | 18,714,065 | - | - | - | - | 18,714,065 |
| **Balance to be received** | 67,066,225 | 80,000,000 | | 62,500,000 | 150,000,000 | |
| **Plus Bridge Return** | 66,512,000 | 4,983,607 | 11,660,615 | 39,789,782 | 27,258,797 | 150,204,800 |
| **Total Remaining Distributions** | 133,578,225 | 85,083,697 | | 102,289,782 | 150,258,057 | |
| **Targeted CSFB Distribution** | | | | | | |
| Equity & Bridge | 76,298,706 | 28,978,544 | | 62,281,281 | 71,240,826 | 267,082,192 |
| Preferred Returns & Interest | 5,044,190 | 2,238,232 | 3,258,901 | 4,171,484 | 4,133,179 | 17,731,696 |
| Profit | - | - | - | - | - | - |
| | 81,342,896 | 31,252,776 | | 66,452,765 | 75,374,005 | 285,928,176 |
| **Total CSFB Dividend** | | | | | | 325,303,228 |
| **Reserve for Development Needs or Future Dividend** | | | | | | 39,375,052 |
| **Add'l reserve From Quail West Mortgage Notes Receivable** | | | | | | 11,297,660 |
| **Total Reserve Available** | | | | | | 50,672,712 |

Of the $325,303,228 in funds available for distribution, Lubert-Adler is proposing that $285,928,176 be distributed to:

- Repay all bridge fundings;

- Return all outstanding equity funded to each investment; and

- Pay all accrued but unpaid preferred returns and interest on Lubert-Adler debt.

Additionally, Lubert-Adler is proposing to hold $50.7 million in reserve ($39.4 million in excess proceeds from the refinance and $11.3 million in proceeds from the sale of Quail West mortgage notes receivable), which will be used to supplement the Revolving Credit Facility (if necessary) and to make payments on account of the loans (if necessary). If development and sales activity occur as projected, the JV anticipates distributing these funds in the future to investors in the more mature Developments first (i.e., Tesoro and Quail West), based upon their relative performance.

z Page 8

June 2, 2006

The proposed $285,928,176 distribution will result in:

1) The immediate mitigation of 100% of the capital risk to Lubert-Adler Funds III and IV, through the repayment of all invested equity and bridge fundings;

2) The removal of all guarantee exposure to Bobby Ginn, Lubert-Adler Fund III and Lubert-Adler Fund IV, because the Credit Suisse Facilities will be non-recourse

3) Substantial non-recourse funding for development and amenities of $220 million - $165 million Revolving Credit Facility plus the $55 million JV reserve. Coupled with lot sales proceeds, this should provide significant capital to fund future development costs.

4) Adequate time to systematically develop each property. Because the loans mature in 5 years and required amortization is nominal, the JV should have adequate financing, subject to covenants, to develop over a longer period of time. This is very attractive "downside protection" financing, because in the event of a downturn, it would be very difficult to obtain such financing in this sector..

## Risk Factors

In considering the proposed financing outlined above, careful consideration should be given to the following issues:

1. Lubert-Adler Funds III and IV will be asked to "pool" their respective investments in the Developments so as to provide Credit Suisse with a package of cross-collateralized assets as security for its loans. From Credit Suisse's point of view, this cross-collateralization theoretically diversifies the risk of non-performance by the borrower--thereby making it feasible for Credit Suisse to extend more credit and provide better terms than would generally be available to the JV if each Project were financed individually. However, the principal risk of any cross-collateralized financing is that Project A, though highly successful on its own, could nevertheless be impacted in the event that Project B or Project C do not perform well, thereby causing the Credit Suisse loan to go into default.

2. The loans have been underwritten to assume that the Developments will perform in accordance with projections of real estate sales and development and amenity costs over the life of the loans. Although Lubert-Adler and GDC believe that the projections are realistic and can be achieved, there can be no assurance that the Developments will in fact perform in accordance with the projections. It is also possible that sales will occur at the projected volumes and prices for each Development but at a different (or more erratic) pace than what is forecast in the projections. In either event, it is possible that the borrower will be unable to remain in compliance with the various financial covenants set forth in the loan documents. As noted above, Lubert-Adler intends to reserve $53MM of otherwise distributable loan proceeds as a contingency fund that could be used to

z Page 9

LA043335

June 2, 2006

"balance" the loans in the event that the Developments collectively fail to perform as anticipated. However, there can be no assurance that $53MM will be sufficient to provide complete protection for all such contingencies, and, if sales do not keep pace with the projections, it may become necessary for the JV to infuse additional capital into the borrower in order to avoid a loan default.

3. If the Developments continue to be developed separately, the owner of each will be free to evaluate whether to invest more capital in that particular Development or let it go--solely on the merits of that particular Development. Once they have become part of a cross-collateralized mortgage pool, the common owner of Project A and Project B may, to some degree, consider support Project A (performing poorly) in order to protect its equity in Project B (performing well).

4. From Credit Suisse's perspective, there will be one common financing secured by a lien for the full amount of the aggregate borrowing against each of the Developments. Functionally speaking, this means that cash generated by on Development in a particular quarter could be used, in its entirety, to repay the Credit Suisse loans, without regard to the fact that no other Development produced any revenues--or repaid any of the Credit Suisse debt--in that quarter.

However, the JV intends, for its own internal accounting purposes, to treat each Development individually, such that each will be deemed to have financial responsibility only for its allocable share of the overall borrowing. That allocable share will be directly related to the percentage of loan proceeds which is allocated, at closing, on account of each Development. In the event that a particular Development contributes disproportionately to the repayment of the loans, the "excess" payment made to Credit Suisse by such Development shall be deemed to have been made for the benefit of the other Developments and, as such, will be treated, for JV accounting purposes, as an interest-bearing loan to such other Developments (in ratable proportion to the imputed benefit conferred upon each such other Development).

In essence, the JV will be keeping a running account of intercompany payables and receivables between the different Developments. However, there can be no assurance that the "debtor" Developments will eventually be able to fully repay their "debts" to the "creditor" Developments, and, in such event, the "creditor" Developments, though successful in their own right, will ultimately be dependent upon the eventual success of the "debtor" Developments to insure that the full profit actually earned, in real time, by such "creditor" Developments is in fact received by the investors in such Developments. In practical terms, the investors in the successful "creditor" Developments could end up with investment risk attributable to the "debtor" Developments.

LA043336

June 2, 2006

**Mitigating Factors**

1. In the event of a downturn, the CSFB financing will provide the JV with sufficient time and capital to build-out each of the Developments. In the absence of this financing, if a downturn occurs, property-level debt financing would be difficult to obtain, potentially requiring the Lubert-Adler Funds to support each of the developments with future equity infusions. If this occurs, this may impact the timing and amounts of future Fund-level distributions.

2. Low LTV – Initially, the loan amounts are set based upon a Total Debt to Total Net Value level of 50%. This level adjusts downward over time, in intervals, based upon the JV's estimate of real estate sales. This low LTV reduces the potential negative impacts of the cross-collateralization. If the Developments were cross collateralized at a much higher LTV – 90% - the risk of default would be much greater.

**Conclusion**

Historically, there have been substantial costs associated with financing each Development on a separate, "stand-alone" basis. While each investment has been separately underwritten and capitalized, financing has been recourse, limited in amount and short term in nature.

A "pooled" financing will offer immediate economic advantages and benefits that cannot be achieved if the Developments are to be financed on a "one-off" basis:

- Greater loan proceeds, with longer duration and better terms;
- Elimination of recourse obligations
- Substantial capital for infrastructure and amenities
- Significant dividend to JV

With this prospective facility, Lubert-Adler believes that it has not only accomplished the goal of appropriately capitalizing the Developments, but done so in a way which eliminates the risk of capital through the return of all equity outstanding.

While a "pooled" or cross-collateralized financing carries with it a variety of new risks, as outlined above, Lubert-Adler is of the opinion that the mitigation of capital risk, and other benefits to each Development, significantly outweighs the incremental risks associated with such a financing. Accordingly, Lubert-Adler recommends that the Advisory Boards of Funds III and IV approve this transaction.

LA043337